IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT CAPITAL MANAGEMENT, | § | |
| LLC, ET AL.,[1] | § | BANKRUPTCY NO. 21-51523-MMP |
| | § | LEAD CASE |
| DEBTORS. | § | JOINTLY ADMINISTERED |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| POLICY SERVICES, INC. | § | BANKRUPTCY NO. 21-51513 |
| | § | |
| DEBTOR. | § | JOINTLY ADMINISTERED |

**TRUSTEE'S MOTION TO APPROVE
(A) SALE OF LIFE INSURANCE POLICIES, (B) SALE PROCEDURES, STALKING HORSE AGREEMENT
AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF PROPERTY OF THE ESTATE OF POLICY
SERVICES, INC., AND (C) THE FORM OF NOTICE FOR THE SALE OF PROPERTY OF THE ESTATE OF
POLICY SERVICES, INC.**

TO THE HONORABLE MICHAEL M. PARKER, UNITED STATES BANKRUPTCY JUDGE:

John Patrick Lowe, Chapter 7 Trustee of the above captioned jointly administered bankruptcy

estates ("**Trustee**"), on behalf of Policy Services, Inc., (the "**Debtor**") in the above administratively

captioned case, by and through Trustee's counsel, Pulman, Cappuccio & Pullen, LLP, hereby files this

*Trustee's Motion to Approve (A) Sale of Life Insurance Policies, (B) Sale Procedures, Stalking Horse*

*Agreement and Bid Protections in Connection with the Sale of Property of the Estate of Policy*

*Services, Inc. and (C) the Form of Notice for the Sale of Property of the Estate of Policy Services, Inc.*

---

[1] The Debtors in these administratively consolidated chapter 7 cases, along with the last four digits of each Debtor's
federal tax identification number, are: Policy Services, Inc. (2864), Wizard Mode Media, LLC (3205), deeproot
Pinball LLC (0320), deeproot Growth Runs Deep Fund, LLC (8046), deeproot 575 Fund, LLC (9404), deeproot 3
Year Bonus Income Debenture Fund, LLC (7731), deeproot Bonus Growth *5* Year Debenture Fund, LLC (9661),
deeproot Tech LLC (9043), deeproot Funds LLC (9404), deeproot Studios LLC (6283), and deeproot Capital
Management, LLC (2638).

(the "**Sale Motion**"), concerning personal property of the Estate of Policy Services, Inc., Debtor, described as follows:

> Life Insurance Policies described in <u>Exhibit A-1</u> attached hereto (the "**In-Force Insurance Policies**"); and Life Insurance Policies described in <u>Exhibit A-2</u> attached hereto (the "**Lapsed Insurance Policies**"). The In-Force Insurance Policies and the Lapsed Insurance Policies are collectively referred to herein either as the "**Policies**" or the "**Life Insurance Policies**" as the context may require.

In support of the Sale Motion, Trustee respectfully represents as follows:

## I.     <u>JURISDICTION AND VENUE</u>

1.    This Court has jurisdiction to consider the Sale Motion pursuant to sections 157 and 1334 of title 28 of the United States Code.  28 U.S.C. §§ 157, 1334.  This is a core proceeding pursuant to section 157(b)(2).  28 U.S.C. §§ 157(b)(2).  Venue is proper before this Court pursuant to sections 1408 and 1409 of title 28 of the United States Code.  28 U.S.C. §§ 1408-1409.

## II.     <u>PROCEDURAL HISTORY</u>

2.    On December 9, 2021 (the "**Petition Date**"), the Debtor filed a voluntary petition under chapter 7, title 11 of the United States Code, 11 U.S.C.  §§ 101-1532 (as amended, the "**Bankruptcy Code**").  The Court authorized that the Debtor's bankruptcy case, along with 10 other debtor affiliates, be jointly administered under lead case *In re: deeproot Capital Management, LLC*, Case No. 21-51523 (the "**Jointly Administered Case**").

3.    On or about December 21, 2021, John Patrick Lowe was appointed as Chapter 7 seTrustee of all eleven bankruptcy cases comprising the Jointly Administered Case.

## III.     <u>SUMMARY</u>

4.    Debtor's estate ("**Estate**") is the owner and sole beneficiary of the In-Force Insurance Policies and the Lapsed Insurance Policies. To the best of Trustees knowledge there are seven or eight life insurance policies still in force which are owned by the Debtor, and at least twelve or thirteen life insurance policies that have lapsed due to non-payment. The face amount (death benefit) of the Lapsed

Insurance Policies is approximately $27,365,000. The face amount (death benefit) of the In-Force Insurance Policies is $7,100,000, although any single policy may have accumulated a debt against the death benefit for unpaid premiums. The In-Force Insurance Policies require the on-going payment of policy premiums which the Trustee estimates will amount to as much as $100,000.00 within the next thirty to sixty days. Currently, the Trustee has approximately $4,947.00 in cash in the Debtor's segregated bank account. The Trustee does not have the funds to pay the on-going premiums for the In-Force Insurance Policies. The In-Force Insurance Policies are the general intangible equivalent of strawberries sitting on the dock. They must be sold, and sold quickly, to maximize any value for the Debtor's Estate.

5.      The Trustee has been approached by a potential purchaser, TuYo Holdings, LLC, a Texas Limited Liability Company (the "**Purchaser**" or "**Stalking Horse Bidder**"). Purchaser has offered to purchase the In-Force Insurance Policies and the Lapsed Insurance Policies for the purchase price of $1,078,389.36 (the "**Purchase Price**"). The Purchase Price represents an amount equal to 25% of the Debtor's cost of acquiring the In-Force Insurance. (*See*, Exhibit A-1). The Purchaser has also offered to acquire all of the Estate's interest in, and any rights the Estate may have to cure or revive, the Lapsed Insurance Policies, and as consideration therefore, Purchaser has agreed that the net proceeds of a sale or of a death benefit received from any of the Lapsed Insurance Policies will be split with Debtor, after the reimbursement of a defined set of expenses, in the event any of the Lapsed Insurance Policies can be reinstated and result in a death benefit or are sold to a third party (*See*, Exhibit A-2). In the exercise of his best business judgment, Trustee has determined that entering into a Life Insurance Policy Purchase and Sale Agreement (the "**Purchase Agreement**" or "**Stalking Horse Agreement**") with the Purchaser in the form attached hereto as Exhibit B, is in the best interests of the Estate. Purchaser has transferred into Trustee's counsel's IOLTA account a deposit in the amount of

$540,000.00 ("**Deposit on Purchase Price**") to be applied against the Purchase Price. The balance of the Purchase Price will be paid upon final approval of this Sale Motion by the Court. Purchaser has also agreed that Trustee may use a portion of the Deposit on Purchase Price to pay any insurance premiums which may come due between the filing of this Sale Motion and the approval of the Sale. Purchaser has already paid *post-petition* premiums totaling approximately $28,000.00 in order to preserve the in-force status of two of the Policies.

6.      Acknowledging that another purchaser may appear and offer a **Topping Bid**[2], Purchaser requires some protection. In order to facilitate the sale, Trustee has agreed to treat Purchaser as a stalking horse bidder and to provide certain protections in the event another purchaser submits a better offer, which protections include: a break-up fee of $50,000.00, reimbursement of Purchaser's reasonable and necessary attorney's fees as approved by the Court and capped at $20,000.00, and treatment of any premiums paid post-petition in accordance with the Stalking Horse Agreement as an administrative expense of the Estate ("**Bid Protections**").

7.      Many creditors have filed proofs of claims in the Estate. It is apparent that these creditors believe they own a direct interest in individual policies in what remains of Debtor's life insurance policy portfolio. Unfortunately for the creditors, each purchased an interest in a life settlement which is a security and does not evidence a direct ownership interest in a life insurance policy. Debtor's financial statements prepared pre-petition indicate that Debtor entered into life settlement agreements with individual investors conveying fractional interests in the death benefits of specific life insurance policies. After investigation of Debtor's business records, Trustee's counsel has discovered documents issued by Debtor to individual investors titled "**Policy Servicing Agreement.**" The Policy Servicing Agreements are each attached to one or more related documents including a

---

[2] A "Topping Bid" is defined as a bid for $1,250,00.00 for the Policies, with a $600,000.00 deposit in the Purchase and Sale Agreement.

Policy Acquisition Application & Life Settlement Disclosure (the "**Policy Acquisition Application**").

Examples of a Policy Acquisition Application and a Policy Servicing Agreement are attached hereto as

Exhibit C-1 and Exhibit C-2, respectively.

8.      Together these documents ostensibly convey to the individual investor a fractional interest in the death benefit payable upon the maturity of the respective individual life insurance policy. Although the Trustee is of the firm conviction that none of the Debtor's creditors are co-owners of any of the Policies, in order to ensure that each investor receives adequate notice of this sale so that each may assert whatever  rights they may hold under 11 U.S.C. 363, and to ensure that the Purchaser receives ownership of the Policies free and clear of any "interest" which an investor may hold, the Trustee requests that the Court approve the Sale Notice so that it may be served on the creditor body and those requesting notice.

9.      The Trustee is hamstrung in his evaluation of the worth of the Policies due to a lack of reliable information. The life insurance companies that issued the Policies do not seem to be accustomed to dealing with a bankruptcy trustee and have been slow to respond to Trustee's counsel's requests to transfer ownership of the Policies, thus the Trustee is not currently recognized by any of them as the registered owner of any of the Policies. Consequently, Trustee has been unable to timely retrieve reliable information regarding the current status of the Policies or the amount of premiums that may be currently due and owing. To the extent the insurance companies do provide information, it is sent by mail to Debtor's address on file and, thus, Trustee must rely upon information received in the mail from the forwarding orders place with the U.S. Postal Service.  The typical delay in receiving mail is thirty to forty-five days. Moreover, Debtor and the other jointly administered debtors, stopped entering financial information into their respective accounting records sometime in 2020.  To the best of Trustee's knowledge and belief, the financial information provided by the Debtor and the other

jointly administered debtors stops as of December 31, 2020. Thus, Trustee is without any financial information after this date, other than the jointly administered debtors' bankruptcy schedules.

10.     In short, the Trustee faces several obstacles to maximizing the value of the remaining life insurance portfolio. First, the life insurance policies may in the long-term be quite valuable but are expensive to maintain, and the Estate is without funds to pay the premiums. Second, the Trustee has insufficient information to properly evaluate and market the Policies to third parties. In short, this sale to Purchaser should be approved before any Policies lapse due to non-payment of premiums.

## IV.     HISTORY OF THE DEBTOR

11.     Debtor and the other jointly administered debtors ran a Ponzi scheme. Debtor's principal, Mr. Robert Mueller ("**Mueller**"), controlled -- as the sole owner, officer and director of Debtor and the other jointly administered debtors -- all of their operations. Upon information and belief, Mueller raised approximately $60,000,000 on behalf of the jointly administered debtors from individual investors over the past decade. Debtor raised these monies through the purported sale of fractional interests in the death benefits of the Policies, otherwise known as life settlements. Debtor, however, ran out of money sufficient to pay the ongoing premiums which were due to the issuers of the life insurance policies and many of them lapsed.

12.     At some point, Mueller stopped raising new money through Debtor and started raising investor money through some of the other jointly administered debtors. The pre-petition balance sheet for the Debtor reflects, as of December 31, 2020, a combination of inter-company liabilities among the jointly administered debtors totaling approximately $30,000,000.  After Mueller switched to raising monies through the other deeproot entities, the investment pitch varied over the years, but essentially Debtor promised a guaranteed annual return of 6% to 7% payable at the end of the applicable investment period.   Investors purchased debentures—or long-term unsecured obligations to pay.

Mueller marketed Debtor as having investments in life settlements, agriculture, real estate, and sports and entertainment. At some point, the jointly administered debtors invested monies in an effort to develop pinball machines. The financial statements prepared by Debtor pre-petition and each of the jointly administered debtors' respective schedules reflect that none of the jointly administered debtors ever had any net income and, in most cases, had no revenue.

13. On August 20, 2021, the United States Securities and Exchange Commission (the "**SEC**") filed suit[3] against most of the jointly administered debtors and Mueller for federal security fraud violations, and some of Mueller's immediate family members as relief parties. An injunction was entered prohibiting the solicitation of additional funds. Shortly thereafter, chapter 7 bankruptcy petitions were filed for each of the jointly administered debtors.

14. Of the twenty or thirty life insurance policies purchased by the Debtor, seven or eight life insurance policies remain in force. The balance of the life insurance policies, as best Trustee can determine, have either lapsed or previously matured. Other than the eight In-Force Insurance Policies and whatever rights the Trustee may have to reinstate the Lapsed Insurance Policies, the only remaining assets in the Debtor's estate are a minority ownership in an agricultural business, an interest in a promissory note secured by a second lien on a car wash, chapter five avoidance claims against the brokers who received commissions for bringing in investor money and insiders, and other litigation claims.

## V.    REQUESTED RELIEF

15. The statutory predicates for the relief requested herein are sections 363 and 503 of the Bankruptcy Code, Rules 6004 and 9014 of the Federal Rules of Bankruptcy Procedure and Local Rule 6004(b) and 9014 of the Local Rules of Bankruptcy Procedure for the Western District of Texas.

---

[3] *Securities and Exchange Commission v. Robert J. Mueller, et al.*, Civil Action No. 5:21-cv-785, U.S. Dist. Ct. for the W. Dist. Of Texas, San Antonio Division.

16.    The following proposed orders are attached hereto for the Court's consideration: (i) Order Authorizing and Approving Stalking Horse Agreement, Bid Procedures and Form of Notice of Sale ("**Sale Procedures Order**"), attached as Exhibit D; and (ii) Order Authorizing and Approving the Sale of Certain Personal Property Free and Clear of All Interests Pursuant to 11 U.S.C. §§ 363(b) and (f), ("**Sale Order**"), attached as Exhibit E.

**A.    The Court should approve a sale of the Life Insurance Policies pursuant to 11 U.S.C. Section 363.**

17.    By this Sale Motion, Trustee requests approval of the sale of the In-Force Insurance Policies and a transfer to the Purchaser of whatever rights the chapter 7 estate may have in, and to reinstate, the Lapsed Insurance Policies,

18.    This is not an operating chapter 7 estate, and this transaction is outside of the ordinary course of business of the Debtor and other jointly administered debtors. Other than assets and claims described above, the In-Force Insurance Policies appear to be substantially all of the existing assets of the Debtor's estate. Pursuant to 11 U.S.C. Section 363, the Trustee seeks approval to sell the Policies to the Purchaser.

**B.    There are no other owners of "interests" in the In-Force Policies.**

19.    The Debtor raised money from investors and may have misled some or all of them into believing that they owned a direct interest in an individual life insurance policy. Unfortunately for each of the investors, regardless of what they may have been told by Mueller, they do not hold an interest in the underlying life insurance policies. Attached as Exhibit F-1 is a copy of an excerpt from the Debtor's Schedules (Doc. # 33, pages 38-39) which identifies a list of fifty-six individual investors identified as unsecured creditors of the Debtor. Debtor's pre-petition balance sheet dated December 31, 2020, attached hereto as Exhibit F-2, reflects in the equity section numerous individual investors categorized apparently by insurance policy. An example the two transaction documents between an

individual creditor (or investor) and Debtor are attached hereto as <u>Exhibit C-1</u> and <u>Exhibit C-2</u>. Missing from these documents is a clear and express transfer of a direct ownership in any given insurance policy. What is clear in the Policy Acquisition Application & Life Settlement Disclosure, <u>Exhibit C-2</u>, is that the investors were purchasing a fractional interest in the death benefit rights of a life settlement.  The document provides:

> As Purchaser desires to purchase Death Benefit rights in a Life Settlement that may be fractionalized, Purchaser voluntarily enters into this pooled transaction as an accredited investor and acknowledges that such fractionalization is in the best interest of Purchaser. Purchaser further agrees to own Purchaser's pro rata share with other third-party purchasers as provided herein as a private transaction in non-securitized form. Purchaser agrees that Purchaser will not own any more or less than Purchaser's pro rata share of the life settlement policy, and therefore: will not receive any more or less than Purchaser's pro rata share of the death benefit, no be required to pay any more or less than the Purchaser's pro rata share of any future premiums (if any).

20.     These individual creditors purchased interests in life settlement agreements which are securities[4], not in the actual life insurance contracts The Trustee has not located any document reflecting that any of the investors were recorded as the owner of any of the Life Insurance Policies. Instead, it appears that the investors were each sold a fractionalized interest in a life settlement agreement, which life settlement agreement obligated the Debtor to pay a specified percentage of the death benefit of a life insurance policy owned by Debtor, should that life insurance policy ever mature. In short, the creditors who are listed on <u>Exhibit F-2</u> have an unmatured contractual obligation from the Debtor—they are unsecured creditors[5].

---

[4] *See, In the Matter of Living Benefits Asset Management, L.L.C.*, 916 F.3d 528, 543 (5th Cir. 2019) (Holding that life settlements were investment contracts within the meaning of the Investment Advisors Act of 1940.). *See also, Life Partners, Inc. v. Arnold*, 464 S.W.3d 660, 662 (Tex. Sup. Ct. 2015) ("The primary issue…is whether a 'life settlement agreement'…is an 'investment contract' and thus a 'security' under the Texas Securities Act. We hold that the agreements at issue are investment contracts because they constitute transactions in which a person pays money to participate in a common enterprise with the expectation of receiving profits, under circumstances in which the failure or success of the enterprise and the person's realization of the expected profits is at least predominately due to the entrepreneurial or managerial efforts of others.").

[5] Admittedly, a reasonable conclusion from a reading of the transaction documents is that they were drafted with the intention of being confusing and unclear to the investor. However, inartful drafting in *Ponzi* scheme documents is neither surprising, not does it change the outcome here. The primary asset of this debtor is a portfolio of life insurance policies that

21.     The Trustee has uncovered no evidence that any individual investor or any other third party may have an interest in or claim to direct ownership of any single Policy. In examining the Debtor's records that are available to Trustee no written record of direct ownership in any individual Policy has been discovered nor have any collateral assignments of any of the Policies been located. All of the premium invoices from the insurance carriers that have been received or examined by the Trustee have been addressed to the Debtor. Thus, Trustee may sell the Policies to Purchaser pursuant to 11 U.S.C. Section 363(b) and (f), subsections (h) and (i) are not implicated because there are no co-owners of the Policies.[6]

**C.      There are no lienholders in any of the In-Force Insurance Policies.**

22.     Debtor's schedules do not reflect a secured lien on any of the Life Insurance Policies. The U.S. Small Business Administration does have a UCC-1 recorded against the assets of Debtor. However, a lien on an insurance policy is not governed by the Uniform Commercial Code because it is not a good. Therefore, the means to perfect a lien on a life insurance policy is through the execution of a collateral assignment of the proceeds of that individual life insurance policy.  *See, e.g., Banco Popular, North America v. Kanning*, 638 Fed.Appx. 328, 338 (5th Cir. 2016). Trustee is not aware of the existence of any collateral assignment of any of the Policies.

---

must be sold or their value will simply lapse and disappear for all concerned. When asked at the 341 meeting of creditors whether any individual policy was sold to a specific investor, the Debtor's representative, Mr. Robert Mueller, asserted his right to avoid self-incrimination pursuant to Fifth Amendment to the United States Constitution.

[6] The distinction between these individual creditors owning an undivided interest in a life insurance policy and therefore being a co-owner, or  having a contractual right against the Debtor, as the Court is undoubtedly aware, is the difference between whether the In-Force Insurance Policies can be sold through this contested matter now, or whether the interest of the co-owner must be sold through the powers of the Court granted in 11 U.S.C. Section 363(h), after a lengthy adversary proceeding pursuant to Fed. R. Bankr. P. 7001(3). *See In re Lyons,* 995 F.2d 923, 924 (9th Cir. 1993).  If the creditors have an "interest" in the In-Force Insurance Policies requiring the filing and prosecution of an adversary proceeding to determine whether the requirements of 363(h) have been met, there will simply be nothing to sell. The Debtor's Estate is without the resources to pay the on-going premium obligation, and the Stalking Horse Bidder is unwilling to wait for months and pay insurance premiums for policies which it cannot acquire.

**D.  The Life Insurance Policies are not subject to "deemed rejection" under 11 U.S.C 365(d)(1).**

23.  The In-Force Insurance Policies and the Lapsed Insurance Policies, either individually or as a group, do not constitute "executory contracts" as that term is used in the context of 11 U.S.C. § 365.  Debtor did not identify any of the Policies on its schedules as executory contracts, and Trustee did not assume any of the Policies as executory contracts.  Life insurance policies are not "executory contracts" as defined under the *Countryman* or functional approaches.  As the Fifth Circuit recognized in the litigation arising from the Stanford International Bank *ponzi* scheme, "Courts in the Fifth Circuit have relied at times upon Countryman's material breach test and have relied at other times upon more functional approaches." *See* Janvey v. Alguire, No. 3:09-CV-0724-N, 2014 WL 12654910, at *8 (N.D. Tex. July 30, 2014), aff'd, 847 F.3d 231 (5th Cir. 2017).[7]

24.  Under the *Countryman* test, "a contract is executory if performance remains due to some extent on both sides and if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *Matter of Provider Meds, L.L.C.*, 907 F.3d 845, 852 (5th Cir. 2018), *citing Phoenix Exploration, Inc. v. Yaquinto (In re Murexco Petroleum, Inc.)*, 15 F.3d 60, 62-63, (5th Cir. 1994) (*per curium*); *accord Ocean Marine Servs. P'ship No. 1 v. Digicon, Inc. (In re Digicon, Inc.)*, No. 03-20121, 2003 WL 21418127, at *5 (5th Cir. 2003) (approving of district court language adopting this definition).  However, like the Fifth Circuit, "several courts have rejected the traditional Countryman test as the sole benchmark for determining whether a contract is subject to assumption or rejection.  These courts have employed a result-oriented approach which focuses upon whether or not

---

[7] For example, compare *In re Murexco Petroleum, Inc.,* 15 F.3d 60, 62–63 (5th Cir. 1994) ("Courts applying § 365(a) have indicated that an agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party."), with *In re El Paso Refinery*, L.P., 220 B.R. 37, 42 n.15 (Bankr. W.D. Tex. 1998) ("Examining the instant case in this manner also allows us—requires us, in fact—to exercise a functional approach to the executory contract. As has been noted elsewhere, the focus of the functional approach is not whether the contract is 'executory,' but instead whether its assumption or rejection could in any way benefit the estate.")

the estate will benefit from the assumption or rejection of the contract rather than fundamentally looking at mutuality of commitments." *In re Spectrum Information Technologies, Inc.*, 190 B.R. 741, 747 (E.D.N.Y. 1996).

25.     Although a life insurance policy may contain covenants to be performed by both parties in the future, and therefore satisfy the logic and requirements of the *Countryman* test, the debtor's failure to pay premiums post-petition does not result in the accrual of any administrative expense to the estate. The policy benefit simply lapses.[8]   Thus, when the court analyzes a life insurance policy using the "functional approach," as was described in *In re Spectrum Information Technologies, Inc*, 190 B.R. 741, 747 (E.D. N.Y. 1996), the life insurance policy is not an "executory contract" subject to deemed rejection. As the court in *Spectrum* explains: "it is necessary to work backward, proceeding from an examination of the goals rejection is expected to accomplish … [i]f those purposes have already been accomplished or if they cannot be accomplished through rejection, then the contract is not executory within the meaning of the Code."

26.     Life insurance policies owned by a debtor, without any other contractual obligations attached, are certainly contracts with some executory features, but are not the kind of executory contracts which are subject to deemed rejection pursuant to 11 U.S.C Section 365(d).  If the Debtor continues to pay premiums after sixty days from petition date, no rights under the insurance policies have changed, and the issuer of the insurance policy could not refuse to pay the death benefit if the insured died. Without regard to their executory or non-executory nature, Trustee, with Court approval,

---

[8] *See*, *Bezanson v. Metropolitan Ins. and Annuity Co*., 952 F.2d 1, 15 (1st Cir. 1991) ("[I]nsurance, perhaps particularly life insurance, where the insurer cannot refuse to renew, does not fit the conventional pattern.  The policy owner, bankrupt or otherwise, has no obligation to pay premiums; he can stop at any time.  He needs no court order.  Correspondingly, the life insurer will never have a claim to file against the bankrupt, or concern as to the future. If the premium is paid when due, it will continue the policy; if it is not, it does not. Unlike a landlord, for example, advance notice of the policy owner's intentions is of no moment.").

may transfer all right, title and interest of the Estate in and to the In-Force Insurance Policies and the Lapsed Insurance Policies pursuant to 11. U.S.C. §363(b) and (f) to a Purchaser.

**E.  The Purchaser is acting in Good Faith and Negotiations have been at Arm's Length.**

27.     Trustee has made inquiry of Purchaser with respect to its connection to Debtor, its affiliates and insiders. In paragraph 6(o) of the Stalking Horse Agreement, <u>Exhibit D</u>, Purchaser represents and warrants to Trustee with respect to his connections to the Debtor. One of the principals of the Purchaser is Mr. Chris Turner of Turner Logic, LLC ("**Turner Logic**"). Turner Logic is identified as a creditor of one or more of the jointly administered debtors. Turner Logic provided computer software services to the one of more the jointly administered debtors for use in the pinball machines under development. According to Mr. Turner, Turner Logic did not receive any payments from any jointly administered debtor within ninety days of filing of the petition. Neither Mr. Mueller nor any other insider of the jointly administered debtors have any interest in Purchaser or will receive a financial benefit from the proposed transaction.

28.     Trustee and Trustee's counsel have been negotiating the Stalking Horse Agreement with Purchaser for three weeks. Negotiations have been arms-length.

**F.  Stalking Horse Agreement**

29.     Subject to the provisions of this Sale Motion, Trustee has entered into the Stalking Horse Agreement, subject to the receipt and acceptance of an otherwise better Qualified Bid from a Qualified Bidder, as provided herein.

30.     The Stalking Horse Agreement contains certain customary terms and conditions, including terms providing for the reimbursement of premiums amounting to approximately $28,000.00, which Purchaser paid post-petition and prior to Trustee filing of this Sale Motion, and those which may be paid pursuant to the Stalking Horse Agreement as administrative expenses

pursuant to 11 U.S.C. 503, a break-up fee in favor of Purchaser in the amount of $50,000.00, and the right to apply to the Court for the reimbursement of up to $20,000.00 in reasonable and necessary attorney's fees, as described in the Stalking Horse Agreement (the "Bid Protections").

31.     The Court should approve the Stalking Horse Agreement and Bid Protections. "[P]ursuant to § 363(b), a bankruptcy court may authorize a debtor in possession to enter into a reimbursement agreement with a potential buyer." *In re ASARCO, LLC*, 441 B.R. 813, 829 (S.D. TX 2010) (*citing*, *United States Trustee v. Bethlehem Steel Corp.* (*In re Bethlehem Steel Corp.*), Civ. No. 02-02854, 2003 WL 21738964, at *9-*10 (S.D.N.Y. July 28, 2003). "Section 363 of the Bankruptcy Code addresses the debtor's use of property of the estate and incorporates a business judgment standard. Subsection 363(b) provides that a debtor-in-possession, 'after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.' " *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) (citing *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir.1986) (quoting 11 U.S.C. § 363(b)(1)). "In such circumstances, 'for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification, good business judgment, or sound business reasons.'" *Id.* "The business judgment standard in section 363 is flexible and encourages discretion. 'Whether the proffered business justification is sufficient depends on the case…. [T]he bankruptcy judge 'should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders alike.'"" *ASARCO, L.L.C.*, 650 F.3d at 601 (quoting Cont'l Air Lines, 780 F.2d at 1226 (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983))).

32.     Application of the business judgment standard is the correct legal standard when determining whether a break-up fee is permissible. *See*, *In re ASARCO, LLC*, 441 B.R. at 831. In *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147

B.R. 650 (S.D.N.Y 1992) "the district court fashioned a three-question inquiry based on the business judgement rule, which it used to determine whether the break-up fee was permissible, asking: (1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage bidding; and (3) is the amount of the fee unreasonable to the proposed purchase price?" *In re ASARCO, LLC,* 441 B.R. at 826 (citing, *Integrated Resources*).[9]

33.     In the present action, the business judgment standard is appropriate to evaluate the Bid Protections given that investment in the Polices carries with it substantial risk, investment in the Policies is illiquid and the Policies are not readily resaleable, the life span of the insured is uncertain and no return will be realized until the insured dies, and premiums may increase substantially or policies may terminate if the insured(s) live past their life expectancy projection completely eliminating any expected return to the investor.

34.     Trustee submits that in applying the foregoing three-question inquiry to the Sale Motion, the Court should find: first, that there is no evidence of any self-dealing or manipulation by or among Trustee and the principals of the Stalking Horse Bidder; second, approval of the Stalking Horse Agreement and proposed Bid Protections will facilitate the auction process by indicating to potential bidders there is value in the Policies, and by setting a floor for the purchase price that will encourage higher bids; and, third, the Bid Protections are reasonable given the amount of the Purchase Price and the provisions in the Stalking Horse Agreement that permit Trustee, with the Stalking Horse Bidder's consent, to use the Deposit on Purchase Price to pay premiums in combined amounts equaling up to $25,000.00, to maintain the enforceability of the In-Force Insurance Policies.

---

[9] In deciding that the bankruptcy court had not erred in granting the debtor's reimbursement motion, the district court in *ASARCO* applied the three-question inquiry proposed by the *Integrated Resources* court, finding: first, that there was no evidence of any self-dealing or manipulation by the parties who negotiated the reimbursement procedures, second, that the reimbursement order facilitated the auction process, even if no sale was ultimately made, and third, the size of the fee to paid to the bidders was reasonable in comparison to the of the size and complexity of the asset being sold. *Id.* at 831 - 832.

35.     Purchaser has made its offer and has entered into the Stalking Horse Agreement in good faith. Other than an entity owned by the principal of the Purchaser having provided services to some of the jointly administered debtors prior to the Petition Date, neither Purchaser nor any of its owners, principals, agents, investors, lenders or any other persons who may benefit in some fashion from the Stalking Horse Agreement or its consummation, has any connection to the Debtor or its principal, Mr. Robert Mueller. Purchaser has no intention or agreement, written, oral or otherwise, to share in the profits, losses or in any other manner with Debtor, its principals, the other jointly administered debtors or an insider (including a non-statutory insider) as defined at 11 U.S.C. Section 101.  Given the fact that the Stalking Horse Bidder has already paid two insurance premiums without any guarantee or promise that those monies would be repaid in the event this proposed transaction is not approved by the Court, there can be little doubt about their *bona fides.*

36.     The Stalking Horse Agreement and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and the Stalking Horse Bidder will be deemed to be a Qualified Bidder.  Other than as provided by order of the Court prior to the entry of the Sale Order, no other party submitting a Bid shall be entitled to a break-up fee or reimbursement except for the Bid Protections for the Stalking Horse Bidder that are approved by the Court.

37.     The Trustee in the exercise of his business judgment asks that the Stalking Horse Agreement with the Bid Protections be approved.

## G.  Sale Procedures

38.     Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private or public sale.  Trustee believes that good cause exists to expose the Policies to a public sale.  A public sale conducted substantially in accordance with the sale procedures (the "Sale Procedures"), attached hereto as Exhibit G, will enable Trustee to obtain the highest and best

offer for the Policies, thereby maximizing their value for the benefit of the Estate. The Sale Procedures provide for an expeditious manner to obtain the highest and best offers for the Policies. Therefore, Trustee respectfully requests that this Court approve the Sale Procedures.

39.     Any party wishing to participate as a qualified bidder should submit (a) a sealed bid for the Policies ("**Bid**"), (b) a purchase agreement, signed by an authorized representative of such bidder, marked against the Stalking Horse Agreement to show all changes requested by such bidder, and (c) evidence of the bidder's financial ability to close the transaction, to J. Patrick Lowe, Trustee, and (d) deposit Six Hundred Thousand and no/100 Dollars ($600,000.00) with Trustee's counsel, Randall A. Pulman, at Pulman, Cappuccio & Pullen, LLP, by no later than **March 31, 2022** (the "**Bid Deadline**"). Any such Bid submitted by the Bid Deadline shall be in the amount of at least One Million, Two Hundred and Fifty Thousand and no/100 Dollars ($1,250,000.00) to be a qualified bid ("**Qualified Bid**") and to allow the bidder to become a Qualified Bidder ("**Qualified Bidder**"). The deposit of all Qualified Bidders (except for the highest bidder (the "**Successful Bidder**")) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

40.     By no later than noon on **April 1, 2022**, Trustee will file a notice (the "**Bid Notice**") with the Court stating whether it has timely received a binding offer to purchase the Policies in a cash amount of at least $1,250,000.00.

41.     In the event that Trustee files the Bid Notice stating that it has not received a cash offer of at least $1,250,000.00, the Court shall hold a final hearing to approve a sale of the Policies to the Stalking Horse Bidder, or its assignee, free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. § 363. Such hearing shall be held seven (7) days following the filing of the Bid Notice, or as soon thereafter as may be schedule by the Court (the "**Sale Hearing**").

42.     In the event Trustee receives at least one Qualified Bid, counsel for Trustee will file the Bid Notice with the Court and notify the Court's courtroom deputy that the Sale Hearing will be held seven (7) days following the filing of the Bid Notice, or as soon thereafter as may be scheduled by the Court, where Trustee will seek approval of the sale of the Policies to the Successful Bidder.

43.     In the event Trustee receives at least one Qualified Bid by the Bid Deadline, the Trustee may in his absolute discretion, exercising only his best business judgment on behalf of the estate, negotiate with the Stalking Horse Bidder and one or more of the Qualified Bidders on price and terms of the Qualified Bid and Trustee shall select the Successful Bidder.

44.     The closing of the sale of the Policies shall occur no later than **May 2, 2022** (the "**Closing Deadline**"). The Closing Deadline may occur sooner and be modified upon agreement between Trustee and the Successful Bidder.

45.     If any Successful Bidder fails to consummate a Sale because of a breach or failure to perform, the Qualified Bidder that submitted the next highest or otherwise best Qualified Bid (if any), as determined by Trustee (the "**Back-Up Bidder(s)**") will be deemed the Successful Bidder and Trustee will be authorized to consummate the Sale to such Back-Up Bidder without further order of the Court and such Qualified Bid shall thereupon be deemed the Successful Bid.

46.     If any Successful Bidder fails to consummate the purchase of the Policies, and such failure is the result of a breach by such Successful Bidder, twenty-five percent (25%) of the Successful Bidder's deposit shall be forfeited to Debtor's Estate.

47.     Any objection(s) filed to the sale of the Policies (i) shall be in writing and shall specify with particularity the grounds for such objections or other statements of position and (ii) shall be filed with the Court on or before March 31, 2022**,** or as otherwise may be determined by the Court (the "**Objection Deadline**").  Any person failing to timely file an objection to the Sale prior to the

Objection Deadline shall be forever barred from objecting to the Sale, including the transfer of the Policies free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale. Any objections to the Sale Motion will be heard at the **Sale Hearing**.

48.     Trustee reserves the right to (i) determine in its discretion whether any Qualified Bid is a Successful Bid, and (ii) reject, at any time prior to the entry of the Sale Order, without liability, any Bid that Trustee in its discretion, determines to be inadequate, insufficient, not in conformity with the Sale Procedures or the Bankruptcy Code, or contrary to the best interests of the Estate.

49.     Trustee reserves the right to modify the Sale Procedures, without the need for any further order of the Court, including, without limitation (i) extending the deadlines set forth in these Sale Procedures, and (ii) requesting a continuance of the Sale Hearing. Nothing contained in the Sale Procedures shall limit, alter, modify, waive or otherwise impair Trustee's reasonable business judgment in relation to the sale process contemplated by the Sale Procedures.

**H.  Sale Notice**

50.     Bankruptcy Rule 2002(a) provides, in relevant part, that all creditors must be given at least twenty-one (21) days' notice by mail of a proposed use, sale or lease of property of the estate other than in the ordinary course of business. However, for "cause," the notice period can be shortened. Cause exists in this case, as the In-Force Insurance Policies must be sold, or they will lapse and be of no value. Trustee requests that notice be shortened to ten (10) days.

51.     Within three business days after the Court enters an Order approving the Sale Motion, Trustee shall serve the Sale Notice ("**Sale Notice**") by (a) first-class United States mail, postage prepaid on (i) the parties identified on the Creditor Matrix in this Case at the addresses set forth therein, (ii) the parties that have filed proofs of claim in this Case at the addresses set forth in the respective proofs of claim, and (iii) any other parties who have expressed an interest in acquiring the Policies; and (b) the Court's electronic filing system on those parties receiving electronic notice by

such system.  Service of such Sale Notice is proper, due, timely, good, and sufficient notice of, among other things, the Sale Procedures, the auction, the proposed Sale, and the procedure for objecting thereto.  Additionally, Trustee may provide publication notice but only to the extent that Trustee believes such additional notice would improve the results of the auction and is in the best interest of the estate.  A proposed form of Sale Notice is attached hereto as Exhibit H.

## I.   Relief from Bankruptcy Rule 6004(h) is Appropriate

52.    Under Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

53.    To preserve the value of Trustee's estate and limit the costs of administering and preserving the Property, it is critical that Trustee close the sale of the Policies as soon as possible after all closing conditions have been met or waived. Accordingly, the hereby request that the Court waive the fourteen-day stay periods under Bankruptcy Rules 6004(h).

54.    The following proposed orders are attached hereto for the Court's consideration: (i) Order Authorizing and Approving Stalking Horse Agreement, Bid Procedures and Form of Notice of Sale ("**Sale Procedures Order**"), attached as Exhibit D; and (ii) Order Authorizing and Approving the Sale of Certain Personal Property Free and Clear of All Interests Pursuant to 11 U.S.C. §§ 363(b) and (f), ("**Sale Order**"), attached as Exhibit E.

## VI.    PRAYER

WHEREFORE, Trustee respectfully requests that the Court enter Orders approving (a) the Stalking Horse Agreement, Stalking Horse Bidder and Bid Protections; (b) the Sale and Bidding

Procedures; (c) the form and manner of the Sale Notice; (d) the date and time to conduct the auction at the Sale Hearing; (e) waiving the fourteen-day periods under Bankruptcy Rules 6004(h); (f) and (g) such other relief, both at law and in equity to which Trustee may be justly entitled.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: /s/_____
    Randall A. Pulman
    Texas State Bar No. 16393250
    rpulman@pulmanlaw.com


**ATTORNEYS FOR JOHN PATRICK LOWE, CHAPTER 7 TRUSTEE**

### CERTIFICATE OF SERVICE

    I hereby certify that on the 15th day of March, 2022, I electronically filed the foregoing document using the CM/ECF system, which will serve the document on the following list of parties in interest and parties requesting notice; it was served on the Debtors via CM/ECF to their counsel, as indicated below  A copy will also be mailed to the parties on the full service list and a supplemental certificate of service will be filed evidencing that service.

***Via Counsel CM/ECF:***
*catherine.curtis@wickphillips.com*
*;jason.rudd@wickphillips.com*
Policy Services, Inc.
deeproot Pinball, LLC
deeproot Growth Runs Deep Fund, LLC
deeproot 575 Fund, LLC
deeproot 3 Year Bonus Income Fund, LLC
deeproot BonusGrowth 5 Year Debenture Fund, LLC
deeproot Tech, LLC
deeproot Funds, LLC
deeproot Studios, LLC
deeproot Capital Management, LLC
12621 Silicon Dr.
San Antonio, TX 78249

***Via Counsel Via CM/ECF:***
*catherine.curtis@wickphillips.com;*
*jason.rudd@wickphillips.com*
Wizard Mode Media, LLC
12227 S. Business Park Drive, Suite 130
Draper, UT 84020
Debtor's Counsel

***Via CM/ECF: *pat.lowe.law@gmail.com***
John Patrick Lowe
2402 East Main Street
Uvalde, TX 78801

***Via CM/ECF:***
*catherine.curtis@wickphillips.com;*
*jason.rudd@wickphillips.com*
Catherine A. Curtis
Jason M. Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Ave, Suite 500
Dallas, TX 75204

***Via CM/ECF:***
*USTPRegion07.SN.ECF@usdoj.gov*
United States Trustee - SA12
US Trustee's Office
615 E Houston, Suite 533
San Antonio, TX 78295-1539

***Via CM/ECF: *rbattaglialaw@outlook.com***
Raymond W. Battaglia
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218

***Via CM/ECF: *jpetree@mcslaw.com***
Jonathan Petree
McGuire, Craddock & Strother, P.C.
500 N. Akard Street Suite 2200
Dallas, TX 75201

***Via CM/ECF: *jdunne@smfadlaw.com***
John C. Dunne
SMFAD Law
1001 McKinney Street #1100
Houston, TX 77002

***Via CM/ECF: *bk-cmurphy@oag.texas.gov***
Texas Workforce Commission
c/o Christopher S. Murphy
Texas Attorney General's Office
PO Box 12548
Austin, TX 78711

*s/ Randall A. Pulman*
Randall A. Pulman

# EXHIBIT A-1

## IN-FORCE INSURANCE POLICIES

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy | Acquisition Cost |
|---|---|---|---|---|---|---|
| Protective Life Insurance Company (West Coast Life) | ANDE75 | REDACTED | In-Force | REDACTED 575 | $2,000,000.00 | $1,212,121.21 |
| Brighthouse Life Insurance Company | JKN22A | REDACTED | In-Force | REDACTED 315 REDACTED | $2,500,000.00 | $1,648,351.65 |
| John Hancock Life Insurance Company | FEE287 | REDACTED | In-Force | REDACTED 287 | $500,000.00 | $338,983.05 |
| John Hancock Life Insurance Company | FEE548 | REDACTED | In-Force | REDACTED 548 | $500,000.00 | $338,983.05 |
| Occidental Life Insurance Company NC | MAR790 | REDACTED | In-Force | REDACTED 790 | $100,000.00 | $67,039.11 |
| Transamerica Life Insurance Company | JMD135 | REDACTED | In-Force | REDACTED 135 | $500,000.00 | $305,295.36 |
| Brighthouse Life Insurance Company | KFFN57 | REDACTED | In-Force | REDACTED 157 REDACTED | $500,000.00 | $254,104.00 |
| Protective Life Insurance Company | RID363 | REDACTED | In-Force | REDACTED 371 | $500,000.00 | $148,680.00 |

**Total Acquisition Cost:**  $4,313,557.43

**Purchase Price (25%):**  $1,078,389.36

# <u>EXHIBIT A-2</u>

## LAPSED INSURANCE POLICIES

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy |
|---|---|---|---|---|---|
| **Midland National Life** | GRR553 | REDACTED | Lapsed | REDACTED 553 | $242,520.00 |
| **ING Reliastar Life (VOYA)** | PER437 | REDACTED | Lapsed | REDACTED 378 | $1,000,000.00 |
| **SunLife Financial** | SUL428 | REDACTED | Lapsed | REDACTED 428 | $300,000.00 |
| **SunLife Financial** | SUL429 | REDACTED | Lapsed | REDACTED 429 | $300,000.00 |
| **US Life City NY** | UD33NL | REDACTED | Lapsed | REDACTED 0NL | $750,000.00 |
| **Protective Life Insurance Company** | LW7116 | REDACTED | Lapsed | REDACTED 116 | $1,100,000.00 |
| **American General Life** | JDE21L | REDACTED | Lapsed | REDACTED 21L | $633,342.81 |
| **Transamerica Life** | SIE687 | REDACTED | Lapsed | REDACTED 687 | $1,500,000.00 |
| **AXA Equitable Life** | FERN07 | REDACTED | Lapsed | REDACTED 607 | $10,000,000.00 |
| **Mass Mutual** | HCS883 | REDACTED | Lapsed | REDACTED 883 | $1,540,000.00 |
| **Principal** | ANDR62 | REDACTED | Lapsed | REDACTED 262 | $1,000,000.00 |
| **Transamerica Life** | BASH82 | REDACTED | Lapsed | | $9,000,000.00 |

# **EXHIBIT B**

## **STALKING HORSE AGREEMENT**

### LIFE INSURANCE POLICY PURCHASE AND SALE AGREEMENT

This LIFE INSURANCE POLICY PURCHASE AND SALE AGREEMENT ("Agreement") is made and entered into as of March __, 2022, by and between J. PATRICK LOWE, the chapter 7 Trustee for the estate of *In re Policy Services, Inc.*, Case No. 21-51513, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division, which case is being Jointly Administered under *In re deeproot Capital Management, LLC, et al.*, Case No. 21-51523, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division ("Seller" and/or "Trustee"), and TuYo Holdings, LLC, a Texas limited liability company ("Purchaser") (and together, the "Parties").

## RECITALS

A. Policy Services, Inc., a Texas corporation, ("Debtor") the owner and sole beneficiary of the Policies (defined below), filed for Chapter 7 bankruptcy on December 9, 2021, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Case No. 21-51513, which case is being Jointly Administered in said Court under *In re deeproot Capital Management, LLC, et al.*, Case No. 21-51523 ("Bankruptcy Case").

B. Debtor was in the business of purchasing and holding existing life insurance policies as investments. Some of the insurance policies purchased by Debtor have already lapsed due to non-payment of premium.

C. Trustee, in connection with the performance of his statutory duties, and in the exercise of his best business judgement has determined that the sale of the life insurance policies believed to remain in force (described below) to Purchaser is in the best interests of the bankruptcy estate.

D. Purchaser has paid directly to two insurance companies premiums totaling $28,079.66 which were due post-petition for the purpose of keeping these two insurance policies in a paid up status with the insurance companies.

E. In connection with the purchase and sale of the life insurance policies, counsel to Trustee will prepare and file a Motion to Sell and other ancillary motions with the Court in the Bankruptcy Case. Each motion must be granted, and the requested relief ordered by the Court before the sale of the life insurance policies contemplated by this Agreement may be closed.

F. Purchaser is aware of the risks associated with the purchase of existing and lapsed life insurance policies.

G. Seller desires to sell to Purchaser the life insurance policies described on **Exhibit A**, attached hereto (each a "Policy" and collectively, the "Policies").

H. Each of the Policies remaining in force require the ongoing payment of premiums in order to keep said Policies in force. Purchaser and Trustee have agreed on a mechanism for Purchaser to fund the payment of insurance premiums going forward from now until a sale is approved by the Bankruptcy Court.

I. Trustee will also assign and convey to Purchaser all rights, title and interest (including the right to reinstatement) that Trustee or the Debtor holds in the lapsed insurance policies described on **Exhibit B**, attached hereto (each a "Lapsed Policy" and collectively, the "Lapsed Policies"). Purchaser intends to seek reinstatement of the Lapsed Policies through administrative and legal processes.

1

J.   Purchaser desires to purchase all rights, title and interest in and to the Policies and the Lapsed Policies in accordance with the terms and conditions of this Agreement.

## AGREEMENT

NOW THEREFORE, for and in consideration of the RECITALS, which are incorporated into this Agreement, the mutual promises and covenants set further herein and for the other good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the Parties hereto agree as follows:

1.   **Purchase Price; Closing.**

(a)   Purchaser hereby agrees to pay $1,078,389.36 ("Purchase Price") for the sole purpose of acquiring all rights, title and interest in and to the Policies and Lapsed Policies.  Purchaser hereby agrees to immediately deposit into the IOLTA account of Trustee's counsel, acting on behalf of Seller, the sum of $540,000.00 ("Deposit on Purchase Price") for the sole purpose of acquiring all rights, title and interest in and to the Policies.  Said funds shall be held in trust in an IOLTA account controlled by Trustee's counsel and shall be disbursed immediately to Seller upon the proper transfer of the ownership and beneficiary of the Policies to Purchaser (the "Closing").  The balance of the Purchase Price remaining unpaid after the Deposit has been made shall be paid by Purchaser to Seller at Closing.  Purchaser shall cause the Deposit on Purchase Price and all other payments to the Seller to be wired to Trustee's counsel IOLTA account using the following instructions:

JP Morgan Chase Bank
712 Main Street
10th Floor South
Houston, Texas 77002
(713) 216-2041

redacted
redacted
redacted
redacted

(b)   Purchaser will endeavor to reinstate each of the Lapsed Policies conveyed to it as part of this Agreement. As additional consideration and in addition to the Purchase Price listed above, Purchaser agrees to remit to Trustee fifty percent (50%) of the Net Insurance Benefits (as defined below) resulting from the successful reinstatement of a Lapsed Policy or its sale to a third party, subject to the terms and conditions herein.  Purchaser shall not be required to exhaust any and all legal remedies available to it, but shall instead be entitled to exercise its business judgment in pursuing reinstatement of each individual Lapsed Policy.  To the extent Purchaser is successful in reinstating any one Lapsed Policy and Purchaser receives payment of an associated insurance benefit or proceeds from the sale of the reinstated policy ("Gross Insurance Benefit"), Purchaser shall be entitled to reimburse itself for all expenses collectively incurred during Purchaser's reinstatement efforts for all of the Lapsed Polices. Within ten (10) days after receiving the Gross Insurance Benefits and reimbursing itself for its reimbursable expenses, Purchaser agrees to pay to Trustee an amount equal to fifty percent (50%) of the remaining insurance benefit actually received ("Net Insurance Benefit").  Purchaser's reimbursable expenses shall include, but will not be limited

2

to, reasonable and necessary attorney's fees, costs of court, insurance premium payments, administrative fees, brokerage fees, and any other fees reasonably related to reinstatement and maintenance of the Lapsed Policy. Reimbursable expenses do not include the costs and attorney's fees incurred by Purchaser in connection with this Agreement or acquiring the rights to the Policies or Lapsed Policies from Seller.

2. **Payment of Insurance Premiums prior to Closing**.

   a. Purchaser acknowledges that Trustee is without sufficient funds in the Policy Services, Inc. Estate to pay any insurance premiums going forward. In the likely event that insurance premiums for the Policies come due before the Order approving the sale and granting the Motion becomes final, Trustee may use a portion of the Deposit on Purchase Price to pay any such life insurance premium then due, in an amount up to $25,000, only after receiving the written consent of the Purchaser, which shall not be unreasonably withheld for a period of thirty (30) days after the execution of this Agreement. Alternatively, provided that Purchaser gives advance notice to Trustee and Trustee gives his written approval, which shall not be unreasonably withheld, Purchaser may directly pay the insurance premium then due using Purchaser's separate funds. At Closing, Purchaser will receive a credit to the Purchase Price for any premiums paid directly by Purchaser.

   b. If Trustee's Motion to Sell (defined below) is denied by the Bankruptcy Court, then the Deposit on Purchase Price, less any premiums paid therefrom by the Trustee, shall be refunded to Purchaser eleven (11) days from the date that the Bankruptcy Court's denial of Trustee's Motion becomes final. In such event this Agreement shall terminate. In such event, Purchaser waives its right to apply to the court for the reimbursement of an administrative expense pursuant to 11 U.S.C Section 503 or for repayment of a post-petition loan pursuant to 11 U.S.C. 364, or under any like statute or legal theory.

   c. If Trustee's Motion to Sell is granted by the Bankruptcy Court, but a third-party outbids Purchaser and such third-party is subsequently approved as the purchaser, then the Deposit on Purchase Price (including all premiums paid by the Trustee therefrom and any premiums directly paid by Purchaser) shall be treated as an administrative expense of the Policy Services, Inc. Estate pursuant to 11 U.S.C. Section 503 and refunded to Purchaser. In such event, Purchaser shall also receive the Stalking Horse Fee (described below) and reasonable and necessary attorney's fees as approved by the Bankruptcy Court, and this Agreement shall terminate.

3. **Motion to Sell, and Stalking Horse Bid and Procedures**.

   (a) Seller agrees to file a motion to sell the Policies and Lapsed Policies pursuant to 11 U.S.C Sections 363 and to the extent necessary Section 364 in order to authorize the payment of insurance premiums by the Purchaser prior to closing (the "Motion to Sell"), within three (3) business days after the effective date of this Agreement, seeking entry of an order of the Bankruptcy Court ("Order") approving the sale pursuant to the terms of this Agreement. If entry of the Order approving the sale has not occurred within 30days after the effective date of the Agreement, Purchaser may terminate the Agreement by written notice to Seller. If Court

approval is denied, the Agreement shall automatically terminate, and the Deposit on Purchase Price shall be returned to Purchaser pursuant to the provisions of Section 2(b) above.

(b)  Purchaser acknowledges that Seller will submit this Agreement to the Bankruptcy Court for approval and that any other interested party will have the right to bid on the Policies and the Lapsed Policies.

(c)  Trustee shall present Purchaser's offer to the Bankruptcy Court as a stalking horse bid on the Policies and Lapsed pursuant to Bid Procedures provided to Purchaser and approved by the Bankruptcy Court. In the event another purchaser offers a better offer to the Trustee (a "Topping Bid"), as determined solely in exercise of the Trustee's best business judgment and discretion, and the Trustee accepts the Topping Bid, Trustee covenants to do the following:

> 1)  Refund to the Purchaser the Deposit on Purchase Price including the amount of premiums that may have been paid (either from the Deposit on Purchase Price or directly by Purchaser) in the interim within ten (10) days of the Order of Sale becoming final, and

> 2)  As consideration for entering into this Agreement and allowing Trustee to use the Deposit on Purchase Price to pay premiums in order to keep the Policies in force, Trustee will seek authorization to pay to Purchaser an additional amount equal to $50,000.00 as a stalking horse fee, plus Purchaser's reasonable and necessary attorney's fees as approved by the Court, in an amount not to exceed $20,000 (collectively, the "Stalking Horse Fee").

> 3)  Trustee covenants to defend the adequacy and reasonableness of the Stalking Horse Fee, however, Purchaser acknowledges that the Bankruptcy Court must approve the amount of the Stalking Horse Fee and the payment thereof to Purchaser.

> 4)  In all circumstances, the Trustee reserves the right to negotiate for a better offer from all bidders.

4.  **Conveyance of Ownership Rights to Purchaser**.

a)  After entry of the Bankruptcy Court's Order approving the sale pursuant to the terms of this Agreement, Trustee shall make best efforts to cause each respective life insurance company to transfer record ownership of all rights, title and interest in and to each of the Policies and Lapsed Policies to Purchaser as soon as practicable. The parties contemplate the individual transfer of record ownership of each Policy and Lapsed Policy to occur as soon as practicable for each such individual Policy or Lapsed Policy, notwithstanding delays to the transfer of other Policies or Lapsed Policies. Trustee will execute all documents reasonably required by the Purchaser and issuing insurance company to accomplish a transfer of ownership of the Policies.

b)  If any of the insured individuals under any of the Policies die after the execution of this Agreement, but before the entry of the Bankruptcy Court's Order approving the sale pursuant to the terms of this Agreement, Purchaser and Trustee shall each be entitled to 50% of the associated death benefit (the "Death Benefit") of the subject policy. The subject policy will be withdrawn from the Policies to be transferred to Purchaser; there shall be no

adjustment to the Purchase Price. Within ten (10) days after receiving the Death Benefit, or within such time as may otherwise be approved by the Court in the Bankruptcy Case, Trustee agrees to pay to Purchaser an amount equal to 50% of the Death Benefit of the subject policy received by Trustee.

c)  If, after the entry of the Bankruptcy Court's Order approving the sale pursuant to the terms of this Agreement and Trustee's receipt of the balance of the Purchase Price, an insured individual under any Policy dies, Purchaser shall be entitled to receive 100% of the Death Benefit of such Policy, even if the death of such insured individual occurs prior to the effective transfer of record ownership of such Policy to Purchaser.

5. **Seller's Duties**:

a)  Seller shall make best efforts to provide Purchaser access to Debtor's life insurance files that are within the custody and control of Seller that contain documents and information concerning the Policies and the Lapsed Policies, which may include, copies of life insurance policies, life expectancy evaluations, premium illustrations, policy funding agreements, transfer of ownership forms, premium statements, grace notices, past due payment notices, correspondence, and medical records and other personally identifiable information of the insureds. Debtor's life insurance policy files shall be made available to Purchaser for review and copying during regular business hours, upon reasonable advance notice, at the offices of Trustee's counsel. NEITHER TRUSTEE NOR ITS COUNSEL MAKES ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF DEBTOR'S LIFE INSURANCE POLICY FILES OR THE ACCURACY, COMPLETENESS, ADEQUACY, OR TRUTHFULNESS OF THE DOCUMENTS, INFORMATION OR DATA CONTAINED THEREIN. LIKEWISE, NEITHER TRUSTEE NOR ITS COUNSEL MAKES ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY, COMPLETENESS, OR ADEQUACY OF ANY SUMMARIES, SPREADSHEETS OR MEMORANDA CONCERNING SUCH FILES, DOCUMENTS, INFORMATION OR DATA THAT HAVE BEEN PREPARED BY TRUSTEE OR TRUSTEE'S COUNSEL AND THAT MAY BE PROVIDED TO PURCHASER BY TRUSTEE OR TRUSTEE'S COUNSEL IN CONNECTION WITH THIS AGREEMENT OR THAT MAY OTHERWISE BE FOUND WITHIN DEBTOR'S LIFE INSURANCE POLICY FILES.

b)  Seller agrees to execute all required documents and forms and to take all steps necessary, to effect the transfer of ownership of the Policies and the Lapsed Policies to Purchaser.

c)  Seller shall perform, or cause to be performed, the Closing, which shall include obtaining a verification of coverage from the respective issuing insurance companies verifying th the Policy or Policies in question are in force, have no liens or loans against them and that the owners and beneficiaries are correctly listed as owners and beneficiaries on the records of the insurance companies that issued the Policies.

d)  Seller through Trustee's counsel shall file a Motion to Sell pursuant to 11 U.S.C Section 363 together with a Motion to Approve Bid Process, and a Motion to Expedite the consideration of the Motion to Sell and the Motion to Approve Bid Process. Trustee's counsel shall file such Motions within three (3) business days of receipt of the Purchase Price by Trustee's Counsel.

6. **Purchaser's Representations, Warranties and Acknowledgements**. Purchaser represents and warrants to Trustee that as of the date hereof that:

a) The Purchaser is a company legally organized, validly existing and in good standing under the laws of the State of its formation. The Purchaser has the full organizational right, power and authority and has taken all necessary organizational action to authorize it to enter into, execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder. No consent, approval or authorization of, or declaration, filing or registration with, any governmental authority, and no consent of any other person, including, without limitation, consents from parties to loans, contracts, leases or other agreements, is required in connection with execution, delivery and performance of this Agreement by the Purchaser.

b) This Agreement has been duly executed and delivered by the Purchaser and constitutes the legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting enforceability of creditors' rights generally and except as availability of the remedy of specific performance, injunctive relief or other equitable relief is subject to the discretion of the court before which any proceeding therefore may be brought.

c) There are no material actions, suits, claims, investigations or legal or administrative or arbitration (or other binding alternative dispute resolution) proceedings relating to this Agreement or the transactions contemplated hereby in respect of which the Purchaser has been served or, to the best of the Purchaser's knowledge, which is pending or threatened, in each case, before or by any governmental authority, and no judgment, award, order, writ, injunction, arbitration decision or decree has been entered against or served upon the Purchaser relating to this Agreement or the transactions contemplated hereby.

d) The execution and delivery of this Agreement, the consummation by the Purchaser of the transactions contemplated hereby and the performance by the Purchaser of its obligations hereunder, do not and shall not (i) violate or conflict with the terms of, or result in a breach by the Purchaser of, or constitute a default under, any material contract or agreement to which the Purchaser is a party or by which such party may otherwise be bound or affected, (ii) violate any judgment, decree or order of any governmental authority applicable to the Purchaser, (iii) violate or conflict with any applicable law, or (iv) violate or conflict with the organizational documents of the Purchaser.

e) If Purchaser chooses to resell the Policies, Lapsed Policies, or any interest therein, directly or indirectly, Purchaser shall comply with any and all state, federal and/or international laws, including all state and federal laws governing the sale of securities, applicable to such resale.

f) Purchaser is knowledgeable about the sale and purchase of life insurance policies and understands that numerous risks exist in association with the purchase of the Policies, including the following:

i. that the actual life span of the Insured may significantly exceed the Insured's estimated life expectancy;

6

    ii.   that for any given policy the premiums may increase significantly if the insured outlives the life expectancy projection

    iii.   that the life insurance company which issued the Policy on the Insured may become insolvent or become unable to pay some or all of the expected death benefit;

    iv.   that laws may change in a manner that adversely impacts the validity of viatical and life settlement contracts;

    v.   that the Insured may disappear or become untraceable;

    vi.   that an investment in the Policy is illiquid and the Policy is not readily resaleable;

    vii.   that no return will be realized until the Insured dies;

    viii.   that the Purchaser, subject to Closing, is responsible for making all premium payments, tracking all premium payments, the method and frequency of premium payments as well as any other actions required to keep the Policies in force, and that Trustee has no responsibility for any of these activities whatsoever; and

    ix.   that if the Insured(s) lives past their life expectancies it could have a material adverse impact or completely eliminate any expected return on an investment in the Policies.

g) It understands and acknowledges that any and all illustrations provided are merely projections provided by the insurance company to a future point in time, based upon current rate projections, and that Seller makes no representation as to the accuracy of such projections.

h) It understands and acknowledges that any and all premium payment schedules (PPS) are based upon illustrations that are merely projections provided by the insurance company to a future point in time, based upon current rate projections, and that Purchaser must rely upon the insurance company to provide accurate projections. Purchaser acknowledges that this may or may not be enough to carry the policy to that point.

i) It understands and acknowledges that Purchaser shall rely upon the respective insurance companies to provide accurate verification of coverage information.

j) Purchaser represents that there are no actions, suits or proceedings (whether administrative, regulatory, civil or criminal) pending, or to their knowledge threatened, against or affecting the Purchaser that could impact the Purchaser's ability to undertake the transactions set forth in this Agreement.  Purchaser also represents that there are no actions, suits or proceedings (whether administrative, regulatory, civil or criminal) pending, or to their knowledge threatened, against or affecting the Purchaser or its officers, directors, employees, agents or affiliates related to allegations of improper fundraising or money laundering.

k) Purchaser represents and warrants that any funds borrowed, raised or otherwise obtained by the Purchaser in order to fund the transaction contemplated by this Agreement were

7

borrowed, raised or otherwise obtained in a legal manner, consistent with all applicable local, state, federal and/or international laws.

l) No Person Affiliated with the Purchaser or that makes funds available to the Purchaser or any affiliate of the Purchaser in order to allow the Purchaser to fulfill its obligations under this Agreement or for the purpose of funding the investment in the Purchaser is: (A) a Person listed in the Annex to Executive Order No. 13224 (2001) issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), (B) named on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Assets Control, (C) a non-U.S. shell bank or is providing banking services indirectly to a non-U.S. shell bank, (D) a senior non-U.S. political figure or an immediate family member or close associate of such figure, or (E) otherwise prohibited from investing in the Purchaser pursuant to applicable U.S. anti-money laundering, anti-terrorist and asset control Laws, regulations, rules or orders.

m) **PURCHASER IS NOT RELYING UPON AND HEREBY DISCLAIMS RELIANCE ON ANY REPRESENTATION, WARRANTY, OPINION, STATEMENT OF FACT OR PREDICTION MADE BY TRUSTEE, OR TRUSTEE'S COUNSEL IN MAKING THE DECISION TO ENTER INTO THIS AGREEMENT. PURCHASER IS ACQUIRING ONLY THE RIGHTS AND TITLE TO THE POLICIES THAT TRUSTEE MAY HAVE AND ACKNOWLEDGES THAT PURCHASER IS TAKING OWNERSHIP WITHOUT REPRESENTATION OR WARRANTY, AND WITHOUT RECOURSE TO TRUSTEE OR THE ESTATE OF POLICY SERVICES, INC.**

n) Purchaser acknowledges that Trustee and Trustee's counsel is working from incomplete information concerning the status of the Policies and Lapsed Policies and cannot verify the accuracy or completeness of any of data or information provided to Purchaser.

o) Other than an entity owned by the principal of the Purchaser having provided services to some of the deeproot entities prior to petition date, Purchaser and none of its owners, principals, agents, investors, lenders or any other persons who may benefit in some fashion from this Agreement or its consummation, has any connection to the Debtor or its principal, Mr. Robert Mueller. Purchaser has no intention or agreement, written, oral or otherwise to share in the profits, losses or in any other manner with the Debtor, its principals or an insider (including a non-statutory insider) as defined at 11 U.S.C. Section 101.

7. **Provisions to be Included in Order Authorizing Trustee Sale**. The entry of an Order authorizing the sale of the Policies and Lapsed Policies to the Purchaser pursuant to the terms of the Agreement in the jointly administered cases under title 11 of the United States Code styled "In re Deeproot Capital Management, LLC, et al., jointly administered at Case No. 21-51523, United States Bankruptcy Court, Western District of Texas, San Antonio Division, which Order shall be effective and with respect to which no stay has been entered (or if a stay has been entered, such stay shall have been dissolved), shall contain the following provisions:

a) authorizing and directing that the sale of the Policies and Lapsed Policies to the Purchaser is free and clear of any interest (including without limitation any liens or claims of purported owners of fractional interests, or of any debtors in the Bankruptcy Case) in such Policies or Lapsed Policies pursuant to 11 U.S.C. §363(f);

8

b)      an affirmative finding that the Policies (and Lapsed Policies) are not executory contracts of the kind which are subject to deemed rejection as described in 11 U.S.C. §365(d)(1);

c)      an affirmative finding that the Policies (and Lapsed Policies) are transferable and are transferred and that Purchaser has purchased the property "in good faith" for the purposes of 11 U.S.C. §363(m); and

d)      a provision that the Order is effective upon entry on the docket in the case pursuant to Bankruptcy Rule 6004.

8.  **Indemnification and hold harmless by Purchaser**.  Purchaser hereby indemnifies Seller and agents and lawyers, and any assignees, designees or successors of same (the "Seller Indemnified Parties") against, and agree to hold the Seller Indemnified Parties harmless from, any and all damages, losses, liabilities and expenses (including, without limitation, reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any action, suit or proceeding), incurred or suffered by the Seller Indemnified Parties arising out of, resulting from, or related to: (i) any misrepresentation or breach of any representation or warranty made by Purchaser pursuant to this Agreement; (ii) any breach of a covenant or agreement made or to be performed by Purchaser  pursuant to this Agreement, and (iii) any breach or violation of any applicable law by Purchaser in connection with this Agreement. Purchaser hereby holds harmless Seller and agents and lawyers, and assignees, designees, or successors of the same from, any and all damages, losses, liabilities and expenses incurred or suffered by Purchaser arising out of, resulting from, or related to: (i) any inaccuracy of any verification of coverage documentation provided by any insurance carrier at the time of closing; and (ii) the inaccuracy of any information provided by the insurance company in the verification of coverage at Closing.

9.  **Insured Tracking**.  Purchaser shall be responsible for tracking the insureds under the Policies.

10.  **Liquidated Damages for a Breach by Purchaser.** In the event Purchaser fails to close on this transaction as a result of Purchaser's breach of this Agreement, Seller's sole remedy shall be to keep and retain 25% of the Deposit on Purchase Price as liquidated damages.  The Parties agree that the calculation of damages for a breach by Purchaser would be difficult to ascertain and that this remedy is a reasonable estimate of the damages which the Trustee may sustain due to breach.

11.  **Binding Effect.** Once approved by the Bankruptcy Court for the Western District of Texas, this Agreement is irrevocably binding upon and shall inure to the benefit of and shall be enforceable by the parties hereto and their respective successors, assigns, executors, administrators and heirs.

12.  **Severability.** If any provision of this agreement shall be held invalid in a court of law, the remaining provisions shall be construed as if the invalid provision were not included in this Agreement.

13.  **Notices.** Any and all notices, requests, consents, notifications, and other communications given to any Party to this Agreement shall be given in writing and will be as elected by the party giving said notice, hand-delivered by messenger or courier service, telecopied, electronically communicated, or sent via registered or certified mail, return receipt requested, postage prepaid, to the address of

each party at the addresses below  and deemed given when received by Party being served such notice.

| Seller: | With a copy to counsel: |
|---|---|
| Jon Patrick Lowe | Randall A. Pulman |
| Chapter 7 Trustee for Estate of Policy Services, Inc. | Pulman, Cappuccio & Pullen, LLP |
| | 2161 N. W. Military Highway, Suite 400 |
| Uvalde, Texas | San Antonio, Texas 78213 |
| Telephone: | Telephone: 210-892-0420 |
| E-mail:_____ | e-mail: rpulman@pulmanlaw.com |
| Purchaser | With a copy to counsel: |
| | |
| | |
| | |
| | |
| | |
| | |

14. **Waiver.** Either Party's failure to insist in any one or more instances upon strict performance by the other Party of any of the terms of this Agreement shall not be construed as a waiver of any continuing or subsequent failure to perform or delay in performance of any term hereof.

15. **Contract Assignable.**  Purchaser may assign this Agreement and its obligations hereunder to an entity which is wholly owned by Purchaser provided such assignment is made expressly in writing and delivered to Seller.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their successors and assigns.

16. **Choice of law.** The Parties hereby agree and confirm that the laws of Texas and Title 11 of the United States Code shall control this Agreement.

17. **Counterparts and Facsimile.** This Agreement may be signed in one or more counterparts, each of which is deemed an original, but all of which together constitute one and the same instrument. A facsimile copy of this executed Agreement shall be deemed valid as if it were the original.

18. **Headings.** The headings and subheadings contained in this Agreement are for convenience of reference only and are not to be considered part of this Agreement and will not limit or otherwise affect in any way meaning or interpretation of this Agreement.

19. **Time.** Time is of the essence in this Agreement.

20. **<u>Representation by Counsel.</u>** The Parties acknowledge that they have been or have had the opportunity to have been represented by their own counsel throughout the negotiations and at the signing of this Agreement and all other documents signed incidental to this Agreement and, therefore, neither Party shall claim or assert that any provision of this Agreement or any ancillary documents should be constructed against their drafter.

In WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day, month and year first above written.


**SELLER:**

**By:** _____
    **Jon Patrick Lowe, Chapter 7 Trustee**
    **For the Estate of Policy Services, Inc.**
**Date:**_____


**PURCHASER:**

**By:**_____
**Name:**_____
**Its:**_____
**Date:**_____

# EXHIBIT A

## POLICIES

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy |
|---|---|---|---|---|---|
| **Protective Life Insurance Company (West Coast Life)** | ANDE75 | REDACTED | Inforce | REDACTED 575 | $2,000,000.00 |
| **Brighthouse Life Insurance Company** | JKN22A | REDACTED | Inforce | REDACTED 319 REDACTED | $2,500,000.00 |
| **John Hancock Life Insurance Company** | FEE287 | REDACTED | Inforce | REDACTED 287 | $500,000.00 |
| **John Hancock Life Insurance Company** | FEE548 | REDACTED | Inforce | REDACTED 548 | $500,000.00 |
| **Occidental Life Insurance Company NC** | MAR790 | REDACTED | Inforce | REDACTED 790 | $100,000.00 |
| **Transamerica Life Insurance Company** | JMD135 | REDACTED | Inforce | REDACTED 135 | $500,000.00 |
| **Brighthouse Life Insurance Company** | KFFN57 | REDACTED | Inforce | REDACTED 157 REDACTED | $500,000.00 |
| **Protective Life Insurance Company** | RID363 | REDACTED | Inforce | REDACTED 371 | $500,000.00 |

**EXHIBIT B**

**LAPSED POLICIES**

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy |
|---|---|---|---|---|---|
| Midland National Life | GRR553 | REDACTED | Lapsed | REDACTED 553 | $242,520.00 |
| ING Reliastar Life (VOYA) | PER437 | REDACTED | Lapsed | REDACTED 378 | $1,000,000.00 |
| SunLife Financial | SUL428 | REDACTED | Lapsed | REDACTED 428 | $300,000.00 |
| SunLife Financial | SUL429 | REDACTED | Lapsed | REDACTED 429 | $300,000.00 |
| US Life City NY | UD33NL | REDACTED | Lapsed | REDACTED 0NL | $750,000.00 |
| Protective Life Insurance Company | LW7116 | REDACTED | Lapsed | REDACTED 116 | $1,100,000.00 |
| American General Life | JDE21L | REDACTED | Lapsed | REDACTED 21L | $633,342.81 |
| Transamerica Life | SIE687 | REDACTED | Lapsed | REDACTED 687 | $1,500,000.00 |
| AXA Equitable Life | FERN07 | REDACTED | Lapsed | REDACTED 607 | $10,000,000.00 |
| Mass Mutual | HCS883 | REDACTED | Lapsed | REDACTED 883 | $1,540,000.00 |
| Principal | ANDR62 | REDACTED | Lapsed | REDACTED 262 | $1,000,000.00 |
| Transamerica Life | BASH82 | REDACTED | Lapsed | | $9,000,000.00 |

## **EXHIBIT C-1**

## **POLICY ACQUISITION APPLICATION**

# Policy Acquisition Application
# & Life Settlement Disclosures

**Life-Gift, Inc.**
1005 Country Club Avenue
Cheyenne, WY 82001
(877) 264-7077 voice

## SECTION A: OWNERSHIP TYPE

- ❑ NQ - INDIVIDUAL ( 1 Only )
- ❑ NQ - JOINT TENANT WITH RIGHT OF SURVIVORSHIP ( 1 & 2 )
- ❑ NQ - JOINT TENANTS IN COMMON ( 1 & 2 )
- ❑ NQ - TRUST / ENTITY ( 1 & 3 – 2 is optional )
- ■ QUALFIED - IRA / ROTH / SEP ( 1 & 4 )

Licensee Number: _____ REDACTED ?
REDACTED

Account Number: _____
Internal Use Only

## 1  Individual • Trustee • Officer

| | | | | | |
|---|---|---|---|---|---|
| First | REDACTED | MI | REDACTED | Physical | REDACTED |
| Last | REDACTED | Suffix | ED | | |
| Sex | M | Marital | M | Mailing | Same as Physical |
| DOB | REDACTED | SSN | REDACTED | | |
| Drivers License (State/#) | Tx. / REDACTED | | | Home Phone | ( ) - |
| Nationality | Us | | | Mobile Phone | ( REDACTED ) — |
| | | | | Email Address | REDACTED @yahoo.com |

■ Individual  ❑ Husband  ❑ Trustee  ❑ Officer  ❑ Custodian

## 2  Joint • Trustee • Officer

| | | | | |
|---|---|---|---|---|
| First | | MI | Physical | |
| Last | | Suffix | | |
| Sex | | Marital | Mailing | |
| DOB | | SSN | | |
| Drivers License (State/#) | | | Home Phone | REDACTED |
| Nationality | | | Mobile Phone | |
| | | | Email Address | |

❑ Joint Individual  ❑ Wife  ❑ Trustee  ❑ Officer  ❑ Minor

## 3  Trust • Entity

❑ Revocable Trust  ❑ Irrevocable Trust  ❑ Corporation  ❑ LLC  ❑ LLP  ❑ Gen

| | | | |
|---|---|---|---|
| Entity Name | | Address | |
| Trust/ Entity Creation Date | | | |
| Situs State _____ EIN _____ - _____ | | Office | ( _____ ) _____ - _____ |
| | | Fax | ( _____ ) _____ - _____ |

## 4  Traditional IRA • ROTH • SEP • Qualified Plan

Custodian for qualified accounts:
REDACTED

**Mailing**
REDACTED

**Physical**
REDACTED

Select Type:  ■ Traditional IRA  ❑ ROTH  ❑ SEP

- ❑ Traditional IRA or ROTH Contribution ( Year: _____ )
- ❑ SEP Contribution ( current year only )
- ❑ Rollover ( 60 Day IRA Rollover from Traditional/ROTH/SEP ) *
- ❑ Direct Transfer/Rollover ( from Traditional/ROTH/SEP ) *
- ❑ ROTH Conversion *
- ❑ Recharacterized Contribution or Transfer *
- ❑ Inherited (Stretch) IRA *
- ☒ 403 Rollover                              * Irrevocable Election

**Select One if Over 70-½ this Year**
- ❑ I have already taken my RMD this year.
- ❑ I will take my RMD from another qualified account I own.
- ❑ The funds are from an IRA Owner who died this year.

**Important guidelines:**
- Checks/transfers must be made payable to 'Horizon Trust FBO *Your_Name* IRA'
- A 5305 SEP Plan Agreement form is required for SEP accounts
- All *qualified account* set-up & annual fees are paid by **Policy Services, Inc.** provided you maintain a Reserve Fixed Account ('RFA') balance of $2,000; otherwise you personally will be charged by Horizon Trust (currently: $300 per year). Please make your election in Section B below.

© 2013-2014 Life-Gift, Inc.

# Policy Acquisition Application
# & Life Settlement Disclosures

## SECTION B: FEES, RENEWABLE PERIOD & PRINCIPAL AMOUNTS  *See Funding Procedures Addendum Page*

**NON-QUALIFIED ACCOUNTS**

TOTAL AMOUNT  $ _____

**FUNDS AVAILABLE**
❑ Now  ❑ On: _____

**QUALIFIED ACCOUNTS**

CONTRIBUTION AMOUNT  $ _____ REDACTED
ROLLOVER AMOUNT  $ __REDACTED__)0
DIRECT TRANSFER AMOUNT  $ _____
*Include RFA Amounts*

**FUNDS AVAILABLE**
■ Now  ❑ On: _____

**QUALIFIED FEE CHOICE**
*You must select one*
■ RFA Election (See PSA)
❑ Bill Me (Check enclosed)
❑ Bill Me (Credit Card)

## SECTION C: ACCREDITED INVESTOR CERTIFICATION  *Must be initialed by all Investors*

Under the Securities Act of 1933 a company that offers or sells securities must register a private placement with the SEC and State securities agencies or find an exemption from the registration requirement. The Act provides companies with a number of exemptions. For some of the exemptions, such as rule 506 of Regulation D, a company may offer a private placement to an unlimited number of "accredited investors", and no more than thirty-five non accredited investors, per offering. Each Investor must **initial** which category such Investor is affirming to under Rule 501(a) of Regulation D:

REDACTED
_____ My net worth (either individually or with my spouse, if any) including investments in all property or other assets excluding my primary residence, is in excess of $1 million.

_____ My individual annual income was in excess of $200,000 in each of the two most recent years and I expect such income in the current year.

_____ My income jointly with my spouse is in excess of $300,000 in each of the two most recent years and I expect such income in the current year.

_____ The Investor is a legal entity and all of the entity's equity owners meet at least one of the three tests listed above.

_____ I hereby affirmatively represent that I am an accredited investor as defined in SEC Rule 501 under Regulation D for one or more of the foregoing reasons which I decline specifically due to issues of financial privacy.

_____ I hereby affirmatively represent that I am not an accredited investor as defined in SEC Rule 501 under Regulation D, but am sophisticated and well-informed about investments to be able to protect my own interests, and affirmatively waive any additional disclosure requirements that may be granted me by the Code by not being an accredited investor.

## SECTION D: SUITABILITY REVIEW  *Must be completed by the Primary Investor*

**Education:**  ❑ H.S. Diploma or G.E.D.  ❑ Associates Degree  ■ Bachelors Degree  ❑ Masters Degree  ❑ JD, MD, PhD

**Prior Investment Experience:**  ■ Bank Account  ❑ CD  ■ Stocks  ❑ Bonds  ❑ Mutual Funds  ■ Hedge Funds
❑ REIT  ■ Real Estate  ❑ Annuities  ❑ Commodities  ❑ Options  ❑ Life Insurance

**Employment:**  ❑ Employed  ❑ Self-Employed  ■ Retired  ❑ Unemployed

**Decision Making:**  ❑ I rely on an investment advisor or professional for all my investment decisions.
■ I consult with an investment advisor or professional, but make my own investment decisions.
❑ I rely on my own investment knowledge and skill-set to make my own investment decisions.

**Liquidity Needs:**  ❑ I will need access to all of this money during the initial term.
❑ I might need access to some of this money during the initial term.
■ I do not need access to any of this money during the initial term.

Do you anticipate any significant changes to your **income** over the initial term? ■ No Change  ❑ Will Increase  ❑ Will Decrease

Do you anticipate any significant changes to your **expenses** over the initial term? ■ No Change  ❑ Will Increase  ❑ Will Decrease

Current Annual Income:  ❑ < $25,000  ■ $25,000 - $75,000  ❑ $75,000 - $150,000  ❑ > $150,000

Percentage of Investment to Total Assets:  ❑ 0-25%  ■ 25-50%  ❑ 50-75%  ❑ > 75%

REDACTED
Do you understand that if you die, your heirs are subject to the same withdrawal rights as if you were alive? _____ 'ES
*initial*

# Policy Acquisition Application
# & Life Settlement Disclosures

**SECTION E: BENEFICIARY ELECTIONS**

I designate that upon my death, the assets in this account be paid to the beneficiaries named below. The interest of any beneficiary that predeceases me terminates completely, and the percentage share of any remaining beneficiaries will be increased on a pro rata basis. If no beneficiaries are named, my estate will be my beneficiary.  **You may not designate beneficiaries if your ownership is Trust or Entity.**

## PRIMARY BENEFICIARIES *(The total percentage designated must equal 100%.)*

Name REDACTED

Address REDACTED

City/State/ZIP REDACTED

Date of Birth REDACTED    Relationship __Wife__

Tax ID *(SSN/TIN)* REDACTED    Percent Designated __100__

Name _____

Address _____

City/State/ZIP _____

Date of Birth _____ Relationship _____

Tax ID *(SSN/TIN)* _____

Name _____

Address _____

City/State/ZIP _____

Date of Birth _____ Relationship _____

Tax ID *(SSN/TIN)* _____ Percent Designated _____

Name _____

Address _____

City/State/ZIP _____

Date of Birth _____ Relationship _____

Tax ID *(SSN/TIN)* _____ Percent Designated _____

## CONTINGENT BENEFICIARIES *(The total percentage designated must equal 100%.)  (The balance in the account will be payable to these beneficiaries if all primary beneficiaries have predeceased the last investor to die.)*

Name REDACTED

Address REDACTED

City/State/ZIP REDACTED

Date of Birth REDACTED    Relationship __Son__

Tax ID *(SSN/TIN)* REDACTED    Percent Designated __50__

Name REDACTED

Address REDACTED

City/State/ZIP REDACTED

Date of Birth REDACTED    Relationship __Son__

Tax ID *(SSN/TIN)*    Percent Designated __50__

Name _____

Address _____

City/State/ZIP _____

Date of Birth _____ Relationship _____

Tax ID *(SSN/TIN)* _____ Percent Designated _____

Name _____

Address _____

City/State/ZIP _____

Date of Birth _____ Relationship _____

Tax ID *(SSN/TIN)* _____ Percent Designated _____

❑  *Check here if additional beneficiaries are listed on an attached addendum.* Total number of addendums attached to this Application _____

## MARITAL CONSENT STATUS
## (REQUIRED FOR ALL ACCOUNTS WHERE SPOUSE IS NOT A JOINT ACCOUNT HOLDER OR 100% PRIMARY BENEFICIARY)

❑ **I Am Not Married –** I understand that if I become married in the future, I should review the requirements for spousal consent.
❑ **I Am Married –** I understand that if I choose to designate a primary beneficiary other than or in addition to my spouse, my spouse should sign below.  *N/A*

I am the spouse of the above-named NQ or IRA owner. I acknowledge that I have received a fair and reasonable disclosure of my spouse's property and financial obligations. Because of the important tax consequences of giving up my interest in this NQ/IRA, I have been advised to see a tax professional.

I hereby give the NQ/IRA owner my interest in the assets or property deposited in this account and consent to the beneficiary designation indicated above. I assume full responsibility for any adverse consequences that may result.

X_____    _____
Signature of Spouse    Date *(mm/dd/yyyy)*

X_____    _____
Signature of Witness    Date *(mm/dd/yyyy)*

# Policy Acquisition Application
# & Life Settlement Disclosures

## SECTION F: CUSTODIAL AGREEMENTS & INVESTMENT DIRECTION            (IRA / ROTH / QUALIFIED ACCOUNTS ONLY)

If you are opening a qualified account (*i.e.* Traditional IRA, Roth, SEP, Rollover, etc.), you must initial that you have received the following three documents, that you have read and been provided the opportunity to ask and receive questions concerning them, and that you are voluntarily proceeding with this Application and Subscription Agreement under the terms and provisions therein. If you are initiating a direct transfer, then you also need to fill out and submit the IRA TO IRA TRANSFER form.  If you are converting a non-ROTH IRA to a ROTH IRA, you need to fill out and submit the ROTH CONVERSION form.

REDACTED
*Initial* -        INDIVIDUAL RETIREMENT CUSTODIAL ACCOUNT AGREEMENT & IRA FINANCIAL DISCLOSURE WORKSHEET
REDACTED             (Form 5305-A / Form 5305-SEP / Form 5305-RA)

*Initial*
REDACTED       —       HORIZON TRUST – SELF DIRECTED ACCOUNT AGREEMENT

*Initial*
REDACTED             LIMITED ACCOUNT ACCESS FORM (Original must be returned to us)

*Initial*

I understand that my IRA account is being designated as a self-directed account, and I alone am responsible for the selection, due diligence, management, review and retention of all investments in my account. I agree that Horizon Trust Company as Custodian is not a "fiduciary" for my account, as the term is defined in the Internal Revenue Code, ERISA or any other applicable federal, state or local laws. Therefore, I hereby direct the Custodian, in a passive capacity, to enact this transaction for my account, in accordance with my agreement. I have read and received all pertinent information relating to one or more Life Settlement Policy(ies) and direct Custodian to immediately transfer the indicate sums (or rollovers or transfers upon receipt) to Policy Services, Inc. for placement.

Please choose a 4 digit PIN Code

REDACTED                                                      REDACTED

2/17/2015
Date

## SECTION G: INVESTMENT DIRECTION FOR NQ ACCOUNTS        (INDIVIDUAL, JTWROS, JT COMMON, TRUST, ENTITY ONLY)

For your protection and to ensure maximum compliance with federal and state laws, Policy Services, Inc. requires all non-qualified accounts to be payable through an Escrow account at Horizon Trust Company.  This relationship ensures that Policy Services, Inc. as administrator of your life settlement policy interests has additional oversight over your funds in compliance with industry standards. By signing, you agree that Horizon Trust Company as the escrow agent is not a "fiduciary" for my account, as the term is defined by in the Internal Revenue Code or any other applicable federal, state or local laws. Therefore, you hereby direct that Horizon Trust Company, in a passive capacity, to enact this transaction for your account, in accordance with this agreement. You have read and received all pertinent information relating to one or more Life Settlement Policy(ies) and direct Horizon Trust Company to immediately transfer the indicate sums to Policy Services, Inc. for placement. You must submit a LIMITED ACCOUNT ACCESS FORM to us, providing us the ability to discuss your account with Horizon Trust.

Please choose a 4 digit PIN Code

_____          _____
Investor Signature                    Date

_____          _____
Investor Signature                    Date

## SECTION H: PURCHASE AGREEMENT, TERMS & DISCLOSURES

This Policy Acquisition Application is made effective on the day so executed, between the foregoing parties (in Section A herein) referred to singularly as "Purchaser" and Life-Gift, Inc. 1005 Country Club Avenue, Cheyenne, WY 82001, hereafter referred to as the "Agent".  All of the above are hereinafter referred to as the "Parties".

### ARTICLE I
### RECITALS

WHEREAS, Agent is involved in the business of identifying, and facilitating the purchase of life insurance policies at a discount to face value, and all related Death Benefit rights, being held on the lives of individuals with actuarially and/or medically estimated life expectancies, such transactions known as a "Life Settlement"; and

WHEREAS, the Purchaser desires to purchase Death Benefit rights in a Life Settlement transaction and affirmatively agrees to hold such policy interest by and under Policy Services, Inc. ('Administrator'); and

WHEREAS, The Parties shall execute a Policy Services Agreement setting forth their rights, responsibilities, and obligations in such Life Settlements; and

WHEREAS, the relationship between Purchaser and Agent herein is that of

Purchaser and Agent.  No transaction entered into hereunder shall be interpreted as the purchase of life insurance on Purchaser.

### ARTICLE II
### DEFINITIONS

CHANGE OF BENEFICIARY: A transaction whereby the Policy Owner after having a Release of Death Benefit rights from current beneficiaries, names another party as beneficiary to receive Death Benefit rights at Policy Maturity.

CHANGE OF OWNERSHIP:  A transaction whereby a Policy Owner surrenders all ownership rights and privileges to another party.

DEATH BENEFITS: Amount paid to the Purchaser upon the death of the Insured.

ELIGIBLE INSURANCE POLICY: An insurance policy which has passed the contestability period defined by the life insurance company.

ELIGIBLE INSURED PERSON: An insured person with an estimated life expectancy who meets the medical & other criteria specified by the Agent.

ESTIMATED LIFE EXPECTANCY: The insured's expected (in the statistical sense) number of years of life remaining at any given age.

LIFE SETTLEMENT: A life settlement is a financial transaction in which the owner of a life insurance policy sells an unneeded policy to a third party for more than its cash value and less than its face value. A life settlement is an alternative to

# Policy Acquisition Application
# & Life Settlement Disclosures

this surrender or lapse of a policy, or when the owner of a life insurance policy no longer needs or wants the policy, the policy is underperforming or can no longer afford to pay the premiums.

MATURITY DATE OR POLICY MATURITY: The date Death Benefit rights of the life insurance policy become due and payable under the terms of the policy.

NON QUALIFIED PURCHASE: Transactions of such a nature that are not considered to fall within an IRS Tax Qualified Plan.

POLICY: A life insurance policy issued by an Insurance Carrier that provides for the payment of a sum of money

QUALIFIED PURCHASE: Transactions of such a nature that they are considered to fall within an IRS Tax Qualified Plan.

## ARTICLE III
### RESPONSIBILITIES OF AGENT

The responsibilities of Agent shall be:

1. To establish that:
   a. The Eligible Insured Person(s) has been determined to have an actuarially and/or medically estimated Life Expectancy, which shall be determined by an independent qualified life expectancy provider;
   b. At closing, the Policy will be free and clear from any loans, liens or encumbrances; and
   c. the life insurance policy is not within a contestability period.
2. To set aside a portion of the transaction representing future premium due to be held by the Administrator, who shall pay such premium into the policy cash accounts at the insurer, and is a nonrefundable cost of the transaction.
3. To secure the services of a reputable and competent servicing company who will:
   a. Monitor and file all administrative forms as needed;
   b. File the maturity claim on behalf of the Purchaser;
   c. Track and monitor the insured's time of demise; and
   d. Provide Purchaser with documentation reflecting the purchase of the Death Benefit rights.

## ARTICLE IV
### PURCHASER ACKNOWLEDGEMENTS AND WARRANTIES

1. All data and information provided by the Purchaser in making this agreement is true and correct, expressly including all assertions in Sections C & D.
2. Purchaser specifically and immediately grants Agent and Administrator special powers of attorney to enter into all documents necessary to facilitate the purchase of Purchaser-approved life settlement policies, including but not limited to any of the powers to transact necessary business with any respective insurance companies to protect, enforce, maintain or secure Purchaser's rights. These granted powers shall lapse upon the Maturity of all policies.
3. The Death Benefit rights purchased hereunder are being acquired by Purchaser for the sole benefit of the Purchaser and paid for the benefit of the Purchaser or the Purchaser's designated trust and not for resale, assignment or distribution to others.
4. Purchaser acknowledges that the purchase of Death Benefit rights pursuant to this agreement represents an illiquid transaction and that no funds or proceeds will be available until Policy Maturity without penalty.
5. Purchaser is sophisticated in financial matters, having sought either professional advice or having access to professional advice or possesses or has access to such knowledge, education and/or experience in matters relating to finance, tax, or business, so that Purchaser is able to evaluate the consideration involved in making this purchase and to make a diligent, comfortable and informed decision with respect thereto.
6. The Purchaser recognizes that medical research is ongoing, and advances in research and treatment may alter and extend a Client's estimated Life Expectancy or Estimated Demise Date. Estimated Demise Dates are based only actuarial and medical knowledge. Purchaser understands that the Estimated Demise Date is based solely upon an independent medical review and opinion and the Agent provides no guarantee as to the Maturity Date of the Policy or the Payment date of the Death Benefit rights under such policy.
7. Purchaser confirms that Purchaser is an "accredited investor" as defined under Rule 501(a) of Regulation D, if purchaser resides in a jurisdiction where purchasing a fractionalized life settlement would require such to be an accredited investor; and such Purchaser hereinafter waives any claims against Agent or Administrator for failing to disclose this requirement.
8. Purchaser acknowledges that any advisor assisting Purchaser to enter into, or complete this transaction, is not an employee of Agent and where any conflicts

may arise between the representations of such advisor and this Agreement or any other written agreements with Agent or its assigns, such conflicts shall be resolved in favor of this Agreement or other written agreements.

## ARTICLE V
### INDEMNIES

PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS READ THIS AGREEMENT AND CLEARLY UNDERSTANDS THE MEANING, AND LEGAL CONSEQUENCES OF THE REPRESENTATIONS AND WARRANTIES MADE HEREIN AND THAT THE PURCHASER HAS HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL BEFORE SIGNING THIS AGREEMENT AND THEREFORE DOES HEREBY, FOR HIM[HER]SELF, HIS[HER] HEIRS, ASSIGNS AND REPRESENTATIVES, INDEMNIFY AND HOLD HARMLESS AGENT AND AGENTS PRINCIPALS, AGENTS REPRESENTATIVES, CONSULTANTS, HORIZON TRUST COMPANY, ADMINISTRATOR, AND OTHERS ASSOCIATED WITH OR WORKING IN COOPERATION WITH AGENT PURSUANT TO THE AUTHORIZATION CONTAINED HEREIN FROM ANY AND ALL DAMAGE AND/OR LIABILITY DUE TO OR ARISING FROM ANY ACTIVITY OR ACTION OUTSIDE THE CONTROL OF THE AGENT INCLUDING BUT NOT LIMITED TO THE FAILURE OF THE INSURED TO DIE WITHIN THE ESTIMATED LIFE EXPECTANCY.

## ARTICLE VI
### ADVISOR OR REPRESENTATIVE DISCLOSURE

Unless the following professional designation is made, I (we) assert that I (we) have not received outside professional advice in evaluating the Company and the proposed activities thereof and have waived such right by evaluating the risks and merits of this prospective investment myself (ourselves). However, if the following professional designation is made and I (we) may have received professional advice, I (we) have nonetheless evaluated the risks and merits of this prospective investment myself (ourselves). Furthermore I (we) have received a written statement from my (our) purchaser representative in which is disclosed (1) his/her relationship, if any, with the Company and/or to the individual presenting this program, which has existed at any time during the previous two years and compensation received or to be received as a result of such relationship, and (2) his/her education, experience and knowledge in financial and business matters which enables him/her to evaluate the relative merits and risks of an investment in the Company. It is my (our) responsibility to ask for and receive such written statement.

| | |
|---|---|
| Professional: | REDACTED _____ |
| Entity (if any): | REDACTED _____ |
| Address: | _____ |
| | _____ |
| Occupation: | REDACTED |
| Licenses (if any): | _____ |

## ARTICLE VII
### FRACTIONALIZED POLICY DISCLOSURE

Oftentimes a singular life settlement policy cannot be fully purchased by one Purchaser. In such case, the policy may be fractionalized. That is, the policy will have two or more distinct Purchasers who will each own a pro rata share of such policy's Death Benefits rights, and also be responsible for each's pro rata share of any costs (if any) or future premium requirements (if any). Such pro rata share shall be calculated as to the percentage ownership of each Purchaser's purchase amount, as compared to the total acquisition cost.

As Purchaser desires to purchase Death Benefit rights in a Life Settlement that may be fractionalized, Purchaser voluntarily enters into this pooled transaction as an accredited investor and acknowledges that such fractionalization is in the best interest of Purchaser. Purchaser further agrees to own Purchaser's pro rata share with other third party purchasers as provided herein as a private transaction in non-securitized form. Purchaser agrees that Purchaser will not own any more or less than Purchaser's pro rata share of the life settlement policy, and therefore: will not receive any more or less than Purchaser's pro rata share of the death benefit, nor be required to pay any more or less than Purchaser's pro rata share of any future premiums (if any).

If one or more laws, regulations, judicial decisions, or jurisdictions determine that your ownership interest is indeed a security after the purchase thereof,

# Policy Acquisition Application & Life Settlement Disclosures

then you acknowledge you entered into this transaction with full disclosure of that possibility and hereby waive all claims and indemnify us, our successors and assigns of any intentional, negligent, fraudulent, etc. misrepresentation or other communication or improper solicitation to the contrary.

To preserve the confidentiality of all Purchasers in a fractionalized interest, Purchaser affirmatively agrees to refrain from contacting or communicating any other Purchaser for any reason. All communication must be made through the offices of Agent and/or Administrator.

### ARTICLE VIII
### ACCEPTANCE OF RISK AND OTHER DISCLOSURES

Please acknowledge your understanding of the following by initialing the indicated blanks. All Purchasers must initial.

REDACTED

_____ Life-Gift, Inc. agrees to use best efforts to assist in the completion of the transfer of ownership of said policies.

REDACTED

_____ Purchaser understands and agrees that a life settlement policy is a "buy and hold" proposition and is a transaction that carries some risk and fees.

REDACTED

_____ Purchaser hereby represents that such Purchaser was at the time of purchase of the referenced policies of sound mind, capable of making informed decisions and under no constraint or undue influence by any of the parties.

REDACTED

_____ Purchaser individually and collectively hereby represents that none of the parties under this agreement were under any legal obligation

to buy or assist in buying said policies and that no civil, criminal or administrative complaint or will be filed or alleged by Purchaser against any party released by this agreement.

REDACTED

_____ Purchaser understands that any gain realized from this purchase is based from the proceeds paid from the referenced policy and that there is no "guaranteed annualized return".

REDACTED

_____ Purchaser understands that a purchase of a life settlement is based on an estimated life expectancy and that it is an actuarial science, but not an exact science. Purchaser further understands that the estimated life expectancy is not an exact date and time and that no one has the ability to determine someone's will to live or not live based upon their on physical, medical and psychological circumstances.

REDACTED

_____ Life-Gift, Inc. and its licensees have relied on your affirmative representations of qualifying as an accredited investor, and further We understand that you intend this purchase to be held for an indeterminate amount of time and understand that you may experience a loss of your investment if you wish to terminate your purchase before the maturity of your policy(ies).

REDACTED

_____ Purchaser hereby confirms that the undersigned witness or advisor is not an agent, employee or representative of Life-Gift, Inc or Policy Services, Inc.; and that any representations, advice, opinions or recommendations made by such witness or advisor are his/her alone and not the representations, advice, opinions or recommendations of Life-Gift, Inc. or Policy Services, Inc.

## SECTION I: ACKNOWLEDGMENTS & EXECUTION

**IF YOU ARE OPENING AN IRA OR QUALIFIED PLAN:** I understand the eligibility requirements for the type of IRA deposit I am making, and I state that I do qualify to make the deposit. I have received a copy of the IRA Application, the 5305-A Custodial Account Agreement, the Financial Disclosure, and the Disclosure Statement. I understand that the terms and conditions that apply to this IRA are contained in this Application and the Custodial Account Agreement. I agree to be bound by those terms and conditions. Within seven days from the date I open this IRA I may revoke it without penalty by mailing or delivering a written notice to the Custodian. I assume complete responsibility for: (i) determining that I am eligible for an IRA each year I make a contribution; (ii) ensuring that all contributions I make are within the limits set forth by the tax laws; and (iii) the tax consequences of any contributions (including rollover contributions) and distributions.

**IN WITNESS WHEREOF,** the Investor(s) [a.k.a. Purchaser(s)] hereto have understood, agreed and executed this Policy Acquisition Application on the day, month and year so signed.

REDACTED

| | |
|---|---|
| 2/17/2015 | |
| Investor Signature     Date | Investor Signature     Date |

REDACTED

Printed Name of Investor          Printed Name of Investor

Title of Investor (if applicable)      Title of Investor (if applicable)

REDACTED

SSN of Primary Investor

REDACTED
Color Copy or Photo of
Drivers License(s) Required

Please enclose or email to contact@policy-services.net

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**ACCEPTED BY:**

Horizon Trust Company        Date

## **EXHIBIT C-2**

## **POLICY SERVICING AGREEMENT**

# Policy Servicing Agreement (PSA) & RFA Election

**Policy Services, Inc.**
101 Convention Center Dr., Ste. 700
Las Vegas, NV 89109
(888) 505-3601 voice
(888) 505-2258 fax

## PURCHASER OWNERSHIP INFORMATION

Primary First MI Last _REDACTED_ _____

Joint First MI Last _____

Entity Name _____

SSN or EIN  _REDACTED_ _____

Account Number: _____
Internal Use Only

## PURCHASER SERVICING AGREEMENT, TERMS & DISCLOSURES

This Policy Servicing Agreement ('PSA') is made on the date so acknowledged by the undersigned Purchaser(s) herein referred to in the singular as **"Purchaser"**, **Life-Gift, Inc.** 1005 Country Club Avenue, Cheyenne, WY 82001, hereafter referred to as the **"Agent"**, and **Policy Services, Inc.**, hereafter referred to as **"Administrator"**. All of the above named individuals and entities are hereinafter referred to as the "Parties" under the laws of the State of Nevada.

### ARTICLE I
### RECITALS

WHEREAS, Agent is a corporation involved in the business of identifying, and facilitating the purchase of at discount face value life insurance policies, and all related Death Benefit rights; and

WHEREAS, the Purchaser desires to purchase the Death Benefit rights of a certain life settlement policy; and

WHEREAS, Administrator is thereafter obligated to hold in custody and disburse Purchase Amount strictly in accordance with the terms and provisions of this Policy Servicing Agreement, and as further set forth in certain Policy Acquisition Application executed by Purchaser.

### ARTICLE II
### AGENT AND PURCHASER AGREEMENTS

Policy Services, Inc. shall serve as the Administrator hereunder. When Purchaser desires to purchase Death Benefit rights in a Life Settlement:

a. Purchaser must execute (or have previously executed) a Policy Acquisition Application along with all required supplemental forms, and deliver the forms (if applicable), accompanied by this Policy Servicing Agreement and Purchase Amount to the Administrator.

b. Purchaser hereby agrees to convey the Purchase Amount of $ **131,352.00** U.S. dollars (excluding any RFA amount) for the purchase of the following life settlement and the payment of all costs related thereto (*leave blank if unknown at time of execution*).

CASE NAME: _____ (*Leave Blank for 1st Available*)

INTERNAL CASE ID: _____ (*Internal Use Only*)

INSURANCE CO: _____

% OF LS OWNED: _____ (*rounded off to the hundredths*)

ESTIMATED LIFE EXPECTANCY: _____ (*months*)

c. All Purchase Amount proceeds must be payable to: Horizon Trust Company, as escrow and custodian for all purchases according to the funding instructions in the Policy Acquisition application.

d. **Purchaser must initial each of the following, in full and complete understanding and accord of the Administrator's duties and power of attorney over your Purchase Amount:**

_REDACTED_

_____ Purchaser specifically authorizes Administrator to receive the Purchaser Amount for the following transactions:

1. Purchasing a life settlement on behalf of the Purchaser pursuant

to this Agreement, the Policy Acquisition Application and any other disclosures;
2. Paying costs or premiums on behalf of the Purchaser; and
3. Receiving Death Benefits at Policy Maturity and distributing such proceeds to the Purchaser (or Purchaser's designated beneficiary[ies]), as stated herein.

_REDACTED_

_____ Purchaser hereby authorizes Administrator to transfer to Administrator money sufficient to pay all costs and premium associated with the purchase of Death Benefits rights through the indicated estimated life expectancy, as an unrefundable cost of the transaction. Purchaser further understands and acknowledges that in return for the benefit of not having to pay any future premium, any premium set aside at closing is not escrowed or held for Purchaser, and no Purchaser has any ownership therein.

_REDACTED_

_____ During the life expectancy period, Administrator shall pay into the above referenced policy's cash account held with the insurance carrier, any cost or premium requirement as may be due to keep the policy in force. Purchaser understands and acknowledges that in the event the insured's actual life exceeds the estimated life expectancy, then Administrator shall continue to make additional policy premium payments for the remainder of the insured's actual life, without further cost or obligation to Purchaser.

_REDACTED_

_____ Purchaser acknowledges that at Policy Maturity the Death Benefit rights shall be paid to the Purchaser (if non-qualified), or to the Custodian of Purchaser's qualified plan (if qualified), less any applicable fees. If Purchaser is not an entity, and Purchaser has predeceased the Policy Maturity, then payment shall be made to Purchaser's designated beneficiary(ies); provided however if no beneficiary(ies) are designated, then to the estate of Purchaser.

### ARTICLE III
### FEES, COSTS, & EARLY WITHDRAWAL PENALTY

Purchaser acknowledges that Agent has not made any representation as to what minimum or specific face amount will be accepted by the insured in any policy purchase, nor as to the specific fees paid by Agent or Administrator for medical personnel, attorneys, consultants, or legal costs. Purchaser acknowledges that any premium payments due during the insured's actual life are the sole responsibility of Administrator; that no premium payments are escrowed on behalf of Purchaser; and all excess premium funds remain the sole property of Administrator. Upon Policy Maturity, the full amount of Purchaser's interest in and to the Death Benefit rights will be paid to Purchaser, Purchaser's entity or Purchaser's qualified Custodian, or (if applicable) to Purchaser's designated beneficiary(ies), less a nominal transaction fee.

Any request for a partial or full return of the Purchase Amount by Purchaser or Purchaser's beneficiary(ies) before Policy Maturity will be subject to a predetermined early withdrawal penalty assessed against the return of your Purchase Amount (and RFA if applicable) as outlined in the table below. Time will be calculated annually from contract anniversary to contract anniversary. By executing this Agreement, Purchaser (and Purchasers heirs, beneficiaries or assigns) expressly

# Policy Servicing Agreement (PSA) & RFA Election - Continued

agrees that such penalty is a material term of this Agreement, is irrevocable, non-negotiable and will result in the respective specified loss of the Purchase Amount upon refund.

| Penalty if Withdrawal taken in... | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10+ |
| 20% | 16% | 14% | 14% | 12% | 10% | 8% | 6% | 5% | 4% |

**ARTICLE IV**
**MISCELLANEOUS**

With respect to the Administrator's duties and rights, the Parties agree as follows:

1. Administrator undertakes to perform only such duties as are expressly set forth herein.

2. The Parties covenant and agree that in performing any of its duties under this Agreement, Administrator shall not be liable for any loss or damages which may occur as a result of serving as Administrator hereunder, except for any loss of damages occasioned by its willful default or gross negligence.

3. Administrator may resign upon thirty (30) days written notice to Agent; provided that such resignation shall not become effective until a successor Administrator, acceptable to Agent, has been retained.

4. This Agreement, combined with the Policy Acquisition Application and other supplemental forms, constitutes the entire agreement between the Parties hereto with respect to the transaction completed therein. This agreement may not be changed, waived or modified orally and may

only be changed, waived or modified by agreement in writing signed by the parties.

5. This Agreement shall be binding and inure to the benefit of said respective parties, their respective licensees or representatives, successors, heirs, distributes and assigns.

6. This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be original.

**ARTICLE V**
**INDEMNITIES**

PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS READ THIS AGREEMENT AND CLEARLY UNDERSTANDS THE MEANING, AND LEGAL CONSEQUENCES OF THE REPRESENTATIONS AND WARRANTIES MADE HEREIN AND PURCHASER HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL BEFORE SIGNING THIS AGREEMENT AND THEREFORE DOES HEREBY, FOR HIM[HER]SELF AND HIS[HER] HEIRS, ASSIGNS & REPRESENTATIVES INDEMNIFY AND HOLD HARMLESS AGENT, ADMINISTRATOR, CUSOTDAN AND SUCH'S PRINCIPALS, REPRESENTATIVES, CONSULTANTS, EMPLOYEES, OR ASSIGNS HEREINFROM ANY AND ALL DAMAGES AND/OR LIABILITIES DUE TO OR ARISING FROM ANY ACTIVITY OR ACTING OUTSIDE THE CONTROL OF THE SAME INCLUDING BUT NOT LIMITED TO PREMIUM OWNERSHIP & USE, EARLY WITHDRAWAL PENALTIES, OR THE FAILURE OF THE INSURED TO DIE WITHIN THE ACTUARIALLY AND MEDICALLY DETERMINABLE ESTIMATED LIFE EXPECTANCY.

## RESERVE FIXED ACCOUNT ELECTION                                    (FOR QUALIFIED ACCOUNTS ONLY)

The **RESERVE FIXED ACCOUNT** ('RFA') is required for all Qualified account holders.  The RFA account is used to cover qualified account custodial fees.  You only need to fund ONE RFA account for all your life settlement purchases.  Please read the below RFA Disclosure, and then initial the most applicable selection below to acknowledge your understanding and agreement:

REDACTED

_____  I am submitting only one PSA form and I do not have an existing RFA account.  Setup my RFA account with $2,000.00.

_____  I am submitting more than one PSA form and I do not have an existing RFA account.  Setup my RFA account with $2,000.00.

_____  I have an existing RFA account from a prior Purchase, and request that this Purchase be attached to that RFA account.

**RFA Account Disclosure:** Once open, your RFA will be deducted up front for the initial Custodian fees.  Each year thereafter your RFA account balance will be reduced by the Custodian fees, simple interest of 3.0% credited on the balance, and thereafter reimbursed for the annual fee, up to $300 annually. You specifically authorize Horizon Trust Company to bill Policy Services, Inc. for fees until the benefits lapse. You further understand that these benefits will lapse on the earlier to occur of the depletion of your account value or termination of the account at life settlement maturity. Without an RFA account, you will be responsible for all fees that Horizon Trust Company charges for its Custodian services, at its then current rates.

## PURCHASER ACKNOWLEDGEMENTS

In WITNESS WHEREOF, the parties hereto have agreed on this day, month and year.

REDACTED

| | |
|---|---|
| 2/17/2015 | |
| Purchaser Signature ⋁    Date | Purchaser Signature    Date |
| REDACTED | |
| Printed Name of Purchaser | Printed Name of Purchaser |
| | |
| Title of Purchaser (if applicable) | Title of Purchaser (if applicable) |
| REDACTED | |
| REPORTING SSN OF PURCHASER | Licensee Number (if applicable) |
| Acceptance by Life-Gift, Inc.    Date | Acceptance by Policy Services, Inc.    Date |

# EXHIBIT D

## SALE PROCEDURE ORDER

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT CAPITAL MANAGEMENT, | § | |
| LLC, ET AL.,[1] | § | BANKRUPTCY NO. 21-51523-MMP |
| | § | LEAD CASE |
| DEBTORS. | § | JOINTLY ADMINISTERED |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| POLICY SERVICES, INC. | § | BANKRUPTCY NO. 21-51513 |
| | § | |
| DEBTOR. | § | JOINTLY ADMINISTERED |

**ORDER APPROVING TRUSTEE'S MOTION TO APPROVE**
**(A) SALE PROCEDURES, STALKING HORSE AGREEMENT AND BID PROTECTIONS IN**
**CONNECTION WITH THE SALE OF PROPERTY OF THE ESTATE OF POLICY SERVICES, INC. AND**
**(B) THE FORM OF NOTICE FOR THE SALE OF PROPERTY**
**OF THE ESTATE OF POLICY SERVICES, INC.**

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, are: Policy Services, Inc. (2864), Wizard Mode Media, LLC (3205), deeproot Pinball LLC (0320), deeproot Growth Runs Deep Fund, LLC (8046), deeproot 575 Fund, LLC (9404), deeproot 3 Year Bonus Income Debenture Fund, LLC (7731), deeproot Bonus Growth *5* Year Debenture Fund, LLC (9661), deeproot Tech LLC (9043), deeproot Funds LLC (9404), deeproot Studios LLC (6283), and deeproot Capital Management, LLC (2638).

{00568910;1}

Came on for consideration the *Trustee's Motion to Approve (A) Sale Procedures, Stalking Horse Agreement and Bid Protections in Connection with the Sale of Property of the Estate of Policy Services, Inc. and (B) the Form of Notice for the Sale of Property of the Estate of Policy Services, Inc.* (the "**Sale Procedures Motion**").[2]  Based on the representations made in the Sale Procedures Motion, the Court finds that (i) it has jurisdiction over the matters raised in the Sale Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order on the Sale Procedures Motion; (iii) the relief requested in the Sale Procedures Motion seeking the establishment of Sale Procedures and the approval of the Stalking Horse Agreement and the Bid Protections in connection with the sale of the property of the Estate of Policy Services, Inc. is in the best interests of the Estate and the creditors; (iv) proper and adequate notice of the Sale Procedures Motion has been given and no further notice is necessary; (v) all objections to the Sale Procedures Motion that were filed have been resolved or are hereby overruled; and (vi) based on the record herein, after due deliberation, good and sufficient cause exists for the granting of the Sale Procedures Motion in all respects, and pursuant to Bankruptcy Rule 7052, made applicable by Bankruptcy Rule 9014, the Court makes the additional **FINDINGS OF FACT AND CONCLUSIONS OF LAW.**

**THE COURT FINDS THAT:**

A.       Notice of the Sale Procedures Motion and related hearing or matter was reasonable and sufficient and complied with all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules in light of the circumstances and nature of the relief requested therein, and no other or further notice is necessary.  A reasonable and fair opportunity to object to the Sale Procedures Motion and all relief requested therein and granted in this Order has been afforded.

---

[2] Capitalized terms unless otherwise defined herein shall have the meaning as ascribed to them in the Sale Procedures Motion.

B.      The legal and factual basis set forth in the Sale Procedures Motion establish just cause for the relief granted herein. Granting the relief is in the best interests of the Estate and the creditors.

C.      Trustee has articulated good and sufficient reasons for this Court to grant the Sale Procedures Motion and to approve the Sale Notice, in substantially the same form as Exhibit 1 to this Order, and the Sale Procedures, in substantially the same form as Exhibit 2 to this Order.

D.      The Sale Procedures are reasonable and appropriate and designed to maximize the value of the property of the Estate.

**THEREFORE, IT IS ORDERED THAT:**

1.      The Sale Procedures Motion is approved and granted.

2.      Any objections to the Sale Procedures Motion that have not been withdrawn, waived or settled as announced to the Court at the hearing on the Sale Procedures Motion, are overruled in their entirety.

3.      The Sale Notice, attached as <u>Exhibit 1</u> to this Order, is approved.  Within three business days after the Court enters an Order approving this Sale Procedures Motion, Debtor shall serve the Sale Notice by (a) first-class United States mail, postage-prepaid on (i) the parties identified on the Creditor Matrix in these Cases at the addresses set forth therein, (ii) the parties that have filed proofs of claim in these Cases at the addresses set forth in the respective proofs of claim, and (iii) any other parties who have expressed an interest in acquiring the Property; and (b) the Court's electronic-filing system on those parties receiving electronic notice by such system. Service of such Sale Notice is proper, due, timely, good, and sufficient notice of, among other things, the Sale Procedures, the auction, the proposed Sale, and the procedure for objecting thereto.

4.      The Sale Procedures, attached as <u>Exhibit 2</u> to this Order, which relate to the sale of the Policies (the "**Sale**"), are approved.

5.      The Stalking Horse Agreement, attached as <u>Exhibit 3</u> to this Order, is approved.

6.      The Stalking Horse Bidder, TuYo Holdings, LLC, a Texas limited liability company, is approved.

7.      The Bid Protections provided in the Stalking Horse Agreement, attached as Exhibit 3 to this Order, are approved.

8.      The Stalking Horse Agreement and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and the Stalking Horse Bidder will be deemed to be a Qualified Bidder.

9.      Any party wishing to participate as a qualified bidder should submit (a) a <u>sealed</u> bid for the Policies ("**Bid**"), (b) a purchase agreement ("**Purchase Agreement**"), signed by an authorized representative of such bidder, marked against the Stalking Horse Agreement to show all changes requested by such bidder, and (c) evidence of the bidder's financial ability to close the transaction, to J. Patrick Lowe, Trustee, and deposit Six Hundred Thousand and no/100 Dollars ($600,000.00) ("**Earnest Money Deposit**") with Trustee's counsel, Randall A. Pulman, at Pulman, Cappuccio & Pullen, LLP, by no later than **March 31, 2022** (the "**Bid Deadline**"). Any such Bid submitted by the Bid Deadline shall be in the amount of at least One Million, Two Hundred Fifty Thousand and no/100 Dollars ($1,250,000.00) to be a qualified bid ("**Qualified Bid**") and to allow the bidder to become a Qualified Bidder ("**Qualified Bidder**"). The deposited funds will be held by Pulman, Cappuccio & Pullen, LLP in its trust account until after the closing of the sale. The Earnest Money Deposit of all Qualified Bidders (except for the highest bidder (the "**Successful**

**Bidder**")) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

10.     By no later than noon on **April 1, 2022**, Trustee will file a notice with the Court stating whether it has timely received a binding offer to purchase the Policies in a cash amount of at least $1,250,000.00.

11.     In the event that Trustee files a notice stating that it has not received a cash offer of at least $1,250,000.00, the Court shall hold a hearing to approve a sale of the Policies to the Stalking Horse Bidder, or its assignee, free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. § 363, based on the Stalking Horse Agreement.  Such hearing shall be held on **April __, 2022, at 10:00 A.M**. (the "**Sale Hearing**").

12.     In the event Trustee receives at least one Qualified Bid, counsel for Trustee will file a notice with the Court and notify the Court's courtroom deputy that the Sale Hearing will be continued to **April ___, 2022, at 9:30 a.m**., where Trustee will seek approval of the sale of the Policies to the Successful Bidder.

13.     In the event Trustee receives at least one Qualified Bid by the Bid Deadline, the Trustee may in his absolute discretion, exercising only his best business judgment on behalf of the Estate, negotiate with the Stalking Horse Bidder and one or more of the Qualified Bidders on price and terms of the Qualified Bid and Trustee shall, in his absolute discretion, exercising only his best business judgment on behalf of the Estate, select the Successful Bidder.

14.     The closing of the sale of the Policies to the Successful Bidder shall occur no later than May 2, 2022 (the "**Closing Deadline**"). The Closing Deadline may be modified upon an agreement between Trustee and the Successful Bidder.

15.     If any Successful Bidder fails to consummate a Sale because of a breach or failure

to perform on the part of such Successful Bidder, the Qualified Bidder that had submitted the next highest or otherwise best Qualified Bid (if any), as determined by the Trustee (the "**Back-Up Bidder(s)**"), will be deemed to be the Successful Bidder for the Policies and Trustee will be authorized to consummate the Sale of the Policies to such Back-Up Bidder without further order of the Bankruptcy Court and such Qualified Bid shall thereupon be deemed the Successful Bid.

16.     If any Successful Bidder fails to consummate the purchase of the Policies, and such failure to consummate the purchase is the result of a breach by such Successful Bidder, the Earnest Money Deposit of such Successful Bidder shall be forfeited to the estate.

17.     Any objection(s) filed to the sale of the Policies (i) shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position and (ii) shall be filed with the Court on or before **April __, 2022** (the "**Objection Deadline**").  Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the Sale, including the transferring of the Policies free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

18.     Trustee reserves the right to (i) determine in its discretion whether any Qualified Bid is a Successful Bid and (ii) reject, at any time prior to the entry of the Sale Order by the Bankruptcy Court, without liability, any Bid that Trustee in its discretion, determines to be inadequate, insufficient, not in conformity with the Sale Procedures or the Bankruptcy Code, or contrary to the best interests of the Estate.

19.     Trustee reserves the right to modify the Sale Procedures, without the need for any further order of the Bankruptcy Court, including, without limitation (a) extending the deadlines set forth in these Sale Procedures, and (b) requesting a continuance of the hearing on the Sale Motion.

20.     Nothing contained in the Sale Procedures or this Order shall limit, restrict, alter, modify, waive or otherwise impair Trustee's reasonable business judgment in relation to the sale process contemplated by the Sale Procedures.

21.     Notwithstanding Bankruptcy Rule 6004, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. To the extent applicable, the stays described in Bankruptcy Rule 6004(h) is hereby waived.

22.     The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

### # # #

**ORDER SUBMITTED BY:**

Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

**ATTORNEYS FOR CHAPTER 7 TRUSTEE**

Exhibit 1 to Sale Procedures Order

## SALE NOTICE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT CAPITAL MANAGEMENT, | § | |
| LLC, ET AL.,[1] | § | BANKRUPTCY NO. 21-51523-MMP |
| | § | LEAD CASE |
| DEBTORS. | § | JOINTLY ADMINISTERED |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| POLICY SERVICES, INC. | § | BANKRUPTCY NO. 21-51513 |
| | § | |
| DEBTOR. | § | JOINTLY ADMINISTERED |

TRUSTEE'S NOTICE OF SALE OF THE PROPERTY OF THE ESTATE OF POLICY SERVICES, INC.

**PLEASE READ THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED AS SET FORTH HEREIN.**

On December 9, 2021 (the "**Petition Date**"), the Debtors filed their respective voluntary petitions under Chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"). The Court approved joint administration of Debtors listed in the captioned footnote on December 20, 2021. On December 21, 2021, John Patrick Lowe was appointed Chapter 7 Trustee (the "Trustee") of the estates of the Jointly Administered Debtors.

On March ___, 2022, Trustee filed *Trustee's Motion to Approve (A) Sale of Life Insurance Policies, (B) Sale Procedures, Stalking Horse Agreement and Bid Protections in Connection with the Sale of Property of the Estate of Policy Services, Inc. and (C) the Form of Notice for the Sale of Property of the Estate of Policy Services, Inc.* (the "**Sale Procedures Motion**") seeking approval of certain procedures for the sale of and taking bids (the "**Sale Process**") on Policy Services, Inc.'s Estate's property. Through this Sale Process, Trustee seeks the highest and best offer(s) for the sale (the "**Sale**") of certain life insurance policies (the "**Policies**") free and clear of any and all liens, claims, rights, interests, and encumbrances in

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, are: Policy Services, Inc. (2864), Wizard Mode Media, LLC (3205), deeproot Pinball LLC (0320), deeproot Growth Runs Deep Fund, LLC (8046), deeproot 575 Fund, LLC (9404), deeproot 3 Year Bonus Income Debenture Fund, LLC (7731), deeproot Bonus Growth 5 Year Debenture Fund, LLC (9661), deeproot Tech LLC (9043), deeproot Funds LLC (9404), deeproot Studios LLC (6283), and deeproot Capital Management, LLC (2638).

accordance with Section 363(f) of the Bankruptcy Code, with such liens, claims, rights, interests, and encumbrances to attach to the sale proceeds. The Sale Process is subject to, and all offers must be in accordance with, the sale procedures approved by the Bankruptcy Court, which are attached hereto as **Exhibit A** (the "**Sale Procedures**").

On March ___, 2022, the Bankruptcy Court entered its *Order Approving Trustee's Motion to Approve (A) Sale of Life Insurance Policies, (B) Sale Procedures and Bid Protections in Connection with the Sale of the Property of the Estate of Policy Services, Inc. and (C) The Form of Notice for the Sale of the Property of the Estate of Policy Services, Inc.* [Docket No. ___ (the "**Sales Procedures Order**") in which the Bankruptcy Court, among other things, (a) approved the Sales Procedures, (b) approved the Stalking Horse Agreement, (c) approved the form and manner of notice of the Sale Procedures, (d) set an Objection Deadline to the Sale, and (e) established the date for the Sale.

Any party wishing to participate as a qualified bidder should submit (a) a <u>sealed</u> bid for the Policies ("**Bid**"), (b) a purchase agreement ("**Purchase Agreement**"), signed by an authorized representative of such bidder, marked against the Stalking Horse Agreement to show all changes requested by such bidder, and (c) evidence of the bidder's financial ability to close the transaction, to J. Patrick Lowe, Trustee, 2402 E. Main, Uvalde, Texas 78801; email pat.lowe.law@gmail.com, and deposit Six Hundred Thousand and no/100 Dollars ($600,000.00) ("**Earnest Money Deposit**") with Trustee's counsel, Randall A. Pulman, at Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Phone No. (210) 222-9494, Fax No. (210) 892-1610; email rpulman@pulmanlaw.com by no later than **March 31, 2022 at 5:00 p.m. prevailing Central Time** (the "**Bid Deadline**"). Any such Bid submitted by the Bid Deadline shall be in the amount of at least One Million, Two Hundred Fifty Thousand and no/100 Dollars ($1,250,000.00) to be a qualified bid ("**Qualified Bid**") and to allow the bidder to become a Qualified Bidder ("**Qualified Bidder**"). The deposited funds will be held by Pulman, Cappuccio & Pullen, LLP in its trust account until after the closing of the sale. The Earnest Money Deposit of all Qualified Bidders (except for the highest bidder (the "**Successful Bidder**")) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

In the event Trustee receives at least one Qualified Bid by the Bid Deadline, the Trustee may in his absolute discretion, exercising only his best business judgment on behalf of the estate, negotiate with the Stalking Horse Bidder and one or more of the Qualified Bidders on price and terms of a Qualified Bid and Trustee shall, in his absolute discretion, exercising only his best business judgment on behalf of the Estate, announce the Successful Bidder.

After announcing the Successful Bidder, Trustee shall request that the Court approval the Sale at a hearing to be held at Hipolito F. Garcia Federal Building and United State Courthouse, Courtroom No. 3, Fifth Floor, 615 E. Houston St., San Antonio, Texas 78205 **on April ___, 2022 at 9:30 a.m., prevailing Central Time** (the "**Sale Hearing**").

Objections, if any, to the consummation of the Sale, shall be filed with the Bankruptcy Court by no later than **March 31, 2022** (the "**Objection Deadline**"). Any person failing to timely file an objection to the Sale prior to the deadlines set forth in the Bid

Procedures Order shall be forever barred from objecting to the Sale, including the transferring of the Policies free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: _____
      Randall A. Pulman
      Texas State Bar No. 16393250
      rpulman@pulmanlaw.com

**ATTORNEYS FOR JOHN PATRICK LOWE, CHAPTER 7 TRUSTEE**

## EXHIBIT A TO SALE NOTICE
## SALE PROCEDURES

## SALE PROCEDURES

On December 9, 2021 (the "**Petition Date**"), Policy Services, Inc., one of the eleven jointly administered debtors ("**Debtor**"), the owner and sole beneficiary of the Policies (defined below), filed a voluntary petition under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

On December 21, 2021, J. Patrick Lowe, was appointed chapter 7 Trustee ("**Trustee**") for the estate of *In re Policy Services, Inc.*, Case No. 21-51513, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division, which case is being Jointly Administered under *In re deeproot Capital Management, LLC, et al.*, Case No. 21-51523, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division.

These Sale Procedures have been approved and authorized pursuant to the *Trustee's Motion to Approve (A) Sale Procedures, Stalking Horse Agreement and Bid Protections in Connection with the Sale of Property of the Estate of Policy Services, Inc. and (B) the Form of Notice for the Sale of Property of the Estate of Policy Services, Inc.* (the "**Sale Procedures Motion**") and the *Order Approving Trustee's Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of Property of the Estate of Policy Services, Inc. and (B) the Form of Notice for the Sale of Property of the Estate of Policy Services, Inc.* (the "**Sale Procedures Order**"), entered by the United States Bankruptcy Court for the Western District of Texas, San Antonio Division.

### A. Assets to be Sold

Generally, the assets to be sold include the conveyance free and clear of all liens, claims, encumbrances, and interests in certain life insurance policies, as described on Exhibit A and Exhibit B attached hereto (collectively, the "**Policies**").

### B. Stalking Horse Agreement

Subject to the provisions set forth herein, Trustee has entered into a certain Life Insurance Policy Purchase and Sale Agreement (the "Stalking Horse Agreement") with TuYo Holdings, LLC, a Texas limited liability company (the "Stalking Horse Bidder"), pursuant to which Trustee has agreed to sell and the Stalking Horse Bidder has agreed to purchase the Policies, subject to the receipt and acceptance of an otherwise better Qualified Bid from a Qualified Bidder, as provided herein**.**

The Stalking Horse Agreement and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and the Stalking Horse Bidder will be deemed to be a Qualified Bidder. Other than as provided by order of the Bankruptcy Court prior to the entry of the Sale Order, no party submitting a Bid shall be entitled to a break-up fee or expense reimbursement except for the Bid Protections for the Stalking Horse Bidder that are approved by the Bankruptcy Court

### C. Submission of Initial Qualifying Bids by Potential Purchasers

Any party wishing to participate as a qualified bidder should submit (a) a sealed bid for the Policies ("**Bid**"), (b) a purchase agreement ("**Purchase Agreement**"), signed by an authorized representative of such bidder, marked against the Stalking Horse Agreement to show all changes

requested by such bidder, and (c) evidence of the bidder's financial ability to close the transaction, to J. Patrick Lowe, Trustee, 2402 E. Main, Uvalde, Texas 78801; email pat.lowe.law@gmail.com, and deposit Six Hundred Thousand and no/100 Dollars ($600,000.00) ("**Earnest Money Deposit**") with Trustee's counsel, Randall A. Pulman, at Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Phone No. (210) 222-9494, Fax No. (210) 892-1610; email rpulman@pulmanlaw.com by no later than **March 31, 2022** (the "**Bid Deadline**").

Any such Bid submitted by the Bid Deadline shall be in the amount of at least One Million, Two Hundred Fifty Thousand and no/100 Dollars ($1,250,000.00) to be a qualified bid ("**Qualified Bid**") and to allow the bidder to become a Qualified Bidder ("**Qualified Bidder**"). The deposited funds will be held by Pulman, Cappuccio & Pullen, LLP in its trust account until after the closing of the sale. The Earnest Money Deposit of all Qualified Bidders (except for the highest bidder (the "**Successful Bidder**")) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale

**The Bid should be sealed.**

### D. <u>The Selection of the Successful Bid</u>

In the event Trustee receives at least one Qualified Bid by the Bid Deadline, the Trustee may in his absolute discretion, exercising only his best business judgment on behalf of the estate, negotiate with the Stalking Horse Bidder and one or more of the Qualified Bidders on price and terms of a Qualified Bid.

### E. <u>Objections to Sale</u>

Any objection(s) filed to the sale of the Policies (i) shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position; (ii) shall be filed with the Court on or before **March 31, 2022** (the "**Objection Deadline**"). Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the Sale, including the transferring of the Property free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

### F. <u>Court Approval</u>

In the event that Trustee has not received a Qualifying Bid with a cash offer of at least $1,250,000.00 by March 31, 2022, the Court shall hold a hearing to approve the sale of the Policies to the Stalking Horse Bidder or its assignee, free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. § 363.

In the event Trustee receives at least one Qualified Bid, counsel for Trustee will file a notice with the Court and notify the Court's courtroom deputy that the sale hearing will be continued to **April ___, 2022,** (the "**Sale Hearing**") where Trustee will seek approval of the sale of the Policies to the Successful Bidder.

At the Sale Hearing, Trustee will seek entry of an order approving the sale of the Policies to the Successful Bidder pursuant to 11 U.S.C. §363(f) and free and clear of all liens, claims, encumbrances, and interests. The Sale Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court or by Trustee with the approval of the Successful Bidder and without further notice to creditors and parties in interest other than by announcement by Trustee of the adjourned date at the Sale Hearing.

Trustee's presentation to the Bankruptcy Court for approval of a Successful Bid does not constitute Trustee's acceptance of the Bid. Trustee will be deemed to have accepted a Bid only when the Bid has been approved by Order of the Bankruptcy Court.

### G.  Closing

The closing of the sale of the Policies shall occur no later than **May 2, 2022** (the "**Final Closing Deadline**"); provided, however, that this requirement may be waived upon an agreement between Trustee and the Successful Bidder.

### H.  Failure to Consummate Purchase

If any Successful Bidder fails to consummate the purchase of the Policies, and such failure to consummate the purchase is the result of a breach by such Successful Bidder, the Earnest Money Deposit of such Successful Bidder shall be forfeited to the Estate.

### I.  Back-Up Bidders

If any Successful Bidder fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, the Qualified Bidder that had submitted the next highest or otherwise best Qualified Bid at the Auction (if any), (the "**Back-Up Bidder(s)**") will be deemed to be the Successful Bidder for the Policies and Trustee will be authorized to consummate the Sale of the Policies to such Back-Up Bidder without further order of the Bankruptcy Court and such Qualified Bid shall thereupon be deemed the Successful Bid. If any Qualified Bidder fails to consummate the sale because of a breach or failure to perform on the part of such Qualified Bidder or for any reason within ten days after being deemed the Back-Up Bidder pursuant to this section of the Sale Procedures, the process described above may continue as determined by Trustee until a Qualified Bidder shall consummate the sale.

### J.  Return of Earnest Money Deposit

The Earnest Money Deposit of all Qualified Bidders, who are not the Successful Bidder, will be returned, without interest, to each such Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

### K.  Reservation of Rights

1.  <u>Determination of Successful Bid</u>. Trustee reserves the right to: (a) determine whether any Qualified Bid is a successful bid, and (b) reject, at any time prior to the entry of the Sale Order,

any Bid that the Trustee in its discretion determines to be inadequate, insufficient, not in conformity with the Sales Procedures or the Bankruptcy Code, or contrary to the best interest of the Trustee and its Estate.

2.     <u>Modification of Bidding Procedures</u>. Trustee may modify the Sale Procedures, without the need for any further order of the Bankruptcy Court, including, without limitation (a) extending the deadlines set forth in these Sale Procedures, and (b) adjourning the Sale Hearing.

3.     Nothing contained in these Sale Procedures, or the court's order, shall limit, restrict, alter, modify, waive or otherwise impair Trustee's reasonable business judgment in relation to the sale process contemplated by these Sale Procedures.

**L.  <u>As Is, Where As Sale</u>**

The sale of the Policies shall be on an **"as is, where as"** basis and without representations or warranties of any kind, nature, or description by the Trustee, the Estate, or its agents and representatives. Except as otherwise expressly provided in these Sale Procedures, by submitting a Bid, each bidder shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Policies prior to makings its bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any and all documents and/or the Policies in making its bid, and (iii) did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Policies, or the completeness of any information provided in connection therewith.

**M.  <u>Trustee's 's Counsel</u>**

Any questions regarding these Sales Procedures should be addressed to Trustee's Counsel whose contact information is:

Randall A. Pulman
rpulman@pulmanlaw.com
W. Drew Mallender
dmallender@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

## Exhibit A to Sale Procedures

IN FORCE POLICIES

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy | Acquisition Cost |
|---|---|---|---|---|---|---|
| Protective Life Insurance Company (West Coast Life) | ANDE75 | REDACTED | In-Force | REDACTED 575 | $2,000,000.00 | $1,212,121.21 |
| Brighthouse Life Insurance Company | JKN22A | REDACTED | In-Force | REDACTED 315 REDACTED | $2,500,000.00 | $1,648,351.65 |
| John Hancock Life Insurance Company | FEE287 | REDACTED | In-Force | REDACTED 287 | $500,000.00 | $338,983.05 |
| John Hancock Life Insurance Company | FEE548 | REDACTED | In-Force | REDACTED 548 | $500,000.00 | $338,983.05 |
| Occidental Life Insurance Company NC | MAR790 | REDACTED | In-Force | REDACTED 790 | $100,000.00 | $67,039.11 |
| Transamerica Life Insurance Company | JMD135 | REDACTED | In-Force | REDACTED 135 | $500,000.00 | $305,295.36 |
| Brighthouse Life Insurance Company | KFFN57 | REDACTED | In-Force | REDACTED 157 REDACTED | $500,000.00 | $254,104.00 |
| Protective Life Insurance Company | RID363 | REDACTED | In-Force | REDACTED 371 | $500,000.00 | $148,680.00 |

Total Acquisition Cost:  **$4,313,557.43**

Purchase Price (25%):  **$1,078,389.36**

# Exhibit B to Sale Procedures

## LAPSED POLICIES

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy |
|---|---|---|---|---|---|
| **Midland National Life** | GRR553 | REDACTED | Lapsed | REDACTED 553 | $242,520.00 |
| **ING Reliastar Life (VOYA)** | PER437 | REDACTED | Lapsed | REDACTED 378 | $1,000,000.00 |
| **SunLife Financial** | SUL428 | REDACTED | Lapsed | REDACTED 428 | $300,000.00 |
| **SunLife Financial** | SUL429 | REDACTED | Lapsed | REDACTED 429 | $300,000.00 |
| **US Life City NY** | UD33NL | REDACTED | Lapsed | REDACTED 0NL | $750,000.00 |
| **Protective Life Insurance Company** | LW7116 | REDACTED | Lapsed | REDACTED 116 | $1,100,000.00 |
| **American General Life** | JDE21L | REDACTED | Lapsed | REDACTED 21L | $633,342.81 |
| **Transamerica Life** | SIE687 | REDACTED | Lapsed | REDACTED 687 | $1,500,000.00 |
| **AXA Equitable Life** | FERN07 | REDACTED | Lapsed | REDACTED 507 | $10,000,000.00 |
| **Mass Mutual** | HCS883 | REDACTED | Lapsed | REDACTED 883 | $1,540,000.00 |
| **Principal** | ANDR62 | REDACTED | Lapsed | REDACTED 262 | $1,000,000.00 |
| **Transamerica Life** | BASH82 | REDACTED | Lapsed | | $9,000,000.00 |

Exhibit 2 to Sale Procedures Order

# SALE PROCEDURES

## SALE PROCEDURES

On December 9, 2021 (the "**Petition Date**"), Policy Services, Inc., one of the eleven jointly administered debtors ("**Debtor**"), the owner and sole beneficiary of the Policies (defined below), filed a voluntary petition under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

On December 21, 2021, J. Patrick Lowe, was appointed chapter 7 Trustee ("**Trustee**") for the estate of *In re Policy Services, Inc.*, Case No. 21-51513, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division, which case is being Jointly Administered under *In re deeproot Capital Management, LLC, et al.*, Case No. 21-51523, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division.

These Sale Procedures have been approved and authorized pursuant to the *Trustee's Motion to Approve (A) Sale Procedures, Stalking Horse Agreement and Bid Protections in Connection with the Sale of Property of the Estate of Policy Services, Inc. and (B) the Form of Notice for the Sale of Property of the Estate of Policy Services, Inc.* (the "**Sale Procedures Motion**") and the *Order Approving Trustee's Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of Property of the Estate of Policy Services, Inc. and (B) the Form of Notice for the Sale of Property of the Estate of Policy Services, Inc.* (the "**Sale Procedures Order**"), entered by the United States Bankruptcy Court for the Western District of Texas, San Antonio Division.

### A. Assets to be Sold

Generally, the assets to be sold include the conveyance free and clear of all liens, claims, encumbrances, and interests in certain life insurance policies, as described on Exhibit A and Exhibit B attached hereto (collectively, the "**Policies**").

### B. Stalking Horse Agreement

Subject to the provisions set forth herein, Trustee has entered into a certain Life Insurance Policy Purchase and Sale Agreement (the "Stalking Horse Agreement") with TuYo Holdings, LLC, a Texas limited liability company (the "Stalking Horse Bidder"), pursuant to which Trustee has agreed to sell and the Stalking Horse Bidder has agreed to purchase the Policies, subject to the receipt and acceptance of an otherwise better Qualified Bid from a Qualified Bidder, as provided herein**.**

The Stalking Horse Agreement and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and the Stalking Horse Bidder will be deemed to be a Qualified Bidder. Other than as provided by order of the Bankruptcy Court prior to the entry of the Sale Order, no party submitting a Bid shall be entitled to a break-up fee or expense reimbursement except for the Bid Protections for the Stalking Horse Bidder that are approved by the Bankruptcy Court

### C. Submission of Initial Qualifying Bids by Potential Purchasers

Any party wishing to participate as a qualified bidder should submit (a) a sealed bid for the Policies ("**Bid**"), (b) a purchase agreement ("**Purchase Agreement**"), signed by an authorized representative of such bidder, marked against the Stalking Horse Agreement to show all changes

requested by such bidder, and (c) evidence of the bidder's financial ability to close the transaction, to J. Patrick Lowe, Trustee, 2402 E. Main, Uvalde, Texas 78801; email pat.lowe.law@gmail.com, and deposit Six Hundred Thousand and no/100 Dollars ($600,000.00) ("**Earnest Money Deposit**") with Trustee's counsel, Randall A. Pulman, at Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Phone No. (210) 222-9494, Fax No. (210) 892-1610; email rpulman@pulmanlaw.com by no later than **March 31, 2022** (the "**Bid Deadline**").

Any such Bid submitted by the Bid Deadline shall be in the amount of at least One Million, Two Hundred Fifty Thousand and no/100 Dollars ($1,250,000.00) to be a qualified bid ("**Qualified Bid**") and to allow the bidder to become a Qualified Bidder ("**Qualified Bidder**"). The deposited funds will be held by Pulman, Cappuccio & Pullen, LLP in its trust account until after the closing of the sale. The Earnest Money Deposit of all Qualified Bidders (except for the highest bidder (the "**Successful Bidder**")) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale

**The Bid should be sealed.**

### D.  The Selection of the Successful Bid

In the event Trustee receives at least one Qualified Bid by the Bid Deadline, the Trustee may in his absolute discretion, exercising only his best business judgment on behalf of the estate, negotiate with the Stalking Horse Bidder and one or more of the Qualified Bidders on price and terms of a Qualified Bid.

### E.  Objections to Sale

Any objection(s) filed to the sale of the Policies (i) shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position; (ii) shall be filed with the Court on or before **March 31, 2022** (the "**Objection Deadline**"). Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the Sale, including the transferring of the Property free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

### F.  Court Approval

In the event that Trustee has not received a Qualifying Bid with a cash offer of at least $1,250,000.00 by March 31, 2022, the Court shall hold a hearing to approve the sale of the Policies to the Stalking Horse Bidder or its assignee, free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. § 363.

In the event Trustee receives at least one Qualified Bid, counsel for Trustee will file a notice with the Court and notify the Court's courtroom deputy that the sale hearing will be continued to **April ___, 2022,** (the "**Sale Hearing**") where Trustee will seek approval of the sale of the Policies to the Successful Bidder.

At the Sale Hearing, Trustee will seek entry of an order approving the sale of the Policies to the Successful Bidder pursuant to 11 U.S.C. §363(f) and free and clear of all liens, claims, encumbrances, and interests. The Sale Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court or by Trustee with the approval of the Successful Bidder and without further notice to creditors and parties in interest other than by announcement by Trustee of the adjourned date at the Sale Hearing.

Trustee's presentation to the Bankruptcy Court for approval of a Successful Bid does not constitute Trustee's acceptance of the Bid. Trustee will be deemed to have accepted a Bid only when the Bid has been approved by Order of the Bankruptcy Court.

## G. Closing

The closing of the sale of the Policies shall occur no later than **May 2, 2022** (the "**Final Closing Deadline**"); provided, however, that this requirement may be waived upon an agreement between Trustee and the Successful Bidder.

## H. Failure to Consummate Purchase

If any Successful Bidder fails to consummate the purchase of the Policies, and such failure to consummate the purchase is the result of a breach by such Successful Bidder, the Earnest Money Deposit of such Successful Bidder shall be forfeited to the Estate.

## I. Back-Up Bidders

If any Successful Bidder fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, the Qualified Bidder that had submitted the next highest or otherwise best Qualified Bid at the Auction (if any), (the "**Back-Up Bidder(s)**") will be deemed to be the Successful Bidder for the Policies and Trustee will be authorized to consummate the Sale of the Policies to such Back-Up Bidder without further order of the Bankruptcy Court and such Qualified Bid shall thereupon be deemed the Successful Bid. If any Qualified Bidder fails to consummate the sale because of a breach or failure to perform on the part of such Qualified Bidder or for any reason within ten days after being deemed the Back-Up Bidder pursuant to this section of the Sale Procedures, the process described above may continue as determined by Trustee until a Qualified Bidder shall consummate the sale.

## J. Return of Earnest Money Deposit

The Earnest Money Deposit of all Qualified Bidders, who are not the Successful Bidder, will be returned, without interest, to each such Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

## K. Reservation of Rights

1. <u>Determination of Successful Bid</u>. Trustee reserves the right to: (a) determine whether any Qualified Bid is a successful bid, and (b) reject, at any time prior to the entry of the Sale Order,

any Bid that the Trustee in its discretion determines to be inadequate, insufficient, not in conformity with the Sales Procedures or the Bankruptcy Code, or contrary to the best interest of the Trustee and its Estate.

　　　2.　　__Modification of Bidding Procedures__. Trustee may modify the Sale Procedures, without the need for any further order of the Bankruptcy Court, including, without limitation (a) extending the deadlines set forth in these Sale Procedures, and (b) adjourning the Sale Hearing.

　　　3.　　Nothing contained in these Sale Procedures, or the court's order, shall limit, restrict, alter, modify, waive or otherwise impair Trustee's reasonable business judgment in relation to the sale process contemplated by these Sale Procedures.

## L.　__As Is, Where As Sale__

　　　The sale of the Policies shall be on an **"as is, where as"** basis and without representations or warranties of any kind, nature, or description by the Trustee, the Estate, or its agents and representatives. Except as otherwise expressly provided in these Sale Procedures, by submitting a Bid, each bidder shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Policies prior to makings its bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any and all documents and/or the Policies in making its bid, and (iii) did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Policies, or the completeness of any information provided in connection therewith.

## M.　__Trustee's 's Counsel__

　　　Any questions regarding these Sales Procedures should be addressed to Trustee's Counsel whose contact information is:

　　　Randall A. Pulman
　　　rpulman@pulmanlaw.com
　　　W. Drew Mallender
　　　dmallender@pulmanlaw.com
　　　**PULMAN, CAPPUCCIO & PULLEN, LLP**
　　　2161 NW Military Highway, Suite 400
　　　San Antonio, Texas 78213
　　　www.pulmanlaw.com
　　　(210) 222-9494 Telephone
　　　(210) 892-1610 Facsimile

## Exhibit A to Sale Procedures

### IN FORCE POLICIES

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy | Acquisition Cost |
|---|---|---|---|---|---|---|
| Protective Life Insurance Company (West Coast Life) | ANDE75 | REDACTED | In-Force | REDACTED 575 | $2,000,000.00 | $1,212,121.21 |
| Brighthouse Life Insurance Company | JKN22A | REDACTED | In-Force | REDACTED 315 REDACTED | $2,500,000.00 | $1,648,351.65 |
| John Hancock Life Insurance Company | FEE287 | REDACTED | In-Force | REDACTED 287 | $500,000.00 | $338,983.05 |
| John Hancock Life Insurance Company | FEE548 | REDACTED | In-Force | REDACTED 548 | $500,000.00 | $338,983.05 |
| Occidental Life Insurance Company NC | MAR790 | REDACTED | In-Force | REDACTED 790 | $100,000.00 | $67,039.11 |
| Transamerica Life Insurance Company | JMD135 | REDACTED | In-Force | REDACTED 135 | $500,000.00 | $305,295.36 |
| Brighthouse Life Insurance Company | KFFN57 | REDACTED | In-Force | REDACTED 157 REDACTED | $500,000.00 | $254,104.00 |
| Protective Life Insurance Company | RID363 | REDACTED | In-Force | REDACTED 371 | $500,000.00 | $148,680.00 |

Total Acquisition Cost:  **$4,313,557.43**

Purchase Price (25%):  **$1,078,389.36**

## Exhibit B to Sale Procedures

### LAPSED POLICIES

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy |
|---|---|---|---|---|---|
| Midland National Life | GRR553 | REDACTED | Lapsed | RED ACT ED 553 | $242,520.00 |
| ING Reliastar Life (VOYA) | PER437 | REDACTED | Lapsed | REDACTED 378 | $1,000,000.00 |
| SunLife Financial | SUL428 | REDACTED | Lapsed | REDACTED 428 | $300,000.00 |
| SunLife Financial | SUL429 | REDACTED | Lapsed | REDACTED 429 | $300,000.00 |
| US Life City NY | UD33NL | REDACTED | Lapsed | REDACTED 0NL | $750,000.00 |
| Protective Life Insurance Company | LW7116 | REDACTED | Lapsed | REDACTED 116 | $1,100,000.00 |
| American General Life | JDE21L | REDACTED | Lapsed | REDACTED 21L | $633,342.81 |
| Transamerica Life | SIE687 | REDACTED | Lapsed | REDACTED 687 | $1,500,000.00 |
| AXA Equitable Life | FERN07 | REDACTED | Lapsed | REDACTED 507 | $10,000,000.00 |
| Mass Mutual | HCS883 | REDACTED | Lapsed | REDACTED 883 | $1,540,000.00 |
| Principal | ANDR62 | REDACTED | Lapsed | REDACTED 262 | $1,000,000.00 |
| Transamerica Life | BASH82 | REDACTED | Lapsed | | $9,000,000.00 |

Exhibit 3 to Sale Procedures Order

# STALKING HORSE AGREEMENT

**LIFE INSURANCE POLICY PURCHASE AND SALE AGREEMENT**

This LIFE INSURANCE POLICY PURCHASE AND SALE AGREEMENT ("Agreement") is made and entered into as of March __, 2022, by and between J. PATRICK LOWE, the chapter 7 Trustee for the estate of *In re Policy Services, Inc.*, Case No. 21-51513, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division, which case is being Jointly Administered under *In re deeproot Capital Management, LLC, et al.*, Case No. 21-51523, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division ("Seller" and/or "Trustee"), and TuYo Holdings, LLC, a Texas limited liability company ("Purchaser") (and together, the "Parties").

## RECITALS

A.  Policy Services, Inc., a Texas corporation, ("Debtor") the owner and sole beneficiary of the Policies (defined below), filed for Chapter 7 bankruptcy on December 9, 2021, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Case No. 21-51513, which case is being Jointly Administered in said Court under *In re deeproot Capital Management, LLC, et al.*, Case No. 21-51523 ("Bankruptcy Case").

B.  Debtor was in the business of purchasing and holding existing life insurance policies as investments. Some of the insurance policies purchased by Debtor have already lapsed due to non-payment of premium.

C.  Trustee, in connection with the performance of his statutory duties, and in the exercise of his best business judgement has determined that the sale of the life insurance policies believed to remain in force (described below) to Purchaser is in the best interests of the bankruptcy estate.

D.  Purchaser has paid directly to two insurance companies premiums totaling $28,079.66 which were due post-petition for the purpose of keeping these two insurance policies in a paid up status with the insurance companies.

E.  In connection with the purchase and sale of the life insurance policies, counsel to Trustee will prepare and file a Motion to Sell and other ancillary motions with the Court in the Bankruptcy Case. Each motion must be granted, and the requested relief ordered by the Court before the sale of the life insurance policies contemplated by this Agreement may be closed.

F.  Purchaser is aware of the risks associated with the purchase of existing and lapsed life insurance policies.

G.  Seller desires to sell to Purchaser the life insurance policies described on **Exhibit A**, attached hereto (each a "Policy" and collectively, the "Policies").

H.  Each of the Policies remaining in force require the ongoing payment of premiums in order to keep said Policies in force. Purchaser and Trustee have agreed on a mechanism for Purchaser to fund the payment of insurance premiums going forward from now until a sale is approved by the Bankruptcy Court.

I.  Trustee will also assign and convey to Purchaser all rights, title and interest (including the right to reinstatement) that Trustee or the Debtor holds in the lapsed insurance policies described on **Exhibit B**, attached hereto (each a "Lapsed Policy" and collectively, the "Lapsed Policies"). Purchaser intends to seek reinstatement of the Lapsed Policies through administrative and legal processes.

1

J.    Purchaser desires to purchase all rights, title and interest in and to the Policies and the Lapsed Policies in accordance with the terms and conditions of this Agreement.

## AGREEMENT

NOW THEREFORE, for and in consideration of the RECITALS, which are incorporated into this Agreement, the mutual promises and covenants set further herein and for the other good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the Parties hereto agree as follows:

1.    **Purchase Price; Closing.**

(a)    Purchaser hereby agrees to pay $1,078,389.36 ("Purchase Price") for the sole purpose of acquiring all rights, title and interest in and to the Policies and Lapsed Policies.  Purchaser hereby agrees to immediately deposit into the IOLTA account of Trustee's counsel, acting on behalf of Seller, the sum of $540,000.00 ("Deposit on Purchase Price") for the sole purpose of acquiring all rights, title and interest in and to the Policies.  Said funds shall be held in trust in an IOLTA account controlled by Trustee's counsel and shall be disbursed immediately to Seller upon the proper transfer of the ownership and beneficiary of the Policies to Purchaser (the "Closing").  The balance of the Purchase Price remaining unpaid after the Deposit has been made shall be paid by Purchaser to Seller at Closing.  Purchaser shall cause the Deposit on Purchase Price and all other payments to the Seller to be wired to Trustee's counsel IOLTA account using the following instructions:

JP Morgan Chase Bank
712 Main Street
10th Floor South
Houston, Texas 77002
(713) 216-2041

redacted

(b)    Purchaser will endeavor to reinstate each of the Lapsed Policies conveyed to it as part of this Agreement. As additional consideration and in addition to the Purchase Price listed above, Purchaser agrees to remit to Trustee fifty percent (50%) of the Net Insurance Benefits (as defined below) resulting from the successful reinstatement of a Lapsed Policy or its sale to a third party, subject to the terms and conditions herein.  Purchaser shall not be required to exhaust any and all legal remedies available to it, but shall instead be entitled to exercise its business judgment in pursuing reinstatement of each individual Lapsed Policy.  To the extent Purchaser is successful in reinstating any one Lapsed Policy and Purchaser receives payment of an associated insurance benefit or proceeds from the sale of the reinstated policy ("Gross Insurance Benefit"), Purchaser shall be entitled to reimburse itself for all expenses collectively incurred during Purchaser's reinstatement efforts for all of the Lapsed Polices. Within ten (10) days after receiving the Gross Insurance Benefits and reimbursing itself for its reimbursable expenses, Purchaser agrees to pay to Trustee an amount equal to fifty percent (50%) of the remaining insurance benefit actually received ("Net Insurance Benefit").  Purchaser's reimbursable expenses shall include, but will not be limited

2

to, reasonable and necessary attorney's fees, costs of court, insurance premium payments, administrative fees, brokerage fees, and any other fees reasonably related to reinstatement and maintenance of the Lapsed Policy. Reimbursable expenses do not include the costs and attorney's fees incurred by Purchaser in connection with this Agreement or acquiring the rights to the Policies or Lapsed Policies from Seller.

2. **Payment of Insurance Premiums prior to Closing**.

    a.    Purchaser acknowledges that Trustee is without sufficient funds in the Policy Services, Inc. Estate to pay any insurance premiums going forward. In the likely event that insurance premiums for the Policies come due before the Order approving the sale and granting the Motion becomes final, Trustee may use a portion of the Deposit on Purchase Price to pay any such life insurance premium then due, in an amount up to $25,000, only after receiving the written consent of the Purchaser, which shall not be unreasonably withheld for a period of thirty (30) days after the execution of this Agreement. Alternatively, provided that Purchaser gives advance notice to Trustee and Trustee gives his written approval, which shall not be unreasonably withheld, Purchaser may directly pay the insurance premium then due using Purchaser's separate funds. At Closing, Purchaser will receive a credit to the Purchase Price for any premiums paid directly by Purchaser.

    b.    If Trustee's Motion to Sell (defined below) is denied by the Bankruptcy Court, then the Deposit on Purchase Price, less any premiums paid therefrom by the Trustee, shall be refunded to Purchaser eleven (11) days from the date that the Bankruptcy Court's denial of Trustee's Motion becomes final. In such event this Agreement shall terminate. In such event, Purchaser waives its right to apply to the court for the reimbursement of an administrative expense pursuant to 11 U.S.C Section 503 or for repayment of a post-petition loan pursuant to 11 U.S.C. 364, or under any like statute or legal theory.

    c.    If Trustee's Motion to Sell is granted by the Bankruptcy Court, but a third-party outbids Purchaser and such third-party is subsequently approved as the purchaser, then the Deposit on Purchase Price (including all premiums paid by the Trustee therefrom and any premiums directly paid by Purchaser) shall be treated as an administrative expense of the Policy Services, Inc. Estate pursuant to 11 U.S.C. Section 503 and refunded to Purchaser. In such event, Purchaser shall also receive the Stalking Horse Fee (described below) and reasonable and necessary attorney's fees as approved by the Bankruptcy Court, and this Agreement shall terminate.

3. **Motion to Sell, and Stalking Horse Bid and Procedures**.

(a) Seller agrees to file a motion to sell the Policies and Lapsed Policies pursuant to 11 U.S.C Sections 363 and to the extent necessary Section 364 in order to authorize the payment of insurance premiums by the Purchaser prior to closing (the "Motion to Sell"), within three (3) business days after the effective date of this Agreement, seeking entry of an order of the Bankruptcy Court ("Order") approving the sale pursuant to the terms of this Agreement. If entry of the Order approving the sale has not occurred within 30days after the effective date of the Agreement, Purchaser may terminate the Agreement by written notice to Seller. If Court

approval is denied, the Agreement shall automatically terminate, and the Deposit on Purchase Price shall be returned to Purchaser pursuant to the provisions of Section 2(b) above.

(b) Purchaser acknowledges that Seller will submit this Agreement to the Bankruptcy Court for approval and that any other interested party will have the right to bid on the Policies and the Lapsed Policies.

(c) Trustee shall present Purchaser's offer to the Bankruptcy Court as a stalking horse bid on the Policies and Lapsed pursuant to Bid Procedures provided to Purchaser and approved by the Bankruptcy Court. In the event another purchaser offers a better offer to the Trustee (a "Topping Bid"), as determined solely in exercise of the Trustee's best business judgment and discretion, and the Trustee accepts the Topping Bid, Trustee covenants to do the following:

    1)      Refund to the Purchaser the Deposit on Purchase Price including the amount of premiums that may have been paid (either from the Deposit on Purchase Price or directly by Purchaser) in the interim within ten (10) days of the Order of Sale becoming final, and

    2)      As consideration for entering into this Agreement and allowing Trustee to use the Deposit on Purchase Price to pay premiums in order to keep the Policies in force, Trustee will seek authorization to pay to Purchaser an additional amount equal to $50,000.00 as a stalking horse fee, plus Purchaser's reasonable and necessary attorney's fees as approved by the Court, in an amount not to exceed $20,000 (collectively, the "Stalking Horse Fee").

    3)      Trustee covenants to defend the adequacy and reasonableness of the Stalking Horse Fee, however, Purchaser acknowledges that the Bankruptcy Court must approve the amount of the Stalking Horse Fee and the payment thereof to Purchaser.

    4)      In all circumstances, the Trustee reserves the right to negotiate for a better offer from all bidders.

4. **Conveyance of Ownership Rights to Purchaser**.

    a)    After entry of the Bankruptcy Court's Order approving the sale pursuant to the terms of this Agreement, Trustee shall make best efforts to cause each respective life insurance company to transfer record ownership of all rights, title and interest in and to each of the Policies and Lapsed Policies to Purchaser as soon as practicable. The parties contemplate the individual transfer of record ownership of each Policy and Lapsed Policy to occur as soon as practicable for each such individual Policy or Lapsed Policy, notwithstanding delays to the transfer of other Policies or Lapsed Policies. Trustee will execute all documents reasonably required by the Purchaser and issuing insurance company to accomplish a transfer of ownership of the Policies.

    b)    If any of the insured individuals under any of the Policies die after the execution of this Agreement, but before the entry of the Bankruptcy Court's Order approving the sale pursuant to the terms of this Agreement, Purchaser and Trustee shall each be entitled to 50% of the associated death benefit (the "Death Benefit") of the subject policy. The subject policy will be withdrawn from the Policies to be transferred to Purchaser; there shall be no

4

adjustment to the Purchase Price.  Within ten (10) days after receiving the Death Benefit, or within such time as may otherwise be approved by the Court in the Bankruptcy Case, Trustee agrees to pay to Purchaser an amount equal to 50% of the Death Benefit of the subject policy received by Trustee.

c)  If,  after the entry of the Bankruptcy Court's Order approving the sale pursuant to the terms of this Agreement and Trustee's receipt of the balance of the Purchase Price, an insured individual under any Policy dies, Purchaser shall be entitled to receive  100% of the Death Benefit of such Policy, even if the death of such insured individual occurs prior to  the effective transfer of record ownership of such Policy to Purchaser.

5.  **Seller's Duties**:

a)  Seller shall make best efforts to provide Purchaser access to Debtor's life insurance files that are within the custody and control of Seller that contain documents and information concerning the Policies and the Lapsed Policies, which may include, copies of life insurance policies, life expectancy evaluations, premium illustrations, policy funding agreements, transfer of ownership forms, premium statements, grace notices, past due payment notices, correspondence, and medical records and other personally identifiable information of the insureds.  Debtor's life insurance policy files shall be made available to Purchaser for review and copying during regular business hours, upon reasonable advance notice, at the offices of Trustee's counsel.  NEITHER TRUSTEE NOR ITS COUNSEL MAKES ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF DEBTOR'S LIFE INSURANCE POLICY FILES OR THE ACCURACY, COMPLETENESS, ADEQUACY, OR TRUTHFULNESS OF THE DOCUMENTS, INFORMATION OR DATA CONTAINED THEREIN. LIKEWISE, NEITHER TRUSTEE NOR ITS COUNSEL MAKES ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY, COMPLETENESS, OR ADEQUACY OF ANY SUMMARIES, SPREADSHEETS OR MEMORANDA CONCERNING SUCH FILES, DOCUMENTS, INFORMATION OR DATA THAT HAVE BEEN PREPARED BY TRUSTEE OR TRUSTEE'S COUNSEL AND THAT MAY BE PROVIDED TO PURCHASER BY TRUSTEE OR TRUSTEE'S COUNSEL IN CONNECTION WITH THIS AGREEMENT OR THAT MAY OTHERWISE BE FOUND WITHIN DEBTOR'S LIFE INSURANCE POLICY FILES.

b)  Seller agrees to execute all required documents and forms and to take all steps necessary, to effect the transfer of ownership of the Policies and the Lapsed Policies to Purchaser.

c)  Seller shall perform, or cause to be performed, the Closing, which shall include obtaining a verification of coverage from the respective issuing insurance companies verifying th the Policy or Policies in question are in force, have no liens or loans against them and that the owners and beneficiaries are correctly listed as owners and beneficiaries on the records of the insurance companies that issued the Policies.

d)  Seller through Trustee's counsel shall file a Motion to Sell pursuant to 11 U.S.C Section 363 together with a Motion to Approve Bid Process, and a Motion to Expedite the consideration of the Motion to Sell and the Motion to Approve Bid Process. Trustee's counsel shall file such Motions within three (3) business days of receipt of the Purchase Price by Trustee's Counsel.

6. **Purchaser's Representations, Warranties and Acknowledgements**.   Purchaser represents and warrants to Trustee that as of the date hereof that:

   a) The Purchaser is a company legally organized, validly existing and in good standing under the laws of the State of its formation.  The Purchaser has the full organizational right, power and authority and has taken all necessary organizational action to authorize it to enter into, execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder.  No consent, approval or authorization of, or declaration, filing or registration with, any governmental authority, and no consent of any other person, including, without limitation, consents from parties to loans, contracts, leases or other agreements, is required in connection with execution, delivery and performance of this Agreement by the Purchaser.

   b) This Agreement has been duly executed and delivered by the Purchaser and constitutes the legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting enforceability of creditors' rights generally and except as availability of the remedy of specific performance, injunctive relief or other equitable relief is subject to the discretion of the court before which any proceeding therefore may be brought.

   c) There are no material actions, suits, claims, investigations or legal or administrative or arbitration (or other binding alternative dispute resolution) proceedings relating to this Agreement or the transactions contemplated hereby in respect of which the Purchaser has been served or, to the best of the Purchaser's knowledge, which is pending or threatened, in each case, before or by any governmental authority, and no judgment, award, order, writ, injunction, arbitration decision or decree has been entered against or served upon the Purchaser relating to this Agreement or the transactions contemplated hereby.

   d) The execution and delivery of this Agreement, the consummation by the Purchaser of the transactions contemplated hereby and the performance by the Purchaser of its obligations hereunder, do not and shall not (i) violate or conflict with the terms of, or result in a breach by the Purchaser of, or constitute a default under, any material contract or agreement to which the Purchaser is a party or by which such party may otherwise be bound or affected, (ii) violate any judgment, decree or order of any governmental authority applicable to the Purchaser, (iii) violate or conflict with any applicable law, or (iv) violate or conflict with the organizational documents of the Purchaser.

   e) If Purchaser chooses to resell the Policies, Lapsed Policies, or any interest therein, directly or indirectly, Purchaser shall comply with any and all state, federal and/or international laws, including all state and federal laws governing the sale of securities, applicable to such resale.

   f) Purchaser is knowledgeable about the sale and purchase of life insurance policies and understands that numerous risks exist in association with the purchase of the Policies, including the following:

      i. that the actual life span of the Insured may significantly exceed the Insured's estimated life expectancy;

6

ii. that for any given policy the premiums may increase significantly if the insured outlives the life expectancy projection

iii. that the life insurance company which issued the Policy on the Insured may become insolvent or become unable to pay some or all of the expected death benefit;

iv. that laws may change in a manner that adversely impacts the validity of viatical and life settlement contracts;

v. that the Insured may disappear or become untraceable;

vi. that an investment in the Policy is illiquid and the Policy is not readily resaleable;

vii. that no return will be realized until the Insured dies;

viii. that the Purchaser, subject to Closing, is responsible for making all premium payments, tracking all premium payments, the method and frequency of premium payments as well as any other actions required to keep the Policies in force, and that Trustee has no responsibility for any of these activities whatsoever; and

ix. that if the Insured(s) lives past their life expectancies it could have a material adverse impact or completely eliminate any expected return on an investment in the Policies.

g) It understands and acknowledges that any and all illustrations provided are merely projections provided by the insurance company to a future point in time, based upon current rate projections, and that Seller makes no representation as to the accuracy of such projections.

h) It understands and acknowledges that any and all premium payment schedules (PPS) are based upon illustrations that are merely projections provided by the insurance company to a future point in time, based upon current rate projections, and that Purchaser must rely upon the insurance company to provide accurate projections. Purchaser acknowledges that this may or may not be enough to carry the policy to that point.

i) It understands and acknowledges that Purchaser shall rely upon the respective insurance companies to provide accurate verification of coverage information.

j) Purchaser represents that there are no actions, suits or proceedings (whether administrative, regulatory, civil or criminal) pending, or to their knowledge threatened, against or affecting the Purchaser that could impact the Purchaser's ability to undertake the transactions set forth in this Agreement. Purchaser also represents that there are no actions, suits or proceedings (whether administrative, regulatory, civil or criminal) pending, or to their knowledge threatened, against or affecting the Purchaser or its officers, directors, employees, agents or affiliates related to allegations of improper fundraising or money laundering.

k) Purchaser represents and warrants that any funds borrowed, raised or otherwise obtained by the Purchaser in order to fund the transaction contemplated by this Agreement were

borrowed, raised or otherwise obtained in a legal manner, consistent with all applicable local, state, federal and/or international laws.

l)   No Person Affiliated with the Purchaser or that makes funds available to the Purchaser or any affiliate of the Purchaser in order to allow the Purchaser to fulfill its obligations under this Agreement or for the purpose of funding the investment in the Purchaser is: (A) a Person listed in the Annex to Executive Order No. 13224 (2001) issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), (B) named on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Assets Control, (C) a non-U.S. shell bank or is providing banking services indirectly to a non-U.S. shell bank, (D) a senior non-U.S. political figure or an immediate family member or close associate of such figure, or (E) otherwise prohibited from investing in the Purchaser pursuant to applicable U.S. anti-money laundering, anti-terrorist and asset control Laws, regulations, rules or orders.

m)  PURCHASER IS NOT RELYING UPON **AND HEREBY DISCLAIMS RELIANCE ON** ANY REPRESENTATION, WARRANTY, OPINION, STATEMENT OF FACT OR PREDICTION MADE BY TRUSTEE, OR TRUSTEE'S COUNSEL IN MAKING THE DECISION TO ENTER INTO THIS AGREEMENT. PURCHASER IS ACQUIRING ONLY THE RIGHTS AND TITLE TO THE POLICIES THAT TRUSTEE MAY HAVE AND ACKNOWLEDGES THAT PURCHASER IS TAKING OWNERSHIP WITHOUT REPRESENTATION OR WARRANTY, AND WITHOUT RECOURSE TO TRUSTEE OR THE ESTATE OF POLICY SERVICES, INC.

n)   Purchaser acknowledges that Trustee and Trustee's counsel is working from incomplete information concerning the status of the Policies and Lapsed Policies and cannot verify the accuracy or completeness of any of data or information provided to Purchaser.

o)   Other than an entity owned by the principal of the Purchaser having provided services to some of the deeproot entities prior to petition date, Purchaser and none of its owners, principals, agents, investors, lenders or any other persons who may benefit in some fashion from this Agreement or its consummation, has any connection to the Debtor or its principal, Mr. Robert Mueller. Purchaser has no intention or agreement, written, oral or otherwise to share in the profits, losses or in any other manner with the Debtor, its principals or an insider (including a non-statutory insider) as defined at 11 U.S.C. Section 101.

7.  **Provisions to be Included in Order Authorizing Trustee Sale**. The entry of an Order authorizing the sale of the Policies and Lapsed Policies to the Purchaser pursuant to the terms of the Agreement in the jointly administered cases under title 11 of the United States Code styled "In re Deeproot Capital Management, LLC, et al., jointly administered at Case No. 21-51523, United States Bankruptcy Court, Western District of Texas, San Antonio Division, which Order shall be effective and with respect to which no stay has been entered (or if a stay has been entered, such stay shall have been dissolved), shall contain the following provisions:

a)       authorizing and directing that the sale of the Policies and Lapsed Policies to the Purchaser is free and clear of any interest (including without limitation any liens or claims of purported owners of fractional interests, or of any debtors in the Bankruptcy Case) in such Policies or Lapsed Policies pursuant to 11 U.S.C. §363(f);

8

b)      an affirmative finding that the Policies (and Lapsed Policies) are not executory contracts of the kind which are subject to deemed rejection as described in 11 U.S.C. §365(d)(1);

c)      an affirmative finding that the Policies (and Lapsed Policies) are transferable and are transferred and that Purchaser has purchased the property "in good faith" for the purposes of 11 U.S.C. §363(m); and

d)      a provision that the Order is effective upon entry on the docket in the case pursuant to Bankruptcy Rule 6004.

8.  **Indemnification and hold harmless by Purchaser**.  Purchaser hereby indemnifies Seller and agents and lawyers, and any assignees, designees or successors of same (the "Seller Indemnified Parties") against, and agree to hold the Seller Indemnified Parties harmless from, any and all damages, losses, liabilities and expenses (including, without limitation, reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any action, suit or proceeding), incurred or suffered by the Seller Indemnified Parties arising out of, resulting from, or related to: (i) any misrepresentation or breach of any representation or warranty made by Purchaser pursuant to this Agreement; (ii) any breach of a covenant or agreement made or to be performed by Purchaser  pursuant to this Agreement, and (iii) any breach or violation of any applicable law by Purchaser in connection with this Agreement. Purchaser hereby holds harmless Seller and agents and lawyers, and assignees, designees, or successors of the same from, any and all damages, losses, liabilities and expenses incurred or suffered by Purchaser arising out of, resulting from, or related to: (i) any inaccuracy of any verification of coverage documentation provided by any insurance carrier at the time of closing; and (ii) the inaccuracy of any information provided by the insurance company in the verification of coverage at Closing.

9.  **Insured Tracking**.  Purchaser shall be responsible for tracking the insureds under the Policies.

10. **Liquidated Damages for a Breach by Purchaser.** In the event Purchaser fails to close on this transaction as a result of Purchaser's breach of this Agreement, Seller's sole remedy shall be to keep and retain 25% of the Deposit on Purchase Price as liquidated damages.  The Parties agree that the calculation of damages for a breach by Purchaser would be difficult to ascertain and that this remedy is a reasonable estimate of the damages which the Trustee may sustain due to breach.

11. **Binding Effect.** Once approved by the Bankruptcy Court for the Western District of Texas, this Agreement is irrevocably binding upon and shall inure to the benefit of and shall be enforceable by the parties hereto and their respective successors, assigns, executors, administrators and heirs.

12. **Severability.** If any provision of this agreement shall be held invalid in a court of law, the remaining provisions shall be construed as if the invalid provision were not included in this Agreement.

13. **Notices.** Any and all notices, requests, consents, notifications, and other communications given to any Party to this Agreement shall be given in writing and will be as elected by the party giving said notice, hand-delivered by messenger or courier service, telecopied, electronically communicated, or sent via registered or certified mail, return receipt requested, postage prepaid, to the address of

9

each party at the addresses below  and deemed given when received by Party being served such notice.

| Seller: | With a copy to counsel: |
|---|---|
| Jon Patrick Lowe | Randall A. Pulman |
| Chapter 7 Trustee for Estate of Policy Services, Inc. | Pulman, Cappuccio & Pullen, LLP |
|  | 2161 N. W. Military Highway, Suite 400 |
| Uvalde, Texas | San Antonio, Texas 78213 |
| Telephone: | Telephone: 210-892-0420 |
| E-mail: _____ | e-mail: rpulman@pulmanlaw.com |
| Purchaser | With a copy to counsel: |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

14. **Waiver.** Either Party's failure to insist in any one or more instances upon strict performance by the other Party of any of the terms of this Agreement shall not be construed as a waiver of any continuing or subsequent failure to perform or delay in performance of any term hereof.

15. **Contract Assignable.**  Purchaser may assign this Agreement and its obligations hereunder to an entity which is wholly owned by Purchaser provided such assignment is made expressly in writing and delivered to Seller.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their successors and assigns.

16. **Choice of law.** The Parties hereby agree and confirm that the laws of Texas and Title 11 of the United States Code shall control this Agreement.

17. **Counterparts and Facsimile.** This Agreement may be signed in one or more counterparts, each of which is deemed an original, but all of which together constitute one and the same instrument. A facsimile copy of this executed Agreement shall be deemed valid as if it were the original.

18. **Headings.** The headings and subheadings contained in this Agreement are for convenience of reference only and are not to be considered part of this Agreement and will not limit or otherwise affect in any way meaning or interpretation of this Agreement.

19. **Time.** Time is of the essence in this Agreement.

20. **<u>Representation by Counsel.</u>** The Parties acknowledge that they have been or have had the opportunity to have been represented by their own counsel throughout the negotiations and at the signing of this Agreement and all other documents signed incidental to this Agreement and, therefore, neither Party shall claim or assert that any provision of this Agreement or any ancillary documents should be constructed against their drafter.

In WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day, month and year first above written.


**SELLER:**

**By: _____**
    **Jon Patrick Lowe, Chapter 7 Trustee**
    **For the Estate of Policy Services, Inc.**
**Date:_____**



**PURCHASER:**

**By:_____**
**Name:_____**
**Its:_____**
**Date:_____**

**EXHIBIT A**

**POLICIES**

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy |
|---|---|---|---|---|---|
| **Protective Life Insurance Company (West Coast Life)** | ANDE75 | REDACTED | Inforce | REDACTED 575 | $2,000,000.00 |
| **Brighthouse Life Insurance Company** | JKN22A | REDACTED | Inforce | REDACTED 319 REDACTED | $2,500,000.00 |
| **John Hancock Life Insurance Company** | FEE287 | REDACTED | Inforce | REDACTED 287 | $500,000.00 |
| **John Hancock Life Insurance Company** | FEE548 | REDACTED | Inforce | REDACTED 548 | $500,000.00 |
| **Occidental Life Insurance Company NC** | MAR790 | REDACTED | Inforce | REDACTED 790 | $100,000.00 |
| **Transamerica Life Insurance Company** | JMD135 | REDACTED | Inforce | REDACTED 135 | $500,000.00 |
| **Brighthouse Life Insurance Company** | KFFN57 | REDACTED | Inforce | REDACTED 157 REDACTED | $500,000.00 |
| **Protective Life Insurance Company** | RID363 | REDACTED | Inforce | REDACTED 371 | $500,000.00 |

**EXHIBIT B**

**LAPSED POLICIES**

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy |
|---------|-----------|-----------|--------|---------------|----------------------|
| Midland National Life | GRR553 | REDACTED | Lapsed | REDACTED 553 | $242,520.00 |
| ING Reliastar Life (VOYA) | PER437 | REDACTED | Lapsed | REDACTED 378 | $1,000,000.00 |
| SunLife Financial | SUL428 | REDACTED | Lapsed | REDACTED 428 | $300,000.00 |
| SunLife Financial | SUL429 | REDACTED | Lapsed | REDACTED 429 | $300,000.00 |
| US Life City NY | UD33NL | REDACTED | Lapsed | REDACTED 0NL | $750,000.00 |
| Protective Life Insurance Company | LW7116 | REDACTED | Lapsed | REDACTED 116 | $1,100,000.00 |
| American General Life | JDE21L | REDACTED | Lapsed | REDACTED 21L | $633,342.81 |
| Transamerica Life | SIE687 | REDACTED | Lapsed | REDACTED 687 | $1,500,000.00 |
| AXA Equitable Life | FERN07 | REDACTED | Lapsed | REDACTED 607 | $10,000,000.00 |
| Mass Mutual | HCS883 | REDACTED | Lapsed | REDACTED 883 | $1,540,000.00 |
| Principal | ANDR62 | REDACTED | Lapsed | REDACTED 262 | $1,000,000.00 |
| Transamerica Life | BASH82 | REDACTED | Lapsed |  | $9,000,000.00 |

13

## EXHIBIT E

## SALE ORDER

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT CAPITAL MANAGEMENT, | § | |
| LLC, ET AL.,[1] | § | BANKRUPTCY NO. 21-51523-MMP |
| | § | LEAD CASE |
| DEBTORS. | § | JOINTLY ADMINISTERED |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| POLICY SERVICES, INC. | § | BANKRUPTCY NO. 21-51513 |
| | § | |
| DEBTOR. | § | JOINTLY ADMINISTERED |

**ORDER AUTHORIZING AND APPROVING THE SALE
OF CERTAIN PERSONAL PROPERTY FREE AND CLEAR OF ALL INTERESTS
PURSUANT TO 11 U.S.C. §§ 363(b) and (f)**

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, are: Policy Services, Inc. (2864), Wizard Mode Media, LLC (3205), deeproot Pinball LLC (0320), deeproot Growth Runs Deep Fund, LLC (8046), deeproot 575 Fund, LLC (9404), deeproot 3 Year Bonus Income Debenture Fund, LLC (7731), deeproot Bonus Growth 5 Year Debenture Fund, LLC (9661), deeproot Tech LLC (9043), deeproot Funds LLC (9404), deeproot Studios LLC (6283), and deeproot Capital Management, LLC (2638).

On March ___, 2022 the Court conduced a hearing on the *Motion* of John Patrick Lowe, the Trustee ("**Trustee**") of the bankruptcy estate of in the case of In re Policy Services, Inc., Case No. 21-51513, ("**Policy Services**") which case is jointly administered with that of deeproot Capital Management, LLC and other related entities at Case No. 21-51523-mmp, *for an Order Authorizing and Approving the Sale of Certain Personal Property Free and Clear of Interests Pursuant to 11 U.S.C. §§ 363(b) and (f)* (the "**Sale Motion**") concerning personal property described as follows:

> Life Insurance Policies detailed on Exhibit "A-1" to the Sale Motion and attached hereto as Exhibit A, and incorporated by this reference (the "**In-Force Insurance Policies**");

> Life Insurance Policies detailed on Exhibit "A-2": to the Sale Motion and attached hereto as Exhibit B, and incorporated by this reference (the "**Lapsed Insurance Policies**"),

The "In-Force Insurance Policies" and the "Lapsed Insurance Policies" are referred to herein, collectively, as "**the Assets**". The sale and conveyance of the Assets for which approval is sought is occasionally referred to herein as "the Sale". The Court has reviewed the Sale Motion and has heard the evidence in support of the relief requested therein at a hearing before the Court on _____, 2022 (the "**Sale Hearing**").   The Court considered any objections to the Sale Motion, each of which are overruled, resolved, or withdrawn; and including the announcements and agreements stated on the record at the hearing, the Court has determined that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein.  After due deliberation the Court finds that:

1.      Jurisdiction and Venue.  This Court has jurisdiction over this bankruptcy case and the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 105(a).  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (M).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

2.      <u>Statutory Predicates</u>.  The statutory predicates for the relief sought in the Sale Motion are sections 105(a) and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") 2002, 6004, 9007 and 9014, and the applicable Local Rules for the United States Bankruptcy Court for the Western District of Texas (the "**Local Rules**").

3.      <u>Final Order</u>.  This order approving the Sale Motion (the "**Order**") constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and to any extent necessary under Bankruptcy Rules 9014, Rule 54(b) of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7054, and any other applicable rule or law, the Court expressly finds that there is no just reason for the delay in the implementation of this Order, waives any stay, and expressly directs entry of the order as set forth herein.  This Order shall be effective and enforceable immediately upon entry.

4.      <u>Notice</u>.  As evidenced by the certificates of service filed with this Court, based upon the record of the case and representations of counsel at the Sale Hearing:  (i) in accordance with inter alia, Bankruptcy Rule 2002, due proper, timely, adequate and sufficient notice of the Sale Motion and the transactions contemplated by Sales Procedures Order (Docket No. _____) (the "**Sale**") has been provided; (ii) no other or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate under the circumstances of this bankruptcy case; and (iv) no other or further notice of the Sale Motion, the Sale Hearing or the Sale is or shall be required.  The disclosures made by the Trustee concerning the Sale Motion, the Sale, the Sale Hearing were reasonable, adequate, and complete.

5.      <u>Opportunity to Object</u>.  A reasonable opportunity to object and to be heard with respect to the proposed Sale, the Sale Motion and the relief requested therein has been given to

all interested persons and entities, including, without limitation, the following: (i) all potential purchasers previously identified by the Trustee and any additional parties who have expressed an interest in potentially acquiring the In-Force Insurance Policies and the Lapsed Insurance Policies, including those parties that have submitted formal expressions of interest; (ii) all other potentially interested parties identified by the Trustee in his business judgment as a potential purchaser of the In-Force Insurance Policies and the Lapsed Insurance Policies; (iii) the Office of the United States Trustee; (iv) all applicable federal, state and local regulatory or taxing authorities; and (v) the debtors and all parties on the most current service list.

6.      Arm's-Length Sale.  The Sale was negotiated, proposed, and entered into by the Trustee of behalf of Policy Services, Inc. and TuYo, Holdings, LLC, a Texas limited liability company ["**Turner-Yost Entity**"] for the purchase price of $1,078,389.36, and such additional consideration as provided in the Life Insurance Policy Purchase and Sale Agreement with respect to Lapsed Policies, without collusion, in good faith and from arm's-length bargaining positions. Neither the Trustee nor the Turner-Yost Entity, nor any of their respective representatives, have engaged in any conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code. Specifically, neither the Turner-Yost Entity, nor any of its representatives have acted in a collusive manner with any person. The terms and conditions of the Sale and the transaction contemplated thereby (including without limitation the consideration provided in respect thereof) are fair and reasonable and shall not be avoided under section 363(n) of the Bankruptcy Code.

7.      Good Faith Purchaser.  Turner-Yost Entity is purchasing the In-Force Insurance Policies and the Lapsed Insurance Policies in good faith and is a good faith purchaser of the Assets within the meaning of section 363(m) of the Bankruptcy Code and is therefore entitled to

all of the protections afforded by that provision. Turner-Yost Entity and its representatives have proceeded in good faith and without collusion in all respects in connection with the Sale and Sale Hearing.

8.      Sale in the Best Interests of the Trustee, the Debtors' Estates and Creditors.  Good and sufficient reasons for approval of the Sale have been articulated, and the relief requested in the Sale Motion and granted herein is in the best interest of the Trustee, Policy Services, Inc., and the other Debtors, their estates, their creditors, and other parties in interest.

9.      Business Justification.  The Trustee has demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Sale outside of the ordinary course of business under section 363(f) of the Bankruptcy Code in that, among other things, the immediate approval by this Court of the Sale to Turner-Yost Entity is necessary and appropriate to maximize the value of the Debtors' estates.   Given all the circumstances of this bankruptcy case and the adequacy and fair value of the purchase price, the proposed Sale constitutes a reasonable and sound exercise of the Trustee's business judgment and should be approved.

10.      Free and Clear.  Policy Services, Inc. is the sole and lawful owners of the In-Force Insurance Policies and the Lapsed Insurance Policies.  The conveyance of the In-Force Insurance Policies will be a legal, valid, and effective transfer of the Assets and vests or will vest Turner-Yost Entity  with all right, title, and interest of the Debtors to the Assets free and clear of all interests to the fullest extent permitted under 11 U.S.C. §363(f) including without limitation all liens (as defined in section 101(37) of the Bankruptcy Code, whether consensual, statutory, possessory, judicial or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code and including without limitation successor liability claims), or other interests, of any kind or

nature whatsoever, whether known or unknown, legal or equitable, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or after the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise, accruing, arising or relating thereto (collectively, the "Interests"[2]), at any time prior to the date of the Closing Date.

11. <u>Satisfaction of 363(f) Standards</u>. The Trustee may sell and transfer, and Turner Yost Entity may purchase, the In-Force Insurance Policies and the Lapsed Insurance Policies free and clear of any interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. The proposed sale of the In-Force Insurance Policies and the Lapsed Insurance Policies will be free and clear of all liens, claims, Interests, and encumbrances including any liabilities that arose prior to the Closing Date, with all such liens, claims, Interests, encumbrances and liabilities to transfer and attach to the sale proceeds with the same validity, priority, force and effect (if any) that such liens, claims, interests, encumbrances and liabilities had on the In-Force Insurance Policies and the Lapsed Insurance Policies immediately prior to the closing date.

12. <u>Not Executory Contracts</u>. The In-Force Insurance Policies and the Lapsed Insurance Policies, either individually or as a group, do not constitute "executory contracts" as that term is used in the context of 11 U.S.C. § 365. Without regard to their executory or non-executory nature, the Trustee, with Court approval, may transfer all right, title and interest of

---

[2] The term "Interests" as used in this Order includes, without limitations: all encumbrances; obligations; debts; liabilities; demands; guaranties; options; rights; restrictions; contractual commitments, including but not limited to, any license obligations; rights of first refusal or interests; any of the foregoing that purport to give to any party any defense, a defense or right of setoff, or recoupment against or a right or option to effect any forfeiture, modification or termination of the Debtors' interests in the Inforce Insurance Policies and the Lapsed Insurance Policies, or any similar rights; any of the foregoing arising under any mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, the interest of any Debtor other than Policy Services, Inc., or any other person or entity, whether asserted as to the totality of the Inforce Insurance Policies and Lapsed Insurance Policies, or any portion thereof, including any fractional interest in any such policy or policies.

Policy Services, Inc., in and to the In-Force Insurance Policies and the Lapsed Insurance Policies pursuant to 11. U.S.C. §§363(b) and 363(f).

13.  <u>Back-up Bid</u>.  In the event that the sale to Turner-Yost Entity does not close, the Trustee is authorized and directed to proceed to closing of a sale to _____, or their assigns, at a cash sales price of $_____ without further Order of this Court.

NOW, THEREFORE, IT IS ORDERED, ADJUDGMENT AND DECREED THAT:

1. <u>Sale Motion is Granted</u>.  The Sale Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein and on the record of the Sale Hearing, which is incorporated herein in its entirety, and the Sale as contemplated thereby is granted and approved. All findings of fact and conclusions of law of this Court stated on the record as part of the Court's ruling at the Sale Hearing are incorporated herein by reference and made a part hereof. The Trustee is authorized and directed to sell the In-Force Insurance Policies and the Lapsed Insurance Policies to Turner-Yost Entity for $1,078,389.36 and such additional consideration as is provided in the Life Insurance Policy Purchase and Sale Agreement with respect to the Lapsed Policies

2. <u>Objections Overruled</u>.  Any objections to the entry of this Order or the relief granted herein or requested in the Sale Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3. <u>Free and Clear</u>.  Except as expressly provided for in this Order, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, as of the Closing Date, the Trustee shall transfer, and Turner-Yost Entity shall take title to and possession of, the In-Force Insurance Policies and the Lapsed Insurance Policies free and clear of all Interests, with all such Interests attaching to the

proceed of sale, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the In-Force Insurance Policies and the Lapsed Insurance Policies.

4.  <u>Valid Transfer</u>.  As of the Closing Date, the transaction shall effect a legal, valid, enforceable and effective sale and transfer of the In-Force Insurance Policies and the Lapsed Insurance Policies to Turner-Yost Entity and shall vest the Turner-Yost Entity with valid legal title free and clear of any Interests of any kind whatsoever.  The In-Force Insurance Policies and the Lapsed Insurance Policies are transferred to Turner-Yost Entity "as is, where is" with all faults.

5.  <u>Direction to Release Interests</u>.  On the Closing Date, each of the Debtors, creditors or Interest holders is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Interests in the In-Force Insurance Policies and the Lapsed Insurance Policies, if any, as such Interests may have been recorded or may otherwise exist.

6.  <u>Good Faith</u>.  The transactions contemplated are undertaken by Turner Yost entity, its affiliates, agents, and representatives, without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization is duly stayed pending such appeal prior to the closing.  Turner-Yost Entity, which shall include its affiliates, agents and representative, is a good faith purchaser of the Assets, and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

7. <u>Retention of Jurisdiction</u>.  The Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, including, but not limited to, retaining jurisdiction to:  (a) interpret, implement and enforce the provisions of this Order and any related order; and (b) protect Turner-Yost Entity against any Interests in the of any kind or nature whatsoever that attach to the sales proceed.

8. Reserved

9. <u>Application of Sale Proceeds</u>.  Any and all valid and perfected Interests in the In-Force Insurance Policies and the Lapsed Insurance Policies shall attach to any proceeds in the order of priority, and with the same validity, force and effect (if any) that such liens, claims, Interests, encumbrances and liabilities had on the In-Force Insurance Policies and the Lapsed Insurance Policies immediately prior to the Closing Date.

10. <u>Non-Material Modifications</u>.  The Purchase Agreement and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Trustee or the Debtors' estates in the business judgment of the Trustee.

11. <u>General Authorization</u>.  The Trustee is further authorized and directed to perform such tasks and execute, acknowledge and deliver such instruments or documents as may be necessary to evidence and/or consummate the sale of the In-Force Insurance Policies and the Lapsed Insurance Policies pursuant to this Order.

12.  <u>No Stay of Order</u>.  Notwithstanding the provisions of the Bankruptcy Rule 6004 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry.  Time is of the essence in closing the transaction referenced herein, and the Trustee and Purchaser intend to close the Sale as soon as practicable.  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

13.  <u>Sale to the Back-up Bidder</u>.      In the event that the sale to Turner-Yost Entity does not close, the Trustee is authorized and directed to proceed to closing of a sale to_____ or their assigns, at a cash sales price of _____ in accordance with the other terms of this Order.

14.  <u>Order Controls</u>.  To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in this bankruptcy case, the terms of this Order shall govern.

15.  The Court herein incorporates all rulings made on the record as part of this Order.

###

**<u>Submitted by</u>**:

Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile
**ATTORNEY FOR JOHN PATRICK LOWE,
CHAPTER 7 TRUSTEE**

# EXHIBIT A

## IN-FORCE INSURANCE POLICIES

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy | Acquisition Cost |
|---|---|---|---|---|---|---|
| Protective Life Insurance Company (West Coast Life) | ANDE75 | REDACTED | In-Force | REDACTED 575 | $2,000,000.00 | $1,212,121.21 |
| Brighthouse Life Insurance Company | JKN22A | REDACTED | In-Force | REDACTED 315 REDACTED | $2,500,000.00 | $1,648,351.65 |
| John Hancock Life Insurance Company | FEE287 | REDACTED | In-Force | REDACTED 287 | $500,000.00 | $338,983.05 |
| John Hancock Life Insurance Company | FEE548 | REDACTED | In-Force | REDACTED 548 | $500,000.00 | $338,983.05 |
| Occidental Life Insurance Company NC | MAR790 | REDACTED | In-Force | REDACTED 790 | $100,000.00 | $67,039.11 |
| Transamerica Life Insurance Company | JMD135 | REDACTED | In-Force | REDACTED 135 | $500,000.00 | $305,295.36 |
| Brighthouse Life Insurance Company | KFFN57 | REDACTED | In-Force | REDACTED 157 REDACTED | $500,000.00 | $254,104.00 |
| Protective Life Insurance Company | RID363 | REDACTED | In-Force | REDACTED 371 | $500,000.00 | $148,680.00 |

**Total Acquisition Cost:**  **$4,313,557.43**

**Purchase Price (25%):**  **$1,078,389.36**

# EXHIBIT B

## LAPSED INSURANCE POLICIES

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy |
|---|---|---|---|---|---|
| **Midland National Life** | GRR553 | REDACTED | Lapsed | REDACTED 553 | $242,520.00 |
| **ING Reliastar Life (VOYA)** | PER437 | REDACTED | Lapsed | REDACTED 378 | $1,000,000.00 |
| **SunLife Financial** | SUL428 | REDACTED | Lapsed | REDACTED 428 | $300,000.00 |
| **SunLife Financial** | SUL429 | REDACTED | Lapsed | REDACTED 429 | $300,000.00 |
| **US Life City NY** | UD33NL | REDACTED | Lapsed | REDACTED 0NL | $750,000.00 |
| **Protective Life Insurance Company** | LW7116 | REDACTED | Lapsed | REDACTED 116 | $1,100,000.00 |
| **American General Life** | JDE21L | REDACTED | Lapsed | REDACTED 21L | $633,342.81 |
| **Transamerica Life** | SIE687 | REDACTED | Lapsed | REDACTED 687 | $1,500,000.00 |
| **AXA Equitable Life** | FERN07 | REDACTED | Lapsed | REDACTED 607 | $10,000,000.00 |
| **Mass Mutual** | HCS883 | REDACTED | Lapsed | REDACTED 883 | $1,540,000.00 |
| **Principal** | ANDR62 | REDACTED | Lapsed | REDACTED 262 | $1,000,000.00 |
| **Transamerica Life** | BASH82 | REDACTED | Lapsed | | $9,000,000.00 |

# **EXHIBIT F-1**

## **INDIVIDUAL INVESTORS/UNSECURED CREDITORS**

Exhibit to Schedule E/F 6.842: Numerous investors

| | |
|---|---|
| Elizabeth Allen | 407 Victory Ln, Mansfield, TX 76063-3489 |
| Philip Anderson | 6744 Hidden Hickory Cir., Colorado Springs, CO 80927-4049 |
| Debra Atkins | 5609 72nd St., Lubbock, TX 79424-1807 |
| Carter Berry | 8 North St., Taylors, SC 29687-2445 |
| Carrie Blair | 4502 80th St., Lubbock, TX 79424-3208 |
| Timothy Boykin | 1609 Main Blvd., Brownwood, TX 76801-1510 |
| Beau Brock | 1595 FM 3030, Silverton, TX 79257-5344 |
| Brooks Brock | 513 Commerce, Silverton, TX 79257 |
| Clifford Brock | 1595 FM 3030, Silverton, TX 79257-5344 |
| Shelley Brock | 1595 FM 3030, Silverton, TX 79257-5344 |
| Henry Chiles | 2491 Crown Orchard Rd., Batesville, VA 22924 |
| Judy Chiles | 2491 Crown Orchard Rd., Batesville, VA 22924 |
| Ann Clinkscales | 305 Parkwood Rd., Greenwood, SC 29646-8546 |
| Ricky Coker | 1121 Carriage Ct, Seabrook, TX 77586-2587 |
| David Croy | 203 Dunkirk Rd, Oldsmar, FL 34677-4001 |
| Jill Ellis | 3460 Compass Way, Bluff Dale, TX 76433-4205 |
| Janna Forbes | 842 County Road 325, Brownfield, TX 79316-7556 |
| Donald Haney | 5404 80th St., Lubbock, TX 79424-2825 |
| Nazlin Hemani | 12514 Eagles Entry Dr., Odessa, FL 33556-2831 |
| Randall James | 556 CR 189, Zephyr, TX 76890-4116 |
| John Jennings | 3015 Cokesbury Rd., Hodges, SC 29653-9177 |
| Karen Jennings | 3015 Cokesbury Rd., Hodges, SC 29653-9177 |
| Becca Judd | 1176 El Nito Ct., Henderson, NV 89012-5005 |
| Charles Knight | 2178 Old Greenville Rd., Staunton, VA 24401-9608 |
| Gregory Knight | 2096 Old Greenville Rd, Staunton, VA 24401-9611 |
| Audrey Mallinckrodt | 210 High Meadow Ln, Foley, MO 63347-2871 |
| Billy Massey | 7110 Forbess Dr., Brownwood, TX 76801-0059 |
| Karen Masters | 1200 N Veitch St APT 410, Arlington , VA 22201-5822 |
| Forrest Mayes | 3850 C.R. 276, Zephyr, TX 76890-3856 |
| Bryan Miles | 4939 Monterey Dr., Frisco, TX 75034-4083 |
| E. Omsberg | 563 Sherwood Forrest Dr., Woodville, TX 75979-7272 |
| Lloyd Omsberg | 563 Sherwood Forrest Dr., Woodville, TX 75979-7272 |
| Dennis Plunk | 201 Brickey Rd., Dumas, TX 79029-3548 |
| Sonja Romero | 6532 7th St., Lubbock, TX 79416-3770 |
| Bill Rousseau | 6905 Michelle Dr., Amarillo, TX 79109-7414 |
| Lauri Rousseau | 6905 Michelle Dr., Amarillo, TX 79109-7414 |
| Marsha Sanders | 7477 PR 2564, Quinlan, TX 75474-5252 |
| Jimmy Soules | 8100 County Road 206, Grandview, TX 76050-3616 |
| Susan Soules | 8100 County Road 206, Grandview, TX 76050-3616 |
| Patty Stovall | 215 Creekwood Dr., Bandera, TX 78003-4217 |
| Wesley Stovall | 215 Creekwood Dr., Bandera, TX 78003-4217 |
| Julia Towler | 5239 Preserve Park Dr., Spring, TX 77389-1551 |
| Jason Uldrick | 1201 Abner Creek Rd., Greer, SC 29651-7156 |
| Thomas Walker | 28302 Bonn Mountain, San Antonio, TX 78260-1416 |
| Mark Weaver | 4618 13th St., Lubbock, TX 79416-4824 |
| Alma Wesley | 3215 Windshire Ln Unit 211, Charlotte, NC 28273-4190 |
| Alan Wolf | 115 Linkside Dr., Taylors, SC 29687-6611 |

Exhibit to Schedule E/F 6.842: Numerous investors

| | |
|---|---|
| Susan Wolf | 115 Linkside Dr., Taylors, SC 29684-6611 |
| Gary Worley | 814 Brook Hollow St., Brownwood, TX 76801-6306 |
| Leah Wotipka | 15611 Long Road, Houston, TX 77044-5929 |
| C&C, LLC | 2491 Crown Orchard Rd., Batesville, VA 22924 |
| Generations Funding, LLC | 115 Linkside Dr., Taylors, SC 29687-6611 |
| Howard M. Carr Revocable T | 1029 Grand Isle Dr, Naples, FL 34108-3324 |
| Jarmco, Inc. | 2811 Hood St Unit J, Dallas, TX 75219-4807 |
| The Dewbre Family Trust | 908 N Austin St., Comanche, TX 76442-1735 |
| The Stovall Family Trust | 106 Yaupon Dr., Kerrville, TX 78028-7709 |

# **EXHIBIT F-2**

## **DEBTOR'S PRE-PETITION BALANCE SHEET**

3:10 PM

01/07/21

Cash Basis

# Policy Services, Inc.
## Balance Sheet
### As of December 31, 2020

|  | Dec 31, 20 |
|---|---:|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Client Reserve 3081 | 1,012.67 |
| Corporate Checking 8461 | 289.25 |
| RFA 3099 | 134.31 |
| Sweep Account 8487 | 67.88 |
| **Total Checking/Savings** | 1,504.11 |
| | |
| **Other Current Assets** | |
| Hawaii Investment | 135,000.00 |
| Security Deposit (Silicon Dr) | 200,797.96 |
| CCW Investment | 1,241,000.00 |
| A/R--Robert Mueller | 2,034,870.17 |
| **Internal Investments** | |
| Food Development Stk Investment | 435,000.00 |
| **Horizon Trust** | |
| Money Market Account | 3.00 |
| **Total Horizon Trust** | 3.00 |
| **Total Internal Investments** | 435,003.00 |
| | |
| Commissions & fees | 2,540,521.23 |
| **Investor Acquisitions** | |
| Investors Acquisitions-not iden | 5,169.76 |
| Paul | 25,000.00 |
| Bash82 | 4,045,275.00 |
| Ridley - RID363 | 191,225.00 |
| SEI Trust - FERN07 | 3,242,199.49 |
| American General - JDE21L | 457,704.34 |
| West Coast Life - ANDE75 | 947,054.54 |
| American General - UD33NL | 483,250.32 |
| Mass Mutual - Smith HCS883 | 1,004,922.45 |
| Midland National - GRR553 | 177,257.01 |
| Metlife Investors US - JKN22A | 1,434,095.09 |
| Principal - ANDR62 | 412,126.00 |
| Principal - Androli | 45,689.00 |
| Protective Life - LW7116 | 236,083.97 |
| Sunlife - SUL428 | 208,359.90 |
| Sunlife - SUL429 | 208,359.54 |
| ING Reliastar Life Ins - PER437 | 619,608.26 |
| John Hancock - FEE287 | 320,160.41 |
| John Hancock - FEE548 | 319,953.18 |
| Jackson National - MILU82 | 19,000.00 |
| Transamerica Life - SIE687 | 842,973.81 |
| Occidental Life - MAR790 | 55,765.06 |
| Transamerica Life -JMD135 | 251,355.72 |
| Brighthouse - Kaufmann - KFFN57 | 261,337.00 |
| **Total Investor Acquisitions** | 15,813,924.85 |
| **Prepaid Expenses** | 150,000.00 |
| **Total Other Current Assets** | 22,551,117.21 |
| **Total Current Assets** | 22,552,621.32 |
| | |
| **Fixed Assets** | |
| Leasehold Improvements | 99,103.66 |
| **Pinball Machines** | |
| Original Cost | 41,140.47 |
| **Total Pinball Machines** | 41,140.47 |

Page 1

3:10 PM
01/07/21
Cash Basis

# Policy Services, Inc.
# Balance Sheet
### As of December 31, 2020

|  | Dec 31, 20 |
|---|---|
| **Office Equipment** | |
| Original Cost | 44,751.60 |
| **Total Office Equipment** | 44,751.60 |
| **Computer Equipment** | |
| Original Cost | 60,658.81 |
| **Total Computer Equipment** | 60,658.81 |
| **Computer Software** | |
| Original Cost | 12,284.45 |
| **Total Computer Software** | 12,284.45 |
| **Furniture & Fixtures** | |
| Original Cost | 77,999.94 |
| **Total Furniture & Fixtures** | 77,999.94 |
| **Improvements** | |
| Original Cost | 24,739.27 |
| **Total Improvements** | 24,739.27 |
| Accumulated Depr | -242,155.00 |
| **Total Fixed Assets** | 118,523.20 |
| **TOTAL ASSETS** | **22,671,144.52** |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| N/P--Wells Fargo LOC | 34,941.24 |
| N/P--EIDG | 10,000.00 |
| N/P--PPP Loan | 112,948.00 |
| **Intercompany Loans** | |
| Due from WMM | -7,255.10 ✓ |
| Due from DR Studios, LLC | -184,115.28 — |
| Due from Deeproot Queue Fund, L | -89,850.15 *closed* |
| Due from DR Tech, LLC | -362,252.95 — |
| Due from DR STFR Debenture Fund | 40,264.00 *closed* |
| Due from Deeproot Funds LLC | 8,724,260.63 — |
| Due from DR Bonus Growth 5 Yr | 2,472,718.04 — |
| Due from DR 3 Year Bonus Reset | 449,868.78 — |
| Due from DR 3 Year Bonus Income | 29,448.29 *closed* |
| Due from DR 575 Fund | 13,280,209.51 — |
| Due from DR Growth Runs | 8,668,259.11 — |
| Due from DR Pinball, LLC | 185,682.64 — |
| **Total Intercompany Loans** | 33,207,237.52 |
| **Payable to Investors** | |
| **RFA Balance Accounts** | |
| Gallion, Kelly | 3,000.00 |
| **Total RFA Balance Accounts** | 3,000.00 |

3:10 PM

01/07/21

Cash Basis

# Policy Services, Inc.
## Balance Sheet
### As of December 31, 2020

| | Dec 31, 20 |
|---|---|
| **SWEEP** | |
| Hogan, Thomas M - TX120043 | 46,438.75 |
| Mower, Dora A - TX120047 | 450,000.00 |
| Mower, Dora A - TX120047 #2 | 60,000.00 |
| Quave, Jean M - TX120078 | 12,000.00 |
| Quave, Jean M - TX120078 #2 | 12,000.00 |
| Stephens, Maybelle | 176,000.00 |
| Stoval, Wesley J - TX120073 | 51,893.40 |
| Valenzuela, Brandi - TX120085 | 100,000.00 |
| **Total SWEEP** | 908,332.15 |
| **JDE21L--American General** | |
| Boykin, Timothy - TX120114 | 41,171.04 |
| Brock, Brooks - TX120110 | 6,926.94 |
| Mayers, Forrest - TX120041 | 110,000.00 |
| Wolf, Alan - SC120012 | 10,000.00 |
| Wotipka, Leah - TX120045 | 229,969.12 |
| **Total JDE21L--American General** | 398,067.10 |
| **ANDE75--West Coast Life** | |
| C&C, LLC | 50,000.00 |
| Haney, Donald - TX120115 | 8,801.28 |
| Boykin, Timothy - TX120114 | 67,152.93 |
| Brock, Beau - TX120108 | 15,203.28 |
| Carr, Howard - FL120019 | 20,000.00 |
| Clinkscales, Ann - SC120019 | 61,000.00 |
| Hemani, Nazlin - FL120029 | 100,000.00 |
| James, Randall - TX120096 | 50,000.00 |
| Judd, Becca - NV120011 | 112,781.49 |
| Sanders, Marsha - TX120094 | 17,983.51 |
| Soules, Susan - TX120062 | 318,106.21 |
| STFR Deb Fund, LLC Deeproot TX | 55,361.95 |
| **Total ANDE75--West Coast Life** | 876,390.65 |
| **UD33NL--American General Life** | |
| Boykin, Timothy - TX20114 | 55,966.35 |
| Carr, Howard - FL120019 | 10,000.00 |
| Clinkscales, Ann - SC20019 | 35,000.00 |
| Colby, David - TX120084 | 3,000.00 |
| Ellis, Jill - TX120071 | 11,472.23 |
| Soules, Jimmy - TX120061 | 24,000.00 |
| Soules, Susan - TX120062 | 92,591.43 |
| STFR Deb Fund, LLC Droot -TX01 | 180,843.05 |
| Stoval, James & Jo - TX120075 | 25,000.00 |
| Stoval, Patty - TX120074 | 23,484.63 |
| Stoval, Wesley - TX120073 | 5,000.00 |
| Wolf, Alan - SC1200012 | 10,000.00 |
| Worley, Gary - TX120064 | 50,000.00 |
| **Total UD33NL--American General Life** | 526,357.69 |
| **GRR553--Midland National** | |
| Massey, Billy - TX120097 | 94,424.85 |
| Valenzeula, Brandi - TX120085 | 21,335.40 |
| Walker, Thomas - TX120089 | 10,000.00 |
| **Total GRR553--Midland National** | 125,760.25 |

**3:10 PM**
**01/07/21**
**Cash Basis**

# Policy Services, Inc.
## Balance Sheet
### As of December 31, 2020

|  | Dec 31, 20 |
|---|---|
| **JKN22A--Metlife Investors US** | |
| Anderson, Phillip - CO120003 | 29,859.21 |
| Brock, Shelly - TX120106 | 13,318.23 |
| Clinkscales, Ann - SC120019 | 25,000.00 |
| Clinkscales, Ann - SC120019#2 | 25,000.00 |
| Croy, David - FL120016 | 35,251.42 |
| Deeproot BGD5 - TX120002 | 178,470.00 |
| Deeproot BRD3 - TX120003 | 43,650.00 |
| Dewbre, Bruce - TX120081 | 25,000.00 |
| Fairbrother, Jeffery - TX120082 | 150,000.00 |
| Haney, Donald - TX120115 | 8,801.00 |
| Jennings, John SC120015 | 33,000.00 |
| Jennings, Karen - SC120016 | 33,000.00 |
| Knight, Charles - VA120007 | 29,857.55 |
| Knight, Gregord - VA120004 | 38,816.72 |
| Mallinckrodt, Audrey - MO120023 | 85,900.00 |
| Masters, Karen - SC120032 | 33,604.40 |
| Plunk, Dennis - TX120105 | 22,161.10 |
| Saunders, Marsha - TX120094 | 15,000.00 |
| Towler, Julia S - TX120089 | 25,000.00 |
| Walker, Thomas - TX120089 | 25,000.00 |
| Wolf, Alan - SC120012 | 24,600.00 |
| Wolf, Susan - SC120013 | 55,000.00 |
| **Total JKN22A--Metlife Investors US** | 955,289.63 |
| | |
| **SUL428--Sunlife** | |
| Dewbre, Bruce - TX120081 | 75,000.00 |
| Jennings, John - SC120015 | 15,000.00 |
| Jennings, Karen - SC120016 | 15,000.00 |
| Wolf, Susan - SC120013 | 31,212.21 |
| **Total SUL428--Sunlife** | 136,212.21 |
| | |
| **SUL429--Sunlife** | |
| Boykin, Timothy - TX120114 | 38,709.68 |
| Brock, Clifford - TX120107 | 13,318.23 |
| Carr, Howard - FL120019 | 20,000.00 |
| Coker, Sr., Ricky - TX120102 | 25,000.00 |
| Fairbrother, Jeffery - TX120082 | 50,000.00 |
| Valenzeula, Brandi - TX120085 | 48,003.60 |
| **Total SUL429--Sunlife** | 195,031.51 |
| | |
| **PER437--ING Reliastar Life Ins** | |
| Wolf, Alan | 19,685.94 |
| Carr, Howard - FL120019 | 25,000.00 |
| Jennnings, Karen - SC120016 | 20,400.00 |
| Chiles, Henry - VA120006 | 34,865.43 |
| Haney, Donald - TX120115 | 8,801.00 |
| Allen, Elizabeth - TX120092 | 42,495.00 |
| Anderson, Phillip - CO120003 | 29,859.20 |
| Clickscales, Ann - SC120019 | 55,000.00 |
| Fairbrother, Jeffery - TX120082 | 50,000.00 |
| James, Randall - TX120096 | 54,125.00 |
| Jennings, John - SC120015 | 10,000.00 |
| Massey, Billy - TX120097 | 97,000.00 |
| Masters, Karen - SC120032 | 20,000.00 |
| Romero, Sonja - TX120095 | 10,550.45 |
| Sanders, Marsha - TX120094 | 17,016.49 |
| Towler, Julia S - TX120119 | 25,000.00 |
| Weaver, Mark - TX120093 | 20,000.00 |
| Wesley, Alma - IN120009 | 20,813.89 |
| **Total PER437--ING Reliastar Life Ins** | 560,612.40 |

**Policy Services, Inc.**
# Balance Sheet
### As of December 31, 2020

3:10 PM

01/07/21

Cash Basis

|  | Dec 31, 20 |
|---|---|
| **FEE287--John Hancock** | |
| Atkins, Debra - TX120101 | 16,000.00 |
| Coker, Sr., Ricky - TX120102 | 10,000.00 |
| James, Randall - TX120096 | 50,000.00 |
| Masters, Karen - SC120032 | 20,000.00 |
| McLaughlin, Scott - TX120098 | 25,000.00 |
| Miles, Bryan - TX120099 | 96,464.67 |
| Sovall, Wesley - TX120073 | 100,000.00 |
| Weaver, Mark - TX120093 | 15,518.38 |
| Wolf, Alan - SC120033 | 6,000.00 |
| **Total FEE287--John Hancock** | 338,983.05 |
| | |
| **FEE548--John Hancock** | |
| Anderson, Philip - CO120003 | 65,281.03 |
| Chiles, Judy - VA120002 | 75,000.00 |
| Clinkscales, Ann - SC120019 | 35,000.00 |
| Forbes, Janna - TX120103 | 10,000.00 |
| Miles, Bryan - TX120099 | 103,535.33 |
| Plunk, Dennis - TX120105 | 18,166.67 |
| Romero, Sonja - TX120095 | 10,000.00 |
| Uldrick, Jason - SC120028 | 18,000.00 |
| **Total FEE548--John Hancock** | 334,983.03 |
| | |
| **MILU82--Jackson Natl Life** | |
| Jennings, Karen | 10,000.00 |
| **Total MILU82--Jackson Natl Life** | 10,000.00 |
| | |
| **SIE687--Transamerica Life** | |
| Berry, Carter - SC120034 | 72,698.53 |
| Blair, Stephen - TX120116 | 10,000.00 |
| Masters, Karen - SC120032 | 20,000.00 |
| Miles, Bryan - TX120099 | 100,000.00 |
| DR BGD 5 yr Debenture | 187,695.00 |
| **Total SIE687--Transamerica Life** | 390,393.53 |
| | |
| **MAR790--Occidental Life** | |
| Omsberg, Lloyd - TX120123 | 13,271.97 |
| Omsberg, E. Helen - TX120124 | 13,271.97 |
| Rousseau, Lauri - TX120122 | 22,837.94 |
| **Total MAR790--Occidental Life** | 49,381.88 |
| | |
| **JMD135--Transamerica Life** | |
| Jennings, John - SC120015 | 15,000.00 |
| Omsberg, Lloyd - TX120123 | 118,081.03 |
| Omsberg, E. Helen - TX120124 | 118,081.03 |
| Rousseau, Bill - TX120122 | 23,837.94 |
| **Total JMD135--Transamerica Life** | 275,000.00 |
| | |
| Payable to Investors - Other | 10,000.00 |
| **Total Payable to Investors** | 6,093,795.08 |
| **Total Other Current Liabilities** | 39,458,921.84 |
| **Total Current Liabilities** | 39,458,921.84 |
| | |
| **Long Term Liabilities** | |
| N/P--Ascentium | 74,018.33 |
| N/P--SBA | 100,700.00 |
| **Total Long Term Liabilities** | 174,718.33 |
| | |
| **Total Liabilities** | 39,633,640.17 |

3:10 PM

01/07/21

Cash Basis

## Policy Services, Inc.
## Balance Sheet
### As of December 31, 2020

|  | Dec 31, 20 |
|---|---|
| **Equity** | |
| Distributions--RM | -135,000.00 |
| Retained Earnings | -14,534,977.44 |
| Net Income | -2,292,518.21 |
| **Total Equity** | -16,962,495.65 |
| **TOTAL LIABILITIES & EQUITY** | 22,671,144.52 |

3:10 PM

01/07/21

Cash Basis

## Policy Services, Inc.
## Profit & Loss
### January through December 2020

|  | Jan - Dec 20 |
| --- | --- |
| **Ordinary Income/Expense** | |
| **Expense** | |
| IRA Fees | 200.00 |
| Finance Charges | 1,071.24 |
| Accounting Fees | 4,985.00 |
| Bank Charges | 1,544.31 |
| Contract Labor | 26,460.00 |
| Finders Fee | 638,784.73 |
| Insurance | 2,303.67 |
| **Insurance - Health** | |
| Employees | 532,172.48 |
| Rob | 23,634.78 |
| **Total Insurance - Health** | 555,807.26 |
| Legal Fees | 5,000.00 |
| Office Expenses | 958.76 |
| Outside Services | 840.00 |
| Payroll Processing Charges | 7,420.79 |
| Payroll Taxes | 42,877.49 |
| Rent or Lease | 381,531.50 |
| Salaries | 606,140.17 |
| Travel | 1,194.35 |
| **Total Expense** | 2,277,119.27 |
| **Net Ordinary Income** | -2,277,119.27 |
| **Other Income/Expense** | |
| **Other Income** | |
| Dividend Income | 601.06 |
| **Total Other Income** | 601.06 |
| **Other Expense** | |
| Loan Fees Forfeited | 16,000.00 |
| **Total Other Expense** | 16,000.00 |
| **Net Other Income** | -15,398.94 |
| **Net Income** | -2,292,518.21 |

# EXHIBIT G

## SALE PROCEDURES

## SALE PROCEDURES

On December 9, 2021 (the "**Petition Date**"), Policy Services, Inc., one of the eleven jointly administered debtors ("**Debtor**"), the owner and sole beneficiary of the Policies (defined below), filed a voluntary petition under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

On December 21, 2021, J. Patrick Lowe, was appointed chapter 7 Trustee ("**Trustee**") for the estate of *In re Policy Services, Inc.*, Case No. 21-51513, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division, which case is being Jointly Administered under *In re deeproot Capital Management, LLC, et al.*, Case No. 21-51523, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division.

These Sale Procedures have been approved and authorized pursuant to the *Trustee's Motion to Approve (A) Sale Procedures, Stalking Horse Agreement and Bid Protections in Connection with the Sale of Property of the Estate of Policy Services, Inc. and (B) the Form of Notice for the Sale of Property of the Estate of Policy Services, Inc.* (the "**Sale Procedures Motion**") and the *Order Approving Trustee's Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of Property of the Estate of Policy Services, Inc. and (B) the Form of Notice for the Sale of Property of the Estate of Policy Services, Inc.* (the "**Sale Procedures Order**"), entered by the United States Bankruptcy Court for the Western District of Texas, San Antonio Division.

### A. Assets to be Sold

Generally, the assets to be sold include the conveyance free and clear of all liens, claims, encumbrances, and interests in certain life insurance policies, as described on Exhibit A and Exhibit B attached hereto (collectively, the "**Policies**").

### B. Stalking Horse Agreement

Subject to the provisions set forth herein, Trustee has entered into a certain Life Insurance Policy Purchase and Sale Agreement (the "Stalking Horse Agreement") with TuYo Holdings, LLC, a Texas limited liability company (the "Stalking Horse Bidder"), pursuant to which Trustee has agreed to sell and the Stalking Horse Bidder has agreed to purchase the Policies, subject to the receipt and acceptance of an otherwise better Qualified Bid from a Qualified Bidder, as provided herein**.**

The Stalking Horse Agreement and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and the Stalking Horse Bidder will be deemed to be a Qualified Bidder. Other than as provided by order of the Bankruptcy Court prior to the entry of the Sale Order, no party submitting a Bid shall be entitled to a break-up fee or expense reimbursement except for the Bid Protections for the Stalking Horse Bidder that are approved by the Bankruptcy Court

### C. Submission of Initial Qualifying Bids by Potential Purchasers

Any party wishing to participate as a qualified bidder should submit (a) a sealed bid for the Policies ("**Bid**"), (b) a purchase agreement ("**Purchase Agreement**"), signed by an authorized representative of such bidder, marked against the Stalking Horse Agreement to show all changes

requested by such bidder, and (c) evidence of the bidder's financial ability to close the transaction, to J. Patrick Lowe, Trustee, 2402 E. Main, Uvalde, Texas 78801; email pat.lowe.law@gmail.com, and deposit Six Hundred Thousand and no/100 Dollars ($600,000.00) ("**Earnest Money Deposit**") with Trustee's counsel, Randall A. Pulman, at Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Phone No. (210) 222-9494, Fax No. (210) 892-1610; email rpulman@pulmanlaw.com by no later than **March 31, 2022** (the "**Bid Deadline**").

Any such Bid submitted by the Bid Deadline shall be in the amount of at least One Million, Two Hundred Fifty Thousand and no/100 Dollars ($1,250,000.00) to be a qualified bid ("**Qualified Bid**") and to allow the bidder to become a Qualified Bidder ("**Qualified Bidder**").  The deposited funds will be held by Pulman, Cappuccio & Pullen, LLP in its trust account until after the closing of the sale. The Earnest Money Deposit of all Qualified Bidders (except for the highest bidder (the "**Successful Bidder**")) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale

**The Bid should be sealed.**

### D.  <u>The Selection of the Successful Bid</u>

In the event Trustee receives at least one Qualified Bid by the Bid Deadline, the Trustee may in his absolute discretion, exercising only his best business judgment on behalf of the estate, negotiate with the Stalking Horse Bidder and one or more of the Qualified Bidders on price and terms of a Qualified Bid.

### E.  <u>Objections to Sale</u>

Any objection(s) filed to the sale of the Policies (i) shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position; (ii) shall be filed with the Court on or before **March 31, 2022** (the "**Objection Deadline**").  Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the Sale, including the transferring of the Property free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

### F.  <u>Court Approval</u>

In the event that Trustee has not received a Qualifying Bid with a cash offer of at least $1,250,000.00 by March 31, 2022, the Court shall hold a hearing to approve the sale of the Policies to the Stalking Horse Bidder or its assignee, free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. § 363.

In the event Trustee receives at least one Qualified Bid, counsel for Trustee will file a notice with the Court and notify the Court's courtroom deputy that the sale hearing will be continued to **April ___, 2022,** (the "**Sale Hearing**") where Trustee will seek approval of the sale of the Policies to the Successful Bidder.

At the Sale Hearing, Trustee will seek entry of an order approving the sale of the Policies to the Successful Bidder pursuant to 11 U.S.C. §363(f) and free and clear of all liens, claims, encumbrances, and interests.  The Sale Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court or by Trustee with the approval of the Successful Bidder and without further notice to creditors and parties in interest other than by announcement by Trustee of the adjourned date at the Sale Hearing.

Trustee's presentation to the Bankruptcy Court for approval of a Successful Bid does not constitute Trustee's acceptance of the Bid. Trustee will be deemed to have accepted a Bid only when the Bid has been approved by Order of the Bankruptcy Court.

### G.  Closing

The closing of the sale of the Policies shall occur no later than **May 2, 2022** (the "**Final Closing Deadline**"); provided, however, that this requirement may be waived upon an agreement between Trustee and the Successful Bidder.

### H.  Failure to Consummate Purchase

If any Successful Bidder fails to consummate the purchase of the Policies, and such failure to consummate the purchase is the result of a breach by such Successful Bidder, the Earnest Money Deposit of such Successful Bidder shall be forfeited to the Estate.

### I.  Back-Up Bidders

If any Successful Bidder fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, the Qualified Bidder that had submitted the next highest or otherwise best Qualified Bid at the Auction (if any), (the "**Back-Up Bidder(s)**") will be deemed to be the Successful Bidder for the Policies and Trustee will be authorized to consummate the Sale of the Policies to such Back-Up Bidder without further order of the Bankruptcy Court and such Qualified Bid shall thereupon be deemed the Successful Bid. If any Qualified Bidder fails to consummate the sale because of a breach or failure to perform on the part of such Qualified Bidder or for any reason within ten days after being deemed the Back-Up Bidder pursuant to this section of the Sale Procedures, the process described above may continue as determined by Trustee until a Qualified Bidder shall consummate the sale.

### J.  Return of Earnest Money Deposit

The Earnest Money Deposit of all Qualified Bidders, who are not the Successful Bidder, will be returned, without interest, to each such Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

### K.  Reservation of Rights

1.      Determination of Successful Bid. Trustee reserves the right to: (a) determine whether any Qualified Bid is a successful bid, and (b) reject, at any time prior to the entry of the Sale Order,

any Bid that the Trustee in its discretion determines to be inadequate, insufficient, not in conformity with the Sales Procedures or the Bankruptcy Code, or contrary to the best interest of the Trustee and its Estate.

      2.    <u>Modification of Bidding Procedures</u>. Trustee may modify the Sale Procedures, without the need for any further order of the Bankruptcy Court, including, without limitation (a) extending the deadlines set forth in these Sale Procedures, and (b) adjourning the Sale Hearing.

      3.    Nothing contained in these Sale Procedures, or the court's order, shall limit, restrict, alter, modify, waive or otherwise impair Trustee's reasonable business judgment in relation to the sale process contemplated by these Sale Procedures.

**L.  <u>As Is, Where As Sale</u>**

      The sale of the Policies shall be on an **"as is, where as"** basis and without representations or warranties of any kind, nature, or description by the Trustee, the Estate, or its agents and representatives. Except as otherwise expressly provided in these Sale Procedures, by submitting a Bid, each bidder shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Policies prior to makings its bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any and all documents and/or the Policies in making its bid, and (iii) did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Policies, or the completeness of any information provided in connection therewith.

**M.  <u>Trustee's 's Counsel</u>**

      Any questions regarding these Sales Procedures should be addressed to Trustee's Counsel whose contact information is:

Randall A. Pulman
rpulman@pulmanlaw.com
W. Drew Mallender
dmallender@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

## Exhibit A to Sale Procedures

### IN FORCE POLICIES

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy | Acquisition Cost |
|---|---|---|---|---|---|---|
| Protective Life Insurance Company (West Coast Life) | ANDE75 | REDACTED | In-Force | REDACTED 575 | $2,000,000.00 | $1,212,121.21 |
| Brighthouse Life Insurance Company | JKN22A | REDACTED | In-Force | REDACTED 315 REDACTED | $2,500,000.00 | $1,648,351.65 |
| John Hancock Life Insurance Company | FEE287 | REDACTED | In-Force | REDACTED 287 | $500,000.00 | $338,983.05 |
| John Hancock Life Insurance Company | FEE548 | REDACTED | In-Force | REDACTED 548 | $500,000.00 | $338,983.05 |
| Occidental Life Insurance Company NC | MAR790 | REDACTED | In-Force | REDACTED 790 | $100,000.00 | $67,039.11 |
| Transamerica Life Insurance Company | JMD135 | REDACTED | In-Force | REDACTED 135 | $500,000.00 | $305,295.36 |
| Brighthouse Life Insurance Company | KFFN57 | REDACTED | In-Force | REDACTED 157 REDACTED | $500,000.00 | $254,104.00 |
| Protective Life Insurance Company | RID363 | REDACTED | In-Force | REDACTED 371 | $500,000.00 | $148,680.00 |

Total Acquisition Cost:  **$4,313,557.43**

Purchase Price (25%):  **$1,078,389.36**

# Exhibit B to Sale Procedures

## LAPSED POLICIES

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy |
|---|---|---|---|---|---|
| Midland National Life | GRR553 | REDACTED | Lapsed | RED ACT ED 553 | $242,520.00 |
| ING Reliastar Life (VOYA) | PER437 | REDACTED | Lapsed | REDACTED 378 | $1,000,000.00 |
| SunLife Financial | SUL428 | REDACTED | Lapsed | REDACTED 428 | $300,000.00 |
| SunLife Financial | SUL429 | REDACTED | Lapsed | REDACTED 429 | $300,000.00 |
| US Life City NY | UD33NL | REDACTED | Lapsed | REDACTED 0NL | $750,000.00 |
| Protective Life Insurance Company | LW7116 | REDACTED | Lapsed | REDACTED 116 | $1,100,000.00 |
| American General Life | JDE21L | REDACTED | Lapsed | REDACTED 21L | $633,342.81 |
| Transamerica Life | SIE687 | REDACTED | Lapsed | REDACTED 687 | $1,500,000.00 |
| AXA Equitable Life | FERN07 | REDACTED | Lapsed | REDACTED 507 | $10,000,000.00 |
| Mass Mutual | HCS883 | REDACTED | Lapsed | REDACTED 883 | $1,540,000.00 |
| Principal | ANDR62 | REDACTED | Lapsed | REDACTED 262 | $1,000,000.00 |
| Transamerica Life | BASH82 | REDACTED | Lapsed | | $9,000,000.00 |

– 6 –

# **EXHIBIT H**

## **SALE NOTICE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT CAPITAL MANAGEMENT, | § | |
| LLC, ET AL.,[1] | § | BANKRUPTCY NO. 21-51523-MMP |
| | § | LEAD CASE |
| DEBTORS. | § | JOINTLY ADMINISTERED |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| POLICY SERVICES, INC. | § | BANKRUPTCY NO. 21-51513 |
| | § | |
| DEBTOR. | § | JOINTLY ADMINISTERED |

**TRUSTEE'S NOTICE OF SALE OF THE PROPERTY OF THE ESTATE OF POLICY SERVICES, INC.**

### PLEASE READ THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED AS SET FORTH HEREIN.

On December 9, 2021 (the "**Petition Date**"), the Debtors filed their respective voluntary petitions under Chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"). The Court approved joint administration of Debtors listed in the captioned footnote on December 20, 2021. On December 21, 2021, John Patrick Lowe was appointed Chapter 7 Trustee (the "Trustee") of the estates of the Jointly Administered Debtors.

On March ___, 2022, Trustee filed *Trustee's Motion to Approve (A) Sale of Life Insurance Policies, (B) Sale Procedures, Stalking Horse Agreement and Bid Protections in Connection with the Sale of Property of the Estate of Policy Services, Inc. and (C) the Form of Notice for the Sale of Property of the Estate of Policy Services, Inc.* (the "**Sale Procedures Motion**") seeking approval of certain procedures for the sale of and taking bids (the "**Sale Process**") on Policy Services, Inc.'s Estate's property. Through this Sale Process, Trustee seeks the highest and best offer(s) for the sale (the "**Sale**") of certain life insurance policies (the "**Policies**") free and clear of any and all liens, claims, rights, interests, and encumbrances in

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, are: Policy Services, Inc. (2864), Wizard Mode Media, LLC (3205), deeproot Pinball LLC (0320), deeproot Growth Runs Deep Fund, LLC (8046), deeproot 575 Fund, LLC (9404), deeproot 3 Year Bonus Income Debenture Fund, LLC (7731), deeproot Bonus Growth 5 Year Debenture Fund, LLC (9661), deeproot Tech LLC (9043), deeproot Funds LLC (9404), deeproot Studios LLC (6283), and deeproot Capital Management, LLC (2638).

accordance with Section 363(f) of the Bankruptcy Code, with such liens, claims, rights, interests, and encumbrances to attach to the sale proceeds. The Sale Process is subject to, and all offers must be in accordance with, the sale procedures approved by the Bankruptcy Court, which are attached hereto as **Exhibit A** (the "**Sale Procedures**").

On March \_\_\_, 2022, the Bankruptcy Court entered its *Order Approving Trustee's Motion to Approve (A) Sale of Life Insurance Policies, (B) Sale Procedures and Bid Protections in Connection with the Sale of the Property of the Estate of Policy Services, Inc. and (C) The Form of Notice for the Sale of the Property of the Estate of Policy Services, Inc.* [Docket No. \_\_\_ (the "**Sales Procedures Order**") in which the Bankruptcy Court, among other things, (a) approved the Sales Procedures, (b) approved the Stalking Horse Agreement, (c) approved the form and manner of notice of the Sale Procedures, (d) set an Objection Deadline to the Sale, and (e) established the date for the Sale.

Any party wishing to participate as a qualified bidder should submit (a) a sealed bid for the Policies ("**Bid**"), (b) a purchase agreement ("**Purchase Agreement**"), signed by an authorized representative of such bidder, marked against the Stalking Horse Agreement to show all changes requested by such bidder, and (c) evidence of the bidder's financial ability to close the transaction, to J. Patrick Lowe, Trustee, 2402 E. Main, Uvalde, Texas 78801; email pat.lowe.law@gmail.com, and deposit Six Hundred Thousand and no/100 Dollars ($600,000.00) ("**Earnest Money Deposit**") with Trustee's counsel, Randall A. Pulman, at Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Phone No. (210) 222-9494, Fax No. (210) 892-1610; email rpulman@pulmanlaw.com by no later than **March 31, 2022 at 5:00 p.m. prevailing Central Time** (the "**Bid Deadline**"). Any such Bid submitted by the Bid Deadline shall be in the amount of at least One Million, Two Hundred Fifty Thousand and no/100 Dollars ($1,250,000.00) to be a qualified bid ("**Qualified Bid**") and to allow the bidder to become a Qualified Bidder ("**Qualified Bidder**"). The deposited funds will be held by Pulman, Cappuccio & Pullen, LLP in its trust account until after the closing of the sale. The Earnest Money Deposit of all Qualified Bidders (except for the highest bidder (the "**Successful Bidder**")) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

In the event Trustee receives at least one Qualified Bid by the Bid Deadline, the Trustee may in his absolute discretion, exercising only his best business judgment on behalf of the estate, negotiate with the Stalking Horse Bidder and one or more of the Qualified Bidders on price and terms of a Qualified Bid and Trustee shall, in his absolute discretion, exercising only his best business judgment on behalf of the Estate, announce the Successful Bidder.

After announcing the Successful Bidder, Trustee shall request that the Court approval the Sale at a hearing to be held at Hipolito F. Garcia Federal Building and United State Courthouse, Courtroom No. 3, Fifth Floor, 615 E. Houston St., San Antonio, Texas 78205 **on April \_\_, 2022 at 9:30 a.m., prevailing Central Time** (the "**Sale Hearing**").

Objections, if any, to the consummation of the Sale, shall be filed with the Bankruptcy Court by no later than **March 31, 2022** (the "**Objection Deadline**"). Any person failing to timely file an objection to the Sale prior to the deadlines set forth in the Bid

Procedures Order shall be forever barred from objecting to the Sale, including the transferring of the Policies free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: _____
Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com

**ATTORNEYS FOR JOHN PATRICK LOWE, CHAPTER 7 TRUSTEE**

# EXHIBIT A TO SALE NOTICE
## SALE PROCEDURES

## SALE PROCEDURES

On December 9, 2021 (the "**Petition Date**"), Policy Services, Inc., one of the eleven jointly administered debtors ("**Debtor**"), the owner and sole beneficiary of the Policies (defined below), filed a voluntary petition under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

On December 21, 2021, J. Patrick Lowe, was appointed chapter 7 Trustee ("**Trustee**") for the estate of *In re Policy Services, Inc.*, Case No. 21-51513, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division, which case is being Jointly Administered under *In re deeproot Capital Management, LLC, et al.*, Case No. 21-51523, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division.

These Sale Procedures have been approved and authorized pursuant to the *Trustee's Motion to Approve (A) Sale Procedures, Stalking Horse Agreement and Bid Protections in Connection with the Sale of Property of the Estate of Policy Services, Inc. and (B) the Form of Notice for the Sale of Property of the Estate of Policy Services, Inc.* (the "**Sale Procedures Motion**") and the *Order Approving Trustee's Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of Property of the Estate of Policy Services, Inc. and (B) the Form of Notice for the Sale of Property of the Estate of Policy Services, Inc.* (the "**Sale Procedures Order**"), entered by the United States Bankruptcy Court for the Western District of Texas, San Antonio Division.

### A. Assets to be Sold

Generally, the assets to be sold include the conveyance free and clear of all liens, claims, encumbrances, and interests in certain life insurance policies, as described on Exhibit A and Exhibit B attached hereto (collectively, the "**Policies**").

### B. Stalking Horse Agreement

Subject to the provisions set forth herein, Trustee has entered into a certain Life Insurance Policy Purchase and Sale Agreement (the "Stalking Horse Agreement") with TuYo Holdings, LLC, a Texas limited liability company (the "Stalking Horse Bidder"), pursuant to which Trustee has agreed to sell and the Stalking Horse Bidder has agreed to purchase the Policies, subject to the receipt and acceptance of an otherwise better Qualified Bid from a Qualified Bidder, as provided herein**.**

The Stalking Horse Agreement and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and the Stalking Horse Bidder will be deemed to be a Qualified Bidder. Other than as provided by order of the Bankruptcy Court prior to the entry of the Sale Order, no party submitting a Bid shall be entitled to a break-up fee or expense reimbursement except for the Bid Protections for the Stalking Horse Bidder that are approved by the Bankruptcy Court

### C. Submission of Initial Qualifying Bids by Potential Purchasers

Any party wishing to participate as a qualified bidder should submit (a) a sealed bid for the Policies ("**Bid**"), (b) a purchase agreement ("**Purchase Agreement**"), signed by an authorized representative of such bidder, marked against the Stalking Horse Agreement to show all changes

requested by such bidder, and (c) evidence of the bidder's financial ability to close the transaction, to J. Patrick Lowe, Trustee, 2402 E. Main, Uvalde, Texas 78801; email pat.lowe.law@gmail.com, and deposit Six Hundred Thousand and no/100 Dollars ($600,000.00) ("**Earnest Money Deposit**") with Trustee's counsel, Randall A. Pulman, at Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Phone No. (210) 222-9494, Fax No. (210) 892-1610; email rpulman@pulmanlaw.com by no later than **March 31, 2022** (the "**Bid Deadline**").

Any such Bid submitted by the Bid Deadline shall be in the amount of at least One Million, Two Hundred Fifty Thousand and no/100 Dollars ($1,250,000.00) to be a qualified bid ("**Qualified Bid**") and to allow the bidder to become a Qualified Bidder ("**Qualified Bidder**").  The deposited funds will be held by Pulman, Cappuccio & Pullen, LLP in its trust account until after the closing of the sale. The Earnest Money Deposit of all Qualified Bidders (except for the highest bidder (the "**Successful Bidder**")) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale

**The Bid should be sealed.**

### D.  <u>The Selection of the Successful Bid</u>

In the event Trustee receives at least one Qualified Bid by the Bid Deadline, the Trustee may in his absolute discretion, exercising only his best business judgment on behalf of the estate, negotiate with the Stalking Horse Bidder and one or more of the Qualified Bidders on price and terms of a Qualified Bid.

### E.  <u>Objections to Sale</u>

Any objection(s) filed to the sale of the Policies (i) shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position; (ii) shall be filed with the Court on or before **March 31, 2022** (the "**Objection Deadline**").  Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the Sale, including the transferring of the Property free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

### F.  <u>Court Approval</u>

In the event that Trustee has not received a Qualifying Bid with a cash offer of at least $1,250,000.00 by March 31, 2022, the Court shall hold a hearing to approve the sale of the Policies to the Stalking Horse Bidder or its assignee, free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. § 363.

In the event Trustee receives at least one Qualified Bid, counsel for Trustee will file a notice with the Court and notify the Court's courtroom deputy that the sale hearing will be continued to **April ___, 2022,** (the "**Sale Hearing**") where Trustee will seek approval of the sale of the Policies to the Successful Bidder.

At the Sale Hearing, Trustee will seek entry of an order approving the sale of the Policies to the Successful Bidder pursuant to 11 U.S.C. §363(f) and free and clear of all liens, claims, encumbrances, and interests.  The Sale Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court or by Trustee with the approval of the Successful Bidder and without further notice to creditors and parties in interest other than by announcement by Trustee of the adjourned date at the Sale Hearing.

Trustee's presentation to the Bankruptcy Court for approval of a Successful Bid does not constitute Trustee's acceptance of the Bid. Trustee will be deemed to have accepted a Bid only when the Bid has been approved by Order of the Bankruptcy Court.

### G.  Closing

The closing of the sale of the Policies shall occur no later than **May 2, 2022** (the "**Final Closing Deadline**"); provided, however, that this requirement may be waived upon an agreement between Trustee and the Successful Bidder.

### H.  Failure to Consummate Purchase

If any Successful Bidder fails to consummate the purchase of the Policies, and such failure to consummate the purchase is the result of a breach by such Successful Bidder, the Earnest Money Deposit of such Successful Bidder shall be forfeited to the Estate.

### I.  Back-Up Bidders

If any Successful Bidder fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, the Qualified Bidder that had submitted the next highest or otherwise best Qualified Bid at the Auction (if any), (the "**Back-Up Bidder(s)**") will be deemed to be the Successful Bidder for the Policies and Trustee will be authorized to consummate the Sale of the Policies to such Back-Up Bidder without further order of the Bankruptcy Court and such Qualified Bid shall thereupon be deemed the Successful Bid. If any Qualified Bidder fails to consummate the sale because of a breach or failure to perform on the part of such Qualified Bidder or for any reason within ten days after being deemed the Back-Up Bidder pursuant to this section of the Sale Procedures, the process described above may continue as determined by Trustee until a Qualified Bidder shall consummate the sale.

### J.  Return of Earnest Money Deposit

The Earnest Money Deposit of all Qualified Bidders, who are not the Successful Bidder, will be returned, without interest, to each such Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

### K.  Reservation of Rights

1.      Determination of Successful Bid. Trustee reserves the right to: (a) determine whether any Qualified Bid is a successful bid, and (b) reject, at any time prior to the entry of the Sale Order,

any Bid that the Trustee in its discretion determines to be inadequate, insufficient, not in conformity with the Sales Procedures or the Bankruptcy Code, or contrary to the best interest of the Trustee and its Estate.

     2.   <u>Modification of Bidding Procedures</u>. Trustee may modify the Sale Procedures, without the need for any further order of the Bankruptcy Court, including, without limitation (a) extending the deadlines set forth in these Sale Procedures, and (b) adjourning the Sale Hearing.

     3.   Nothing contained in these Sale Procedures, or the court's order, shall limit, restrict, alter, modify, waive or otherwise impair Trustee's reasonable business judgment in relation to the sale process contemplated by these Sale Procedures.

## L.  <u>As Is, Where As Sale</u>

The sale of the Policies shall be on an **"as is, where as"** basis and without representations or warranties of any kind, nature, or description by the Trustee, the Estate, or its agents and representatives. Except as otherwise expressly provided in these Sale Procedures, by submitting a Bid, each bidder shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Policies prior to makings its bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any and all documents and/or the Policies in making its bid, and (iii) did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Policies, or the completeness of any information provided in connection therewith.

## M.  <u>Trustee's 's Counsel</u>

Any questions regarding these Sales Procedures should be addressed to Trustee's Counsel whose contact information is:

Randall A. Pulman
rpulman@pulmanlaw.com
W. Drew Mallender
dmallender@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

## Exhibit A to Sale Procedures

### IN FORCE POLICIES

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy | Acquisition Cost |
|---|---|---|---|---|---|---|
| Protective Life Insurance Company (West Coast Life) | ANDE75 | REDACTED | In-Force | REDACTED 575 | $2,000,000.00 | $1,212,121.21 |
| Brighthouse Life Insurance Company | JKN22A | REDACTED | In-Force | REDACTED 315 REDACTED | $2,500,000.00 | $1,648,351.65 |
| John Hancock Life Insurance Company | FEE287 | REDACTED | In-Force | REDACTED 287 | $500,000.00 | $338,983.05 |
| John Hancock Life Insurance Company | FEE548 | REDACTED | In-Force | REDACTED 548 | $500,000.00 | $338,983.05 |
| Occidental Life Insurance Company NC | MAR790 | REDACTED | In-Force | REDACTED 790 | $100,000.00 | $67,039.11 |
| Transamerica Life Insurance Company | JMD135 | REDACTED | In-Force | REDACTED 135 | $500,000.00 | $305,295.36 |
| Brighthouse Life Insurance Company | KFFN57 | REDACTED | In-Force | REDACTED 157 REDACTED | $500,000.00 | $254,104.00 |
| Protective Life Insurance Company | RID363 | REDACTED | In-Force | REDACTED 371 | $500,000.00 | $148,680.00 |

**Total Acquisition Cost:  $4,313,557.43**

**Purchase Price (25%):  $1,078,389.36**

# Exhibit B to Sale Procedures

## LAPSED POLICIES

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy |
|---|---|---|---|---|---|
| **Midland National Life** | GRR553 | REDACTED | Lapsed | REDACTED 553 | $242,520.00 |
| **ING Reliastar Life (VOYA)** | PER437 | REDACTED | Lapsed | REDACTED 378 | $1,000,000.00 |
| **SunLife Financial** | SUL428 | REDACTED | Lapsed | REDACTED 428 | $300,000.00 |
| **SunLife Financial** | SUL429 | REDACTED | Lapsed | REDACTED 429 | $300,000.00 |
| **US Life City NY** | UD33NL | REDACTED | Lapsed | REDACTED 0NL | $750,000.00 |
| **Protective Life Insurance Company** | LW7116 | REDACTED | Lapsed | REDACTED 116 | $1,100,000.00 |
| **American General Life** | JDE21L | REDACTED | Lapsed | REDACTED 21L | $633,342.81 |
| **Transamerica Life** | SIE687 | REDACTED | Lapsed | REDACTED 687 | $1,500,000.00 |
| **AXA Equitable Life** | FERN07 | REDACTED | Lapsed | REDACTED 507 | $10,000,000.00 |
| **Mass Mutual** | HCS883 | REDACTED | Lapsed | REDACTED 883 | $1,540,000.00 |
| **Principal** | ANDR62 | REDACTED | Lapsed | REDACTED 262 | $1,000,000.00 |
| **Transamerica Life** | BASH82 | REDACTED | Lapsed | | $9,000,000.00 |