# Exhibit 5

2015 and 2019 575 Fund PPMs




# EQUITY FUND PACKET WELCOME SHEET

## THANK YOU FOR CHOOSING deeproot® FUNDS!

As a premier alternative fund company, deeproot® is committed to making your investment experience the absolute best. We have provided some basic information about us and the application process below.

**We want to help!** So, please do not hesitate to contact us if you have any questions!

## I. PRE-QUALIFY

If you have not already done so, please start the application process by submitting the easy, secure webform at:
http://www.deeprootfunds.com/pre-qualify

## II. REVIEW MARKETING MATERIALS & APPLICATION PACKET

Once the Pre-Qualification webform is received, you will receive an overnight Application Packet for review. Please ask questions about our products or forms BEFORE you fill-out or submit your paperwork.

## III. SUBMIT APPLICATION & FUNDS

Please follow the instructions below depending on whether your money is non-qualified or qualified. **All applications must be accompanied by a color copy of your drivers license or other ID.** You can also email us a picture at contact@deeprootfunds.com.

### >> A. QUALIFIED – IRA/ROTH

For qualified investments (ie. IRA, Roth, SEP, etc.) you will simply fill out, sign and return to us the **Application & Subscription Agreement**. **Unless you are submitting a personal or direct rollover check, one (or more) IRA Transfer form(s), Limited Account Access and ID Notarization forms must also be completed and returned to us.** YOU KEEP THE 5305 & Bank of Utah AGREEMENT DOCUMENTS. **All qualified checks must be made out to: *Bank of Utah f/b/o (your name)***

### >> B. NON-QUALIFIED

For non-qualified investments (ie. using non-retirement funds) you will simply fill out, sign and return the **Application & Subscription Agreement**. We prefer WIRE TRANSFERS of the investment funds using the wiring information on the last page of the Application, over checks due to regulatory holds and fraud flags. **All non-qualified checks are subject to a $40.00 processing fee, & must be made out to: *deeproot Funds***

## IV. ACCEPTANCE AND RECEIPT

Once we accept your application and apply your investment funds, you will receive a welcome packet by mail. In the welcome packet, you will have a confirmation letter, an original authenticated Certificate of Ownership with the details of your investment, and a copy of your Application and other paperwork.



**Mailing**
deeproot Funds
PO Box 691610
San Antonio, TX 78269

**Physical**
deeproot Funds
8200 IH-10 West, Ste. 600
San Antonio, TX 78230

# THE575™ ALLOCATION MODIFICATION DISCLOSURE

## PURPOSE OF THIS DISCLOSURE

On January 20, 2017, deeproot Funds, LLC ('we', 'us') announced the modification of the underlying asset allocation of several of our funds. This includes the575™. We sent proxies to all prior investors to vote on the inclusion of two new minority allocations wherein we proposed that a Sports and Entertainment component and a Commercial Real Estate component replace a majority of the existing Tech allocation. These modifications were approved by a majority of votes.

Of the (up to) 45% already allowed under the575™ for Tech purposes, we have amended the PPM to allow between 0% and 20% to be directed to Sports and Entertainment and between 0% and 20% to be directed to Commercial Real Estate. The remainder may be used for Tech or Policies.

## EXCERPTS FROM THE PROXY

We have included the follow statement conveyed to investors for that proxy that explains the reasoning for doing so.

> *As we continue to grow, making the magic happen only gets more challenging in an ever changing marketplace. Those challenges are best resolved by being proactive. In looking forward over the next three to five years, we have found two key and critical diversification opportunities that will decrease external risk, create additional short term revenues, while not dramatically affecting the overall lower risk profile of our funds.*
>
> *As steward of your investment dollars, we will hold ourselves to the high standard you expect of us. The private placement memorandum you received for the funds you invested in permits us to add, change, or remove allocations with mere notice. ... The confidential disclosure documents detailing the new investment allocations can be viewed and downloaded from our secure website. Not only do they include details on the anticipated allocations, but also limitations and restrictions we must abide by.*
>
> *To be clear, Institutional Life Policies will always comprise the vast majority allocation that we employ. We are merely proactively tweaking the minor allocation assets to: i) enhance short term income; ii) bolster long term profitability; and iii) further minimize external risk.*
>
> *We will update the disclosure documents from time to time, as the allocations are employed on our secure portal to let you know how they are progressing. If you do not have access to our secure portal, please contact us to get signed up.*

## ACKNOWLEDGEMENT

By submitting an application for the575™, you acknowledge receiving the disclosures for the Sports and Entertainment and the Commercial Real Estate allocations which are contained herein. Furthermore, you agree to those allocations for the575™ and understand they are incorporated into the PPM as such. Lastly, you understand that we are bound by the disclosures therein, or as amended, and will abide by the terms and conditions set forth.



**Mailing**
PO Box 691610
San Antonio, TX 78269-1610

**Overnight/Physical**
8200 IH-10 West, Ste. 600
San Antonio, TX 78230

Toll Free (888) 316-2935

deeproot 575 Fund, LLC (the "Company", "us", "we", or "**the575™**") is a new private equity investment offering that will invest in a number of asset classes including life settlements or ownership of life insurance policies insuring the lives of persons not employed or affiliated with the Company; capital investments in deeproot Tech; and cash or cash equivalents. To capitalize the Company, we are offering a series of preferred membership interests ("shares" or "Offering") designed to meet the needs of Investors.

The Shares will be offered only to persons whom we reasonably believe are Accredited Investors as defined in Securities and Exchange Commission ("SEC") Regulation D, 17 CFR 501(a), and to the maximum legally allowable non-accredited or non-institutional investors; all of whom are known as "prospective investors." Prospective investors will be asked to complete an Application and Subscription Agreement, a Form W-9 and provide photo identification. We intend to claim an issuer's exemption from the requirement to register this offering under SEC Regulation D, Rule 506.

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION DOES NOT PASS UPON THE MERITS OF OR GIVE ITS APPROVAL TO ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING DOCUMENT OR OTHER SELLING LITERATURE. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE COMMISSION; HOWEVER, THE COMMISSION HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED HEREUNDER ARE EXEMPT FROM REGISTRATION.

THIS OFFERING INVOLVES A HIGH DEGREE OF RISK TO INVESTORS. See "Risk Factors."

| | Principal Amount[1] | Underwriting discount and commissions[2] | Proceeds to issuer or other persons |
|---|---|---|---|
| Per unit Total | $25,000.00 | $1,750.00 | $23,250.00 |
| | | | |
| Total Minimum[3] | $100,000.00 | $7,000.00 | $93,000.00 |
| Total Maximum | $25,000,000.00 | $1,750,000.00 | $23,250,000.00 |

[1]This is the aggregate principal amount of the Offering offered through this offering document.
[2] This offering is made primarily by us. However, we may engage third parties to help us sell Shares under this offering. Any persons who may receive compensation will be registered as a broker, or an otherwise lawful finder. Compensation to such persons, if any, will vary and may be paid out of the Investors principal.
[3] All proceeds will be held in a separate account until we have received the minimum amount of $100,000 in order to start the enterprise. Thereafter, we will not place prospective investors' monies in escrow or a separate account. Certain amounts may be retained for administration or management purposes.

DATED SEPTEMBER 1, 2015

**THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED TO DEEPROOT IF YOU DO NOT INVEST.**

NOTICES TO INVESTORS

THE LIMITED LIABILITY COMPANY SHARES HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY SECURITIES LAWS OF ANY STATE. THE SHARES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR EXEMPTIONS FROM REGISTRATION ARE AVAILABLE. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE AUTHORITY OR AGENCY HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING OR THE COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THERE IS NO PUBLIC MARKET FOR THE SHARES.

NO OFFERING LITERATURE, OTHER THAN THIS PRIVATE PLACEMENT MEMORANDUM, OR ADVERTISING, IN ANY FORM, WILL BE EMPLOYED IN THE OFFERING OF THESE SECURITIES. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OTHER THAN THOSE CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM, AND, IF MADE, SUCH REPRESENTATIONS MUST NOT BE RELIED UPON. THIS PRIVATE PLACEMENT MEMORANDUM IS SUBMITTED IN CONNECTION WITH THE PRIVATE PLACEMENT OF THESE SHARES AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE. ANY DISTRIBUTION OF THIS PRIVATE PLACEMENT MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS UNAUTHORIZED.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS PRIVATE PLACEMENT MEMORANDUM AS LEGAL OR TAX ADVICE. EACH INVESTOR SHOULD SEEK HIS OWN LEGAL AND TAX ADVICE AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT.

THE OFFEREE, BY ACCEPTANCE OF THIS PRIVATE PLACEMENT MEMORANDUM, AGREES TO RETURN THIS DOCUMENT AND ALL RELATED DOCUMENTS TO THE COMPANY IF THE OFFEREE DOES NOT DECIDE TO PURCHASE ANY OF THE SHARES OFFERED HEREBY.

THIS OFFERING IS PRELIMINARY AND MADE SUBJECT TO WITHDRAWAL, TERMINATION OR MATERIAL MODIFICATION BY THE COMPANY WITHOUT NOTICE. WHETHER OR NOT WITHDRAWN OR TERMINATED, THE COMPANY RESERVES THE RIGHT TO OFFER SHARES IN THE FUTURE AT A PRICE LESS THAN, EQUAL TO OR GREATER THAN THE PRICE OF SHARES OFFERED HEREBY. THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK AND ARE SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.

deeproot 575 Fund, LLC
(a Texas Limited Liability Company)

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

OFFERING DATED SEPTEMBER 1, 2015

The information in this Private Placement Memorandum ("PPM") is furnished on a confidential basis exclusively for the use of the person named below, who, by accepting this PPM, **agrees to return it promptly to the Company**, upon request or if no investment occurs, and agrees not to reproduce or disclose to any persons (other than such person's legal, tax, accounting and other advisors) all or any part off this PPM without the express written permission of the Company.

______________________________
Name

575x55
Copy No.

deeproot®

deeproot 575 Fund, LLC

("the575™")

$25,000,000

Class B Membership Shares

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**deeproot 575 Fund, LLC** (the "Company", "us, "we", "our", or "**the575™**") is a Texas limited liability company of which deeproot Funds, LLC ("dF") is the sole member. **dF** owns all of the Class A Membership Shares ("Class A Shares") and Robert J. Mueller, the sole principal of the deeproot® family of companies is the current Manager of the Company.

**the575™** is a significant step forward in the evolution of deeproot®'s fixed-rate, fixed-term investment options. **the575™** provides a securitized investment in a pool of life settlement policies and capital acquisition in deeproot Tech, which offers investors either a growth or income option in five year terms. The Operating Agreement of the Company is attached hereto as Appendix I. The Company's principal business office is located at 8200 W Interstate 10, Suite 600, San Antonio, Texas 78230. While ground-breaking, there is no assurance that the Company's business plan will be successful.

## I
## THE OFFERING

**Structure**

1. The Company is initially offering up to $25,000,000, or 1,000 Class B Membership Shares ("Class B Shares") at a price of $25,000 per Class B Share, or a fraction thereof. The minimum investment per transaction is $25,000, or 1 Class B Share. Fractional shares up to four decimal places are permitted. The Company reserves the right to increase the outstanding, issued, and/or authorized amount of Class B Shares, without notice or permission, to accommodate renewals by existing Class B Shareholders.

2. Subscription payments will be held in an interest-bearing account until at least $100,000 of Class B Shares (4 Class B Shares) are sold. Once the Company attains that level of sales, the Company will commence business by purchasing the first assets. If subscriptions to purchase at least 4 Class B Shares have not been accepted by January 31, 2016, and by unanimous vote of all Class B Shareholders, all payments received will be returned *pro rata*, together with interest earned thereon (if any). ** UPDATE: Subscriptions to purchase Class B Shares exceeded 4 shares by the end of calendar year 2015 and the Company commenced business. **

3. The Company will have a board of Managers who will be responsible for the management of the Company. Robert J. Mueller has been designated as the initial Manager. Biographies of the management team are contained herein.

4. Any commissions or discounts paid (if any) with respect to the offering of the Class B Shares shall be at the expense of the Company. Advisory fees shall be at the expense of the Class B Shareholder.

**Offering Details**

5. **the575™** is an equity investment with a Mandatory Call five years, less one day ("subscription term"), from the Start Date. The Start Date is the date when all of the following conditions are satisfied: i) the Class B Shareholder's Application and Subscription Agreement is approved by the Company; ii) the Class B Shareholder makes the irrevocable Priority Return Election; and iii) all subscribed funds/monies ("Invested Capital" or "Principal" herein) are received by the Company, and are available for use.

6. On or before the Start Date, a Class B Shareholder must make an irrevocable ***election*** as to how to receive the Priority Return. The "Priority Return" may either be: i) **deferred** (i.e. growth) – a simple fixed rate of seven percent (7%) per annum of the Invested Capital; the cumulative sum of deferred Priority Returns to be paid lump-sum on the Pay Date; or ii) **periodic** (i.e. income) – a fixed rate of five percent (5%) per annum of the Invested Capital, paid in monthly pro rata payments, commencing sixty days after the Start Date. The irrevocable ***election*** defined in this paragraph will herein be referred to as the "Priority Return Election."

7. On or about the thirtieth (30th) day after each Class B Shareholder's Mandatory Call ("Pay Date"), the Company will pay to the order of the respective Class B Shareholder the "Liquidation Amount", being equal to: i) the Invested Capital; and ii) a bonus (if any), as defined *infra* in sub-paragraph 9. *If the deferred Priority Return Election was chosen*, the Company will also pay any un-paid deferred cumulative Priority Returns.

8. If permitted by the Company, a Class B Shareholder may elect to ***renew*** for another subscription term if a Class B Shareholder provides written notice to the Company, that must be received at least three business days before the Pay Date, of such's intent to renew. The ability to renew is determined in the sole and absolute discretion of the Company.

» If renewed: i) the renewed Start Date shall be reset to the prior Pay Date; ii) the renewed Mandatory Call will be reset to five years, less one day, from the prior Pay Date, and iii) the Class B Shareholder must elect a new Priority Return Election, in writing, for the renewed subscription term, on or before the renewed Start Date.

» For any renewed subscription, "Invested Capital" or "Principal" shall thereinafter refer to sum of the: i) *reinvested* funds/monies from the prior Liquidation Amount; and ii) additionally contributed monies/funds (if any); all less any withdrawals or fees.

9. The Company provides two **bonus** opportunities. Any bonus credited by the Company will not be used in Priority Return calculations during the subscription term it is credited.

» For the initial subscription term only: a bonus equal to five percent (5%) of the Invested Capital will be credited on the Start Date, and paid on the Pay Date, unless renewed in part or in full, for any subscription wherein Invested Capital equals or exceeds $350,000.00.

» For all renewal subscription terms: If permitted by the Company at the time of renewal, and if the Class B Shareholder renews at least ninety percent (90%) of the prior subscription term's Liquidation Amount, then a bonus equal to five percent (5%) of the renewed Invested Capital will be credited on the renewed Start Date, and paid on the renewed Pay Date, unless renewed in part or in full again.

10. The Company is permitted to issue a "Premature Call" before the full five year Mandatory Call term is satisfied. However, the Company must satisfy the full Priority Return due any prematurely called Class B Shareholder(s), as if the full five year term had been satisfied by a *normal* Mandatory Call. All calls are made in the sole discretion of the Company and are absolute, and without recourse. Any normal, or adverse, income tax implications arising from a Premature Call are the sole responsibility of the Class B Shareholder.

11. **the575™** does not permit any Class B Shareholder to request any Invested Capital or Principal outside of a Mandatory or Premature Call. As such, Class B Shares (even in a periodic Priority Return Election) are not suitable for emergency, living expenses, other income requirements, or Required Minimum Distributions (RMDs).

12. Any investment, renewal, or additional contribution of Invested Capital must meet the aggregate minimum investment amount of $25,000.

13. The Company is responsible for all premiums or outlays to maintain the assets in return for an advance of principal, and a share of any assets that mature.

14. There are no costs, fees, or expenses that will be assessed against a Class B Shareholder's account, other than those disclosed in Articles VI or VII herein.

**Other Offering Details**

15. Class A Shareholders retain all standard voting rights. The Fund Advisor or Manager(s) retain sole and absolute discretion over due diligence, purchase, and maintenance of the assets.

16. Class B Shareholders have a right to receive certain information, as further described herein; and retain limited voting rights, such as the right to consent to: i) any substantial changes to the Offering; ii) substantial changes to the ownership or management of the Company; iii) the sale, lease, exchange or disposal of all or substantially all of the Company's property and assets; iv) any requirement that forces the majority of Class B Shareholders to make additional capital contributions; or v) any amendment or restatement of the Articles of the Company that would adversely impact the rights, privileges, or benefits of any Class B Shareholder.

17. Class B Shareholders are granted a contingent security interest in and to the underlying assets, pro rata, as a pool. As such, the Company agrees to not accept future principal, if doing so would result in non-securitization of a majority of Class B Shareholder positions.

18. If a Class B Shareholder dies, such Class B Shareholder's custodian(s), beneficiary(ies), legal representative(s), and/or assign(s) are subject to the same registration and terms upon which the Class B Shareholder would have been, had the Shareholder remained alive. The Company retains the sole and absolute right to require adequate documentation or authentication determinative of the legal right of the requesting custodian, beneficiary, legal representative, or assign to request or receive the deceased Class B Shareholder's principal and/or return. The Company also retains the absolute and sole discretion to reject any such request without a written order (to do so) issued by a court of proper jurisdiction.

## II
## SUITABILITY STANDARDS FOR INVESTORS

Investment in the Class B Shares of the Company offered hereby involves a high degree of risk. The Class B Shares offered hereby are suitable only for those investors whose business and investment experience, either alone or together with their financial advisors, makes them capable of evaluating the merits or risks of their prospective investments in the Company and who can afford to bear the economic risk of their investment for an indefinite period and have no need for liquidity in this investment. There will not be any public market for the Class B Shares. The Class B Shares have not been registered with the Securities and Exchange Commission, nor with any state securities agency. This is an offering made only to a limited number of investors for investment only. Each investor will be required to execute the Subscription Agreement. Under the Subscription Agreement, each investor will be required to represent, among other things, that he is acquiring the units for his own account, for investment, and not with any intention of making a distribution or resale thereof, either in whole or in part. Furthermore, no resale or transfer will be permitted except in accordance with the provisions of the Federal Securities Act of 1933, as amended, the rules and regulations thereunder, the applicable state securities laws, and the terms of the Operating Agreement.

No Class B Shares will be sold to any person unless he executes and delivers to the Company a copy of the Subscription Agreement and accompanying documents, which contain representations regarding the prospective investor's net worth and certain other matters. The Company will not accept subscriptions from any prospective investor unless such investor certifies that (1) his net income before taxes for each of the two immediately preceding years was at least $200,000 and there is a reasonable expectation of reaching the same income level in the current year, or (2) his net worth (exclusive of primary residence, furnishings and automobiles) is at least $1,000,000, or (3) his financial position is otherwise suitable for the degree of risk associated with this investment. In addition, a prospective investor must have sufficient knowledge and experience in financial and business matters to enable such prospective investor to evaluate the merits and risks of an investment in the Company or must have the assistance of a person other than the Company or its affiliates, who possesses such knowledge and expertise. The Company will have the sole discretion regarding admittance of any investor into the Company.

# III
# RISK FACTORS

Participation in the Company requires a minimum investment of 1 Class B Share ($25,000), and the ability and willingness of the investor to accept substantial investment risks and lack of liquidity.

In addition to the factors set forth elsewhere in this PPM, prospective investors in the Company should carefully consider the following.

INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL FORECASTS, HAS BEEN OBTAINED FROM THE COMPANY AND THE MANAGERS AND FROM OTHER SOURCES DEEMED RELIABLE. THIS INFORMATION HAS BEEN PREPARED BASED UPON CURRENTLY AVAILABLE DATA AND NECESSARILY INCORPORATES SIGNIFICANT ASSUMPTIONS AS TO FACTUAL MATTERS. THERE IS NO ASSURANCE THAT THESE ASSUMPTIONS ARE, OR WILL PROVE, ACCURATE IN ALL MATERIAL RESPECTS, SO THAT, AMONG OTHER THINGS, THE FINANCIAL FORECASTS CONTAINED HEREIN CAN, OR WILL, BE ATTAINED.

EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT HIS OWN TAX COUNSEL, ACCOUNTANT AND OTHER PERSONAL ADVISORS CONCERNING THE LEGAL, FINANCIAL AND TAX ASPECTS OF THIS INVESTMENT. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE ANY PART OF THE CONTENTS OF THIS SUMMARY AS LEGAL OR TAX ADVICE.

FURTHERMORE, INVESTORS CAN RECEIVE NO GUARANTEE WHATSOEVER THAT THEY WILL RECEIVE ANY RETURN ON THEIR CONTRIBUTIONS TO THE VENTURE. THE MANAGERS SHALL NOT HAVE ANY LIABILITY TO THE INVESTORS FOR ANY ACT OR OMISSION NOT AMOUNTING TO FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.

A. Lack of Operating History.

The Company has recently commenced operations and has no evidence other than that presented herein to predict future earnings. As such, the Company will be subject to all the risks of a new business enterprise.

B. Investors will not be able to evaluate our portfolio of Investments prior to purchasing Class B Shares.

Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them.

C. Investment in the Class B Shares involves an enhanced degree of risk.

We will only be able to meet our obligations to the Class B Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio. Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than other traditional investments offered in the open market. There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon.

D. It is possible Class B Shareholders may have to contribute additional money.

As more fully described below, when we acquire a life policy, we may be required to pay policy premiums. While it is anticipated that Class B Shareholders will never have to satisfy a future premium obligation, or other asset obligations, the Company reserves the right to request Class B Shareholders to advance additional principal if: i) the Class B Shareholders are given reasonable notice; and ii) by doing so is in the financial best interest of the Class B Shareholders.

E. Dependence on Managers.

The success of the Company will depend, to a significant extent, on the quality of the management provided by the Managers. In the event Robert J. Mueller is incapacitated or dies, or is removed or resigns, there can be no assurance that a satisfactory replacement could be obtained or would be available on the same terms. Furthermore, the Managers will not be obligated, and are not expected, to devote full time and attention to the affairs of the Company. The Class B Shareholders will have limited right to participate in the management of the Company.

F. Some Agreements, Including Those Involving Compensation, Not at Arms-Length.

As described herein, we and our parent entity(ies), as Class A Shareholders, will receive any returns from the pool of investments over the returns due and payable to Class B Shareholders. Our return may be potentially large and the magnitude of this return has been determined without the benefit of arms-length bargaining. However, in our opinion, the risk of loss to us and the fees and charges paid by us in connection with the investments, justifies the division of the total potential return.

deeproot Funds, LLC operates other investment funds. Those funds may, from time to time, purchase Class B Shares in the Company to hold as assets in those other funds. Should dF purchase Class B Shares, they are subject to the same identical terms as any other Class B Shareholder.

G. Lack of Liquidity.

The Class B Shareholders should be fully aware of the long-term nature of this investment. There is no market for resale of Class B Shares, nor is one likely to develop. The Shares are intended to be held indefinitely and are therefore, illiquid. As such, they are not suitable for emergency, living expenses, other income requirements, or required minimum distributions (RMD's). There are a number of restrictions on the transferability of the Class B Shares offered hereunder. In addition, Class B Shares may only be assigned subject to limitations imposed by federal and state securities laws and the necessity of avoiding adverse tax consequences. Additionally, an assignee may only become a substitute member with the consent of the Managers and upon satisfaction of the other conditions set forth in the Operating Agreement. Accordingly, Class B Shareholders may not be able to liquidate this investment, even in the event of an emergency. Additionally, the Company may decline to declare or distribute net maturity proceeds for reasons that may or may not be agreeable to Shareholders.

H. Not Suitable for Required Minimum Distributions.

The Shares are not intended to satisfy Required Minimum Distributions (RMDs), even though a Class B Shareholder's elected periodic Priority Return might be greater than the annual RMD requirement. RMD's generally are minimum amounts that a retirement plan account owner must withdraw annually starting with the year that he or she reaches 70 ½ years of age or, if later, the year in which he or she retires. As such, any RMD amount that would have been withdrawn from this Offering, must instead be withdrawn out of Shareholder's other qualified accounts.

I. Our Ability or Inability to Employ High Quality Underwriting Standards and Adhere to them in Building the Portfolio.

Our ability to find and obtain quality investments for our portfolio is a mission-critical endeavor. While we have current readily available sources of high quality investments, there is an inherent risk that such sources could be frustrated by external forces, yield lower quality investments, or dry up entirely.

J. Determination of Company's Profit and Loss.

Profit and loss shall be considered to have been earned over the period of the Company's fiscal year, except that profits and losses arising from the disposition of properties shall be taken into account as of the date thereof and except that if additional capital is contributed during the course of the Company's fiscal year, a separate determination of profit and loss shall be made as of the last day of the month preceding the month in which such additional capital is contributed, and the profit and loss of the Company for the period before such date shall be apportioned among the members in accordance with their respective interests on such date.

K. Determination of Class B Shareholder's Share of Profit.

In all cases, a Class B Shareholder's maximum share, over the duration of fiscal years held, of any profit is limited to the principal invested, plus any unpaid elected Priority Return.

L. No Guarantee of Fixed Returns.

Consistent and predictable growth is ideal in the Company's effort to provide the respective return. In the short-term, if overall growth in the value of our portfolio falls below our obligations to the Class B Shareholders, our excess reserves would be expected to cover the deficit. However, there is a risk that a longer term deficit will exceed our reserves, potentially lowering the return. As the actual death of an insured, maturity of any life policy, or return of capital from a capital acquisition are unknown at the time of investment, we may not be able to pay a periodic Priority Return or Liquidation Amount when due.

M. Inadequate Valuations and Their Effect on the Accounting of the Company and Class B Shares.

Low or inadequate valuations of our investment portfolio may lead to the appearance of an accounting deficit on a portion or all of the investment portfolio. Based upon the overwhelming intended allocation of investment funds to life policies and the fact that the face value of all life policies purchased for the portfolio will eventually be realized, we believe that Class B Shareholders will actually earn the amount owed upon each maturity. However, in the event of low valuations, the accounting of the investment portfolio may actually be less than when realized.

N. Possible Classification as an Investment Company.

Because we will invest in items which may be deemed to be securities, we could be classified as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Classification as an investment company under the Investment Company Act would have a substantial adverse impact on our operations as it would require registration with the SEC and various state securities agencies. We intend to restrict investment in our securities (including the Debentures) to a maximum of 100 Class B Shareholders in order to meet an exemption from registration under the Investment Company Act. Since we do not intend to register as an investment company, Class B Shareholders will not have any of the protections that may be afforded by the Investment Company Act.

O. Some Information may not be Provided.

Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, Class B Shareholders may not be permitted to request or receive sensitive, non-public, privileged or confidential information about the Company, including, but not limited to: details of underlying assets, sensitive accounting or transactions, trade secrets, identifiable payroll or personnel information, non-public (internal) marketing or sales information, etc.

P. Federal Income Tax Risks.

WE HAVE NOT OBTAINED A LEGAL OPINION CONCERNING THE TAX IMPLICATIONS OF AN INVESTMENT IN THE OFFERING. IT IS EACH PROSPECTIVE INVESTOR'S RESPONSIBILITY TO OBTAIN AN INDEPENDENT TAX OPINION CONCERNING THE TAX STATUS OR IMPLICATIONS OF INVESTING IN THE OFFERING. Investors are presumed to have access to needed legal and tax advice. Prospective investors are expected to consult their own tax advisors as to their own tax situation prior to investment in the Class B Shares. The cost of such consultation could, depending on the amount thereof, materially increase the cost of purchasing an interest in this Offering and may decrease any anticipated yield on the investment. A number of changes in the tax laws have been made and/or are under consideration, and such professional consultation is essential.

Q. Risk of Audit.

Our federal tax returns may be audited by the IRS. Such audit may result in the challenge and disallowance of some of the deductions or increase in the taxable income described in such returns. No assurance or warranty of any kind can be made with respect to the deductibility or taxability of any such items on our tax return in the event of either an audit or any litigation resulting from an audit. While an audit may decrease our ability to perform, such an audit should not affect the tax treatment afforded Investors with respect to the Offering.

## IV
## UNDERLYING ASSETS

**Life Policies**

We will invest in Life Policies (aka Life Settlements), which are sales to third parties, of existing life insurance contracts held on insureds who are 65 years of age or older. Policies are purchased for more than their cash surrender value but less than the net death benefits to be paid under the policies. These Life Settlements may, but are unlikely to, include policies on the lives of terminally ill patients under the age of 65 as long as such's combined Face Value is less than five percent (5%) of the aggregate Face Value of the pool of life policies. When we acquire such a contract, we may be required to pay the policy premiums in return for the receipt of the net death benefit as the new owner and beneficiary under the policy. Investments in these contracts involve certain risks, including liquidity risk, risk of excessive premium payments beyond the insured individual's life expectancy, credit risk of the insurance company, and inaccurate estimations of life expectancy of the insured individuals. These policies are considered illiquid in that they are bought and sold in a secondary market through life settlement agencies and not on any exchange

where settlement of a transaction is required in a timely manner. In the event of a bankruptcy of the insurance carrier for a policy, we may receive reduced or no benefits under the contract. Although unlikely, the Company may internally encounter losses on the investments if there is an inaccurate estimation of the life expectancies by having to pay higher-than-anticipated premium obligations.

We will seek to minimize risk by investing in policies issued by a diverse range of highly-rated insurance carriers; and in policies that vary: by life expectancy, by net death benefits, and by annual premium payments. We intend to reduce the life expectancy risk by investing only in contracts where the life expectancy was reviewed by an experienced independent medical professional and/or actuary, as well as by diversifying the investments across insured individuals' varying ages and medical profiles.

**Target Life Settlement Portfolio Summary**

| | |
|---|---|
| Minimum target age of insured individuals | 65 |
| % of Face Value <65 years of age | < 5% of aggregate investments |
| Policy Types | Whole, UL, IUL, VUL, Convertible Term |
| Life Expectancy Range | 3 - 12 years |
| Internal Life Expectancy/Premium Reserves | Life Expectancy + 1 |
| Insurance carrier [AM Best] rating | B++ or higher |
| Second to Die policies | < 5% of aggregate investments |

In the past, our principals have purchased life insurance policies through secondary market transactions directly from a middle source provider. The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Each policy considered by us will be underwritten by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured. We will base our life expectancy estimates on the estimates provided by the actuarial firm plus one year. The policies we will purchase are whole or universal life insurance policies issued by rated life insurance companies. Universal life insurance is a type of permanent life insurance in which premium payments above the cost of insurance are credited to the "cash value" of the policy. The cash value is credited each month with interest based on the terms of the insurance policy agreement. If a universal life insurance policy were to lapse, the insured or other owner of the policy would nonetheless have a right to receive the cash value of the policy. Universal life insurance is different from "term" life insurance in that "term" life insurance does not have a cash value associated with it. We may purchase convertible Term policies. Convertible term means that the term policy can be converted to a Universal Life policy under certain conditions.

The price we will be willing to pay for a policy in the secondary market is primarily a function of: (1) the policy's face value; (2) the expected actuarial mortality of the insured; (3) the premiums expected to be paid over the life of the insured; and (4) market competition from other competitors. We seek to earn profits by purchasing policies at discounts to the face value of the insurance benefit. The discounts at which we purchase are expected to exceed the costs necessary to pay premiums, financing and servicing costs through the date of the insured's mortality. We rely on the medical/actuarial life expectancy assumptions provided to us by third-party medical actuary underwriters to estimate the expected mortality of the insured.

**Capital Acquisition in deeproot Tech**

A capital acquisition is a purchase of an internal, affiliated investment position in another enterprise, wherein such enterprise is intended to enhance Company's reputability, safety, or financials through joint venture, partnership or collaboration, or minimize pool risk, lower administrative overhead or expenses, or to develop additional product lines. There is a high risk in this type of investment, which may yield higher gains or higher losses. We minimize this risk by limiting the capital acquisition component of the Company to forty-five percent (45%) of the asset portfolio.

The purpose of this investment type is: i) to provide liquid revenue or distributions to pay off positions sooner and more frequently than waiting on life policy maturities; and ii) the safer diversifying of underlying assets away from just life policies.

Currently, deeproot Tech's sole project is deeproot Pinball, LLC ("dP") which is anticipated to be a multi-year project, starting in 2016 or 2017. Capital acquisition in **dP** would consist of the purchase of **dP** Class B Shares that Company will hold, as are further outlined below.

» **dP** is offering up to $6,000,000 of Class B Membership Shares ("Class B Shares") at a price of $1,000 per Class B Share.

» Per annum, **dP** Class B Shares will be entitled to a Priority Return equivalent to: i) six percent (6%); and ii) a pro rata share of twenty percent (20%), as a class, of any allocations of net profits. For purposes of calculations, per annum refers to the then designated fiscal year of the Company.

» **dP** Class B Shares may be called at any time after December 31, 2016, at a call amount equal to the principal, plus: a cumulative ten percent (10%) per annum (or pro rata for partial years) return on the shares; less any Priority Return(s) previously distributed.

» **dP** will have common management and control, and will retain all voting rights.

» Pinball has been a staple for entertainment since the 1600's. Modern coin operated pinball grew from non-electric bagatelle machines during Prohibition. Modern solid-state pinball machines appeared in the mid-1970's and grew to a height in the 1990's with multiple manufacturers. By 2000, all but one manufacturer had left the business to focus on gambling, console & arcade games. Since 2000, demand for pinball machines has changed from a commercial to a home-use setting.

» Today, thousands of used and new pinball machines are sold every year, making pinball a profitable vintage industry in the tens of millions of dollars annually. Since 2012 interest and demand for new pinball machine concepts and designs, as well as sales prices, are at all-time highs. While complicated machines to design and manufacture, pinball machines do not require advanced circuitry or programming that modern arcade or video games require. Most of the basic components (switches, lamps, solenoids, plastic, metal, and wood) are in ready supply and haven't changed much in decades. This provides a lower entry cost into the industry. And because of the profit margins, an enterprise doesn't have to sell a lot of machines to be profitable.

» **dP's** approximate use of funds is as follows, and is subject to change at any time without notice:

| | | |
|---|---|---|
| Purchase of Equipment (est.) | $ 602,015 | 10.03% |
| Purchase of Real Property / Improvements (est.) | $3,250,000 | 54.17% |
| Organizational, Legal and Accounting Fees (est.) | $ 242,285 | 4.04% |
| R&D Overhead (est.) | $ 925,300 | 15.42% |
| Inventory / Working Capital / Capital Reserve (est.) | $ 980,400 | 16.34% |
| TOTAL | $6,000,000 | |

**Other Asset Classes**

The Company reserves the right to include other assets or asset classes, with reasonable notice to Class B Shareholders.

## V
## REPORTING

Class B Shareholders have certain rights to receive ongoing information about the Company, the Company's financial status, and the Class B Shareholder's position(s). Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, some information may be exempt from reporting.

Secure online access is available at https://secure.deeprootfunds.com. For purposes of this Offering/PPM, all references to Company's duty (whether mandatory or permissive) to report, notify, convey, or deliver any

information or document(s) shall be deemed to be reported, notified, conveyed, or delivered by online access to your secure account; whether or not you have requested such access. For shareholders that wish to have printed, postal mail notifications, you must contact us in writing.

We have an affirmative duty to provide some ongoing information without need for any Class B Shareholders' prior requests. These include:

» notice of any default of any underlying asset
» notice of a failure to pay a Liquidation Amount to any Class B Shareholder
» a statement of account at least once annually, or digital access to the same
» a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same
» notice of any adverse regulatory or legal notice, proceeding or decision regarding us that directly and significantly affects the Class B Shareholders' rights or values
» notice of any other event that has a significant potential to negatively affect our ability to return principal and interest to the Class B Shareholders

We also have a duty to release certain information only upon request by a Class B Shareholder. These include:

» a statement of account value at the time of request
» a statement of Company's current financial condition at the time of request

We retain the right to not release certain information to any Class B Shareholder. This information includes but is not limited to:

» copies of any confidential, privileged or proprietary information that does not directly involve any Class B Shareholder's interest
» any information concerning another Class B Shareholder's interest
» specific positions, investments, assets, or transactions underlying in our portfolio
» private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators

## VI
## COSTS AND APPLICATION OF PROCEEDS

The proceeds from the sale of Class B Shares will be used to begin purchasing assets identified above. We have already sought out appropriate assets, and (if not already attained), will commence operations upon receipt of a minimum of $100,000 from Class B shareholders. The proceeds of sales of additional Class B Shares will be used as the sales are closed. The following are the minimum amounts that will be utilized for the indicated purposes per $25,000 of principal received (or pro rata thereof), but may be less if no compensation is earned or paid.

| Cost of Services | Minimum Per $25,000 |
|---|---|
| Principal | $23,250.00 |
| Expenditures (~7%)<br>*Initial Compensation (if any)* | $ 1,750.00 |

**Agent Compensation**

If a Class B Shareholder is represented by a representative, agent, advisor, broker, or other professional who may legally receive compensation for referring, advising, or providing this Offering to Class B Shareholder, then the Company may pay to the order of such professional an amount of compensation that has been disclosed to the Class B Shareholder. There are some types of compensation that must be paid by the Class B Shareholder. In that case, the Class B Shareholder fully indemnifies Company from being responsible for those payments, as provided in Article VII. A representative, agent, advisor, or broker may not earn compensation on principal invested by the same (i.e. as a Class B Shareholder).

**Company Advance**

The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees. Despite an advance, one hundred percent (100%) of the Class B Shareholder's Principal shall be returned at the Pay Date.

## VII
## ADMINISTRATION STRUCTURE & FEES

The Company is managed by a Board of Managers. However, the sole current Manager is Robert J. Mueller, Esq. All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice.

| | |
|---|---|
| Annual Account Fee | $0.00 |
| Annual IRA/Qualified Fee | *As billed by the Bank of Utah, or,* $400 in 2016, $450 in 2017, and $500 per year in 2018 - 2020. * |
| Call Notice and Payment | $0.00 |
| Check Fee | $0.00 |
| Overnight Fee | $50.00 |
| EFT Fee | $25.00 |
| Wire Fee | $50.00 |
| Investor Advisory Fees | *See below* ** |

* For qualified positions: the Company will advance annual IRA custodian fees until all of any respective Class B Shareholder position(s) mature(s). The Company shall deduct any or all advanced annual IRA fees from an investor's Liquidation Amount at the (or *each*) Pay Date, up to the lesser of: i) the actual advance; or ii) $500.00 per year. After 2020, the contract between deeproot Funds and the Bank of Utah is up for renewal. Any fees assessed thereafter will not be known until after such negotiation has taken place, and the Company notifies all Class B Shareholders with IRA accounts whether the annual fee will exceed $500.00 per year.

** For Investor Advisory Fees: If Company is billed for and pays any investment advisory fees from an advisor or advisory firm that represents the Class B Shareholder, then such advisory fees, plus three percent (3%) compounded interest, shall be deducted from the respective Class B Shareholder's Liquidation Amount at the Pay Date.

## VIII
## PRINCIPALS & ADVISORS

**Robert J. Mueller, Esq.**
**Manager, the575™**

Robert J. Mueller is an attorney and financial advisor with over twelve years of experience in the legal and financial industries. Robert earned a B.B.A. in Finance from the University of Texas at San Antonio, while concurrently learning about the financial markets with USAA Investment Management Company. After completing his undergraduate studies, Robert attended St. Mary's Law School in San Antonio, where he graduated in December 2000.

Robert has since concentrated his legal and financial practice in the area of estate planning, insurance products and investments. He has personally drafted, delivered, and presented hundreds of simple and complex trust and financial estate plans for his clients. Robert is a member of the State Bar of Texas, Estate Probate & Trust Law Section of the State Bar of Texas, Texas Young Lawyers Association, San Antonio Bar Association, and is insurance licensed in Texas.

Mr. Mueller is responsible for deeproot®'s product design, marketing, and strategic planning areas.

## IX
## SUBSCRIPTION PROCEDURE

In order to subscribe for Class B Shares, a Class B Shareholder must deliver to the Company, at its offices:

1. One completed and executed copy of **the575™** Application & Subscription Agreement, per registration type;
2. A bank or certified check, or Wire, in the amount of Twenty-Five Thousand Dollars ($25,000.00) for each full Class B Share subscribed for, or fractional part thereof, payable to the order of: **deeproot Funds**; or rollover or qualified transfer paperwork for the same.

Executed copies of the documents to be completed by the Class B Shareholders are being delivered with this Confidential PPM.

EACH CLASS B SHAREHOLDER IS URGED TO READ THE SUBSCRIPTION AGREEMENT AND THE ACCOMPANYING DOCUMENTS IN THEIR ENTIRETY BEFORE EXECUTING THEM.

In the event the Company rejects or revokes acceptance of a subscription, funds delivered by the subscriber to the Company in connection with the subscription will be returned without interest. Each Class B Shareholder who is solely and affirmatively responsible for keeping their contact information (and bank information for EFT payments) current with the Company. The Company will not be responsible for any delayed, missing, or incorrect notices or payments due to Shareholder's inaction to affirmatively update such information.

Share certificates shall not be issued for any shares subscribed to herein. Rather, a certificate of ownership, in lieu of a share certificate, shall be issued to each Class B Shareholder in a closing packet, along with copies of the application and subscription agreement.

deeproot Funds, LLC handles the administrative operations for the Company. Any subscription to this Offering constitutes a perpetual acknowledgment and consent to such.

## X
## AVAILABLE INFORMATION

The statements in this PPM as to the contents of any contract or other document are of necessity brief descriptions thereof and are not necessarily complete; each such statement is qualified in its entirety by reference to such contract or document.

Any Class B Shareholder desiring additional information about the Company should contact deeproot Funds, LLC, 8200 W Interstate 10, Suite 600, San Antonio, Texas 78230, telephone: (888) 316-2935. All reasonable, permissible requests for books, records, and financial information regarding the Company shall be made available in reasonable amounts of time to the Class B Shareholder.

## XI
## CONTINGENT SECURITY AGREEMENT

The Company agrees to immediately grant a security interest to Class B Shareholders in all assets it holds in the Company's investment portfolio (ie. underlying assets) upon a substantial default. A substantial default is defined as:

» The inability of Company to pay a periodic Priority Return to any Class B shareholder, if still unpaid thirty (30) days after it is due;

» The inability of Company to pay a liquidation amount to any Class B shareholder, if still unpaid sixty (60) days after it is due;

» Enough losses from the underlying assets that would prevent the future repayment of each Class B Shareholder's principal amount;

- » Any officer or advisor convicted of a felony, that was committed in furtherance of performing such's duties under this Offering; or
- » A court or regulatory order that finds Company has committed a substantial default.

The Company will immediately perfect that security interest and provide immediate security information, including the security interest(s), upon a substantial default. Class B Shareholders must appoint a Trustee or other fiduciary who will receive, possess, hold, maintain, and dispose of any assets under the security interest.

The Company is only required to perfect a security interest in its entire investment portfolio upon the first occurrence of a substantial default, if it cannot cure within ninety (90) days of such default.

## XII
## FREQUENTLY ASKED QUESTIONS (FAQ)

**Why are there Class A and Class B shares?**
deeproot 575 Fund, LLC ("**the575**™") is organized as a Limited Liability Company (LLC), and not as a For-Profit Corporation. This was done for ease of organization, lower filing and maintenance costs, tax options, etc. In order for an LLC to mirror a For-Profit Corporation's issuance of Common and Preferred Stock, we use 'classes' of membership interests ('shares'). Each class is comprised of shareholders who enjoy the same rights and privileges.

**What are Class A shares?**
Class A Shares in **the575**™ are the equivalent to common stock in a For-Profit Corporation. They have voting rights and the ability to receive dividends or distributions of capital from the business, subject to Class B's preferential rights.

**What are Class B shares?**
Class B Shares in **the575**™ are the equivalent to preferred stock in a For-Profit Corporation that includes a Mandatory or Premature Call feature. While they do have limited voting rights, they have preferential rights to receive dividends or distributions of capital from the Company, over any other class' shares.

**Are Class B shares 'cumulative'?**
Yes. A cumulative Priority Return is the equivalent of cumulative preferred stock. That is, if any Priority Return payments have been omitted in the past, all omitted Priority Return payments must first be paid out in-full to Class B Shareholders, before any other class' shareholders may receive net distributions.

**Are Class B shares 'participating'?**
No. Participating preferred shareholders would be entitled to receive profits or incur losses outside of the preferred return. In this Offering, the Company accepts the risk of participation interests or losses.

**What is my Priority Return and When will I receive it?**
The Priority Return you receive will be based on the Priority Return Election you make for the subscription term. Class B Shareholders with a periodic Priority Return Election will receive monthly (starting sixty days after each's respective Start Date) Priority Return payments equal to the monthly pro rata share of the fixed annualized return. Class B Shareholders with a deferred Priority Return Election will receive the cumulative deferred Priority Returns on or about the Pay Date.

**What does it mean that the Company can 'call' my shares?**
A ***call*** is a right retained by the Company to buy-back Class B Shares. The Company's right to call is absolute and without recourse. Upon any call, all rights and privileges as to a Class B Shareholder's called position(s) will be terminated, and the Company will convey the Class B Shareholder's Liquidation Amount on the Pay Date. The Mandatory Call under the **the575**™ is pre-determined at five years, less one day, from the Start Date. A Premature Call can happen at any time before, and supersedes, the Mandatory Call.

**How do Class B Shareholders get notified when a 'call' occurs?**
For a Mandatory Call, the Company will notify you in writing shortly before the Mandatory Call to provide you details about the Liquidation Amount, the Pay Date, and any renewal rights or benefits (if any). For a Premature Call, the Company will notify you at least sixty days before the premature call date, to provide you details about the Liquidation Amount, the Pay Date, and any renewal rights or benefits (if any).

**How can I get my Principal back?**
Unless renewed in full, or part, your Principal will be returned at the Pay Date. All requests for Invested Capital or Principal outside of a call (and subsequent Pay Date), will be rejected.

**Can I change my Priority Return election?**
Yes and no, depending on ***when*** you request a change. Once a Priority Return Election is chosen on or before the Start Date, it may not be changed or altered until a call occurs. If you invest sufficient additional amounts of principal to open a new investment position, or at a renewal, you can keep the same Priority Return Election, or change it, only for the additional or renewed Invested Capital.

**Is my principal or liquidation amount protected?**
Each Class B Shareholder's principal is backed up by the assets of the Company in a contingent security agreement, based on the performance of the assets, subject to the liabilities of the Company. That does not guarantee that there will always be enough assets that can be disposed of to cover all sums owed to the Class B shareholders. Class B shares have a preferential right to assets over any other shareholders (including Class A Shareholders) should the unfortunate occur and the Company is forced to wind-up due to insolvency. The return is not backed up or guaranteed by the Company, and may only be payable, in whole or part, if enough assets exist at some future time, to pay them.

**Do I get to have a say in the Company?**
Pursuant to the Operating Agreement, Class B shares have limited voting rights, or say, in the affairs of the Company.

**THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED TO DEEPROOT IF YOU DO NOT INVEST.**

*The area below the following line is intentionally left blank.*

---

**CONFIDENTIAL**

***You may not copy or disseminate this document to any other person or entity without our prior written authorization.***

## deeproot Funds Commercial Real Estate Allocation Disclosure

### Background

Purchases of commercial real estate by Company for use in various debenture and equity funds can include, but is not limited to: multi-tenant housing, single or multi-tenant buildings, new or existing business structures, commercial real estate for investment or use, or other structures. The property's intended use might be classified as family, office, business services, or industrial property. It could even involve residential properties like apartment complexes or rental houses being held for business or income-producing purposes. Owning commercial real estate poses inherent risks not usually found in other type of real estate, many risks of which cannot be foreseen. Depending on the nature of the business occupying the property, commercial property may have existing liens or title problems. There may be greater concerns about hazardous materials or zoning issues. Furthermore, in many instances, there may be other risks such as: debt service and lender requirements, market fluctuations, hazardous waste and environmental contamination, tenant occupancy issues, collection of rent, evicting non-compliant tenants, local regulatory compliance, property management oversight, and dealing with potentially unlimited costs such as taxes, property management, overhead administration, upkeep and maintenance.

Our purpose of investing in commercial real estate is to achieve income or capital appreciation by using a collateralized asset. While changes in property values and other market fluctuations can have a minor effect on the sale of commercial real estate, income fluctuations pose a greater risk and can directly influence the profitability of the investment (ie. return on investment). Since the valuation of commercial real estate is often based on a multiplier of average rental rates and income or the business itself, income fluctuations will significantly increase or decrease the attractiveness of a property to potential third party purchasers.

### Outlay and Operating Costs

We plan to invest at least $3MM over the next four years into the acquisition of commercial real estate, up to the maximum percentage investments permitted.

While the actual amounts might be less or more, we do not plan to exceed specific percentages of the overall value of the asset portfolio (see below on a per fund basis).

**Maximum Exposure per Fund**

In order to maintain diversified safety within the funds, we voluntarily are limiting the exposure of each respective fund in and to the allocation. The following maximum percentages are as to Principal received from existing and future investors. This minimizes the investment risk to you and to us. Any additional outlays are permitted as long as the total investor risk does not exceed two times the current notice.

| Fund | Maximum Percentage Investment |
|---|---|
| deeproot Debenture Funds (BGD5,BRD3,INC3) | Existing |
| deeproot 575 Fund | 20%* |
| deeproot Growth Runs Deep Fund | 0% |

*the575's current tech allocation of 45% will be reduced with proxy ventures.

**Types of Commercial Real Estate**

In looking at the attractive commercial real estate projects that would complement and fit our risk threshold and return requirements, we will focus on the following three sub classes: multi-tenant housing, capital acquisition with real estate, and own-use structure. The choice of commercial real estate, and more specifically those sub classes, are six-fold: continued diversification of assets, immediate income to offset payments to investors, short term hold time, capital return if ownership is acquired, collateralized safety to avoid default issues, and overall return on the investment in line with those owed to investors.

**Internal Investment Goals**

While policies will always be our main focus, they have a few inherent shortcomings when it comes to income and short term liquidity. The limited use of commercial real estate will help offset those shortcomings by adding a reasonably risk-leveraged asset class that provides income and liquidity.

Most of the assets employed in deeproot®'s portfolio are mid to long term in nature. While portfolio allocations in the other asset classes minimize cash flow and liquidity risks, a need for short-term income would help minimize and eliminate these risks. It would not only cover administrative & day-to-day expenses and fund

overhead, but would also cover income or priority return payments to investors. By doing this with minimal additional risk we can ensure that we keep short term and long term promises made with investors.

A short hold time may not be guaranteed, but there are a multitude of marketable opportunities to flip or divest of real estate. This cannot be accomplished in and of itself with Institutional Life Policies. Marketability and liquidity of assets as we continue to grow will be an increased need in the perpetually changing market place. In addition, it is also easier to adequately value commercial real estate, which increases the liquidity factor. Valuation aggregation can help ease liquidity issues and artificially increase the fair market value of an asset group.

Some commercial real estate may be in the form of a business. Business assets further collateralize the investment, and provide a premium acquisition opportunity for other third party investment companies. There are several industries where this model has been extremely successful. By selling to the proprietors or third party groups, we can further increase the likelihood of receiving a capital appreciation return on the divestiture of the commercial real estate.

The continued preservation of assets is a part of the promises we make to investors. By using collateralized positions for commercial or other real estate investments, we might not eliminate risk to principal, but severely minimize the effects of economic or industry volatility. This is further mooted by our diversification in and to real estate asset classes.

While collateralization and return is important, the purpose is to return enough income or capital to cover existing promises to investors. We have chosen three subclasses based on their historic and underlying potential to return over our promised returns. This cushion is important as some income may fluctuate, or hold times may increase.

**Multi-Tenant Real Estate**

Multi-tenant real estate can involve several types of structures that range from duplexes to apartments. The focus is on income by creating rental value, reducing maintenance expenses, and minimizing vacancies. Capital returns from sale are possible but tend to be mid to long term opportunities.

There are ten factors that the Company reviews and determines before purchasing a multi-tenant real property for any fund, as show below. These factors also comprise

much of the risk in investing in multi-tenant housing. Importance is on a scale of 1 to 5, with 1 being 'important' and 5 being 'critical'.

| FACTOR | IMPORTANCE | THRESHOLD / EXPLANATION |
|---|---|---|
| Historical Profitability | 4 | Must be projected to maintain or be profitable in at least 3 years. |
| Current Occupancy | 4 | While occupancy is important, increasing occupancy usually parallels better mgmt. |
| Current Average Rent | 3 | Current average rent per unit type must be uniform and comparable with similar properties. |
| Credit Worthiness of Tenants | 3 | Credit worthiness is important for future marketability and predictability of stable income. |
| Economic Condition of Local Area | 5 | The economic condition of the surrounding area must be stable enough to support growth. |
| Current Property Condition & Quality of Structure | 3 | The quality and condition of the structure will directly influence improvement costs. |
| Anticipated Improvement and Upkeep Costs | 5 | While distressed properties offer higher returns, predictable improvements & upkeep are critical. |
| Property Use Matches Fund Goals | 3 | Potential future marketability might outweigh current income fund goals. |
| Future Market Value | 4 | The ability to sell property for profit within 5 yrs is a critical factor to weigh against other factors. |
| Foreseen & Unforeseen Risks & Obstacles | 4 | Tax problems, liability issues, and surprises must be weighed against other foreseen factors. |

San Antonio's real estate market is far exceeding expectations. As of January of 2016, San Antonio has moved into the top 20 real estate markets to watch. This is due to the low cost of living and low cost of doing business, which in turn, is driving the market. Many businesses are moving to San Antonio and this has caused an influx in population to the area which has a direct correlation to the increase in occupancy rate. Last year alone, vacancy rates dropped nearly 110 basis points, rents increased 600 basis points and are expected to increase another 420 basis points into 2017. Studies also show that homeownership rates are down which has led to an increased pool of renters. Source: Forbes Magazine.

We plan to invest at least $3MM into multi-tenant housing from the Third Quarter of 2017. Actual investment might be delayed until 2018 depending on the closing of the other commercial real estate deal described below.

To minimize risks, we have sought an experienced and reputable partner in the local multi-tenant housing industry. We believe Keller Capital and Keller Property (http://kellerpropertycompany.com/communities) is a perfect fit. Keller Property Company is the management arm of Keller Capital. The principals of Keller Capital have been owner/managers of residential apartment units since 1985, owning and managing multifamily properties in Utah, Kansas, Oklahoma, and Texas. Keller Capital creates value with their unique renovation and rebranding process by bringing Class-A design and amenities to value-added multi-tenant properties built in the 1970's and 80's.

They leverage their experience and relationships to complete projects much sooner, and at a lower cost than by using traditional methods. Today, Keller Property Company consists of more than 70 full-time employees, as well as an experienced executive team. Their current portfolio consists of 2,180 units that are directly owned and managed, and an additional 1,027 units of passive investment units. As they continue to grow they are seeking alternative funding options as the credit markets are often restrictive and expensive.

The anticipated deal with Keller Capital would result in a shared equity position in a new purchase of an apartment complex in which a note (debt component) would result in income averaging 8-12% per annum depending on a variety of factors. The initial deal would last approximately two years, with six-month extension options for repayment (mainly to leverage against a rolling of future complexes). If extensions are agreed to, they would continue to be under the 8-12% per annum debt rate as well.

**Capital Acquisitions**

Capital acquisition collateralized by real estate and business assets is a unique hybrid subclass of commercial real estate. Whereas most commercial real estate is reliant on the underlying tenants, the benefits of a business model are four-fold: business assets provide additional collateral to protect the investment, more leverage of the business and return models, potentially higher income and capital appreciation, and more control over, and likelihood of, a favorable exit strategy.

The easiest path forward is one that is in a historically very profitable business model involving a drive-through tunnel carwash facility in the Braun Heights subdivision in the northwest side of San Antonio, Texas, a major metropolitan market in the United States, is an attractive investment opportunity. The investment objective is to develop unimproved commercial property on this stretch into a drive-through tunnel carwash facility. After the completion of the construction of the facility, the Company will own a majority 80% position of the business and underlying real estate, with 70% of the net income. Mr. Clif Conrad will manage and operate the facility.

Clif Conrad has been involved in the car wash business for 16 years with several highly profitable complexes in Sacramento, CA and St. George, Utah. Of the four types of car washes (manual, moving unit, drive through, and full service), Mr. Conrad will focus on the drive through which has proven to be very profitable in drier climates.

The carwash is based on a conveyor system that moves the vehicle through the cycle of soft cloth cleaners and soaps at approximately one car every 20-30 seconds (each car will be completely processed from entrance to exit in about 3 minutes). The cycle is finished with a blow dry system just before the car exits the wash. The customer then exits the wash and can simply drive away or turn into one of our many free self-serve vacuum stalls and clean the inside of the vehicle. Important characteristics of this service are: a quality wash; speed of wash; economical wash and polish and free vacuums.

Due to heavy discounts and marketing the first year, a return of less than 8% is expected. However escalating in years two – five, the operation is expected to annually yield upwards of 11% which is industry normal for established washing operations of this type.

While the ROI from net income will self-liquidize the investment, it is very common in the washing industry for investment groups to purchase operations within 2-4 years of profitability. A capital buy-out feature is a plus, but not necessary for deeproot to meet its own internal liquidity requirements.

**Own-Use Structure**

The Company's current lease in the Fountainhead office building lasts until November 2018. The Company may choose to renew that lease and if so, this option is null and void. However, the Company reserves the right to purchase for own-use

an existing or new structure within the limitations of this allocation. The own-use structure might be part of an existing structure, or a free-standing structure. It might allow for additional rental space for other tenants (creating added internal liquidity), or for other or affiliated businesses.

Such own-use terms would require rent to be paid by the Company not be less than 8% of the capital employed. This would provide liquidity and resources back to the Funds and investors, and would alleviate conflict of interest and self-dealing concerns.

©2017 deeproot Funds, LLC. All Rights Reserved.

Updates to this disclosure, as they may occur, may be downloaded from our secure portal website.

**CONFIDENTIAL**

***You may not copy or disseminate this document to any other person or entity without our prior written authorization.***

**deeproot Funds Sports and Entertainment Allocation Disclosure**

**Background**

As some of you might know, deeproot Funds, LLC was a sponsor for the now-disbanded San Antonio Scorpions ('Scorpions') in 2014 & 2015, a non-profit charitable soccer team which played in the North American Soccer League ('NASL') between 2012 and 2015. It was the only charitable professional sports team in the country during its tenure. The Scorpions owner, Gordon Hartman sold the team, stadium and rights to governmental and private parties in December 2015. During that time, we benefited multiple charitable causes, and made strategic relationships in the soccer marketplace.

One of the strategic relationships formed while sponsoring with the Scorpions was with Howard Cornfield, who served as the General Manager. As you can see from Mr. Cornfield's bio (attached as Exhibit A), he is an exceptional resource in the sports industry having managed and owned soccer and hockey teams. Over the last few months, we have retained Mr. Cornfield to scout out potential cities to organize and operate a minor league soccer team in the NASL or USL, which has included: Austin, Boise, Albuquerque, Omaha, Madison, Ft. Collins, & Baton Rouge.

We have tentatively reached rough terms with Bobby Epstein, the current owner of the Austin Aztecs, a team in the United Soccer Leagues (USL). If those terms fall through with formal execution, we would continue scouting other cities. First however, it is important to understand how the leagues are made up, the profitability of the endeavor, and why this is important for us and for you.

**The Leagues**

United Soccer Leagues (USL) was recently moved from 3rd tier to the 2nd tier of the FIFA sanctioned United States Soccer Federation (USSF). USSF determines which league qualifies for which tier. Currently, USSF sanctions Major League Soccer (MLS) as the 1st tier, and NASL and USL share in 2nd tier competition.

One of the most appealing aspects of the USL is their affiliation with MLS. Like Major League Baseball ('MLB') with MiLB, MLS has contract agreements to farm

players to USL teams. These contracts have provided USL with incredible stability, not only in player acquisition, but in having wealthy owners from MLS teams that support the lower tier of US Soccer. Beginning in 2014 and coinciding with the agreement with MLS, USL has more than doubled in size adding MLS tens of affiliate teams to the original 11 members.

USL just ended its 7th season of play since the NASL/USL split and 22nd season of play as a sanctioned league in the USSF. USL is now divided into two conferences with 32 operating franchises. Teams are spread across the US and Canada. Average attendance across the league is 3,500 per match with most of the independent franchises (not affiliated with a MLS team) drawing well above that average.

While the USL is the ideal league for investment, the NASL might be an equally opportunistic option. It is a smaller league and the entrance and operating costs might be lower over the long run. It also has firm backing from the USSF and committed owners. The determination of which league to join will be determined at a later time, and will involve many factors. These factors will include variables like entrance costs, operating expenses, viability of the league, public perception, league management, owner and team viability, player availability and support, etc. We do not anticipate that the long term success of the venture will be affected by joining one league over the other.

**Internal Investment Goals**

Our ability to invest in one of the fastest growing sports and entertainment leagues in the country provides a necessary strategic opportunity to achieve some very critical goals important for us and you. Our mutual goals would include, but not be limited to: i) continued preservation of principal in a collateralized asset class; ii) diversification of assets into a well-known and reliable asset class; iii) increase the overall safety profile of our investors' long-term principal and maturity interest returns; iv) improve internal short-term investment returns; and v) build a long-term capital appreciation component from the future sale of the team for use in our 'Queue Fund'. In addition, this allocation would substantially increase the national and regional exposure of the deeproot® brand. The more recognition the deeproot® brand has, the more investments made. The more investments made, the more capital/assets in the funds; the more capital/assets, the safer your money will be.

**Summary of Basic Startup Risks**

- Not getting the approval necessary to obtain a franchise.

- Not raising the minimum capital necessary to successfully launch a minor league soccer franchise in an under-served sports market.
- Not obtaining local government approval and funding for the facilities.
- Attendance, merchandise, and sponsorship revenues lower than anticipated in any given year.
- Franchise expenses exceed expected thresholds.
- Negative press or economic factors which negatively affect revenues, and/or increase expenses.
- The termination of the franchise requiring litigation, or the cessation of the USL or NASL.

**Outlay and Operating Costs**

We plan to invest at least $3MM and as much as $7MM over two years into the acquisition and/or rights to operate a USL team through the end of 2018. While the actual amounts might be less or more, we do not plan to exceed specific percentages of the overall value of the asset portfolio (see below on a per fund basis). This does not include the purchase or building costs of a stadium which would be paid for or assumed by the local government. We are currently working with governmental officials and business owners in the above stated key markets. A sample annual budget is attached as Exhibit B.

**Maximum Exposure per Fund**

In order to maintain diversified safety within the funds, we voluntarily are limiting the exposure of each respective fund in and to the allocation. The following maximum percentages are as to Principal received from existing and future investors. While some overage might occur due to accounting offsets, the important concession is that this is intended to be an up-front one time funding of the venture for the first season; with the venture self-generating capital for future seasons. This minimizes the investment risk to you and to us. Any additional outlays are permitted as long as the total investor risk does not exceed two times the current notice.

| Fund | Maximum Percentage Investment |
|---|---|
| deeproot Debenture Funds (BGD5,BRD3,INC3) | 20% |
| deeproot 575 Fund | 20%* |
| deeproot Growth Runs Deep Fund | Excess Reserves Only |

*the575's current tech allocation of 45% will be reduced and replaced with proxy ventures.

The investment through the dGRD will solely be through excess reserves held for premiums or maturities, as accounted for on an annual basis, or on positions retained by the Company. The queue itself will not change, nor will the operation of any of the queue components.

**Operating Rationale**

Howard Cornfield, who has years in sports (and soccer) management experience will setup, operate, and protect our mutual interests in the team. Our intent is not to: be the best team in the league; create a championship team at all costs; nor throw money at the wind as many owners try to do. Instead our rationale is more sensible and business-oriented. That is, to: first achieve our reasonable business goals and objectives; second build loyalty by creating a family/cost friendly entertainment experience for the citizens of the locale; and third put forth a competitive (but not overpriced championship-styled) sports team. Howard is the right, and possibly one of the very few experienced managers, that has a history of achieving this rationale.

**Objectives for Success**

# 1: *To get the team started with seed money that while maintaining a 1:1 underlying capital value of the franchise.*

We intend to maintain at least a 1:1 underlying capital value. That is, we intend for the underlying assets (both tangible and intangible) to be worth what we put into it. While a buy-in or buy-out remains as future contingent options, we cannot be sure that those opportunities will materialize; nor can we estimate the value of such capital beyond a 1:1 ratio.

We intend for seed money to be the majority of all capital expended into the venture. While most professional sports organizations experience a loss, our objective over the first few seasons is to wash or generate a small profit. Our value-oriented approach is to maximize fan loyalty and value-proposition entertainment. It is not for ego, fame, or oversized player budgets. We know this can be done because Howard has already done this multiple times.

# 2: *Provide annual returns from operations and sponsorships, after expenses, that would be break even the first year, and be profitable years 2 through 7.*

It is expected that within 7 years (or likely less), we will recoup not only our initial seed capital, but also returns that would fulfill deeproot's obligations to investors.

This could be achieved by accumulated annual net revenues, and/or capital buy-out. While we might not keep the franchise seven years, it is a reasonable projected time period for adequate return of capital.

There are some very good historical and practical factors that support this objective. First, revenues tend to come from three main sources: sponsorships, ticket sales, and concessions/merchandising. All three of these sources tend to escalate progressively over time and then plateau, with seasonal fluctuations. This is because it takes time for the team, and the entertainment proposition, to saturate the market. While seasonal fluctuations may vary due to weather, success of the team, and economic disposable income, the tools for achievement are sound. Second, expenses tend to follow revenues. While there are some fixed expenses (staff payroll, utilities, player salaries, stadium costs, etc.) that will be offset by base revenues, most of the variable costs tend to directly tie to increased revenues. As a result, we are better able to control variable expenses as we will tend to have increased revenues to offset them. Third, we aren't reinventing the wheel. Mr. Cornfield has accomplished what we are attempting to do before, in arguably much more difficult circumstances. While past financials might not be an indicator of future results, we don't need to have outrageous profits to meet our very minimal goals.

# 3: *Partner with governmental or private organizations to minimize risk in the venture.*

The majority of costs in team startup that we intend to avoid, are those involving the building, or renovations of, a stadium to play in. It is not only very normal for a governmental entity to fund a stadium, our meager stadium needs would be insignificant to a governmental entity.

All leagues under the USSF have requirements for stadium size, type, etc. The USL specifically enforces a soccer-specific stadium due to abuses in the past. We have done a study of other stadiums and with rough plans have received quotes that a 5000 – 8000 bleacher seat soccer-specific stadium would cost around $8MM. It is important to note that we are not looking for fancy…but for functional.

For most governmental entities in the current locales, $8MM is a drop in the bucket, and likely would not even require a new or supplemental bond vote. In addition, we have seen politicians fall over themselves willing to spend this little amount of money for positive press, community outreach, and support of sports/healthy living in their respective communities. While we would not be able to proceed with this

venture without a stadium being provided, we have had numerous offers to build what we need.

Lastly, there are possibilities that a minority owner partner (or partners) might come forth to assuage some risk. Each interest would be analyzed on its own accord as to how our goals are met, rather than theirs. This is an option we are actively researching to reduce overall risk.

**Summary of Risk Avoidance Measures**

Every enterprise has an inherent and foreseeable amount of risk. We have discussed in this document how we are going to proactively address these risk components. Unforeseeable risk is a factor that we have also mitigated in the following ways:

- Extensive market research to determine best location for a successful franchise to exist. Vital in these studies are determining fan interest, local government involvement, identifying potential corporate partners for sponsorships and cooperation.
- Build upon a budding relationship with league corporate offices to garner best possible cooperation in establishing a franchise and ensuring best practices and procedures are followed for launch success.
- Leverage pre-existing relationships with previous experienced front office personnel to build a front office staff that takes on a three-fold mission: first, plan and construct facilities commiserate with market indicators and professional-level sports to include pairing with city and county officials for funding of joint ventures; second, building a portfolio of corporate sponsors to provide for and maintain expenses to operate the franchise; and third, acquire players and coaches to put the most competitive team on the field possible within budgetary restrictions.
- Create expense threshold and ceilings that maximize entertainment value and profitability over championships and prestige.
- Market and focus on an appealing entertainment value proposition to fans and families.

©2017 deeproot Funds, LLC. All Rights Reserved.

Updates to this disclosure, as they may occur, may be downloaded from our secure portal website.

# EXHIBIT A

## HOWARD CORNFIELD

### SPORTS ADMINISTRATION BIO

Howard Cornfield has earned the reputation as one of minor league sports top administrators, overseeing profitable, championship-winning organizations.

He joined San Antonio Scorpions FC in October 2012 and oversaw the rebuilding of the organization into one of the most successful soccer teams in North America as well as helping with the Scorpions move to their new home, Toyota Field, an 8,000 seat state-of-the-art soccer stadium. In 2014, the Scorpions stunned the soccer world when they won the NASL Fall Season Championship as well as the Season Championship.

Prior to joining the Scorpions, Cornfield served as Managing Director of Beacon Sports Properties International, a full-service development, finance, and consulting company, focusing exclusively within the professional sports and entertainment industry. After joining Beacon Sports Properties International in 2005, Cornfield initiated and completed highly visible international projects in Australia and China as well as working on the sale of an NHL team.

As the Owner / President / General Manager of the Quad City Mallards of the United Hockey League from 1996-2005, Cornfield guided the franchise through a period of success unprecedented in professional hockey. During his tenure, the Mallards compiled 451 victories, more than any other team in professional hockey during that span, with just 175 losses (.704 winning percentage), seven Division Championships, six consecutive appearances in the league championship series and three United Hockey League Championships. The Mallards are the only team in professional hockey history to win 50 or more games in six consecutive seasons, earning a place in the Hockey Hall-of-Fame.

Along with his teams' on-ice success, Cornfield also oversaw the business operations of one of the most successful and profitable operations in minor league professional sports as over 2.7 million fans attended Mallards home games during Cornfield's tenure at the helm. The organization was honored twice as UHL Member Club of the Year including the 1998 season when the team averaged over 8,646 per game and sold $1.2M in merchandise. Cornfield has earned a multitude of individual honors including Executive of the Year, Marketing Director of the Year

and General Manager of the Year awards in addition to being honored as Quad City Times Sports Man of the Year in 1997. During his tenure, Just Hockey Magazine recognized Cornfield as one of the Top Power Brokers in Minor League Hockey. In January 2017, Cornfield became the first person to be enshrined in the Quad City Mallards Hall-of-Fame.

As a Principal in the Mallards parent company, United Sports Ventures, Cornfield also served as Vice President Hockey Operations and was responsible for the start-up operations and the day-to-day operations of USV's other three professional hockey teams, the Rockford IceHogs and Missouri River Otters of the United Hockey League and Mobile Mysticks of the ECHL. USV also owned and operated professional baseball teams in Fort Wayne, IN; Columbia, SC and Mobile, AL.

Cornfield's experience includes ten years in NCAA Division I Athletics as an Athletics Director at Jacksonville University and Brooklyn College. Cornfield also spent time in the American Hockey League and East Coast Hockey League with the Carolina (Greensboro) Monarchs, the Central Hockey League with the Cincinnati Tigers and Colorado Flames and has international experience with the Australian National Basketball League, Australian National Rugby League and Nepal's ANFA Cup.

Cornfield earned his BA Degree from The University of South Carolina and a MA from Jacksonville University.

EXHIBIT B

***CONFIDENTIAL***

## Generic USL Club Pro-Forma

NOTES:
- Below is a representative P+L Forecast for a USL Expansion Club.
- These financial projections have not been reviewed and/or endorsed by the USL League Office.
- The total expenses below are conservative, and are significantly greater than League averages.

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|
| *Key assumptions:* | | | | | | |
| # of League Games | 16 | 16 | 16 | 16 | 16 | 16 |
| # of Exhibition/Other Games | 2 | 2 | 2 | 2 | 2 | 2 |
| # of "Big Exhibition" Games | 1 | 1 | 1 | 1 | 1 | 1 |
| **Stadium Inputs** | | | | | | |
| Avg League Game Paid Non-Premium (not in | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Avg Exhibition Paid Non-Premium (not incl. S | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Avg "Big Game" Paid Non-Premium | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| # of Suites | 0 | 0 | 0 | 0 | 0 | 0 |
| # of Tickets per Suite | 0 | 0 | 0 | 0 | 0 | 0 |
| # of Club Seats | 600 | 600 | 600 | 600 | 600 | 600 |
| ATP - League Game (non-premium) | $19.00 | $19.95 | $20.95 | $21.99 | $23.09 | $24.25 |
| ATP - Exhibition Game (non-premium) | $19.00 | $19.95 | $20.95 | $21.99 | $23.09 | $24.25 |
| ATP - "Big Game" (non-premium) | $20.00 | $21.00 | $22.05 | $23.15 | $24.31 | $25.53 |
| ATP - Club Seat | $60.00 | $63.00 | $66.15 | $69.46 | $72.93 | $76.58 |
| Avg Suite price | $10,000 | $10,500 | $11,025 | $11,576 | $12,155 | $12,763 |
| Comp Tickets Distributed | 250 | 250 | 250 | 250 | 250 | 250 |
| No-show rate | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% |
| Total In-Venue Attendance (Per League Gam | 5,265 | 5,265 | 5,265 | 5,265 | 5,265 | 5,265 |
| Total In-Venue Attendance (Per Exhibition/Pl | 5,265 | 5,265 | 5,265 | 5,265 | 5,265 | 5,265 |
| Total In-Venue Attendance ("Big Game") | 9,765 | 9,765 | 9,765 | 9,765 | 9,765 | 9,765 |
| Concession Per Cap | $10.00 | $10.30 | $10.61 | $10.93 | $11.26 | $11.59 |
| % of Concessions Attributable to Team | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% |
| Merchandise Per Cap | $4.00 | $4.00 | $4.00 | $4.00 | $4.00 | $4.00 |
| Parking | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| % of Attendees Parking | 35.7% | 35.7% | 35.7% | 35.7% | 35.7% | 35.7% |
| % of Parking Attributable to Team | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% |
| Day-of-Game Stadium Expenses (incl. Game I | $16,500 | $16,995 | $17,505 | $18,030 | $18,571 | $19,128 |
| Per Game Stadium Rent | $3,500 | $3,605 | $3,713 | $3,825 | $3,939 | $4,057 |
| Additional Exhibition Game Expenses | $5,000 | $5,150 | $5,305 | $5,464 | $5,628 | $5,796 |
| Additional "Big Game" Expenses | $25,000 | $25,750 | $26,523 | $27,318 | $28,138 | $28,982 |
| Sponsor Fulfillment Costs | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| Ticket Sales Commission | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% |
| **Revenues** | | | | | | |
| Gross League Regular Ticket Sales | $1,520,000 | $1,596,000 | $1,675,800 | $1,759,590 | $1,847,570 | $1,939,948 |
| Exhibition Regular Ticket Sales | 190,000 | 199,500 | 209,475 | 219,949 | 230,946 | 242,493 |
| "Big Game" Ticket Revenue (incl Club) | 236,000 | 247,800 | 260,190 | 273,200 | 286,859 | 301,202 |
| Gross Club Seat Revenue (League + Exhibitioı | 648,000 | 680,400 | 714,420 | 750,141 | 787,648 | 827,030 |
| Gross Suite Revenue | -- | -- | -- | -- | -- | -- |
| Total Ticket Sales Revenue | $2,594,000 | $2,723,700 | $2,859,885 | $3,002,879 | $3,153,023 | $3,310,674 |
| Stadium Naming Rights | $0 | $0 | $0 | $0 | $0 | $0 |
| Kit Sponsorship | 200,000 | 206,000 | 212,180 | 218,545 | 225,102 | 231,855 |
| Other Sponsorship | 700,000 | 770,000 | 847,000 | 931,700 | 1,024,870 | 1,127,357 |
| Total Sponsorship Revenue | $900,000 | $976,000 | $1,059,180 | $1,150,245 | $1,249,972 | $1,359,212 |
| Concessions | $313,605 | $323,013 | $332,704 | $342,685 | $352,965 | $363,554 |
| Gameday Merchandise | 418,140 | 418,140 | 418,140 | 418,140 | 418,140 | 418,140 |
| Retail Merchandise | 100,000 | 105,000 | 110,250 | 115,763 | 121,551 | 127,628 |
| Parking | -- | -- | -- | -- | -- | -- |

EXHIBIT B

| | | | | | | |
|---|---|---|---|---|---|---|
| Broadcasting | -- | -- | -- | -- | -- | -- |
| Combines / Tryouts / Tournaments / Camps , | 50,000 | 52,500 | 55,125 | 57,881 | 60,775 | 63,814 |
| Rental Income / Non-Team Events | -- | -- | -- | -- | -- | -- |
| Other Income | -- | -- | -- | -- | -- | -- |
| Total Other Revenues | $881,745 | $898,653 | $916,219 | $934,468 | $953,431 | $973,136 |
| **Total Revenues** | **$4,375,745** | **$4,598,353** | **$4,835,284** | **$5,087,593** | **$5,356,426** | **$5,643,023** |

EXHIBIT B

| Expenses | | | | | | |
|---|---|---|---|---|---|---|
| Coaching + Team Staff | $210,000 | $216,300 | $222,789 | $229,473 | $236,357 | $243,448 |
| Players | 340,000 | 350,200 | 360,706 | 371,527 | 382,673 | 394,153 |
| Training | 50,000 | 51,500 | 53,045 | 54,636 | 56,275 | 57,964 |
| Player Relocation / Housing | 125,000 | 128,750 | 132,613 | 136,591 | 140,689 | 144,909 |
| Legal / Medical | 42,000 | 43,260 | 44,558 | 45,895 | 47,271 | 48,690 |
| Scouting | 25,000 | 25,750 | 26,523 | 27,318 | 28,138 | 28,982 |
| Travel - USL | 150,000 | 154,500 | 159,135 | 163,909 | 168,826 | 173,891 |
| Travel - Other (Preseason, exhibitions, etc.) | 40,000 | 41,200 | 42,436 | 43,709 | 45,020 | 46,371 |
| Other - Team Costs | 25,000 | 25,750 | 26,523 | 27,318 | 28,138 | 28,982 |
| Total Team Costs | $1,007,000 | $1,037,210 | $1,068,326 | $1,100,376 | $1,133,387 | $1,167,389 |
| | | | | | | |
| Payroll - Operations | $50,000 | $51,500 | $53,045 | $54,636 | $56,275 | $57,964 |
| Day of Game / Stadium Operations | 313,500 | 322,905 | 332,592 | 342,570 | 352,847 | 363,432 |
| Exhibition + "Big Game" Expenses | 35,000 | 36,050 | 37,132 | 38,245 | 39,393 | 40,575 |
| Stadium Rent | 66,500 | 68,495 | 70,550 | 72,666 | 74,846 | 77,092 |
| Other - Operations | 15,000 | 15,450 | 15,914 | 16,391 | 16,883 | 17,389 |
| Total Operational Costs | $480,000 | $494,400 | $509,232 | $524,509 | $540,244 | $556,452 |
| | | | | | | |
| Payroll - Ticket Sales | $201,880 | $207,936 | $214,174 | $220,600 | $227,218 | $234,034 |
| Credit Card Fee | 64,850 | 68,093 | 71,497 | 75,072 | 78,826 | 82,767 |
| Other - Ticket Sales | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,001 |
| Total Ticket Sales Costs | $341,730 | $351,029 | $360,672 | $370,672 | $381,043 | $391,802 |
| | | | | | | |
| Payroll - Marketing / Communications | $175,000 | $180,250 | $185,658 | $191,227 | $196,964 | $202,873 |
| Broadcasting costs | 95,000 | 97,850 | 100,786 | 103,809 | 106,923 | 110,131 |
| Community relations | 25,000 | 25,750 | 26,523 | 27,318 | 28,138 | 28,982 |
| Marketing expenses | 200,000 | 206,000 | 212,180 | 218,545 | 225,102 | 231,855 |
| Advertising | 50,000 | 51,500 | 53,045 | 54,636 | 56,275 | 57,964 |
| Promotional items | 25,000 | 25,750 | 26,523 | 27,318 | 28,138 | 28,982 |
| Total Marketing Costs | $570,000 | $587,100 | $604,713 | $622,854 | $641,540 | $660,786 |
| | | | | | | |
| Payroll - Sponsorship | $125,000 | $128,750 | $132,613 | $136,591 | $140,689 | $144,909 |
| Fulfillment | 45,000 | 48,800 | 52,959 | 57,512 | 62,499 | 67,961 |
| Other - Sponsorship | 15,000 | 15,450 | 15,914 | 16,391 | 16,883 | 17,389 |
| Total Corporate Sponsorship Costs | $185,000 | $193,000 | $201,485 | $210,494 | $220,070 | $230,259 |
| | | | | | | |
| Payroll - Administrative | $293,000 | $301,790 | $310,844 | $320,169 | $329,774 | $339,667 |
| Merchandise costs | 362,698 | 366,198 | 369,873 | 373,732 | 377,783 | 382,038 |
| Professional costs (Finance, Legal, etc.) | 50,000 | 51,500 | 53,045 | 54,636 | 56,275 | 57,964 |
| Employee benefits | 155,190 | 159,846 | 164,641 | 169,581 | 174,668 | 179,908 |
| Insurance | 75,000 | 77,250 | 79,568 | 81,955 | 84,413 | 86,946 |
| Office expenses (incl rent) | 100,000 | 103,000 | 106,090 | 109,273 | 112,551 | 115,927 |
| League Fees | 95,000 | 95,000 | 95,000 | 95,000 | 95,000 | 95,000 |
| Other / Misc Office Expenses | 50,000 | 51,500 | 53,045 | 54,636 | 56,275 | 57,964 |
| Total Administration Costs | $1,180,888 | $1,206,084 | $1,232,106 | $1,258,981 | $1,286,741 | $1,315,414 |
| | | | | | | |
| Contingency (5%) | $188,231 | $193,441 | $198,827 | $204,394 | $210,151 | $216,105 |
| | | | | | | |
| **Total Expenses** | **$3,952,849** | **$4,062,264** | **$4,175,360** | **$4,292,281** | **$4,413,177** | **$4,538,207** |
| | | | | | | |
| **Operating Profit** | | | | | | |
| Total Revenue | $4,375,745 | $4,598,353 | $4,835,284 | $5,087,593 | $5,356,426 | $5,643,023 |
| Total Expenses | 3,952,849 | 4,062,264 | 4,175,360 | 4,292,281 | 4,413,177 | 4,538,207 |
| **Operating Profit / EBITDA** | **$422,896** | **$536,089** | **$659,923** | **$795,312** | **$943,249** | **$1,104,816** |
| **Cumulative Profit / EBITDA** | **$422,896** | **$958,985** | **$1,618,908** | **$2,414,220** | **$3,357,470** | **$4,462,286** |

**OPERATING AGREEMENT**

**OF**

**deeproot 575 Fund, LLC**
**(a Texas limited liability company)**

**September 1, 2015**

**THE MEMBERSHIP INTERESTS EVIDENCED BY SHARES OFFERED AND ISSUED PURSUANT TO THE TERMS AND CONDITIONS OF THIS AGREEMENT AND RELATED SUBSCRIPTION AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), BUT ARE BEING SOLD PURSUANT TO AN EXEMPTION PROVIDED BY SECTION 4(2) OF THE ACT AND/OR RULE 506 OF REGULATION D PROMULGATED THEREUNDER. THE SHARES MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT PURSUANT TO A REGISTRATION STATEMENT REGISTERING THE SHARES UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED. NO RESALES OR OTHER TRANSFERS OF THE SHARES MAY OCCUR WITHOUT THE PERMISSION OF THE COMPANY.**

**STATEMENT OF AGREEMENT** ..... 1

**ORGANIZATIONAL MATTERS** ..... 1

1. GENERAL ..... 1
2. NAME ..... 1
3. PURPOSES AND GENERAL POWERS ..... 1
4. ORGANIZATIONAL FILINGS ..... 1
   (a) Texas ..... 1
   (b) Other States ..... 1
   (c) Cooperation ..... 1
5. NATURE OF ENTITY ..... 1
6. PRINCIPAL OFFICE AND PLACE OF BUSINESS ..... 2
7. AGENT FOR SERVICE OF PROCESS ..... 2
8. TAX MATTERS MEMBER ..... 2
9. TERM ..... 2

**FINANCIAL AND ACCOUNTING MATTERS** ..... 2

10. CAPITAL CONTRIBUTIONS ..... 2
    (a) Initial Members ..... 2
    (b) Investors ..... 2
    (c) Limitations ..... 2
    (d) Credit to Capital Account ..... 3
11. LOANS ..... 3
12. FISCAL YEAR AND ACCOUNTING METHODS ..... 3
13. CAPITAL ACCOUNTS ..... 3
14. OWNERSHIP INTERESTS ..... 3
    (a) Shares ..... 3
    (b) Class A Shares ..... 4
    (c) Class B Shares ..... 4
    (d) Computation of Profits and Losses ..... 4
    (e) Allocations ..... 4
    (f) . Except as otherwise provided herein, net profits, net losses, and credits of the Company shall be allocated to and among each Class A Member in accordance with each's respective Percentage Interests. ..... 4
    (g) Specific Items ..... 4
    (h) Unrealized Gain or Loss ..... 4
    (i) Varying Interests ..... 5
15. SPECIAL CIRCUMSTANCES ALLOCATIONS ..... 5
    (a) General ..... 5
    (b) Incorporation of Certain Rules ..... 5
    (c) Certain Fee Payments to Members ..... 5
    (d) Certain Imputed Interest ..... 5
16. ELECTIONS ..... 6
17. CURRENT DISTRIBUTIONS ..... 6
18. DISTRIBUTIONS UPON WINDING-UP ..... 6
    (a) Creditors ..... 6
    (b) Class B Members ..... 6

(c) Class B Members ... 6
(d) Class A Members ... 6
19. ACTIONS BY THE MEMBERS ... 6
(a) General ... 6
(b) Meetings ... 6
(c) Written Action ... 7
(d) Actions Binding ... 7
20. MANAGEMENT OF THE COMPANY ... 7
(a) General ... 7
(b) Initial Manager ... 7
(c) Election of Managers ... 7
(d) Resignation and Removal ... 7
(e) Powers and Authority ... 7
(f) Limitations ... 8
(g) Officers ... 9
(h) Duties of the Managers ... 9
(i) Other Activities ... 9
21. BANK ACCOUNTS ... 9
22. RECORDS AND REPORTS ... 9
(a) Records ... 9
(b) Annual Reports ... 9
(c) Inspections ... 10
(d) Other Information ... 10
23. COMPENSATION ... 10
24. RELIANCE ON ACTS OF THE MANAGERS AND OFFICERS ... 10
25. INDEMNIFICATION ... 10

**FUNDAMENTAL CHANGES ... 10**

26. WITHDRAWAL ... 10
27. RESTRICTIONS ON TRANSFERS OF SHARES ... 10
(a) Requirements for Transfer ... 10
(b) Effectiveness of Assignment ... 11
(c) Requirements for Admission ... 11
(d) Rights of Mere Assignees ... 11
(e) Call Rights of the Company ... 12
(f) General ... 12
(g) Liquidation and Termination ... 12
(h) Final Accounting ... 13
28. AMENDMENTS ... 13
(a) By the Managers ... 13
(b) By Majority Consent ... 13
(c) By Unanimous Consent ... 13
(d) Other Amendments ... 13
(e) Notice of Proposed Amendments ... 13

**MISCELLANEOUS** .......... **13**
29. NOTICES .......... 13
30. TIME PERIODS .......... 13
31. ENTIRE AGREEMENT .......... 14
32. SUCCESSORS IN INTEREST .......... 14
33. COUNTERPARTS AND FACSIMILES .......... 14
34. SEVERABILITY .......... 14
35. CAPTIONS .......... 14
36. ADDITIONAL DOCUMENTS .......... 14
37. INDEMNIFICATION .......... 14
38. NO THIRD PARTY BENEFIT .......... 14
39. GENDERS AND NUMBERS .......... 14
40. NON-WAIVER .......... 15
41. COMPLIANCE WITH SECURITIES LAWS .......... 15
42. SURVIVAL .......... 15
43. VENUE .......... 15
44. APPLICABLE LAW .......... 15
45. SCHEDULES AND EXHIBITS .......... 15
**SCHEDULE 10(A)** .......... **17**
**SCHEDULE 10(B)** .......... **18**

deeproot 575 FUND, LLC
OPERATING AGREEMENT

This Operating Agreement (this "**Agreement**") is entered into effective as of September 1, 2015 by and among deeproot Funds, LLC (collectively, the "**Initial Members**" and each an "**Initial Member**") and those Investors who have subscribed to become Class B Members of the Company (the "**Investors**"). As used herein, the term "**Member**" shall refer to each of the Initial Class A Members and to each Investor hereafter admitted to the Company as a Member, as provided in this Agreement.

**STATEMENT OF AGREEMENT**

For good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, the Members agree as follows:

**ORGANIZATIONAL MATTERS**

1. General. The Members are entering into this Agreement for the purposes of forming and/or continuing a limited liability company (the "**Company**") under the laws of the State of Texas and of setting forth the rights and obligations of the Members of the Company.

2. Name. The name of the Company shall be "**deeproot 575 Fund, LLC**", "**the575™**," or such other name selected by the Members as may be required in order to be acceptable to the Secretary of State of Texas and of such other states, if any, in which the Company may do business.

3. Purposes and General Powers. The purposes of the Company shall be to engage generally in the sale of Class B Membership Interests, which invests in a pool of life insurance policies and other assets, on behalf of the Investors, and to engage in any and all other activities incidental or related to any of the foregoing. Unless hereafter restricted by amendments to this Agreement or to the Company's Articles of Organization (the "**Articles**"), the Company shall have and may exercise all powers and rights which a limited liability company may legally exercise pursuant to the Texas Limited Liability Company Act (the "**Texas Act**").

4. Organizational Filings.

(a) Texas. The Members have caused (or promptly shall cause) the Articles to be filed with the Secretary of State of Texas pursuant to the Texas Act, and shall cause the Company to comply with all other applicable requirements of the Texas Act.

(b) Other States. Prior to the Company's beginning to conduct business in any jurisdiction other than the State of Texas, if any, the Managers shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company authorized to do business in such jurisdiction.

(c) Cooperation. At the request of any Member or Manager, each Member or Manager shall execute, acknowledge or verify and deliver all certificates and other instruments consistent with this Agreement which are necessary or appropriate to qualify, continue or terminate the qualification of the Company as a limited liability company in Texas and/or as a foreign limited liability company authorized to do business in jurisdictions other than Texas.

5. Nature of Entity. It is the intention of the Members that the Company, as a limited liability company, shall not constitute or be treated as a partnership, limited partnership or joint venture for any purpose other than for federal and state income tax purposes. Except as otherwise specifically provided in this Agreement

or required by applicable law, no Member or Manager shall be liable for any debts, obligations or liabilities of the Company, whether resulting from the judgment, decree or order of any court or otherwise.

6. Principal Office and Place of Business. The address, principal office and principal place of business of the Company shall be at 8200 W. Interstate 10, Ste. 600, San Antonio, TX 78230 or at such other place as the Managers may designate from time to time.

7. Agent for Service of Process. The Company's initial agent for service of process in Texas is Robert J. Mueller, Esq., and shall be such person as the Managers may designate from time to time by filing appropriate instruments with the Secretary of State of Texas pursuant to the Texas Act.

8. Tax Matters Member. The Managers may appoint Company's "**tax matters partner**" for purposes of §6231(a)(7) of the Internal Revenue Code of 1986 (the "**Code**"), otherwise §6231(a)(7)(B) shall apply until such time as his successor is duly appointed. The Member so designated (the "**Tax Matters Member**") shall, at the expense of the Company, exercise the authority and carry out the responsibilities prescribed for a tax matters partner by §6223 et seq. of the Code in accordance with those provisions and the Treasury Regulations (the "**Regulations**") thereunder, including, without limitation, acting on behalf of the Company in administrative and judicial proceedings involving proposed adjustments to Company items and keeping all Members informed of such proposed adjustments. Any other Member may, at its own expense, participate in such proceedings as permitted by those provisions of the Code and Regulations. The Tax Matters Member shall advise all other Members in writing of any proposed settlement of such a proposed adjustment, of any requested extensions of any applicable statute of limitations and of any "**final partnership administrative adjustment**," as that term is used in the above-referenced provisions of the Code. Unless approved by a majority in interest of all Members, the Tax Matters Member shall not cause the Company to agree to any such proposed settlement or extension or to pursue judicial review of any such final partnership administrative adjustment. The Tax Matters Member shall have no liability to the Company or any Member for any action taken or not taken by it in good faith in accordance with this Section 8.

9. Term. The existence of the Company shall continue on a perpetual basis unless the Company is sooner terminated and liquidated and its affairs wound up pursuant to applicable provisions of the Texas Act and applicable provisions of this Agreement.

## FINANCIAL AND ACCOUNTING MATTERS

10. Capital Contributions.

(a) Initial Members. The Company shall authorize and issue 2,500 membership shares in the aggregate to the Members. Of the 2,500 membership shares authorized and issued, 1,500 shall be issued to the Initial Members as Class A Shares. The capital contribution and number of Class A Shares allocated to each Initial Member is set forth opposite such Member's name on Schedule 10(a) attached hereto.

(b) Investors. For each $25,000.00 contributed, in whole or part, to the capital of the Company by an Investor pursuant to Subscription Agreements accepted in whole or in part by the Company, the Company shall issue to such Investor one (1) Class B Share(s), or a fraction thereof (as such Class is described in Section 14(c) hereof). The Company is hereby authorized to issue to Investors up to 1,000 Class B Shares in exchange for contributions to the capital of the Company of up to $25,000,000 in the aggregate. The capital contribution and number of Class B Shares allocated to each Investor is set forth opposite such Investor's name on Schedule 10(b) attached hereto. Any authorized but unissued shares shall be retained and owned by Company.

(c) Limitations. Except as otherwise specifically provided in this Agreement or required by applicable law, (i) no Member shall be required to make any further contribution to the capital of the

Company to restore any loss of the Company, to discharge any liability of the Company, to eliminate any negative Capital Account (as defined below) or for any other purpose; (ii) no Member or Manager shall be personally liable for any liabilities of the Company; (iii) no contribution or other amount credited to the Capital Account of any Member shall earn interest at any time; (iv) no Member shall have the right to demand the return of any capital contribution or any other amount credited to the Capital Account of such Member; (v) no Member or Manager shall be personally liable for the return of all or any part of any capital contribution or any other amount credited to the Capital Account of any Member, it being expressly understood by each Member that any such return shall be made solely from the assets of the Company; and (vi) no Member shall have any right to demand or receive property other than cash in return for such Member's capital contribution or any other amount credited to the Capital Account of such Member, unless so requested in writing by such Member and approved in writing by the Managers, in their sole discretion.

(d) Credit to Capital Account. Contributions to the capital of the Company by a Member, as provided in this Agreement, shall be credited to the Capital Account of such Member as of the effective date of receipt by the Company.

11. Loans. A Member or Manager may (but, unless otherwise specifically provided herein, shall not be obligated to) loan funds to the Company for use in the business operations of the Company. Any loan made to the Company by any Member or Manager shall be at a commercially reasonable interest rate and on other commercially reasonable terms as shall be determined by agreement of the lending person and the Managers, and such lending Member or Manager shall be treated as a general creditor of the Company with respect to such loan.

12. Fiscal Year and Accounting Methods. The fiscal year of the Company shall be from January 1st to December 31st. The books of the Company shall be kept by the Managers in a manner consistent with the provisions of Sections 13, 15 and 16 and as otherwise determined to be appropriate based upon consultation with the Company's accountants.

13. Capital Accounts. A single capital account ("**Capital Account**") shall be maintained for each Member in accordance with the capital account accounting rules of §704(b) of the Code and the Regulations thereunder. Each Member's beginning Capital Account shall be the amount of such Member's initial contribution to the capital of the Company made as provided in this Agreement. Thereafter, a Member's Capital Account (a) shall be credited with and increased by (i) such Member's subsequent contributions of money, if any; (ii) the agreed net fair market value of property, if any, subsequently contributed by such Member; (iii) income and gain (including unrealized gain) allocated to such Member as provided in this Agreement; and (iv) such other amounts as may be required in order for the Capital Accounts to be considered to be determined and maintained in accordance with rules of Regulation §1.704-1(b)(2)(iv); and (b) shall be debited with and reduced by (i) distributions of money to such Member; (ii) the net fair market value of property, if any, distributed to such Member; (iii) losses and deductions (including unrealized loss) allocated to such Member as provided in this Agreement; and (iv) such other amounts as may be required in order for the Capital Accounts to be considered to be determined and maintained in accordance with the rules of Regulation §1.704-1(b)(2)(iv). Notwithstanding the foregoing, nor any contrary provision in the Code and the Regulations, capital accounts for Class B Members shall be accounted for basis only of Invested Capital, as otherwise provided hereinafter.

14. Ownership Interests.

(a) Shares. Ownership interests in the Company shall be denominated in "**Shares**". Fractional Shares, rounded to the nearest one thousandth or third decimal place, may be issued by the Company if necessary to reflect the agreed upon number of Shares to be issued in accordance with the terms of this Agreement. A Member's "**Percentage Interest**", rounded to the nearest one thousandth or third decimal place, shall be determined by dividing the number of Shares owned by such Member by the total number of Shares owned by all Members. The Company shall initially issue 2,500 shares, segregated into two classes: 1,500 Class A Shares and

1,000 Class B Shares, as described in subparagraphs (b) and (c) below. Each Share shall evidence, represent and constitute ownership of the Percentage Interest, the Capital Account balance and other rights attributable to that Share, all as set forth in this Agreement.

(b) Class A Shares. "**Class A Shares**" as to any Member shall mean and refer to Shares issued to the Initial Members which entitle the holder to cast two votes for each Class A Share held by the Member on all matters reserved for the Members' approval, consent or consideration.

(c) Class B Shares. "**Class B Shares**" as to any Member shall mean and refer to Shares which entitle the holder to cast one vote for any matters reserved for the Members' approval, consent or consideration.

(d) Computation of Profits and Losses. Profits and losses of the Company shall be computed in the same manner as used by the Company for federal income tax purposes, except that (i) for purposes of computing gain, loss, depreciation and other items, property of the Company shall be considered to have a book value equal to its fair market value as most recently determined pursuant to Section 14(d); (ii) income of the Company exempt from tax, and expenses of the Company not deductible or not properly chargeable to capital for tax purposes, under the Code shall be included in the computation; and (iii) unrealized gain or loss shall be taken into account as provided in Section 15(d).

(e) Allocations. Except as otherwise provided herein, net profits, net losses, and credits of the Company shall be allocated to and among each Class A Member in accordance with each's respective Percentage Interests.

For the purposes of this Agreement, the following definitions shall apply:

(A) "**Priority Return**" shall be defined by the Priority Return Election chosen by the Investor during a subscription term. For a **deferred** Priority Return Election, the Priority Return shall mean the cumulative deferred (and unpaid) returns calculated per annum by multiplying each respective Class B Member's Invested Capital by seven percent (7%); the deferred sum of which are paid at the Pay Date. For a **periodic** Priority Return Election, the Priority Return shall mean monthly payments calculated per annum by multiplying each respective Class B Member's Invested Capital by five percent (5%), and then dividing by twelve (12). Regardless of the Priority Return Election, priority returns shall be cumulative commencing on subscription (the "**Start Date**"), and any unpaiud priority returns due on or about thrity (30) days (the "**Pay Date**"), after the mandatory Call, such Call being pre-determined as five years less one day after the Start Date, by the Company; and

(B) "**Invested Capital**" shall mean an amount equal to the contributed capital made to the Company by a Class B Member under Section 10(b) hereof, less any return of capital previously distributed to such Class B Member.

(g) Specific Items. Specific items of Company income, gain, loss and deduction shall be allocated to and among the Class A Members in proportion to the respective allocations of net profits and losses to and among such Members, except that each Class A Member's distributive share of depreciation, amortization and gain or loss with respect to any Company property, as computed for tax purposes, shall be determined so as to reflect the varying interests of the Members in unrealized gain or loss for prior periods, and otherwise to take into account the variation, if any, between the adjusted basis and book value of the property as required by §704(c) of the Code and the Regulations.

(h) Unrealized Gain or Loss. On each Adjustment Date (as hereinafter defined), the properties of the Company (including any property being distributed by the Company) shall be considered to have

been sold on such date at fair market value (as determined by the Managers, using their reasonable business judgment). The unrealized gain or loss attributable to such deemed sale shall be allocated to and among the Members in accordance with Section 15(b). The amount of any distribution in kind shall be considered to be the fair market value of the distributed property, as so determined. As used in this Agreement, "**Adjustment Date**" shall mean the date of the dissolution of the Company and each other date upon which there is (i) a distribution in kind of Company property; (ii) a contribution of money or other property (other than a de minimus amount) to the Company by a new or existing Member as consideration for an interest in the Company; or (iii) a distribution of money (other than a de minimus amount) by the Company to a withdrawing or continuing Member as consideration for an interest in the Company.

(i) Varying Interests. If additional Shares are issued, or if any Share is transferred during any fiscal year, the net profits and losses and credits allocated to the Members for such year shall be determined on a daily, monthly or other basis, as selected by the Managers using any method permitted under Code §706 and the Regulations thereunder. The transferee of a Share shall succeed to the Capital Account attributable to the Share so transferred.

15. Special Circumstances Allocations.

(a) General. The Code and Regulations impose a number of requirements that must be satisfied in connection with allocations made by the Company (including a requirement that, in order for an allocation of an item of income, gain, loss or deduction to be recognized for federal income tax purposes, the allocation must have substantial economic effect or otherwise must be in accordance with the Members' interests in the Company). It is the intention of the Members that all allocations made under this Agreement shall comply with those requirements and shall be made in manners consistent with Code §§704(b) and 704(c) and Regulations §§1.704-1 and 1.704-2. In addition to any other steps which may need to be taken to implement that intention, and in connection with certain other special circumstances which might arise, allocations shall be made under the provisions of this Section 16, to the extent applicable, before making any allocations under Section 15.

(b) Incorporation of Certain Rules. The "**qualified income offset**" rules, the "nonrecourse deduction" rules, the "partner nonrecourse deduction" rules, the "partner minimum gain" rules, the "partnership minimum gain" rules and the related "chargeback" rules of Regulations §§1.704-1 and 1.704-2 are incorporated in this Agreement by reference. In addition, no loss or deduction shall be allocated to a Member if such allocation would cause or increase a deficit balance in such Member's Capital Account, adjusted as described in Regulations §1.704-1(b)(2)(ii)(d)(3) et seq. Any special allocations of items pursuant to such rules or otherwise made to implement the intentions stated in Section 16(a) shall be taken into account in computing and making subsequent allocations to and among the Members so that the net amount of any items so allocated and the profits, losses and all other items allocated to each Member shall, to the extent possible, be equal to the net amount that would have been allocated to each Member under Section 15 if such special allocations had not occurred.

(c) Certain Fee Payments to Members. If and to the extent that any payments in the nature of fees made to a Member are finally determined by the Internal Revenue Service or otherwise to be distributions to a Member for federal income tax purposes (instead of being treated as fees), gross income shall be allocated to such Member in the amount of such distributions.

(d) Certain Imputed Interest. If and to the extent that the Company is entitled to a deduction for interest imputed under any provision of the Code on any loan or advance from a Member to the Company (whether such interest is currently deducted, capitalized or amortized), such deduction shall be allocated solely to such Member.

16. Elections. The Managers, in their discretion, may cause the Company to make any election required or permitted to be made by the Company under the Code and applicable Regulations, including, without limitation, an election pursuant to §754 of the Code to adjust the basis of the Company's assets for all transfers of Shares.

17. Current Distributions. Except as required by the Code and the Regulations thereunder, cash available for distribution shall be distributed with respect to a fiscal year at times determined by the Managers in the following order and priority as net profit, net loss and credit of the Company is allocated pursuant to Section 15(b) hereof.

18. Distributions Upon Winding-Up. Upon dissolution of the Company and the winding-up of the Company's affairs, the assets of the Company (after giving effect to the provisions of Section 15(d)) shall, subject to the requirements of applicable Texas law, be applied and distributed in the following order of priority:

(a) Creditors. To the payment of debts and liabilities of the Company to creditors of the Company (including those to Members other than liabilities to Members for distributions), including, without limitation, expenses of winding-up and the establishment of any reserves against liabilities and obligations of the Company which the liquidator, in the liquidators sole discretion, deems appropriate.

(b) Class B Members. To the Class B Members in accordance with, and in proportion to, their respective positive Capital Account balances.

(c) Class B Members. To the Class B Members, pro rata, in accordance with, and in proportion to, any unpaid Priority Returns.

(d) Class A Members. To the Class A Members in accordance with, and in proportion to, their respective positive Capital Account balances.

## OPERATIONS

19. Actions by the Members.

(a) General. Whenever this Agreement requires the vote, consent, approval or other action by a specified fraction or percentage "in interest" of some or all of the Members, such requirement shall be satisfied if such vote, consent, approval or other action is provided or authorized by Members who own Class A shares which represent at least the specified fraction or percentage of the total shares owned by all Members entitled to participate in such decision. Unless otherwise specifically provided, any proposed decision or action shall require approval by a majority in interest of the Class A Members, which Class A Members shall be entitled to vote on all matters reserved for their approval or consent. Except as otherwise specifically provided in this Agreement or required by applicable law, no Member shall be disqualified from participating in the making of any such decision or the taking of any such action solely because such Member has an interest in the outcome thereof.

(b) Meetings. Unless hereafter required by the vote of a majority in interest of all Class A Members, there will be no regularly scheduled annual or other meetings of the Members. However a meeting of the Members may be called at any time upon at least ten days' written notice (the "**Meeting Notice**") to all of the Members given by the Managers or by seventy-five percent in interest of the Class B Members. The Meeting Notice shall specify the subject matters to be considered at the meeting. Unless the Managers or a majority in interest of the Members calling the meeting agree upon and state in the Meeting Notice a San Antonio, Texas location for the meeting, each meeting shall be by teleconference with arrangements which permit each Member participating in the teleconference to hear (and to be heard by) each of the other participating Members. A majority in interest of all Members (present in person or by written proxy) shall constitute a quorum for any meeting of the Members, and action may be taken at such meeting only with respect to matters directly related to the subject

matters specified in the Meeting Notice, unless otherwise agreed upon at such meeting by unanimous consent of the Class A Members participating in the meeting.

(c) Written Action. Any action of the Class A Members set forth in writing and signed by the requisite percentage in interest of such Class A Members shall be effective whether or not a meeting of Members has been called and held for the purpose of considering such action.

(d) Actions Binding. Any action taken by the Class A Members at a meeting or in writing, as described above, shall be binding and conclusive upon the Company and all Members and Managers, and a copy of the minutes of the meeting or of the written action in which such action was taken shall be certified to be true, accurate and complete by the Managers and shall promptly be provided by the Managers to all of the Members.

20. Management of the Company.

(a) General. In general, and except as otherwise provided herein or by applicable law, the persons elected annually by the Members as managers of the Company (the "**Managers**"), shall be responsible for the management of the Company. No Member who is not a duly elected Manager, or officer of the Company shall have any responsibility, right or power to take part in the control of the Company's business or any authority or power to act or sign for or otherwise bind the Company or any other Member.

(b) Initial Manager. The initial Manager is ROBERT J. MUELLER, who shall serve as Manager until such time as his/her/their respective successors are duly elected by the Class A Members.

(c) Election of Managers. Class A Members shall, from time to time, determine the number of persons to be elected as the Managers of the Company and shall elect the number of Managers so decided upon.

(d) Resignation and Removal. A Manager may resign at any time, may be removed by a unanimous vote of Class A Members, or may be removed, for cause, by any other interested party, for conduct rising to clear and unambiguous criminal conduct, by a judge or court having subject matter and person jurisdiction over the Manager.

(e) Powers and Authority. Except as otherwise provided herein or by non-waivable provisions of applicable law, the powers and authority of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Managers (with the consent of a majority of the Managers being required for action by the Managers). Unless hereafter required by the vote of a majority of the Managers, there will be no regularly scheduled annual or other meetings of the Managers. However, a meeting of the Managers may be called at any time upon at least ten days' written notice (the "**Meeting Notice**") given by any Manager to all of the other Managers. The Meeting Notice shall specify the subject matters to be considered at the meeting. Unless otherwise agreed upon in writing by a majority of the Managers specifying an agreed upon time and place for the meeting, each meeting shall be by teleconference with arrangements which permit each Manager participating in the teleconference to hear (and to be heard by) each of the other participating Managers. A majority of all Managers (present in person or by written proxy) shall constitute a quorum for any meeting of the Managers, and action may be taken at such meeting only with respect to matters directly related to the subject matters specified in the Meeting Notice, unless otherwise agreed upon at such meeting by a majority of the Members participating in the meeting. Any action of the Managers set forth in writing and signed by the requisite number of the Managers shall be effective whether or not a meeting of Managers has been called and held for the purpose of considering such action. Any action taken by the Managers at a meeting or in writing, as described above, shall be binding and conclusive upon the Company and all Members and Managers, and a copy of the minutes of the meeting or of the written action in which such action was taken shall

be certified to be true, accurate and complete by the Managers and shall promptly be provided by the Mangers to all of the Members. Subject to the foregoing, the powers and authority of the Managers shall include, without limitation, the power and authority:

(i) to enter into, make and perform contracts, agreements and other undertakings binding the Company that may be necessary, appropriate or advisable in furtherance of the purposes of the Company and to make all decisions and waivers thereunder;

(ii) to open and maintain bank and investment accounts and arrangements, to draw checks and other orders for the payment of money and to designate individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(iii) to maintain the assets of the Company in good order;

(iv) to collect sums due to the Company;

(v) to the extent that funds of the Company are available therefore, to pay debts and obligations of the Company;

(vi) to acquire, utilize for Company purposes and dispose of any asset of the Company;

(vii) to borrow money or otherwise commit the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

(viii) to select, remove and change the authority and responsibility of lawyers, accountants and other advisers and consultants;

(ix) to obtain insurance for the Company;

(x) to make decisions concerning distributions by the Company of cash and other property as provided in Sections 18 and 19; and

(xi) to adopt, amend or restate bylaws for the Company.

(xii) to develop property in any way that the Members deem appropriate; and

(xiii) to take any and all other action that is permitted by law and customary in or reasonably related to the conduct of the Company's business affairs.

(f) Limitations. Except with the consent and approval of a three-quarters majority in interest of <u>all</u> Members, the Managers shall not:

(i) sell, lease, exchange or otherwise dispose of (other than by way of a pledge, mortgage, deed of trust or trust indenture) all or substantially all of the Company's property and assets;

(ii) require any Member to make additional capital contributions;

(iii) amend or restate the Articles of the Company or, except as otherwise specifically permitted herein, this Agreement.

(g) Officers. From time to time, at the discretion of the Managers, the Managers may elect persons as officers of the Company, including, without limitation, a chief executive officer, a president, a secretary, a treasurer and such vice presidents, assistant secretaries and assistant treasurers as the Managers may deem desirable. Subject to the provisions of any employment or other agreements (approved by the Managers) between such officer and the Company, each officer so elected shall serve in that capacity at the pleasure of the Managers, and may be removed from such office by the Managers at any time for any reason, with or without cause. The officers so elected by the Managers shall have such powers, duties and responsibilities as would be customary for officers of corporations with corresponding titles and as otherwise may reasonably be assigned to them, from time to time, by the Managers.

(h) Duties of the Managers. The Managers shall manage or cause to be managed the affairs of the Company in a prudent and businesslike manner, devoting such portion of his time and effort to Company affairs as may reasonably be required for the effective management of such affairs; provided, however, that it is expressly understood and agreed that the Managers shall not be required to devote their entire time or effort to the business of the Company and shall not be restricted in any manner from participating in any other business or activities. The Managers also shall cause to be filed such certificates and shall do such other acts as may be required by law to qualify and maintain the Company as a limited liability company under the laws of the State of Texas and of any other jurisdiction in which the Company transacts business.

(i) Other Activities. No Member, Manager or other person related to or affiliated with any Member or Manager shall be prevented or restricted from engaging or participating in or conducting any other business or activity whatsoever (or have any accountability, liability or obligation whatsoever to the Company or any Member with respect thereto), even if such other business or activity competes with, or is enhanced by, the business and activities of the Company.

21. Bank Accounts. All cash receipts and other funds of the Company shall be deposited to one or more bank accounts in the name of the Company at one or more banks or other depositories selected by the Managers from time to time. Checks and other withdrawals from such accounts may be signed by the Managers or by any one or more other persons who may be selected by the Managers from time to time. All funds of the Company shall be used solely for Company purposes and shall not be commingled with funds of any Manager, Member or other person.

22. Records and Reports.

(a) Records. The Managers shall keep or cause to be kept proper books of account in accordance with Section 11 and in such other manner as the Managers and the Company's accountants determine to be appropriate. The Managers shall promptly enter or cause to be entered in the Company's books a full and accurate record of each transaction made by the Managers on behalf of the Company. All books of account, with all other written records and other documents of the Company, shall be maintained at the principal office of the Company or at any other location in Texas that may be selected by the Managers from time to time, and shall be open to the reasonable inspection and copying by any Member or such Member's duly authorized representative, as provided in Section 23(c).

(b) Annual Reports. Within 90 days after the end of each fiscal year, the Managers shall cause to be prepared and delivered to each Member (i) financial statements of the Company for that year, including an income statement, balance sheet, statement of cash flow and statement of changes in Members' equity, with a summary for each Member; and (ii) federal and other applicable income tax returns of the Company for that year, including Schedules K-1 for all Members. A Member's online access to such reports shall be deemed delivered.

(c) Inspections. Any Member shall have the right to inspect and copy, at such Member's own expense, any of the Company's records required to be maintained pursuant to the Act, at such Member's reasonable request and during regular business hours; provided, however that the Managers may restrict or redact records, or parts thereof, that constitutes confidential, privileged, or proprietary information.

(d) Other Information. The Managers shall keep the Members informed generally of the transactions entered into by the Managers on behalf of the Company, only as such transactions may involve the Call of investment positions.

23. Compensation. A person serving as a Manager shall be entitled to receive compensation for services rendered to the Company as a Manager only if and as approved from time to time by a majority of the Managers. A person serving as an officer shall be entitled to receive compensation for services rendered to the Company as an officer only if and as approved from time to time by the Managers. All Managers and officers shall be entitled to reimbursement of reasonable expenses incurred by them on behalf of the Company.

24. Reliance on Acts of the Managers and Officers. No financial institution or any other person dealing with the Managers or officers of the Company shall be required to ascertain whether a Manager or officer is acting in accordance with this Agreement, but such financial institution or such other person shall be protected in relying solely upon the assurances of, and the execution and delivery of documents by, a Manager or officer.

25. Indemnification. Each Member, Manager and officer of the Company is hereby indemnified by the Company with respect to the matters described in, to the full extent permitted by and in accordance with the provisions of the Texas Act. Notwithstanding the foregoing, the Company shall not indemnify (a) a Member with respect to any dispute among the Members or among the Company and any Members arising out of this Agreement or any other agreement among such Members and the Company, or (b) any Manager or officer with respect to any dispute between such Manager or officer and the Company arising out of any agreement between the Company and such Manager or officer.

**FUNDAMENTAL CHANGES**

26. Withdrawal. The withdrawal of a Class B Member shall not cause the dissolution of the Company. Accordingly, except as otherwise provided herein, no Class B Member shall have any right or power to voluntarily withdraw from the Company as a Member, or any right (under any provision of the Texas Act or otherwise) to receive any payment or compensation for such Member's Shares upon voluntary withdrawal from the Company, whether or not the withdrawal is in violation of this Agreement.

27. Restrictions on Transfers of Shares.

(a) Requirements for Transfer. Subject to any restrictions on transferability required by law (including the Securities Act of 1933, any state securities or "Blue Sky" law, and the rules promulgated thereunder), and subject to the provisions of Section 27(c), which shall have priority, each Member shall have the right to transfer (but not to substitute the assignee as a substitute Member in his or its place, except in accordance with Section 27(c) hereof), by a written instrument, the whole or any part of his or its Shares, provided that: (i) the transferee is a citizen and resident of the United States, and otherwise not a tax-exempt entity under Section 168(h) of the Code; (ii) the transferor delivers to the Company and the Remaining Members an unqualified opinion of counsel designated by the Remaining Members that neither the transfer nor any offering in connection therewith violates any provision of any federal or state securities law; (iii) the transferee executes a statement that he or it is acquiring such Shares or such part thereof for his or its own account for investment and not with a view to distribution, fractionalization or resale thereof; and (iv) the Company receives a favorable opinion of the Company's legal counsel or such other counsel selected by the Remaining Members that such transfer would not result in the termination of the Company (within the meaning of Section 708(b) of the Code) or the termination of

its status as a partnership under the Code; *provided, further*, that the Remaining Members may elect to waive the requirement of the opinions of counsel set forth in Sections 27(a)(ii) and (iv) above should each of them, in their sole discretion, determine that the cost of time delays involved in procuring such opinions may impede the Company's ability to effect the contemplated transfer.

(b) Effectiveness of Assignment. No transfer shall be effective unless and until the requirements of Section 27(a) are satisfied. The transfer by a Member of all or part of his or its Shares shall become effective on the first day of the calendar month immediately succeeding the month in which all of the requirements of this Section 27 have been met, and the Company has received from the transferor a transfer fee sufficient to cover all expenses of the Company connection with such transfer; *provided*, however, that the Remaining Members may elect to waive this fee in their sole discretion. All distributions made thereafter in respect of the Shares of the transferor shall be made to the transferee of such transferor's Shares.

(c) Requirements for Admission. No transferee of the whole or a portion of a Member's Shares shall have the right to become a Member unless and until all of the following conditions are satisfied:

(i) a duly executed and acknowledged written instrument of transfer approved by the Class A Members has been filed with the Company setting forth (A) the intention of the transferee to be admitted as a Member; (B) the notice address of the transferee; and (C) the percentage and Class of Shares transferred by the transferor to the transferee;

(ii) the opinions of counsel described in Section 27(a) above are delivered to the Company and the Remaining Members, subject to the Remaining Members right to waive the delivery of these opinions in their sole discretion;

(iii) the transferor and transferee execute and acknowledge, and cause such other persons to execute and acknowledge, such other instruments and provide such other evidence as the Class A Members may reasonably deem necessary or desirable to effect such admission, including without limitation: (A) the written acceptance and adoption by the transferee of the provisions of this Agreement; (B) the transferee's completion of a purchaser qualification questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under this Securities Act of 1933 and relevant state law; and (C) the transferee's completion, if applicable, of an acknowledgement of the use of a purchaser representative, and such representative's completion of a purchaser representative questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under the Securities Act of 1933 and relevant state law;

(iv) the admission is approved within the sole and absolute discretion by a majority of the Class A Members, unless and except all Class A Shares are being transferred, in which a super majority of two-thirds of Class B Members must approve the admission; and

(v) a transfer fee has been paid to the Company by the transferor sufficient to cover all expenses in connection with the transfer and admission, including but not limited to attorney's fees for the legal opinions referred to in Sections 27(a) and (c), subject to the Remaining Members' right to waive the payment of this fee in their sole discretion.

(d) Rights of Mere Assignees. If a transferee of Shares is not admitted as a Member, he or it shall be entitled to receive the allocations and distributions attributable to receive the allocations and distributions attributable to the transferred Shares, but he or it shall not be entitled to inspect the Company's books and records, receive an accounting of the Company's financial affairs, exercise the voting rights of a Member, or otherwise take part in the Company's business or exercise the rights of a Member under this Operating Agreement.

(e) Call Rights of the Company.

(i) Under terms of a certain private placement memorandum dated September 1, 2015, the mandatory Call date for each subscription is set at five years, less one day, from the Start Date. At any time prior to the mandatory Call date, the Company may mandate a premature Call of one or more Class B Shares, as long as Company pays a lump sum amount equaling the i) already accrued, but unpaid priority returns (if any); and ii) the cumulative priority returns that would have been due Investor, if the premature Call had not occurred, and the mandatory Call date applied. In order to exercise this Call right, the Company shall provide a written call notice to each Class B Member, specifying, at a minimum, the Pay Date, form of payment, amount of payment, and number of Class B Shares to be called.

(ii) Upon each exercise by the Company of its call rights provided for herein, the Class B Members shall be required to sell to the Company all of the Class B Shares of such Members listed in the call notice. The purchase price shall be equal to the Invested Capital related to the called Class B Shares, plus any unpaid priority returns (if any).

(f) General. The Company shall be dissolved and its affairs wound up upon the occurrence of any of the following events:

(i) the written agreement of a majority in interest of all Class A Members to dissolve the Company.

(ii) at any time when there are no remaining Members of the Company. (In any other situation where, following the withdrawal of any Member, there is at least one remaining Member, the Company shall not be dissolved, and the business and existence of the Company shall be continued by such remaining Member(s).

(iii) the entry of a decree of judicial dissolution of the Company under the Texas Act.

(iv) the sale or other disposition of all or substantially all of the assets of the Company.

(g) Liquidation and Termination. Upon dissolution of the Company, the Managers shall act as liquidator or may appoint one or more of the Managers to act as liquidator. (If there are no Managers then serving, a majority in interest of the remaining Members shall select one or more persons to act as liquidator.) The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers. A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the liquidator to minimize any losses resulting from liquidation. The liquidator, as promptly as possible after dissolution and again after final liquidation, shall cause a proper accounting to be made by a certified public accounting firm of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable, and shall apply the proceeds of liquidation as provided in Section 19 and in accordance with the time requirements of §1.704-1(b)(2)(ii)(b)(2) of the Regulations. If, in the reasonable judgment of the liquidator, it will not be possible or prudent to complete the liquidation of the Company's assets and the distributions to the Members within that prescribed time period, the liquidator shall, on or before the last day of such period, distribute all remaining assets and liabilities of the Company to a trust, with the liquidator or such other person as the liquidator may appoint serving as the trustee thereof, for the purpose of complying with such timing requirements. The trustee of said trust shall, thereafter, proceed with the completion of the liquidation of said remaining assets in the manner

described in this Section 29(b) and with the application of the proceeds therefrom in the manner described in Section 19, and the trust shall be terminated as promptly as possible after completing all such actions.

(h) Final Accounting. Each of the Members shall be furnished with a statement prepared by the Company's accountants, which shall set forth the assets and liabilities of the Company as of the last day of the month which includes the date of dissolution and shall provide relevant information concerning the application and disposition of such assets and the proceeds thereof. Upon compliance by the liquidator with the foregoing provisions, the liquidator shall execute and cause to be filed Articles of Dissolution and any and all other documents necessary with respect to termination and cancellation of the Company under the Texas Act.

28. Amendments

(a) By the Managers. This Agreement may be amended by the Managers, without the consent or approval of the Members, if such amendment (i) is solely for the purpose of reflecting the admission of additional Members or substituted Members who have been admitted as additional or substituted Members of the Company in accordance with the terms of this Agreement; or (ii) is, in the opinion of counsel for the Company, necessary or appropriate to satisfy requirements of the Code or Regulations or of any federal or state securities laws or regulations. Any amendment made pursuant to Section 28(a)(ii) may be made effective as of the date of this Agreement.

(b) By Majority Consent. Notwithstanding any other provisions of this Agreement except the provisions of Section 28(a), the unanimous consent of all Class A Members, and the majority of Class B Members, are required to ratify any other amendments to this Agreement which would (i) permit any substantial changes to the offering documents, or (ii) permit substantial changes to the ownership or management of the Company.

(c) By Unanimous Consent. Notwithstanding any other provisions of this Agreement except the provisions of Section 28(a) & (b), the unanimous consent of all Members are required to ratify any other amendments to this Agreement which would (i) change the method of allocating profit and loss under Section 14 or 15 or of making distributions under Section 17 or 18, (ii) change any voting rights or required voting percentages otherwise set forth in this Agreement, (iii) expose any Members to personal liability for obligations of the Company, (iv) change the method of admitting additional Members shall require the written consent of all Members, (v) authorize the sale, lease, exchange or disposal of all or substantially all of the Company's property and assets, or (vi) ratifies any amendment or restatement of the Articles of the Company that would adversely impact the rights, privileges, or benefits of any Class B Shareholder.

(d) Other Amendments. Except as otherwise provided in this Section 28, amendments to this Agreement shall require the written consent of two-thirds in interest of all Class A Members.

(e) Notice of Proposed Amendments. A copy of any amendment proposed to be made pursuant to this Section 28 shall be provided to each Member by the Managers at least 15 days prior to its proposed adoption date.

**MISCELLANEOUS**

29. Notices. Any notice, election or other written communication required or desired to be given hereunder shall be deemed given or made at such time as it (a) is delivered personally to the intended recipient, or (b) is delivered to Federal Express, UPS or any similar express delivery service, or is deposited in the United States mails, by registered or certified mail, return receipt requested, bearing proper postage, addressed to the intended recipient at the address set forth on the signature page(s) of this Agreement (in the case of any communication to a Member) or the address of the principal office of the Company (in the case of any communication to the Company). Any Member or the Company may specify some other address for the receipt

of such written communications by giving written notice of such change to the other Members. Although a notice, election or other communication shall be deemed given or made when delivered to an express delivery service or deposited in the mails as provided above, any time period that is to begin running by reason of such communication shall not commence until such communication actually is received by the intended recipient.

30. Time Periods. In the case of any time period which, pursuant to the terms of this Agreement, begins to run upon receipt of any notice or the occurrence of any other act or event, the day after such receipt or occurrence shall constitute the first day of such period, and such period shall expire at midnight of the last day of such period.

31. Entire Agreement. Except as otherwise specifically indicated herein, this document contains the entire agreement of the parties and supersedes any and all prior understandings, agreements, representations and negotiations between them respecting the subject matters hereof.

32. Successors in Interest. Except as otherwise provided herein, all provisions of this Agreement shall be binding upon, inure to the benefit of and be enforceable by and against the Company, the Members and their respective heirs, executors, administrators, personal representatives, successors and permitted assigns.

33. Counterparts and Facsimiles. This Agreement and any other documents related to this Agreement may be executed in several counterparts, and each executed counterpart shall be considered as an original of this Agreement or such other document, as the case may be. A counterpart executed and transmitted by facsimile device by any person to the intended recipient thereof shall constitute and be accepted as an executed and delivered original of this Agreement or such other document, as the case may be.

34. Severability. In the event any provision of this Agreement or any application thereof is held to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the other provisions hereof and of any other application of the specific provision involved shall not be affected or impaired in any manner.

35. Captions. The captions at the beginnings of the sections and paragraphs of this Agreement are not part of the context of this Agreement, but are merely labels to assist in locating those sections and paragraphs, and shall be ignored in construing this Agreement.

36. Additional Documents. Each Member shall, and shall cause the Company to, execute, acknowledge or verify and deliver any and all documents from time to time reasonably requested by the Company or any other Member or Manager to carry out the purposes and intent of this Agreement.

37. Indemnification. If any Member violates any provision of this Agreement, then, in addition to being subject to all other remedies, liabilities and obligations imposed upon that Member for such violation under this Agreement or under any applicable law, that Member shall indemnify the Company and the other Members against any and all liabilities, losses, damages, claims, costs and expenses of any kind whatsoever relating to or arising directly or indirectly out of or by reason of any such violation (including, without limitation, consequential damages; legal fees and other costs and expenses of prosecuting or defending claims or controversies, whether litigated or unlitigated; and interest on any such liabilities, losses, damages, claims, costs and expenses from the date paid at a floating rate equal to 2% plus the prime rate of interest as published in The Wall Street Journal from time to time).

38. No Third Party Benefit. Except as otherwise specifically provided herein, this Agreement is intended for the exclusive benefit of the Company and the Members and their respective successors and

permitted assigns, and nothing contained in this Agreement shall be construed as creating any right or benefit in or to any third party.

39. Genders and Numbers. When permitted by the context, each pronoun used in this Agreement includes the same pronoun in other numbers or genders, and each noun used in this Agreement includes the same noun in other numbers.

40. Non-Waiver. No failure by the Company or any Member to insist upon strict compliance with any term of this Agreement or to exercise any option, enforce any right or seek any remedy upon any default of any other person shall affect, or constitute a waiver of, the Company's or such Member's right to insist upon such strict compliance, exercise that option, enforce that right or seek that remedy with respect to that default or any prior, contemporaneous or subsequent default; nor shall any custom or practice at variance with any provision of this Agreement affect, or constitute a waiver of, the Company's or any Member's right to demand strict compliance with all provisions of this Agreement.

41. Compliance with Securities Laws. In addition to the restrictions on Transfers of Shares under other provisions of this Agreement, no such Share may be sold or otherwise Transferred unless and until (a) such Share has been registered under all applicable federal and state securities laws pursuant to an effective registration statement which contemplates the proposed Transfer and complies with the then-applicable regulations, rules and administrative procedures and practices of any applicable federal and state securities commission or regulator, or (b) the Company has received (or, in its sole discretion, has waived its right to receive) a legal opinion of, or satisfactory to, its legal counsel that no such registration is required.

42. Survival. If any provision of this Agreement establishes, with respect to any Member or the Company, any rights and/or obligations which are to be in effect after the termination or expiration of this Agreement, such provision shall survive the termination or expiration of this Agreement and shall be binding upon all persons affected by such provision for such period of time as may reasonably be required in order to give full effect to the intended application of such provision.

43. Venue. The Company and the Members hereby designate the courts sitting in San Antonio, Texas, as the courts of proper and exclusive subject matter and personal jurisdiction and venue of and for any and all actions and proceedings relating to this Agreement; hereby irrevocably consent to such designation, jurisdiction and venue; hereby waive any objections or defenses relating to jurisdiction or venue with respect to any action or proceeding initiated in any of said courts; and agree that service of process or notice in any such action or proceeding shall be effective if delivered or mailed in accordance with the notice provisions of this Agreement.

44. Applicable Law. The Company is being formed under the laws of the State of Texas, and all rights, duties and obligations of the Company and of the Members under this Agreement shall be determined in accordance with the laws of said State.

45. Schedules and Exhibits. All schedules, exhibits and other attachments (including all duly authorized substitutions and replacements therefore) referred to in, and attached to, this Agreement hereby are incorporated in this Agreement by reference.

IN WITNESS WHEREOF, this Agreement has been executed and delivered effective as of the date first set forth above.

MANAGER:

ROBERT J. MUELLER, Manager

INITIAL CLASS A MEMBER(S):

deeproot Funds, LLC by ROBERT J. MUELLER, VP

CLASS B MEMBER(S):

*As amended from time-to-time by attachment and incorporation by reference.*

**Schedule 10(a)**

| Member Name and Address | Capital Contribution | Class A Shares | Date Subscribed |
|---|---|---|---|
| deeproot Funds, LLC<br>8200 W. Interstate 10, Ste. 600 San Antonio, TX 78230 | $1,000.00 | 1,500 | 9/1/2015 |

**Schedule 10(b)**

| Member Name and Address | Capital Contribution | Class B Shares | Date Subscribed |
|---|---|---|---|
| | | | |




# EQUITY FUND PACKET WELCOME SHEET

## THANK YOU FOR CHOOSING deeproot® FUNDS!

As a premier alternative fund company, deeproot® is committed to making your investment experience the absolute best. We have provided some basic information about us and the application process below. **We want to help!** So, please do not hesitate to contact us if you have any questions!

## I. PRE-QUALIFY

If you have not already done so, please start the application process by submitting the easy, secure webform at:

http://www.deeprootfunds.com/pre-qualify

## II. REVIEW MARKETING MATERIALS & APPLICATION PACKET

Once the Pre-Qualification webform is received, you will receive an overnight Application Packet for review. Please ask questions about our products or forms BEFORE you fill-out or submit your paperwork. Or you can download them with our webapp process at https://dprtapp.com.

## III. SUBMIT APPLICATION & FUNDS

Please follow the instructions below for paper applications, depending on whether your money is non-qualified or qualified. **All applications must be accompanied by a color copy of your drivers license or other ID.** You can also email us a picture at contact@deeprootfunds.com. For digital applications, please go to: https://dprtapp.com.

### >> A. QUALIFIED – IRA/ROTH (PAPER)

For qualified investments (ie. IRA, Roth, SEP, etc.) you will simply fill out, sign and return to us the **Application & Subscription Agreement. Unless you are submitting a personal or direct rollover check, one (or more) IRA Applications and Transfer form(s), and other CNB CUSTODY forms must also be completed and returned to us. All qualified checks must be made out to: *Community National Bank f/b/o (your name)*!**

### >> B. NON-QUALIFIED (PAPER)

For non-qualified investments (ie. using non-retirement funds) you will simply fill out, sign and return the **Application & Subscription Agreement**. We prefer WIRE TRANSFERS of the investment funds using the wiring information on the last page of the Application, over checks due to regulatory holds and fraud flags. **All non-qualified checks are subject to a $250.00 processing fee, & must be made out to: *deeproot Funds***

## IV. ACCEPTANCE AND RECEIPT

Once we accept your application and apply your investment funds, you will receive a welcome packet by mail. In the welcome packet, you will have a confirmation letter, an original authenticated Certificate of Ownership with the details of your investment, and a copy of your Application and other paperwork.



**Mailing**
PO Box 691610
San Antonio, TX 78269-1610

**Overnight/Physical**
12621 Silicon Dr
San Antonio, Texas 78249-3447

Toll Free (888) 316-2935

# CLASS B MEMBERSHIP SHARES

Version 2019

deeproot 575 Fund, LLC (the "Company", "us", "we", or "**the575**™") is a private equity investment offering that will invest in a number of asset classes including life settlements or ownership of life insurance policies insuring the lives of persons not employed or affiliated with the Company; capital investments in deeproot affiliates; and cash or cash equivalents. To capitalize the Company, we are offering a series of preferred membership interests ("shares" or "Offering") designed to meet the needs of Investors.

The Shares will be offered only to persons whom we reasonably believe are Accredited Investors as defined in Securities and Exchange Commission ("SEC") Regulation D, 17 CFR 501(a), and to the maximum legally allowable non-accredited or non-institutional investors; all of whom are known as "prospective investors." Prospective investors will be asked to complete an Application and Subscription Agreement and provide photo identification. We intend to claim an issuer's exemption from the requirement to register this offering under SEC Regulation D, Rule 506, Subsection (b).

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION DOES NOT PASS UPON THE MERITS OF OR GIVE ITS APPROVAL TO ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING DOCUMENT OR OTHER SELLING LITERATURE. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE COMMISSION; HOWEVER, THE COMMISSION HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED HEREUNDER ARE EXEMPT FROM REGISTRATION.

THIS OFFERING INVOLVES A HIGH DEGREE OF RISK TO INVESTORS. See "Risk Factors."

| | Principal Amount[1] | Underwriting discount and commissions[2] | Proceeds to issuer or other persons |
|---|---|---|---|
| Per unit Total | $25,000.00 | $1,625.00 | $23,375.00 |
| | | | |
| Total Minimum[3] | $50,000.00 | $3,000.00 | $97,000.00 |
| Total Maximum | $75,000,000.00 | $4,875,000.00 | $70,125,000.00 |

[1]This is the aggregate principal amount of the Offering offered through this offering document.
[2] This offering is made primarily by us. However, we may engage third parties to help us sell Shares under this offering. Any persons who may receive compensation will be registered as a broker, or an otherwise lawful finder. Compensation to such persons, if any, will vary and may be paid out of the Investors principal, subject to reimbursement by Company as detailed herein.
[3] Proceeds will not be held in a separate account and will be immediately employed to purchase assets. Certain amounts may be retained for administration or management purposes.

DATED SEPTEMBER 16, 2019

**THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED TO DEEPROOT IF YOU DO NOT INVEST.**

NOTICES TO INVESTORS

THE LIMITED LIABILITY COMPANY SHARES HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY SECURITIES LAWS OF ANY STATE. THE SHARES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR EXEMPTIONS FROM REGISTRATION ARE AVAILABLE. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE AUTHORITY OR AGENCY HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING OR THE COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THERE IS NO PUBLIC MARKET FOR THE SHARES.

NO OFFERING LITERATURE, OTHER THAN THIS PRIVATE PLACEMENT MEMORANDUM, OR ADVERTISING, IN ANY FORM, WILL BE EMPLOYED IN THE OFFERING OF THESE SECURITIES. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OTHER THAN THOSE CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM, AND, IF MADE, SUCH REPRESENTATIONS MUST NOT BE RELIED UPON. THIS PRIVATE PLACEMENT MEMORANDUM IS SUBMITTED IN CONNECTION WITH THE PRIVATE PLACEMENT OF THESE SHARES AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE. ANY DISTRIBUTION OF THIS PRIVATE PLACEMENT MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS UNAUTHORIZED.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS PRIVATE PLACEMENT MEMORANDUM AS LEGAL OR TAX ADVICE. EACH INVESTOR SHOULD SEEK HIS OWN LEGAL AND TAX ADVICE AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT.

THE OFFEREE, BY ACCEPTANCE OF THIS PRIVATE PLACEMENT MEMORANDUM, AGREES TO RETURN THIS DOCUMENT AND ALL RELATED DOCUMENTS TO THE COMPANY IF THE OFFEREE DOES NOT DECIDE TO PURCHASE ANY OF THE SHARES OFFERED HEREBY.

THIS OFFERING IS PRELIMINARY AND MADE SUBJECT TO WITHDRAWAL, TERMINATION OR MATERIAL MODIFICATION BY THE COMPANY WITHOUT NOTICE. WHETHER OR NOT WITHDRAWN OR TERMINATED, THE COMPANY RESERVES THE RIGHT TO OFFER SHARES IN THE FUTURE AT A PRICE LESS THAN, EQUAL TO OR GREATER THAN THE PRICE OF SHARES OFFERED HEREBY. THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK AND ARE SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.

deeproot 575 Fund, LLC
(a Texas Limited Liability Company)

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

CLASS B SHARES OFFERING

The information in this Private Placement Memorandum ("PPM") is furnished on a confidential basis exclusively for the use of the person named below, who, by accepting this PPM, **agrees to return it promptly to the Company**, upon request or if no investment occurs, and agrees not to reproduce or disclose to any persons (other than such person's legal, tax, accounting and other advisors) all or any part off this PPM without the express written permission of the Company.

575Y9R

Name

Copy No.

deeproot®

deeproot 575 Fund, LLC

("the575™")

$75,000,000

Class B Membership Shares

Version 2019

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**deeproot 575 Fund, LLC** (the "Company", "us, "we", "our", or "the575™") is a Texas limited liability company of which deeproot Funds, LLC ("dF") is the sole member. **dF** owns all of the Class A Membership Shares ("Class A Shares") and Robert J. Mueller, the sole shareholder and principal of the deeproot® family of companies is the current Manager of the Company.

**the575™** is a fixed-rate, fixed-term investment fund. **the575™** provides a securitized investment in a pool of life settlement policies and capital acquisition in deeproot affiliates, which offers investors either a growth or income option in five year terms. The Operating Agreement of the Company is attached hereto as Appendix I.

A modified version of this Offering of Class B Shares existed previously and has been closed to new investment. That Offering will continue in its current form and payout for all of those investors. The Class B Shareholders of this 2019 Version will substantially also invest in the same pooled assets materially supporting and backing up their investments.

The Company's principal business offices are located at 12621 Silicon Dr, San Antonio, Texas 78249-3447.

## I
## THE OFFERING

**Structure**

1. The Company is initially offering up to $75,000,000, or 3,000 Class B Membership Shares ("Class B Shares") at a price of $25,000 per Class B Share, or a fraction thereof. The minimum investment per transaction is $50,000, or 2 Class B Shares. Fractional shares up to five decimal places are permitted. The Company reserves the right to increase the outstanding, issued, and/or authorized amount of Class B Shares, without notice or permission, to accommodate renewals by existing Class B Shareholders.

2. The Company will have a board of Managers who will be responsible for the management of the Company. Robert J. Mueller has been designated as the initial Manager. Biographies of the management team are contained herein.

3. Any commissions or discounts paid (if any) to a Broker Dealer with respect to the offering of the Class B Shares shall be at the expense of the Company. See Agent Compensation under Section 6 for additional information.

**Offering Basics**

4. **the575™** is an equity investment with a Mandatory Call five years, less one day ("subscription term"), from the Start Date. The Start Date is the date when all of the following conditions are satisfied: i) the Class B Shareholder's Application and Subscription Agreement is approved by the Company; ii) the Class B Shareholder makes the irrevocable Priority Return Election; and iii) all subscribed funds/monies ("Invested Capital" or "Principal" herein), for the singular transaction, are received by the Company, and are available for use.

5. On or before the Start Date, a Class B Shareholder must make an irrevocable ***election*** as to how to receive the Priority Return. The "Priority Return" may either be: i) **deferred** (i.e. growth) – a simple fixed rate, lump-sum return of the Invested Capital; or ii) periodic (i.e. income) – a fixed rate of either five percent (5%) of Invested Capital if less than $400,000.00, or seven percent (7%) per annum of Invested Capital $400,000.00 or higher, paid in either monthly or quarterly payments. The irrevocable ***election*** defined in this paragraph will herein be referred to as the "Priority Return Election."

6. On or about the thirtieth (30th) day after each Class B Shareholder's Mandatory Call ("Pay Date"), the Company will pay to the order of the respective Class B Shareholder the "Liquidation Amount". The Liquidation Amount shall be equal to the Invested Capital, plus one of the following:

(a) if *deferred*, and the Invested Capital was less than $400,000.00, a lump sum capital gain of 35% of the Invested Capital.

(b) if *deferred*, and the Invested Capital was $400,000.00 or greater, a lump sum capital gain of 45% of the Invested Capital.

(c) if *periodic*, any unpaid priority returns.

7. The Company is permitted to issue a "Premature Call" before the full five year Mandatory Call term is satisfied. However, the Company must satisfy the full Priority Return due any prematurely called Class B Shareholder(s), as if the full five year term had been satisfied by a *normal* Mandatory Call. All calls are made in the sole discretion of the Company and are absolute, and without recourse. Any normal, or adverse, income tax implications arising from a Premature Call are the sole responsibility of the Class B Shareholder.

8. the575™ does not permit any Class B Shareholder to request any Invested Capital or Principal outside of a Mandatory or Premature Call. As such, Class B Shares (even in a periodic Priority Return Election) are not suitable for emergency, living expenses, other income requirements, or Required Minimum Distributions (RMDs).

9. The Company is responsible for all premiums or outlays to maintain the assets in return for an advance of principal, and a share of any assets that mature.

10. There are no costs, fees, or expenses that will be assessed against a Class B Shareholder's account, other than those disclosed in Articles VI or VII herein.

**Other Offering Details**

11. Class A Shareholders retain all standard voting rights. The Fund Advisor or Manager(s) retain sole and absolute discretion over due diligence, purchase, and maintenance of the assets.

12. Class B Shareholders have a right to receive certain information, as further described herein; and retain limited voting rights, such as the right to consent to: i) any substantial changes to this Offering; ii) substantial changes to the ownership or management of the Company; iii) the sale, lease, exchange or disposal of all or substantially all of the Company's property and assets; iv) any requirement that forces the majority of Class B Shareholders to make additional capital contributions; or v) any amendment or restatement of the Articles of the Company that would adversely impact the rights, privileges, or benefits of any Class B Shareholder.

13. If a Class B Shareholder dies, such Class B Shareholder's custodian(s), beneficiary(ies), legal representative(s), and/or assign(s) are subject to the same registration and terms upon which the Class B Shareholder would have been, had the Shareholder remained alive. The Company retains the sole and absolute right to require adequate documentation or authentication determinative of the legal right of the requesting custodian, beneficiary, legal representative, or assign to request or receive the deceased Class B Shareholder's principal and/or return. The Company also retains the absolute and sole discretion to reject any such request without a written order (to do so) issued by a court of proper jurisdiction.

**II**

## SUITABILITY STANDARDS FOR INVESTORS

Investment in the Class B Shares of the Company offered hereby involves a high degree of risk. The Class B Shares offered hereby are suitable only for those investors whose business and investment experience, either alone or together with their financial advisors, makes them capable of evaluating the merits or risks of their prospective investments in the Company and who can afford to bear the economic risk of their investment for an indefinite period and have no need for liquidity in this investment. There will not be any public market for the Class B Shares. The Class B Shares have not been registered with the Securities and Exchange Commission, nor with any state securities agency. This is an offering made only to a limited number of investors for investment only. Each investor will be required to execute the Subscription Agreement. Under the Subscription Agreement, each investor will be required to represent, among other things, that he is acquiring the units for his own account, for investment, and not with any intention of making a distribution or resale thereof, either in whole or in part. Furthermore, no resale or transfer will be permitted except in accordance with the provisions of the Federal Securities Act of 1933, as amended, the rules and regulations thereunder, the applicable state securities laws, and the terms of the Operating Agreement.

No Class B Shares will be sold to any person unless he executes and delivers to the Company a copy of the Subscription Agreement and accompanying documents, which contain representations regarding the prospective investor's net worth and certain other matters. The Company will not accept subscriptions from any prospective investor unless such investor certifies that (1) his net income before taxes for each of the two immediately preceding years was at least $200,000 and there is a reasonable expectation of reaching the same income level in the current year, or (2) his net worth (exclusive of primary residence, furnishings and automobiles) is at least $1,000,000, or (3) his financial position is otherwise suitable for the degree of risk associated with this investment. In addition, a prospective investor must have sufficient knowledge and experience in financial and business matters to enable such prospective investor to evaluate the merits and risks of an investment in the Company or must have the assistance of a person other than the Company or its affiliates, who possesses such knowledge and expertise. The Company will have the sole discretion regarding admittance of any investor into the Company.

## III
## RISK FACTORS

Participation in the Company requires a minimum investment of 2 Class B Shares ($50,000), and the ability and willingness of the investor to accept substantial investment risks and lack of liquidity.

In addition to the factors set forth elsewhere in this PPM, prospective investors in the Company should carefully consider the following.

INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL FORECASTS, HAS BEEN OBTAINED FROM THE COMPANY AND THE MANAGERS AND FROM OTHER SOURCES DEEMED RELIABLE. THIS INFORMATION HAS BEEN PREPARED BASED UPON CURRENTLY AVAILABLE DATA AND NECESSARILY INCORPORATES SIGNIFICANT ASSUMPTIONS AS TO FACTUAL MATTERS. THERE IS NO ASSURANCE THAT THESE ASSUMPTIONS ARE, OR WILL PROVE, ACCURATE IN ALL MATERIAL RESPECTS, SO THAT, AMONG OTHER THINGS, THE FINANCIAL FORECASTS CONTAINED HEREIN CAN, OR WILL, BE ATTAINED.

EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT HIS OWN TAX COUNSEL, ACCOUNTANT AND OTHER PERSONAL ADVISORS CONCERNING THE LEGAL, FINANCIAL AND TAX ASPECTS OF THIS INVESTMENT. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE ANY PART OF THE CONTENTS OF THIS SUMMARY AS LEGAL OR TAX ADVICE.

FURTHERMORE, INVESTORS CAN RECEIVE NO GUARANTEE WHATSOEVER THAT THEY WILL RECEIVE ANY RETURN ON THEIR CONTRIBUTIONS TO THE VENTURE. THE MANAGERS SHALL NOT HAVE ANY LIABILITY TO THE INVESTORS FOR ANY ACT OR OMISSION NOT AMOUNTING TO FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.

A. Lack of Operating History.

Even though the Company has been in operation since 2015, it still is subject to all the risks of a new business enterprise. The current version of this Offering will not necessarily have the benefit of a track record of success that the previous Offering enjoyed. However, many of the affiliates that money might be invested in may not have any operating history and thus be subject to the foreseeable risks of a startup.

B. Investors will not be able to evaluate our portfolio of Investments prior to purchasing Class B Shares.

Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them.

C. Investment in the Class B Shares involves an enhanced degree of risk.

We will only be able to meet our obligations to the Class B Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio. Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than other traditional investments offered in the open market. There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon.

D. It is possible Class B Shareholders may have to contribute additional money.

As more fully described below, when we acquire a life policy, we may be required to pay policy premiums. While it is anticipated that Class B Shareholders will never have to satisfy a future premium obligation, or other asset obligations, the Company reserves the right to request Class B Shareholders to advance additional principal if: i) the Class B Shareholders are given reasonable notice; and ii) by doing so is in the financial best interest of the Class B Shareholders.

E. Dependence on Managers.

The success of the Company will depend, to a significant extent, on the quality of the management provided by the Managers. In the event Robert J. Mueller is incapacitated or dies, or is removed or resigns, there can be no assurance that a satisfactory replacement could be obtained or would be available on the same terms. Furthermore, the Managers will not be obligated, and are not expected, to devote full time and attention to the affairs of the Company. The Class B Shareholders will have limited right to participate in the management of the Company.

F. Some Agreements, Including Those Involving Compensation, Not at Arms-Length.

As described herein, we and our parent entity(ies), as Class A Shareholders, will receive any returns from the pool of investments over the returns due and payable to Class B Shareholders. Our return may be potentially large and the magnitude of this return has been determined without the benefit of arms-length bargaining. However, in our opinion, the risk of loss to us and the fees and charges paid by us in connection with the investments, justifies the division of the total potential return.

deeproot Funds, LLC operates other investment funds. Those funds may, from time to time, purchase Class B Shares in the Company to hold as assets in those other funds. Should dF purchase Class B Shares, they are subject to the same identical terms as any other Class B Shareholder.

G. Lack of Liquidity.

The Class B Shareholders should be fully aware of the long-term nature of this investment. There is no market for resale of Class B Shares, nor is one likely to develop. The Shares are intended to be held indefinitely and are therefore, illiquid. As such, they are not suitable for emergency, living expenses, other income requirements, or required minimum distributions (RMD's). There are a number of restrictions on the transferability of the Class B Shares offered hereunder. In addition, Class B Shares may only be assigned subject to limitations imposed by federal and state securities laws and the necessity of avoiding adverse tax consequences. Additionally, an assignee may only become a substitute member with the consent of the Managers and upon satisfaction of the other conditions set forth in the Operating Agreement. Accordingly, Class B Shareholders may not be able to liquidate this investment, even in the event of an emergency. Additionally, the Company may decline to declare or distribute net maturity proceeds for reasons that may or may not be agreeable to Shareholders.

H. Not Suitable for Required Minimum Distributions.

The Shares are not intended to satisfy Required Minimum Distributions (RMDs), even though a Class B Shareholder's elected periodic Priority Return might be greater than the annual RMD requirement. RMD's generally are minimum amounts that a retirement plan account owner must withdraw annually starting with the year that he or she reaches 70 ½ years of age or, if later, the year in which he or she retires. As such, any RMD amount that would have been withdrawn from this Offering, must instead be withdrawn out of Shareholder's other qualified accounts.

I. Our Ability or Inability to Employ High Quality Underwriting Standards and Adhere to them in Building the Portfolio.

Our ability to find and obtain quality investments for our portfolio is a mission-critical endeavor. While we have current readily available sources of high quality investments, there is an inherent risk that such sources could be frustrated by external forces, yield lower quality investments, or dry up entirely.

J. Determination of Company's Profit and Loss.

Profit and loss shall be considered to have been earned over the period of the Company's fiscal year, except that profits and losses arising from the disposition of properties shall be taken into account as of the date thereof and except that if additional capital is contributed during the course of the Company's fiscal year, a separate determination of profit and loss shall be made as of the last day of the month preceding the month in which such additional capital is contributed, and the profit and loss of the Company for the period before such date shall be apportioned among the members in accordance with their respective interests on such date.

K. Determination of Class B Shareholder's Share of Profit.

In all cases, a Class B Shareholder's maximum share, over the duration of fiscal years held, of any profit is limited to the principal invested, plus any unpaid elected Priority Return.

L. No Guarantee of Fixed Returns.

Consistent and predictable growth is ideal in the Company's effort to provide the respective return. In the short-term, if overall growth in the value of our portfolio falls below our obligations to the Class B Shareholders, our excess reserves would be expected to cover the deficit. However, there is a risk that a longer term deficit will exceed our reserves, potentially lowering the return. As the actual death of an insured, maturity of any life policy, or return of capital from a capital acquisition are unknown at the time of investment, we may not be able to pay a periodic Priority Return or Liquidation Amount when due.

M. Inadequate Valuations and Their Effect on the Accounting of the Company and Class B Shares.

Low or inadequate valuations of our investment portfolio may lead to the appearance of an accounting deficit on a portion or all of the investment portfolio. Based upon the overwhelming intended allocation of investment funds to life policies and the fact that the face value of all life policies purchased for the portfolio will eventually be realized, we believe that Class B Shareholders will actually earn the amount owed upon each maturity. However, in the event of low valuations, the accounting of the investment portfolio may actually be less than when realized.

N. Possible Classification as an Investment Company.

Because we will invest in items which may be deemed to be securities, we could be classified as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Classification as an investment company under the Investment Company Act would have a substantial adverse impact on our operations as it would require registration with the SEC and various state securities agencies. We intend to restrict investment in our securities to the maximum number of Class B Shareholders permitted under then-current federal law, in order to meet an exemption from registration under the Investment Company Act. Since we do not intend to register as an investment company, Class B Shareholders will not have any of the protections that may be afforded by the Investment Company Act.

O. Some Information may not be Provided.

Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, Class B Shareholders may not be permitted to request or receive sensitive, non-public, privileged or confidential information about the Company, including, but not limited to: details of underlying assets, sensitive accounting or transactions, trade secrets, identifiable payroll or personnel information, non-public (internal) marketing or sales information, etc.

P. Federal Income Tax Risks.

WE HAVE NOT OBTAINED A LEGAL OPINION CONCERNING THE TAX IMPLICATIONS OF AN INVESTMENT IN THE OFFERING. IT IS EACH PROSPECTIVE INVESTOR'S RESPONSIBILITY TO OBTAIN AN INDEPENDENT TAX OPINION CONCERNING THE TAX STATUS OR IMPLICATIONS OF INVESTING IN THE OFFERING. Investors are presumed to have access to needed legal and tax advice. Prospective investors are expected to consult their own tax advisors as to their own tax situation prior to investment in the Class B Shares. The cost of such consultation could, depending on the amount thereof, materially increase the cost of purchasing an interest in this Offering and may decrease any anticipated yield on the investment. A number of changes in the tax laws have been made and/or are under consideration, and such professional consultation is essential.

Q. Risk of Audit.

Our federal tax returns may be audited by the IRS. Such audit may result in the challenge and disallowance of some of the deductions or increase in the taxable income described in such returns. No assurance or warranty of any kind can be made with respect to the deductibility or taxability of any such items on our tax return in the event of either an audit or any litigation resulting from an audit. While an audit may decrease our ability to perform, such an audit should not affect the tax treatment afforded Investors with respect to the Offering.

## IV
## UNDERLYING ASSETS

**Life Policies**

We will invest in Life Insurance Policies ("Life Policies", "Policies", "Contracts") as the simple majority of our Fund Assets. **We anticipate that all Life Policies purchased by this Fund will be purchased as a turn-key package through an affiliate offering with the deeproot Growth Runs Deep Fund, LLC.** As disclosed in that fund, the following disclosures would ultimately apply to any purchase made hereunder.

Life Policies are sales to third parties, of existing life insurance contracts held on insureds who are typically within 15 years of life expectancy, or 65 years of age or older. Policies are purchased at a discount; for more than their cash surrender value but less than the net death benefit to be paid under the policies. When we acquire such a contract, we may be required to pay the policy premiums in return for the receipt of the net death benefit as the new owner and beneficiary under the policy. These policies are considered illiquid in that they are bought and sold in a secondary market through policy brokers and not on any exchange where settlement of a transaction is required in a timely manner.

The Manager intend to diversify a portfolio of Life Policies amongst multiple types, amounts, and underwriting classes. Utilizing a diversified portfolio minimizes: overall risk, premium expenses, cost of insurance fluctuations, mortality expenses, carrier default, and hold times to maturity.

The Life Policies we buy should not be confused with (retail) life settlements or viaticals, both of which have negative connotations, substantial added risks, and are different than the institutional policies we source. A viatical is a policy that is bought to gamble on the potentially short life span of a terminally ill insured, usually under the age of 65. We do not buy viaticals. Retail life settlements refer to life policies that are bought and resold on the primary and secondary markets directly to investors (as opposed to being pooled in a fund). Since the investors tend to take on additional risk (such as premium and life expectancy risks), these policies tend to have attributes less favorable to our stricter underwriting guidelines.

Types of Policies

There are several types of insurance contracts that we might purchase. Some of these types of contracts might include whole life, universal life, or convertible term. Some of these types might have multiple subtypes. For example, universal life contracts can further be distinguished by indexed universal life, variable universal life, or fixed universal life. Each of these types of life policies have pros and cons. The Manager intend to use multiple types of contracts to diversify the portfolio.

Whole life insurance constitutes permanent cash-value life insurance policies that typically earn a fixed rate of internal interest above the cost of insurance. On the other hand, universal life insurance is a type of permanent life insurance in which premium payments above the cost of insurance are credited to cash value of the policy utilizing an

investment-style under-lying mechanism. The investment-style crediting of a universal policy varies depending on if the allocation is fixed, indexed, or variable.

Whereas whole and universal life insurance policies are considered 'owned' policies; term life insurance are considered 'rented' or 'leased' policies. This is because term policies are only available for certain underwriting and age classes, only last for specific terms of time, and do not carry any cash value. Convertible Term policies are a variation in that you can 'lease to own'. In other words, the 'leased' term policy can be converted to an 'owned' whole or universal life policy under certain conditions.

Target Life Settlement Portfolio Summary

In sourcing life policies for a diversified portfolio, there are a number of attributes we look at before purchasing a contract. First and foremost is the reliability of the underwriting or life expectancy report. These reports are provided to us by our middle source provider, having been conducted by a well-known and reputable underwriter. In addition, we assess the following attributes and how the potential policy purchase would impact, and hopefully further diversify, the existing portfolio.

| | |
|---|---|
| Minimum Age of Insureds | 65 |
| Target Min Age for Male Insureds | 72 |
| Target Min Age for Female Insureds | 73 |
| Target Min Avg Face-to-Acquisition Cost Ratio @ LE+1 | 0.70 |
| Policy Types | Whole, UL, IUL, VUL, Convertible Term |
| Target Policy Life Expectancy Range | 3 - 12 years |
| Target Portfolio Life Expectancy | 4 - 6 years |
| Internal Life Expectancy/Premium Expense | Life Expectancy + 1 or higher |
| Carrier [AM Best] permissible ratings | B+, B++, A-, A, A+, A++ |
| <65 Age policies | < 5% of aggregate investments |
| Second to Die policies | < 5% of aggregate investments |

Sourcing

There are two main markets to source policies from. The primary market constitutes sales directly from the insured to us. We have never bought directly from the primary market for many reasons; chief amongst them the expertise required to properly vet a policy before purchase. The secondary market constitutes sales where the policy has already been sold out of the primary market, and a third party, middle source provider, or broker holds and is selling the policy.

In the past, our Manager have purchased Life Policies through secondary market transactions directly from a middle source provider (ie. Broker). The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Ongoing, we will continue to use brokers to purchase secondary market policies.

Each policy we consider will be reviewed by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured. We rely on the medical/actuarial life expectancy assumptions provided to us by the third party medical actuarial firm to estimate the expected mortality of the insured. At a minimum, we will base our life expectancy estimates on the estimates provided by the actuarial firm plus one year (ie. LE+1). It is management's experience that on average that (as each policy specs dictate) LE+1 to LE+3 is a responsible and conservative approach to estimating the life expectancy of the policies that we plan to purchase, due to the fact that LE is an actuarial based estimate for an insured's life expectancy.

The policies we will purchase are whole, universal, or convertible term life insurance policies issued by well-rated life insurance companies. Some of the insurance carriers our Manager have purchased policies in the past from, are: AIG, Transamerica, Met Life, VOYA, Lincoln Financial, Protective Life, AXA Financial, Midland National, etc.

The price we are willing to pay for a policy (the "Acquisition Cost") in the secondary market is primarily a function of: (1) the policy's face value; (2) the expected actuarial mortality of the insured; (3) the premiums expected to be paid over the life of the insured; and (4) market competition from other competitors. We seek to earn profits by purchasing policies at discounts to the face value of the insurance benefit. The discounts at which we purchase are

expected to not only exceed the costs necessary to pay premiums and the costs to cover our operating expenses, but also to return the liquidation amount to all investors.

Investment Allocation Policy

It is our policy to avoid conflicts of interest in allocation of funds to life policies. We segregate assets between classes of shares. Since life policies available for purchase are always in flux (being time and money dependent at any given time), we will only allocate capital from a specific Fund for purchase of the life policy for that Fund. This allocation policy prevents the Manager from favoring one Fund over another. If money is readily available from multiple Funds at the same time, the Manager may use discretion to choose appropriate policies for each Fund given the capital available with the then available policies at the time.

Risk Management

We will seek to minimize risk by investing in policies issued by a diverse range of highly-rated insurance carriers; and in policies that vary: by life expectancy, by net death benefits, and by annual premium payments. We intend to reduce the life expectancy risk by investing only in contracts where the life expectancy was reviewed by an experienced independent medical professional and/or actuary, as well as by diversifying the investments across insured individuals' varying ages and medical profiles. Some risks apply to this asset, which are discussed as follows.

Risks - Sourcing

The United States is one of only a few financial markets in the world where quality life insurance can be obtained at low cost with a dynamic range of underwriting profiles. While historical trends indicate that most life policies are sold to overseas institutions and investors, domestic purchases have dwindled for various reasons. Sourcing is not amongst those reasons. Retention of our sourcing providers are a key element to our success. Our sourcing providers are able to tap the vibrant supply currently being sought after by foreign institutions and investors. While we do not expect any changes to the quality or quantity of life polices over the next decade, if this trend changes, we are prepared to adjust with other traditional or alternative capital appreciation assets.

Risks - Illiquidity

A life policy matures when the underwritten insured dies, an authenticated claim is filed with the insurance company, and the death benefits are paid. Until that time, the policy is practically illiquid. While the wait-for-funds-before-Call design of the dGRD minimizes this risk, future premium payments beyond normal reserves poses potential liquidity risks. Withdrawals of cash value will usually significantly alter the underlying accounting of policy, and even result in a potential lapse of the policy. As a result, it is our corporate policy to not withdraw cash value outright unless doing so will not affect the underlying accounting of the policy. We differentiate 'withdrawal' of cash from a life policy (for our retention or other use) from 'spending the cash down' for purposes of internal cash leverage to reduce premium outlay at the expense of the insurance carrier. In addition, by using our ultimate parent company, Policy Services, Inc., as our sole affiliated policy administration provider between us and the insurance carrier, we are unable to 'raid the piggy bank'. While we reserve the right to resell a policy held by us in secondary market to one or more third parties, in return for fair market value (i.e. usually calculated as the face amount of the policy, less a discount for marketability and life expectancy), the inability to sell a policy that has become economically toxic could be an issue.

Risks - Unknown Maturities

There is no guaranteed method of predicting the death of an insured. The closest we can come to predicting a range of life expectancy is with a medical review, underwriting analysis, and governmental or industry mortality tables. While we intend to purchase life policies in the secondary market with life expectancy terms that average between four and six years, there could be maturities both sooner or later. Maturity directly affects two key aspects of our fund: the annualized return of the investment, and the pace of queue position advancement. Both of these aspects are equally important to fulfilling the expectations of investors.

Risks - Out of Control Premium Costs

Life policies usually require premiums to be paid periodically until maturity. The timely and accurate payment of premium is the most essential and critical component of holding a life policy portfolio. We, on the other hand, have arranged for our portfolio to be administered by Policy Services, Inc. While some policies will require additional premium as billed, normally there is some semblance of reserves capable of funding the underwritten life expectancy of the insured, plus one year (LE+1). As a result, we do not anticipate having to dip into reserves or face exigencies

until after such time as the insured has lived beyond LE+3. This significantly reduces the short and long term financial expenditures or costs of the Offering and increases internal liquidity.

Risks - Life Policy Forfeiture or Lapse
When premium is not timely paid, or not enough premium is paid, an insurance carrier might *lapse* the policy (i.e. terminate the policy for less than fair market value). This could happen due to oversight on our part, and/or by illicit behavior by carrier. In either circumstance, we might have to pay additional sums to reinstate the policy, or in the worst case scenario, litigate the matter. Litigation is extremely expensive and time consuming. Trends indicate that the risk of litigating a lapsed policy (whether occurring by our own fault, or that of the carrier) is only getting higher, as many carriers have adopted a 'come and take it' attitude. With that said, we do not anticipate that for most of our policies this will be an issue.

Risks - Carrier Rehabilitation or Liquidation
In the worst case scenario wherein a life insurance company enters rehabilitation by order of a state insurance official, files for bankruptcy, or is liquidated, we might not receive the full face value of the life policy. While one or more state guaranty funds might cover some or all of the losses, it is a historically-potential risk. While a risk, we do not anticipate that this will occur given the financial strength of the carriers our life policies are underwritten by. In addition, if this ever occurs it will likely only be with one or two carriers. A systemic failure of life insurance market would arguably only occur in conjunction with a substantial or major economic disaster that would also affect every other industry and everyone, everywhere.

**Capital Acquisition in deeproot Affiliates**

A capital acquisition is a purchase of an internal, affiliated investment position in another enterprise, wherein such enterprise is intended to enhance Company's reputability, safety, or financials through joint venture, partnership or collaboration, or minimize pool risk, lower administrative overhead or expenses, or to develop additional product lines. There is a high risk in this type of investment, which may yield higher gains or higher losses. We minimize this risk by limiting the capital acquisition component of the Company to no more than fifty percent (50%) of the asset portfolio.

The purpose of this investment type is: i) to provide short term liquidity; ii) to provide liquid revenue or distributions to pay off positions sooner and more frequently than waiting on life policy maturities; and iii) the safer diversification of underlying assets away from just life policies.

Class B Shareholders are investing with the expectation of absolute reliance on the management team to successfully start, administer and execute these affiliates, in whatever form or structure may dictate. The enhanced risk of this reliance is minimized by limiting the portfolio exposure in affiliates, and the pro rata sub-project distribution with this portfolio exposure. The Class B Shareholders do not share in any equity, debt, risks, profits, or losses with these affiliates. The Class B Shareholders sole 'bargain' is the enhanced returns of this Offering in return for the minimized commiserate risk.

Currently, the Company will invest in the following enterprises of which disclosures are available upon request. The brief summary provided is only meant to provide clarity and does not limit or fully describe the operations that may be commenced. The Company reserves the right to alter the disclosure, or affiliates invested in, without notice or permission.

deeproot Tech
deeproot Tech is an enterprise that is comprised of engineers and scientists that develop, research & develop of tangible technology.

deeproot Pinball
deeproot Pinball is an enterprise which innovates, builds, and sells original and themed pinball machines.

deeproot Manufacturing
deeproot Manufacturing is an enterprise which contracts out to manufacture tangible goods or private label variations.

deeproot Studios

deeproot Studios is an enterprise in Utah that creates and develops art, animation, virtual reality, toys, and tangible games.

deeproot Toys

*See deeproot Studios.*

deeproot Games

*See deeproot Studios.*

deeproot Sports & Entertainment

deeproot Sports & Entertainment operates professional teams primarily in the soccer, football, and hockey sports, as well as operates entertainment venues.

**Other Asset Classes**

The Company reserves the right to include other assets or asset classes, with reasonable notice to Class B Shareholders.

## V
## REPORTING

Class B Shareholders have certain rights to receive ongoing information about the Company, the Company's financial status, and the Class B Shareholder's position(s). Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, some information may be exempt from reporting.

Secure online access is available at https://secure.deeprootfunds.com. For purposes of this Offering/PPM, all references to Company's duty (whether mandatory or permissive) to report, notify, convey, or deliver any information or document(s) shall be deemed to be reported, notified, conveyed, or delivered by online access to your secure account; whether or not you have requested such access. For shareholders that wish to have printed, postal mail notifications, you must contact us in writing.

We have an affirmative duty to provide some ongoing information without need for any Class B Shareholders' prior requests. These include:

- notice of any default of any underlying asset
- notice of a failure to pay a Liquidation Amount to any Class B Shareholder
- a statement of account at least once annually, or digital access to the same
- a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same
- notice of any adverse regulatory or legal notice, proceeding or decision regarding us that directly and significantly affects the Class B Shareholders' rights or values
- notice of any other event that has a significant potential to negatively affect our ability to return principal and interest to the Class B Shareholders

We also have a duty to release certain information only upon request by a Class B Shareholder. These include:

- a statement of account value at the time of request
- a statement of Company's current financial condition at the time of request

We retain the right to not release certain information to any Class B Shareholder. This information includes but is not limited to:

- copies of any confidential, privileged or proprietary information that does not directly involve any Class B Shareholder's interest

» any information concerning another Class B Shareholder's interest
» specific positions, investments, assets, or transactions underlying in our portfolio
» private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators

## VI
## COSTS AND APPLICATION OF PROCEEDS

The proceeds from the sale of Class B Shares will be used to begin purchasing assets identified above. The proceeds of sales of additional Class B Shares will be used as the sales are closed. The following are the minimum amounts that will be utilized for the indicated purposes per $25,000 of principal received (or pro rata thereof), but may be less if no compensation is earned or paid.

| Cost of Services | Minimum Per $25,000 |
|---|---|
| Principal | $23,375.00 |
| Expenditures (~6%)<br>*Initial Compensation (if any)* | $ 1,625.00 |

**Agent Compensation**

If a Class B Shareholder is represented by a broker or other professional who may legally receive commissions or other compensation for referring, advising, or providing this Offering to Class B Shareholder, then the Company may pay to the order of such professional an amount of compensation that has been disclosed to the Class B Shareholder.

There are some types of compensation that must be paid by the Class B Shareholder, such as advisory fees. In that case, the Class B Shareholder fully indemnifies Company from being responsible for those payments. In addition, we will not pay any selling commissions, but will pay Manager fees, in connection with the sale of Class B Shares to investors whose contracts for investment advisory and related brokerage services include a fixed or "wrap" fee feature. Investors may agree with their broker-dealers to reduce the amount of selling commissions payable with respect to the purchase of their preferred shares down to zero: (i) if the investor has engaged the services of a registered investment advisor, or RIA, or other financial advisor who will be paid compensation for investment advisory services or other financial or investment advice, or (ii) if the investor is investing through a bank trust account with respect to which the investor has delegated the decision-making authority for investments made through the account to a bank trust department. The net proceeds to us will not be affected by reducing commissions payable in connection with such sales. Neither our Manager nor its affiliates will directly or indirectly compensate any person engaged as an investment advisor or a bank trust department by a potential investor as an inducement for such investment advisor or bank trust department to advise favorably for an investment in the Class B Shares offered hereby.

**Company Advance**

The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees. Despite an advance, one hundred percent (100%) of the Class B Shareholder's Principal shall be returned at the Pay Date.

## VII
## ADMINISTRATION STRUCTURE & FEES

The Company is managed by a Board of Managers. However, the sole current Manager is Robert J. Mueller, Esq. All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice.

| | |
|---|---|
| NQ Account Set up Fee (Check) | $250.00 ^ |
| Annual Account Fee | $0.00 |
| Annual IRA/Qualified Fee | Minimum $450 or *As billed by the Custodian* + |
| Call Notice and Payment | $0.00 |
| Check Fee | $0.00 |
| Overnight Fee | Minimum $50.00 or *As billed by the Custodian* |
| Wire Fee | Minimum $50.00 or *As billed by the Custodian* |
| Investor Advisory Fees | *See below* * |

^ Any initial investment amount for non-qualified queue positions that is not wired or in cashier's check form (i.e. personal check, money order, teller check) will incur a $250.00 fee for delays in processing due to bank holds.

+ For each annual year that a Class B Shareholder has and maintains at least $400,000.00 of Invested Capital in this Offering, Company shall cover that year's Annual IRA/Qualified Fee cost.

* For Investor Advisory Fees: If Company is billed for and pays any investment advisory fees from an advisor or advisory firm that represents the Class B Shareholder, then such advisory fees, plus three percent (3%) compounded interest, shall be deducted from the respective Class B Shareholder's Liquidation Amount at the Pay Date.

## VIII
## PRINCIPALS & ADVISORS

**Robert J. Mueller, Esq.**
**Manager, the575™**

There is only one director and executive officer of the Company: Robert J. Mueller. He is an executive, attorney, and financial advisor with over fifteen years of experience in the legal and financial industries. Robert earned a B.B.A. in Finance from the University of Texas at San Antonio, while concurrently learning about the financial markets with USAA Investment Management Company. After completing his undergraduate studies, Robert attended St. Mary's Law School in San Antonio, where he graduated a semester early in December 2000, and was admitted to the Texas Bar in May 2001.

Robert is age 44 as of the date of this Prospectus, and has been the principal officer, director, or manager of Policy Services, Inc., and all of the deeproot® family of companies since 2012 (see Pages 19 & 20 for entity information). Prior to creating Policy Services, Inc, and the deeproot® family of companies in 2012, Robert practiced full time estate planning law, sold insurance products, and operated two companies in the insurance services industry, creating a book of business with over 750 clients.

Mr. Mueller is responsible for deeproot's product design, marketing, and strategic planning areas, as well as operation and management of multiple entities. Robert is the architect and implementer of all products, services, or designs Policy Services, Inc. or the deeproot® family of companies have marketed or sold. He has also personally managed all aspects of the administrative functions of the enterprises, supervised all investor or client care, handled most of the clerical and processing of investor or client paperwork, designed the IT systems and client portal, and is chiefly responsible for the growth and success of all the enterprises. Robert also has backgrounds in accounting, valuation, information technology, graphic design, marketing, programming, and other technical areas.

Robert J. Mueller is the only executive of the Company. He receives no direct compensation from the dGRD Fund. Robert is paid a salary from the Ultimate Parent for all services provided across all the entities. Neither he, nor any other executive or personnel serving or employed from the Ultimate Parent downwards, may earn a commission on any Preferred Shares sold. Any marketing or travel expenses on behalf of the dGRD Fund will be expensed by invoice.

It is not the Company's policy to permit an executive to hold any queue positions in his/her individual capacity.

It is the Company's policy to allow non-executive employees to hold queue positions, either as compensation, bonus, incentive, or retirement contributions; provided however that: i) cost and profit extend to a parent entity; and ii) such non-executive employees must follow the same rules as all other investors in being assigned queue positions at the back of the line, progress in the same sequential order, and receive a liquidation multiplier commiserate with the investment level.

**Security Ownership of Beneficial Owners**

| (1) Title of Class | (2) Name and Address of Beneficial Owner | (3) Amount and Nature of Beneficial Ownership | (4) Percent of class |
|---|---|---|---|
| Membership Interests / Shares | Robert J. Mueller<br>12621 Silicon Dr<br>San Antonio, TX 78249 | 100%<br>*By and through Parent Entities of the Company* | 100% |

**Security Ownership of Management**

| (1) Title of Class | (2) Name and Title of Manager | (3) Amount and Nature of Beneficial Ownership | (4) Percent of class |
|---|---|---|---|
| Membership Interests / Shares | Robert J. Mueller | 100%<br>*By and through Parent Entities of the Company* | 100% |

## IX
## SUBSCRIPTION PROCEDURE

In order to subscribe for Class B Shares, a Class B Shareholder must deliver to the Company, at its offices:

1. One completed and executed copy of the dGRD Application & Subscription Agreement, per registration type;
2. A bank or certified check, or Wire, in the amount of Twenty-Five Thousand Dollars ($25,000.00) for each full Class B Share subscribed for, or fractional part thereof, with a minimum of $50,000.00, payable to the order of: **deeproot Funds**; or deeproot Fund's designated custodian.

Executed copies of the documents to be completed by the Class B Shareholders are being delivered with this Confidential PPM. EACH CLASS B SHAREHOLDER IS URGED TO READ THE SUBSCRIPTION AGREEMENT AND THE ACCOMPANYING DOCUMENTS IN THEIR ENTIRETY BEFORE EXECUTING THEM.

In the event the Company rejects or revokes acceptance of a subscription, funds delivered by the subscriber to the Company in connection with the subscription will be returned without interest. Each Class B Shareholder who is solely and affirmatively responsible for keeping their contact information (and bank information for EFT payments) current with the Company. The Company will not be responsible for any delayed, missing, or incorrect notices or payments due to Shareholder's inaction to affirmatively update such information.

Share certificates shall not be issued for any shares subscribed to herein. Depending on the custodian: i) a certificate of ownership, in lieu of a share certificate, shall be issued to each Class B Shareholder in a closing packet, along with copies of the application and subscription agreement; or ii) a certificate will be held in street form with the custodian.

deeproot Funds, LLC handles the administrative operations for the Company. Any subscription to this Offering constitutes a perpetual acknowledgment and consent to such.

## X
## AVAILABLE INFORMATION

The statements in this PPM as to the contents of any contract or other document are of necessity brief descriptions thereof and are not necessarily complete; each such statement is qualified in its entirety by reference to such contract or document.

Any Class B Shareholder desiring additional information about the Company should contact deeproot Funds, LLC, 12621 Silicon Dr, San Antonio, Texas 78249, telephone: (888) 316-2935. All reasonable, permissible requests for books, records, and financial information regarding the Company shall be made available in reasonable amounts of time to the Class B Shareholder.

## XI
## FREQUENTLY ASKED QUESTIONS (FAQ)

**Why are there Class A and Class B shares?**
deeproot 575 Fund, LLC ("**the575™**") is organized as a Limited Liability Company (LLC), and not as a For-Profit Corporation. This was done for ease of organization, lower filing and maintenance costs, tax options, etc. In order for an LLC to mirror a For-Profit Corporation's issuance of Common and Preferred Stock, we use 'classes' of membership interests ('shares'). Each class is comprised of shareholders who enjoy the same rights and privileges.

**What are Class A shares?**
Class A Shares in **the575™** are the equivalent to common stock in a For-Profit Corporation. They have voting rights and the ability to receive dividends or distributions of capital from the business, subject to Class B's preferential rights.

**What are Class B shares?**
Class B Shares in **the575™** are the equivalent to preferred stock in a For-Profit Corporation that includes a Mandatory or Premature Call feature. While they do have limited voting rights, they have preferential rights to receive dividends or distributions of capital from the Company, over any other class' shares.

**Are Class B shares 'cumulative'?**
Yes. A cumulative Priority Return is the equivalent of cumulative preferred stock. That is, if any Priority Return payments have been omitted in the past, all omitted Priority Return payments must first be paid out in-full to Class B Shareholders, before any other class' shareholders may receive net distributions.

**Are Class B shares 'participating'?**
No. Participating preferred shareholders would be entitled to receive profits or incur losses outside of the preferred return. In this Offering, the Company accepts the risk of participation interests or losses.

**What is my Priority Return and When will I receive it?**
The Priority Return you receive will be based on the Priority Return Election you make for the subscription term. Class B Shareholders with a periodic Priority Return Election will receive monthly or quarterly Priority Return payments equal to the monthly pro rata share of the fixed annualized return. Class B Shareholders with a deferred Priority Return Election will receive a lump sum capital gain on or about the Pay Date.

**What does it mean that the Company can 'call' my shares?**
A *call* is a right retained by the Company to buy-back Class B Shares. The Company's right to call is absolute and without recourse. Upon any call, all rights and privileges as to a Class B Shareholder's called position(s) will be terminated, and the Company will convey the Class B Shareholder's Liquidation Amount on the Pay Date. The Mandatory Call under the **the575™** is pre-determined at five years, less one day, from the Start Date. A Premature Call can happen at any time before, and supersedes, the Mandatory Call.

**How do Class B Shareholders get notified when a 'call' occurs?**
For a Mandatory Call, the Company will notify you in writing shortly before the Mandatory Call to provide you details about the Liquidation Amount, the Pay Date, and any renewal rights or benefits (if any). For a Premature Call, the Company will notify you at least sixty days before the premature call date, to provide you details about the Liquidation Amount, the Pay Date, and any renewal rights or benefits (if any).

**How can I get my Principal back?**
Unless renewed in full, or part, your Principal will be returned at the Pay Date. All requests for Invested Capital or Principal outside of a call (and subsequent Pay Date), will be rejected.

**Can I change my Priority Return election?**
No. Once a Priority Return Election is chosen on or before the Start Date, it may not be changed or altered until a call occurs.

**Is my principal or liquidation amount protected?**
Each Class B Shareholder's principal is backed up by the assets of the Company in a contingent security agreement, based on the performance of the assets, subject to the liabilities of the Company. That does not guarantee that there will always be enough assets that can be disposed of to cover all sums owed to the Class B shareholders. Class B shares have a preferential right to assets over any other shareholders (including Class A Shareholders) should the unfortunate occur and the Company is forced to wind-up due to insolvency. The return is not backed up or guaranteed by the Company, and may only be payable, in whole or part, if enough assets exist at some future time, to pay them.

**Do I get a share of the profits from any of the Affiliates?**
No. The *bargain* of this Offering is an enhanced return for the commiserate risk of the Company bearing the main risk of success or failure in these new enterprises. Thus, the Class B Shareholder does not share in the gross risk, profits, losses, management, etc. of the affiliates.

**Do I get to have a say in the Company?**
Pursuant to the Operating Agreement, Class B shares have limited voting rights, or say, in the affairs of the Company.

**THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED TO DEEPROOT IF YOU DO NOT INVEST.**

*The area below the following line is intentionally left blank*

---

# OPERATING AGREEMENT

# OF

# deeproot 575 Fund, LLC
(a Texas limited liability company)

September 1, 2015

As Amended and Effective February 26, 2018

**THE MEMBERSHIP INTERESTS EVIDENCED BY SHARES OFFERED AND ISSUED PURSUANT TO THE TERMS AND CONDITIONS OF THIS AGREEMENT AND RELATED SUBSCRIPTION AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), BUT ARE BEING SOLD PURSUANT TO AN EXEMPTION PROVIDED BY SECTION 4(2) OF THE ACT AND/OR RULE 506 OF REGULATION D PROMULGATED THEREUNDER. THE SHARES MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT PURSUANT TO A REGISTRATION STATEMENT REGISTERING THE SHARES UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED. NO RESALES OR OTHER TRANSFERS OF THE SHARES MAY OCCUR WITHOUT THE PERMISSION OF THE COMPANY.**

STATEMENT OF AGREEMENT .......... 1

ORGANIZATIONAL MATTERS .......... 1

1. GENERAL .......... 1
2. NAME .......... 1
3. PURPOSES AND GENERAL POWERS .......... 1
4. ORGANIZATIONAL FILINGS .......... 1
   (a) Texas .......... 1
   (b) Other States .......... 1
   (c) Cooperation .......... 1
5. NATURE OF ENTITY .......... 1
6. PRINCIPAL OFFICE AND PLACE OF BUSINESS .......... 2
7. AGENT FOR SERVICE OF PROCESS .......... 2
8. TAX MATTERS MEMBER .......... 2
9. TERM .......... 2

FINANCIAL AND ACCOUNTING MATTERS .......... 2

10. CAPITAL CONTRIBUTIONS .......... 2
   (a) Initial Members .......... 2
   (b) Investors .......... 2
   (c) Limitations .......... 3
   (d) Credit to Capital Account .......... 3
11. LOANS .......... 3
12. FISCAL YEAR AND ACCOUNTING METHODS .......... 3
13. CAPITAL ACCOUNTS .......... 3
14. OWNERSHIP INTERESTS .......... 3
   (a) Shares .......... 3
   (b) Class A Shares .......... 4
   (c) Class B Shares .......... 4
   (d) Computation of Profits and Losses .......... 4
   (e) Allocations .......... 4
   (f) . Except as otherwise provided herein, net profits, net losses, and credits of the Company shall be allocated to and among each Class A Member in accordance with each's respective Percentage Interests. .......... 4
   (g) Specific Items .......... 4
   (h) Unrealized Gain or Loss .......... 5
   (i) Varying Interests .......... 5
15. SPECIAL CIRCUMSTANCES ALLOCATIONS .......... 5
   (a) General .......... 5
   (b) Incorporation of Certain Rules .......... 5
   (c) Certain Fee Payments to Members .......... 5
   (d) Certain Imputed Interest .......... 5
16. ELECTIONS .......... 6
17. CURRENT DISTRIBUTIONS .......... 6
18. DISTRIBUTIONS UPON WINDING-UP .......... 6
   (a) Creditors .......... 6
   (b) Class B Members .......... **Error! Bookmark not defined.**
   (c) Class B Members .......... **Error! Bookmark not defined.**
   (d) Class A Members .......... 6
19. ACTIONS BY THE MEMBERS .......... 6
   (a) General .......... 6
   (b) Meetings .......... 6
   (c) Written Action .......... 7
   (d) Actions Binding .......... 7
20. MANAGEMENT OF THE COMPANY .......... 7
   (a) General .......... 7
   (b) Initial Manager .......... 7

(c) Election of Managers ..... 7
(d) Resignation and Removal ..... 7
(e) Powers and Authority ..... 7
(f) Limitations ..... 8
(g) Officers ..... 9
(h) Duties of the Managers ..... 9
(i) Other Activities ..... 9
21. BANK ACCOUNTS ..... 9
22. RECORDS AND REPORTS ..... 9
(a) Records ..... 9
(b) Annual Reports ..... 9
(c) Inspections ..... 9
(d) Other Information ..... 10
23. COMPENSATION ..... 10
24. RELIANCE ON ACTS OF THE MANAGERS AND OFFICERS ..... 10
25. INDEMNIFICATION ..... 10

**FUNDAMENTAL CHANGES ..... 10**

26. WITHDRAWAL ..... 10
27. RESTRICTIONS ON TRANSFERS OF SHARES ..... 10
(a) Requirements for Transfer ..... 10
(b) Effectiveness of Assignment ..... 11
(c) Requirements for Admission ..... 11
(d) Rights of Mere Assignees ..... 11
(e) Call Rights of the Company ..... 11
(f) General ..... 12
(g) Liquidation and Termination ..... 12
(h) Final Accounting ..... 13
28. AMENDMENTS ..... 13
(a) By the Managers ..... 13
(b) By Majority Consent ..... 13
(c) By Unanimous Consent ..... 13
(d) Other Amendments ..... 13
(e) Notice of Proposed Amendments ..... 13

**MISCELLANEOUS** .......... 13

29. NOTICES .......... 14
30. TIME PERIODS .......... 14
31. ENTIRE AGREEMENT .......... 14
32. SUCCESSORS IN INTEREST .......... 14
33. COUNTERPARTS AND FACSIMILES .......... 14
34. SEVERABILITY .......... 14
35. CAPTIONS .......... 14
36. ADDITIONAL DOCUMENTS .......... 14
37. INDEMNIFICATION .......... 14
38. NO THIRD PARTY BENEFIT .......... 15
39. GENDERS AND NUMBERS .......... 15
40. NON-WAIVER .......... 15
41. COMPLIANCE WITH SECURITIES LAWS .......... 15
42. SURVIVAL .......... 15
43. VENUE .......... 15
44. APPLICABLE LAW .......... 15
45. SCHEDULES AND EXHIBITS .......... 15

**SCHEDULE 10(A)** .......... 17

**SCHEDULE 10(B)** .......... ERROR! BOOKMARK NOT DEFINED.

deeproot 575 FUND, LLC
OPERATING AGREEMENT

This Operating Agreement (this "**Agreement**") originally entered into on September 1, 2015, and hereby amended, and restated in the entirety, on February 5, 2018, by and among deeproot Funds, LLC (collectively, the "**Initial Members**" and each an "**Initial Member**") and those Investors who have subscribed to become Class B Members or Class C Members of the Company (the "**Investors**"). As used herein, the term "**Member**" shall refer to each of the Initial Class A Members and to each Investor hereafter admitted to the Company as a Member, as provided in this Agreement.

## STATEMENT OF AGREEMENT

For good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, the Members agree as follows:

## ORGANIZATIONAL MATTERS

1. General. The Members are entering into this Agreement for the purposes of forming and/or continuing a limited liability company (the "**Company**") under the laws of the State of Texas and of setting forth the rights and obligations of the Members of the Company.

2. Name. The name of the Company shall be "**deeproot 575 Fund, LLC**", "**the575™**," or such other name selected by the Members as may be required in order to be acceptable to the Secretary of State of Texas and of such other states, if any, in which the Company may do business.

3. Purposes and General Powers. The purposes of the Company shall be to engage generally in the sale of Class B and Class C Membership Interests, which invests in a pool of life insurance policies and other assets, on behalf of the Investors, and to engage in any and all other activities incidental or related to any of the foregoing. Unless hereafter restricted by amendments to this Agreement or to the Company's Articles of Organization (the "**Articles**"), the Company shall have and may exercise all powers and rights which a limited liability company may legally exercise pursuant to the Texas Limited Liability Company Act (the "**Texas Act**").

4. Organizational Filings.

(a) Texas. The Members have caused (or promptly shall cause) the Articles to be filed with the Secretary of State of Texas pursuant to the Texas Act, and shall cause the Company to comply with all other applicable requirements of the Texas Act.

(b) Other States. Prior to the Company's beginning to conduct business in any jurisdiction other than the State of Texas, if any, the Managers shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company authorized to do business in such jurisdiction.

(c) Cooperation. At the request of any Member or Manager, each Member or Manager shall execute, acknowledge or verify and deliver all certificates and other instruments consistent with this Agreement which are necessary or appropriate to qualify, continue or terminate the qualification of the Company as a limited liability company in Texas and/or as a foreign limited liability company authorized to do business in jurisdictions other than Texas.

5. Nature of Entity. It is the intention of the Members that the Company, as a limited liability company, shall not constitute or be treated as a partnership, limited partnership or joint venture for any purpose

other than for federal and state income tax purposes. Except as otherwise specifically provided in this Agreement or required by applicable law, no Member or Manager shall be liable for any debts, obligations or liabilities of the Company, whether resulting from the judgment, decree or order of any court or otherwise.

6. Principal Office and Place of Business. The address, principal office and principal place of business of the Company shall be at 8200 W. Interstate 10, Ste. 600, San Antonio, TX 78230 or at such other place as the Managers may designate from time to time.

7. Agent for Service of Process. The Company's initial agent for service of process in Texas is Robert J. Mueller, Esq., and shall be such person as the Managers may designate from time to time by filing appropriate instruments with the Secretary of State of Texas pursuant to the Texas Act.

8. Tax Matters Member. The Managers may appoint Company's "**tax matters partner**" for purposes of §6231(a)(7) of the Internal Revenue Code of 1986 (the "**Code**"), otherwise §6231(a)(7)(B) shall apply until such time as his successor is duly appointed. The Member so designated (the "**Tax Matters Member**") shall, at the expense of the Company, exercise the authority and carry out the responsibilities prescribed for a tax matters partner by §6223 et seq. of the Code in accordance with those provisions and the Treasury Regulations (the "**Regulations**") thereunder, including, without limitation, acting on behalf of the Company in administrative and judicial proceedings involving proposed adjustments to Company items and keeping all Members informed of such proposed adjustments. Any other Member may, at its own expense, participate in such proceedings as permitted by those provisions of the Code and Regulations. The Tax Matters Member shall advise all other Members in writing of any proposed settlement of such a proposed adjustment, of any requested extensions of any applicable statute of limitations and of any "**final partnership administrative adjustment**," as that term is used in the above-referenced provisions of the Code. Unless approved by a majority in interest of all Members, the Tax Matters Member shall not cause the Company to agree to any such proposed settlement or extension or to pursue judicial review of any such final partnership administrative adjustment. The Tax Matters Member shall have no liability to the Company or any Member for any action taken or not taken by it in good faith in accordance with this Section 8.

9. Term. The existence of the Company shall continue on a perpetual basis unless the Company is sooner terminated and liquidated and its affairs wound up pursuant to applicable provisions of the Texas Act and applicable provisions of this Agreement.

## FINANCIAL AND ACCOUNTING MATTERS

10. Capital Contributions.

(a) Initial Members. The Company shall authorize and issue 1,500 Class A membership shares to the Initial Members. The capital contribution and number of Class A Shares allocated to each Initial Member is set forth opposite such Member's name on Schedule 10(a) attached hereto.

(b) Investors. For each $25,000.00 contributed, in whole or part, to the capital of the Company by an Investor pursuant to Subscription Agreements accepted in whole or in part by the Company, the Company shall issue to such Investor either: (i) one (1) Class B Share(s), or a fraction thereof (as such Class is described in Section 14(c) hereof); or (ii) one (1) Class C Share(s), or a fraction thereof (as such Class is described in 14(c) hereof). The Company is hereby authorized to issue to Investors up to 1,000 Class B Shares and 3,000 Class C Shares in exchange for contributions to the capital of the Company of up to $100,000,000 ($25,000,000 for Class B Shares, or $75,000,000 for Class C Shares) in the aggregate. The capital contribution and number of Class B Shares or Class C Shares allocated to each Investor shall be retained on the records of the Company. Any authorized but unissued shares shall be retained and owned by Company.

(c) Limitations. Except as otherwise specifically provided in this Agreement or required by applicable law, (i) no Member shall be required to make any further contribution to the capital of the Company to restore any loss of the Company, to discharge any liability of the Company, to eliminate any negative Capital Account (as defined below) or for any other purpose; (ii) no Member or Manager shall be personally liable for any liabilities of the Company; (iii) no contribution or other amount credited to the Capital Account of any Member shall earn interest at any time; (iv) no Member shall have the right to demand the return of any capital contribution or any other amount credited to the Capital Account of such Member; (v) no Member or Manager shall be personally liable for the return of all or any part of any capital contribution or any other amount credited to the Capital Account of any Member, it being expressly understood by each Member that any such return shall be made solely from the assets of the Company; and (vi) no Member shall have any right to demand or receive property other than cash in return for such Member's capital contribution or any other amount credited to the Capital Account of such Member, unless so requested in writing by such Member and approved in writing by the Managers, in their sole discretion.

(d) Credit to Capital Account. Contributions to the capital of the Company by a Member, as provided in this Agreement, shall be credited to the Capital Account of such Member as of the effective date of receipt by the Company.

11. Loans. A Member or Manager may (but, unless otherwise specifically provided herein, shall not be obligated to) loan funds to the Company for use in the business operations of the Company. Any loan made to the Company by any Member or Manager shall be at a commercially reasonable interest rate and on other commercially reasonable terms as shall be determined by agreement of the lending person and the Managers, and such lending Member or Manager shall be treated as a general creditor of the Company with respect to such loan.

12. Fiscal Year and Accounting Methods. The fiscal year of the Company shall be from January 1st to December 31st. The books of the Company shall be kept by the Managers in a manner consistent with the provisions of Sections 13, 15 and 16 and as otherwise determined to be appropriate based upon consultation with the Company's accountants.

13. Capital Accounts. A single capital account (**"Capital Account"**) shall be maintained for each Member in accordance with the capital account accounting rules of §704(b) of the Code and the Regulations thereunder. Each Member's beginning Capital Account shall be the amount of such Member's initial contribution to the capital of the Company made as provided in this Agreement. Thereafter, a Member's Capital Account (a) shall be credited with and increased by (i) such Member's subsequent contributions of money, if any; (ii) the agreed net fair market value of property, if any, subsequently contributed by such Member; (iii) income and gain (including unrealized gain) allocated to such Member as provided in this Agreement; and (iv) such other amounts as may be required in order for the Capital Accounts to be considered to be determined and maintained in accordance with rules of Regulation §1.704-l(b)(2)(iv); and (b) shall be debited with and reduced by (i) distributions of money to such Member; (ii) the net fair market value of property, if any, distributed to such Member; (iii) losses and deductions (including unrealized loss) allocated to such Member as provided in this Agreement; and (iv) such other amounts as may be required in order for the Capital Accounts to be considered to be determined and maintained in accordance with the rules of Regulation §1.704-1(b)(2)(iv). Notwithstanding the foregoing, nor any contrary provision in the Code and the Regulations, capital accounts for Investors shall be accounted for basis only of Invested Capital, as otherwise provided hereinafter.

14. Ownership Interests.

(a) Shares. Ownership interests in the Company shall be denominated in "**Shares**". Fractional Shares, rounded to the nearest fifth decimal place, may be issued by the Company if necessary to reflect the agreed upon number of Shares to be issued in accordance with the terms of this Agreement. A Member's "**Percentage Interest**", rounded to the nearest fifth decimal place, shall be determined by dividing the number of

Shares owned by such Member by the total number of Shares owned by all Members of the same class. The Company is authorized to issue 5,500 shares, segregated into three classes: 1,500 Class A Shares, 1,000 Class B Shares, and 3,000 Class C Shares, as described in subparagraphs (b) and (c) below. Each Share shall evidence, represent and constitute ownership of the Percentage Interest, the Capital Account balance and other rights attributable to that Share, all as set forth in this Agreement.

(b) Class A Shares. "**Class A Shares**" as to any Member shall mean and refer to Shares issued to the Initial Members which entitle the holder to cast two votes for each Class A Share held by the Member on all matters reserved for the Members' approval, consent or consideration.

(c) Investor Shares. "**Class B Shares**" or "**Class C Shares**" as to any Member shall mean and refer to Shares which entitle the holder to cast one vote for any matters reserved for the Members' approval, consent or consideration.

(d) Computation of Profits and Losses. Profits and losses of the Company shall be computed in the same manner as used by the Company for federal income tax purposes, except that (i) for purposes of computing gain, loss, depreciation and other items, property of the Company shall be considered to have a book value equal to its fair market value as most recently determined pursuant to Section 14(d); (ii) income of the Company exempt from tax, and expenses of the Company not deductible or not properly chargeable to capital for tax purposes, under the Code shall be included in the computation; and (iii) unrealized gain or loss shall be taken into account as provided in Section 15(d).

(e) Allocations. Except as otherwise provided herein, net profits, net losses, and credits of the Company shall be allocated to and among each Class A Member in accordance with each's respective Percentage Interests.

For the purposes of this Agreement, the following definitions shall apply:

(A) **"Priority Return"** shall be defined by the Priority Return Election chosen by the Investor during a subscription term. For a **deferred** Priority Return Election, the Priority Return shall mean the cumulative deferred (and unpaid) returns calculated per annum by multiplying each respective Investor's Invested Capital by seven percent (7%); the deferred sum of which are paid at the Pay Date. For a **periodic** Priority Return Election, the Priority Return shall mean monthly payments calculated per annum by multiplying each respective Investor's Invested Capital by five percent (5%), and then dividing by twelve (12). Regardless of the Priority Return Election, priority returns shall be cumulative commencing on subscription (the **"Start Date"**), and any unpaid priority returns due on or about thirty (30) days (the **"Pay Date"**), after the mandatory Call, such Call being pre-determined as five years less one day after the Start Date, by the Company; and

(B) **"Invested Capital"** shall mean an amount equal to the contributed capital made to the Company by a Class B Member or Class C Member under Section 10(b) hereof, less any return of capital previously distributed to such Investor.

(g) Specific Items. Specific items of Company income, gain, loss and deduction shall be allocated to and among the Class A Members in proportion to the respective allocations of net profits and losses to and among such Members, except that each Class A Member's distributive share of depreciation, amortization and gain or loss with respect to any Company property, as computed for tax purposes, shall be determined so as to reflect the varying interests of the Members in unrealized gain or loss for prior periods, and otherwise to take into account the variation, if any, between the adjusted basis and book value of the property as required by §704(c) of the Code and the Regulations.

(h) Unrealized Gain or Loss. On each Adjustment Date (as hereinafter defined), the properties of the Company (including any property being distributed by the Company) shall be considered to have been sold on such date at fair market value (as determined by the Managers, using their reasonable business judgment). The unrealized gain or loss attributable to such deemed sale shall be allocated to and among the Members in accordance with Section 15(b). The amount of any distribution in kind shall be considered to be the fair market value of the distributed property, as so determined. As used in this Agreement, "**Adjustment Date**" shall mean the date of the dissolution of the Company and each other date upon which there is (i) a distribution in kind of Company property; (ii) a contribution of money or other property (other than a de minimus amount) to the Company by a new or existing Member as consideration for an interest in the Company; or (iii) a distribution of money (other than a de minimus amount) by the Company to a withdrawing or continuing Member as consideration for an interest in the Company.

(i) Varying Interests. If additional Shares are issued, or if any Share is transferred during any fiscal year, the net profits and losses and credits allocated to the Members for such year shall be determined on a daily, monthly or other basis, as selected by the Managers using any method permitted under Code §706 and the Regulations thereunder. The transferee of a Share shall succeed to the Capital Account attributable to the Share so transferred.

15. Special Circumstances Allocations.

(a) General. The Code and Regulations impose a number of requirements that must be satisfied in connection with allocations made by the Company (including a requirement that, in order for an allocation of an item of income, gain, loss or deduction to be recognized for federal income tax purposes, the allocation must have substantial economic effect or otherwise must be in accordance with the Members' interests in the Company). It is the intention of the Members that all allocations made under this Agreement shall comply with those requirements and shall be made in manners consistent with Code §§704(b) and 704(c) and Regulations §§1.704-1 and 1.704-2. In addition to any other steps which may need to be taken to implement that intention, and in connection with certain other special circumstances which might arise, allocations shall be made under the provisions of this Section 16, to the extent applicable, before making any allocations under Section 15.

(b) Incorporation of Certain Rules. The "**qualified income offset**" rules, the "nonrecourse deduction" rules, the "partner nonrecourse deduction" rules, the "partner minimum gain" rules, the "partnership minimum gain" rules and the related "chargeback" rules of Regulations §§1.704-1 and 1.704-2 are incorporated in this Agreement by reference. In addition, no loss or deduction shall be allocated to a Member if such allocation would cause or increase a deficit balance in such Member's Capital Account, adjusted as described in Regulations §1.704-1(b)(2)(ii)(d)(3) et seq. Any special allocations of items pursuant to such rules or otherwise made to implement the intentions stated in Section 16(a) shall be taken into account in computing and making subsequent allocations to and among the Members so that the net amount of any items so allocated and the profits, losses and all other items allocated to each Member shall, to the extent possible, be equal to the net amount that would have been allocated to each Member under Section 15 if such special allocations had not occurred.

(c) Certain Fee Payments to Members. If and to the extent that any payments in the nature of fees made to a Member are finally determined by the Internal Revenue Service or otherwise to be distributions to a Member for federal income tax purposes (instead of being treated as fees), gross income shall be allocated to such Member in the amount of such distributions.

(d) Certain Imputed Interest. If and to the extent that the Company is entitled to a deduction for interest imputed under any provision of the Code on any loan or advance from a Member to the Company (whether such interest is currently deducted, capitalized or amortized), such deduction shall be allocated solely to such Member.

16. Elections. The Managers, in their discretion, may cause the Company to make any election required or permitted to be made by the Company under the Code and applicable Regulations, including, without limitation, an election pursuant to §754 of the Code to adjust the basis of the Company's assets for all transfers of Shares.

17. Current Distributions. Except as required by the Code and the Regulations thereunder, cash available for distribution shall be distributed with respect to a fiscal year at times determined by the Managers in the following order and priority as net profit, net loss and credit of the Company is allocated pursuant to Section 15(b) hereof.

18. Distributions Upon Winding-Up. Upon dissolution of the Company and the winding-up of the Company's affairs, the assets of the Company (after giving effect to the provisions of Section 15(d)) shall, subject to the requirements of applicable Texas law, be applied and distributed in the following order of priority:

(a) Creditors. To the payment of debts and liabilities of the Company to creditors of the Company (including those to Members other than liabilities to Members for distributions), including, without limitation, expenses of winding-up and the establishment of any reserves against liabilities and obligations of the Company which the liquidator, in the liquidators sole discretion, deems appropriate.

(b) Investors. To the Class B Members in accordance with, and in proportion to, their respective positive Capital Account balances. Then to Class C Members in accordance with, and in proportion to, their respective positive Capital Account balances.

(c) Investors. To the Class B Members, pro rata, in accordance with, and in proportion to, any unpaid Priority Returns. Then to the Class C Members, pro rata, in accordance with, and in proportion to, any unpaid Priority Returns.

(d) Class A Members. To the Class A Members in accordance with, and in proportion to, their respective positive Capital Account balances.

## OPERATIONS

19. Actions by the Members.

(a) General. Whenever this Agreement requires the vote, consent, approval or other action by a specified fraction or percentage "in interest" of some or all of the Members, such requirement shall be satisfied if such vote, consent, approval or other action is provided or authorized by Members who own Class A shares which represent at least the specified fraction or percentage of the total shares owned by all Members entitled to participate in such decision. Unless otherwise specifically provided, any proposed decision or action shall require approval by a majority in interest of the Class A Members, which Class A Members shall be entitled to vote on all matters reserved for their approval or consent. Except as otherwise specifically provided in this Agreement or required by applicable law, no Member shall be disqualified from participating in the making of any such decision or the taking of any such action solely because such Member has an interest in the outcome thereof.

(b) Meetings. Unless hereafter required by the vote of a majority in interest of all Class A Members, there will be no regularly scheduled annual or other meetings of the Members. However a meeting of the Members may be called at any time upon at least ten days' written notice (the "**Meeting Notice**") to all of the Members given by the Managers or by seventy-five percent in interest of the Investors. The Meeting Notice shall specify the subject matters to be considered at the meeting. Unless the Managers or a majority in interest of the Members calling the meeting agree upon and state in the Meeting Notice a San Antonio, Texas location for the meeting, each meeting shall be by teleconference with arrangements which permit each Member participating in the teleconference to hear (and to be heard by) each of the other participating Members. A majority

in interest of all Members (present in person or by written proxy) shall constitute a quorum for any meeting of the Members, and action may be taken at such meeting only with respect to matters directly related to the subject matters specified in the Meeting Notice, unless otherwise agreed upon at such meeting by unanimous consent of the Class A Members participating in the meeting.

(c) Written Action. Any action of the Class A Members set forth in writing and signed by the requisite percentage in interest of such Class A Members shall be effective whether or not a meeting of Members has been called and held for the purpose of considering such action.

(d) Actions Binding. Any action taken by the Class A Members at a meeting or in writing, as described above, shall be binding and conclusive upon the Company and all Members and Managers, and a copy of the minutes of the meeting or of the written action in which such action was taken shall be certified to be true, accurate and complete by the Managers and shall promptly be provided by the Managers to all of the Members.

20. Management of the Company.

(a) General. In general, and except as otherwise provided herein or by applicable law, the persons elected annually by the Members as managers of the Company (the "**Managers**"), shall be responsible for the management of the Company. No Member who is not a duly elected Manager, or officer of the Company shall have any responsibility, right or power to take part in the control of the Company's business or any authority or power to act or sign for or otherwise bind the Company or any other Member.

(b) Initial Manager. The initial Manager is ROBERT J. MUELLER, who shall serve as Manager until such time as his/her/their respective successors are duly elected by the Class A Members.

(c) Election of Managers. Class A Members shall, from time to time, determine the number of persons to be elected as the Managers of the Company and shall elect the number of Managers so decided upon.

(d) Resignation and Removal. A Manager may resign at any time, may be removed by a unanimous vote of Class A Members, or may be removed, for cause, by any other interested party, for conduct rising to clear and unambiguous criminal conduct, by a judge or court having subject matter and person jurisdiction over the Manager.

(e) Powers and Authority. Except as otherwise provided herein or by non-waivable provisions of applicable law, the powers and authority of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Managers (with the consent of a majority of the Managers being required for action by the Managers). Unless hereafter required by the vote of a majority of the Managers, there will be no regularly scheduled annual or other meetings of the Managers. However, a meeting of the Managers may be called at any time upon at least ten days' written notice (the "**Meeting Notice**") given by any Manager to all of the other Managers. The Meeting Notice shall specify the subject matters to be considered at the meeting. Unless otherwise agreed upon in writing by a majority of the Managers specifying an agreed upon time and place for the meeting, each meeting shall be by teleconference with arrangements which permit each Manager participating in the teleconference to hear (and to be heard by) each of the other participating Managers. A majority of all Managers (present in person or by written proxy) shall constitute a quorum for any meeting of the Managers, and action may be taken at such meeting only with respect to matters directly related to the subject matters specified in the Meeting Notice, unless otherwise agreed upon at such meeting by a majority of the Members participating in the meeting. Any action of the Managers set forth in writing and signed by the requisite number of the Managers shall be effective whether or not a meeting of Managers has been called and held for the purpose of considering such action. Any action taken by the Managers at a meeting

or in writing, as described above, shall be binding and conclusive upon the Company and all Members and Managers, and a copy of the minutes of the meeting or of the written action in which such action was taken shall be certified to be true, accurate and complete by the Managers and shall promptly be provided by the Mangers to all of the Members. Subject to the foregoing, the powers and authority of the Managers shall include, without limitation, the power and authority:

(i) to enter into, make and perform contracts, agreements and other undertakings binding the Company that may be necessary, appropriate or advisable in furtherance of the purposes of the Company and to make all decisions and waivers thereunder;

(ii) to open and maintain bank and investment accounts and arrangements, to draw checks and other orders for the payment of money and to designate individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(iii) to maintain the assets of the Company in good order;

(iv) to collect sums due to the Company;

(v) to the extent that funds of the Company are available therefore, to pay debts and obligations of the Company;

(vi) to acquire, utilize for Company purposes and dispose of any asset of the Company;

(vii) to borrow money or otherwise commit the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

(viii) to select, remove and change the authority and responsibility of lawyers, accountants and other advisers and consultants;

(ix) to obtain insurance for the Company;

(x) to make decisions concerning distributions by the Company of cash and other property as provided in Sections 18 and 19; and

(xi) to adopt, amend or restate bylaws for the Company.

(xii) to develop property in any way that the Members deem appropriate; and

(xiii) to take any and all other action that is permitted by law and customary in or reasonably related to the conduct of the Company's business affairs.

(f) Limitations. Except with the consent and approval of a three-quarters majority in interest of <u>all</u> Members, the Managers shall not:

(i) sell, lease, exchange or otherwise dispose of (other than by way of a pledge, mortgage, deed of trust or trust indenture) all or substantially all of the Company's property and assets;

(ii) require any Member to make additional capital contributions;

(iii) amend or restate the Articles of the Company or, except as otherwise specifically permitted herein, this Agreement.

(g) Officers. From time to time, at the discretion of the Managers, the Managers may elect persons as officers of the Company, including, without limitation, a chief executive officer, a president, a secretary, a treasurer and such vice presidents, assistant secretaries and assistant treasurers as the Managers may deem desirable. Subject to the provisions of any employment or other agreements (approved by the Managers) between such officer and the Company, each officer so elected shall serve in that capacity at the pleasure of the Managers, and may be removed from such office by the Managers at any time for any reason, with or without cause. The officers so elected by the Managers shall have such powers, duties and responsibilities as would be customary for officers of corporations with corresponding titles and as otherwise may reasonably be assigned to them, from time to time, by the Managers.

(h) Duties of the Managers. The Managers shall manage or cause to be managed the affairs of the Company in a prudent and businesslike manner, devoting such portion of his time and effort to Company affairs as may reasonably be required for the effective management of such affairs; provided, however, that it is expressly understood and agreed that the Managers shall not be required to devote their entire time or effort to the business of the Company and shall not be restricted in any manner from participating in any other business or activities. The Managers also shall cause to be filed such certificates and shall do such other acts as may be required by law to qualify and maintain the Company as a limited liability company under the laws of the State of Texas and of any other jurisdiction in which the Company transacts business.

(i) Other Activities. No Member, Manager or other person related to or affiliated with any Member or Manager shall be prevented or restricted from engaging or participating in or conducting any other business or activity whatsoever (or have any accountability, liability or obligation whatsoever to the Company or any Member with respect thereto), even if such other business or activity competes with, or is enhanced by, the business and activities of the Company.

21. Bank Accounts. All cash receipts and other funds of the Company shall be deposited to one or more bank accounts in the name of the Company at one or more banks or other depositories selected by the Managers from time to time. Checks and other withdrawals from such accounts may be signed by the Managers or by any one or more other persons who may be selected by the Managers from time to time. All funds of the Company shall be used solely for Company purposes and shall not be commingled with funds of any Manager, Member or other person.

22. Records and Reports.

(a) Records. The Managers shall keep or cause to be kept proper books of account in accordance with Section 11 and in such other manner as the Managers and the Company's accountants determine to be appropriate. The Managers shall promptly enter or cause to be entered in the Company's books a full and accurate record of each transaction made by the Managers on behalf of the Company. All books of account, with all other written records and other documents of the Company, shall be maintained at the principal office of the Company or at any other location in Texas that may be selected by the Managers from time to time, and shall be open to the reasonable inspection and copying by any Member or such Member's duly authorized representative, as provided in Section 23(c).

(b) Annual Reports. Upon request, the Managers shall cause to be prepared and delivered to a Member (i) financial statements of the Company for the preceding year, including an income statement, balance sheet, statement of cash flow and statement of changes in Members' equity, with a summary for such Member; and (ii) federal and other applicable income tax returns of the Company for the preceding year. A Member's online access to such reports shall be deemed delivered.

(c) Inspections. Any Member shall have the right to inspect and copy, at such Member's own expense, any of the Company's records required to be maintained pursuant to the Act, at such

Member's reasonable request and during regular business hours; provided, however that the Managers may restrict or redact records, or parts thereof, that constitutes confidential, privileged, or proprietary information.

(d) Other Information. The Managers shall keep the Members informed generally of the transactions entered into by the Managers on behalf of the Company, only as such transactions may involve the Call of investment positions.

23. Compensation. A person serving as a Manager shall be entitled to receive compensation for services rendered to the Company as a Manager only if and as approved from time to time by a majority of the Managers. A person serving as an officer shall be entitled to receive compensation for services rendered to the Company as an officer only if and as approved from time to time by the Managers. All Managers and officers shall be entitled to reimbursement of reasonable expenses incurred by them on behalf of the Company.

24. Reliance on Acts of the Managers and Officers. No financial institution or any other person dealing with the Managers or officers of the Company shall be required to ascertain whether a Manager or officer is acting in accordance with this Agreement, but such financial institution or such other person shall be protected in relying solely upon the assurances of, and the execution and delivery of documents by, a Manager or officer.

25. Indemnification. Each Member, Manager and officer of the Company is hereby indemnified by the Company with respect to the matters described in, to the full extent permitted by and in accordance with the provisions of the Texas Act. Notwithstanding the foregoing, the Company shall not indemnify (a) a Member with respect to any dispute among the Members or among the Company and any Members arising out of this Agreement or any other agreement among such Members and the Company, or (b) any Manager or officer with respect to any dispute between such Manager or officer and the Company arising out of any agreement between the Company and such Manager or officer.

**FUNDAMENTAL CHANGES**

26. Withdrawal. The withdrawal of an Investor (as a Member) shall not cause the dissolution of the Company. Accordingly, except as otherwise provided herein, no Investor shall have any right or power to voluntarily withdraw from the Company as a Member, or any right (under any provision of the Texas Act or otherwise) to receive any payment or compensation for such Member's Shares upon voluntary withdrawal from the Company, whether or not the withdrawal is in violation of this Agreement.

27. Restrictions on Transfers of Shares.

(a) Requirements for Transfer. Subject to any restrictions on transferability required by law (including the Securities Act of 1933, any state securities or "Blue Sky" law, and the rules promulgated thereunder), and subject to the provisions of Section 27(c), which shall have priority, each Member shall have the right to transfer (but not to substitute the assignee as a substitute Member in his or its place, except in accordance with Section 27(c) hereof), by a written instrument, the whole or any part of his or its Shares, provided that: (i) the transferee is a citizen and resident of the United States, and otherwise not a tax-exempt entity under Section 168(h) of the Code; (ii) the transferor delivers to the Company and the Remaining Members an unqualified opinion of counsel designated by the Remaining Members that neither the transfer nor any offering in connection therewith violates any provision of any federal or state securities law; (iii) the transferee executes a statement that he or it is acquiring such Shares or such part thereof for his or its own account for investment and not with a view to distribution, fractionalization or resale thereof; and (iv) the Company receives a favorable opinion of the Company's legal counsel or such other counsel selected by the Remaining Members that such transfer would not result in the termination of the Company (within the meaning of Section 708(b) of the Code) or the termination of its status as a partnership under the Code; *provided, further*, that the Remaining Members may elect to waive the requirement of the opinions of counsel set forth in Sections 27(a)(ii) and (iv) above should each of them, in their

sole discretion, determine that the cost of time delays involved in procuring such opinions may impede the Company's ability to effect the contemplated transfer.

(b) Effectiveness of Assignment. No transfer shall be effective unless and until the requirements of Section 27(a) are satisfied. The transfer by a Member of all or part of his or its Shares shall become effective on the first day of the calendar month immediately succeeding the month in which all of the requirements of this Section 27 have been met, and the Company has received from the transferor a transfer fee sufficient to cover all expenses of the Company connection with such transfer; *provided*, however, that the Remaining Members may elect to waive this fee in their sole discretion. All distributions made thereafter in respect of the Shares of the transferor shall be made to the transferee of such transferor's Shares.

(c) Requirements for Admission. No transferee of the whole or a portion of a Member's Shares shall have the right to become a Member unless and until all of the following conditions are satisfied:

(i) a duly executed and acknowledged written instrument of transfer approved by the Class A Members has been filed with the Company setting forth (A) the intention of the transferee to be admitted as a Member; (B) the notice address of the transferee; and (C) the percentage and Class of Shares transferred by the transferor to the transferee;

(ii) the opinions of counsel described in Section 27(a) above are delivered to the Company and the Remaining Members, subject to the Remaining Members right to waive the delivery of these opinions in their sole discretion;

(iii) the transferor and transferee execute and acknowledge, and cause such other persons to execute and acknowledge, such other instruments and provide such other evidence as the Class A Members may reasonably deem necessary or desirable to effect such admission, including without limitation: (A) the written acceptance and adoption by the transferee of the provisions of this Agreement; (B) the transferee's completion of a purchaser qualification questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under this Securities Act of 1933 and relevant state law; and (C) the transferee's completion, if applicable, of an acknowledgement of the use of a purchaser representative, and such representative's completion of a purchaser representative questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under the Securities Act of 1933 and relevant state law;

(iv) the admission is approved within the sole and absolute discretion by a majority of the Class A Members, unless and except all Class A Shares are being transferred, in which a super majority of two-thirds of Class B Members must approve the admission; and

(v) a transfer fee has been paid to the Company by the transferor sufficient to cover all expenses in connection with the transfer and admission, including but not limited to attorney's fees for the legal opinions referred to in Sections 27(a) and (c), subject to the Remaining Members' right to waive the payment of this fee in their sole discretion.

(d) Rights of Mere Assignees. If a transferee of Shares is not admitted as a Member, he or it shall be entitled to receive the allocations and distributions attributable to receive the allocations and distributions attributable to the transferred Shares, but he or it shall not be entitled to inspect the Company's books and records, receive an accounting of the Company's financial affairs, exercise the voting rights of a Member, or otherwise take part in the Company's business or exercise the rights of a Member under this Operating Agreement.

(e) Call Rights of the Company.

(i) For Class B Members, under terms of a certain private placement memorandum dated September 1, 2015, the mandatory Call date for each subscription is set at five years, less one day, from the Start Date. At any time prior to the mandatory Call date, the Company may mandate a premature Call of one or more Class B Shares, as long as Company pays a lump sum amount equaling the i) already accrued, but unpaid priority returns (if any); and ii) the cumulative priority returns that would have been due Investor, if the premature Call had not occurred, and the mandatory Call date applied. In order to exercise this Call right, the Company shall provide a written call notice to each Class B Member, specifying, at a minimum, the Pay Date, form of payment, amount of payment, and number of Class B Shares to be called.

(ii) For Class C Members, under terms of a certain private placement memorandum dated February 5, 2018, the mandatory Call date for each subscription is set at five years, less one day, from the Start Date. At any time prior to the mandatory Call date, the Company may mandate a premature Call of one or more Class C Shares, as long as Company pays a lump sum amount equaling the i) already accrued, but unpaid priority returns (if any); and ii) the cumulative priority returns that would have been due Investor, if the premature Call had not occurred, and the mandatory Call date applied. In order to exercise this Call right, the Company shall provide a written call notice to each Class C Member, specifying, at a minimum, the Pay Date, form of payment, amount of payment, and number of Class C Shares to be called.

(iii) Upon each exercise by the Company of its call rights provided for herein, the Class B Members or Class C Members shall be required to sell to the Company all of the respective Shares of such Investors listed in the call notice. The purchase price shall be equal to the Invested Capital related to the called Shares, plus any unpaid priority returns (if any).

(f) General. The Company shall be dissolved and its affairs wound up upon the occurrence of any of the following events:

(i) the written agreement of a majority in interest of all Class A Members to dissolve the Company.

(ii) at any time when there are no remaining Members of the Company. (In any other situation where, following the withdrawal of any Member, there is at least one remaining Member, the Company shall not be dissolved, and the business and existence of the Company shall be continued by such remaining Member(s).

(iii) the entry of a decree of judicial dissolution of the Company under the Texas Act.

(iv) the sale or other disposition of all or substantially all of the assets of the Company.

(g) Liquidation and Termination. Upon dissolution of the Company, the Managers shall act as liquidator or may appoint one or more of the Managers to act as liquidator. (If there are no Managers then serving, a majority in interest of the remaining Members shall select one or more persons to act as liquidator.) The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers. A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the liquidator to minimize any losses resulting from liquidation. The liquidator, as promptly as possible after dissolution and again after final liquidation, shall cause a proper accounting to be made by a certified public accounting firm of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable, and

shall apply the proceeds of liquidation as provided in Section 19 and in accordance with the time requirements of §1.704-1(b)(2)(ii)(b)(2) of the Regulations. If, in the reasonable judgment of the liquidator, it will not be possible or prudent to complete the liquidation of the Company's assets and the distributions to the Members within that prescribed time period, the liquidator shall, on or before the last day of such period, distribute all remaining assets and liabilities of the Company to a trust, with the liquidator or such other person as the liquidator may appoint serving as the trustee thereof, for the purpose of complying with such timing requirements. The trustee of said trust shall, thereafter, proceed with the completion of the liquidation of said remaining assets in the manner described in this Section 29(b) and with the application of the proceeds therefrom in the manner described in Section 19, and the trust shall be terminated as promptly as possible after completing all such actions.

(h) Final Accounting. Each of the Members shall be furnished with a statement prepared by the Company's accountants, which shall set forth the assets and liabilities of the Company as of the last day of the month which includes the date of dissolution and shall provide relevant information concerning the application and disposition of such assets and the proceeds thereof. Upon compliance by the liquidator with the foregoing provisions, the liquidator shall execute and cause to be filed Articles of Dissolution and any and all other documents necessary with respect to termination and cancellation of the Company under the Texas Act.

28. Amendments

(a) By the Managers. This Agreement may be amended by the Managers, without the consent or approval of the Members, if such amendment (i) is solely for the purpose of reflecting the admission of additional Members or substituted Members who have been admitted as additional or substituted Members of the Company in accordance with the terms of this Agreement; or (ii) is, in the opinion of counsel for the Company, necessary or appropriate to satisfy requirements of the Code or Regulations or of any federal or state securities laws or regulations. Any amendment made pursuant to Section 28(a)(ii) may be made effective as of the date of this Agreement.

(b) By Majority Consent. Notwithstanding any other provisions of this Agreement except the provisions of Section 28(a), the unanimous consent of all Class A Members, and the majority of Class B Members, are required to ratify any other amendments to this Agreement which would (i) permit any substantial changes to the offering documents, or (ii) permit substantial changes to the ownership or management of the Company.

(c) By Unanimous Consent. Notwithstanding any other provisions of this Agreement except the provisions of Section 28(a) & (b), the unanimous consent of all Members are required to ratify any other amendments to this Agreement which would (i) change the method of allocating profit and loss under Section 14 or 15 or of making distributions under Section 17 or 18, (ii) change any voting rights or required voting percentages otherwise set forth in this Agreement, (iii) expose any Members to personal liability for obligations of the Company, (iv) change the method of admitting additional Members shall require the written consent of all Members, (v) authorize the sale, lease, exchange or disposal of all or substantially all of the Company's property and assets, or (vi) ratifies any amendment or restatement of the Articles of the Company that would adversely impact the rights, privileges, or benefits of any Investor.

(d) Other Amendments. Except as otherwise provided in this Section 28, amendments to this Agreement shall require the written consent of two-thirds in interest of all Class A Members.

(e) Notice of Proposed Amendments. A copy of any amendment proposed to be made pursuant to this Section 28 shall be provided to each Member by the Managers at least 15 days prior to its proposed adoption date.

**MISCELLANEOUS**

29. Notices. Any notice, election or other written communication required or desired to be given hereunder shall be deemed given or made at such time as it (a) is delivered personally to the intended recipient, or (b) is delivered to Federal Express, UPS or any similar express delivery service, or is deposited in the United States mails, by registered or certified mail, return receipt requested, bearing proper postage, addressed to the intended recipient at the address set forth on the signature page(s) of this Agreement (in the case of any communication to a Member) or the address of the principal office of the Company (in the case of any communication to the Company). Any Member or the Company may specify some other address for the receipt of such written communications by giving written notice of such change to the other Members. Although a notice, election or other communication shall be deemed given or made when delivered to an express delivery service or deposited in the mails as provided above, any time period that is to begin running by reason of such communication shall not commence until such communication actually is received by the intended recipient.

30. Time Periods. In the case of any time period which, pursuant to the terms of this Agreement, begins to run upon receipt of any notice or the occurrence of any other act or event, the day after such receipt or occurrence shall constitute the first day of such period, and such period shall expire at midnight of the last day of such period.

31. Entire Agreement. Except as otherwise specifically indicated herein, this document contains the entire agreement of the parties and supersedes any and all prior understandings, agreements, representations and negotiations between them respecting the subject matters hereof.

32. Successors in Interest. Except as otherwise provided herein, all provisions of this Agreement shall be binding upon, inure to the benefit of and be enforceable by and against the Company, the Members and their respective heirs, executors, administrators, personal representatives, successors and permitted assigns.

33. Counterparts and Facsimiles. This Agreement and any other documents related to this Agreement may be executed in several counterparts, and each executed counterpart shall be considered as an original of this Agreement or such other document, as the case may be. A counterpart executed and transmitted by facsimile device by any person to the intended recipient thereof shall constitute and be accepted as an executed and delivered original of this Agreement or such other document, as the case may be.

34. Severability. In the event any provision of this Agreement or any application thereof is held to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the other provisions hereof and of any other application of the specific provision involved shall not be affected or impaired in any manner.

35. Captions. The captions at the beginnings of the sections and paragraphs of this Agreement are not part of the context of this Agreement, but are merely labels to assist in locating those sections and paragraphs, and shall be ignored in construing this Agreement.

36. Additional Documents. Each Member shall, and shall cause the Company to, execute, acknowledge or verify and deliver any and all documents from time to time reasonably requested by the Company or any other Member or Manager to carry out the purposes and intent of this Agreement.

37. Indemnification. If any Member violates any provision of this Agreement, then, in addition to being subject to all other remedies, liabilities and obligations imposed upon that Member for such violation under this Agreement or under any applicable law, that Member shall indemnify the Company and the other Members against any and all liabilities, losses, damages, claims, costs and expenses of any kind whatsoever relating to or arising directly or indirectly out of or by reason of any such violation (including, without limitation, consequential damages; legal fees and other costs and expenses of prosecuting or defending claims or

controversies, whether litigated or unlitigated; and interest on any such liabilities, losses, damages, claims, costs and expenses from the date paid at a floating rate equal to 2% plus the prime rate of interest as published in The Wall Street Journal from time to time).

38. No Third Party Benefit. Except as otherwise specifically provided herein, this Agreement is intended for the exclusive benefit of the Company and the Members and their respective successors and permitted assigns, and nothing contained in this Agreement shall be construed as creating any right or benefit in or to any third party.

39. Genders and Numbers. When permitted by the context, each pronoun used in this Agreement includes the same pronoun in other numbers or genders, and each noun used in this Agreement includes the same noun in other numbers.

40. Non-Waiver. No failure by the Company or any Member to insist upon strict compliance with any term of this Agreement or to exercise any option, enforce any right or seek any remedy upon any default of any other person shall affect, or constitute a waiver of, the Company's or such Member's right to insist upon such strict compliance, exercise that option, enforce that right or seek that remedy with respect to that default or any prior, contemporaneous or subsequent default; nor shall any custom or practice at variance with any provision of this Agreement affect, or constitute a waiver of, the Company's or any Member's right to demand strict compliance with all provisions of this Agreement.

41. Compliance with Securities Laws. In addition to the restrictions on Transfers of Shares under other provisions of this Agreement, no such Share may be sold or otherwise Transferred unless and until (a) such Share has been registered under all applicable federal and state securities laws pursuant to an effective registration statement which contemplates the proposed Transfer and complies with the then-applicable regulations, rules and administrative procedures and practices of any applicable federal and state securities commission or regulator, or (b) the Company has received (or, in its sole discretion, has waived its right to receive) a legal opinion of, or satisfactory to, its legal counsel that no such registration is required.

42. Survival. If any provision of this Agreement establishes, with respect to any Member or the Company, any rights and/or obligations which are to be in effect after the termination or expiration of this Agreement, such provision shall survive the termination or expiration of this Agreement and shall be binding upon all persons affected by such provision for such period of time as may reasonably be required in order to give full effect to the intended application of such provision.

43. Venue. The Company and the Members hereby designate the courts sitting in San Antonio, Texas, as the courts of proper and exclusive subject matter and personal jurisdiction and venue of and for any and all actions and proceedings relating to this Agreement; hereby irrevocably consent to such designation, jurisdiction and venue; hereby waive any objections or defenses relating to jurisdiction or venue with respect to any action or proceeding initiated in any of said courts; and agree that service of process or notice in any such action or proceeding shall be effective if delivered or mailed in accordance with the notice provisions of this Agreement.

44. Applicable Law. The Company is being formed under the laws of the State of Texas, and all rights, duties and obligations of the Company and of the Members under this Agreement shall be determined in accordance with the laws of said State.

45. Schedules and Exhibits. All schedules, exhibits and other attachments (including all duly authorized substitutions and replacements therefore) referred to in, and attached to, this Agreement hereby are incorporated in this Agreement by reference.

IN WITNESS WHEREOF, this amended Agreement has been executed as of the date first set forth above, and unless further amended, shall be adopted and effective as of February 26, 2018.

**MANAGER:**

ROBERT J. MUELLER, Manager

**CLASS A MEMBER(S):**

deeproot Funds, LLC by ROBERT J. MUELLER, VP

**CLASS B & CLASS C MEMBER(S):**

*Authorization by subscription as held on the records of the company.*

**Schedule 10(a)**

| Member Name and Address | Capital Contribution | Class A Shares | Date Subscribed |
|---|---|---|---|
| deeproot Funds, LLC<br>8200 W. Interstate 10, Ste. 600 San Antonio, TX 78230 | $1,000.00 | 1,500 | 9/1/2015 |