## TENANT ESTOPPEL CERTIFICATE

The undersigned Tenant of the premises located at 12621 Silicon Dr. in San Antonio, Texas and made a part hereof by this reference (the "Premises"), certifies and affirms the following to (i) Silicon Drive Office Venture, LLC ("Landlord"), (ii) to JPN VENTURES, INC., a Minnesota corporation and/or assigns ("Landlord's Assignee/ Purchaser"), and (iii) to Purchaser's lender ("Lender"):

1. Attached hereto is a true, correct and complete copy of the Lease provided as Exhibit "A", including all assignments, amendments, supplements and modifications thereto, if any. The Lease has not been otherwise assigned, amended, supplemented or modified as of the date hereof and is the only lease between the Tenant and the Landlord affecting the Premises.

2. Basic Lease Terms:

    (a)   Date of Lease: January 26, 2018.
    (b)   Date of Amendments or Modifications: June 1, 2018 and March 30, 2021.
    (c)   Square Footage Leased: approximately 41,752 square feet.
    (d)   Date of Commencement: April 1, 2018.
    (e)   Date of Expiration: March 31, 2023.
    (f)   Remaining Renewal Options: None.
    (g)   Current Monthly Base Rent: $47,524.52.
    (h)   Current Monthly Additional Rent: 19,205.92.
    (h)   Basic Rental Escalations: Increase to $48,950.25 per month for the period beginning April 1, 2022 to March 31, 2023.
    (i)   Security Deposit: $106,357.26.

3. Tenant is the sole possessor of and occupier of the Premises. Tenant has not subleased all or any part of the Premises or assigned the Lease, or otherwise transferred its interest in the Lease or the Premises.

4. The Lease is in full force and effect and is binding and enforceable against Tenant in accordance with its terms. Neither Tenant, nor the Landlord, is in default under the terms and conditions of the Lease, and Tenant has no knowledge of existing facts or circumstances which, with the giving of notice or the passage of time, or both, would constitute a default or an event of default by either Tenant, or the Landlord. Tenant has no claim against the Landlord with respect to the Lease, the Premises, or the common areas associated with the Premises and has no offset, defense or counterclaims against the rent or other charges payable by Tenant under the Lease. Tenant accepts the Premises in its current condition and is not aware of any defect in the Premises, including but not limited to environmental contamination.

5. All obligations of the Landlord to perform tenant finish work or similar improvements on the Premises pursuant to the Lease have been satisfied and performed in full. Any construction, build-out, improvements, alternations, or additions to the Premises required under the Lease have been fully completed in accordance with the plans and specifications described in the Lease.

## Exhibit 1

6.  There are no other agreements, written or oral, between the Landlord and Tenant relating to the occupancy of the Premises, including, without limitation, any agreement relating to the obligation of the Landlord to perform any tenant finish work, repairs, painting, alterations or other improvements on Tenant's behalf or to provide any discounts, concessions, rebates, abatements or allowances with respect to the rent and other charges payable under the Lease.

7.  Landlord has not given any consent to Tenant (for example, consent to sublease or alter the Premises) that is required under the Lease before the taking of any action by Tenant.

8.  Tenant has no options or rights (and have not exercised any options or rights) to renew, extend, amend, modify, or change the term of the Lease.

9.  Tenant has no expansion option or right of first refusal to lease additional space.

10. Tenant has no right of first refusal to purchase, right of first offer to purchase, or option to purchase the Premises (or any portion thereof). Tenant has no other interest in any other part of the building of which the Premises form a part or to any personal property appurtenant thereto or used in connection therewith.

11. No rent has been collected in the current month other than as provided for in the Lease. Tenant has not been given any free rent, partial rent, rebates, rent abatements, or rent concessions of any kind, except as provided in the Lease.

12. Tenant has deposited the Security Deposit stated above with Landlord, and none of the Security Deposit as set forth above has been applied by Landlord to the payment of rent or any other amounts due under the Lease. Pursuant to the terms of the Lease, Tenant is not entitled to earn any interest on said security deposit.

13. No action or proceeding has been threatened or instituted by Tenant against the Landlord under the Lease in any federal or state court. Tenant has not filed and is not the subject of any filing for bankruptcy or reorganization under federal bankruptcy laws.

14. The person signing this letter on behalf of Tenant is a duly authorized agent of the Tenant.

Tenant understands that Landlord, Landlord's Assignee/Purchaser, and Lender will rely on the certifications set forth above, and all such certifications shall inure to the benefit of Landlord, Landlord's Assignee/Purchaser, Lender, and their successors and assigns, and shall be binding upon the undersigned, and its successors, heirs, legal representatives and assigns.

DEEPROOT CAPITAL MANAGEMENT, LLC

By:

Printed Name: Robert J. Mueller
Its: Principal/Manager

**Exhibit 1**

EXHIBIT "A" – COPY OF LEASE

**Exhibit 1**

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE (this "Amendment") is entered into as of the 30th day of March, 2021 (the "Amendment Effective Date") by and between SILICON DRIVE OFFICE VENTURE, LLC ("Landlord") and DEEPROOT CAPITAL MANAGEMENT, LLC ("Tenant").

WHEREAS, Landlord and Tenant are the current parties to that certain Lease Agreement dated January 26, 2018, as modified by First Amendment to Lease dated June 1, 2018 (collectively the "Lease") covering the premises located at 12621 Silicon Dr., San Antonio, Texas (the " Premises"), as more particularly set forth in the Lease;

WHEREAS, Landlord and Tenant desire to amend the Lease for their mutual benefit in accordance with the terms and conditions set forth hereinbelow.

NOW, THEREFORE, in consideration of the Premises and the mutual covenants between the parties herein contained, Landlord and Tenant hereby agree as follows:

1.      Rent. Notwithstanding anything to the contrary in the Lease, beginning April 1, 2021, all Rent (inclusive of the Base Rent and Additional Rent, except for Additional Rent of such a nature that it is not payable in installments) shall be due and payable in advance on a monthly basis on the 1st day of each month during the remaining Term of the Lease. For the purposes of clarification, the Base Rent shall be as follows for the remaining Term of the Lease:

| Monthly Periods | Annual Base Rent | Monthly Base Rent | Annual Base Rent PSF |
|---|---|---|---|
| 04/01/2021-03/31/2022 | $570,294.22 | $47,524.52 | $13.6591 |
| 04/01/2022-03/31/2023 | $587,403.05 | $48,950.25 | $14.0689 |

The estimated Additional Rent for Tenant's Pro Rata Share of CAM Costs for the period of April 1, 2021 through December 31, 2021 shall be $18,730.56 per month. The Additional Rent for CAM Costs shall continue to be adjusted and reconciled in accordance with the provisions of the Lease.

2.      Security Deposit. The Security Deposit as provided in Section 4.01 of the Lease is reduced to $106,357.26. The remaining portion in the amount of $106,357.27 out of the original security deposit in the amount of $212,714.53 which was provided upon the execution of the Lease shall be applied as follows:

(i)     The sum of $74,725.17 shall be retained by Landlord and applied to the outstanding balance of Base Rent, Additional Rent, Late Charges, Interest or Late Fees owed by Tenant.

(ii)    The sum of $31,632.10 shall be returned by Landlord to Tenant.

Landlord and Tenant confirm and agree that following the application of the $74,725.17 balance from the original security deposit amount, there is no outstanding balance due by Tenant

1

## Exhibit 1

for the Base Rent, Additional Rent, CAM Costs (subject to year-end reconciliations), Late Fees, Late Charges, or Interest for the period through March 31, 2021, and all said sums have been paid in full. Tenant's next payment due shall be for the advance monthly payment of Base Rent and estimated CAM Costs in the amount of $66,255.08 which shall become due on April 01, 2021.

3.      Defined Terms. All terms not otherwise defined herein shall have the same meaning assigned to them in the Lease.

4.      Ratification of Lease. Except as amended hereby, the Lease shall remain in full force and effect in accordance with its terms and is hereby ratified. In the event of a conflict between the Lease and this Amendment, this Amendment shall control.

5.      Entire Agreement. This Amendment, together with the Lease, contains all of the agreements of the parties hereto with respect to any matter covered or mentioned in this Amendment or the Lease, and no prior agreement, understanding or representation pertaining to any such matter shall be effective for any purpose.

6.      Successors and Assigns. The terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

7.      Paragraph Headings. The paragraph headings contained in this Amendment are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several paragraphs hereof.

8.      Severability. A determination that any provision of this Amendment is unenforceable or invalid shall not affect the enforceability or validity of any other provision hereof and any determination that the application of any provision of this Amendment to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

9.      Governing Law. This Amendment shall be governed by the laws of the State of Texas.

10.     Estoppel. Tenant hereby represents, warrants and agrees that as of Amendment Effective Date: (1) there exists no breach, default or event of default by Landlord under the Lease, or any event or condition which, with the notice or passage of time or both, would constitute a breach, default or event of default by Landlord under the Lease; (2) the Lease continues to be a legal, valid and binding agreement and obligation of Tenant; and (3) Tenant has no current offset or defense to its performance or obligations under the Lease. TENANT HEREBY WAIVES AND RELEASES ALL DEMANDS, CHARGES, CLAIMS, ACCOUNTS OR CAUSES OF ACTION OF ANY NATURE AGAINST LANDLORD OR LANDLORD'S EMPLOYEES OR AGENTS, INCLUDING WITHOUT LIMITATION, BOTH KNOWN AND UNKNOWN DEMANDS, CHARGES, CLAIMS, ACCOUNTS, AND CAUSES OF ACTION THAT HAVE PREVIOUSLY ARISEN OUT OF OR IN CONNECTION WITH THE LEASE.

2

**Exhibit 1**

IN WITNESS WHEREOF, the parties have executed this Amendment to be effective as of the Amendment Effective Date.

**LANDLORD:**                                    **TENANT:**

**SILICON DRIVE OFFICE VENTURE, LLC**            **DEEPROOT CAPITAL MANAGEMENT, LLC**

By: _____                      By: _____

David A. Spencer, Manager                        Printed Name: Robert J. Mueller
                                                 Its: Principal/Manager

3

**Exhibit 1**

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "Amendment") is entered into as of the 1st day of June, 2018, by and between SILICON OFFICE VENTURE, LLC, a Texas limited liability company ("Landlord") and DEEPROOT CAPITAL MANAGEMENT, LLC, a Texas limited liability company ("Tenant").

WHEREAS, Landlord and Tenant are parties to that certain Lease Agreement dated as of January 26, 2018 (the "Lease") covering the building located at 12621 Silicon Dr. in San Antonio, Bexar County, Texas (the " Premises");

WHEREAS, Landlord and Tenant desire to amend the Lease for their mutual benefit in accordance with the terms and conditions set forth hereinbelow.

NOW, THEREFORE, in consideration of the Premises and the mutual covenants between the parties herein contained, Landlord and Tenant hereby agree as follows:

1.      Repair and Replacement of HVAC Units. Tenant covenants and agrees that it has or will retain the services of Holts Mechanical to install and complete certain repairs and maintenance to twelve (12) existing HVAC units at the Premises and the replacement of sixteen (16) roof top HVAC units at the Premises, all as more particularly described in Option B of the proposal attached hereto as Exhibit "A" (the "HVAC Work"), which HVAC Work and all corresponding installation expenses (including any controls, thermostats, ducting, and other components) shall be completed at Tenant's sole cost and expense, and in accordance with the requirements for the completion of Tenant's Work as outlined in Exhibit C of the Lease.    As consideration for Tenant's completion and payment for the HVAC Work by Tenant, Landlord has agreed, as Landlord's sole contribution to the costs and expenses related to the HVAC Work and any other miscellaneous expenses incurred by Tenant in connection therewith, to credit the sum of Two Hundred Thousand and 00/100 Dollars ($200,000.00) to Tenant's next Rent payment coming due on June 1, 2018 ("Landlord HVAC Credit"). Accordingly, following the reduction to the Rent for the Landlord HVAC Credit, the sum of $192,677.56 shall be due by Tenant on June 1, 2018 for the second half of advance Rent payment of semiannual Base Rent and estimated semiannual Additional Rent for the second half of the first year of the Lease (period of October 1, 2018 through March 31, 2019).

Upon completion of the HVAC Work, Tenant shall provide Landlord with copies of all documentation related to the HVAC Work, including but not limited to invoices, proof of payment, warranties, and any other information reasonably requested by Landlord and related thereto. Tenant shall also provide Landlord with executed lien waivers and/or releases of lien for the HVAC Work in accordance with the requirements of Exhibit C to the Lease.

2.      HVAC Repair Obligations. The Lease is hereby modified so that Landlord shall have no further obligation to maintain, replace, and/or repair the HVAC system servicing the Premises during the initial two (2) year term of the Lease as set forth in Section 7.03(b) of the Lease. Tenant acknowledges and agrees that all future maintenance, repair, and replacement of the HVAC system servicing the Premises for the remainder of the term of the Lease shall be at Tenant's sole cost and expense, and without any payment or contribution by Landlord.

1

## Exhibit 1

3.     Option to Purchase. Landlord and Tenant hereby agree that the Purchase Price for the option to purchase the Project contained in Section 16.1 and Exhibit B of the Lease is hereby increased by the sum of $150,000.00 to $4,508,960.00. There shall be no commissions due to Landlord's Broker or Tenant's Broker for the $150,000 increase portion of the Purchase Price in the event that Tenant consummates the option to purchase the Project.

4.     Defined Terms. All terms not otherwise defined herein shall have the same meaning assigned to them in the Lease.

5.     Ratification of Lease. Except as amended hereby, the Lease shall remain in full force and effect in accordance with its terms and is hereby ratified. In the event of a conflict between the Lease and this Amendment, this Amendment shall control.

6.     Entire Agreement. This Amendment, together with the Lease, contains all of the agreements of the parties hereto with respect to any matter covered or mentioned in this Amendment or the Lease, and no prior agreement, understanding or representation pertaining to any such matter shall be effective for any purpose.

7.     Successors and Assigns. The terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

8.     Paragraph Headings. The paragraph headings contained in this Amendment are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several paragraphs hereof.

9.     Severability. A determination that any provision of this Amendment is unenforceable or invalid shall not affect the enforceability or validity of any other provision hereof and any determination that the application of any provision of this Amendment to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

10.    Governing Law. This Amendment shall be governed by the laws of the State of Texas.

11.    Estoppel. Tenant and Landlord each hereby represent, warrant and agree that: (1) the Lease continues to be a legal, valid and binding agreement and obligation of Tenant and Landlord; and (2) there exists no breach, default or event of default by the other party under the Lease, or any event or condition which, with the notice or passage of time or both, would constitute a breach, default or event of default by the other party under the Lease

**Exhibit 1**

IN WITNESS WHEREOF, the parties have executed this Amendment as of June 1, 2018.

LANDLORD:                               TENANT:

SILICON OFFICE VENTURE, LLC             DEEPROOT CAPITAL
                                        MANAGEMENT, LLC

By: _____          By: _____

David A. Spencer                        Robert J. Mueller
Its Manager                             Its Manager

EXHIBIT "A"

3

**Exhibit 1**

# Proposal

 **HOLTS MECHANICAL**

TACLA3476C

5522 RITTIMAN ROAD
SAN ANTONIO, TX 78218
210-661-7600, Fax: 210-662-9122

| Proposal Number | 0000063603 |
|---|---|

| | Date |
|---|---|
| | 5/3/2018 |

| Submitted To |
|---|
| DEEPROOT TECH |
| 8200 IH-10 WEST SUITE 600 |
| SAN ANTONIO TX  78230 |
| |
| ATTN: SEAN |
| Customer Phone |

| Job Name |
|---|
| NEW FACILITY HVAC OPTIONS |
| 12621 SILICON DR. |

## Description

REWORK THE EXISTING HVAC AS PER PLANS DATED 4/10/18 WITH MINIMAL DETAILS AND OUR WALK-THRU OF THE FACILITY.

**OPTION A:**
CLEAN AND SERVICE THE 22 EXISTING UNITS INCLUDING CLEANING THE COILS, OILING MOTORS, REPLACING BELTS, MINOR REPAIRS, CHECK HEATING AND COOLING AND REPLACING THE FILTERS. MAKE NON-MAJOR REPAIRS TO 10 OF THE EXISTING UNITS AS PER LIST PROVIDED BY MANAGEMENT OFFICE. INCLUDES 4 CONTACTOR'S, 2 HP SWITCHES, 2 CAPACITORS, REPAIRING THE CONDENSATE DRAINS ON 4 UNITS BUT NO NEW THERMOSTATS.
REPLACE THE 6 WORST ROOF TOP UNITS WITH NEW UNITS OF THE SAME CAPACITY, UNIT ACCESSORIES PER CODE, RECONNECT THE DUCTWORK, DRAIN LINES, CONTROLS AND POWER. INCLUDES CRANE CHARGES, PERMIT, INSPECTIONS, CONDENSER COIL HAIL GUARDS AND HAULING AWAY THE OLD UNITS.
UNITS TO BE REPLACED: (6 TON UNITS: #5 & #13B), (10 TON UNIT: #18), (12 1/2 TON UNITS: #4 & #7), (15 TON UNIT: #14)
QUOTE: $104,418.00 PLUS TAX

**OPTION B:**
CLEAN AND SERVICE THE 12 EXISTING UNITS INCLUDING CLEANING THE COILS, OILING MOTORS, REPLACING BELTS, MINOR REPAIRS, CHECK HEATING AND COOLING AND REPLACING THE FILTERS.
REPLACE THE 16 ROOF TOP UNITS THAT NEED REPAIRS WITH NEW UNITS OF THE SAME CAPACITY. UNIT ACCESSORIES PER CODE, RECONNECT THE DUCTWORK, DRAIN LINES, CONTROLS AND POWER. INCLUDES CRANE CHARGES, PERMIT, INSPECTIONS, CONDENSER COIL GUARDS AND HAULING AWAY THE OLD UNITS.
UNITS TO BE REPLACED: (3 TON UNITS: #21 & #2*), (4 TON UNIT: #12), (5 TON UNIT: #15B), (6 TON UNITS: #5, #9, #13B & #19), (10 TON UNITS: #18, #23, & #24), (12 1/2 TON UNITS: #4, #10  & #7), (15 TON UNIT: #14 & #20)
QUOTE: $266,511.00 PLUS TAX

THESE PRICES DO NOT COVER THE CONTROLS, THERMOSTAT ISSUES OR REPAIRS.

4

**Exhibit 1**

LEASE AGREEMENT

BETWEEN

SILICON OFFICE VENTURE, LLC
a Texas limited liability company

(Landlord)

AND

DEEPROOT CAPITAL MANAGEMENT, LLC
a Texas limited liability company

(Tenant)

**Exhibit 1**

## EXHIBITS AND RIDERS

The following Exhibits and Riders are attached hereto and by this reference made a part of this Lease:

EXHIBIT A     Legal Description of Land

EXHIBIT B     Terms for Purchase and Sale

EXHIBIT C     Construction Work Letter

EXHIBIT D     Building Rules and Regulations

deeproot 12621 Silicon Lease

# LEASE AGREEMENT

THIS LEASE AGREEMENT ("this Lease") is made and entered into by and between Silicon Drive Office Venture, LLC, a Texas limited liability company ("Landlord") and deeproot Capital Management, LLC, a Texas limited liability company ("Tenant"), on the 26th day of January, 2018 (the "Effective Date"), upon all the terms set forth in this Lease and in all Exhibits and Riders hereto, to each and all of which terms Landlord and Tenant hereby mutually agree as follows:

## ARTICLE 1

## BASIC LEASE INFORMATION AND CERTAIN DEFINITIONS

Section 1.01.    Each reference in this Lease to information and definitions contained in the Basic Lease Information and Certain Definitions and each use of the terms capitalized and defined in this Section 1.01 shall be deemed to refer to, and shall have the respective meaning set forth in, this Section 1.01.

| | | |
|---|---|---|
| A. | Premises: | The premises (the "Premises"), containing approximately 41,752 square feet of Net Rentable Area (as defined in Section 2.01), at the building located at 12621 Silicon Drive in San Antonio, Bexar County, Texas (the "Building"). The legal description of Landlord's tract is set forth on the attached Exhibit A (the "Land"). The Land and Building are hereinafter collectively referred to as (the "Project"). |
| B. | Commencement Date: | April 1, 2018 |
| C. | Term: | Sixty (60) months, beginning on the Commencement Date and ending at 11:59 p.m. on the Expiration Date, unless this Lease is sooner terminated as provided herein. |
| D. | Net Rentable Area of the Building: | 41,752 square feet. |
| E. | Tenant's Pro Rata Share: | 100%, representing a fraction, the numerator of which is the Net Rentable Area of the Premises and the denominator of which is the Net Rentable Area of the Building. |
| F. | Rent: | The Base Rent and the Additional Rent. |
| G. | Base Rent: | The Base Rent shall be as follows: |

| Monthly Periods | Annual Base Rent | Semiannual Base Rent | Annual Base Rent PSF |
|---|---|---|---|
| First Year | $521,900.00 | $260,950.00 | $12.5000 |
| Second Year | $537,557.00 | $268,778.50 | $12.8750 |
| Third Year | $553,683.71 | $276,841.85 | $13.2613 |
| Fourth Year | $570,294.22 | $285,147.11 | $13.6591 |
| Fifth Year | $587,403.05 | $293,701.52 | $14.0689 |

| | | |
|---|---|---|
| H. | Additional Rent: | The Additional Rent shall be Tenant's CAM Costs, consisting of all Operating Expenses, including all tax and insurances and all other sums due and payable by Tenant under the Lease. Tenant's Share of CAM Costs, shall be payable beginning on the Commencement Date. |
| I. | Extension Term(s): | None. |
| J. | Tenant's Permitted Uses: | General office and light manufacturing purposes (subject to compliance with all applicable laws, rules, regulations, requirements, and restrictions) |
| K. | Security Deposit: | $212,714.53 |
| L. | Tenant's Broker: | Transwestern Kelly Ralston, Russell T. Noll |

8200 IH-10 West, Suite 800
San Antonio, Texas 78230

| M. | Landlord's Broker: | Peloton Commercial Real Estate (Andrew Price) 250 W. Nottingham Place, Suite 115 San Antonio, Texas 78209 |
|---|---|---|
| N. | Landlord's Address for Payments And Notices: | Silicon Drive Office Venture, LLC Attention: David A. Spencer 229 North Main Street Boerne, Texas 78006 |
| O. | Tenant's Address for Notice: | deeproot Capital Management, LLC P.O. Box 691610 San Antonio, TX 78269-1610 |

P.  Sums due from Tenant upon execution of Lease:     Security Deposit of $212,714.53

Q.  Sums due from Tenant upon Commencement Date

| | |
|---|---|
| 1st Year Semiannual Advance  Base Rent | $260,950.00 |
| 1st Year Advance Semiannual estimated Additional Rent | $131,727.56 |
| Total sum due upon Commencement Date | $392,677.56 |

## ARTICLE 2: LEASE OF PREMISES, TERM, AND POSSESSION

Section 2.01.  Lease of Premises.

In consideration of the mutual covenants herein, and subject to and upon the terms, provisions and conditions hereinafter set forth, Landlord does hereby lease, demise, and let to Tenant, and Tenant does hereby lease from Landlord, those certain premises (the "Premises"), in the building located at 12621 Silicon Drive in San Antonio, Texas (the "Building") constructed on the land legally described on Exhibit "A" (the "Land"). (The Building and Land, and all buildings and other improvements and appurtenances now or hereafter constructed on the Land, are collectively referred to herein as the "Project"). The Premises contains 41,752 square feet of Net Rentable Area.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS LEASE, IT IS UNDERSTOOD AND AGREED THAT THE PREMISES ARE BEING LEASED "AS IS", WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, BY LANDLORD EXCEPT AS EXPRESSLY SET FORTH HEREIN. LANDLORD HAS NOT MADE (EXCEPT AS EXPRESSLY SET FORTH HEREIN) ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PREMISES, ITS CONDITION (INCLUDING WITHOUT LIMITATION ANY REPRESENTATION OR WARRANTY REGARDING SUITABILITY, HABITABILITY, QUALITY OF CONSTRUCTION, WORKMANSHIP, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE), ENVIRONMENTAL CONDITION OR COMPLIANCE WITH ENVIRONMENTAL OR OTHER APPLICABLE LAWS, INCOME TO BE DERIVED THEREFROM OR EXPENSES TO BE INCURRED WITH RESPECT THERETO, OR ITS OBLIGATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE SAME. TENANT FURTHER ACKNOWLEDGES AND AGREES THAT TENANT HAS BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PREMISES PRIOR TO THE EXECUTION OF THIS LEASE.

TENANT IS NOT RELYING (AND WILL NOT RELY IN THE FUTURE), AND HEREBY EXPRESSLY DISCLAIMS RELIANCE ON ANY STATEMENTS, FACTS OR REPRESENTATIONS, ORAL OR WRITTEN, EXCEPT FOR THOSE MATTERS SPECIFICALLY SET FORTH IN THE LEASE.

The term "Net Rentable Area" shall mean the net rentable area measured according to standards similar to those published by the Building Owners and Managers Association International, Publication ANSI Z 65.1-1996, as amended or replaced from time to time (the "Modified BOMA Standard"). The Modified BOMA Standard has been used in calculating the Net Rentable Area of the Building and the Premises, and Tenant and Landlord hereby stipulate and agree that same are correct, notwithstanding any

minor variations in measurement or other variations that may have been incurred in the calculation thereto. The Net Rentable Area of the Building is stipulated for all purposes to be 41,752 square feet.

The term "Common Areas" shall refer to facilities and areas of the Building that are intended and designated by Landlord, from time to time for the common, general, and non-exclusive use of all tenants of the Building, and those portions of the Project existing from time to time that are outside of the Building, and are generally available for use by all tenants in the Building, and their respective employees, agents and invitees, parking areas, driveways, loading areas, sidewalks, trash areas, and all landscaped areas. Tenant and its employees, agents and invitees shall have the non-exclusive right, along with others designated from time to time by Landlord, to the free use of the Common Areas, subject to the Building Rules (as hereinafter defined).

Section 2.02. Term. Subject to and upon the terms and conditions set forth herein, or in any exhibit or addendum hereto, this Lease shall continue in force for the term of months set out in Section 1.01 (C), above, but adjusted as herein provided.

Section 2.03. Landlord Delivery of the Premises. Landlord shall permit Tenant and its agents, to enter the Premises prior to the Commencement Date to prepare the Premises for Tenant's use and occupancy and perform Tenant's Work. Any such permission shall constitute a license only, conditioned upon Tenant's: (a) working in harmony with Landlord and Landlord's agents, contractors, workmen, mechanics and suppliers and with other tenants and occupants; and (b) furnishing Landlord with the insurance required of Tenant pursuant to the Lease, and causing all other parties entering the Building to perform such work on behalf of Tenant, to provide Landlord with the same types, and amounts, of coverages required of the Tenant in the Lease.

Landlord shall not be liable in any way for any injury, loss or damage which may occur to any of Tenant's property or installations in the Premises prior to the Commencement Date. Tenant waives any claims therefore and shall protect, defend, indemnify and save harmless Landlord from all liabilities, costs, damages, fees and expenses arising out of the activities of Tenant or its agents, Tenant's contractor, other contractors, suppliers or workmen in the Premises or the Building. Tenant agrees that any such entry into and occupation of the Premises shall be deemed to be under all of the terms, covenants, conditions and provisions of the Lease except as to the covenant to pay Rent. If Tenant fails to comply with any of the conditions set forth above, such license may immediately be terminated by Landlord.

Section 2.04. Commencement. The Term of this Lease (the "Term") shall commence on April 01, 2018 (the "Commencement Date"), and shall expire, without notice to Tenant on March 31, 2023 (the "Expiration Date"), unless sooner terminated or extended to a later date under any other term or provision hereof.

Section 2.05. Completion. Tenant will perform or cause to be performed the work and/or construction of Tenant's Leasehold Improvements in accordance with the Final Plans and Specifications in the Work Letter. For purposes of this Lease, "Leasehold Improvements" shall mean all improvements and fixtures situated in the Premises as of the Effective Date, and all alterations and constructions of Landlord's Work and Tenant's Work as contemplated by the Work Letter in Exhibit "C".

Section 2.06. Surrender of the Premises. Upon the expiration or earlier termination of this Lease, or upon the occurrence of a Default by Tenant, then, upon the exercise by Landlord of its right to re-enter the Premises without terminating this Lease, Tenant shall immediately surrender the Premises and all keys to the Premises to Landlord, together with all alterations, improvements and other property (other than Tenant's Property, as defined in Section 2.08, below) as provided elsewhere herein, in good order, condition and repair, ordinary wear and tear and damage due to casualty excepted, and, failing this, Landlord may restore the Premises to such condition at Tenant's expense, and Tenant shall reimburse Landlord within ten (10) days after delivery to Tenant of an invoice therefore. The Premises shall be left in a broom-clean condition. The provisions of this Section 2.06 shall survive the expiration or earlier termination of this Lease.

Section 2.07. Holding Over. In the event of holding over by Tenant after expiration or other termination of this Lease without the prior written consent of Landlord (and Landlord shall be under no duty to provide such consent), then such possession shall be an unlawful detainer and no tenancy or interest shall result from such possession, excepting only that Tenant will be deemed to be occupying the Premises as a tenant at sufferance at a daily rental rate equal to one hundred fifty percent (150%) of the Base Rent (determined on a daily basis), plus any and all Additional Rent and other charges which would have been applicable had the Term of this Lease continued through the period of such holding over by Tenant. No holdover by Tenant or payment by Tenant after the expiration or early termination of this Lease shall be construed as to extend the Term or prevent Landlord from immediate recovery of possession of the Premises by summary proceedings or otherwise. Notwithstanding anything herein to the contrary, pursuant to Section 91.001(c) of the Texas Property Code, Landlord and Tenant specifically agree that no notice to terminate Tenant's tenancy hereunder will be required from and after the expiration of the Term of this

Lease under Section 91.001 or Section 24.005 of the Texas Property Code before Landlord files a forcible detainer suit on grounds that the tenant is holding over beyond the end of the rental term or renewal period (if any) hereof; and any sublease hereunder shall not be approved unless it also contains a specific comparable waiver by the subtenant thereunder. The provisions of this Section 2.07 shall survive the expiration or earlier termination of this Lease.

Section 2.08. Furniture, Fixtures and Personal Property. Tenant may remove its trade fixtures, personalty, and movable furniture and equipment not attached to the Building (collectively "Tenant's Property"), provided: (i) such removal is made prior to the termination of the Term of this Lease; (ii) this Lease is in full force and effect and there is no Event of Default under this Lease at the time of such removal; (iii) all removals and work described above shall be accomplished in a good and workmanlike manner and shall be conducted so as not to damage the Premises or the Project or the plumbing, electrical lines or other utilities serving the Project; and (iv) Tenant promptly repairs all damage caused to the Premises or the Project by any such removal. Tenant shall not remove any plumbing or electrical fixtures or equipment, heating or air-conditioning equipment, floor coverings, walls or ceilings, all of which constitute a part of the freehold or leasehold interest of Landlord, nor shall Tenant remove any fixtures or machinery furnished or paid for by Landlord (whether initially installed or replaced); Notwithstanding the foregoing, upon the expiration of this Lease, and there is no Event of Default under this Lease at such expiration, Tenant shall remove any such items remaining on the Premises, and, if Tenant fails to do so, Landlord may remove and dispose of any such items at the expense of Tenant, and Tenant shall reimburse Landlord within ten (10) days after delivery to Tenant of an invoice therefore for any such costs upon demand, and this obligation of Tenant shall survive expiration or earlier termination of this Lease. If Tenant shall fail to remove any and all such trade fixtures, personalty, movable furniture or equipment upon expiration or earlier termination of this Lease, then at the option of Landlord, in its sole and absolute discretion, the same shall be deemed abandoned by Tenant and may be used or disposed of by Landlord in whatever manner Landlord may determine in its sole and absolute discretion. The provisions of this Section 2.08 shall survive expiration or earlier termination of this Lease.

ARTICLE 3: RENT

Section 3.01. Rent. Tenant hereby agrees to pay Landlord the Rent when due hereunder, without notice, demand, setoff or deduction whatsoever. "Rent", as used herein, shall include Base Rent, Additional Rent, and all such other sums of money as shall become due and payable by Tenant to Landlord under this Lease, the nonpayment of which (after notice and time to cure as provided in Section 19.01(a), below), shall entitle Landlord to exercise all such rights and remedies as are herein provided. The Rent (other than Additional Rent of such a nature that it is not payable in installments) shall be due and payable in advance in semiannual installments, commencing on the Commencement Date, and on each April 1st and October 1st thereafter, during the Term of this Lease, and Tenant hereby agrees to pay such Rent to Landlord at Landlord's address provided herein, or electronic bank transfer to an account provided by Landlord, without any advance notice, invoice, demand, setoff or deduction whatsoever; provided that the sum of $392,677.56 for the second half of the advance payment of semiannual Base Rent and estimated semiannual Additional Rent for the first year of the Lease (period of October 01, 2018 through March 31, 2019) shall be due and payable in advance on June 01, 2018. The following advance payment of semiannual Base Rent and estimated semiannual Additional Rent for the first half of the second year of the Lease (period of April 01, 2019 through September 30, 2019) shall be due and payable on April 01, 2019.

Section 3.02. Late Fees. Tenant's failure to pay Base Rent, Additional Rent, or any other Lease cost when due under this Lease (and payment by check which is not honored, due to insufficient funds or any other cause, constitutes failure to pay) may cause Landlord to incur unanticipated costs, the exact amount of which are impractical or difficult to ascertain. Accordingly, if any Rent payment or other sum due by Tenant to Landlord is past due for more than ten (10) days after the date that it is due: (i) Tenant shall pay a fee, which shall constitute liquidated damages, equal to five percent (5%) of such Rent or other sum (the "Late Charge"); and (ii) Tenant shall incur interest charges on all past due installments of Rent, from the date initially due until paid, which shall be due and payable with the payment of such Rent, at the "Stipulated Rate", defined as fifteen percent (15%) per annum (provided, however, that the Stipulated Rate shall at all times be limited to the maximum rate of interest from time to time permitted under applicable federal and Texas law). All Late Charges shall become Additional Rent immediately due and payable hereunder. Nothing contained herein shall be construed as to compel Landlord to accept any payment of Rent, Additional Rent, or Late Charge or other sums of money due and payable hereunder in arrears should Landlord elect to apply its rights and remedies available under this Lease or at law or in equity in the event of Default hereunder by Tenant. If any rent is paid by check that is returned for insufficient funds, Tenant shall immediately make the required payment to Landlord in good funds; moreover, Tenant shall also pay Landlord the amounts specified above in this Section 3.02, plus an additional fee of $50.00 to compensate Landlord for its expense and effort in connection with the dishonored check.

Section 3.03. Base Rent. For purposes of this Lease, Base Rent is the sum set out in Section 1.01 (G), above which shall be due and payable in advance semiannual installments.

Section 3.04. Additional Rent. During the Term of this Lease, in addition to the Base Rent set out in Section 1.01 (G), above, Tenant shall pay as Additional Rent, Tenant's Pro Rata Share of the CAM Costs for each year during the Term hereof, determined in accordance with Section 3.05, below, which shall be due and payable in advance semiannual installments.

(a)     At least thirty (30) days prior to the annual anniversary of the Commencement Date for each year during Tenant's occupancy, or as soon thereafter as reasonably possible, Landlord shall provide to Tenant an estimate of CAM Costs for the then next lease year (the "Notice of Estimated CAM Costs"). On each annual anniversary of the Commencement Date during the Term hereof, Tenant shall pay to Landlord, as Additional Rent, in addition to the Base Rent, and in advance, the semiannual installment equal to Tenant's Pro-Rata Share of the estimate of CAM Costs as set forth in such Notice of Estimated Costs. If Landlord does not provide Tenant with a Notice of Estimated CAM Costs by an annual anniversary of the Commencement Date, Tenant shall continue to pay semiannual installments based on the previous year's payments until Landlord provides Tenant with the new estimate.

(b)     On or before July 1st of each calendar year beginning July 01, 2019, or as soon thereafter as reasonably possible, Landlord shall furnish to Tenant a statement of Landlord's CAM Costs for the previous year (the "Statement of Actual CAM Costs"), reflecting the difference between the Tenant's Pro Rata Share of actual CAM Costs and the actual payments made by Tenant with respect to CAM Costs for the previous year. Within thirty (30) days of the delivery to Tenant of the Statement of Actual CAM Costs for the previous year, (i) in the case of any excess paid by Tenant, such amount shall be credited by Landlord to Rent payments next due, in order of maturity, or, if the Term of this Lease expires prior to the determination of the actual CAM Costs, refunded to Tenant, less the amount of Rent then due, and (ii) in the case of any shortage in payment, Tenant shall pay Landlord, as Additional Rent, within thirty (30) days of notice, an amount equal to such difference. The effect of these reconciliation payments is that Tenant will pay, during the Term of this Lease, Additional Rent equal to Tenant's Pro Rata Share of the actual CAM Costs for the Project.

(c)     Landlord shall keep accurate records of the CAM Costs for a period of three (3) years. Tenant shall have the right, upon not less than twenty (20) business days' notice, which right shall be exercisable not more than once in any lease year, to inspect such records during regular business hours and on normal working days at the office of Landlord excluding, however, any period during which Landlord's annual audit is being conducted at the office of Landlord. The records obtained by Tenant shall be treated as confidential. In no event shall Tenant be permitted to examine Landlord's records or to dispute any statement of CAM Costs unless Tenant has paid and continues to pay all Rent when due. Tenant's failure by Tenant to exercise an audit right or Landlord to dispute any Tenant audit within the specified time period or the failure of either party to otherwise fail to contest or dispute the calculation or allocation of CAM Costs within twelve (12) months of the date any statement for CAM Costs is submitted to Tenant: (i) is deemed a waiver of the applicable audit or dispute right and any right to contest CAM Costs (overcharges or undercharges) for the applicable year; (ii) is deemed accepting of CAM Costs as submitted to and reviewed by Tenant; and (iii) constitutes full release of Landlord by Tenant for any overcharges of CAM Costs more than one (1) year old. Tenant may review only those records of Landlord that are specifically related to CAM Costs. Without limiting the foregoing, Tenant may not review any other leases or Landlord's tax returns or financial statements. In conducting an audit, Tenant must utilize an independent certified public accountant experienced in auditing office building records, which accountant shall not be paid on a contingency basis. The audit shall be conducted in a location determined by Landlord. Tenant will keep confidential all agreements involving Tenant's audit rights hereunder and the results of any audits conducted hereunder. Notwithstanding the foregoing, Tenant shall be permitted to furnish the foregoing information to its attorneys, accountants and auditors to the extent necessary to perform their respective services for Tenant. Tenant may not conduct an audit more often than once each calendar year.

Section 3.05. CAM Costs Allocation.

(a)     CAM Costs will be allocated to Tenant by multiplying the CAM Costs for the Project, as applicable by the applicable Tenant's Pro Rata Share (as set out in 1.01 (E), above).

(b)     For each year of the Term, the CAM Costs will be determined based upon the actual costs incurred during that year. For the initial year of the term of the Lease, the CAM Costs are estimated at $6.31/sf (subject to adjustments as provided in the Lease).

(c)     Landlord and Tenant agree that each provision of this Lease for determining charges, amounts and other Additional Rent payable by Tenant is commercially reasonable and, as to each such charge or amount, constitutes a "method by which the charge is to be computed" for purposes of Section 93.012 of the Texas Property Code.

Section 3.06. CAM Costs Defined. "CAM Costs", as used herein, shall consist of all Operating Expenses of or attributable to the Project and all other expenditures reasonably incurred by Landlord to operate, maintain, manage and repair all facilities in the Project. Tenant acknowledges and agrees that it is

intended that this is a triple net lease that is completely carefree to the Landlord, except as expressly set out in this Lease, and the Tenant shall pay all charges, expenses, costs, and outlays of every nature and kind relating to the Premises including but not limited to, property taxes, insurance and utilities applicable to the Premises and the Building.

The term "Operating Expenses" as used herein shall mean all expenses, costs, and disbursements which Landlord shall incur in connection with Landlord's ownership, operation, maintenance and repair of the Common Areas and the Project, including, but not limited to, the following:

(a)    All supplies, materials and equipment, whether leased or purchased, used in the operation, maintenance or repair of the Project;

(b)    Cost of all utilities serving the Premises or the Common Areas of the Project which is not separately metered or sub-metered, and maintenance of all utility lines, for the Common Areas of the Project;

(c)    Cost of all maintenance, repairs, and service agreements for the Common Areas of the Project;

(d)    Cost of all insurance relating to the Project, including the cost of casualty and liability insurance applicable to the Project;

(e)    All taxes, assessments and governmental charges, whether federal, state, county or municipal, and whether they be by taxing districts or authorities presently taxing the Project or by others, subsequently created or otherwise, and any other taxes and assessments attributable to the Project or its operation;

(f)    Cost of all repairs and general maintenance of the Project (excluding repairs and general maintenance paid by proceeds of insurance or by Tenant or other third parties) including, but not limited to maintenance of the roof (excluding total replacement of the roof), repairing, resealing and restriping the parking lot (excluding total replacement of the parking lot) as Landlord deems necessary;

(g)    Amortization of the cost of installation of capital investment items (i) which are primarily for the purpose of reducing operating costs, (ii) to bring the Building in compliance with changes in Legal Requirements (as defined in Section 21.19 below) applicable to the occupancy and use of the Building or any portion thereof; or (iii) to protect the life or safety of tenants of the Building; all such costs will be amortized over the reasonable useful life of the capital investment items in accordance with generally accepted accounting principles, in no event to extend beyond the reasonable useful life of the Building;

(h)    Administrative costs of the Project, including Landlord's legal and accounting costs applicable to the Project;

(i)    Except as provided in Section (g), above, costs incurred by Landlord to maintain the Project in compliance with changes in Legal Requirements and applicable to the occupancy and use of the Building;

(j)    Management fees involved in the management of the Project – so long as such fees will not exceed reasonable market rates for a single tenant building; and

(k)    Other costs reasonably necessary to operate, repair, upgrade, manage and maintain the Project.

CAM Costs shall not include: 1) electrical charges for any portion of the Building if, and to the extent, metered separately if such metered charges are paid in full by Tenant; 2) capital expenditures (except as provided in Subsection (g), above); 3) leasing commissions and other personnel expenses, costs, disbursements, inducements, and other expenses incurred in leasing, renovating, or improving space related to procuring tenants for the Building; 4) marketing and leasing expenses and fees and related attorney's fees and advertising expenses, 5) costs incurred because Landlord or another tenant violated the terms of any lease; 6) interest on debt (including points and loan fees) or amortization payments on mortgages or deeds of trust or any other debt for borrowed money; 7) items and services for which any tenant reimburses Landlord or pays third parties, or which are not generally available for all tenants in the Building; 8) costs incurred to remedy structural defects in original construction materials or installations; 9) any costs, fines, or penalties incurred because Landlord violated any governmental law, rule or authority; 10) interest and penalties on taxes, except to the extent related to taxes challenged by Landlord in good faith; 11) Landlord's federal income taxes; 12) interest paid to Landlord on capital expenditures; 13) costs for which Landlord is entitled to and receives reimbursement from any source, including insurance proceeds (but other than for CAM Costs hereunder); 14) tort claims to extent not covered by insurance; or 15) depreciation.

ARTICLE 4: SECURITY DEPOSIT

Section 4.01. The Security Deposit shall be the sum of Two Hundred Twelve Thousand Seven Hundred Fourteen and 53/100 Dollars ($212,714.53), which is payable on the execution of this Lease. Upon the occurrence of any Event of Default (as hereinafter defined) by Tenant, Landlord may, from time to time, without prejudice to any other remedy, use the security deposit paid to Landlord by Tenant as herein provided to the extent necessary to make good any arrears of Rent and any other damage, injury, expense or liability caused to Landlord by such Event of Default. Following any such application of the security deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the security deposit to the amount thereof existing prior to such application. Any remaining balance of the security deposit shall be returned by Landlord to Tenant within sixty (60) days after the termination of this Lease Agreement and after Tenant provides written notice to Landlord of Tenant's forwarding address; provided, however, Landlord shall have the right to retain and expend such remaining balance (a) to reimburse Landlord for any and all rentals or other sums due hereunder that have not been paid in full by Tenant and/or (b) for cleaning and repairing the Premises if Tenant shall fail to deliver same at the termination of this Lease Agreement in a neat and clean condition and in as good a condition as existed at the date of possession of same by Tenant, ordinary wear and tear only excepted. Tenant shall not be entitled to any interest on the security deposit. Such security deposit shall not be considered an advance payment of rental or a measure of Landlord's damages in case of an Event of Default by Tenant.

ARTICLE 5: USE AND OCCUPANCY

Section 5.01. Permitted Use. The Premises shall be used solely for the Permitted Use set out in Sections 1.01 (J), and for no other use whatsoever. Tenant shall comply with the rules and regulations of the Building attached as Exhibit "D", as may be amended by Landlord from time to time (the "Building Rules"). Tenant shall also cause its agents, contractors, subcontractors, employees, invitees, and subtenants to comply with all such Building Rules. All such Building Rules are hereby made a part hereof. All reasonable changes and amendments to the Building Rules sent by Landlord to Tenant in writing and conforming to the foregoing standards shall be carried out and observed by Tenant. Landlord hereby reserves all rights necessary to implement and enforce the Building Rules and each and every provision of this Lease. Landlord shall not be liable to Tenant for the failure of any other tenant or other person to comply with the Building Rules. Tenant shall comply with all Legal Requirements regarding the operation of Tenant's business and the use, condition, configuration and occupancy of the Premises. Tenant, within ten (10) days after receipt, shall provide Landlord with copies of any notices it receives regarding a violation or alleged violation of any Legal Requirements.

Section 5.02. Prohibited Uses. Tenant shall not use or permit the use of the Premises for any purpose which is illegal, dangerous to persons or property, deemed to be extra hazardous on account of fire, or permit anything to be done which would in any way increase the rate of fire or liability or any other insurance coverage on the Building and/or its contents or which unreasonably disturbs any other tenants of the Building.

Section 5.03. Nuisance. Tenant covenants and agrees with Landlord to conduct its business and control its agents, employees, invitees and visitors in such manner as not to permit any nuisance, noise, fumes, obnoxious or offensive odors or emissions, cigarette or cigar or pipe smoke, or other actions to interfere with, annoy, unreasonably disturb or endanger any other tenant of Landlord in its operation of the Building. The Building is designated as a "Non-Smoking Environment". Tenant will use its best efforts to cause its employees, agents and invitees to adhere to these rules in furtherance of the goal to make the Building a "Non-Smoking Environment."

Section 5.04. Tenant covenants and agrees to:

(a)     Permit access to the Premises to Landlord at all reasonable times and with reasonable notice except in the case of an emergency for inspection and for such repairs, alterations, additions, installments and removals, including among others, pipes, wires and other apparatus, as Landlord may deem proper or useful for serving the Premises or the Building;

(b)     Comply with such other rules and regulations as Landlord shall, in its good faith, determine to be in the best interests of the Project, and which do not materially and unreasonably interfere with Tenant's use and enjoyment of the Premises in accordance with this Lease;

(c)     Keep the Premises free from termites, insects, vermin and other pests, and not to keep or permit any live animals of any kind in, upon, or about the Premises, and the cost of all pest control shall be the sole responsibility of Tenant; and

(d)     Keep the Premises clean, neat and orderly and shall not permit any dangerous conditions to exist in, or upon, the Premises.

Section 5.05. Compliance with Law. Tenant covenants that during the Lease Term, Tenant will comply, at Tenant's sole cost and expense, irrespective of cost and whether or not foreseeable, with all laws, ordinances, orders, rules, regulations and requirements or all federal, state or municipal governments and appropriate departments, commissions, boards and officers thereof, including but not limited to all of the foregoing pertaining to health, safety, disabled persons and the environment ("Applicable Laws"). Tenant shall not at any time use or occupy the Premises in violation of the certificates of occupancy issued for the Building.

Section 5.06. Enforcement. The Building Rules, and any restriction on uses set out herein, or set out in any other lease agreement between Landlord and any other tenant in the Building, are made and intended solely for the benefit of Landlord, and Landlord shall solely be able to enforce the same. Although Tenant and other tenants of the Building may benefit from such restrictions, Tenant and such other tenants shall have no right to enforce them or to require Landlord to enforce them.

Section 5.07. Entry by Landlord. Tenant covenants and agrees with Landlord to permit Landlord or its agents or representatives to enter into and upon any part of the Premises upon reasonable notice (and in emergencies at all times) to inspect the same, or to show the Premises to prospective purchasers, mortgagees, or insurers, to clean or make repairs, alterations or additions thereto, as Landlord may deem necessary or desirable and Tenant shall not be entitled to any abatement or reduction of rent by reason thereof.

ARTICLE 6: UTILITIES AND SERVICE

Section 6.01. Basic Services Provided by Landlord.

(a)     Landlord, as a CAM Cost hereunder, agrees to provide maintenance and repair of the Project as described in Section 7.03, below, and such other services as Landlord reasonably determines are necessary or appropriate for the Project.

(b)     Landlord reserves the right, with notice to Tenant other than in the case of emergency, to interrupt services as reasonably necessary to make repairs, alterations, upgrades, or changes to any Common Systems (as defined in Section 7.03(d), below). Landlord's failure to furnish, or any interruption or termination of, services due to the application of Legal Requirements, the failure of any Common System (as defined in Section 7.03(d), below), the performance of repairs, improvements or alterations, or the occurrence of any event or cause beyond the reasonable control of Landlord (a "Service Failure"), shall not render Landlord liable to Tenant, constitute a constructive eviction of Tenant, give rise to an abatement of Rent, nor relieve Tenant from the obligation to fulfill any covenant or agreement. In no event, however, shall Landlord be liable to Tenant for any loss or damage, including the theft of Tenant's Property, arising out of or in connection with the failure of any security services, personnel or equipment.

Section 6.02. Electrical Services. The house meter for electric service to the common areas of the Project shall be paid by Landlord and included as an Operating Expense. Tenant shall contract directly with City Public Service for the electric service to the Building, which shall be paid for by Tenant by a separate charge payable solely by Tenant directly to the electric provider.

Section 6.03. Telecommunications Providers. Notwithstanding anything else contained in this Lease to the contrary, Landlord shall not be liable nor have any responsibility for the interruption of any telecommunication services provided to the Premises, and any such interruption(s) shall not in any way be construed as a constructive eviction of Tenant in any manner whatsoever. In the event Tenant desires to install any satellite dishes or any other equipment within the Premises or on the roof, this shall be subject to Landlord's prior written approval, must be fully screened and not be visible from the Common Areas or any public right-of-way adjoining the Land. Tenant may not access the roof without the prior written consent of Landlord, and any roof cuts shall be made solely by Landlord's roofing contractor so as not to void the general warranty on the roof.

Section 6.03.     Janitorial Services. Tenant shall at Tenant's sole cost and expense provide all janitorial services to the Premises as required by Tenant. If commercially reasonable, Tenant shall cause its janitorial service company to maintain a) commercial general liability insurance, with limits of not less than $2 million per occurrence (the portion of such coverage over $1 million may be provided under an umbrella or excess liability policy), for personal injury, bodily injury or death or property damage or destruction, arising out of or relating to the work at or in connection with the Premises, and b) statutory worker's compensation and employer's liability coverage with limits of at least $500,000 for each accident. Landlord shall be named as an additional insured on such policies.

ARTICLE 7: IMPROVEMENTS, ALTERATIONS, REPAIRS AND MAINTENANCE

7.01.  Construction.

(a)     Landlord's Construction Obligation. Landlord's construction obligations under this Lease are as set forth in the Work Letter attached as Exhibit "C".

(b)     Tenant's Construction Obligation. All other construction of improvements other than expressly provided to be performed by Landlord in the Work Letter for the occupancy of the Premises, and the cost of such construction shall be borne solely by Tenant in accordance with Tenant's Work letter attached hereto and made a part hereof as Exhibit "C". Upon Landlord and Tenant's approval in writing of the Final Working Drawings of Tenant's improvements, Tenant shall promptly commence work on such improvements and shall thereafter diligently pursue the completion thereof. Tenant shall be solely responsible for obtaining all permits necessary to carry on the work, and any asbestos survey. Tenant shall be solely responsible for compliance with the Americans with Disabilities Act (Public Law 101-336 (July 26, 1990) and the Texas Architectural Barriers Act (Article 9102, Tex. Rev. Civ. St. (1991)), as each may be amended from time to time within the Premises. Tenant acknowledges and accepts (1) the Premises as suitable for the purposes for which they are leased and (2) the Property and every part and appurtenance thereof as being in good and satisfactory condition. Notwithstanding any provision of Landlord's and Tenant's Work Letter or otherwise provided in this Lease, Tenant acknowledges and agrees that Landlord has not undertaken to perform any modification, alteration or improvements to the Premises other than the Landlord's Work in accordance with the Work Letter.

Section 7.02. Alteration of Building. For purposes of this Lease, "Leasehold Alterations" are any modifications to the improvements from and after the date of Substantial Completion.

(a)     Leasehold Alterations by Landlord. Landlord hereby reserves the right and at all times shall have the right to repair, change, redecorate, alter, improve, modify, renovate, enclose or make additions to any part of the Project (including, without limitation, the Common Areas and structural elements and load bearing elements within the Premises) and to enclose and/or change the arrangement and/or location of driveways or parking areas or landscaping or sidewalks or other Common Areas, all without being held guilty of an actual or constructive eviction of Tenant or breach of the implied warranty of suitability and without an abatement of Rent (the "Reserved Right").

(b)     Leasehold Alterations by Tenant. Tenant shall not alter any portion of the Premises, without the prior written consent of Landlord. Any Leasehold Alterations within Tenant's Premises, may only be made by Tenant, in each case: (i) with the prior written consent of Landlord, which consent will not be unreasonably withheld or delayed if the alterations comply with Legal Requirements, could not reasonably be expected to adversely affect the Common Systems, are not visible from the exterior of the Premises, are in keeping with the improvements made to comparable buildings and will not reduce the value of the Leasehold Improvements; (ii) at the sole cost and expense of Tenant; (iii) completed by a contractor subject to the written approval of Landlord, in its sole discretion, and such contractor shall purchase, at its expense or at the expense of Tenant, and maintain for the entire duration of such contractor's work at the Premises or the Building, insurance coverage for the particular work as Landlord may reasonably require, and shall, at least ten (10) days prior to commencement of any work at the Premises or the Building, provide a Certificate of Insurance in form acceptable to Landlord, evidencing the existence of such insurance coverage; and (iv) in conformance with all Legal Requirements, including the requirements of applicable building, plumbing, and electrical codes and the requirements of any authority having jurisdiction over, or with respect to, such work.

Section 7.03. Maintenance and Repairs by Landlord.

(a)     Landlord covenants with Tenant to keep the Common Areas in a neat, clean and orderly condition, and shall repair any damage to the Common Areas or Commons Systems (the cost of all of which shall be included as CAM Costs). The manner in which the Common Areas are maintained and expenditures made in connection therewith shall be in a commercially reasonable manner. Landlord may temporarily close parts of the Common Areas for such periods of time as may be necessary for (i) repairs or alterations in or to the Common Areas or to any utility-type facilities; (ii) preventing the public from obtaining prescriptive rights in or to the Common Areas; (iii) emergency or added safety reasons; or (iv) doing and performing such other acts as in the use of good business judgment Landlord shall determine to be appropriate for the Project; provided, however, that Landlord shall use reasonable efforts not to materially and unreasonably interfere with or disrupt Tenant's business or access to or the visibility of the Premises;

(b)     Subject to the provisions hereof, Landlord covenants with Tenant to repair, as expeditiously as reasonably possible, the roof, or Common Systems, the cost of all of which shall be a CAM Cost hereunder. Notwithstanding the foregoing, for the initial two (2) years of the term of this Lease, Landlord shall, at its sole cost and expense, maintain, replace (in the event that the particular HVAC unit is beyond repair) and repair the HVAC system servicing the Premises, within reasonable load tolerances necessary for a tenant, but specifically excluding the replacement of any filters and any periodic service contracts for the HVAC system, which cost shall be included as a CAM Cost hereunder, and further provided that Landlord shall not be required to make repairs necessitated by reason of the negligence of the Tenant or any claiming under the Tenant, or by reason of the failure of the Tenant to perform or observe

any conditions or agreements in this Lease contained, or caused by theft or vandalism to the units, or by alterations, or improvements made by the Tenant or anyone claiming under the Tenant. Subject to the foregoing provisions, Landlord shall not have any duty to repair or maintain any other portion of the Premises, including plumbing, ventilating, electrical, or other mechanical or electromotive installations It is understood and agreed that the Landlord shall be under no obligation to make any repairs, alterations, renewals, replacements or improvements to and upon the Premises or the mechanical equipment exclusively serving the Premises at any time except as expressly provided in this Lease. Landlord shall not be required to repair any damage occasioned by any act or negligence of Tenant, its agents, employees, subtenants, licensees and concessionaires (including, but not limited to, roof leaks resulting from Tenant's installation of air conditioning equipment or any other roof penetration), except and to the extent such damage is covered by the insurance required to be carried by Landlord under this Lease (provided, in any event, Tenant shall be responsible for the payment of any deductible applicable to the insurance coverage for such damage). Landlord shall not be liable to Tenant for any damage to trade fixtures or personal property of Tenant in the Premises caused by water leakage from roof, water lines, sprinkler or heating and cooling equipment, UNLESS THE SAME IS CAUSED BY OR RESULTS FROM THE GROSS NEGLIGENCE, BUT NOT ORDINARY NEGLIGENCE, OR WILLFUL MISCONDUCT OF LANDLORD. Tenant shall also repair any damage in connection with any burglary, robbery, or vandalism of, or forcible entry into the Premises, or any other criminal activity associated with the Premises, at Tenant's sole cost and expense.

(c)     Landlord will, at all times, maintain the Common Areas of the Project in compliance with the Legal Requirements, excepting only to the extent any non-compliance with Legal Requirements is a result of an act or failure to act by Tenant, or is the result of Tenant's specific use of the Premises, in which case the expense thereof will be charged to Tenant as Additional Rent hereunder.

(d)     For purposes of this Lease, "Common Systems" shall mean (i) any system or installation of the Building or any component or portion thereof, which serves or exists for the benefit in common by Tenant and all other tenants in the Building, including but not limited to, plumbing, electrical, heating, ventilating and air conditioning, fire protection and fire alert or safety systems, building maintenance, stairs, plazas, sidewalks, landscaping, public washrooms, mechanical, electrical or telephone closets and (ii) structural components of the Building, such as foundation, exterior walls and mullions, columns, beams, and shafts.

Section 7.04. Repairs by Tenant. Except as otherwise expressly provided herein, Tenant covenants and agrees with Landlord, at Tenant's expense, to maintain the Premises (including all Leasehold Improvements or Alterations, plumbing, electrical {including light bulbs and ballasts} and HVAC), doors or door frames, in good repair, reasonable wear and tear excepted, and to repair or replace any damage or injury done to the Premises or Project or any part thereof (including the Leasehold Improvements, furniture, fixtures or equipment of other tenants in the Building), caused by Tenant or Tenant's agents, employees, invitees, or visitors; provided that Landlord shall be responsible for the cost of all repairs and maintenance to the HVAC system during the initial two years of the term of this Lease as set forth above (except for replacement filters and service contracts which shall be a CAM Cost). Following the initial two years of the term of this Lease, Tenant agrees, unless Landlord has elected to provide this service as part of the CAM, to contract for HVAC maintenance services for all HVAC systems serving the Premises with a firm acceptable to Landlord in Landlord's reasonable discretion. Any repairs shall be performed in conformance with the requirements of Section 7.02 and 7.03, above. Tenant shall be solely responsible for any water damage resulting from any plumbing leak or overflow from any plumbing facilities located within the Premises which damages the Premises or the premises or furniture, fixtures or equipment of other tenants in the Building, UNLESS THE SAME IS CAUSED BY OR RESULTS FROM THE GROSS NEGLIGENCE, BUT NOT ORDINARY NEGLIGENCE, OR WILLFUL MISCONDUCT OF LANDLORD. All Tenant repairs shall restore the Premises to the same or as good a condition as existed prior to such injury or damage. If Tenant fails to make such repairs or replacement within thirty (30) days after receipt of written notice from Landlord, or sooner if required in the case of emergency, it shall be in Default hereunder, and Landlord may, at its option, make such repairs or replacements, and Tenant shall repay the reasonable cost thereof to Landlord as Additional Rent within ten (10) days after invoice therefore, and upon such payment such Default will cease. Notwithstanding the foregoing: (i) Tenant shall have no obligation for repair of any casualty caused by Tenant or its employees, agents or invitees to the extent covered by insurance carried by Landlord; and (ii) Tenant shall not be required to make any repair to modification of, or addition to the Common Systems or otherwise to the Project (other than within the Premises) except to the extent caused by Tenant or its employees, agents or invitees.

Section 7.05. Signage. Tenant accepts the existing signage in its current "AS IS" condition, and has no general right to change or move the existing signage; provided however, that Landlord shall remove or 'wipe' any existing or previous tenant's exterior signage prior to the Commencement Date. Other than Tenant's right to install reasonable signage on the exterior of the Premises, no additional signs of any kind or nature, symbol or identifying mark shall be put on the Building, in the halls, staircases, entrances, parking areas or upon the doors or walls, whether plate glass or otherwise, of the Premises, or exterior of the Building without prior written approval of Landlord; such approval will not be unreasonably withheld, delayed or conditioned. All signs or lettering shall conform in all respects to the sign and/or lettering criteria

established by Landlord, and all applicable protective covenants, governmental laws, codes, ordinances, rules, and regulations.

Section 7.06. Care of the Premises. Tenant covenants and agrees with Landlord not to commit or allow any waste or damage to be committed on any portion of the Premises, and at the termination of this Lease, by lapse of time or otherwise, to deliver up the Premises (including all Leasehold Improvements or Alterations therein) to Landlord in as good condition as at the date of the commencement of the Term of this Lease, ordinary wear and tear excepted.

Section 7.07. Ownership of Alterations, Additions and Improvements. Any and all Leasehold Improvements or Leasehold Alterations, when made, shall at once become the property of Landlord and shall be surrendered to Landlord upon termination of this Lease by lapse of time or otherwise.

Section 7.08. Security Measures Installed by Tenant. Tenant may install security measures in the Premises with the prior written consent of Landlord, which consent will not be unreasonably withheld; however, approval of such security measures will not be a representation or warranty, express or implied, as to the effectiveness of any such security measures. Tenant will keep and maintain any such security measures in good working order, condition and repair and will pay all costs and expenses for installation, maintenance, repair and replacement thereof; and upon expiration or earlier termination of this Lease, Tenant at its expense will remove all such security measures in the manner set forth in Section 2.07, above; provided however, that any security measures that existed at the Effective Date may be excepted from this requirement. Tenant releases Landlord from and indemnifies Landlord Parties (as defined in Section 20.02, below) against any claims or losses arising out of or resulting from the presence or absence or malfunction of any such security measures.

Section 7.09. Trash Pick-Up. Landlord shall obtain a common trash dumpster for the Building, the cost of which will be part of CAM Costs. Tenant shall keep the Premises free from filth, danger of fire or any nuisance, and shall comply with all city ordinances, state laws and regulations applicable thereto, and protect and defend Landlord from all charges for such.

## ARTICLE 8: PARKING

Section 8.01. Parking. All parking areas shall be under the control of Landlord, and Tenant agrees that Tenant, its agents, employees and invitees shall conform to such reasonable written parking regulations, conditions and provisions as may from time to time be prescribed by Landlord. TENANT, AS A MATERIAL PART OF THE CONSIDERATION TO BE RENDERED TO LANDLORD UNDER THIS LEASE, HEREBY WAIVES ALL CLAIMS AGAINST LANDLORD FOR DAMAGES TO PROPERTY OR INJURIES TO PERSONS ARISING FROM OR OCCASIONED BY USE OF THE PARKING AREAS, EXCEPT TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE (BUT NOT ORDINARY NEGLIGENCE) OR WILLFUL MISCONDUCT OF LANDLORD, ITS EMPLOYEES, OR ITS AGENTS. LANDLORD SHALL NOT BE LIABLE TO TENANT FOR ANY DAMAGES BY OR FROM ANY ACT OR NEGLIGENCE OF ANY OTHER OCCUPANT OF THE BUILDING OR BY ANY OWNER OR OCCUPANT OF ADJOINING OR CONTIGUOUS PROPERTY ON ANY ACT OR NEGLIGENCE OF ANY PERSON UPON OR IN SUCH PARKING AREAS, EXCEPT TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE (BUT NOT ORDINARY NEGLIGENCE) OR WILLFUL MISCONDUCT OF LANDLORD, ITS EMPLOYEES, OR ITS AGENTS. As between Landlord and Tenant, Tenant shall be responsible for the acts, omissions, negligence or willful misconduct of its employees, agents and invitees in the parking areas.

## ARTICLE 9: TAXES

Section 9.01. Landlord's Obligations. Landlord shall pay all ad valorem taxes and assessments against the Project, and all such taxes shall be included in CAM Costs in accordance with the terms hereof.

Section 9.02. Tenant's Taxes. Tenant shall pay all ad valorem taxes and assessments or other taxes, if any, assessed against Tenant's personal property in the Premises or any improvements (other than Tenant's Improvements) constructed in the Premises by or on behalf of Tenant.

Section 9.03. Challenge to Ad Valorem Taxes. Landlord shall take commercially reasonable steps to contest taxes levied against the Premises or the Project for the taxes for the year 2018, and in the event of any future unreasonable increases by the appraisal district. The cost and expense of contesting the taxes, including any fees or percentages charged by property tax reduction consultants shall be included as an Operating Expense / CAM Cost which shall be passed through to the Tenant. Landlord makes no representations or warranties regarding its ability to successfully contest and reduce the taxes.

Section 9.04. Additional Taxes. If and to the extent that legislation is enacted which makes the Rent, or any portion thereof, subject to any sales tax, rent tax, or any other tax based on the rental income of Landlord or otherwise, such taxes shall be the responsibility of Tenant.

ARTICLE 10: INSURANCE

Section 10.01. Tenant's Insurance. Tenant shall purchase, at its own expense, maintain during the entire Term of this Lease and any extension thereof, insurance coverage as follows:

(a) Property Insurance. Property insurance shall cover risks of direct physical loss, including, but not limited to, loss occasioned by fire, extended coverage perils, leakage or overflow of domestic water appliances and theft, covering the replacement cost of all of the personal property, fixtures and all leasehold improvements in or about the Premises (herein "Tenant's Personal Property"). This insurance must be written on an "all risk" or "special form" policy form and must include an agreed-amount endorsement for no less than one hundred percent (100%) of the full replacement cost of the Leasehold Improvements in the Premises (new, without deduction or depreciation), must be written in amounts of coverage that meet any coinsurance requirements of the policy or policies, and must include vandalism and malicious mischief coverage and sprinkler coverage (if applicable). This policy must be endorsed and the Certificate of Insurance must show:

- Waiver of Subrogation in favor of Landlord consistent with Article 11, below.
- Additional Insured Endorsement in favor of Landlord and Landlord's manager of the Building.

(b) Commercial General Liability. Commercial general liability insurance on an occurrence form providing for bodily injury, property damage, independent contractors, products liability and completed operations, broad form contractual liability, broad form property damage and explosion, collapse and underground hazards, including liability coverage for Tenant's invitees for any act or omission which may occur by or to any invitee in the Project, with limits of liability of:

- $2,000,000 General Aggregate (per location)
- $1,000,000 Personal and Advertising Injury Limit
- $2,000,000 Each Occurrence
- $ 50,000 Fire Damage
- $ 5,000 Medical Expense

This policy must be endorsed and the Certificate of Insurance must show:

- Waiver of Subrogation in favor of Landlord consistent with Article 11, below.
- Additional Insured Endorsement in favor of Landlord and Landlord's manager of the Building.

(c) Worker's Compensation. Statutory worker's compensation and employers liability coverage at limits of:

- $500,000 Each Accident
- $500,000 Each Employee by Disease
- $500,000 Policy Limit by Disease

The insurance policies required by this Section 10.01 shall:

(i) Be issued by insurance companies licensed to do business in the State of Texas, with general policyholder's ratings of at least A and a financial rating of at least XI in the most current "Best Key Rating Guide" available on the date hereof; if the "Best's" ratings are changed or discontinued, the parties shall agree to an equivalent method of rating insurance companies;

(ii) Provide that the insurance may not be cancelled or not renewed or materially reduced in the scope or amount of coverage unless thirty (30) days' prior written notice is given to Landlord;

(iii) Have deductibles not greater than $10,000 (or such greater amount with the prior written consent of Landlord, which consent will not be unreasonably withheld or delayed);

(iv) Be primary insurance for all claims under such insurance and must provide that any insurance carried by Landlord or the Building's manager is strictly excess, secondary and noncontributing with any insurance carried by Tenant;

(v) Be maintained during the entire Term and any extension thereof; and

(vi) Contain a clause that such policy and the coverage evidenced thereby shall be "primary" with respect to any policies carried by Landlord, and that any coverage carried by Landlord shall be excess insurance.

By the Commencement Date and at least five (5) business days prior to each renewal of its insurance policies, Tenant shall deliver the appropriate certificates of insurance to Landlord. The certificate shall specify amounts, types of coverage, all additional insured endorsements, all loss payee endorsements, all mortgagee clauses, and all waivers of subrogation, and the insurance criteria listed in this Section 10.01. The policies shall be renewed or replaced and maintained by the Tenant as herein provided.

In the event Tenant fails to procure, maintain, and/or pay for the insurance required by this Lease, at the times and for the duration specified in this Lease, Landlord shall have the right (but not the obligation), at any time and from time to time, and without notice, to procure such insurance and/or pay the premiums for such insurance. In the event that Landlord procures such insurance or pays such premiums, Tenant shall repay Landlord, immediately upon demand by Landlord, as Additional Rent, all sums so paid by Landlord together with interest thereon and any costs or expenses incurred by Landlord in connection therewith, without prejudice to any other rights and remedies of the Landlord under this Lease, but Tenant will nevertheless be in default hereunder (such failure to be deemed an "Event of Default") until Landlord is fully reimbursed for all such costs.

Section 10.02. Blanket Policy. Any insurance required of Tenant under this Lease may be furnished by Tenant under a "Blanket Policy", with the written consent of Landlord, which consent will not be unreasonably withheld or delayed. Such Blanket Policy shall contain an endorsement that names Landlord as an additional insured, references the Premises, guarantees a minimum limit available for the Premises equal to the insurance amounts required in this Lease, and otherwise satisfies the Tenant insurance requirements as provided herein.

Section 10.03. Landlord's Insurance. Landlord shall insure the Building in such amounts as Landlord may deem reasonable for comparable office buildings, and the cost of such insurance shall be a CAM Cost hereunder. Landlord does not undertake any responsibility to insure any Leasehold Improvements.

## ARTICLE 11: WAIVER OF SUBROGATION RIGHTS

Anything in this Lease to the contrary notwithstanding:

(a) To the extent that any claim herein described is or would be covered by any insurance policies carried or required to be carried by Landlord hereunder, and to the fullest extent permitted by applicable law, Landlord hereby waives any and all claims, and releases Tenant Parties (as hereinafter defined) from any and all liability or responsibility to Landlord or anyone claiming through or under Landlord, by way of subrogation or otherwise, for any (i) loss or damage to any building, structure, or other tangible property, (ii) liability for personal injury or other tortious conduct or (iii) losses under workers' compensation laws and benefits, even though such loss, damages, or liability might be caused by the negligence of such party, its agents, contractors, invitees, or employees; and

(b) To the extent that any claim herein described is or would be covered by any insurance policies carried or required to be carried by Tenant hereunder, and to the fullest extent permitted by applicable law, Tenant hereby waives any and all claims, and releases Landlord Parties (as hereinafter defined), and any other tenant which is leasing space in the Building, from any and all liability or responsibility to Tenant or anyone claiming through or under Tenant, by way of subrogation or otherwise, for any (i) loss or damage to any building, structure, or other tangible property, (ii) liability for personal injury or other tortious conduct, or (iii) losses under workers' compensation laws and benefits, even though such loss, damages, or liability might be caused by the negligence of such party, its agents, contractors, invitees, or employees.

For purposes of this Article 11, "Landlord Parties" means (i) Landlord, its shareholders, partners, affiliated companies, (ii) Landlord's lenders, (iii) any manager of the Building, and (iv) their respective officers, directors, employees, agents, successors and assigns; and "Tenant Parties" means (i) Tenant, its shareholders, partners, and its parent, and/or subsidiary and affiliated companies, and (ii) their respective officers, directors, employees, agents, successors and assigns.

## ARTICLE 12: ASSIGNMENT AND SUBLETTING

Section 12.01. Assignment or Subletting by Tenant. Other than Turner Logic, LLC, Tenant shall not, without the prior written consent of Landlord (which Landlord may grant or withhold in its sole discretion), (a) assign, mortgage, pledge, encumber, or in any manner transfer this Lease or any estate or interest therein, (b) permit any assignment of this Lease or any estate or interest therein by operation of law, (c) sublease the Premises or any part thereof, (d) grant any license, concession or other right of occupancy on any portion of the Premises, or (e) permit the use of the Premises by any parties other than Tenant, its agents and employees. If Tenant is a corporation or other legal entity, any transfer or attempted transfer of all or any part of the shares or other evidence of ownership of that entity which results in a change in actual

control of that entity, shall be deemed to be an attempt to assign this Lease. Consent by Landlord, if provided, to one or more assignments or subletting shall not operate as a waiver of Landlord's rights as to any subsequent assignment or subletting. No assignee or sublessee of the Premises or any portion thereof may assign or sublet the Premises or any portion thereof. Notwithstanding any assignment or subletting, Tenant shall at all times remain fully responsible and liable for the payment of the Rent and for compliance with all of Tenant's obligations under this Lease. If an Event of Default should occur while the Premises or any part thereof are then assigned or sublet, Landlord, in addition to any other remedies provided herein or by law, may at its option collect directly from such assignee or subtenant all rents becoming due to Tenant under such assignment or sublease and apply such rent against any sums due to Landlord by Tenant hereunder. Tenant hereby authorizes and directs any such assignee and subtenant to make such payments of rent directly to Landlord upon receipt of notice from Landlord. Consent by Landlord to one or more assignments or sublettings shall not operate as a waiver of Landlord's right as to any subsequent assignments and sublettings. No direct collection by Landlord from any such assignee or subtenant shall be construed to constitute a waiver or release of Tenant, or any guarantor of Tenant, from the further performance of its obligations hereunder. Receipt by Landlord of Rent from any assignee, subtenant, or occupant of the Premises shall not be deemed (i) a waiver of the covenant contained in this Lease against assignment and subletting, or (ii) a release of Tenant under this Lease. Any assignment made by Tenant shall be in recordable form and shall contain a covenant of assumption by the assignee running to Landlord. All reasonable legal fees and expenses incurred by Landlord in connection with any assignment or sublease proposed by Tenant will be the responsibility of Tenant and will be paid by Tenant within five (5) days of receipt of an invoice from Landlord. Any attempted assignment, sublease, mortgage or encumbrance by Tenant in violation of the terms and covenants of this Section shall be void.

Section 12.02. Transfers by Landlord. Landlord shall have the right to transfer and assign, in whole or in part, all its rights and obligations hereunder and in the Building and property referred to herein, and in such event Landlord shall be released from any further obligations hereunder, and Tenant agrees to attorn (recognize) and be bound to any such successor in interest of Landlord for the performance of such obligations.

ARTICLE 13: SUBORDINATION

This Lease is subject and subordinate to any mortgage or deed of trust which may now or hereafter encumber the Project. This clause shall be self operative and no further instrument of subordination need be required by any mortgagee. In confirmation of such subordination, Tenant shall, without charge, within ten (10) business days after request from Landlord execute any certificate or instrument evidencing such subordination in such form as Landlord may reasonably require. In the event of the enforcement by the trustee or the beneficiary under any such mortgage or deed of trust of the remedies provided for by law or by such mortgage or deed of trust, in addition to all other rights and remedies otherwise available to any person or party succeeding to the interest of Landlord as a result of such enforcement, Tenant will, upon request, automatically become the tenant of such successor in interest without change in the terms or provisions of this Lease.

ARTICLE 14: LIENS

Section 14.01. Mechanic's and Materialman's Liens. Tenant shall not permit mechanic's or other liens to be placed upon the Project, Premises or Tenant's leasehold interest in connection with any work or service done or purportedly done by or for benefit of Tenant. If a lien is so placed, Tenant shall, within 10 days of notice from Landlord of the filing of the lien, fully discharge the lien by settling the claim which resulted in the lien or by bonding or insuring over the lien in the manner prescribed by the applicable lien law. If Tenant fails to discharge the lien, then, in addition to any other right or remedy of Landlord, Landlord may bond or insure over the lien or otherwise discharge the lien. Tenant shall reimburse Landlord for any amount paid by Landlord to bond or insure over the lien or discharge the lien, including, without limitation, reasonable attorneys' fees (if and to the extent permitted by law) within ten (10) days after receipt of notice or demand from Landlord. Nothing in this Lease shall be deemed to be, or construed in any way to constitute, the consent or request of Landlord, express or implied, by inference or otherwise, to any person, firm or corporation for the performance of any labor or the furnishing of any materials for any construction, rebuilding, alteration or repair of or to the Premises or any part thereof, nor as giving Tenant any right, power or authority to contract or permit the rendering of any services or the furnishing of any materials, which might in any way give rise to the right to file any lien against Landlord's interest in the Premises. Landlord shall have the right to post and keep posted at all reasonable times on the Premises any notice which Landlord deem it advisable to post for the protection of Landlord and the Premises from any such lien.

ARTICLE 15: ESTOPPEL CERTIFICATE

Tenant shall, within ten (10) business days following written request by Landlord and without charge, execute, acknowledge, and deliver to Landlord an Estoppel Certificate in such form as may be reasonably required by Landlord, such Certificate to be executed by Tenant certifying: (i) that this Lease is

unmodified and in full effect if such is the case (or, if there have been modifications, that this Lease is in full effect as modified, and setting forth such modification), (ii) the Commencement Date of this Lease, (iii) the Expiration Date of this Lease, (iv) the dates to which the Rent has been paid, and (v) either stating that to the knowledge of Tenant no default exists hereunder up to the date of such certificate or specifying each such default of which Tenant may have knowledge and such other matters as may be reasonably requested by Landlord; it being intended that any such statement by Tenant may be relied upon by any prospective purchaser or current or prospective mortgagee of the Project.

## ARTICLE 16: PURCHASE OPTION

Section 16.1   Provided that an Event of Default under this Lease shall not then exist, Tenant (but no assignee or subtenant of Tenant herein) shall have the right to purchase all, but not less than all, of the Project upon giving notice in writing to Landlord (the "Purchase Notice") at any time prior to January 31, 2020, with time being of the essence. If Tenant exercises this Option to Purchase, then Tenant shall purchase and Landlord shall sell the Project upon the terms and conditions set forth on the Terms for Sale and Purchase attached hereto as Exhibit "B" (the "Purchase Terms"). Upon the closing of title pursuant to the above-mentioned Purchase Terms, this Lease shall terminate and end. The purchase price for the Project ("Purchase Price") shall be $4,358,960.00. If Tenant fails to timely exercise this purchase option, the foregoing purchase option shall be null and void and of no further force or effect. Furthermore, if this Lease shall be terminated following an Event of Default, or otherwise, the foregoing purchase option shall be null and void and of no further force or effect.

## ARTICLE 17: CASUALTY LOSS

### Section 17.01. Casualty Loss

(a)   If all or any part of the Premises is damaged by fire or other casualty (herein "Casualty Loss"), Tenant shall immediately notify Landlord in writing. During any period of time that all or a material portion of the Premises is rendered untenantable as a result of fire or other casualty, provided the rent loss is covered by insurance actually carried by Landlord, so long as the Casualty Loss is not caused by the negligence of Tenant, any Tenant Parties, or Tenant's invitees, the Rent shall abate for the portion of the Premises that is untenantable and not used by Tenant. Landlord shall have the right to terminate this Lease if: (1) the Building shall be damaged so that, in Landlord's reasonable judgment, substantial alteration or reconstruction of the Building shall be required (whether or not the Premises has been damaged); (2) Landlord is not permitted by Applicable Law to rebuild the Building in substantially the same form as existed before the fire or casualty; (3) the Premises have been materially damaged and there is less than 18 months of the Term remaining on the date of the casualty; (4) any Mortgagee requires that the insurance proceeds be applied to the payment of the mortgage debt; or (5) a material uninsured loss to the Building occurs. Landlord may exercise its right to terminate this Lease by notifying Tenant in writing within 60 days after the date of the casualty. If Landlord does not terminate this Lease, Landlord shall commence and proceed with reasonable diligence to repair and restore the Building and the Leasehold Improvements (excluding any Leasehold Alterations that were performed by Tenant in violation of this Lease, and in no event shall Landlord be required to rebuild, repair or replace any part of the furniture, equipment, fixtures, inventory, supplies or any other personalty or any other improvements which may have been placed by Tenant within the Premises). However, in no event shall Landlord be required to expend sums in excess of the insurance proceeds received by Landlord. Landlord shall not be liable for any loss or damage to Tenant's personal property or to the business of Tenant resulting in any way from the fire or other casualty or from the repair and restoration of the damage. Landlord and Tenant hereby waive the provisions of any Applicable Law relating to the matters addressed in this Section, and agree that their respective rights for damage to or destruction of the Premises shall be those specifically provided in this Lease.

(b)   If all or any portion of the Premises shall be made untenantable by fire or other casualty, Landlord shall, with reasonable promptness, cause an architect or general contractor selected by Landlord to provide Landlord and Tenant with a written estimate of the amount of time required to substantially complete the repair and restoration of the Premises and make the Premises tenantable again, using standard working methods ("Completion Estimate"). If the Completion Estimate indicates that the Premises cannot be made tenantable within 180 days from the date the repair and restoration is begun, then, notwithstanding anything in this section to the contrary, either party shall have the right to terminate this Lease by giving written notice to the other of such election within 10 days after receipt of the Completion Estimate. Tenant, however, shall not have the right to terminate this Lease if an Event of Default by Tenant is then occurring hereunder or if the fire or casualty was caused by the negligence or intentional misconduct of Tenant, Tenant Parties or any of Tenant's transferees, contractors or licensees, unless Landlord fails to commence and diligently pursue the repair and restoration of the Premises as herein provided.

(c)   To the extent the casualty loss is not covered by insurance actually carried by Landlord, Tenant shall be responsible for the expense of any such Casualty Loss caused by the negligence or willful misconduct of Tenant, its employees, agents or invitees and proceeds payable to Tenant to repair

or restore any leasehold improvements in the Premises will be assigned and paid to Landlord to be applied to the repair and restoration of such improvements, irrespective of the cause of such casualty.

Section 17.02. Damage to Tenant's Property. Notwithstanding anything herein to the contrary, Landlord has no responsibility or obligation to repair or restore damage to Tenant's trade fixtures, furniture, equipment, or other property, or any Tenant improvements unless such repairs or restoration are covered losses under insurance policies held by Landlord, but not under policies held by Tenant.

Section 17.03. Effect of Termination. If this Lease terminates under this Article 17, all Rents (including prepaid Rent and Tenant's Additional Rent) shall be prorated through the date of termination, and appropriate refunds shall be made to Tenant or Rent then due shall be paid to Landlord, as the case may be.

Section 17.04. Miscellaneous. Excepting only in the case of an intentional act of Landlord which causes a material adverse effect to Tenant's operations in the Premises, Landlord shall not be liable for any inconvenience or annoyance to Tenant or injury to the business of Tenant resulting in any way from such damage or the repair thereof, except Landlord shall allow Tenant a fair diminution of Rent during the time and to the extent the Premises are unfit for occupancy, as herein provided.

## ARTICLE 18: CONDEMNATION

If the whole or substantially the whole of the Building or Project or Premises should be taken for any public or quasi public use under any governmental law, ordinance, or regulation, or by right of eminent domain or should be sold to the condemning authority in lieu of condemnation, then this Lease shall terminate as of the date when physical possession of the Building or Project or the Premises is taken by the condemning authority. If less than the whole or substantially the whole of the Building, Project or Premises is thus taken or sold, but Tenant's use and enjoyment of the Premises is significantly impaired, then Tenant may terminate this Lease by giving written notice thereof to Landlord within sixty (60) days after the right of election accrues, in which event this Lease shall terminate as of the date when physical possession of such portion of the Building or Premises is taken by the condemning authority. If upon any such taking or sale of less than the whole or substantially the whole of the Building, Project or Premises, this Lease shall not be thus terminated, the Rent payable hereunder shall be diminished by an amount representing that part of the Base Rent as shall properly be allocable to the portion of the Building attributable to the Premises which was so taken or sold and Landlord shall, at Landlord's sole expense, promptly following such taking, restore and reconstruct the Building, Project or the Premises to substantially their former condition to the extent that the same, in Landlord's judgment, may be feasible, but such work shall not exceed the scope of the work done by Landlord in originally constructing the Building and installing building standard items in the Premises, nor shall Landlord in any event be required to spend for such work an amount in excess of the amount received by Landlord as compensation awarded upon a taking of any part or all of the Building or the Premises.

## ARTICLE 19: EVENTS OF DEFAULT

Section 19.01. Definition of Event of Default and Default. The following events shall be deemed to be "Events of Default" by Tenant under this Lease and Tenant shall be in "Default" as herein provided:

(a)     It shall be an Event of Default if Tenant shall fail to pay any installment of Rent or other sum of money payable hereunder when due; and Tenant shall be in Default if such failure shall continue ten (10) days after written notice thereof by Landlord to Tenant;

(b)     Other than payment of Rent, which is governed by Subsection 19.01(a), above, it shall be an Event of Default if Tenant shall fail to comply with any term, provision, or covenant of this Lease; and Tenant shall be in Default if it shall not cure such failure within twenty (20) days after written notice thereof by Landlord to Tenant. However, if such failure cannot be cured by the exercise of reasonable diligence within such 20 day period, then Tenant shall be provided additional time to cure such default, and a Default shall not be deemed to have occurred, if Tenant commences curative action within such 20 day period and thereafter diligently pursues a course of action that will render Tenant in compliance with this Lease within a period not to exceed thirty (30) days. If Tenant shall fail in the performance of any such covenant or agreement of this Lease necessitating notice by Landlord hereunder three (3) or more times in any twelve (12) month period, Tenant's subsequent default in the performance of any such covenant or agreement of this Lease shall, at Landlord's option, be deemed a Default without the necessity of notice or the opportunity for cure. Notwithstanding the foregoing, if such failure results in a condition hazardous to the Project or any portion thereof or any tenant therein, Tenant shall commence and complete the cure thereof as promptly as commercially reasonable, and failure to do so shall constitute a Default hereunder.

(c)     Tenant shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors, or Tenant shall admit in writing its inability to pay its debts as they become due;

(d)      It shall be an Event of Default if Tenant shall file a petition under any section or chapter of the U.S. Bankruptcy Code, as amended, or under any similar law or statute of the United States or any State thereof, or Tenant shall be adjudged bankrupt or insolvent in proceedings filed against Tenant thereunder; or a petition or answer proposing the adjudication of Tenant as a bankrupt or its reorganization under any present or future federal or state bankruptcy or similar law shall be filed in any court; and Tenant shall be in Default if any such petition or answer shall not be discharged or denied within sixty (60) days after the filing thereof;

(e)      It shall be an Event of Default if a receiver or trustee shall be appointed for all or substantially all of the assets of Tenant; and Tenant shall be in Default if the same shall not be discharged within sixty (60) days after such appointment or Tenant shall consent to or acquiesce in such appointment;

(f)      Tenant shall be in Default if Tenant does or permits anything to be done which creates a lien upon the Premises or Tenant's leasehold interest in this Lease, or the leasehold hereunder shall be taken on execution or other process of law in any action against Tenant;

(g)      Tenant shall be in Default if Tenant makes an anticipatory breach of this Lease; and the term "anticipatory breach" means either: (A) Tenant's repudiation of this Lease in writing, or (B) the combination of [x] Tenant's desertion or vacation or commencement of desertion or vacation of the Premises or removal of all or a substantial amount of Tenant's equipment, furniture and fixtures from the Premises; and [y] Tenant's failure to pay any Base Rent or Additional Rent due under this Lease when the same is due and payable;

(h)      Dissolution or Liquidation.  If Tenant is a corporation, limited liability company, or general or limited partnership, it shall be an Event of Default and Tenant shall be in Default if Tenant dissolves or liquidates or otherwise fails to maintain its corporate or partnership structure, as applicable;

(i)      Vacation or Abandonment.  Tenant shall be in Default if Tenant vacates or abandons the Premises; or

(j)      Tenant shall be in Default upon the occurrence of any other event described in this Lease as constituting an Event of Default and the expiration of any cure period, if available.

Section 19.02.  Occurrence of Default.  If a Default shall have occurred, Landlord shall have the right, at its election, then or at any time thereafter while such Default shall continue, to pursue any one or more of the following remedies, in addition to all other rights or remedies provided herein or at law or in equity:

(a)      Recover all Rent.  To the full extent permitted by applicable law, upon the occurrence of a Default, the entire amount of Rent for the entire Term of this Lease then remaining unpaid (that is, the Base Rent for the entire Term of this lease plus all Additional Rent then due) shall, at the option of Landlord, become immediately due and payable, subject to the notice provisions of this Lease.

(b)      No Termination; Repossess Demised Premises.  Without any further notice or demand whatsoever, Landlord may enter upon and take possession of the Premises (by forcible entry and detainer or otherwise) and expel or remove Tenant and any other person who may be occupying the Premises or any part of the Premises, by force, if necessary (except to the extent prohibited by Texas law), without being liable for prosecution or any claim for damages for such action. Such expulsion and removal by Landlord cannot be deemed a termination or forfeiture of this Lease or a waiver of the Default associated with Tenant's surrender of the Premises unless Landlord expressly notifies Tenant in writing that Landlord is terminating or forfeiting this Lease or waiving the Default associated with Tenant's surrender of the Premises.  If Landlord expels or removes Tenant and any other person from the Premises without terminating or forfeiting this Lease or accepting surrender of the Premises, Landlord must attempt to mitigate its damages. Landlord will be entitled to recover from Tenant damages of the sum of the following: (i) the cost of recovering the Premises; (ii) all accrued unpaid Rent and other sums due and owing to Landlord under this Lease (with interest at the Stipulated Rate set forth in Section 3.02, above) through the date Landlord recovers possession of the Premises; (iii) Base Rent and Additional Rent, that would be payable under this Lease if such repossession had not occurred, less the net proceeds, if any, of any re-letting of the Premises after deducting all of Landlord's reasonable expenses in connection with such re-letting, including without limitation all reasonable repossession costs, brokerage commissions, attorneys' fees, expenses of employees, alteration and repair costs, and expenses of preparation for such re-letting; and if, in connection with any re-letting, the new lease term extends beyond the Term, or the Premises covered by such new lease includes other premises not part of the Premises, a fair apportionment of the Base Rent and Additional Rent received from such re-letting and the expenses incurred in connection with such re-letting as provided in this Section will be made in determining the net proceeds from such re-letting, and any rent concessions will be equally apportioned over the term of the new lease; and Tenant will pay such Base Rent, Additional Rent and other sums to Landlord monthly on the day on which the Base Rent would have been payable under this Lease if possession had not been retaken, and Landlord shall be entitled

to receive such Rent and other sums from Tenant on each such day; and (iv) all other reasonable expenses and attorney's fees incurred by Landlord in connection with the Default by Tenant and all other sums of money and damages due to Landlord.

(c)     Terminate Lease. Without any further notice or demand, whatsoever, Landlord may terminate this Lease and forthwith repossess the Premises by delivering written notice accordingly; in which case Tenant must immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which Landlord may have for possession or arrearages in Rent, enter upon and take possession of the Premises, by forcible entry or detainer suit or otherwise, by force if necessary (except where prohibited by Texas law), without demand or notice of any kind to Tenant, without being liable for prosecution for claim or damages therefore; in which case, Landlord will be entitled to recover from Tenant, on demand, the liquidated damages set out as follows. Landlord and Tenant agree that it is difficult to determine, with any degree of certainty, the loss Landlord will incur if this Lease is terminated as a result of a Default; accordingly, Landlord and Tenant agree that the total sum of money determined in accordance with the following formula represents a reasonable estimate of such loss and is intended as a liquidated damages provision: (i) the cost of recovering the Premises; plus (ii) the unpaid Rent earned at the time of termination, including interest thereon at the Stipulated Rate set forth in Section 3.02, above, from the due date; plus (iii) the amount equal to: (1) the total Rent which Landlord would have received under this Lease for the remainder of the Term, discounted at the Prime Rate then in effect to the then present value, less (2) the then fair market value of the remaining un-expired portion of this Lease determined at the then Fair Market Rental Rate for the Premises, discounted at the Prime Rate then in effect to the then present value, and taking into consideration the likelihood and probable timing of the re-letting of the Premises; plus (iv) all other reasonable expenses incurred by Landlord in connection with Tenant's default and all other sums of money and damages due to Landlord.

For the purposes of this Section, the term "Fair Market Rental Rate" shall take into consideration the rental rate for the Premises and other comparable buildings, taking into account any concessions generally granted in the market place, which are generally then prevailing in the market at the time of such determination.

(d)     Cure of Tenant's Non-Monetary Default; Entry by Landlord. Without any further notice or demand, Landlord may enter upon the Premises, if necessary, without being liable for prosecution or claim for damages therefore, and do whatever Tenant is obligated to do under the terms of this Lease; and Landlord may restrain or enjoin any breach or threatened breach of any covenant, duty or obligation of Tenant contained in this Lease, without the necessity of proving the inadequacy of any legal remedy or irreparable harm, and the remedies of Landlord hereunder are deemed to be cumulative and not exclusive of each other. Tenant agrees to reimburse Landlord on demand for any reasonable expenses which Landlord may incur in effecting compliance with Tenant's obligations under this Lease, including, without limitation, reasonable attorneys' fees and interest on the amount so advanced at the Stipulated Rate set forth in Section 3.02, above. Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from such action, unless caused by the negligence of Landlord or its agents or otherwise. Notwithstanding anything herein to the contrary, Landlord will have no obligation to cure any such Default of Tenant.

(e)     Other Remedies for Certain Defaults. Without any further notice or demand whatsoever:

(i)     In the event of any Default described in Subsection 19.01 (f) of this Lease, Landlord may pay or bond around such lien, whether or not contested by Tenant; and in such event Tenant agrees to reimburse Landlord on demand for all costs and expenses incurred in connection with any such action, with Tenant further agreeing that landlord is in no event liable for any damages or claims resulting from such action;

(ii)     In the event of any default described in Subsection 19.01 (d) of this Lease, any assumption and assignment must conform with the requirements of the Bankruptcy Code which provides, in part, that Landlord must be provided with adequate assurance (i) of the source of rent and other consideration due under this Lease; (ii) that the financial condition and operating performance of any proposed assignee and its guarantors, if any, is similar to the financial condition and operating performance of Tenant and its guarantors, if any, as of the date of execution of this Lease; (iii) that any assumption or assignment is subject to all of the provisions of this Lease (including, but not limited to, restrictions as to use) and will not breach any such provision contained in any other lease, financing agreement or other agreement relating to the Project; and (iv) that any assumption or assignment will not disrupt any tenant mix or balance in the Building.

(1)     In order to provide Landlord with the assurance contemplated by the Bankruptcy Code, Tenant must fulfill the following obligations, in addition to any other reasonable obligations that Landlord may require, before any assumption of this Lease is effective: (i) all defaults under Subsection 19.01 (a) of this Lease must be cured within ten (10) days after the date of assumption; (ii) all other defaults under Section 19.01 of this Lease other than under Subsection 19.01 (d) must be cured within

fifteen (15) days after the date of assumption; (iii) all actual monetary losses incurred by Landlord (including, but not limited to, reasonable attorneys fees) must be paid to Landlord within ten (10) days after the date of assumption; and (iv) Landlord must receive within ten (10) days after the date of assumption a security deposit in the amount of six (6) months Base Rent and an advance prepayment of three (3) months Base Rent, both sums to be held by Landlord in accordance with Article 4, above and deemed to be rent under this Lease for the purposes of the Bankruptcy Code as amended and from time to time in effect.

(2) In the event this Lease is assumed in accordance with the requirements of the Bankruptcy Code and this Lease, and is subsequently assigned, then, in addition to any other reasonable obligations that Landlord may require and in order to provide Landlord with the assurances contemplated by the Bankruptcy Code, Landlord must be provided with (i) a financial statement of the proposed assignee prepared in accordance with generally accepted accounting principles consistently applied, though on a cash basis, which reveals a net worth in an amount sufficient, in Landlord's reasonable judgment, to assure the future performance by the proposed assignee of Tenant's obligations under this Lease; or (ii) a written guaranty by one or more guarantors with financial ability sufficient to assure the future performance of Tenant's obligations under this Lease, such guaranty to be in form and content satisfactory to Landlord and to cover the performance of all Tenant's obligations under this Lease.

(f) Other Remedies. Without any further notice or demand, Landlord may pursue any other remedy at law or equity available to Landlord.

Section 19.03. Deficiency. If it is necessary for Landlord to bring suit in order to collect any deficiency, Landlord has the right to allow such deficiencies to accumulate and to bring an action on several or all of the accrued deficiencies at one time. Any such suit cannot prejudice in any way the right of Landlord to bring a similar action for any subsequent deficiency or deficiencies.

Section 19.04. Intentionally Deleted.

Section 19.05. Removal of Furniture; Change of Locks. Upon the occurrence of a Default, and subject to the provisions of Section 93.002 of the Texas Property Code, Landlord is authorized to enter the Premises by use of a duplicate or master key or locksmith's entry procedures, to take possession of the Premises, remove all persons therefrom, and change or re key all locks to entrances to the Premises, and except as specifically required under Section 93.002 of the Texas Property Code, Landlord shall have no obligation to give Tenant notice thereof or to provide Tenant with a key to the Premises; and in such event, Landlord may remove any furniture, fixtures or appliances furnished by Landlord or otherwise located in the Premises; provided, however, such property shall be stored and shall not be disposed of other than in accordance with Section 93.002 of the Texas Property Code.

Section 19.06. Cumulative Remedies. Each right and remedy provided for in this Lease is cumulative and is in addition to every other right or remedy provided for in this Lease or now or after the effective date existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Landlord of any one or more of the rights or remedies provided for in this Lease or now or after the effective date existing at law or in equity or by statute or otherwise will not preclude the simultaneous or later exercise by Landlord of any or all other rights or remedies provided for in this Lease or now or after the effective date existing at law or in equity or by statute or otherwise. All costs reasonably incurred by Landlord in collecting any amounts and damages owing by Tenant pursuant to the provisions of this Lease or to enforce any provision of this Lease, including reasonable attorneys' fees from the date any such matter is turned over to an attorney, whether or not one or more actions are commenced by Landlord, will also be recoverable by Landlord from Tenant.

Section 19.07. Mitigation of Damages. In any situation in which Landlord is attempting to mitigate its damages, Landlord will conclusively be deemed to have done so if Landlord lists the Premises with a real estate broker or agent (which may be affiliated with Landlord) and considers all written proposals for such space made by such broker or agent; provided, however, Landlord is authorized to decorate or to make any repairs, changes, alterations, or additions, in or to the Premises, as Landlord in the exercise of its reasonable judgment, deems necessary in order to relet the Premises, but that in no event will Landlord: (i) be obligated to travel outside a radius of thirty (30) miles from its principal office in order to meet with a prospective tenant; (ii) be obligated to expend monies for finish-out requested by a prospective tenant unless Landlord, in its sole discretion, believes that the excess rent Landlord will receive and the credit of the prospective tenant support such a decision; (iii) be required to give preference to the Premises over other spaces in the Building or in any other property in which Landlord or any affiliate of Landlord has any direct or indirect interest; (iv) be required to agree to allow an existing tenant of the Building to move from their existing space to all or any of the Premises; (v) be obligated to accept any lease proposal whose terms are, in Landlord's good faith but otherwise in its sole discretion, less advantageous than then-current market terms for comparable leased space in the north side of the San Antonio metropolitan area; (vi) will result in a change in the Permitted Use; (vii) will result in Landlord being in violation of any covenant by Landlord in any other lease or agreement to which Landlord is a party, or is not consistent with the tenant mix of the Building; (viii) be required to consider a prospective tenant without requiring the prospective tenant to

demonstrate the same financial wherewithal that Landlord would require as a condition to leasing other space in the Building to the prospective tenant; or (ix) be required to accept any lease proposal which Landlord, in its good faith but otherwise in its sole discretion, deems unacceptable. In attempting to relet or actually reletting the Premises, Landlord will be free to enter into a direct lease with the proposed replacement tenant and will not be acting as Tenant's agent, although the proceeds Landlord actually receives for any time period will be credited against Tenant's obligations for the same time period. Tenant will not be entitled to any additional credit (for example, if Landlord receives amounts during a particular time period in excess of Tenant's obligations for the same time period, Landlord will not be required to credit such excess against Tenant's obligations for any other time period). Until Landlord is able, through such efforts, to relet the Premises, Tenant must pay to Landlord, on or before the first day of each calendar month, all monies due under Section 19.02(b), above, including all Rent in advance, the monthly rents any other charges provided in this Lease. At such time, if any, as Landlord relets the Premises, Tenant must pay to Landlord on the 20th day of each calendar month (i) all monies due under Section 19.02(b), above, plus (ii) the reasonable cost of recovering possession, and all of the reasonable costs and expenses of such decorations, repairs, changes, alterations and additions and the reasonable expense of such reletting and of Landlord's cost of collections of the Rent less (iii) the amounts actually collected by Landlord for such month from the occupant to whom Landlord has re-let the Premises. In addition, Tenant agrees that Landlord may file suit to recover any sums falling due under the terms of Section 19.02(b) and this Section 19.07 from time to time; and no delivery or recovery of any portion due Landlord hereunder shall be any defense in any action to recover any amount not theretofore paid to Landlord, nor shall such reletting be construed as an election on the part of Landlord to terminate this Lease unless a written notice of such intention be given to Tenant by Landlord. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.

ARTICLE 20: NON LIABILITY AND INDEMNIFICATION

Section 20.01. No Personal Liability. Neither the shareholders, officers, directors, managers, members, trustees, individuals or partners comprising Landlord, nor the shareholders (nor any of the partners comprising same), directors, trustees, officers or partners of any of the foregoing, nor their agents (collectively, the "Parties") shall incur any personal liability for the performance of Landlord's obligations under this Lease. The liability of Landlord for Landlord's obligations under this Lease shall not exceed and shall be limited to the value of Landlord's interest in the Project (including available insurance proceeds for casualty loss) and Tenant shall not look to any other property or assets of Landlord or of any of the Parties in seeking either to enforce Landlord's obligations under this Lease or to satisfy a judgment for Landlord's failure to perform such obligations.

Section 20.02. Indemnity. TENANT SHALL INDEMNIFY, HOLD HARMLESS AND DEFEND LANDLORD AND THE LANDLORD PARTIES FROM AND AGAINST ANY AND ALL CLAIMS, ACTIONS, LIABILITY AND EXPENSE, INCLUDING, BUT NOT LIMITED TO, ATTORNEY'S AND OTHER PROFESSIONAL FEES, IN CONNECTION WITH LOSS OF LIFE, PERSONAL INJURY AND/OR DAMAGE TO PROPERTY, ARISING FROM OR OUT OF THE OCCUPANCY OR USE BY TENANT, ITS OFFICERS, AGENTS, CONTRACTORS, EMPLOYEES OR INVITEES (FOR PURPOSES OF THIS ARTICLE 20, THE "TENANT PARTIES"), OF THE PREMISES OR ANY PART THEREOF OR ANY OTHER PART OF THE BUILDING OR PROJECT, OCCASIONED WHOLLY OR IN PART BY ANY ACT OR OMISSION OF ANY OF THE TENANT PARTIES, EXCEPT AND ONLY TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (BUT NOT ORDINARY NEGLIGENCE) OF LANDLORD, ITS OFFICERS, AGENTS, CONTRACTORS, EMPLOYEES OR INVITEES (THE "LANDLORD PARTIES").

LANDLORD SHALL INDEMNIFY, HOLD HARMLESS, AND DEFEND TENANT PARTIES FROM AND AGAINST ANY AND ALL CLAIMS, ACTIONS, LIABILITIES AND EXPENSE, INCLUDING BUT NOT LIMITED TO, ATTORNEY'S AND OTHER PROFESSIONAL FEES, IN CONNECTION WITH LOSS OF LIFE, PERSONAL INJURY AND/OR DAMAGE TO PROPERTY, OCCURRING IN THE COMMON AREAS OF THE PROJECT; PROVIDED, HOWEVER, ANY SUCH INDEMNITY BY LANDLORD SHALL (I) ONLY BE TO THE EXTENT SUCH CLAIM IS SPECIFICALLY BASED UPON THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (BUT NOT ORDINARY NEGLIGENCE) OF ANY OF THE LANDLORD PARTIES, AS DEFINED IN THIS SECTION 20.02, AND (II) SHALL NOT APPLY TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE TENANT PARTIES, AS DEFINED IN THIS SECTION 20.02.

The indemnifying party shall have the right to assume the defense of any such claim on behalf of itself and the indemnified party, so long as (i) the indemnifying party promptly commences and diligently pursues such defense, (ii) the indemnifying party keeps the indemnified party fully informed of all action taken by the indemnifying party in the defense of such claim, and (iii) the attorneys selected by the indemnifying party shall be subject to the approval of the indemnified party, which approval will not be unreasonably withheld or delayed.

SECTION 20.03. APPLICABILITY OF WAIVER AND INDEMNITY. EXCEPT AS SET FORTH IN THIS SECTION 20.03, THE INDEMNITIES AND WAIVERS CONTAINED IN THIS ARTICLE 20 APPLY REGARDLESS OF THE ACTIVE OR PASSIVE NEGLIGENCE OR SOLE, JOINT, CONCURRENT, OR COMPARATIVE NEGLIGENCE OF ANY OF THE LANDLORD OR TENANT PARTIES, AS DEFINED IN SECTION 20.02, AND REGARDLESS OF WHETHER LIABILITY WITHOUT FAULT OR STRICT LIABILITY IS IMPOSED OR SOUGHT TO BE IMPOSED ON ANY OF THE LANDLORD OR TENANT PARTIES. IF THE FINAL JUDGMENT OF A COURT OF COMPETENT JURISDICTION ESTABLISHES, UNDER PRINCIPLES OF COMPARATIVE NEGLIGENCE THEN IN EFFECT IN THE STATE OF TEXAS, THAT THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY OF SUCH LANDLORD PARTIES OR TENANT PARTIES PROXIMATELY CAUSED A PERCENTAGE OF THE DAMAGES SUFFERED BY A THIRD PARTY, THEN, AS TO SUCH PERCENTAGE ONLY, THE INDEMNITIES AND WAIVERS CONTAINED IN THIS ARTICLE 20 WILL NOT APPLY TO SUCH LANDLORD OR TENANT PARTY BUT WILL CONTINUE TO APPLY TO ANY DAMAGE IN EXCESS OF SUCH PERCENTAGE AND TO ALL OF THE OTHER LANDLORD OR TENANT PARTIES.

Section 20.04. Damages From Certain Causes. UNLESS CAUSED BY THE GROSS NEGLIGENCE (BUT NOT ORDINARY NEGLIGENCE) OR WILLFUL MISCONDUCT OF LANDLORD PARTIES IN ACCORDANCE WITH SECTION 20.02, ABOVE, AND WITHOUT LIMITING THE PROVISIONS OF ARTICLE 11, LANDLORD SHALL NOT BE LIABLE TO TENANT FOR ANY CLAIMS, ACTIONS, DEMANDS, COSTS, EXPENSES, DAMAGE OR LIABILITY OF ANY KIND (i) arising out of the use, occupancy or enjoyment of the Premises by Tenant or any person therein or holding under Tenant or by or through the acts or omissions of any of their respective employees, officers, agents, invitees or contractors, (ii) occasioned by act of God, strike, insurrection, war, court order, requisition, or order of governmental body or authority, (iii) which may arise through repair or alteration of any part of the Prjoect, the Building or the Premises, or failure to make any such repairs, (iv) caused by or arising out of fire, explosion, falling sheetrock, gas, electricity, water, rain, snow or dampness, or leaks in any part of the Premises, (v) caused by or arising out of damage to the roof, pipes, appliances or plumbing works or any damage to or malfunction of heating, ventilation or air conditioning equipment, (vi) caused by tenants or any persons either in the Premises or elsewhere in the Project or Common Areas or by the public or by the construction of any private, public or quasi public work or (vii) caused by any act, neglect or negligence of Tenant. In no event shall Landlord be liable to Tenant for any loss of or damage to property of Tenant or of others located in the Premises or any other part of the Project by reason of theft or burglary.

Section 20.05. No Consequential Damages. Any liability of Landlord to Tenant or Tenant to Landlord under this Lease Agreement shall be limited to only direct, actual damages, and shall not extend to any claim for loss of profits or any other consequential damages.

ARTICLE 21: MISCELLANEOUS

Section 21.01. Attorney's Fees. If either party institutes a suit against the other for violation of or to enforce any covenant or condition of this Lease, or if either party intervenes in any suit in which the other is a party to enforce or protect its interest or rights, the prevailing party shall be entitled to all of its costs and expenses, including, without limitation, reasonable attorneys' fees.

Section 21.02. Peaceful Enjoyment. Tenant shall and may peacefully have, hold and enjoy the Premises during the Term of this Lease, subject to the other terms hereof, provided that Tenant pays the Rent and other sums herein recited to be paid by Tenant and performs all of Tenant's covenants and agreements herein contained. It is understood and agreed that this covenant and any and all other covenants of Landlord contained in this Lease shall be binding upon Landlord and its successors only with respect to breaches occurring during its or their respective periods of ownership of Landlord's interest hereunder.

Section 21.03. No Implied Waiver. The failure of either party to insist at any time upon the strict performance of any covenant or agreement or to exercise any option, right, power, or remedy contained in this Lease shall not be construed as a waiver or a relinquishment thereof for the future. The waiver of or redress for any violation of any term, covenant, agreement, or condition contained in this Lease shall not prevent a subsequent act, which would have originally constituted a violation, from having all the force and effect of an original violation. No express waiver shall affect any condition other than the one specified in such waiver and that one only for the time and in the manner specifically stated. The payment by Tenant or the receipt by Landlord of any Rent with knowledge of the breach of any covenant or agreement contained in this Lease shall not be deemed a waiver of such breach, and no waiver by either party of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by such party. No payment by Tenant or receipt by Landlord of a lesser amount than the installment of Rent due under this Lease shall be deemed to be other than on account of the earliest Rent due hereunder, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Tenant may pay and Landlord may accept such check or payment without prejudice to either party's remedy provided in this Lease.

Section 21.04. Notice. Any notice, communication, request, reply or advice (hereinafter severally and collectively called "notice") in this Lease must be in writing, and may, unless otherwise in this Lease expressly provided, be given or be served by hand delivery, via telecopy, reputable overnight courier which provides confirmation of delivery, or by depositing the same in the United States mail, postpaid and certified and addressed to the party to be notified, with return receipt requested. Notice deposited in the mail in the manner herein above described shall be effective, unless otherwise stated in this Lease, on the date on which it is received or attempted to be delivered. Notice given in any other manner shall be effective only if and when received by the party to be notified or the date of refusal to accept receipt of such notice. For purposes of notice, the address of the parties shall, until changed as herein provided, be as set out in Section 1.01, above. The parties hereto and their respective heirs, legal representatives, successors, and assigns shall have the right to change their respective addresses and each shall have the right to specify a new address with at least fifteen (15) days' written notice to the other party delivered in compliance with this Section 21.04.

Section 21.05. Brokers. Except for the Tenant's Broker, who is set out in Section 1.01(L), above, Tenant warrants that it has not had any broker representing Tenant directly or indirectly in connection with this Lease, and Landlord shall not have any liability to any broker claiming by, through or under Tenant (other than the Broker who is set out in Section 1.01(L) above), and Tenant specifically indemnifies Landlord from any such expense except as provided herein. If Tenant is represented by a broker who is designated in Section 1.01(L), above, Landlord agrees to pay such broker a commission pursuant to a separate Brokerage Agreement between Landlord and such broker only. Landlord does hereby indemnify Tenant from and against any claim of any broker by, through or under Landlord. Any commissions to be paid to Landlord's Broker or Tenant's Broker as provided herein are collectively referred to as the "Leasing Commissions." Notwithstanding anything to the contrary in any listing or commission agreement, Landlord shall pay the initial one-half of the Leasing Commissions to Landlord's Broker and Tenant's Broker following Landlord's receipt of the payment of the initial one-half of the advance semiannual Base Rent and Additional Rent from Tenant which is due and payable on April 01, 2018. Landlord shall pay the remaining one-half of the Leasing Commissions to Landlord's Broker and Tenant's Broker following Landlord's receipt of the payment of the second one-half of the advance semiannual Base Rent and Additional Rent from Tenant which is due and payable on June 01, 2018.

Section 21.06. Captions. The captions appearing in this Lease are inserted and included solely for convenience and shall never be considered or given any effect in construing this Lease, or any provisions hereof, or in connection with the duties, obligations, or liabilities of the respective parties hereto or in ascertaining intent, if any question of intent exists.

Section 21.07. Entirety and Amendments. This Lease is presented for discussion and negotiation purposes and is not an offer to lease the Premises and shall not be binding unless and until fully executed by both Landlord and Tenant hereunder. Once fully executed by Landlord and Tenant hereunder, this Lease and the attached Exhibits embody the entire contract between the parties hereto relative to the subject matter hereof. No variations, modifications, changes, or amendments herein or hereof shall be binding upon any party hereto unless in writing and executed by a duly authorized officer or a duly authorized agent of the party to be so bound.

Section 21.09. Severability. If any term or provision of this Lease, or the application thereof to any person or circumstance, shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term of provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforced to the fullest extent permitted by law.

Section 21.10. Binding Effect. All covenants and obligations as contained within this Lease shall bind and extend and inure to the benefit of Landlord, its successors and assigns, and shall be binding upon and inure to the benefit of Tenant, its permitted successors and assigns.

Section 21.11. Number and Gender of Word. All personal pronouns used in this Lease shall include the other gender whether used in the masculine or feminine or neuter gender and the singular shall include the plural whenever and as often as may be appropriate.

Section 21.12. Governing Law. This Lease and the rights and obligations of the parties hereto shall be interpreted, construed, and enforced in accordance with the laws of the State of Texas. Any action brought to enforce or interpret this Lease shall be brought exclusively in in the court of appropriate jurisdiction in Bexar County, Texas

Section 21.13. Force Majeure. Whenever a period of time is herein prescribed for the taking of any action by either party, such party shall not be liable or responsible for, and there shall be excluded from the computation of such period of time, any delays due to strikes (other than work stoppages of the employees of the party in question), riots, acts of God, shortages of labor (other than work stoppages of the employees

of the party in question) or materials, war, Legal Requirements, or any other cause whatsoever beyond the reasonable control of such party (other than lack of funds).

Section 21.14. Limitation on Interest. It is intended that the interest contracted for, charged or received by Landlord shall in no event exceed the maximum amount permissible under applicable law. If, from any circumstance whatsoever, interest would otherwise be payable to Landlord in excess of the maximum lawful amount, the interest payable to Landlord shall be reduced to the maximum amount permitted under applicable law; and, if from any circumstance Landlord shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest received shall be applied to the next installment of Rent, or refunded to Tenant, at Landlord's option.

Section 21.15. Hazardous Substances.

(a)     Restricted Use. Neither Tenant, its successors or assigns, nor any permitted assignee, sublessee, licensee or other person or entity acting at the direction or with the consent of Tenant shall (i) manufacture, treat, use, store or dispose of any Hazardous Substance (as hereinafter defined) on the Premises, the Building, the Project or any part thereof, or (ii) permit the release of a Hazardous Substance on or from the Premises, the Building, the Project or any part thereof; provided, however, Tenant shall be entitled to use (but not "release") Hazardous Substances in its ordinary course of its business, in the smallest quantities reasonably required to meet the requirements of Tenant in the ordinary course of its business, properly used, stored and disposed of in accordance with all laws regulating the use, generation, storage, transportation, or disposal of Hazardous Substances ("Environmental Laws"), and then only with the specific prior written consent of Landlord.

(b)     Tenant's Indemnity. Tenant covenants, at its cost and expense, to protect, indemnify, defend and save Landlord and Landlord Parties harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, or expenses of any kind or nature (including, without limitation, attorney's fees and expert's fees) which may at any time be imposed upon, incurred by or asserted or awarded against Landlord arising from or out of any Hazardous Substance on, in, under or affecting the Premises, the Building, the Project or any part thereof as a result of (x) any act or omission by Tenant, its successors or assigns, or any assignee, permitted sublessee, licensee or other person or entity acting at the direction, knowledge or implied consent of Tenant, and/or (y) the failure by Tenant, its successors or assigns, or any assignee, permitted sublessee, licensee or other person or entity acting at the direction, knowledge or implied consent of Tenant, to provide all information, make all submissions, and take all steps required by all governmental authorities under the Environmental Laws. Tenant's obligations and liabilities under this Section 21.15 shall survive the expiration of this Lease.

(c)     Hazardous Substances. The term "Hazardous Substance" shall mean any waste, substance or material (i) identified in Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as the same may be amended from time to time (herein called "CERCLA"), or (ii) determined to be hazardous, toxic, a pollutant or contaminant, under any applicable federal, state or local statute, law, ordinance, rule, regulation or judicial or administrative order or decision, as same may be amended from time to time, including, but not limited to, petroleum and petroleum products. The term "release" shall have the meaning given to such term in Section 101(22) of CERCLA.

Section 21.16 Prime Rate. The term "Prime Rate" shall mean the prime lending rate of interest last announced by and in effect for Citibank of New York on the last business day of the preceding month (the "Bank Prime Rate"). In the event that such Bank Prime Rate cannot be determined for the last business day of any of such months, the Prime Rate shall be, as an alternative to the Bank Prime Rate for such last business day, the Money Center Prime Rate as reported for such last business day. As used herein, the term "Money Center Prime Rate" shall mean the base rate on corporate loans at large U.S. money center banks as reported in The Wall Street Journal (Southwest Edition) under the column "Money Rates." In the event that neither the Bank Prime Rate nor the Money Center Prime Rate can be determined for the last business day of any of such months, the Prime Rate shall be, as an alternative to the Bank Prime Rate and the Money Center Prime Rate for such last business day, the rate of ten percent (10%) per annum.

Section 21.17 Construction. Each party hereby acknowledges and agrees that such party has consulted legal counsel in connection with the negotiation of this Agreement and that such party has bargaining power equal to that of the other party in connection with the negotiation and execution of this Agreement. Accordingly, the parties agree that the rule of contract construction to the effect that an agreement shall be construed against the draftsman shall have no application in the construction or interpretation of this Agreement.

Section 21.18. Reasonable Standard Landlord. Any requirement for Landlord to exercise any approval or other decision herein in a reasonable manner shall mean such conduct as would be exercised by a sophisticated commercial real estate developer experienced in the development and operation of comparable buildings in San Antonio, Texas; provided that in no event shall such standard imply any

obligation on the part of Landlord to be reasonable in giving or withholding any consent required hereunder except to the extent otherwise expressly provided herein.

Section 21.19. Legal Requirements. The term "Legal Requirements" shall mean all laws, governmental rules or regulations or requirements applicable to the construction, applicable to the occupancy and use of the Building or any portion thereof, including the Americans with Disabilities Act and the Texas Architectural Barriers Act.

Section 21.20. Affiliate. For purposes hereof, the term "Affiliate" of any specified person shall mean any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person. For purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Section 21.21. Exhibits. The Exhibits attached hereto are incorporated herein and made a part of this Lease for all purposes.

Section 21.22. Waiver of Counterclaim and Jury Trial. IN THE EVENT THAT LANDLORD COMMENCES ANY SUMMARY PROCEEDINGS OR ACTION FOR NON-PAYMENT OF RENT. LANDLORD AND TENANT, WITH ADVICE OF LEGAL COUNSEL OF THEIR CHOICE, HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY IRREVOCABLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CAUSE OF ACTION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LEASE, THE PROJECT INCLUDING THE PREMISES, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS OR ACCOUNTS OF ANY PARTY HEREIN. THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH OF LANDLORD AND TENANT ENTERING INTO THIS LEASE.

Section 21.23 Calculation of Charges. Landlord and Tenant agree that each provision of this Lease for determining charges, amounts and additional rent payments by Tenant is commercially reasonable, and as to each such charge or amount, constitutes a "method by which the charge is to be computed" for purposes of Section 93.004 (Assessment of Charges) of the Texas Property Code, as such section now exists or as it may be hereafter amended or succeeded.

Section 21.24. Authority of Tenant. Tenant and each person signing this Lease on behalf of Tenant represents to Landlord as follows: Tenant, if a corporation, is duly incorporated and legally existing under the laws of the state of its incorporation and is duly qualified to do business in the State of Texas. Tenant, if a partnership or joint venture, is duly organized under the Texas Uniform Partnership Act. Tenant, if a limited partnership, is duly organized under the applicable limited partnership act of the State of Texas or, if organized under the laws of a state other than Texas, is qualified under said Texas limited partnership act. Tenant has all requisite power and all governmental certificates of authority, licenses, permits, qualifications and other documentation to lease the Premises and to carry on its business as now conducted and as contemplated to be conducted. Each person signing on behalf of Tenant is authorized to do so. The foregoing representations in this section shall also apply to any corporation, partnership, joint venture or limited partnership which is a general partner or joint venturer of Tenant.

· Section 21.25  Survival of Indemnities. Each indemnity agreement and hold harmless agreement contained herein shall survive the expiration or termination of this Lease.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease in multiple original counterparts as of the date and year first above written.

LANDLORD:                                    TENANT:

Silicon Drive Office Venture, LLC            deeproot Capital Management, LLC

By:                                          By:

David A. Spencer                             Robert J. Mueller
Its Manager                                  Its Manager

EXHIBIT "A"
LEGAL DESCRIPTION OF LAND

LOT 19, BLOCK 3, N.C.B. 17161, TECHNOLOGY PARK, UNIT 6, AN ADDITION IN SAN ANTONIO, BEXAR COUNTY, TEXAS ACCORDING TO THE MAP OR PLAT THEREOF RECORDED IN VOLUME 9547, PAGE 220 DEED AND PLAT RECORDS OF BEXAR COUNTY, TEXAS

EXHIBIT "B"
TERMS FOR PURCHASE AND SALE

If Tenant exercises the option to purchase contained in Section 16.1 of the Lease, the closing of the transfer of the Project shall be controlled by the following provisions. Capitalized terms not defined herein shall have the meaning given them in the Lease to which this Exhibit is attached.

1. PROPERTY DESCRIPTION:

LOT 19, BLOCK 3, N.C.B. 17161, TECHNOLOGY PARK, UNIT 6, AN ADDITION IN SAN ANTONIO, BEXAR COUNTY, TEXAS ACCORDING TO THE MAP OR PLAT THEREOF RECORDED IN VOLUME 9547, PAGE 220 DEED AND PLAT RECORDS OF BEXAR COUNTY, TEXAS .

2. PURCHASE PRICE: The purchase price for the Project ("Purchase Price") shall be $4,358,960.00.

3. EFFECTIVE DATE: The date when the Tenant has delivered a Purchase Notice to the Landlord.

4. PAYMENT OF PURCHASE PRICE: The Purchase Price, subject to applicable adjustments and prorations, shall be paid to Landlord on the Closing Date by certified or cashier's check or by wire transfer.

4. CLOSING DATE: This transaction shall be closed and the deed and other closing papers delivered on the sixtieth (60th) day after the Effective Date.

5. RESTRICTIONS; EASEMENTS; LIMITATIONS: Tenant shall take title subject to all recorded and validly existing restrictions, reservations, covenants, conditions, mineral interests, and water interests outstanding in persons other than Landlord, and other instruments, other than conveyances of the surface fee estate, that affect the Property; all comprehensive land use plans, zoning, and other requirements imposed by governmental authority; and taxes for year of closing and subsequent years (collectively "Permitted Exceptions").

6. ASSIGNABILITY: Neither party may assign its rights under this agreement.

7. PLACE OF CLOSING: Closing shall occur through escrow with the title company selected by Landlord and approved by Tenant.

8. DOCUMENTS FOR CLOSING: Landlord shall furnish a special warranty deed, bill of sale, and a Non-Foreign affidavit. Each party shall execute a closing statement.

9. EXPENSES: Landlord shall pay any commissions due to the Brokers. The title company's escrow fees shall be split between the parties. The cost of recording of deed, survey and title policies shall be paid by Tenant.

10. PRORATIONS; CREDITS: Taxes, assessments, rent, interest, insurance and other expenses of the Project shall be prorated through the day of closing unless they are the responsibility of Tenant under the Lease, in which case they shall not be prorated. Cash at closing shall be increased or decreased as may be required by prorations to be made through day of closing. Advance rent, advance additional rent, and security deposits will be credited to Tenant.

11. ATTORNEY'S FEES; COSTS: In any litigation, including breach, enforcement or interpretation, arising out of these Purchase Terms, the prevailing party in such litigation shall be entitled to recover from the non-prevailing party reasonable attorney's fees, costs and expenses.

12. FAILURE OF PERFORMANCE: If Tenant fails to perform these Purchase Terms within the time specified, Landlord may elect to terminate the exercise of the option to purchase and be relieved of all obligations under these Purchase Terms or Landlord may proceed in equity to seek specific performance of Landlord's rights under these Purchase Terms. If for any reason other than failure of Landlord to cure title defects, Landlord fails, neglects or refuses to perform these Purchase Terms, the Tenant may seek specific performance.

13. PERSONS BOUND; NOTICE: These Purchase Terms shall bind and inure to the benefit of the parties and their successors in interest. Whenever the context permits, singular shall include plural and one gender shall include all. Notice given by or to the attorney for any party shall be as effective as if given by or to that party.

14. CONVEYANCE: Landlord shall convey title to the Premises to Tenant or Tenant's designee by special warranty deed, subject only to the Permitted Exceptions and matters contained in Section 5 of these

Purchase Terms and those otherwise accepted by Tenant. The Project shall be conveyed AS IS, WHERE IS with all faults without any representations or warranties other than warranties of title.

15. OTHER AGREEMENTS: No prior or present agreements or representations shall be binding upon Tenant or Landlord unless included in these Purchase Terms. No modification to or change in these Purchase Terms shall be valid or binding upon the parties unless in writing and executed by the party or parties intended to be bound by it.

EXHIBIT "C"
LANDLORD'S AND TENANT'S WORK LETTER AGREEMENT

I.     LANDLORD'S WORK:

Landlord shall at Landlord's sole cost and expense perform the following work prior to the Commencement Date (collectively "Landlord's Work"):

(i)     Deliver the Premises with all mechanical, electrical, and plumbing systems in good working order. Notwithstanding anything to the contrary herein, save and except for Landlord's obligations relating to the HVAC system during the initial two (2) years of the term of the Lease as provided in Section 7.03(b) above, the cost of all repairs to the mechanical, electrical, and plumbing systems following the Commencement Date shall be part of the CAM Cost;
(ii)    Ensure roof is in good repair;
(iii)   Clean the existing kitchen area;
(iv)    Clean the existing restrooms and replace any necessary fixtures;
(v)     All other areas in general broom clean condition; and
(vi)    Deliver the Premises free of rubbish, and trash and other non-usable items and in broom clean condition including the removal of all daycare equipment, carpet, and porched items in the fenced area.

II.    TENANT'S WORK:

Tenant at Tenant's expense shall perform all other work other than Landlord's Work provided in Article I above, to put the premises in condition to permit Tenant to conduct its business therein (hereinafter referred to as "Tenant's Work"), including but not limited to all plumbing, electrical, flooring, interior partitioning, painting, (including all modifications to existing HVAC systems and duct-work). Tenant's work shall be performed in strict accordance with the provisions of the Lease and the exhibits thereto. Immediately upon Lease Execution, Tenant may, with Landlord's reasonable approval of Final Plans, start construction of Leasehold Improvements, and may continue as such until completion. Landlord shall insure that all utilities are on during this time period at Landlord's expense, and further permit reasonable ingress, egress, and access to the Premises for all approved activities and persons.

III.   CRITERIA, JURISDICTION AND CODES:

1.     The criteria and outline specifications set forth herein represent minimum standards for design, construction, finish and operation of the premises by Tenant. Landlord reserves the right from time to time to revise these criteria and outline specifications as Landlord in its sole discretion deems fit.

2.     This project is developed in and under the jurisdiction of the City of San Antonio and the State of Texas. All design and construction work shall comply with all applicable statutes, ordinances, rules, regulations and codes of the aforementioned jurisdictions, and all other applicable regulations and requirements of the Landlord's fire insurance carriers, the requirements of any company or governmental body supplying utilities or services, all applicable federal building and safety orders, statutes, ordinances, rules, regulations and codes, the requirements and regulations of any environmental protection agency, fire protection district, or quasi-governmental authority having jurisdiction over this retail development.

IV.    PERMITS AND APPROVALS:

1.     Prior to commencement of construction by Tenant, Tenant shall obtain, at Tenant's expense, all necessary permits and approvals and post same upon the premises as required thereby with a copy of the permit forwarded to Landlord.

2.     Tenant shall be required to obtain any certificates of occupancy (CO).

3.     Tenant shall be solely responsible for the payment of all costs associated with compliance with the requirements of the Texas Department of Licensing and Regulation ("TDLR") - Code Review and Inspection Division - Architectural Barriers Program. Said costs include but are not limited to the cost of TDLR inspection and filing fees. Tenant shall perform any required asbestos survey at Tenant's sole expense.

4.     No construction within the premises may commence without Landlord's written approval.

V.     APPROVALS OF TENANT'S PLANS AND SPECIFICATIONS:

1.       Tenant shall within thirty (30) days from the date Final Plans are received from Tenant's architectural firm, at Tenant's expense, prepare and deliver to Landlord, and Landlord's architect for approval, two sets of plans and specifications, covering Tenant's work concerning the premises, in such detail as Landlord may require, in full compliance with the Lease and the Exhibits attached thereto, certified by a licensed and registered architect. Landlord shall deliver its approval or comments on Tenant's plans within seven (7) days of Landlord's receipt of such plans. To avoid delays, Tenant shall be permitted to provide an initial submission of space plans with pricing notes for Landlord's approval for partial commencement of construction.

2.       In the event that Landlord shall notify Tenant that Tenant's plans and specifications are not approved, Tenant shall have ten (10) days from the date of Landlord's disapproval to revise the plans and specifications and resubmit them to Landlord for Landlord's approval. Upon approval by Landlord, the plans and specifications will be deemed to be the "Tenant's Drawings". Landlord's written approval shall be obtained by Tenant prior to the undertaking of any construction work which deviates from or modifies in any way the Tenant's Drawings or any work not explicitly shown on the Tenant's Working Drawings

VI.     MISCELLANEOUS:

1.       Only new, first class materials shall be used in the performance of Tenant's work.

2.       Architectural Work and Finishes to be Provided by Tenant.

3.       Tenant may not access the roof without the written authorization of Landlord, and Landlord may require any access to the roof to be only made by Landlord's approved roofing contractor. Without waiving the foregoing, Tenant shall not make any installation or penetration whatsoever on the roof above the premises without Landlord's prior written authorization. Landlord may request Tenant to only utilize Landlord's approved roofing contractor.

4.       Upon approval of the Tenant's Drawings by both Landlord and Tenant, Tenant agrees to commence construction of the Tenant Improvements and thereafter to diligently pursue the completion of the construction of "Tenant's Work". All work not included in the Tenant's Drawings, if any, must be approved by Landlord in writing, whose timely approval shall not be unreasonably withheld. Prior to commencing construction, Tenant shall submit to Landlord a complete list of all contractors and major subcontractors (including addresses and telephone numbers) for Landlord's approval.

5.       Tenant shall immediately notify Landlord of the completion of Tenant's Work, and Landlord shall review Tenant's Work to inspect its conformity with Tenant's Drawings. Tenant's Work shall not be deemed complete until Landlord has inspected and approved it. Landlord agrees to make such inspection within five (5) days of Tenant's request. Any approval by Landlord of Tenant's Work shall in no way be deemed a representation or warranty of the quality or fitness of the Tenant's Work and/or the construction by Tenant. Any deficiency in design, materials or construction shall be solely the responsibility of Tenant, regardless of whether the Landlord had inspected and approved such work. Any deficiency or defect in the design or construction of Tenant's Work shall not be waived by Landlord's inspection of the Premises or approval of the Tenant's Work, regardless of whether the deficiency or defect had been or not been objected to by Landlord.

6.       The insurance requirements under Article 10 of this Lease and the indemnity requirements under Article 20 of this Lease shall apply during the construction contemplated, in this exhibit and Tenant shall provide evidence of appropriate insurance coverage prior to beginning any of Tenant's Work. In addition, and without limiting the generality of the immediately preceding sentence, at Landlord's option, Landlord may require that prior to beginning any of Tenant's Work, Tenant shall provide Landlord with evidence of insurance covering both Tenant and Tenant's contractor against damage to their personal property, as well as against third party liability and workers' compensation claims arising out of all construction and associated activities. All policies of insurance shall be subject to Landlord's prior approval and shall be endorse showing Landlord as an additional named insured (or, if permitted by Landlord, may provide a waiver of subrogation against Landlord).

7.       Tenant hereby assumes any and all liability, including but not limited to any liability arising out of statutory or common law, for any and all injuries to or death of any and all persons, and any liability for any and all damaged property caused by, resulting from, or arising out of any act or omission on the part of Tenant, its contractors and its or their subcontractors or employees in the performance of Tenant's Work.

8.       Tenant shall cause each contractor and subcontractor doing Tenant's Work to guarantee and warrant, in writing, that the work done by it shall be free from any defects in workmanship and materials for a period of not less than one year from the date of its completion and acceptance by Landlord thereof. All such warranties or guaranties with respect to Tenant's Work shall be contained in the applicable contract or subcontract, and shall provide that such guaranties or warranties shall inure to the benefit of both

Landlord and Tenant shall provide Landlord with such contracts or other evidence of warranties or guaranties as Landlord may desire, from time to time, Tenant covenants to give Landlord any assignment or other assurance necessary to effect such right of direct enforcement.

9.      Tenant, its contractors and subcontractors, shall remove all trash, debris and rubbish from the Premises on a reasonable basis, and shall ensure that no trash, debris or rubbish is visible for unreasonable periods to the public.  If at any time such trash, debris or refuse or fail to remove any such trash, debris or surplus materials, Landlord may remove same at Tenant's expense, and Tenant shall reimburse Landlord for such expenses upon demand by Landlord.

10.      Tenant, its contractors, employees or such others as may enter the Premises on Tenant's behalf (collectively the "Tenant's Contractors") shall not disturb or interfere with Landlord, Landlord's employees or other tenants or invitees of the Project.  Prior to commencing construction, Tenant's Contractors shall provide Landlord with evidence reasonably satisfactory to Landlord that each is covered under such workers compensation and employers liability, public liability and property damage insurance as landlord may reasonably request for its protection.

11.      Tenant's Drawings shall be deemed approved by Landlord unless Landlord provides Tenant with written notice of disapproval within seven (7) days of receipt of Tenant's Drawings.  In the event that the Landlord unreasonably delays or disapproves Tenant's Drawings, and Landlord and Tenant are unable to agree on the Tenant's Drawings or scope of Work within thirty (30) days following Landlord's initial receipt of Tenant's Drawings (the "Plan Approval Deadline"), either Landlord or Tenant can terminate this Lease upon the earlier of a) seven (7) days following the expiration of the Plan Approval Deadline, or b) the Commencement Date of this Lease, in which event the security deposit shall be returned to Tenant, no commissions shall be paid to any brokers, and the parties shall have no further obligation to each other except for those expressly surviving the termination of the Lease.

EXHIBIT "D"
PROJECT RULES AND REGULATIONS

1.      Landlord may from time to time adopt appropriate systems and procedures for the security or safety of the Building, or any equipment, furnishings, or contents of the Building, and Tenant will comply with Landlord's reasonable requirements relative to such systems and procedures.

2.      The sidewalks, halls, passages, exits, entrances, elevators, and stairways of the Building shall not be obstructed by Tenant or used by Tenant for any purpose other than for ingress to and egress from the Premises. The halls, passages, exits, entrances, elevators, escalators, and stairways are not for the general public, and Landlord shall in all cases retain the right, but not the obligation, to control and prevent access to such halls, passages, exits, entrances, elevators, and stairways of all persons whose presence in the judgment of Landlord, in its sole and absolute discretion, would be prejudicial to the safety, character, reputation, and interests of the Building, provided that nothing contained in these Rules and Regulations shall be construed to prevent such access to persons with whom any Tenant normally deals in the ordinary course of its business, unless such persons are engaged in illegal activities. Neither Tenant nor any employee or invitee of Tenant shall have access to the roof of the Building, without the prior written consent of Landlord, provided that any roof penetrations or work relating to the roof shall be made solely by Landlord's roofing contractor at Tenant's sole cost and expense. Tenant shall not be permitted to place or install any object (including without limitation radio and television antennas, loudspeakers, sound amplifiers, microwave dishes, solar devices, or similar devices) on the exterior of the Building or on the roof of the Building, without the prior consent of Landlord, and further provided that any roof penetrations or work relating to the roof shall be made solely by Landlord's roofing contractor at Tenant's sole cost and expense.

3.      No cooking shall be done or permitted by Tenant on the Premises, except in areas of the Premises which are specially constructed for cooking and except that use by the Tenant of a regular oven, microwave ovens, and Underwriters' Laboratory approved equipment for brewing coffee, tea, hot chocolate, and similar beverages shall be permitted, provided that such use is in accordance with all applicable federal, state, and city laws, codes, ordinances, rules, and regulations.

4.      The toilet rooms, toilets, urinals, wash bowls and other plumbing fixtures shall not be used for any purposes other than those for which they were constructed, and no sweepings, rubbish, rags, or other foreign substances shall be thrown in such plumbing fixtures. All damages resulting from any misuse of the fixtures shall be borne by the Tenant who, or whose servants, employees, agents, visitors, or licensees, caused the same.

5.      Tenant shall not in any way deface any part of the Premises or the Building of which they form a part.

6.      Landlord shall install strike plates on all exterior door locks. Tenant shall not alter, change, replace, or rekey any lock or install a new lock or a knocker on any door of the Premises without Landlord's prior permission. Landlord, its agents, or employees shall retain a pass (master) key to all door locks on the Premises. Any new door locks required by Tenant or any change in keying of existing locks shall be installed or changed by Landlord following Tenant's written request to Landlord and shall be at Tenant's expense. All new locks and rekeyed locks shall remain operable by Landlord's pass (master) key. Tenant, upon termination of its tenancy, shall deliver to Landlord all keys and access cards for the Premises and Building that have been furnished to Tenant.

7.      Tenant shall not use or keep in the Premises or the Building any kerosene, gasoline, or any flammable, combustible or explosive fluid or material or chemical substance, other than fluids required in Tenant's normal operations in the Premises. Without Landlord's prior written approval, Tenant shall not use any method of heating or air conditioning other than that supplied by Landlord. Tenant shall not use or keep or permit to be used or kept any foul or noxious gas or substance in the Premises, other than those substances disclosed to Landlord and required in Tenant's normal operations.

8.      Tenant shall not bring any animals (except "Seeing Eye" dogs or other guide animals) or birds into the Building.

9.      Tenant shall see that the doors of the Premises are closed and locked and that all water faucets, water apparatus, and utilities are shut off before Tenant or Tenant's employees leave the Premises, so as to prevent waste or damage, and for any default or carelessness in this regard Tenant shall make good all injuries sustained by other Tenants or occupants of the Building or Landlord.

10.     Landlord shall ensure that all parking areas are lit, however, Landlord shall not be liable for loss of or damage to any vehicle or any contents of such vehicle or accessories to any such vehicle, or any property left in any of the parking areas, resulting from fire, theft, vandalism, accident, conduct of other users of the parking areas and other persons, or any other casualty or cause. Further, Tenant understands

and agrees that: (a) Landlord shall not be obligated to provide any traffic control, security protection or operator for the parking areas; (b) Tenant uses the parking areas at its own risk; and (c) Landlord shall not be liable for personal injury or death, or theft, loss of, or damage to property. Tenant waives and releases Landlord from any and all liability arising out of the use of the parking areas by Tenant, its employees, agents, invitees, and visitors, whether brought by any of such persons or any other person.

11.     Landlord shall not be liable to Tenant for any unavailability of Tenant's designated Parking Spaces nor shall any unavailability entitle Tenant to any refund, deduction, or allowance.

12.     No act or thing done or omitted to be done by Landlord or Landlord's agent during the Term of the Lease in connection with the enforcement of these Rules and Regulations shall constitute an eviction by Landlord of any Tenant nor shall it be deemed an acceptance of surrender of the Premises by any Tenant, and no agreement to accept such termination or surrender shall be valid unless in a writing signed by Landlord.

13.     As used in these Rules and Regulations, the word "Tenant" includes the employees, agents, invitees, and licensees of Tenant and others permitted by Tenant to use or occupy the Premises.

14.     It is the goal of Landlord to make the Project and all public areas in the Project a "Non-Smoking Environment"; and in furtherance of that goal, smoking is not permitted in any part of the Project, including (without limitation) all restrooms, common halls, stairwells, elevator lobbies, elevators other than in any area specifically designated for smoking in the Project, if any, which Landlord may from time to time designate in its sole and absolute discretion. Each Tenant will use its best efforts to cause its employees, agents and invitees to adhere to these rules in furtherance of the goal to make the Project a "Non-Smoking Environment."

15.     These rules and regulations are in addition to, and shall not be construed to modify or amend, in whole or in part, the terms, covenants, agreements, and conditions of the Lease.