IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT CAPITAL MANAGEMENT, | § | |
| LLC, ET AL.,[1] | § | BANKRUPTCY NO. 21-51523-MMP |
| | § | LEAD CASE |
| DEBTORS. | § | JOINTLY ADMINISTERED |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT FUNDS, LLC, | § | BANKRUPTCY NO. 21-51521 |
| | § | |
| DEBTOR. | § | JOINTLY ADMINISTERED |

**TRUSTEE'S MOTION TO APPROVE (A) SALE OF PROPERTY OF THE ESTATE OF DEEPROOT FUNDS, LLC, (B) SALE PROCEDURES IN CONNECTION WITH THE SALE OF PROPERTY OF THE ESTATE OF DEEPROOT FUNDS, LLC, AND (C) THE FORM OF NOTICE FOR THE SALE OF PROPERTY OF THE ESTATE OF DEEPROOT FUNDS, LLC**

TO THE HONORABLE MICHAEL M. PARKER, UNITED STATES BANKRUPTCY JUDGE:

John Patrick Lowe, Chapter 7 Trustee of the above captioned jointly administered bankruptcy estates ("**Trustee**"), on behalf of deeproot Funds, LLC, (the "**Debtor**") in the above administratively captioned case, by and through Trustee's counsel, Pulman, Cappuccio & Pullen, LLP, hereby files this *Trustee's Motion to Approve (A) Sale of Property of the Estate of deeproot Funds, LLC, (B) Sale Procedures in Connection with the Sale of Property of the Estate of deeproot*

---

[1] The jointly administered chapter 7 cases, along with their respective case numbers and the last four digits of each Debtor's federal tax identification number, are: In Re: Policy Services, Inc. 21-51513 (2864), In Re: Wizard Mode Media, LLC, 21-51514 (3205), In Re: deeproot Pinball LLC, 21-51515 (0320), In Re: deeproot Growth Runs Deep Fund, LLC, 21-51516 (8046), In Re: deeproot 575 Fund, LLC, 21-51517 (9404), In Re: deeproot 3 Year Bonus Income Debenture Fund, LLC, 21-51518 (7731), In Re: deeproot Bonus Growth 5 Year Debenture Fund, LLC, 21-51519 (9661), In Re: deeproot Tech LLC, 21-51520 (9043), In Re: deeproot Funds LLC, 21-51521 (9404), In Re: deeproot Studios LLC , 21-51522 (6283), and In Re: deeproot Capital Management, LLC, 21-51523 (2638), each an "**Estate**" and collectively, the "**Estates**".

*Funds, LLC, and (c) the Form of Notice for the Sale of Property of the Estate of deeproot Funds,*

*LLC (* (the "**Sale Motion**"), concerning property of the bankruptcy estate of Debtor, described as

follows:

> Promissory Note dated November 20, 2018, in the original principal sum of $3,350,000 (the "**Note**"), executed by CCW Braun Heights, LLC ("**Purchaser**" and/or "**CCW**"), as maker, and payable to the order of Debtor. Payment of the Note is secured by a lien on certain real property located at 10670 Bandera, San Antonio, Texas 78250 (the "**Property**") pursuant to a certain Subordinated Second Lien Deed of Trust of even date with the Note (the "**Deed of Trust**"), executed by Debtor, as lender, and by CCW, as grantor, and recorded in the official public records of Bexar County, Texas. A copy of the Note and a copy of the Deed of Trust are attached hereto as **Exhibit A**, and **Exhibit B**, respectively.[2]

In support of the Sale Motion, Trustee respectfully represents as follows:

## I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider the Sale Motion pursuant to sections 157 and 1334 of title 28 of the United States Code. 28 U.S.C. §§ 157, 1334. This is a core proceeding pursuant to section 157(b)(2). 28 U.S.C. §§ 157(b)(2). Venue is proper before this Court pursuant to sections 1408 and 1409 of title 28 of the United States Code. 28 U.S.C. §§ 1408-1409.

## II.     PROCEDURAL HISTORY

2.     On December 9, 2021 (the "**Petition Date**"), the Debtor filed a voluntary petition under chapter 7, title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"). The Court authorized that the Debtor's bankruptcy case, along with 10 other debtor affiliates, be jointly administered under lead case *In re: deeproot Capital Management, LLC*, Case No. 21-51523 (the "**Jointly Administered Cases**").

---

[2] All of the Exhibits to this Motion are being filed with the Court. In order to reduce the copying and postage expense of serving this Sale Motion, copies of the Exhibits are not being served on all of the parties in interest identified in the mailing list. A party in interest who requires copies of the Exhibits is directed to please contact MaryAnn Villa, Legal Assistant, Pulman Cappuccio & Pullen, LLP, Tel: (210) 222-9494 Ext. 121, Email: mvilla@pulmanlaw.com.

3.      On or about December 21, 2021, John Patrick Lowe was appointed as Chapter 7 Trustee of all eleven bankruptcy cases comprising the Jointly Administered Cases.

### III.    SUMMARY OF THE NOTE PURCHASE AND SALE AGREEMENT

4.      The Estate of the Debtor is the holder and payee of the Note in the original principal sum of $3,350,000, executed by CCW Braun Heights, LLC, as maker, and payable to the order of Debtor.  To the best of Trustee's information and belief, as of April 30, 2022, the Note had balance of principal plus accrued interest in an amount equal to approximately $2,027,964.73.  Payment of the Note is secured by a second lien on the Property pursuant to the Deed of Trust.

5.      The Trustee has been approached by CCW with an offer to purchase the Note, free and clear of all liens and encumbrances, for the purchase price of $1,000,000 (the "**Purchase Price**").  In the exercise of his best business judgment, the Trustee has determined that entering into a Note Purchase and Sale Agreement (the "**Purchase Agreement**") with CCW as purchaser, in the form attached hereto as Exhibit C, is in the best interests of the Debtor's Bankruptcy Estate. Purchaser has transferred into Trustee's counsel's IOLTA account an earnest money deposit in the amount of $100,000.00 (the "**Deposit**") to be applied against the Purchase Price.

### IV.    A BRIEF HISTORY OF THE DEBTOR

6.      Debtor and the other jointly administered debtors ran a Ponzi scheme. Debtor's principal, Mr. Robert Mueller ("**Mueller**"), controlled -- as the sole owner, officer and director of Debtor and the other jointly administered debtors -- all of their operations. Upon information and belief, Mueller raised approximately $60,000,000 on behalf of the jointly administered debtors from individual investors over the past decade. Mueller marketed Debtor and the other jointly administered debtors as having investments in life settlements, agriculture, real estate, and sports and entertainment. At some point, the jointly administered debtors invested monies in an effort to

develop pinball machines. The financial statements prepared by Debtor pre-petition and each of the jointly administered debtors' respective schedules reflect that none of the jointly administered debtors ever had any net income and, in most cases, had no revenue.

7. On August 20, 2021, the United States Securities and Exchange Commission (the "**SEC**") filed suit[3] against most of the jointly administered debtors and Mueller for federal securities fraud violations, and some of Mueller's immediate family members as relief parties. An injunction was entered prohibiting the solicitation of additional funds. Shortly thereafter, chapter 7 bankruptcy petitions were filed for each of the jointly administered debtors.

8. In or around May of 2017, the Debtor used investor funds that had been raised through the aforementioned Ponzi scheme to invest in a car wash facility being developed by CCW Braun Heights, LLC, as described in Section V, below.

## V. CCW, THE DEBTOR AND THE HISTORY OF THE NOTE

9. CCW Braun Heights, LLC was formed under the laws of the State of Texas, pursuant to a certificate of formation filed on or about September 28, 2016, with the Texas Secretary of State, for the purpose of purchasing undeveloped, commercial real property located on Bandera Road in San Antonio, Texas, and thereon developing a retail car wash facility to be operated under the name of *Auto Glide Express* (the "**Car Wash**").

10. The company affairs of CCW are governed by a *First Amended and Restated Operating Agreement,* dated May 11, 2017 (the "**Restated Operating Agreement**"), as amended by a certain *First Amendment to the First Amended and Restated Operating Agreement,* dated August 22, 2018 ("**First Amendment**"), and a *Second Amendment to the First Amended and*

---

[3] *Securities and Exchange Commission v. Robert J. Mueller, et al.*, Civil Action No. 5:21-cv-785, U.S. Dist. Ct. for the W. Dist. Of Texas, San Antonio Division.

*Restated Operating Agreement,* effective as of November 20, 2018 ("**Second Amendment**"). The Restated Operating Agreement, First Amendment, and Second Amendment are collectively referred to herein as the "**Operating Agreement.**" A copy of the Operating Agreement is attached hereto as Exhibit D.

11.     The members of CCW are its manager member, Conrad Car Wash, Inc., a Utah corporation (the "**Manager Member**"), the Debtor, The Clif and Susan Conrad Trust ("**Conrad Trust**"), and Mike and Angie Conrad ("**M & A Conrad**") (the Manager Member, the Debtor, Conrad Trust, and M & A Conrad are collectively the "**Members**").

12.     On or about May 11, 2017, CCW and Debtor entered into a Subscription Agreement (the "**Deeproot Subscription Agreement**"), pursuant to which Debtor agreed to acquire an ownership interest in CCW in exchange for a capital contribution in the amount of $3,350,000.00, which capital contribution was to be made by installments in accordance with a monthly construction schedule for the Car Wash as set forth in the Deeproot Subscription Agreement.

13.     Approximately eighteen months later, on or about November 20, 2018, CCW and Debtor entered into a First Amendment to Subscription Agreement, amending the Deeproot Subscription Agreement (the Deeproot Subscription Agreement, as amended by the First Amendment to Subscription Agreement, is herein referred to as the "**Subscription Agreement**"). A copy of the Subscription Agreement is attached hereto as Exhibit E.

14.     The Second Amendment and the First Amendment to Subscription Agreement, were precipitated by the Debtor's failure to fund the full amount of its committed equity contributions, which contributions were to have been made pursuant to an installment schedule tied to the progress of the construction of the Car Wash as provided in (i) the Restated Operating Agreement, as amended by the First Amendment, and (ii) the Deeproot Subscription Agreement.

As of the date of the Second Amendment, only $2,057,000 of the $3,350,000 committed by Debtor had been contributed to CCW.

15.     Debtor's failure to fully fund its equity contribution placed CCW in the position of being unable to timely pay contractors and vendors, and caused delay to the construction of the Car Wash.  In an effort to mitigate the effects of Debtor's failure to fund the committed equity, the Managing Member attempted to secure alternative financing from several third-party sources, however those attempts were unsuccessful.  Thus, in order to provide the necessary funds to pay vendors and contractors, Clif and Susan Conrad (the "**Conrads**"), who had contributed $150,000 of equity to CCW through the Conrad Trust, took out a home equity loan on their personal residence and borrowed money from friends, which they loaned to CCW over a period of months, the principal balance of these loans totaled $817,000.  As described in the Second Amendment, the Conrads converted a portion of the total sum of these loans to equity, leaving a principal loan balance of $775,000 (the "**Conrad Loan**"). The Conrad Loan is evidenced by a promissory note from CCW, as maker, in the total principal amount of $775,000, with an interest rate of 10% per annum through the date of maturity (November 1, 2019) and thereafter at the interest rate of 15% per annum (the "**Conrad Note**"), payment of which is secured by a first lien deed of trust granted by CCW against the Property.   In addition, pursuant to the Second Amendment and the Conrad Note, CCW agreed to pay to the Conrads an additional amount equal to all of the Conrads' out-of-pocket expense incurred in raising the funds for the Conrad Loan, including fees and interest incurred by the Conrad's in obtaining the home equity loan and in connection with money borrowed from friends (the "**Conrad Loan Related Costs**").

16.     Pursuant to the Second Amendment, CCW agreed to reimburse the Conrads for the Conrad Loan related costs, and pursuant to the First Amendment to Subscription Agreement

Debtor agreed to reimburse CCW for all interest costs and related costs that CCW incurs arising out of the Conrad Loan. As of May 31, 2022, accrued interest on the Conrad Loan totals $417,851.77, and as set forth in the Subscription Agreement, the Debtor agreed to reimburse CCW for such interest costs.

17.     Pursuant to the Second Amendment, the Debtor's equity contribution to CCW, which then totaled $2,057,000, was redeemed by CCW and converted to a loan to CCW with an outstanding principal balance in that same amount, and by such redemption the Debtor relinquished all interest it had in CCW and ceased to be a member of the company.

18.     Pursuant to the Subscription Agreement, the Debtor agreed to loan CCW an additional principal amount of $1,293,000, which when funded would result in a loan from Debtor in the total principal amount of $3,350,000 (the "**Deeproot Loan**"). It was further agreed that payment of the Deeproot Loan would be secured by a second lien deed of trust subordinate to the Conrad Loan. Sometime prior to August 9, 2019, the Debtor advanced additional loan proceeds to CCW, bringing the total principal balance of the Deeproot Loan to $2,257,000, to the Trustee's knowledge, no further amounts were loaned by Debtor to CCW.

19.     The Deeproot Loan is evidenced by the Note, in the principal sum of $3,350,000, maturing on the date which is five (5) years from the date of the grand opening of the Car Wash, as is defined in the First Amendment to Subscription Agreement. CCW has represented to the Trustee that the grand opening of the Car Wash occurred on March 29, 2019, which establishes the maturity date of the Note as March 29, 2024 (the "**Maturity Date**").

20.     Pursuant to the First Amendment to Subscription Agreement, the total outstanding balance of the amount of principal and interest (in an amount equal to 112.5% of the outstanding principal amount of the loan), shall be due on the Maturity Date in the form of a balloon payment.

{00589409;2}                                     7

As of April 30, 2022, the total amount of principal and interest outstanding on the Note equaled approximately $2,027,964.73.

## VI.  REQUESTED RELIEF

21.    The statutory predicates for the relief requested herein are sections 363 of the Bankruptcy Code, Rules 6004 and 9014 of the Federal Rules of Bankruptcy Procedure and Local Rule 6004(b) and 9014 of the Local Rules of Bankruptcy Procedure for the Western District of Texas.

## VII.  ARGUMENT AND AUTHORITY

### A.  Sale of the Note

22.    By this Sale Motion, the Trustee requests approval of the sale of the Note and the assignment of the Deed of Trust to the Purchaser (the "**Sale**").

23.    This is not an operating chapter 7 estate, and this transaction is outside of the ordinary course of business of the Debtor and other jointly administered debtors. Pursuant to 11 U.S.C. Section 363, the Trustee seeks approval to sell the Note to the Purchaser.

24.    Courts evaluate proposed sales outside the ordinary course of business under section 363(b) based upon the Trustee's sound business justification. S*ee Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); s*ee also In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011); *In re Cowin*, No. 13-30984, 2014 WL 1168714, at *38 (Bankr. S.D. Tex. Mar. 21, 2014).  "Great judicial deference is given to the Trustee's exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole,*

*Ltd.*, 331 B.R. 251, 255 (Bankr. N.D. Tex. 2005) (citing *In re Gulf States Steel*, 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002) (citing *In re Bakalis*, 229 B.R. 525, 531-532 (Bankr. E.D.N.Y. 1998)). "As long as [the sale] appears to enhance a debtor's estate, court approval of a [Trustee's] decision to [sell] should only be withheld if the [Trustee's] judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code…" *Id.* (citing *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5ᵗʰ Cir. 1985) (quoting *Allied Tech., Inc. v. R.B. Brunemann & Sons*, 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982)).

25.     The decision of the Trustee to conduct the Sale is based upon a sound business justification. The Note, as discussed above, is secured by a second lien deed of trust behind the first lien securing payment of the Conrad Note. As of May 31, 2022, the total outstanding balance of principal and interest on the Conrad Note amounted to approximately $1,146,046.77. The 2022 appraised value of the Property (land and improvements), as determined by the Bexar County Appraisal District, is $1,288,650 (a copy of the Bexar Appraisal District, 2022 Notice of Appraised Value, is attached hereto as <u>Exhibit F</u>). Pursuant to the financial information provided to Trustee by CCW, CCW values the Property (land and improvements) in an amount equal to approximately $2,400,000. Based upon the Trustee's analysis of the information available to the Trustee concerning the value of the Property, the amount of the outstanding balance of principal and interest of the Conrad Note, and the uncertainty of the future performance by CCW, the Trustee has determined in his best business judgment that the sale of the Note to the Purchaser for the Purchase Price is in the best interest of the estate and its creditors.

**B. The Subscription Agreement is an Executory Contract Rejected pursuant to 11 U.S.C. §365**

26.     Under §365 of the Bankruptcy Code, a trustee "may assume or reject any executory contract … of the debtor." 11 U.S.C. §365. In a case under chapter 7, if the trustee does not

assume or reject an executory contract within 60 days after the order for relief, then such contract is deemed rejected.  11 U.S.C. §365(d)(1).

27.     "An 'executory contract' is a contract 'on which performance remains due to some extent on both sides.'" *In re DeVries*, 2014 WL 4294540, at *8 (Bankr. N.D. Tex. 2014) (citations omitted). Pursuant to the terms of the Subscription Agreement, performance remains due on both sides, the Debtor is obligated to reimburse CCW for all costs and interest expense incurred by CCW in connection with the Conrad Loan, and CCW is obligated to pay to Debtor the outstanding balance of principal and interest due on the maturity of the Note.  Thus, the Subscription Agreement is an executory contract, and as the Trustee did not expressly accept, or reject, said agreement within 60 days after the order for relief, the Trustee is deemed to have rejected the Subscription Agreement pursuant to §365(d)(1).[4]

28.     "The trustee's ability to accept or reject an executory contract 'reflects the important consideration that the trustee should be able to abandon contracts that impose burdensome liabilities upon the bankruptcy estate, but should also be allowed to retain favorable contracts that benefit the estate.' That is, the estate gets the benefit of good bargains and can repudiate bad ones. This way §365 'advances one of the Code's central purposes, the maximization of the value of the bankruptcy estate for the benefit of creditors.'"  *Sullivan v. Mathew*, 2015 WL 159794, at *4 (N.D. Ill. 2015) (citing, *Matter of Midway Airlines, Inc*., 6 F.3d 492, 494 (7th Cir. 1993).

---

[4] Pursuant to the Second Amendment, upon the redemption of Debtor's equity interest the Debtor ceased to be a member of CCW and, therefore, any obligations Debtor may have had to CCW as a member or under the Operating Agreement ceased as well.  The foregoing notwithstanding, to the extent Debtor may be found to have any continuing obligations arising under the Operating Agreement, such obligations were likewise rejected when the Trustee rejected the Subscription Agreement.  "When several documents are construed as one contract the debtor must assume or reject them together." *In re Mirant Corp*., 303 B.R. 319, 322 n.7 (Bankr. N.D. Tex 2003) (citations omitted).

29.     "The significance of rejection of an unassumed executory contract is that it not only relieves the estate of onerous and burdensome future obligations but it also gives rise to a prepetition general unsecured claim for damages…" *In re Spectrum Information Technologies, Inc.*, 190 B.R. 741, 746 (E.D.N.Y. 1996).

30.     The Trustee's rejection of the Subscription Agreement relieves the Estate of the unduly burdensome future obligation of reimbursing CCW for the interest expense and other related costs incurred by CCW in connection with the Conrad Loan, thus allowing the Trustee to sell the Note unburdened by such obligation thereby maximizing the value of the Note for the benefit of the creditors of the Estate.  CCW has filed a Proof of Claim in the Debtor's bankruptcy case in which it has presented a prepetition general unsecured claim for damages in an amount approximately equal to the amount of the interest expense incurred by CCW in connection with the Conrad Loan. [Claim No. 86].

31.     The Trustee requests the Court to issue an order declaring the Subscription Agreement an executory contract rejected by the Trustee pursuant to §365(d)(1), and further order the Note be sold free and clear of the obligation to reimburse CCW for the interest expense and other related costs incurred by CCW in connection with the Conrad Loan.

**C.  The Purchaser is Acting in Good Faith and Negotiations have been at Arm's Length**

32.     The Trustee submits to the Court that CCW's proposed offer for the purchase of the Note was submitted by CCW to Trustee in good faith and the subsequent negotiations between the parties to reach agreement on the terms and conditions of the Purchase Agreement and agreement on the amount of the Purchase Price were conducted in good faith and at arm's length.

**D.  Sale Procedures**

33.     Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private or public sale.  Trustee believes that good cause exists to expose the Note to a public sale.  A public sale conducted substantially in accordance with the sale procedures (the "**Sale Procedures**"), attached hereto as <u>Exhibit G</u> and incorporated herein by this reference, will enable Trustee to obtain the highest and best offer for the Note, thereby maximizing its value for the benefit of the Estate.  The Sale Procedures provide for an expeditious manner to obtain the highest and best offers for the Note.  Therefore, Trustee respectfully requests that this Court approve the Sale Procedures.

34.      The sale of the Note will be open to the public.  Any interested purchaser will have the right to bid on the Note, provided such interested purchaser meets the requirements to be a Qualified Bidder and submits a Qualified Bid, as defined below.

35.     Any interested purchaser who notifies the Trustee of their desire to submit a bid for the purchase of the Note will, upon request to the Trustee, be provided copies of relevant financial information and due diligence materials (the "**Due Diligence**"), provided such interested purchaser first executes a confidentiality agreement in the form attached hereto as <u>Exhibit H</u> (the "**Confidentiality Agreement**").

36.     If an interested purchaser wishes to submit a Qualified Bid and participate as a Qualified Bidder, such interested purchaser shall, no later than the Bid Deadline (defined below), submit the following to the Trustee: (a) a bid for the purchase of the Note ("**Bid**"), (b) a purchase agreement, signed by an authorized representative of such interested purchaser, in a form acceptable to the Trustee, (c) evidence of financial ability to close the transaction, and (d) an earnest money deposit in the amount of One Hundred Thousand Dollars ($100,000.00), which amount shall be deposited into the IOLTA account of the Trustee's counsel, Randall A. Pulman,

at Pulman, Cappuccio & Pullen, LLP, by no later than five (5) days prior to the hearing on the Sale Motion (the "**Bid Deadline**").  Any such Bid submitted by the Bid Deadline shall be in the amount of at least One Million, Fifty Thousand and no/100 Dollars ($1,050,000.00) to be a qualified bid ("**Qualified Bid**") and to allow the bidder to become a Qualified Bidder ("**Qualified Bidder**"). The deposit of all Qualified Bidders (except for the highest bidder (the "**Successful Bidder**")) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

37.     By no later than noon on the day immediately following day of the Bid Deadline, Trustee will file a notice (the "**Bid Notice**") with the Court stating whether it has timely received a binding offer to purchase the Note in a cash amount of at least $1,050,000.00.

38.     In the event that Trustee files the Bid Notice stating that it has not received a cash offer of at least $1,050,000.00, the Court shall hold a final hearing to approve a sale of the Note to the Purchaser, or its assignee, free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. § 363. Such hearing shall be held seven (7) days following the filing of the Bid Notice, or as soon thereafter as may be scheduled by the Court (the "**Sale Hearing**").

39.     In the event Trustee receives at least one Qualified Bid, counsel for Trustee will file the Bid Notice with the Court and notify the Court's courtroom deputy that the Sale Hearing will be held on the date that is seven (7) days after the filing of the Bid Notice, or as soon thereafter as may be scheduled by the Court, where Trustee will seek approval of the sale of the Note to the Successful Bidder.

40.     In the event Trustee receives at least one Qualified Bid by the Bid Deadline, and such bid is better than CCW 's offer as may be determined solely by the Trustee in exercising his best business judgment and discretion, a public outcry auction shall be conducted at the Sale

Hearing.  Only CCW and any Qualified Bidder(s) shall be eligible to bid at the auction.  At the conclusion of the auction, the Court shall select the Successful Bidder.

41.     If any Successful Bidder fails to consummate a Sale because of a breach or failure to perform, the Qualified Bidder that submitted the next highest or otherwise best Qualified Bid (if any), as determined by Trustee (the "**Back-Up Bidder(s)**") will be deemed the Successful Bidder and Trustee will be authorized to consummate the Sale to such Back-Up Bidder without further order of the Court and such Qualified Bid shall thereupon be deemed the Successful Bid.

42.     If any Successful Bidder fails to consummate the purchase of the Note, and such failure is the result of a breach by such Successful Bidder, twenty-five percent (25%) of the Successful Bidder's deposit shall be forfeited to Debtor's Estate.

43.     Any objection(s) filed to the sale of the Note (i) shall be in writing and shall specify with particularity the grounds for such objections or other statements of position and (ii) shall be filed with the Court no later than five (5) days prior to the hearing on the Sale Motion**,** or as otherwise may be determined by the Court (the "**Objection Deadline**").  Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the Sale, including the transfer of the Note free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.  Any objections to the Sale Motion will be heard at the Sale Hearing.

44.     The Trustee reserves the right to (i) determine in its discretion whether any bid is a Qualified Bid, and (ii) reject, at any time prior to the entry of the Sale Order, without liability, any Bid that Trustee in its discretion, determines to be inadequate, insufficient, not in conformity with the Sale Procedures or the Bankruptcy Code, or contrary to the best interests of the Estate.

45.     The closing of the sale of the Note to the Successful Bidder shall occur no later than seven (7) days following the Court filing an order approving the sale of the Note to the Successful Bidder (the "**Closing Deadline**"). The Closing Deadline may be modified upon an agreement between Trustee and the Successful Bidder.

46.     The Trustee reserves the right to modify the Sale Procedures, without the need for any further order of the Court, including, without limitation (i) extending the deadlines set forth in these Sale Procedures, and (ii) requesting a continuance of the Sale Hearing.  Nothing contained in the Sale Procedures shall limit, alter, modify, waive or otherwise impair Trustee's reasonable business judgment in relation to the sale process contemplated by the Sale Procedures.

**E.  Sale Notice**

47.     Bankruptcy Rule 2002(a) provides, in relevant part, that all creditors must be given at least twenty-one (21) days' notice by mail of a proposed use, sale or lease of property of the estate other than in the ordinary course of business.

48.     Bankruptcy Rule 2002(h)(1) provides, in relevant part, that in a voluntary chapter 7 case, after 70 days following the order for relief under that chapter, the court may direct that all notices required by Rule 2002(a) be mailed to the debtor, the trustee, and creditors that hold claims for which proof of claims have been filed.

49.     By Order dated February 28, 2022 [ECF No. 74] (the "**Limited Notice Order**"), this Court ordered in relevant part that the Trustee is permitted to limit notice for all applicable motions under Rule 2002(a)(2) to the Limited Notice Parties, as defined in said Order (the "**Limited Notice Parties**"), and that such notice may be mailed through United States First Class Mail, or through electronic mail if an email address is provided.

50.     In accordance with the requirements of the Limited Notice Order, within three (3) business days after the Court enters an Order approving the Sale Motion, Trustee shall serve the Sale Notice ("**Sale Notice**") to (a) the Limited Notice Parties, (b) any parties who have expressed an interest in acquiring the Note, and (c) any other party to whom the Court may order notice. Service of such Sale Notice is proper, due, timely, good, and sufficient notice of, among other things, the Sale Procedures, the proposed Sale of the Note, and the procedure for objecting thereto. Additionally, Trustee may provide publication notice but only to the extent that Trustee believes such additional notice would improve the results of the Sale and is in the best interest of the estate. A proposed form of Sale Notice is attached hereto as <u>Exhibit I.</u>

**F.  Sale Free and Clear of All Liens, Claims and Encumbrances**

51.     The Trustee requests the Court order the Sale of the Note free and clear of all liens, claims, and encumbrances, and without recourse against the Trustee or the Debtor's Estate.  The Trustee submits that the Sale as contemplated in this Sale Motion satisfies §§363(b) and (f) of the Bankruptcy Code permitting the Trustee to sell property of the estate free and clear of any interest.

52.     The Trustee further requests the Court order that the Subscription Agreement (and the Operating Agreement, and related agreements) are executory contracts rejected by the Trustee pursuant to §365(d)(1), that the Sale of the Note shall be free and clear of the obligations of the Debtor under the Subscription Agreement (and the Operating Agreement), including the obligation to reimburse CCW for the interest expense and other related costs incurred by CCW in connection with the Conrad Loan, and that such obligations of the Subscription Agreement (and the Operating Agreement) shall not encumber the rights of the Successful Bidder who purchases the Note and takes assignment of the Deed of Trust.

### G. Proposed Orders

53.     The following proposed Orders are attached hereto for the Court's consideration: (a) Order Approving Trustee's Motion to Approve (A) Sale Procedures, and (B) the Form of Notice of Sale of Property of the Estate of deeproot Funds, LLC ("**Sale Procedure Order**"), attached hereto as <u>Exhibit J</u>, and (b) Order Approving Trustee's Motion to Approve the Sale of Property of the Estate of deeproot Funds, LLC, Free and Clear of All Interests Pursuant to 11 U.S.C. §§ 363(b) and (f) ("**Sale Order**"), attached hereto as <u>Exhibit K</u>.

## VIII.   PRAYER

WHEREFORE, the Trustee respectfully requests that the Court enter Orders approving (a) the Sale and Bidding Procedures, (b) the form and manner of the Sale Notice, (c) the date and time to conduct the Sale Hearing, and (d) the Sale of the Note free and clear of all interests and claims pursuant to 11 U.S.C. §§ 363(b) and (f), and such other relief, both at law and in equity to which Trustee may be justly entitled.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Randall A. Pulman*
    Randall A. Pulman
    Texas State Bar No. 16393250
    rpulman@pulmanlaw.com
    W. Drew Mallender
    Texas State Bar No. 24118450
    dmallender@pulmanlaw.com

**ATTORNEYS FOR JOHN PATRICK LOWE, CHAPTER 7 TRUSTEE**

### CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of September, 2022, I electronically filed the foregoing document using the CM/ECF system, which will serve the document on the following list of parties in interest and parties requesting notice..

***Via Counsel CM/ECF:***
*catherine.curtis@wickphillips.com*
*;jason.rudd@wickphillips.com*
Policy Services, Inc.
deeproot Pinball, LLC
deeproot Growth Runs Deep Fund, LLC
deeproot 575 Fund, LLC
deeproot 3 Year Bonus Income Fund, LLC
deeproot BonusGrowth 5 Year Debenture Fund, LLC
deeproot Tech, LLC
deeproot Funds, LLC
deeproot Studios, LLC
deeproot Capital Management, LLC
12621 Silicon Dr.
San Antonio, TX 78249

***Via Counsel Via CM/ECF:***
*catherine.curtis@wickphillips.com;*
*jason.rudd@wickphillips.com*
Wizard Mode Media, LLC
12227 S. Business Park Drive, Suite 130
Draper, UT 84020

***Via CM/ECF: pat.lowe.law@gmail.com***
John Patrick Lowe
2402 East Main Street
Uvalde, TX 78801

***Via CM/ECF:***
*catherine.curtis@wickphillips.com;*
*jason.rudd@wickphillips.com*
Catherine A. Curtis/Jason M. Rudd
WICK PHILLIPS GOULD & MARTIN, LLP
3131 McKinney Ave, Suite 500
Dallas, TX 75204

***Via CM/ECF:***
*USTPRegion07.SN.ECF@usdoj.gov*
*Aubrey.thomas@usdoj.gov*
United States Trustee - SA12
US TRUSTEE'S OFFICE (Aubrey Thomas)
615 E Houston, Suite 533
San Antonio, TX 78295-1539

***Via CM/ECF: don.stecker@lgbs.com***
Don Stecker
Linebarger Goggan et al.
112 E. Pecan, Suite 2200
San Antonio, TX 78205

***Via CM/ECF: rbattaglialaw@outlook.com***
Raymond W. Battaglia
LAW OFFICES OF RAY BATTAGLIA, PLLC
66 Granburg Circle
San Antonio, TX 78218

***Via CM/ECF: jpetree@mcslaw.com***
Jonathan Petree
MCGUIRE, CRADDOCK & STROTHER, P.C.
500 N. Akard Street Suite 2200
Dallas, TX 75201

***Via CM/ECF: jdunne@smfadlaw.com***
John C. Dunne
SHANNON, MARTIN et al.
1001 McKinney Street #1100
Houston, TX 77002

***Via CM/ECF: bk-cmurphy@oag.texas.gov***
Texas Workforce Commission
c/o Christopher S. Murphy
TEXAS ATTORNEY GENERAL'S OFFICE
PO Box 12548
Austin, TX 78711

***Via CM/ECF: pautry@branscomblaw.com***
Patrick H. Autry
BRANSCOMB PLLC
4630 N. Loop 1604 West, Suite 206
San Antonio, TX 78249

***Via CM/ECF: lmjurek@jureklaw.com***
Lynne M. Jurek
THE JUREK LAW GROUP, PLLC
4309 Yoakum Blvd.
Houston, TX  77006

*/s/Randall A. Pulman*
Randall A. Pulman

**<u>EXHIBIT A</u>**

**NOTE**

FINAL EXECUTION COPY

## PROMISSORY NOTE

**Effective Date:** November 20, 2018

**Maker:** CCW Braun Heights, LLC, a Texas limited liability company

**Maker's Mailing Address:** 22809 Citron Circle, San Antonio, TX 78260

**Payee:** deeproot Funds, LLC, a Texas limited liability company

**Place for Payment:** PO Box 691610, San Antonio, TX 78260-1610

**Principal Amount:** THREE MILLION THREE HUNDRED FIFTY THOUSAND DOLLARS AND NO CENTS ($3,350,000.00),as adjusted by the First Amendment to Subscription Agreement of deeproot Funds, LLC. A list of the installments of loan proceeds is attached hereto as Exhibit A.

**Maturity Date:** Five (5) years from the date of the grand opening of the carwash facility (Opening date is defined in the First Amendment to Subscription Agreement of deeproot Funds, LLC).

**Interest Rate on Unpaid Principal:** Pursuant to the First Amendment to Subscription Agreement of deeproot Funds, LLC.

**Annual Interest Rate on Matured, Unpaid Amounts:** FIVE (5%) PERCENT SIMPLE INTEREST, NOT COMPOUNDED

**Terms of Payment:** All accrued interest on the Principal Amount and the Principal Amount shall be due and payable in a balloon amount on the Maturity Date, Pursuant to the First Amendment to Subscription Agreementof deeproot Funds, LLC.

**Security for Payment:** Deed of Trust dated on or about November 20, 2018, securing a second lien against certain real property located in Bexar County, Texas.

Maker promises to pay to the order of Payee, at the place for payment and according to the terms of payment, the principal amount plus interest at the rates and in the amounts stated above. Maker promises to pay interest on matured, unpaid amounts at the Annual Interest Rate on Matured, Unpaid Amounts.

If Maker defaults in the payment of this Promissory Note, and the default continues after Payee gives Maker ten (10) days prior written notice of the default, or if a default occurs pursuant to the terms of the Security Agreement referenced above, then Payee may declare the unpaid principal

DR Promissory Note $3,350,000

FINAL EXECUTION COPY

balance and earned and accrued interest on this note immediately due and payable. Maker waives all demands for payment, presentations for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

If this Promissory Note is given to an attorney for collection or enforcement, or if suit is brought for collection or enforcement, or if it is collected or enforced through probate, bankruptcy, or other judicial proceeding, then Maker shall pay Payee all costs of collection and enforcement, including reasonable attorneys' fees and court costs, in addition to other amounts due.

Interest on the debt evidenced by this note shall not exceed the maximum amount of non-usurious interest that may be contracted for, taken, reserved, charged, or received under the laws of the State of Texas; any interest in excess of that maximum amount shall be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides other provisions in this and all other instruments concerning the debt.

Maker may prepay the principal amount outstanding in whole or in part. Any partial prepayment shall be applied against the principal amount outstanding and shall not postpone the due date of any subsequent monthly installments or change the amounts of such installment, unless the Payee shall otherwise agree in writing. Additional principal payments may be made in any amount on any regular payment date. Maker may pay this note in full at any time without charge or penalty.

Maker is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

[Signature on next page.]

DR Promissory Note $3,350,000

FINAL EXECUTION COPY

balance and earned and accrued interest on this note immediately due and payable. Maker waives all demands for payment, presentations for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

If this Promissory Note is given to an attorney for collection or enforcement, or if suit is brought for collection or enforcement, or if it is collected or enforced through probate, bankruptcy, or other judicial proceeding, then Maker shall pay Payee all costs of collection and enforcement, including reasonable attorneys' fees and court costs, in addition to other amounts due.

Interest on the debt evidenced by this note shall not exceed the maximum amount of non-usurious interest that may be contracted for, taken, reserved, charged, or received under the laws of the State of Texas; any interest in excess of that maximum amount shall be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides other provisions in this and all other instruments concerning the debt.

Maker may prepay the principal amount outstanding in whole or in part. Any partial prepayment shall be applied against the principal amount outstanding and shall not postpone the due date of any subsequent monthly installments or change the amounts of such installment, unless the Payee shall otherwise agree in writing. Additional principal payments may be made in any amount on any regular payment date. Maker may pay this note in full at any time without charge or penalty.

Maker is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

[Signature on next page.]

Grand Opening cccBH

3/29/2019

DR Promissory Note $3,350,000

FINAL EXECUTION COPY

**MAKER:**

CCW Braun Heights, LLC,
a Texas limited liability company

BY: _____
Mike Conrad, Co-Manager Member

Signature Page

FINAL EXECUTION COPY

**Exhibit A**
**Schedule of Funding Dates and Amounts**

| Funding Date | Amount |
|---|---|
| May 12, 2017 | $625,000.00 |
| August 23, 2017 | $250,000.00 |
| August 24, 2017 | $86,000.00 |
| January 10, 2018 | $180,000.00 |
| February 9, 2018 | $40,000.00 |
| May 15, 2018 | $125,000.00 |
| June 6, 2018 | $51,000.00 |
| August 7, 2018 | $100,000.00 |
| September 10, 2018 | $100,000.00 |
| October 19, 2018 | $100,000.00 |
| Subtotal: | $2,057,000.00 |

EXHIBIT A

This is NOT a Tax Statement

# 2022 Notice of Appraised Value

Do Not Pay From This Notice

**BEXAR APPRAISAL DISTRICT**
**411 N. FRIO, P.O. BOX 830248**
**SAN ANTONIO, TX 78283-0248**

Phone: (210) 224-2432    Fax: (210) 242-2453

DATE OF NOTICE: April 8, 2022

#BWNCTVY
#0112871694#

Property ID: 1287169 - 19142-002-0050

D3 REAL ESTATE CONSULTANTS LLC
Agent for: CCW BRAUN HEIGHTS LLC
PO BOX 592226
SAN ANTONIO, TX 78259-0161

**Account#** 1287169
**Ownership %:** 100.00
**Geo ID:** 19142-002-0050
**DBA:** AUTO GLIDE EXPRESS CAR WASH
**Legal:** NCB 19142 (CCW BRAUN HEIGHTS   COMMERCIAL), BLOCK 2 LOT 5
**Legal Acres:** 1.019
**Situs:** 10670 BANDERA  SAN ANTONIO, TX 78250
**Agent ID:** 2872182
**Efile PIN:** XXXXXXXXXXXXXXXXXXXXXXXX

*** THIS IS NOT A BILL ***

Dear Property Owner,
   We have appraised the property listed above for the tax year 2022.  As of January 1, our appraisal is outlined below.

| Appraisal Information | Last Year - 2021 | Proposed - 2022 |
|---|---|---|
| Market Value of Improvements (Structures / Buildings, etc.) | 533,110 | 598,870 |
| Market Value of Non Ag/Timber Land | 664,040 | 689,780 |
| Market Value of Ag/Timber Land | 0 | 0 |
| Market Value of Personal Property/Minerals | 0 | 0 |
| Total Market Value | 1,197,150 | 1,288,650 |
| Productivity Value of Ag/Timber Land | 0 | 0 |
| Appraised Value | **1,197,150** | **1,288,650** |
| Homestead Cap Value excluding Non-Homesite Value (i.e. Ag, Commercial) | 0 | 0 |
| Exemptions     (DV - Disabled Vet; DP-Disabled Person; HS-Homestead; OV65-Over 65) | | |

| 2021 Exemption Amount | 2021 Taxable Value | Taxing Unit | 2022 Proposed Appraised Value | 2022 Exemption Amount | 2022 Taxable Value | 2021 Tax Rate | 2022 Estimated Taxes | FreezeYear and Tax Ceiling |
|---|---|---|---|---|---|---|---|---|
| 0 | 1,197,150 | BEXAR CO RD & FLOOD | 1,288,650 | 0 | 1,288,650 | 0.023668 | 305.00 | |
| 0 | 1,197,150 | SA RIVER AUTH | 1,288,650 | 0 | 1,288,650 | 0.018580 | 239.43 | |
| 0 | 1,197,150 | ALAMO COM COLLEGE | 1,288,650 | 0 | 1,288,650 | 0.149150 | 1,922.02 | |
| 0 | 1,197,150 | UNIV HEALTH SYSTEM | 1,288,650 | 0 | 1,288,650 | 0.276235 | 3,559.70 | |
| 0 | 1,197,150 | BEXAR COUNTY | 1,288,650 | 0 | 1,288,650 | 0.276331 | 3,560.94 | |
| 0 | 1,197,150 | CITY OF SAN ANTONIO | 1,288,650 | 0 | 1,288,650 | 0.558270 | 7,194.14 | |
| 0 | 1,197,150 | NORTHSIDE ISD | 1,288,650 | 0 | 1,288,650 | 1.261300 | 16,253.74 | |

**DO NOT PAY FROM THIS NOTICE**    Total Estimated Tax:  $33,034.97

**The governing body of each unit decides whether or not property taxes will increase.  The appraisal district only determines the value of your property.** _The Texas Legislature does not set the amount of your local taxes.  Your property tax burden is decided by your locally elected officials, and all inquiries concerning your taxes should be directed to those officials._

If you qualified your home for an age 65 and older or disabled person homestead exemption for school taxes, the school taxes on that home cannot increase as long as you own and live in that home. The tax ceiling is the amount that you pay in the year that you qualified for the 65 and older or disabled person exemption. The school taxes on your home may not go above the amount of the ceiling, unless you improve the home (other than normal repairs and maintenance).

Beginning August 7th, visit Texas.gov/PropertyTaxes to find a link to your local property tax database where you can easily access information regarding your property taxes, including information regarding the amount of taxes that each entity that taxes your property will impose if the entity adopts its proposed tax rate. Your local property tax database will be updated regularly during August and September as local elected officials propose and adopt the property tax rates that will determine how much you pay in property taxes. Property owners who file a notice of protest with the appraisal review board (ARB) may request an informal conference with the appraisal district to attempt to resolve disputes prior to a formal ARB hearing. In counties with populations of 1 million or more, property owners may request an ARB special panel for certain property protests. Contact your appraisal district for further information.

**If you currently receive a residence homestead exemption, the exemption amounts shown on this notice are those provided by law as of the date of this notice. If Texas voters approve the proposed constitutional amendment to increase the general residence homestead exemption for school taxes from $25,000 to $40,000, your exemption amount will automatically increase, and school districts will compute your taxes using the greater exemption amount.**

To file a protest, complete the notice of protest form following the instructions included in the form and no later than the deadline below, mail or deliver the form to the appraisal review board at the following address: Bexar Appraisal Review Board * PO Box 830248 * San Antonio, TX 78283-0248

**Deadline for filing a protest:**     **May 16, 2022**
**Location of Hearings:**          **411 N FRIO ST**
**ARB will begin hearings:**       **June 6, 2022**

Included are copies of the following documents published by the Texas Comptroller of Public Accounts: (1) Property Taxpayer Remedies; (2) Notice of Protest; and (3) Exemption Description List.
If you have any questions or need more information, please contact the appraisal district office at (210) 224-2432 or at the address shown above.
Sincerely,
Michael Amezquita, Chief Appraiser

# EXHIBIT B

**DEED OF TRUST**

FINAL EXECUTION COPY

## Subordinate Second Lien Deed of Trust

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

### Terms

SCANNED

| | |
|---|---|
| Date: | November 20, 2018 |
| Grantor: | CCW Braun Heights, LLC, a Texas limited liability company |
| Grantor's Mailing Address: | 22809 Citron Circle, San Antonio, TX 78260 |
| Trustee: | Robert J. Mueller |
| Trustee's Mailing Address: | PO Box 691610, San Antonio, TX 78260-1610 |
| Lender: | deeproot Funds, LLC, a Texas limited liability company |
| Lender's Mailing Address: | PO Box 691610, San Antonio, TX 78260-1610 |

Obligation

    Note

| | |
|---|---|
| Date: | November 20, 2018 |
| Original principal amount: | $3,350,000.00 (as adjusted by the First Amendment to Subscription Agreement of deeproot Funds, LLC) |
| Borrower: | CCW Braun Heights, LLC, a Texas limited liability company |
| Lender: | deeproot Funds, LLC, a Texas limited liability company |
| Maturity date: | Five (5) years from the Opening Date of the carwash facility (Opening Date is defined in the First Amendment to Subscription Agreement of deeprrot Funds, LLC) |
| Property (including any improvements): | Being that certain 1.019 acre tract in Bexar County, Texas as more particularly described in Exhibit A, |

FINAL EXECUTION COPY

attached hereto.

Second-Lien: This lien created by this Deed of Trust will be subordinated to the lien securing payment of a note, and any renewals, extensions, and modifications, thereof, in the original principal amount of $775,000.00 dated on or about December 1, 2018, executed by CCW Braun Heights, LLC, a Texas limited liability company payable to the order of Clif and Susan Conrad ("**Conrad Note**"), and more fully described in the Deed of Trust recorded in the real property records of Bexar County, Texas ("**Conrad First Lien**").

Other Exceptions to Conveyance and Warranty: Existing easements, rights-of-way, and prescriptive rights, whether of record or not; all presently recorded and existing restrictive covenants, instruments, reservations, covenants, conditions, oi; and gas leases, mineral interests, and water interests, and other instruments that affect the Property: any discrepancies, encroachments, conflicts, or shortages in area or boundary lines; existing debts and liens, and current taxes.

For value received and to secure payment of the Obligation, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Obligation and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

### Clauses and Covenants

**A.    Grantor's Obligations**

Grantor agrees —

1.    to keep the Property in good repair and condition;

2.    to pay all taxes and assessments on the Property before delinquency, not authorize a taxing entity to transfer its tax lien on the Property to anyone other than Lender, and not request a deferral of the collection of taxes pursuant to section 33.06 of the Texas Tax Code;

3.    to defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

4.    to maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender at least ten days before the expiration of the Required Insurance Coverages;

5.    to obey all laws, ordinances, and restrictive covenants applicable to the Property;

6.    to keep any buildings occupied as required by the Required Insurance Coverages;

DR Deed of Trust $3,350,000                                                             Page 2 of 7

FINAL EXECUTION COPY

7.     if the lien of this deed of trust is not a first lien, to pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments; and

8.     to notify Lender of any change of address.

9.     that this deed of trust

    a.     is unconditionally subordinated to the Conrad Note and Conrad First Lien;

    b.     if any action is instituted to foreclose or otherwise to this deed of trust, no action may be taken that would terminate any occupancy or tenancy without the prior written consent of the holder of the Conrad Note and Conrad First Lien, and that consent, if granted, may be conditioned in any manner the holder determines;

    c.     rents, if collected by or for the holder of this deed of trust, will be applied first to the payment of the obligations under the Conrad Note and Conrad First Lien then due and to expenses incurred in the ownership, operation, and maintenance of the Property in any order holder of the Conrad Note and Conrad First Lien may determine, before being applied to any indebtedness secured by this deed of trust;

    d.     written notice of default under this deed of trust and written notice of the commencement of any action to foreclose or otherwise enforce this deed of trust must be given to holder of the Conrad Note and the Conrad First Lien concurrently with or immediately after the occurrence of any such default or commencement; and

    e.     in the event of the bankruptcy of Grantor, all amounts due on or with respect to the obligations under the Conrad Note and Conrad First Lien will be payable in full before any payments on the indebtedness secured this deed of trust.

10.     that in the event that the Grantor obtains a loan that is used to pay off the Conrad Note, then the Grantor agrees to execute a subordination agreement with the new lender that has the effect of subordinating this deed of trust to that lender's deed of trust and other security documents.

**B.     Lender's Rights**

1.     Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees, succeeding to all rights and responsibilities of Trustee.

2.     If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

3.     Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligation or to repair or replace damaged or destroyed

DR Deed of Trust $3,350,000                                          Page 3 of 7

FINAL EXECUTION COPY

improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the property insurance proceeds available to Grantor for repairs.

4.    Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

5.    If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

6.    If a default exists in payment of the Obligation or performance of Grantor's obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may—

     a.    declare the unpaid principal balance and earned interest on the Obligation immediately due;

     b.    exercise Lender's rights with respect to rent under the Texas Property Code as then in effect;

     c.    direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

     d.    purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

7.    Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

**C.    Trustee's Rights and Duties**

If directed by Lender to foreclose this lien, Trustee will—

1.    either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2.    sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Lien and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

3.    from the proceeds of the sale, pay, in this order—

FINAL EXECUTION COPY

a.    expenses of foreclosure, including a reasonable commission to Trustee;

b.    to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

c.    any amounts required by law to be paid before payment to Grantor; and

d.    to Grantor, any balance; and

4.    be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

## D.    General Provisions

1.    If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.    Recitals in any trustee's deed conveying the Property will be presumed to be true.

3.    Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4.    This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

5.    If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

6.    Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7.    Grantor collaterally assigns to Lender all present and future rent from the Property and its proceeds. Grantor warrants the validity and enforceability of the assignment. Grantor will apply all rent to payment of the Obligation and performance of this deed of trust, but if the rent exceeds the amount due with respect to the Obligation and the deed of trust, Grantor may retain the excess. If a default exists in payment of the Obligation or performance of this deed of trust, Lender may exercise Lender's rights with respect to rent under the Texas Property Code as then in effect. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph

DR Deed of Trust $3,350,000                                       Page 5 of 7

FINAL EXECUTION COPY

without taking possession of the Property. Lender will apply all rent collected under this paragraph as required by the Texas Property Code as then in effect. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies.

8.      Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9.      In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10.      If Grantor transfers any part of the Property without Lender's prior written consent, Lender may declare the Obligation immediately payable and invoke any remedies provided in this deed of trust for default. If the Property is residential real property containing fewer than five dwelling units or a residential manufactured home, this provision does not apply to (a) a subordinate lien or encumbrance that does not transfer rights of occupancy of the Property; (b) creation of a purchase-money security interest for household appliances; (c) transfer by devise, descent, or operation of law on the death of a co-Grantor; (d) grant of a leasehold interest of three years or less without an option to purchase; (e) transfer to a spouse or children of Grantor or between co-Grantors; (f) transfer to a relative of Grantor on Grantor's death; (g) a transfer resulting from a decree of a dissolution of marriage, a legal separation agreement, or an incidental property settlement agreement by which the spouse of Grantor becomes an owner of the Property; or (h) transfer to an inter vivos trust in which Grantor is and remains a beneficiary and occupant of the Property.

11.      Grantor may not sell, transfer, or otherwise dispose of any Property, whether voluntarily or by operation of law, without the prior written consent of Lender. If granted, consent may be conditioned upon (a) the grantee's integrity, reputation, character, creditworthiness, and management ability being satisfactory to Lender; and (b) the grantee's executing, before such sale, transfer, or other disposition, a written assumption agreement containing any terms Lender may require, such as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation.

12.      When the context requires, singular nouns and pronouns include the plural.

13.      The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

14.      This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

FINAL EXECUTION COPY

15.    If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

16.    Grantor and each surety, endorser, and guarantor of the Obligation waive, to the extent permitted by law, all (a) demand for payment, (b) presentation for payment, (c) notice of intention to accelerate maturity, (d) notice of acceleration of maturity, and (e) protest.

17.    Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

18.    If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

19.    The term *Lender* includes any mortgage servicer for Lender.

20.    Grantor represents that this deed of trust and the Note are given for the following purposes: construction of office building.

[Signatures on next page.]

DR Deed of Trust $3,350,000

**GRANTOR:**

CCW Braun Heights, LLC,
a Texas limited liability company

BY: _____
Mike Conrad, Co-Manager Member

Grantor's Signature Page

STATE OF TEXAS
COUNTY OF BEXAR

     This instrument was acknowledged before me on 11/27/2018 by Michael C. Conrad, as Co-Manager Member of CCW Braun Heights, LLC, a Texas limited liability company.

[Seal]

JAMES DONELSON
My Commission Expires
April 10, 2019

                                    NOTARY PUBLIC

My commission expires: 4-10-2019

Grantor's Signature Page

## Exhibit A
## Property Description

**BEING** 1.019 acres out of the JOSE ALAMEDA SURVEY No. 81, ABSTRACT No. 26, COUNTY BLOCK 4017, Bexar County, Texas, said 1.019 acres being out of the GERALD W. HARRELL REVOCABLE TRUST 3.2206 acre tract, 'Tract A,' as recorded in Volume 17191, Page 2337 of the Official Public Records of Bexar County, Texas, said 1.019 acres being more particularly described by metes and bounds as follows:

**BEGINNING** at a found 1/2" rebar with plastic cap "PAPE-DAWSON" for the southern corner of this tract, the southeastern corner of the said GERALD W. HARRELL REVOCABLE TRUST 3.2206 acre tract, the southwestern corner of Lot 3, Block 2, NCB 19142, SAN SABA APARTMENTS SUBDIVISION as shown on plat recorded in Volume 9656, Page 106 of the Deed & Plat Records for Bexar County, Texas, located on the northeastern ROW line of BANDERA ROAD (180' PUBLIC ROW) from which a found 1/2" rebar with plastic cap "PAPE-DAWSON" for the northeastern corner of said GERALD W. HARRELL REVOCABLE TRUST 3.2206 acre tract bears North 17°57'46" East for 643.48 feet (North 18°07'55" East for 643.56 feet, R1) for reference;

**THENCE** northwesterly along a curve to the right for 263.82 feet (R=3759.83', D=4°01'13", CB=N 45°01'08" West, CH=263.77') along the southwestern boundary of this tract, the northeastern ROW of said BANDERA ROAD to a found 1/2" rebar with no identification for a point of tangency;

**THENCE** North 43°20'31" West for 41.39 feet continuing along the southwestern boundary of this tract, the northeastern ROW of said BANDERA ROAD to a found 1/2" rebar with no identification for the western corner of this tract, the southern corner of Lot 2, Block 1, NCB 18280, ATLANTIC – BANDERA/PRUE SUBDIVISION as shown on plat recorded in Volume 9550, Page 39 of the Deed & Plat Records of Bexar County, Texas;

**THENCE** North 35°44'52" East for 156.49 feet along the northwestern boundary of this tract, the southeastern boundary of said Lot 2, Block 1, NCB 18280 departing from the ROW of said BANDERA ROAD to a point for the northern corner of this tract;

**THENCE** through the interior of said GERALD W. HARRELL REVOCABLE TRUST 3.2206 acre tract, along the northeastern boundary of this tract, the following courses and distances:

1.    South 45°03'20" East for 52.36 feet to a point for angle;

2.    North 89°56'40" East for 7.07 feet to a point for angle;

3.    South 45°03'26" East for 143.18 feet to a point for angle;

4.    South 44°56'40" West for 5.00 feet to a point for angle;

Exhibit A

5.      South 45°03'24" East for 50.25 feet to a point for the eastern corner of this tract, located on the eastern boundary of said GERALD W. HARRELL REVOCABLE TRUST 3.2206 acre tract, the western boundary of said Lot 3, Block 2, NCB 19142;

**THENCE** South 17°57'46" West for 174.93 feet along the southeastern boundary of this tract to the **POINT OF BEGINNING**.

**CONTAINING:** 1.019 acres of land.

The Basis of Bearings is Texas State Plane Coordinate System, NAD 1983, South Central Zone (4204). This description was based on a survey made on the ground under my supervision completed on August 18, 2016 from which an exhibit was prepared.

Exhibit A



*VG-46-2018-20180233082*

**File Information**

**FILED IN THE OFFICIAL PUBLIC RECORDS OF BEXAR COUNTY**
**GERARD C. RICKHOFF, BEXAR COUNTY CLERK**

| | |
|---|---|
| **Document Number:** | 20180233082 |
| **Recorded Date:** | November 29, 2018 |
| **Recorded Time:** | 11:13 AM |
| **Total Pages:** | 12 |
| **Total Fees:** | $66.00 |

### ** THIS PAGE IS PART OF THE DOCUMENT **

### ** Do Not Remove **

Any provision herein which restricts the sale or use of the described real property because of race is invalid and unenforceable under Federal law

STATE OF TEXAS, COUNTY OF BEXAR

I hereby Certify that this instrument was FILED in File Number Sequence on this date and at the time stamped hereon by me and was duly RECORDED in the Official Public Record of Bexar County, Texas on:
11/29/2018 11:13 AM

Gerard C. Rickhoff
Bexar County Clerk

## **EXHIBIT C**

## **PURCHASE AGREEMENT**

## Note Purchase and Sale Agreement

This NOTE PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made and entered into as of August ___, 2022, by and between J. PATRICK LOWE, the Chapter 7 Trustee for the bankruptcy estate of *In re deeproot Funds, LLC,* Case No. 21-51521, in the United States Bankruptcy Court of the Western District of Texas, San Antonio Division, which case is being Jointly Administered under Lead Case *In re deeproot Capital Management, LLC, et al.*, Case No. 21-51523, in the United States Bankruptcy Court of the Western District of Texas, San Antonio Division ("**Seller**" and/or "**Trustee**"), and CCW BRAUN HEIGHTS, LLC, a Texas limited liability company, or its assigns (collectively referred to herein as "**Purchaser**" and/or "**CCW**") (Trustee and CCW are herein together referred to as the "**Parties**"). [1]

### Recitals

A. deeproot Funds, LLC, a Texas limited liability company (the "**Debtor**"), the holder and payee of the Note (defined below), filed for Chapter 7 bankruptcy on December 9, 2021, in the United States Bankruptcy Court of the Western District of Texas, San Antonio Division, Case No. 21-51521, which case is being Jointly Administered in said Court under Lead Case *In re deeproot Capital Management, LLC*, et al., Case No. 21-51523 (the "**Bankruptcy Case**").

B. Debtor is the holder and named payee of a certain Promissory Note dated November 20, 2018, in the original principal amount of $3,350,000 (the "**Note**")[2], executed by CCW and payable to the order of Debtor. Payment of the Note is secured by a lien on certain real property located at 10670 Bandera, San Antonio, Texas 78250 (the "**Property**") pursuant to a certain Subordinated Second Lien Deed of Trust of even date with the Note (the "**Deed of Trust**"), executed by Debtor, as lender, and by CCW, as grantor, and recorded in the official public records of Bexar County, Texas. The current outstanding balance of the Note is $2,027,964.73 as of April 30, 2022.  A copy of the Note and a copy of the Deed of Trust are attached hereto as Exhibit A and Exhibit B, respectively.

C. The Trustee, in connection with the performance of his statutory duties, and in the exercise of his best business judgment, has determined that the sale of the Note and the assignment of the Deed of Trust to CCW, in accordance with and pursuant to the terms of this Agreement, is in the best interests of the Bankruptcy Estate of Debtor.

---

[1] The administratively consolidated chapter 7 cases, along with their respective case numbers and the last four digits of each Debtor's federal tax identification number, are:  In Re: Policy Services, Inc. 21-51513 (2864), In Re: Wizard Mode Media, LLC, 21-51514 (3205), In Re: deeproot Pinball LLC, 21-51515 (0320), In Re: deeproot Growth Runs Deep Fund, LLC, 21-51516 (8046), In Re: deeproot 575 Fund, LLC, 21-51517 (9404), In Re: deeproot 3 Year Bonus Income Debenture Fund, LLC, 21-51518 (7731), In Re: deeproot Bonus Growth *5* Year Debenture Fund, LLC, 21-51519 (9661),  In Re: deeproot Tech LLC, 21-51520 (9043), In Re: deeproot Funds LLC, 21-51521  (9404), In Re: deeproot Studios LLC , 21-51522 (6283), and In Re: deeproot Capital Management,  LLC, 21-51523 (2638), each a "**Bankruptcy Estate**" and collectively, the "**Bankruptcy Estates**".

[2] Notwithstanding the face amount of the Note, the total amount advanced was $2,257,000.

D.  CCW desires to purchase all rights, title and interest in and to the Note and to accept the assignment of the Deed of Trust in accordance with and pursuant to the terms and conditions of this Agreement.

E.  In connection with the purchase and sale of the Note and the assignment of the Deed of Trust to CCW, counsel to the Trustee will prepare and file a Motion to Sell (defined below) and other ancillary motions with the Court in the Bankruptcy Case.

F.  Purchaser enters into this Agreement with the understanding that the Motion to Sell must be granted, and the requested relief ordered by the Bankruptcy Court before the sale of the Note and related transactions contemplated by this Agreement may be consummated by the Parties and closed.

## **AGREEMENT**

NOW THEREFORE, for and in consideration of the foregoing RECITALS, which are hereby incorporated into this Agreement, the mutual promises and covenants set further herein, and for other good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the Parties hereto agree as follows:

1.  Purchase Price.  Purchaser hereby agrees to pay the sum of One Million Dollars ($1,000,000.00) (the "**Purchase Price**"), for the sole purpose of acquiring all rights, title and interest in and to the Note and the Deed of Trust.

2.  Deposit.  Upon the execution of this Agreement by the Parties, Purchaser shall provide the Trustee with evidence of financial ability to close, together with a earnest money in the amount of $25,000 ~~$100,000~~ ("Earnest Money").  Five (5) days prior to the hearing on the Motion to Sell Purchaser shall deposit into the IOLTA account of Trustee's counsel, acting on behalf of Seller, an additional sum of $975,000.00 ~~$900,000~~ (together with the Earnest Money, the "**Deposit**") for the sole purpose of acquiring all rights, title and interest in and to the Note and the Deed of Trust.  The Deposit shall be held in trust in the IOLTA account of the Trustee's counsel.  Upon the proper transfer of the ownership of the Note and the Assignment of the Deed of Trust to Purchaser, the Trustee's counsel shall immediately disburse the Deposit to Seller in satisfaction of the Purchase Price (the "**Closing**").  Purchaser shall cause the Deposit to be wire transferred to the Trustee's counsel's IOLTA account using the following instructions:

JP Morgan Chase Bank
712 Main Street
10th Floor South
Houston, Texas 77002
(713) 216-2041

ABA Number: 111000614
International ABA Number: 021000021

{00582691;2}                                    2

DocuSign Envelope ID: 3D342184-AF49-4906-A5FE-FC1CA89D18B5

Account Number:
Swift Code:  CHASUS33

3.      <u>Motion to Sell</u>.  The Trustee shall file a motion to sell the Note and to assign the Deed of Trust pursuant to 11 U.S.C. §363 (the "**Motion to Sell**"), within three (3) business days after the Effective Date of this Agreement, seeking entry of an order of the Bankruptcy Court (the "**Order**") approving the sale of the Note and the assignment of the Deed of Trust free and clear of all liens, claims and interests (the "**Sale").**

    a.   If the Motion to Sell is denied by the Bankruptcy Court, then the Deposit shall be refunded to Purchaser eleven (11) days from the date that the Bankruptcy Court's denial of the Motion to Sell becomes final.  In such event, this Agreement shall terminate.

    b.   If the Motion to Sell is granted by the Bankruptcy Court, but entry of the Order approving the Sale has not occurred within forty-five (45) days after the Effective Date of this Agreement, Purchaser may terminate this Agreement by delivering written notice to Seller (the "**Termination Notice**").  Upon receiving the Termination Notice, the Trustee shall immediately cause the Deposit to be refunded to Purchaser.

    c.   If the Motion to sell is granted by the Bankruptcy Court, but the Purchaser is not the Successful Bidder and the Successful Bidder is subsequently approved by the Bankruptcy Court as the purchaser, then the Trustee shall cause the Deposit to be refunded to Purchaser pursuant to the provisions of Section 3(a), above.

4.      <u>Public Sale; Bidding</u>.  Purchaser acknowledges that the Sale shall be a public, rather than a private, sale and that any other interested purchaser will have the right to bid on the Note, provided such interested party submits a Qualified Bid (as defined below).  Purchaser further acknowledges that the Trustee will not be filing a motion for approval of bid procedures and Purchaser acknowledges and agrees that no stalking horse protections will be provided to Purchaser.

    a.   Any interested purchaser who notifies the Trustee of their desire to participate as a Qualified Bidder will be provided relevant due diligence materials, including the financial information submitted to Trustee by CCW (the "**Due Diligence**"), provided such interested purchaser first executes a confidentiality agreement in the form attached hereto as <u>Exhibit C</u>. If, after reviewing the Due Diligence, the interested purchaser wishes to submit a Qualified Bid and participate as a Qualified Bidder (defined below), such interested purchaser shall, no later than five (5) days prior to the hearing on the Motion to Sell, submit the following to the Trustee, which when received and approved by Trustee, solely in exercising his best business judgment and discretion, shall be deemed a "**Qualified Bid**" and such bidder a "**Qualified Bidder**":

     i.   a bid for the purchase of the Note in an amount no less than $1,050,000,

     ii.   a purchase agreement, signed by an authorized representative of such interested purchaser, in a form acceptable to the Trustee,

One Hundred Thousand Dollars ($100,000)

     iii.   a deposit in the amount of ~~One Million Dollars ($1,000,000.00)~~, which amount shall be deposited into the IOLTA account of the Trustee's counsel, and

     iv.   evidence of financial ability to close the transaction

b.   In the event an interested purchaser submits a Qualified bid and is eligible to participate as a Qualified bidder, and such bid is better than Purchaser's offer (a "**Topping Bid**"), as may be determined solely by the Trustee in exercising his best business judgment and discretion, a public outcry auction shall be conducted at the hearing on the Motion to Sell.  Only the Purchaser and any Qualified Bidder shall be eligible to bid at the auction.  Upon entry of an order approving the sale to a successful bidder (the "Successful Bidder"), the Trustee shall refund the Deposit(s) to all other parties to the auction within three (3) business days of the Bankruptcy Court's Order of Sale to such Successful Bidder becoming final.

.

5.     <u>Seller's Duties</u>.

a.   At Closing, Seller shall deliver the original executed Note and shall execute an allonge and an assignment of the Deed of Trust, to effect the transfer of ownership of the Note and the assignment of the Deed of Trust to the Successful Bidder free and clear of all liens, claims and interests.

b.   Seller, through Trustee's counsel, shall file a Motion to Sell pursuant to 11 U.S.C. §363 with a Motion to Approve Bid Process, and a Motion to Expedite the consideration of the Motion to Sell and Motion to Approve Bid Process.

6.     <u>Withdrawal of Proof of Claim</u>.  Provided Purchaser is the winning bidder, within three (3) business days of Closing, Purchaser agrees that Purchaser shall file a a Notice of Withdrawal pursuant to Rule 3006, withdrawing its Proof of Claim [ECF No. 86] filed in the Bankruptcy Case.

7.     <u>Purchaser's Representations, Warranties and Acknowledgements</u>.  Purchaser represents and warrants to the Trustee that as of the date hereof:

a. The Purchaser is a company legally organized, validly existing and in good standing under the laws of the State of its formation. The Purchaser has the full organizational right, power and authority and has taken all necessary organizational action to authorize it to enter into, execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder. No consent, approval or authorization of, or declaration, filing or registration with, any governmental authority, and no consent of any other person, including, without limitation, consents from parties to loans, contracts, leases or other agreements, is required in connection with execution, delivery and performance of this Agreement by the Purchaser.

b. This Agreement has been duly executed and delivered by the Purchaser and constitutes the legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting enforceability of creditors' rights generally and except as availability of the remedy of specific performance, injunctive relief or other equitable relief is subject to the discretion of the court before which any proceeding therefore may be brought.

c. There are no material actions, suits, claims, investigations or legal or administrative or arbitration (or other binding alternative dispute resolution) proceedings relating to this Agreement or the transactions contemplated hereby in respect of which the Purchaser has been served or, to the best of the Purchaser's knowledge, which is pending or threatened, in each case, before or by any governmental authority, and no judgment, award, order, writ, injunction, arbitration decision or decree has been entered against or served upon the Purchaser relating to this Agreement or the transactions contemplated hereby.

d. The execution and delivery of this Agreement, the consummation by the Purchaser of the transactions contemplated hereby and the performance by the Purchaser of its obligations hereunder, do not and shall not (i) violate or conflict with the terms of, or result in a breach by the Purchaser of, or constitute a default under, any material contract or agreement to which the Purchaser is a party or by which such party may otherwise be bound or affected, (ii) violate any judgment, decree or order of any governmental authority applicable to the Purchaser, (iii) violate or conflict with any applicable law, or (iv) violate or conflict with the organizational documents of the Purchaser.

e. Purchaser represents that there are no actions, suits or proceedings (whether administrative, regulatory, civil or criminal) pending, or to their knowledge threatened, against or affecting the Purchaser that could impact the Purchaser's

DocuSign Envelope ID: 3D342184-AF49-4906-A5FE-FC1CA89D18B5

ability to undertake the transactions set forth in this Agreement. Purchaser also represents that there are no actions, suits or proceedings (whether administrative, regulatory, civil or criminal) pending, or to their knowledge threatened, against or affecting the Purchaser or its officers, directors, employees, agents or affiliates related to allegations of improper fundraising or money laundering.

f.   Purchaser represents and warrants that any funds borrowed, raised or otherwise obtained by the Purchaser in order to fund the transaction contemplated by this Agreement were borrowed, raised or otherwise obtained in a legal manner, consistent with all applicable local, state, federal and/or international laws.

g.   No Person Affiliated with the Purchaser or that makes funds available to the Purchaser or any affiliate of the Purchaser in order to allow the Purchaser to fulfill its obligations under this Agreement or for the purpose of funding the investment in the Purchaser is: (A) a Person listed in the Annex to Executive Order No. 13224 (2001) issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), (B) named on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Assets Control, (C) a non-U.S. shell bank or is providing banking services indirectly to a non-U.S. shell bank, (D) a senior non-U.S. political figure or an immediate family member or close associate of such figure, or (E) otherwise prohibited from investing in the Purchaser pursuant to applicable U.S. anti-money laundering, anti-terrorist and asset control Laws, regulations, rules or orders.

h.   **PURCHASER IS NOT RELYING UPON AND HEREBY DISCLAIMS RELIANCE ON ANY REPRESENTATION, WARRANTY, OPINION, STATEMENT OF FACT OR PREDICTION MADE BY TRUSTEE, OR TRUSTEE'S COUNSEL IN MAKING THE DECISION TO ENTER INTO THIS AGREEMENT.**

i.   **PURCHASER IS ACQUIRING ONLY THE RIGHTS AND TITLE TO THE NOTE THAT TRUSTEE MAY HAVE AND ACKNOWLEDGES THAT PURCHASER IS TAKING OWNERSHIP WITHOUT REPRESENTATION OR WARRANTY, AND WITHOUT RECOURSE TO TRUSTEE OR TO THE BANKRUPTCY ESTATE OF DEEPROOT FUNDS, LLC.**

j.   Other than Purchaser being the maker of the Note, neither Purchaser nor its owners, principals, agents, investors, lenders or any other persons who may benefit in some fashion from this Agreement or its consummation, has any connection to the Debtor or its principal, Mr. Robert Mueller. Purchaser has no intention or agreement, written, oral or otherwise to share in the profits, losses

or in any other manner with the Debtor, its principals, or an insider (including a non-statutory insider) as defined at 11 U.S.C. Section 101.

8. <u>Seller's Representations, Warranties and Acknowledgements</u>. Seller represents and warrants to the Purchaser that as of the date hereof that Seller is the legal and beneficial present owner of the Loan and the Deed of Trust.

9. <u>Indemnification and hold harmless by Purchaser</u>. Purchaser hereby indemnifies Seller and agents and lawyers, and any assignees, designees or successors of same (the "**Seller Indemnified Parties**") against, and agree to hold the Seller Indemnified Parties harmless from, any and all damages, losses, liabilities and expenses (including, without limitation, reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any action, suit or proceeding), incurred or suffered by the Seller Indemnified Parties arising out of, resulting from, or related to: (i) any misrepresentation or breach of any representation or warranty made by Purchaser pursuant to this Agreement; (ii) any breach of a covenant or agreement made or to be performed by Purchaser pursuant to this Agreement, and (iii) any breach or violation of any applicable law by Purchaser in connection with this Agreement.

10. <u>Liquidated Damages for a Breach by Purchaser.</u> In the event Purchaser fails to close on this transaction as a result of Purchaser's breach of this Agreement, Seller's sole remedy shall be to keep and retain the Earnest Money as liquidated damages. The Parties agree that the calculation of damages for a breach by Purchaser would be difficult to ascertain and that this remedy is a reasonable estimate of the damages which the Trustee may sustain due to a breach by Purchaser.

11. <u>Binding Effect.</u> Once approved by the Bankruptcy Court, this Agreement is irrevocably binding upon and shall inure to the benefit of and shall be enforceable by the parties hereto and their respective successors, assigns, executors, administrators and heirs.

12. <u>Severability.</u> If any provision of this agreement shall be held invalid in a court of law, the remaining provisions shall be construed as if the invalid provision were not included in this Agreement.

13. <u>Notices.</u> Any and all notices, requests, consents, notifications, and other communications given to any Party to this Agreement shall be given in writing and will be as elected by the party giving said notice, hand-delivered by messenger or courier service, telecopied, electronically communicated, or sent via registered or certified mail, return receipt requested, postage prepaid, to the address of each party at the addresses below and deemed given when received by the Party being served such notice.

| Seller: | With a copy to counsel: |
|---|---|
| Jon Patrick Lowe | Randall A. Pulman |
| Chapter 7 Trustee for Estate of Policy Services, Inc. | Pulman, Cappuccio & Pullen, LLP |
| 2402 E. Main Street | 2161 N. W. Military Highway, Ste. 400 |
| Uvalde, Texas 78801 | San Antonio, Texas 78213 |
| Telephone: 830-407-5115 | Telephone: 210-892-0420 |
| E-mail: pat.lowe.law@gmail.com | e-mail: rpulman@pulmanlaw.com |
| | |
| **Purchaser:** | **With a copy to counsel:** |
| CCW Braun Heights, LLC | Raymond W. Battaglia |
| | Law Offices of Ray Battaglia, PLLC |
| | 66 Granburg Circle |
| | San Antonio, Texas 78218 |
| Telephone: | Telephone: 210-601-9405 |
| E-mail: | E-mail: battaglialaw@outlook.com |
| | |

14.     Waiver. Either Party's failure to insist in any one or more instances upon strict performance by the other Party of any of the terms of this Agreement shall not be construed as a waiver of any continuing or subsequent failure to perform or delay in performance of any term hereof.

15.     Contract Assignable. Purchaser may assign this Agreement and its obligations hereunder, provided such assignment is made expressly in writing and delivered to Seller. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their successors and assigns.

16.     Choice of law. The Parties hereby agree and confirm that the laws of Texas and Title 11 of the United States Code shall control this Agreement.

17.     Counterparts and Facsimile. This Agreement may be signed in one or more counterparts, each of which is deemed an original, but all of which together constitute one and the same instrument. A facsimile copy of this executed Agreement shall be deemed valid as if it were the original.

18.     Headings. The headings and subheadings contained in this Agreement are for convenience of reference only and are not to be considered part of this Agreement and will not limit or otherwise affect in any way meaning or interpretation of this Agreement.

19.     Time. Time is of the essence in this Agreement.

20.     Representation by Counsel. The Parties acknowledge that they have been or have had the opportunity to have been represented by their own counsel throughout the negotiations and

at the signing of this Agreement and all other documents signed incidental to this Agreement and, therefore, neither Party shall claim or assert that any provision of this Agreement or any ancillary documents should be constructed against their drafter.

21. <u>Effective Date.</u> This Agreement shall be effective upon execution by all Parties and receipt by the Trustee of the Earnest Money

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

BY: _____
    JON PATRICK LOWE, CHAPTER 7 TRUSTEE
    FOR THE ESTATE OF DEEPROOT FUNDS, LLC.

DATE: _____

**PURCHASER:**

CCW BRAUN HEIGHTS, LLC,
A TEXAS LIMITED LIABILITY COMPANY

BY: _____
NAME: MICHAEL CONRAD
ITS: PRESIDENT

DATE: 8/17/22

at the signing of this Agreement and all other documents signed incidental to this Agreement and, therefore, neither Party shall claim or assert that any provision of this Agreement or any ancillary documents should be constructed against their drafter.

     21.    Effective Date. This Agreement shall be effective upon execution by all Parties and receipt by the Trustee of the Earnest Money

     IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

By: _____
    JON PATRICK LOWE, CHAPTER 7 TRUSTEE
    FOR THE ESTATE OF DEEPROOT FUNDS, LLC.

DATE: _____


**PURCHASER:**

CCW BRAUN HEIGHTS, LLC,
A TEXAS LIMITED LIABILITY COMPANY

By: _____
NAME: MICHAEL CONRAD
ITS: PRESIDENT

DATE: 8/17/22

# EXHIBIT A

## NOTE

FINAL EXECUTION COPY

## PROMISSORY NOTE

| | |
|---|---|
| **Effective Date:** | November 20, 2018 |
| **Maker:** | CCW Braun Heights, LLC, a Texas limited liability company |
| **Maker's Mailing Address**: | 22809 Citron Circle, San Antonio, TX 78260 |
| **Payee:** | deeproot Funds, LLC, a Texas limited liability company |
| **Place for Payment:** | PO Box 691610, San Antonio, TX 78260-1610 |
| **Principal Amount:** | THREE MILLION THREE HUNDRED FIFTY THOUSAND DOLLARS AND NO CENTS ($3,350,000.00),as adjusted by the First Amendment to Subscription Agreement of deeproot Funds, LLC. A list of the installments of loan proceeds is attached hereto as <u>Exhibit A</u>. |

**Maturity Date:** Five (5) years from the date of the grand opening of the carwash facility (Opening date is defined in the First Amendment to Subscription Agreement of deeproot Funds, LLC).

**Interest Rate on Unpaid Principal:** Pursuant to the First Amendment to Subscription Agreement of deeproot Funds, LLC.

**Annual Interest Rate on Matured, Unpaid Amounts:** FIVE (5%) PERCENT SIMPLE INTEREST, NOT COMPOUNDED

**Terms of Payment:** All accrued interest on the Principal Amount and the Principal Amount shall be due and payable in a balloon amount on the Maturity Date, Pursuant to the First Amendment to Subscription Agreementof deeproot Funds, LLC.

**Security for Payment:** Deed of Trust dated on or about November 20, 2018, securing a second lien against certain real property located in Bexar County, Texas.

Maker promises to pay to the order of Payee, at the place for payment and according to the terms of payment, the principal amount plus interest at the rates and in the amounts stated above. Maker promises to pay interest on matured, unpaid amounts at the Annual Interest Rate on Matured, Unpaid Amounts.

If Maker defaults in the payment of this Promissory Note, and the default continues after Payee gives Maker ten (10) days prior written notice of the default, or if a default occurs pursuant to the terms of the Security Agreement referenced above, then Payee may declare the unpaid principal

DocuSign Envelope ID: 3D342184-AF49-4906-A5FE-EC1CAB9D18B5

FINAL EXECUTION COPY

balance and earned and accrued interest on this note immediately due and payable. Maker waives all demands for payment, presentations for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

If this Promissory Note is given to an attorney for collection or enforcement, or if suit is brought for collection or enforcement, or if it is collected or enforced through probate, bankruptcy, or other judicial proceeding, then Maker shall pay Payee all costs of collection and enforcement, including reasonable attorneys' fees and court costs, in addition to other amounts due.

Interest on the debt evidenced by this note shall not exceed the maximum amount of non-usurious interest that may be contracted for, taken, reserved, charged, or received under the laws of the State of Texas; any interest in excess of that maximum amount shall be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides other provisions in this and all other instruments concerning the debt.

Maker may prepay the principal amount outstanding in whole or in part. Any partial prepayment shall be applied against the principal amount outstanding and shall not postpone the due date of any subsequent monthly installments or change the amounts of such installment, unless the Payee shall otherwise agree in writing. Additional principal payments may be made in any amount on any regular payment date. Maker may pay this note in full at any time without charge or penalty.

Maker is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

[Signature on next page.]

DocuSign Envelope ID: 3D342184-AF49-4906-A6FE-EC1CA89D18B5

FINAL EXECUTION COPY

**MAKER**:

CCW Braun Heights, LLC,
a Texas limited liability company

BY: _____

Mike Conrad, Co-Manager Member

DocuSign Envelope ID: 3D342184-AF49-4906-A6FB-EC1CAB9D18B5

FINAL EXECUTION COPY

**Exhibit A**
**Schedule of Funding Dates and Amounts**

| Funding Date | Amount |
|---|---|
| May 12, 2017 | $625,000.00 |
| August 23,2017 | $250,000.00 |
| August 24, 2017 | $86,000.00 |
| January 10, 2018 | $180,000.00 |
| February 9, 2018 | $40,000.00 |
| May 15, 2018 | $125,000.00 |
| June 6, 2018 | $51,000.00 |
| August 7, 2018 | $100,000.00 |
| September 10, 2018 | $100,000.00 |
| October 19, 2018 | $100,000.00 |
| Subtotal: | $2,057,000.00 |

EXHIBIT A

DocuSign Envelope ID: 3D342184-AF49-4906-A6FB-EC1CAB9D18B9

## EXHIBIT B

**DEED OF TRUST**

FINAL EXECUTION COPY

## Subordinate Second Lien Deed of Trust

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

### Terms

| | |
|---|---|
| Date: | November 20, 2018 |
| Grantor: | CCW Braun Heights, LLC, a Texas limited liability company |
| Grantor's Mailing Address: | 22809 Citron Circle, San Antonio, TX 78260 |
| Trustee: | Robert J. Mueller |
| Trustee's Mailing Address: | PO Box 691610, San Antonio, TX 78260-1610 |
| Lender: | deeproot Funds, LLC, a Texas limited liability company |
| Lender's Mailing Address: | PO Box 691610, San Antonio, TX 78260-1610 |

Obligation

   Note

| | |
|---|---|
| Date: | November 20, 2018 |
| Original principal amount: | $3,350,000.00 (as adjusted by the First Amendment to Subscription Agreement of deeproot Funds, LLC) |
| Borrower: | CCW Braun Heights, LLC, a Texas limited liability company |
| Lender: | deeproot Funds, LLC, a Texas limited liability company |
| Maturity date: | Five (5) years from the Opening Date of the carwash facility (Opening Date is defined in the First Amendment to Subscription Agreement of deeprrot Funds, LLC) |
| Property (including any improvements): | Being that certain 1.019 acre tract in Bexar County, Texas as more particularly described in Exhibit A, |

DocuSign Envelope ID: 3D342184-AF49-4906-A5FB-FC1CAB9D18B5

FINAL EXECUTION COPY

attached hereto.

Second-Lien: This lien created by this Deed of Trust will be subordinated to the lien securing payment of a note, and any renewals, extensions, and modifications, thereof, in the original principal amount of $775,000.00 dated on or about December 1, 2018, executed by CCW Braun Heights, LLC, a Texas limited liability company payable to the order of Clif and Susan Conrad ("**Conrad Note**"), and more fully described in the Deed of Trust recorded in the real property records of Bexar County, Texas ("**Conrad First Lien**").

Other Exceptions to Conveyance and Warranty: Existing easements, rights-of-way, and prescriptive rights, whether of record or not; all presently recorded and existing restrictive covenants, instruments, reservations, covenants, conditions, oi; and gas leases, mineral interests, and water interests, and other instruments that affect the Property: any discrepancies, encroachments, conflicts, or shortages in area or boundary lines; existing debts and liens, and current taxes.

For value received and to secure payment of the Obligation, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Obligation and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

## Clauses and Covenants

**A.** **Grantor's Obligations**

Grantor agrees —

1.      to keep the Property in good repair and condition;

2.      to pay all taxes and assessments on the Property before delinquency, not authorize a taxing entity to transfer its tax lien on the Property to anyone other than Lender, and not request a deferral of the collection of taxes pursuant to section 33.06 of the Texas Tax Code;

3.      to defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

4.      to maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender at least ten days before the expiration of the Required Insurance Coverages;

5.      to obey all laws, ordinances, and restrictive covenants applicable to the Property;

6.      to keep any buildings occupied as required by the Required Insurance Coverages;

DR Deed of Trust $3,350,000                                                                 Page 2 of 7

FINAL EXECUTION COPY

7.     if the lien of this deed of trust is not a first lien, to pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments; and

8.     to notify Lender of any change of address.

9.     that this deed of trust

     a.     is unconditionally subordinated to the Conrad Note and Conrad First Lien;

     b.     if any action is instituted to foreclose or otherwise to this deed of trust, no action may be taken that would terminate any occupancy or tenancy without the prior written consent of the holder of the Conrad Note and Conrad First Lien, and that consent, if granted, may be conditioned in any manner the holder determines;

     c.     rents, if collected by or for the holder of this deed of trust, will be applied first to the payment of the obligations under the Conrad Note and Conrad First Lien then due and to expenses incurred in the ownership, operation, and maintenance of the Property in any order holder of the Conrad Note and Conrad First Lien may determine, before being applied to any indebtedness secured by this deed of trust;

     d.     written notice of default under this deed of trust and written notice of the commencement of any action to foreclose or otherwise enforce this deed of trust must be given to holder of the Conrad Note and the Conrad First Lien concurrently with or immediately after the occurrence of any such default or commencement; and

     e.     in the event of the bankruptcy of Grantor, all amounts due on or with respect to the obligations under the Conrad Note and Conrad First Lien will be payable in full before any payments on the indebtedness secured this deed of trust.

10.     that in the event that the Grantor obtains a loan that is used to pay off the Conrad Note, then the Grantor agrees to execute a subordination agreement with the new lender that has the effect of subordinating this deed of trust to that lender's deed of trust and other security documents.

## B.     Lender's Rights

1.     Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees, succeeding to all rights and responsibilities of Trustee.

2.     If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

3.     Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligation or to repair or replace damaged or destroyed

FINAL EXECUTION COPY

improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the property insurance proceeds available to Grantor for repairs.

4.      Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

5.      If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

6.      If a default exists in payment of the Obligation or performance of Grantor's obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may—

    a.      declare the unpaid principal balance and earned interest on the Obligation immediately due;

    b.      exercise Lender's rights with respect to rent under the Texas Property Code as then in effect;

    c.      direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

    d.      purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

7.      Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

## C.      Trustee's Rights and Duties

If directed by Lender to foreclose this lien, Trustee will—

1.      either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2.      sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Lien and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

3.      from the proceeds of the sale, pay, in this order—

DocuSign Envelope ID: 3D342184-AF49-4996-A5FB-EC1CAB9D18B5

FINAL EXECUTION COPY

a. expenses of foreclosure, including a reasonable commission to Trustee;

b. to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

c. any amounts required by law to be paid before payment to Grantor; and

d. to Grantor, any balance; and

4. be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

**D. General Provisions**

1. If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2. Recitals in any trustee's deed conveying the Property will be presumed to be true.

3. Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4. This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

5. If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

6. Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7. Grantor collaterally assigns to Lender all present and future rent from the Property and its proceeds. Grantor warrants the validity and enforceability of the assignment. Grantor will apply all rent to payment of the Obligation and performance of this deed of trust, but if the rent exceeds the amount due with respect to the Obligation and the deed of trust, Grantor may retain the excess. If a default exists in payment of the Obligation or performance of this deed of trust, Lender may exercise Lender's rights with respect to rent under the Texas Property Code as then in effect. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph

DR Deed of Trust $3,350,000 Page 5 of 7

FINAL EXECUTION COPY

without taking possession of the Property. Lender will apply all rent collected under this paragraph as required by the Texas Property Code as then in effect. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies.

8. Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9. In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10. If Grantor transfers any part of the Property without Lender's prior written consent, Lender may declare the Obligation immediately payable and invoke any remedies provided in this deed of trust for default. If the Property is residential real property containing fewer than five dwelling units or a residential manufactured home, this provision does not apply to (a) a subordinate lien or encumbrance that does not transfer rights of occupancy of the Property; (b) creation of a purchase-money security interest for household appliances; (c) transfer by devise, descent, or operation of law on the death of a co-Grantor; (d) grant of a leasehold interest of three years or less without an option to purchase; (e) transfer to a spouse or children of Grantor or between co-Grantors; (f) transfer to a relative of Grantor on Grantor's death; (g) a transfer resulting from a decree of a dissolution of marriage, a legal separation agreement, or an incidental property settlement agreement by which the spouse of Grantor becomes an owner of the Property; or (h) transfer to an inter vivos trust in which Grantor is and remains a beneficiary and occupant of the Property.

11. Grantor may not sell, transfer, or otherwise dispose of any Property, whether voluntarily or by operation of law, without the prior written consent of Lender. If granted, consent may be conditioned upon (a) the grantee's integrity, reputation, character, creditworthiness, and management ability being satisfactory to Lender; and (b) the grantee's executing, before such sale, transfer, or other disposition, a written assumption agreement containing any terms Lender may require, such as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation.

12. When the context requires, singular nouns and pronouns include the plural.

13. The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

14. This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

DocuSign Envelope ID: 3D342184-AF49-4906-A6FB-FC1CAB9D18BD

FINAL EXECUTION COPY

15.     If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

16.     Grantor and each surety, endorser, and guarantor of the Obligation waive, to the extent permitted by law, all (a) demand for payment, (b) presentation for payment, (c) notice of intention to accelerate maturity, (d) notice of acceleration of maturity, and (e) protest.

17.     Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

18.     If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

19.     The term *Lender* includes any mortgage servicer for Lender.

20.     Grantor represents that this deed of trust and the Note are given for the following purposes: construction of office building.

[Signatures on next page.]

DocuSign Envelope ID: 3D342184-AF49-4906-A5FD-EC1CAB9D18BD

**<u>GRANTOR</u>:**

CCW Braun Heights, LLC,
a Texas limited liability company


BY: _____
Mike Conrad, Co-Manager Member

Grantor's Signature Page

DocuSign Envelope ID: 3D342184-AF49-4906-A6FB-EC1CA89D18B5

STATE OF TEXAS
COUNTY OF BEXAR

        This instrument was acknowledged before me on _____ by Michael C. Conrad, as Co-Manager Member of CCW Braun Heights, LLC, a Texas limited liability company.

[Seal]

                                _____

                                NOTARY PUBLIC

                                My commission expires:_____

Grantor's Signature Page

DocuSign Envelope ID: 3D342184-AF49-4996-A5FB-EC1CAB9D18B5

**Exhibit A**
**Property Description**

**BEING** 1.019 acres out of the JOSE ALAMEDA SURVEY No. 81, ABSTRACT No. 26, COUNTY BLOCK 4017, Bexar County, Texas, said 1.019 acres being out of the GERALD W. HARRELL REVOCABLE TRUST 3.2206 acre tract, 'Tract A,' as recorded in Volume 17191, Page 2337 of the Official Public Records of Bexar County, Texas, said 1.019 acres being more particularly described by metes and bounds as follows:

**BEGINNING** at a found 1/2" rebar with plastic cap "PAPE-DAWSON" for the southern corner of this tract, the southeastern corner of the said GERALD W. HARRELL REVOCABLE TRUST 3.2206 acre tract, the southwestern corner of Lot 3, Block 2, NCB 19142, SAN SABA APARTMENTS SUBDIVISION as shown on plat recorded in Volume 9656, Page 106 of the Deed & Plat Records for Bexar County, Texas, located on the northeastern ROW line of BANDERA ROAD (180' PUBLIC ROW) from which a found 1/2" rebar with plastic cap "PAPE-DAWSON" for the northeastern corner of said GERALD W. HARRELL REVOCABLE TRUST 3.2206 acre tract bears North 17°57'46" East for 643.48 feet (North 18°07'55" East for 643.56 feet, R1) for reference;

**THENCE** northwesterly along a curve to the right for 263.82 feet (R=3759.83', D=4°01'13", CB=N 45°01'08" West, CH=263.77') along the southwestern boundary of this tract, the northeastern ROW of said BANDERA ROAD to a found 1/2" rebar with no identification for a point of tangency;

**THENCE** North 43°20'31" West for 41.39 feet continuing along the southwestern boundary of this tract, the northeastern ROW of said BANDERA ROAD to a found 1/2" rebar with no identification for the western corner of this tract, the southern corner of Lot 2, Block 1, NCB 18280, ATLANTIC – BANDERA/PRUE SUBDIVISION as shown on plat recorded in Volume 9550, Page 39 of the Deed & Plat Records of Bexar County, Texas;

**THENCE** North 35°44'52" East for 156.49 feet along the northwestern boundary of this tract, the southeastern boundary of said Lot 2, Block 1, NCB 18280 departing from the ROW of said BANDERA ROAD to a point for the northern corner of this tract;

**THENCE** through the interior of said GERALD W. HARRELL REVOCABLE TRUST 3.2206 acre tract, along the northeastern boundary of this tract, the following courses and distances:

1.    South 45°03'20" East for 52.36 feet to a point for angle;

2.    North 89°56'40" East for 7.07 feet to a point for angle;

3.    South 45°03'26" East for 143.18 feet to a point for angle;

4.    South 44°56'40" West for 5.00 feet to a point for angle;

Exhibit A

DocuSign Envelope ID: 3D342184-AF49-4906-A6FB-FC1CA89D48B2

5.      South 45°03'24" East for 50.25 feet to a point for the eastern corner of this tract, located on the eastern boundary of said GERALD W. HARRELL REVOCABLE TRUST 3.2206 acre tract, the western boundary of said Lot 3, Block 2, NCB 19142;

**THENCE** South 17°57'46" West for 174.93 feet along the southeastern boundary of this tract to the **POINT OF BEGINNING**.

**CONTAINING:** 1.019 acres of land.

The Basis of Bearings is Texas State Plane Coordinate System, NAD 1983, South Central Zone (4204). This description was based on a survey made on the ground under my supervision completed on August 18, 2016 from which an exhibit was prepared.

Exhibit A

# Exhibit C

## Form of Confidentiality Agreement

DocuSign Envelope ID: 3D342184-AE49-4906-A6FF-EC1CAB9D18PD

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (this "Agreement") is dated and effective as of June 20, 2022 by and between John Patrick Lowe, Chapter 7 Trustee, ("Trustee" or "Receiving Party".) of, and on behalf of, deeproot Capital Management, LLC and its affiliated entities (collectively the "Debtor"), and CCW BRAUN HEIGHTS, LLC. ("CCW").

WHEREAS, Receiving Party has requested that CCW provide certain information in connection with Receiving Party's consideration of an evaluation of a note purchase offer (the "Note Purchase"), and CCW desires to protect the confidentiality of the information that it provides and to have Receiving Party take or abstain from taking certain actions in accordance with the provisions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Definitions**.

(a) "Confidential Material" means any information (whether prepared by CCW or its Representatives (as defined herein) or any other person, and regardless of the form of communication, including whether written, oral or otherwise) first provided, furnished, or made available on or after the date hereof to Receiving Party or any of its Representatives by or on behalf of CCW or any of its Representatives, and all notes, analyses, compilations, studies, interpretations, memoranda, reports, projections, forecasts or other documents or materials (regardless of the form thereof) prepared by Receiving Party or any of its Representatives which contain or otherwise reproduce or reflect, in whole or in part, any such information; provided, that "Confidential Material" does not include information which:

(i) is or becomes generally available to the public other than as a result of an act or omission directly or indirectly by Receiving Party or any of its Representatives in violation of this Agreement or any other obligation of confidentiality (contractual, fiduciary, or otherwise) known by Receiving Party or any of its Representatives;

(ii) is already in Receiving Party's or any of its Representatives' possession and was not furnished by or on behalf of CCW or its Representatives pursuant to this Agreement or any other person known by Receiving Party or any of its Representatives providing such information in violation of a confidentiality agreement or other obligation of confidentiality (contractual, fiduciary, or otherwise);

(iii) becomes available to Receiving Party or any of its Representatives on a non-confidential basis from a source other than CCW or any of its Representatives, provided, that Receiving Party and its Representatives do not know such source to have made such information available on a non-confidential basis in violation of another confidentiality agreement or other obligation of confidentiality (contractual, fiduciary, or otherwise); or

(iv) is independently developed by Receiving Party or its Representatives without the use of, reference to or reliance upon any information furnished to Receiving Party or any of its Representatives by or on behalf of CCW or any of its Representatives pursuant hereto and without any violation of this Agreement or any other obligation of confidentiality (contractual, fiduciary, or otherwise) known by Receiving Party or any of its Representatives.

(b) "Representatives" means, with respect to a party, such party's directors, officers, employees, agents, and advisors (including without limitation attorneys, accountants, financial advisors,

{00582151;2}

1

DocuSign Envelope ID: 3D342184-AE49-4906-A5FE-EC1CAB9D18BD

and investment bankers). The Trustee and each of his Representatives is considered a Representative of the Debtor for purposes of this Agreement.

(c) The term "<u>person</u>" means any corporation, Debtor, partnership, joint venture, group, limited liability Debtor, or other entity or individual; the term "<u>affiliate</u>" has the meaning set forth in Rule 12b-2 under the Securities Exchange Act of 1934, as amended (such Act, as amended, being referred to herein as the "<u>Exchange Act</u>"); and the term "<u>including</u>" and correlative terms shall be deemed to be followed by "without limitation".

2.    **<u>Use and Disclosure of Confidential Material</u>**.

(a) Receiving Party agrees that it shall, and that it shall cause its Representatives to:

(i) use the Confidential Material solely for the purpose of evaluating and negotiating a Note Purchase; and

(ii) except as provided in Section 3 hereof, keep the Confidential Material confidential and not disclose any Confidential Material, directly or indirectly, to any other person. Notwithstanding the foregoing provisions of this Section 2(a), Receiving Party may: (A) disclose Confidential Material to Receiving Party's Representatives who need to know such information for the sole purpose of evaluating and negotiating a Note Purchase, <u>provided</u>, that Receiving Party's Representatives prior to any such disclosure are informed of the confidential nature of such Confidential Material and agree (i) to use such information solely for the purpose of evaluating and negotiating the Note Purchase and (ii) to maintain the confidentiality of such Confidential Material; and (B)    disclose Confidential Material to potential competing bidders ("Potential Bidders") who need to know such information for the sole purpose of evaluating, preparing and submitting a competing Note Purchase offer, <u>provided</u>, that such Potential Bidders, prior to any such disclosure, are informed of the confidential nature of such Confidential Material and agree (i) to use such information solely for the purpose of evaluating and negotiating the Note Purchase, (ii) to maintain the confidentiality of such Confidential Material, and (iii) execute a Confidentiality Agreement with Receiving Party substantially in form of this Agreement.

(b) Receiving Party shall be directly responsible and liable to CCW for any use or disclosure by any of Receiving Party's Representatives or Potential Bidders of any Confidential Material which, if done by Receiving Party itself, would be a breach of this Agreement, it being understood that such responsibility and liability shall be in addition to and not by way of limitation of any right or remedy CCW may have against Receiving Party's Representatives or Potential Bidders with respect to such breach. Receiving Party agrees, at its sole expense, to use reasonable best efforts to restrain its Representatives or Potential Bidders from making or allowing to be made prohibited or unauthorized uses or disclosures of Confidential Material under this Agreement. Receiving Party shall immediately notify CCW in the event of any breach of this Agreement by the Receiving Party or its Representatives or Potential Bidders

(c) All Confidential Material shall remain the property of CCW. No license or, except as provided in Section 2(a) hereof, right to use or other similar rights with respect to the Confidential Material is granted to Receiving Party or any of its Representatives or Potential Bidders, by implication or otherwise pursuant hereto.

3.    **<u>Legally Required Disclosure</u>**.

If Receiving Party or any of its Representatives or Potential Bidders is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any Confidential Material, Receiving Party shall, to the extent permitted by law, promptly provide CCW with written notice of any such request or

{00582151;2}

DocuSign Envelope ID: 3D342184-AF49-4996-A5FF-FC1CAB9D18BD

requirement (and the terms and conditions thereof). If CCW seeks a protective order or other remedy, Receiving Party shall, at the Debtor's expense, provide such cooperation as CCW shall reasonably request. If, in the absence of a protective order or other remedy or the receipt by Receiving Party of a waiver from CCW, Receiving Party or any of its Representatives or Potential Bidders is nonetheless required to disclose Confidential Material to any tribunal or other entity, then Receiving Party or such Representative or Potential Bidder may, without liability hereunder, disclose to such tribunal or other entity that portion (but only that portion) of the Confidential Material that is legally required to be disclosed, <u>provided</u>, that Receiving Party and such Representative or Potential Bidder shall exercise reasonable best efforts to minimize the disclosure of Confidential Material and to preserve the confidentiality thereof, including by seeking, at the Debtor's expense, to obtain a protective order or other assurance that confidential treatment will be accorded to such Confidential Material. Notwithstanding any of the foregoing to the contrary, the Receiving Party shall cooperate with CCW regarding any disclosures of Confidential Material that may be required in connection with the Case and disclosures made pursuant thereto shall not be a breach of any of the foregoing provided that they are made after such consultation and cooperation with CCW in connection therewith.

4.      <u>**Return of Confidential Material**</u>.

At any time upon the written request of CCW (in its sole discretion and for any or no reason), Receiving Party shall promptly (and in any event within five (5) business days after such request) return to CCW (or, at CCW's option, destroy) all Confidential Material (and all copies thereof) furnished to Receiving Party or its Representatives or Potential Bidders, by or on behalf of CCW or its Representatives, or prepared by Receiving Party or any of its Representatives or Potential Bidders, and shall not retain any copies, extracts or other reproductions (including Confidential Material stored in any computer or other electronic storage device) in whole or in part of such material.

Notwithstanding the return or destruction of Confidential Material, Receiving Party and its Representatives and Potential Bidders shall continue to be bound by their obligations hereunder.

<u>**Term**</u>.

This Agreement shall continue in force and effect until the second (2nd) anniversary of the date hereof. Notwithstanding any such expiration or termination of this Agreement, the Receiving Party's obligations hereunder with respect to trade secrets of CCW shall survive and remain in full force and effect indefinitely following such expiration or termination of this Agreement.

5.      <u>**No Representations and Warranties; Relationship to Definitive Agreement**</u>.

(a)      Receiving Party understands and agrees that neither CCW nor any of its respective affiliates or Representatives, nor any other person on any of their behalves, has made or is making, and that each of the foregoing hereby disclaims, any representation or warranty, express or implied, as to the accuracy or completeness of any of the Confidential Material, and Receiving Party represents that neither it nor any of its affiliates or Representatives has relied, is relying, is entitled to rely on or will rely upon any such representation or warranty, in each case except as may be set forth in any definitive agreement with respect to a Note Purchase. Receiving Party agrees that neither CCW nor any of its respective affiliates or Representatives, nor any Potential Bidder or other person on any of their behalves, shall have any liability to Receiving Party or any of its affiliates or Representatives or any other person relating to or resulting from any use of the Confidential Material or any errors therein or omissions therefrom, in each case except as may be set forth in any definitive agreement with respect to a Note Purchase. Without limiting the generality of the preceding two sentences, the Confidential Material may include statements, estimates and projections provided by CCW or its affiliates or Representatives with respect to the anticipated future performance of CCW. Such statements, estimates and projections reflect various assumptions made by

{00582151;2}

DocuSign Envelope ID: 3D342184-AF49-4996-A5FF-FC1CAB9D18B5

CCW concerning anticipated results, which assumptions may or may not prove to be correct. Other than such statements, estimates and projections are provided in good faith on the basis of reasonable assumptions therefor, no representations are made as to the accuracy of such assumptions, statements, estimates or projections. Only those representations or warranties which are made in a definitive agreement, when, as and if executed, and subject to such limitations and restrictions as may be specified therein, will have any legal effect. For purposes of this Agreement, the term "definitive agreement" means a definitive written agreement executed by the parties hereto, but does not include any executed letter of intent, term sheet or any other preliminary written agreement, nor does it include any written or verbal acceptance of any offer or bid made by one party.

6.    **Contacts and Communications.**

Upon reasonable advance written request by the Receiving Party, CCW shall provide the Receiving Party and its Representatives reasonable access to, and the opportunity to make reasonable investigation of, during normal business hours, and in a manner so as not to interfere unreasonably with the normal operations of CCW's business to help ensure that Trustee is best positioned to consummate the Note Purchase.

7.    **Miscellaneous.**

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to the conflicts of law principles thereof. Each party irrevocably and unconditionally submits to the exclusive jurisdiction of the United States Bankruptcy Court for the Western District of Texas, San Antonio Division, over any suit, action or proceeding arising out of or relating to this Agreement. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO EACH HEREBY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, COUNTERCLAIM OR PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT.

(b)    Receiving Party recognizes and acknowledges the confidential nature of the Confidential Material, and that irreparable damage may result to CCW if information contained therein or derived therefrom is disclosed to any person except as herein provided or is used for any purpose other than the evaluation and negotiation of the Note Purchase. Receiving Party further acknowledges and agrees that money damages will not be a sufficient remedy for any breach of this Agreement by Receiving Party or any of Receiving Party's Representatives, and that CCW shall be entitled to seek equitable relief, including injunctive relief and specific performance, as a remedy for any such breach. Receiving Party agrees to waive any requirement for the posting of any bond or other security in connection therewith. Such remedies shall not be deemed to be the exclusive remedies for a breach of this Agreement by Receiving Party or any of Receiving Party's Representatives, but shall be in addition to all of the Debtor's other remedies available at law or in equity.

(c)    This Agreement may not be assigned in whole or in part by either party without the prior written consent of the other party, and any purported assignment without such consent shall be null and void.

(d)    This Agreement contains the entire agreement between the parties concerning the subject matter hereof. No provision of this Agreement may be waived or amended except by the express written consent of the parties. No failure or delay by the parties in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder.

{00582151;2}

DocuSign Envelope ID: 3D342184-AF49-4996-A5FB-EC1CAB9D18B9

(e)  For the convenience of the parties, this Agreement may be executed by facsimile or e-mail and in counterparts, each of which shall be deemed to be an original, and both of which taken together, shall constitute one agreement binding on both parties.

(f)  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(g)  If any provision or portion of this Agreement is determined to be invalid or unenforceable for any reason, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by applicable law and such invalid or unenforceable provision or portion shall be replaced by a provision or term that is valid and enforceable and that comes closest to expressing the parties' intention with respect to such invalid or unenforceable provision or portion.

Executed as of the date first written above.

_____
**JOHN PATRICK LOWE, Trustee for the Chapter 7, bankruptcy estate of deeproot Capital Management, LLC**

**CCW BRAUN HEIGHTS, LLC.**

By: _____
Name: _____
Title: _____

{00582151;2}



**FIRST AMENDED AND RESTATED OPERATING AGREEMENT**

**OF**

**CCW BRAUN HEIGHTS, LLC**

**A TEXAS LIMITED LIABILITY COMPANY**

EFFECTIVE DATE: May 11, 2017

# TABLE OF CONTENTS

**Article I.  Definitions**      **1**

   1.01     Definitions      1

   1.02     Specific Definitions.      1

**Article II. Organization and Purpose.**      **5**

   2.01     Organization      5
    (a)     Formation      5
    (b)     Name      5
    (c)     Duration      5
    (d)     Registered Office; Registered Agent; Offices      5
    (e)     Foreign Qualification      6
    (f)     No State Law Partnership      6

   2.02     Purpose      6
    (a)     Specific Purpose      6
    (b)     Enabling Purposes      7

**Article III. Capital**      **7**

   3.01     Equity Capital      7
    (a)     Capital Contributions      7
    (b)     Subsequent Contributions      7
    (c)     New Capital      7
    (d)     Capital Accounts      8
    (e)     Restoration Exceptions      8

   3.02     Financing Capital      8
    (a)     Financing      8
    (b)     Guaranty Liability      9
    (c)     Re-Contribution Obligation      9

   3.03     Advances by Members      10

**Article IV. Distributions and Tax Allocations**      **10**

   4.01     Distributions      10
    (a)     Definitions      10
    (b)     Net Cash Flow from Operations      10
    (c)     Net Capital Proceeds from Capital Transactions      10

   4.02     Tax Allocations.      10
    (a)     Target Allocations      11
    (b)     Special and Regulatory Allocations      11

**Article V. Taxes, Books and Records, Reports and Bank Accounts.**      **11**

   5.01     Taxes      11
    (a)     Taxed as a Partnership      11
    (b)     Other Tax Elections      11

|  |  |  |
|---|---|---|
| (c) | Tax Returns | 12 |
| (d) | Tax Advances | 12 |
| (e) | Taxes Advances Subject to Claw-Back | 12 |
| (f) | Tax Matters Partner | 12 |
| 5.02 | Books and Records | 12 |
| 5.03 | Reports | 13 |
| 5.04 | Accounts | 13 |

**Article VI. Management of the Company** — **13**

|  |  |  |
|---|---|---|
| 6.01 | Manager Member | 13 |
| (a) | In General | 13 |
| (b) | Manager Member's Rights and Responsibilities | 13 |
| 6.02 | Officers | 15 |
| 6.03 | Manager Member as Agen | 16 |
| 6.04 | Power of Attorney | 16 |
| (a) | General | 16 |
| (b) | Limitation | 17 |
| (c) | Additional Provisions | 17 |
| 6.05 | Limitation on Authority of Manger Member | 17 |
| 6.06 | Compensation of Manger Member | 18 |
| (a) | Property Management Fee | 18 |
| (b) | Refinance Fee | 18 |
| (c) | Promoted Interest | 18 |
| 6.07 | Limitation on Duties | 19 |
| (a) | Performance | 19 |
| (b) | Not Full Time Occupation | 19 |
| (c) | No Fiduciary Duty | 19 |
| (d) | Conflict of Interest | 19 |
| (e) | Competition | 19 |
| (f) | Exculpation | 19 |
| 6.08 | Indemnification | 19 |
| (a) | Advance Payment | 20 |
| (b) | Indemnification of Officers, Employees, and Agents | 20 |
| (c) | Nonexclusivity of Rights | 20 |
| (d) | Insurance | 20 |

**Article VII. Membership, Transfers, Expulsion, and Buy-Out.** — **22**

|  |  |  |
|---|---|---|
| 7.01 | Members | 22 |
| (a) | In General | 22 |
| (b) | Members' Meetings | 22 |
| (c) | Liability to Third Parties | 23 |
| (d) | Expulsion | 23 |
| (e) | Spouses of Members | 23 |
| 7.02 | Transfer Rights and Restrictions | 24 |
| (a) | General Prohibition | 24 |

| (b) | Permitted Transfers | 24 |
| (c) | Conditions of Transfer | 24 |
| (d) | Status of Transferee | 25 |
| (e) | Acquisition By Operation of Law | 25 |
| (f) | Members' Acknowledgment | 25 |
| 7.03 | Additional Members | 26 |
| (a) | In General | 26 |
| (b) | Amendment | 26 |
| (c) | No Dissolution | 26 |
| 7.04 | Buy-Out | 26 |
| (a) | Buyout Events | 26 |
| (b) | Procedure for Buyout Events | 26 |
| (c) | Purchase Price | 27 |
| (d) | Payment Terms | 27 |
| (e) | Closing Date | 28 |
| (f) | Closing Costs | 28 |
| 7.05 | Option to Purchase Interests | 28 |
| (a) | Option Purchase Price | 28 |
| (b) | EBITDA Definition. | 28 |
| (c) | Payment Terms | 28 |
| (d) | Closing Date | 29 |
| (e) | Closing Costs | 29 |

**Article VIII. Winding-Up, Dissolution, and Termination** — **29**

| 8.01 | Events Requiring Winding Up | 29 |
| 8.02 | Winding Up and Termination | 29 |
| 8.03 | Certificate of Termination | 31 |

**Article IX. General Provisions** — **31**

| 9.01 | Offset | 31 |
| 9.02 | Notices | 31 |
| 9.03 | Entire Agreement; Supersedure | 31 |
| 9.04 | Effect of Waiver or Consent | 31 |
| 9.05 | Amendment or Restatement | 31 |
| 9.06 | Binding Effect | 32 |
| 9.07 | Governing Law; Severability | 32 |
| 9.08 | Further Assurances | 32 |
| 9.09 | Waiver of Certain Rights | 32 |
| 9.10 | Directly or Indirectly | 32 |
| 9.11 | Indemnification | 33 |
| 9.12 | Counterparts | 33 |

FINAL: MAY 11, 2017

**FIRST AMENDED AND RESTATED OPERATING AGREEMENT**

**OF**

**CCW BRAUN HEIGHTS, LLC**

**A TEXAS LIMITED LIABILITY COMPANY**

This FIRST AMENDED AND RESTATED OPERATING AGREEMENT OF CCW BRAUN HEIGHTS, LLC, a Texas limited liability company ("Company") is entered into by and among (i) the Company, (ii) Conrad Car Wash, Inc., a Utah Corporation ("Manager Member"), and (iii) the Persons listed in Exhibit A ("Members").

**RECITALS**

A.  Business Opportunity. The Manager Member has the right to purchase that certain undeveloped, commercial real property located at 10682 Bandera Road, San Antonio, Texas, 78250 more particularly described and defined below as the "Property." The Manager Member and the Members desire to construct, develop, and operate a retail carwash facility on the Property (defined below as the "Business").

B.  Formation of Company. On or about September 28, 2016, the Manager Member formed the Company to accommodate the acquisition, development, ownership, and operation of the Property and Business..

C.  Amending the Operating Agreement. Since the initial formation, the business economics and the capitalization of the Company has been modified; accordingly, the Parties desire to amend and restate the Operating Agreement of the company according to the terms of this Agreement.

For mutual consideration, the parties hereby agree as follows:

## Article I.  Definitions

1.01   Definitions. Certain terms used in this instrument are capitalized.  Such terms shall have the meaning set forth in the text or in Section 1.02.

1.02   Specific Definitions.

(a)   "Affiliates." (a) with respect to any Person who is a natural person, (i) each entity that such Person Controls, and (ii) each member of such Person's immediate family; and (b) with respect to any Person that is an entity, (i) each entity that such Person Controls, (ii) each Person that Controls such Person, and (iii) each entity that is under common Control with such Person.

(b)   "Agreement." This Operating Agreement of CCW Braun Heights, LLC, a Texas limited liability company.

(c)  "BOC." The Business Organizations Code as adopted by the State of Texas and any successor statute, as amended from time to time.

(d)  "Capital Contributions." Cash contributed to the Company by Members described for each Member in Exhibit A, and, if applicable, Exhibit A-1. A Member shall not contribute property (other than cash) except upon the consent of the Manager Member. In the event that the Manager Member approves the contribution of property (other than cash), the Manager Member shall determine the fair market value of the property less any incumbencies against the Property in accordance with the Code.

(e)  Capital Transaction. Any transaction that results in the Company's receipt of cash or other consideration other than Capital Contributions, including proceeds of sales or exchanges or other Dispositions of property not in the ordinary course of business, financings, refinancing, condemnations, recoveries of damage awards, and insurance proceeds that, in accordance with generally accepted accounting principles, are considered capital in nature.

(f)  "Code." The United States Internal Revenue Code of 1986, as amended from time to time. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding Law.

(g)  "Control." The possession, directly or indirectly, through one or more intermediaries, of the following: (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof; (b) in the case of a limited liability company, partnership, limited partnership or venture, the right to more than 50% of the distributions therefrom (including liquidating distributions); (c) in the case of a trust or estate, more than 50% of the beneficial interest therein; (d) in the case of any other entity, more than 50% of the economic or beneficial interest therein; or (e) in the case of any entity, the power or authority, through ownership of voting securities, by contract or otherwise, to direct the management, activities or policies of the entity.

(h)  "Company." CCW Braun Heights, LLC, a Texas limited liability company.

(i)  "Default."  With respect to any Member, (a) the failure of such Member or Person to satisfy any re-contribution requirement listed in Section 3.01(e)(i), (ii), or (iii) within 30 days after notice; or (b) the failure of a Member to comply in any material respect with any of its other agreements, covenants, or obligations under this Agreement, or the failure of any representation or warranty made by a Member in this Agreement to have been true and correct in all material respects at the time it was made, in each case if such default is not cured by the applicable Member within 30 Days of its receiving notice of such default from the Managers or any other Member (or, if such default is not capable of being cured within such 30-Day period, if such Member fails to promptly commence substantial efforts to cure such default or to prosecute such curative efforts to completion with continuity and diligence).

(j)    "<u>Dispositions</u>." With respect to any asset (including Membership Rights or any portion thereof, including an Interest), a sale, assignment, transfer, conveyance, gift, exchange or other disposition of such asset, whether such disposition be voluntary, involuntary, or by operation of Law, including the following: (a) in the case of an asset owned by a natural person, a transfer of such asset upon the death of its owner, whether by will, intestate succession, or otherwise; (b) in the case of an asset owned by an Entity, (i) a merger or consolidation of such Entity, (ii) a conversion of such Entity into another type of Entity, or (iii) a distribution of such asset in connection with the dissolution, liquidation, winding up, or termination of such Entity; and (c) a disposition in connection with, or in lieu of, a foreclosure of an Encumbrance; but such terms shall not include the creation of an Encumbrance.

(k)    "<u>Encumber</u>." The creation of a security interest, lien, pledge, mortgage, or other encumbrance, whether such encumbrance be voluntary, involuntary, or by operation of Law.

(l)    "<u>Capital Contribution</u>." The cash contributions described for each Member in <u>Exhibit A, and, if applicable Exhibit A-1</u>.

(m)    "<u>Interest</u>." A Person's share of the income, gain, loss, deduction and credits of, and the right to receive distributions from, the Company, based on such Person's Sharing Ratio.

(n)    "<u>Law</u>." Any applicable constitutional provision, statute, act, code (including the Code), law, regulation, rule, ordinance, order, decree, ruling, proclamation, resolution, judgment, decision, declaration, or interpretative or advisory opinion or letter of a governmental authority.

(o)    "<u>Majority Interests</u>." Members holding among them at least a majority of all Voting Ratios; provided, however, that, if a provision of this Agreement provides that a Majority Interest, for purposes of such provision, is to be calculated or determined without reference to one or more excluded Members, then, solely for purposes of such provision, *"Majority Interest"* shall mean Members, other than the excluded Members, holding among them at least a majority of all Voting Ratios, other than Voting Ratios held by such excluded Members.

(p)    "<u>Manager Member</u>." Conrad Car Wash, Inc., a Utah Corporation, and any person hereafter elected as the Manager Member of the Company.

(q)    "<u>Member</u>." Any Person executing this Agreement as of the date of this Agreement as a Manager Member or Member or hereafter admitted to the Company as a member as provided in this Agreement, but such term does not include any Person who has ceased to be a member in the Company.

(r)    "<u>Membership Rights</u>." With respect to any Member, (a) that Member's status as a Member; (b) that Member's Interest; (c) all other rights, benefits and privileges enjoyed by that Member (under the BOC, the Certificate of Formation, this

Agreement or otherwise) in its capacity as a Member, including that Member's rights to vote, consent and approve and otherwise to participate in the management of the Company; and (d) all obligations, duties, and liabilities imposed on that Member (under the BOC, the Certificate of Formation, this Agreement or otherwise) in its capacity as a Member, including any obligations to make Capital Contributions; provided, however, that such term shall not include any management rights held by a Member solely in its capacity as a Manager.

(s)     "Net Cash Flow from Operations." All cash funds derived from operations of the Company (including interest received on reserves), but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as determined by the Manager Member. Net Cash Flow shall not include proceeds or costs included in the determination of Net Capital Proceeds but shall be increased by the reduction of any reserve previously established.

(t)     "Net Capital Proceeds from Capital Transactions." The proceeds received by the Company in connection with a Capital Transaction after the payment of costs and expenses incurred by the Company in connection with such Capital Transaction, including brokers' commissions, loan fees, loan payments, other closing costs, and the cost of any alteration, improvement, restoration, or repair of any Company property necessitated by or incurred in connection with such Capital Transaction and, if the Capital Transaction is a financing or refinancing, after the payment of any Company indebtedness that is repaid in connection with such financing or refinancing.

(u)     "Member." Those Members listed and identified in Exhibit A.  As a point of clarification, the Manager Member (and or an Affiliated Person or entity) has made a Capital Contribution, and as to its Capital Contribution it shall be treated as a Member and share in the Return in the same manner as other Member.

(v)     "Operating Agreement." This First Amended and Restated Operating Agreement of CCW Braun Heights, LLC, a Texas limited liability company, as amended from time to time.

(w)     "Persons."  The meaning assigned that term in Section 1.02(69-b) of the BOC.

(x)     "Prime Rate." A rate per annum equal to the lesser of (a) a varying rate per annum that is equal to the interest rate publicly quoted by Wall Street Journal, Southwest Edition from time to time as its prime commercial or similar reference interest rate, with adjustments in that varying rate to be made on the same date as any change in that rate, and (b) the maximum rate permitted by Law.

(y)     "Pro Rata." The amount of each Member's share of a particular distribution shall be based upon the relationship of their Sharing Ratio to the total amount of that particular distribution.

(z)     "<u>Sharing Ratios</u>." Subject in each case to adjustments on account of Dispositions of Membership Rights permitted by this Agreement, (a) in the case of a Member executing this Agreement as of the date of this Agreement or a Person acquiring those Membership Rights, the percentage specified for that Member as its Sharing Ratio on <u>Exhibit A</u>.

(aa)    "<u>Supermajority Interest</u>." Members holding among them at least 67% of all Voting Ratios; provided, however, that, if a provision of this Agreement provides that a Supermajority Interest, for purposes of such provision, is to be calculated or determined without reference to one or more excluded Members, then, solely for purposes of such provision, "Supermajority Interest" shall mean Members, other than the excluded Members, holding among them at least 67% of all Voting Ratios, other than Voting Ratios held by such excluded Members.

(bb)    "<u>Voting Ratios</u>." With respect to any Member, such Member's Sharing Ratio; provided, however, that, if a Member shall have Disposed of all or any portion of its Interest but shall have retained its other Membership Rights, such Member shall be deemed, solely for purposes of determining such Member's Voting Ratio, to continue to hold the Sharing Ratio attributable to the Interest that was the subject of such Disposition.

## Article II. Organization and Purpose.

2.01   <u>Organization</u>.

(a)     <u>Formation</u>.  **CCW Braun Heights, LLC** ("<u>Company</u>") is being formed as a limited liability company under and pursuant to the Texas Business Organizations Code (the "<u>BOC</u>") and other relevant laws of the State of Texas by the filing of a Certificate of Formation with the Secretary of State of the State of Texas on September 28, 2016 ("<u>Certificate of Formation</u>").

(b)     <u>Name</u>.  The name of the Company shall be CCW Braun Heights, LLC.  The Company shall enter into a *Sublicense Agreement* with Conrad Car Wash, Inc. for the purpose of conducting business under the name of *Auto Glide Express*.

(c)     <u>Duration</u>.   The Company shall exist until terminated in accordance with this Agreement.

(d)     <u>Registered Office; Registered Agent; Offices</u>. The initial address of the registered office and the principal office of the Company in the State of Texas shall be 22809 Citron Circle, San Antonio, TX, 78260.  The name of the Company's initial registered agent at that address shall be Clif Conrad.  The Manager Member may change the registered office and the registered agent of the Company from time to time.

(e)     <u>Foreign Qualification</u>.  Prior to the Company conducting any business in any jurisdiction other than Texas, the Manager Member shall qualify the Company to do business as a limited liability in any that jurisdiction.

(f)     <u>No State Law Partnership</u>. The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Member or Manager Member be a partner or joint venture of any other Member or Manager Member, for any purposes other than applicable tax laws, and this Agreement may not be construed to suggest otherwise.

2.02    <u>Purpose</u>.

(a)     <u>Specific Purpose</u>.  Notwithstanding the provision in the Certificate of Formation regarding the Company's purposes, the Company, Manager Member, and Members agree that, solely with respect to this Agreement, the internal affairs of the Company and the relationship among them, the purposes of the Company are to purchase undeveloped commercial land located at 10682 Bandera, San Antonio, Texas 78260 ("<u>Property</u>") and to engage in the business of owning, constructing, developing, and operating a retail carwash ("<u>Business</u>"). After the acquisition of the Property, the Property shall be re-plated and the specific street address may change.

   (i)     <u>Property Acquisition</u>.  The Manager Member, on behalf of the Company, may acquire Property upon such terms and conditions as the Manager Member deems, in its reasonable discretion, to be in the Company's best interests ("<u>Property Acquisition</u>").  The Company is hereby authorized to execute, deliver and perform, and the Manager Member acting alone is hereby authorized to execute, deliver and perform on behalf of the Company, all purchase and acquisition documents, as well as the construction documents, all without any further act, vote or approval of any other Member or any other Person. The specific Officers of the Manager Member are authorized to execute and deliver documents on behalf of the Company: (i) Clif Conrad and (ii) Susan W. Conrad.

   (ii)    <u>Construction of Car Wash Facility</u>.  Upon the closing of the Property Acquisition, the Manager Member, on behalf of the Company, is authorized plan, design, develop, and construction a car wash facility of the Property for the operations of the Business, all without any further act, vote or approval of any other Member or any other Person.

   (iii)   <u>Operation of Car Wash Facility</u>. Upon the closing of the completion of the construction of the car wash facility, the Manager Member, on behalf of the Company, is authorized to manage and operate the Business, all without any further act, vote or approval of any other Member or any other Person.

(b)     <u>Enabling Purposes</u>.  The Company may engage in any other business or activity that now or hereafter may be necessary, incidental, proper, advisable or convenient to accomplish the foregoing specific purposes (including obtaining financing therefor) and that is not forbidden by the Law of the jurisdiction in which the Company engages in that business.

## Article III. Capital

3.01    <u>Equity Capital</u>.

(a)     <u>Capital Contributions</u>.  The Company shall initially offer to the Members a one percent (1%) interest in the total Sharing Ratios for an initial contribution of cash of Thirty-Five Thousand and 00/100 Dollars ($35,000.00).   The initial aggregate offering shall be Three Million, Five Hundred Thousand and No Cents ($3,500,00.00).    The Members agreed to make the total Capital Contributions described for that Member in <u>Exhibit A</u>. Contemporaneously with the execution of this Agreement, each Member shall make the Capital Contributions described for that Member in <u>Exhibit A</u>; and if applicable, the Members shall make monthly installments of their Capital Contributions in accordance with the schedule set forth in <u>Exhibit A-1.</u> Each individual monthly installment shall be remitted to the Company within ten (10) business days after receiving a written email notification from the Manager Member.

(b)     <u>Subsequent Contributions</u>.  Except as provided for in this Article III, neither the Manager Member, nor the Member shall be obligated to contribute additional Capital Contributions.  In the event that the Company needs additional capital, the Manager Member may request the Members to voluntarily contribute additional Capital Contributions, but neither the Manager Member, nor the Members, shall be obligated to do so.

(c)     <u>New Capital</u>.  In the event that the Managing Member determines that the Company has a need for additional capital for the development and operations of Business (as defined in this Agreement), the Manager Member shall offer the opportunity to the existing Members who shall have a commercially reasonable time to either accept or reject the offer, but in no event shall they have less than thirty (30) days to consider the offer.  Thereafter, and, if applicable, after obtaining the consent of all of the Members in accordance with Section 6.05(k), the Manger Member may raise additional capital, in its sole discretion, and negotiate the designations, preferences, conversion or other rights, voting powers, restrictions, limitations as to distributions, qualifications or terms or conditions of redemption of the holders of any new and or additional membership interests.  In the event that the Sponsor desires to develop a separate car wash business at a separate location, then that business opportunity shall not be controlled by this subsection (c); instead, it shall be controlled by the terms and conditions of the *Agreement to Form a Company*, which the parties are executing simultaneously with this Agreement.

(d)     <u>Capital Accounts</u>.

    (i)     <u>Maintenance of Capital Accounts</u>. The company shall maintain a "Capital Account" for each Member in accordance with Treasury Regulation Sec. 1.704-1(b)(2)(iv). If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. A Member that has more than one Interest shall have a single Capital Account that reflects all of its Interests, regardless of the class of Interest owned by that Member and regardless of the time or manner in which it was acquired.

    (ii)     <u>No Restoration of Deficit Capital Accounts</u>. Subject to Sections 3.02(c) and 5.01(e), in the event that a Member has a deficit balance in their Capital Account upon the liquidation of the Company, said Member shall have no obligation to make any capital contribution to the Company, and the negative balance of the Member's capital account shall not be considered a debt owed by the Member to the Company or to any other person for any purpose whatsoever.

(e)     <u>Restoration Exceptions</u>.

    (i)     <u>BOC Limitations</u>. The Members acknowledge that they are obligated to recontribute Company distributions if and to the extent required by BOC. If and to the extent that the Members are so obligated to recontribute Company distributions, the Members shall return such distributions pro rata, in the reverse order in which they received such distributions, above.

    (ii)     <u>Restoration of Excess Tax Advances</u>. The Members acknowledge that they are obligated to recontribute Company excessive Tax Advances as required by Section 5.01(d).

    (iii)     <u>Re-Contribution Obligation</u>. The Members acknowledge that they are obligated to recontribute to the Company distributions as required by Section 3.02(c).

3.02     <u>Financing Capital</u>

    (a)     <u>Financing</u>. From time to time, and, if applicable, after obtaining the consent of all of the Members in accordance with Section 6.05(i), the company may seek financing ("Financing") from a third-party financial institution ("<u>Lender</u>"). After obtaining the consent of all of the Members, if applicable, the Company is hereby authorized to execute, deliver and perform, and the Manager Member acting alone is hereby authorized to execute, deliver and perform on behalf of the Company, all promissory notes, loan agreements, deeds of trust, security agreements, financing statements, and other related loan and financing documentation ("<u>Financing Documents</u>").

FINAL: MAY 11, 2017

(b)    <u>Guaranty Liability</u>.  In the event that the Company seeks Financing from a Lender, the Manger Member and the principals of the Manger Member, Clif Conrad and Susan W. Conrad, may be required to personally guaranty the obligations of the Company under the <u>F</u>inancing Documents ("<u>Principal-Guarantors</u>").  The Principal-Guarantors have agreed to act as guarantors of the Company's obligations under the Financing Documents; provided that, the Members agree to the terms and conditions of the Re-Contribution Obligations as set forth in Section 3.02(c), below.

(c)    <u>Re-Contribution Obligation</u>. The Company, Manger Member, and  Members agree to the terms and conditions of this Section 3.02(c) ("<u>Re-Contribution Obligation</u>").

    (i)    With regards to the Financing and Financing Documents, if at any time during the operations of the Company, or during dissolution, or after dissolution: (i) the Principal-Guarantors, individually or jointly, loan proceeds to the Company in order to cash flow the Company so that the Company will be able satisfy a principal or interest payment, or other loan obligation of the Company, (ii) the Lender makes a demand on the Principal-Guarantors, (iii) the Lender initiates any legal and or dispute resolution against the Principal-Guarantors, or (iv) the Lender recovers monies or property from the Principal-Guarantors, then the Principal-Guarantors shall have the election to send to the Members a "<u>Re-Contribution Obligation Notice</u>."

    (ii)    The "<u>Re-Contribution Obligation Notice</u>" shall describe in detail the relationship with the Lender and state the amount of money that has been paid to the Lender, or loaned to the Company by the Principal-Guarantors, or is being demanded from the Principal-Guarantors by the Lender ("<u>Deficiency Amount</u>").

    (iii)    Upon the delivery of the Contribution Obligation Notice, all distributions under Article IV of the Operating Agreement shall immediately cease until such time that the Principal-Obligators are reimbursed in full for any proceeds they have paid or contributed to satisfy the Deficiency Amount.

    (iv)    Within ten (10) days of receipt of the Re-Contribution Obligation Notice, the Manager-Member and the Members shall contribute back to the Company their pro ratably share of the Deficiency Amount out of their share of the distributions made to them by the Company under Article IV of the Operating Agreement ("<u>Distributed Funds</u>"). In the calculation of the amount of each Member's Distributed Funds, the amount shall not be net of any tax obligation paid and/or owed by such Member to the IRS or any state taxing authority.

    (v)    Each Members' Re-Contribution Obligation is secured by their respective Membership Rights ("<u>Security Agreement</u>").  This Security Agreement shall be governed by the default rules of the laws of Texas governing security interests.

(vi)     In the event that any Member defaults under their Re-Contribution Obligation, then such event shall be, at the election of the Manager Member, a Buyout Event under Section 7.04 of the Operating Agreement. The Manager Member shall be entitled to exercise the buy-out rights under Section 7.04 of the Operating Agreement. The elections under this subparagraph shall be cumulative.

3.03    Advances by Members. If the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so with the consent of the Manager Member may advance all or part of the needed funds to or on behalf of the Company. An advance described in this subsection constitutes a loan from the Member to the Company, bears interest at the Prime Rate from the date of the advance until the date of payment, and is not a Capital Contribution.  The repayment of all advances and interests shall take priority over all distributions to the Members.

## Article IV. Distributions and Tax Allocations

4.01    Distributions.

(a)    Definitions.

(i)     "Investment Capital."  The Capital Contribution plus any additional Capital Contribution of a Member.

(ii)    "Unreturned Investment Capital Balance."  The total Investment Capital of the Member.

(b)    Net Cash Flow from Operations. Net Cash Flow from Operations shall be distributed as determined by the Manager Member but no less frequently than ten (10) days following the end of each fiscal quarter to the Members in the following order of priority:

(i)      82% to the Members, pro rata; and (ii) 18% to the Manger Member.

(c)    Net Capital Proceeds from Capital Transactions. Within 90 days of the Company's receipt of proceeds from a Capital Transaction, the Net Capital Proceeds therefrom shall be distributed and applied by the Company in the following order of priority:

(i)     First, to the Members, pro rata, in an amount equal to the Unreturned Investment Capital Balance; and then,

(ii)    The balance is divided: (i) 20% to the Members, pro rata; and (ii) 80% to the Manger Member.

4.02    Tax Allocations.

    (a)    <u>Target Allocations</u>.

        (i)    <u>Determination</u>. It is the overarching intent of the Members that all allocations of partnership items shall be made: (i) to achieve the Members' business and economic agreements as set forth in the distribution sections under Section 4.01; and (ii) to comply with Sections 703 and 704 of the IRC Code. In the application of the Target Allocation provision set forth in herein, the Manger Member and the Company accountant shall give effect to the applicable Special and Regulatory Allocations set forth in <u>Exhibit B</u>.

        (ii)    <u>Target Allocation</u>. Net profits and losses for any allocation year will be allocated among the Members in a manner that will result in the Capital Account balance for each Member (which may be positive or negative), after adjusting the capital account for all capital contributions and distributions and any special allocations required pursuant to this agreement for the current and all prior years, being (as nearly as possible) equal to (x) the amount that would be distributed to the Member if the company were to sell all of its assets at their current gross asset value, pay all liabilities of the company (limited, with respect to any nonrecourse liabilities, to the value reflected in the Members' capital accounts for the assets securing such nonrecourse liabilities), and distribute the proceeds thereof in accordance with Section 4.01, minus (y) the Member's share of company minimum gain and Member nonrecourse debt minimum gain.

    (b)    <u>Special and Regulatory Allocations</u>. The Manager Member and the Company accountant shall give effect to the applicable Special and Regulatory Allocations, which are attached hereto as <u>Exhibit B</u>.

## Article V. Taxes, Books and Records, Reports and Bank Accounts.

5.01    <u>Taxes</u>.

    (a)    <u>Taxed as a Partnership</u>. The Company shall be taxed under Subchapter K of the Code. Neither the Company nor any Member may make an election for the Company to be excluded from the application of the provisions of Subchapter K of chapter 1 of subtitle A of the Code, or any similar provisions of applicable state law and no provision of this Agreement shall be construed to sanction or approve such an election.

    (b)    <u>Other Tax Elections</u>. The Company shall make the following elections on the appropriate tax returns:

        (i)    to adopt the calendar year as the Company's fiscal year;

(ii)    to adopt the cash method of accounting and to keep the Company's books and records on the income-tax method;

(iii)    if a distribution of the Company's property as described in Code Sec. 734 occurs or upon a transfer of Membership Rights as described in Code Sec. 743 occurs, on request by notice from any Member, to elect to adjust the basis of Company's properties, pursuant to Code Sec. 754;

(iv)    to elect to deduct the maximum amount of organizational expenses in the fiscal year the company begins business and to amortize the balance of the organizational expenses of the Company ratably over a period of 180 months as permitted by Sec. 709(b) of the Code; and

(v)    any other election the Manger Member may deem appropriate and in the best interests of the Members.

(c)    <u>Tax Returns</u>. The Company shall prepare and timely file all federal, state, and local tax returns required to be filed by the Company. Each Member shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's tax returns to be timely prepared and filed. The Company shall deliver a copy of each such return to the Members on or before ten Days prior to the due date of any such return, together with such additional information as may be required by the Members in order for the Members to file their individual returns reflecting the Company's operations. The Company shall bear the costs of the preparation and filing of its returns.

(d)    <u>Tax Advances</u>. The Company will distribute Net Cash Flow to the Members at such times as the Manager Members shall determine; provided that, unless restricted by the terms of any loan agreement, indenture, or other agreement to which the Company is or becomes a party, the Manager Members will make distributions of cash on hand at least equal to the maximum tax liability for each year at such times (considering, among other factors, the requirement to make quarterly estimated tax payments) that each Member will receive such distributions prior to the times payments of taxes or estimated taxes are due ("<u>Tax Advances</u>"). All distributions under this Section shall be made to the Members in proportion to their Sharing Ratios.

(e)    <u>Taxes Advances Subject to Claw-Back</u>. All Tax Advances made to a Member shall be treated as an advance against and shall reduce the amount of the distributions that such Member otherwise would receive under Article IV.  In the event that a Member's Tax Advances exceed their distributive share of income under Article IV, then such Member shall promptly return the excess to the Company.

(f)    <u>Tax Matters Partner</u>. The Manger Member shall be the "tax matters partner" of the Company pursuant to Sec. 6231(a)(7) of the Code.

5.02    <u>Books and Records</u>. The Manger Member shall keep or cause to be kept at the principal office of the Company complete and accurate books and records of the Company, supporting

documentation of the transactions with respect to the conduct of the Company's business, and minutes of the proceedings of its Manager Members, Members, and each committee (if any). The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company; a copy of the Certificate and this Agreement and all amendments thereto; a current list of the names and last known business, residence, or mailing addresses of all Members; each Member's Interest; and the Company's federal, state, and local tax returns for the Company's six most recent tax years.

5.03    Reports. On or before the 120th Day following the end of each fiscal year during the term of the Company, the Manger Member shall cause each Member to be furnished with a balance sheet, an income statement, and a statement of changes in Members' capital of the Company for, or as of the end of, that year. These financial statements must be prepared in accordance with accounting principles generally employed for cash basis records consistently applied (except as therein noted). The Manager Members also may cause to be prepared or delivered such other reports as they may deem appropriate. The Company shall bear the costs of all these reports.

5.04    Accounts. The Manger Member shall establish one or more separate bank and investment accounts and arrangements for the Company, which shall be maintained in the Company's name with financial institutions that the Manger Member determines. The Manger Member may not commingle the Company's funds with the funds of any Member; provided, however, that the Company funds may be invested in a manner the same as or similar to the Manager Members' investment of their own funds or investments by their Affiliates.

## Article VI. Management of the Company

6.01    Manager Member.

(a)     In General.  The Company's business shall be managed by and under the direction of the Manager Member.  Except as expressly provided otherwise in this Agreement; (i) the Manager Member shall have the exclusive responsibility and authority to control, manage and direct the Company's business; (ii) all Company matters shall be decided by and require the consent of the Manager Member; (iii) the Manager Member shall be responsible for the day-to-day management of the Company's Business.

(b)     Manager Member's Rights and Responsibilities.  Without limiting the generality of the provisions set forth in Section 6.01(a) above, the Manager Member shall have the right, without the consent of any Member, to cause the Company to do the following upon such terms and conditions as the Manager Member deems, in its commercially reasonable discretion, to be in the Company's best interests:

(i)     To negotiate the purchase agreement to acquire the Property, execute all transactional documents necessary to effectuate the acquisition of the Property;

FINAL: MAY 11, 2017

(ii)    To negotiate all loan documents with any Lender, construction loan, and any take-out loan relating to the project;

(iii)   To plan, design, and construct a car wash facility on the Property; including, but not limited to, the right to contract with architects, engineers, general contractors, and other design and construction professionals for the design and construction of a car wash facility;

(iv)    To negotiate and execute all contracts, leases, option agreements, notes, deeds of trust, grant deeds, agreements for sale, escrow instructions, releases, easements, maps, construction contracts and other documents and instruments, including, without limitation, the Financing and Financing Documents (and any modifications or amendments thereto);

(v)     To acquire Company business assets, including, without limitation, the Property, machinery, equipment and other supplies needed to operate the Business;

(vi)    To lease or re-lease all or any part of any Company asset, including, without limitation, the Property and Business;

(vii)   Subject to the provisions of 6.05(j) below, to sell, exchange, convey or otherwise dispose of all or any part of any Company asset, including, without limitation, the Property and Business;

(viii)  Subject to the provisions of 6.05(i) below, to borrow money, finance, refinance, mortgage, prepay, in whole or in part, increase, modify or extend any obligation, including, without limitation, pursuant any Financing Documents; provided, however, no Member shall be obligated to personally guarantee any Company obligation without their written consent;

(ix)    To Encumber, pledge or hypothecate all or any part of any Company asset, including, without limitation, the Property and Business;

(x)     To make capital expenditures with respect to any Company asset, including, without limitation, the Property and Business;

(xi)    Subject to the provisions of 6.05(k) below, to raise additional capital and negotiate the designations, preferences, conversion or other rights, voting powers, restrictions, limitations as to distributions, qualifications or terms or conditions of redemption of the holders of any new and or additional membership Interests;

(xii)   To incur costs and liabilities;

(xiii)  To disburse Company funds to pay Company costs and liabilities;

(xiv)  To place amounts into reserves for the Company to satisfy customary and usual claims with respect to the Company's business;

(xv)  To exercise the Company's rights and fulfill the Company's obligations with respect to any entity in which the Company owns an interest, whether such rights and obligations are conferred by law or set forth in the governing instrument for such other entity;

(xvi)  To employ or discharge, at the Company's expense, agents, employees, consultants, independent contractors and/or attorneys, including, without limitation, (i) project management individuals or companies to instigate and oversee development and/or construction projects, (ii) architectural, engineering and environmental consultants, and (iii) marketing, public relations and brokerage firms;

(xvii)  To attend all meetings of any kind on the Company's behalf, conduct all contact with neighboring landowners, governing agencies and other interested parties on the Company's behalf, and represent the Company and its business purposes;

(xviii)  To formulate all plans to be submitted to government entities in connection with the ownership, operation, management, lease or holding for investment of the Property and Business;

(xix)  To obtain insurance for the proper protection of the Company and/or the Members;

(xx)  To operate and maintain Company assets;

(xxi)  To adjust and settle any and all claims against the Company;

(xxii)  To compromise or release any Company claim without payment in full;

(xxiii)  To submit a Company claim or liability to arbitration or reference;

(xxiv)  Subject to the provisions of 6.05(l ) below, to dissolve the Company;

(xxv)  To generally perform daily project management duties; and/or

(xxvi)  To enter into a *Sublicense Agreement* with Conrad Car Wash, Inc. for the purpose of conducting business under the name of *Auto Glide Express*.

6.02  <u>Officers</u>. The Manger Member may designate one or more Persons to be "<u>Officers</u>" of the Company. No Officer need be a resident of the State of Texas, a Member or a Manger Member. Any Officers so designated shall have such authority and perform such duties as the Manger Member may delegate to them. The Manger Member may assign titles to particular Officers. Unless the Manger Member decide otherwise, if the title is one commonly used for Officers of a business corporation formed under the BOC, the assignment of such title shall

constitute the delegation to such Officer of the authority and duties that are normally associated with that office.

6.03    <u>Manager Member as Agent</u>.  To the extent of its powers set forth in this Agreement, (i) the Manager Member is an agent of the Company for the purpose of the Company's Business, and (ii) actions of the Manager Member taken pursuant to such powers set forth in this Agreement shall bind the Company.

6.04    <u>Power of Attorney</u>.

(a)    <u>General</u>. Each Member and Assignee hereby irrevocably constitutes and appoints the Manager Member, any liquidating trustee, and authorized officers and attorneys-in-fact of each (the "<u>Attorney in Fact</u>"), and each of those acting singly, in each case with full power of substitution, as its true and lawful agent and attorney-in-fact, with full power and authority in its name, place and stead to:

(i)    execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (i) all certificates, documents and other instruments (including, without limitation, this Agreement and the Certificate of Formation and all amendments, supplements or restatements thereof) that the Attorney in Fact deems appropriate or necessary to form, qualify or continue the existence or qualification of the Company in the State of; (ii) all instruments that the Attorney in Fact deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement duly adopted in accordance with its terms; (iii) all conveyances and other instruments or documents that the Attorney in Fact deems appropriate or necessary to reflect the dissolution and winding up of the Membership pursuant to the terms of this Agreement, including, without limitation, Articles of Dissolution and Certificate of Termination; (iv) all conveyances and other instruments or documents that the Attorney in Fact deems appropriate or necessary to reflect the sale, distribution or exchange of assets of the Company pursuant to the terms of this Agreement; (e) all instruments relating to the admission, withdrawal, removal or substitution of any Member pursuant to, or other events described in, this Agreement, or the capital contribution of any Member; and (f) all certificates, documents and other instruments relating to the determination of the rights, preferences and privileges relating to Member's Interests; and

(ii)    execute, swear to, acknowledge and file all ballots, consents, approvals, waivers, certificates and other instruments appropriate or necessary, in the sole and absolute discretion of the Attorney in Fact to make, evidence, give, confirm or ratify any vote, consent, approval, agreement or other action which is made or given by the Members hereunder or is consistent with the terms of this Agreement or appropriate or necessary, in the sole and absolute discretion of the Manager Member or the liquidating trustee to effectuate the terms or intent of this Agreement.

(b)     <u>Limitation</u>. Nothing contained herein shall be construed as authorizing the Attorney in Fact to amend this Agreement except in accordance with Section 6.05(a) hereof or as may be otherwise expressly provided for in this Agreement.

(c)     <u>Additional Provisions</u>. The foregoing power of attorney is hereby declared to be irrevocable and a special power coupled with an interest, in recognition of the fact that each of the Members and Assignees will be relying upon the power of the Manager Member or the liquidating trustee to act as contemplated by this Agreement in any filing or other action by it on behalf of the Membership, and it shall survive and not be affected by the subsequent incapacity of any Member or assignee and the transfer or assignment of all or any portion of such Person's Interest (as the case may be) and shall extend to such Person's heirs, successors, assigns and personal representatives. Each such Member and Assignee hereby agrees to be bound by any representation made by the Manager Member or the liquidating trustee, acting in good faith pursuant to such power of attorney; and each such Member and Assignee hereby waives any and all defenses that may be available to contest, negate or disaffirm the action of the Manager Member or the liquidating trustee, taken in good faith under such power of attorney. Each Member and Assignee shall execute and deliver to the Manager Member or the liquidating trustee, within fifteen (15) days after receipt of the Manager Member's or the liquidating trustee's request thereof, such further designation, powers of attorney and other instruments as the Manager Member or the liquidating trustee (as the case may be) deems necessary to effectuate this Agreement and the purposes of the Membership.

6.05   <u>Limitation on Authority of Manger Member</u>. Notwithstanding any other provision in this Agreement to the contrary, the Manager Member shall not do any of the following on behalf of the Company without the written unanimous consent of all Members:

(a)     Amend this Agreement;

(b)     Confess a judgment;

(c)     File a petition for bankruptcy, or avail of any insolvency proceeding under state law;

(d)     Alter the nature of  Business of the Company);

(e)     Authorize a merger with another business entity;

(f)     Do any act detrimental to the best interests of the Company or which would make it impossible for the Company to carry on its business;

(g)     Possess property of the Company, or assign its rights in specific property of the Company, for other than a purpose of the Company;

(h)     Do any act in contravention of the Agreement;

(i)     Prior to the fifth anniversary of the opening of the Business, to borrow money, finance, refinance, mortgage, prepay, in whole or in part, increase, modify or extend any obligation, including, without limitation, pursuant any Financing Documents; provided, however, no Member shall be obligated to personally guarantee any Company obligation without their written consent;

(j)     Prior to the fifth anniversary of the opening of the Business, the sale, exchange, conveyance, of all of the Company's assets, the Property, and or the Business;

(k)     Prior to the fifth anniversary of the opening of the Business, to raise additional capital and negotiate the designations, preferences, conversion or other rights, voting powers, restrictions, limitations as to distributions, qualifications or terms or conditions of redemption of the holders of any new and or additional membership Interests; or

(l)     Prior to the fifth anniversary of the opening of the Business, to dissolve the Company.

(m)    Prior to the fifth anniversary of the opening of the Business, to admit a new Member to the Company.

6.06    <u>Compensation of Manger Member</u>.

(a)     <u>Property Management Fee</u>.    The Manager Member in its capacity as the "Property Manager" shall be entitled to receive a monthly fee for management of the Property ("<u>Property Management Fee</u>"). The Property Management Fee shall equal seven percent (7%) of the gross sales collected from the Business.   The Property Management Fee shall be payable monthly, if and to the extent of available operating funds.  If and to the extent operating funds are insufficient, unpaid portions of the Property Management Fee shall carry over and be paid in subsequent months if and to the extent of available operating funds.  The Property Manager shall not be entitled to interest on any unpaid portion of the Property Management Fee. The Property Manager shall also be reimbursed for all expenses incurred on behalf of the Property for valid business purposes, (including, but not limited to telephone, travel, postage, photocopy and record storage expenses). In the event that the Company shall request the Property Manager to undertake work exceeding that usual to normal property management services, then a fee shall be agreed upon for such services before the work begins.

(b)     <u>Refinance Fee</u>.  The Manager Member shall receive a commission of one percent (1%) on any refinance loan amount or and secondary financing loan amount obtained by the Company ("<u>Refinance Fee</u>"). The Refinance Fee described herein shall be apart, separate, and in addition to any loan fees payable to any lender and or loan broker.

(c)     <u>Promoted Interest</u>. The Manager Member shall receive a performance incentive as set forth above in the distributions under Sections 4.01 (b) and (c). The performance incentive is commonly referred to as a "promoted" interest or "carried" interest or "profits" interest, and it shall be referred to herein as the "<u>carried-interest</u>".

6.07    Limitation on Duties.

(a)    Performance. The Manager Member Performance shall perform its managerial duties in good faith and in a manner it reasonably believes to be in the best interests of the Company. The Manager Member does not, in any way, guarantee the return of the Member's contributions or a profit for the Members from the operations of the Company.

(b)    Not Full Time Occupation. The Manager Member shall not be obligated to devote all of its business time to the Company, but shall devote to the Company only such time as is reasonably necessary and appropriate to carry out its obligations under this Agreement.

(c)    No Fiduciary Duty. The Manager Member shall not have a fiduciary obligation to the Company and its Members.

(d)    **Conflict of Interest. Subject to the other express provisions of this Agreement, and subject to the "RFOR" granted to deeproot Funds, LLC, in the *Agreement to Form a Company,* each Member, Manger Member, Officer, or Affiliate thereof may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member, Manger Member, or Officer the right to participate therein. The Company may transact business with any Member, Manger Member, Officer, or Affiliate thereof, provided the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties.**

(e)    Competition. Notwithstanding the foregoing, the Manager Member shall not directly or indirectly own, develop, or operate a car wash facility within a three (3) mile radius of the Business.

(f)    Exculpation. The Manager Member shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence or willful misconduct. Except for such duties as may be expressly set forth in this Agreement, a Manger Member shall not be subject to any duties (including fiduciary duties) in the management of the Company.

6.08    Indemnification. The Company shall indemnify, defend, protect, and hold harmless each Manager Member from and against all actions, suits or proceedings (whether civil, criminal, administrative, arbitrative, or investigative) (collectively, "Proceedings"), and all other claims, demands, losses, damages, liabilities, judgments, awards, penalties, fines, settlements, costs, and expenses (including court costs and reasonable attorneys' fees), arising out of the management of the Company or such Manager Member's service or status as a Manager Member. THIS INDEMNITY SHALL APPLY TO MATTERS THAT ARISE OUT OF THE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OR RESPONSIBILITY BY

SUCH MANAGER MEMBER; PROVIDED, HOWEVER, THAT THIS INDEMNITY SHALL NOT APPLY TO MATTERS ARISING OUT OF THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR BREACH OF THIS AGREEMENT BY SUCH MANAGER MEMBER.

(a)     <u>Advance Payment</u>. The right to indemnification conferred in this Section 6.08 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Manager Member who was, is, or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Manager Member's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by such Manager Member in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such Manager Member of its good faith belief that it has met the standard of conduct necessary for indemnification under this Section 6.08 and a written undertaking, by or on behalf of such Manager Member, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Manager Member is not entitled to be indemnified under this Section 6.08 or otherwise. The Company shall also pay or reimburse a Manager Member for reasonable expenses in connection with such Manager Member's appearance as a witness or other participation in a Proceeding.

(b)     <u>Indemnification of Officers, Employees, and Agents</u>. The Company, by adoption of a resolution of the Manager Members, may indemnify and advance expenses to an Officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Manager Member under this Section 6.08.

(c)     <u>Nonexclusivity of Rights</u>. The right to indemnification and the advancement and payment of expenses conferred in this Section 6.08 shall not be exclusive of any other right which a Manager Member or other Person indemnified pursuant to Section 6.08 may have or hereafter acquire under any Law, provision of the Articles or this Agreement, agreement, vote of Members or disinterested Manager Member, or otherwise.

(d)     <u>Insurance</u>. The Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was serving as a Manager Member, Officer, employee or agent of the Company against any expense, liability, or loss.

6.09    <u>Removal and Replacement of Manager</u>.  Upon the affirmative vote of a Majority Interest, the Members may remove the Manager Member for Good Cause (defined hereafter) and elect a new Manager Member.

(a)     <u>Good Cause</u>. The term "<u>Good Cause</u>" shall mean any of these acts:

(i)      Dishonesty with respect to the Company;

(ii)     Misappropriation of any of the Company's funds or property;

(iii)   The willful or intentional violation or reckless disregard of covenants, obligations, and duties owed to the Company; or

(iv)   The resignation of the Manager Member.

(b)   <u>Removal Procedure</u>.  In the event that a member claims that the Manager Member should be removed for Good Cause, then the parties shall proceed through the following course of action:

(i)   The Members shall notify the Manager Member in writing describing in detail the facts and circumstances that constitute Good Cause for removal ("Removal Notice").

(ii)   Within five (5) business days of receipt of the Removal Notice, the Manager Members shall provide the Members a written response to the Removal Notice ("Responsive Letter").

(iii)   Within five (5) business days of receipt of the Responsive Letter, the Parties shall mediate in order to determine if a resolution may be resolved by mutual consent and agreement.

(iv)   In the event that a mutually acceptable agreement is not negotiated in the mediation, then the Parties will permit the Manager Member thirty (30) days to obtain third-party financing to buy-out the other Members at a purchase price that returns all of their Capital Contribution and a negotiated return that would place the Members in the same position they would have been in had they invested in a similar investment; provided, however, if the Parties are unable to agree upon the buy-out amount, then the Parties will enter into binding arbitration to determine that amount.

(v)   In the event that the Manager Member is unable to obtain third-party financing to buy out the other Members, then the Members will conduct a meeting to vote on the removal of the Manager Member. If the Manager Member is removed, then the Members will elect a new Manager Member. In such an event, the Parties will submit to mediation, and if necessary, to binding arbitration, a commercially reasonable split and division of the Manager Member's "carried-interest" between the original and the new Manager Member.

(vi)   In the event that the Parties enter into binding arbitration as provided for above, then the arbitration shall be adjudicated by JAMS, and the award may be entered by a court having jurisdiction in San Antonio, Bexar County, Texas. All mediation and arbitration proceeding shall take place in San Antonio, Bexar County, Texas. In determining the division of the "carried-interest", the factors to be considered shall include:

    (1)     the site and equipment selection;

    (2)     the execution of the original investment plan;

    (3)     the timeliness of performance;

    (4)     the adherence to the original estimated budgets;

    (5)     the profitability of the business; and

    (6)     other commercially reasonable factors.

## Article VII. Membership, Transfers, Expulsion, and Buy-Out.

7.01    <u>Members</u>.

(a)    <u>In General</u>.  Except as expressly provided otherwise in this Agreement, the Members shall have neither (i) the right to participate in the conduct of the Company's Business, nor (ii) the power to bind the Company in any contract agreement, compromise or undertaking.

(b)    <u>Members' Meetings</u>.

    (i)    <u>Annual Meeting</u>. An annual meeting of the Members for the transaction of such business as may properly come before the meeting shall be held on such date and at such time as the Manager Members shall specify in the notice of the meeting, which shall be delivered to each Member at least 20 Days prior to such meeting.

    (ii)    <u>Special Meeting</u>. Special meetings of the Members may be called by the Manager Members or by Members among them at least ten percent of the Sharing Ratios of all Members. Any such meeting shall be held on such date and at such time as the Person calling such meeting shall specify in the notice of the meeting, which shall be delivered to each Member at least ten Days prior to such meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) for such meeting may be conducted at such meeting.

    (iii)    <u>Quorum</u>. A Majority Interest (represented either in person or by proxy) shall constitute a quorum for the transaction of business at any meeting of the Members. With respect to any matter, other than a matter for which the affirmative vote of a Supermajority Interest or other specified portion of the Members is required by this Agreement, an act of a Majority Interest shall be the act of the Members.

(iv)    <u>Place of Meeting</u>. Any such meeting shall be held at the principal place of business of the Company, unless the notice of such meeting (or resolution of the Manager Members) specifies a different place, which need not be in the State of Texas.

(v)    <u>Waiver of Notice Through Attendance</u>. Attendance of a Person at such meeting shall constitute a waiver of notice of such meeting, except where such Person attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(vi)    <u>Proxies</u>. A Person may vote at such meeting by a written proxy executed by that Person and delivered to another Manger Member, Member, or Member of the committee, as applicable. A proxy shall be revocable unless it is stated to be irrevocable.

(vii)    <u>Action by Written Consent</u>. Any action required or permitted to be taken at such a meeting may be taken without a meeting, without prior notice, and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by the Manager Members and the Members, having not fewer than the minimum cumulative percentage of Sharing Ratios that would be necessary to take the action at a meeting at which all Members, Manager Members, or Members of the committee, as applicable, entitled to vote on the action were present and voted.

(viii)    <u>Meetings by Telephone</u>. Manager Members or d Members, as applicable, may participate in and hold such meeting by means of conference telephone, videoconference, or similar communications equipment by means of which all Persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c)    <u>Liability to Third Parties</u>. No Member or Manger Member shall be liable for the debts, obligations, or liabilities, of the Company, including under a judgment decree or order of a court.

(d)    <u>Expulsion</u>. A Member may not be expelled from the Company except in accordance with Section 7.04.

(e)    <u>Spouses of Members</u>. Spouses of the Members do not become Members as a result of such marital relationship. Each spouse of a Member has executed a Spouse's Agreement in the form of <u>Exhibit C</u>. This subsection does not apply to Members that are entities or trusts.

7.02    Transfer Rights and Restrictions.

(a)    General Prohibition.

 (i)    A Member may not Dispose or Encumber all or any part of its Membership Rights or Interest in the Company without the written consent of the Manager Member.

 (ii)    A Person who acquires a Member's Interest, may not Dispose or Encumber all or any part of its Interest without written consent of the Manager Member.

 (iii)    Any attempted Disposition or Encumbrance of a Person's Membership Rights or Interest in the Company in violation of this Section 7.02(a) shall be invalid and of no force or effect. Accordingly, such Member shall not be relieved of any of its obligations under the Agreement, and the proposed transferee shall not acquire any Membership Rights as a member of this Company, as such rights are set forth in the Agreement and/or conferred by Law.

(b)    Permitted Transfers. Subject to Section 7.02(c) below, a Member may sell, assign or otherwise transfer all or any part of its Interest in the Company to a Permitted Transferee without the consent of any other Member, but only if and to the extent that such transaction does not trigger a tax termination of the Company under Code Section 708(b)(1)(B). For purposes of this Agreement, a "Permitted Transferee" shall mean a revocable living trust established for the primary benefit of such Member and its spouse, if any, provided and for so long as (i) such Member is a trustee of such trust, (ii) the Company deals only with such Member in its capacity as a trustee of such trust, and (iii) the governing instrument of such trust authorizes third parties to rely on the signature of such Member in its capacity as trustee of such trust, as constituting the authority and consent of all trustees of such trust. The Company shall not dissolve by reason of a transfer pursuant to this Section 7.02(b).

(c)    Conditions of Transfer. Any transferee who acquires Membership Rights and or Interests in the Company in accordance with Section 7.02(a) above shall satisfy each of the following conditions:

 (i)    The transferee must execute a written agreement whereby such transferee agrees to be bound by all of the terms and conditions set forth in this Agreement;

 (ii)    The spouse of such transferee, if any, must execute a spousal consent in the form attached to this Agreement as Exhibit C;

 (iii)    The transferee must obtain the Manager Member's consent to the form of assignment and other documentation; and

> (iv)    The transferee must reimburse the Company for all reasonable legal and accounting fees and other costs which the Company incurs as a result of the transaction.

(d)    <u>Status of Transferee</u>.

> (i)    <u>Status as Member</u>.  Upon a transferee's acquisition of a Member's interest in the Company pursuant to Section 7.02(a) above, and satisfaction of those conditions set forth in Section 7.02(c) above, the transferee shall succeed to the Company interest of the transferor Member in the same capacity as the transferor Member held in the Company.  Accordingly, the transferee shall acquire all rights and obligations with respect to title, management, capital, allocations and distributions which the transferor Member held in the Company, as such rights and obligations are set forth in this Agreement and/or conferred by law.

> (ii)    <u>Status as Economic Interest Holder</u>.  If a transferee acquires all or any part of a Member's interest in the Company in violation of Section 7.02(a) above, or if any of the conditions set forth in Section 7.02(c) above are not satisfied by the transferee or waived in writing by the Manager Member, then (i) the transferor Member shall not be relieved of any of its obligations as a member of the Company (as such obligations are set forth in this Agreement and/or conferred by law), and (ii) the transferee shall not be entitled to any rights of a Member (as such rights are set forth in this Agreement and/or conferred by law), other than the right to receive to the extent assigned, those Company distributions and allocations which the transferor Member otherwise would be entitled to receive under this Agreement.  Such a transferee shall be referred to herein as an "<u>Economic Interest Holder</u>".

(e)    <u>Acquisition By Operation of Law</u>.  If any party acquires all or any part of a Member's Interest in the Company by operation of law (including by death or court decree), such party shall not be entitled to any Membership Rights other than as an Economic Interest Holder, unless (i) such acquisition is approved or permitted pursuant to Section 7.02(a) above, and (ii) the conditions set forth in Section 7.02(c) above are satisfied.

(f)    <u>Members' Acknowledgment</u>.    The Members acknowledge that the Company interests represented by this Agreement have been acquired for investment and have not been registered under the Securities Act of 1933, as amended, or the securities laws of any state.  Upon the written demand of the Manager Member, any other Member who desires to transfer any part of its Membership Rights in the Company pursuant to this Section 7.02 must first submit to the Manager Member either (i) an opinion of counsel satisfactory to the former that the Company interest sought to be transferred is not a security or that registration is not required for the transfer of such Company interests, or (ii) such other evidence as may be satisfactory to the former to the effect that the proposed transfer will not violate the Securities Act of 1933, as

amended, or applicable state securities laws or any rule or regulation promulgated thereunder.  The limitation on transfers set forth in this Section 7.02(f) shall be in addition to other limitations or transfers set forth in this Section 7.02.

7.03    <u>Additional Members</u>.

(a)    <u>In General</u>.    Subject to the provisions of 6.05(m) above, an additional member may be admitted to the Company (i.e., pursuant to such additional member's capital contribution and in a manner which dilutes another Member's ownership interest) only in accordance with the following provisions:

(i)    A person or entity may be admitted as an additional member of the Company only with the prior written consent of the Manager Member, which consent may be withheld for any reason or no reason at all; and

(ii)    Notwithstanding subsection (i) above, the Manager Member may admit Additional Members to the Company as set forth in this Agreement without the consent of any other Member.

(b)    <u>Amendment</u>. Upon the admission of an additional member in accordance with Section 7.03(a) above, such additional member shall execute an amendment to this Agreement evidencing (i) such additional member's consent to be bound by the terms and conditions set forth in this Agreement, and (ii) the Members' new interests in Company profits, losses, capital, distributions and voting.

(c)    <u>No Dissolution</u>.    The Company shall not dissolve by reason of either (i) the admission of an additional member to the Company pursuant to this Section 7.03, or (ii) the death or dissolution of a Member, provided there is at least one remaining Member.

7.04    <u>Buy-Out</u>.

(a)    <u>Buyout Events.</u>    This Section 7.04 shall apply to any of the following events (each a "<u>Buyout Event</u>"):

(i)    a Member shall become Bankrupt;

(ii)    a Member shall commit a Default; or

(iii)    a Person acquires Member's Interest in violation of Section 7.02(a).

In each case, the Member or Person with respect to whom a Buyout Event has occurred is referred to herein as the "<u>Affected Person</u>."

(b)    <u>Procedure for Buyout Events</u>.    At any time after the occurrence of the Buyout Event, the Manager Member, or at the Manager Member's sole election, the Company, may buy the Membership Rights or Interest of the Affected Person for the Purchase Price

and Payment Terms set forth in subsections (c), (d), (e), and (f), below. The Manager Member may assign its rights under this Section 7.04. There is no time limitation on when the Manager Member may elect to exercise its options under this Section 7.04 after the occurrence of a Buyout Event.

(c)     Purchase Price. The "Purchase Price" shall be equal to the "Book Value" of the Affected Person's equity of the Company.

    (i)     Definition of Book Value. The term "Book Value" means the book value, computed in accordance with generally accepted accounting principles, of the seller's equity of the Company as of the end of the last full taxable year immediately preceding the year in which the event giving rise to the purchase and sale of the Membership Rights or Interest occurred (the "Book Value"). Notwithstanding anything contained in this Agreement to the contrary, the computation of Book Value shall be subject to the following provisions:

        (1)     Book Value shall not include any proceeds collected or collectable by the Company, under any policy or policies of life or disability insurance insuring the life or disability of a Member, as a result of the death or disability of a Member.

        (2)     No additional allowance of any kind shall be made for the goodwill, trade names, or any other intangible asset or assets (the "Intangible Assets") of the Company.

        (3)     Reserves for contingent liabilities shall not be treated as a liability for purposes of determining Book Value.

        (4)     No adjustment shall be made to Book Value as a result of any event occurring subsequent to the date as of which Book Value is to be determined.

        (5)     Anything contained in this Agreement to the contrary notwithstanding, Book Value shall be calculated for the purposes of this Agreement on an accrual basis even if the Company shall have used different accounting principles for that or any prior period.

        (6)     Book Value shall be determined by the accountants regularly employed by the Company. The determination of the accountants shall, for the purposes of this Agreement, be binding and conclusive upon all parties.

(d)     Payment Terms. The Purchaser shall pay at least fifteen percent (15%) of the Purchase Price in cash at closing and the balance by its promissory note. Such promissory note shall (i) be in a commercially form reasonably satisfactory to the Manager Member, (ii) mature not later than the earlier of five (5) years following closing or the date on which the Company sells all or substantially all of its property, (iii) be payable in

equal annual installments of principal and interest with the first payment due and payable on the first (1st) anniversary of the closing, and (iv) bear interest at an annual rate equal to the Prime Rate.

(e) <u>Closing Date</u>. The transaction shall close on a date determined by the Manager Member.

(f) <u>Closing Costs</u>. The purchaser and seller each bear the cost of 50% of all expenses incurred in connection with the transfer.

7.05 <u>Option to Purchase Interests</u>. At any time after the fifth (5th) anniversary of the opening of the Business, the Manager Member shall have the option to purchase the Membership Rights of any or all of the Members (and or the Interests of any Economic Interest Holder) in accordance with this Section 7.05.

(a) <u>Option Purchase Price</u>. The "<u>Purchase Price</u>" shall be an amount equal to the greater of (i) product of (x) 8.0 and (y) EBITDA and (z) the Sharing Ratio of the Person's Membership Rights (or Interest of Economic Interest Holder) being acquired ("<u>EBITDA Purchase Price</u>"); or, the Minimum Purchase Price (as defined below).

(b) <u>EBITDA Definition</u>. "<u>EBITDA</u>" is net operating income before interest, taxes, depreciation, and amortization. EBITDA shall be calculated on the twelve-month period (full months) prior to the notice of the election to exercise the option. The "net operating income" shall mean "taxable income" as determine under the Internal Revenue Code (prior to taking deductions for interest, taxes, depreciation, and amortization), but it shall not include extraordinary items of expense. The terms "interest," "taxes," "depreciation," and "amortization" shall have the same meaning as those terms are used to determine recognizable business deductions under the Internal Revenue Code.

(c) The "Minimum Purchase Price" shall mean the sum of (1) the total Capital Contributions of the Member (initial and any additional contributions) and (2) the product of (x) .02 simple interest and (y) the total Capital Contributions of the Member (initial and any additional contributions).

(d) <u>Review Process</u>. With the assistants of the company's accountant, the Sponsor shall calculate the EBITDA Purchase Price and the Minimum Purchase Price and deliver the calculations to the Members for their review and comment ("<u>Delivery Date</u>"). The Members shall have twenty-five (25) days from the Delivery Date to review and comment on the calculations ("<u>Review Period</u>"). Upon request, the Sponsor shall deliver to the Members the financial documents supporting the calculations. If a Member objects to the calculations, then the Member and Sponsor shall enter into discussion to resolve any objection. If a resolution cannot be reached during the Review Period, the disagreement shall be submitted to an independent certified public accountant ("<u>Independent Accountant</u>") for determination. The parties shall mutually decide upon the selection of the Independent Accountant; however, in the event that the parties cannot agree, then each will select an accountant, and those accountants

shall mutually agree upon the accountant, who will act as the Independent Accountant. The Sponsor and the Company shall fully cooperate with the Independent Accountant regarding any financial information and documentation needed for this determination. Each party shall be provided adequate opportunity to present their calculations and business reasons supporting their position. After each party has been provided adequate opportunity to state their point of view, the Independent Accountant shall render his calculations as to the EBITDA Purchase Price and the Minimum Purchase Price, which shall be final and binding upon the Parties. The Member and the Sponsor shall each bear 50% of the fees and costs of the Independent Accountant for such determination.

(e) <u>Payment Terms</u>. The Manager Member shall pay the Purchase Price in cash, either by certified check or wire transfer.

(f) <u>Closing Date</u>. The transaction shall close on a date determined by the Manager Member.

(g) <u>Closing Costs</u>. The Manager Member shall bear the cost of all expenses incurred in transfer.

## <u>Article VIII. Winding-Up, Dissolution, and Termination</u>

8.01 <u>Events Requiring Winding Up</u>.  Subject to Section 8.02, the Company shall go into a state of winding up and its affairs shall be wound up on the first to occur of the following events (each a "<u>Winding Up Event</u>"):

(a) Subject to the provisions of 6.05(l) above, the consent of the Manager Member and a Supermajority Interest;

(b) entry of a decree of judicial dissolution of the Company under the BOC; and

(c) the occurrence of the event provided for in Sec. 11.056 of the BOC and the failure of the legal representative or successor to take the actions specified in Sec. 11.056 within the time specified therein.

No other event will cause the Company to wind up.

8.02 <u>Winding Up and Termination</u>. On the occurrence of a Winding Up Event, the Manger Member shall act as liquidator or may appoint one or more Persons as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the BOC. The costs of winding up shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Manager Members. The steps to be accomplished by the liquidator are as follows:

(a)    as promptly as possible after dissolution and again after final winding up, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable;

(b)    the liquidator shall cause the notice described in the BOC to be mailed to each known creditor of and claimant against the Company in the manner described in the BOC;

(c)    the liquidator shall pay, satisfy, or discharge from Company funds all of the debts, liabilities, and obligations of the Company (including all expenses incurred in winding up and any advances described in Sec. 3.03 or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d)    all remaining assets of the Company shall be distributed to the Members as follows:

(i)    the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members in accordance with the provisions of Article IV;

(ii)    with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii)    Company property shall be distributed among the Members in accordance with Article IV; and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, 90 Days after the date of the liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this subsection. The distribution of cash and/or property to a Member in accordance with the provisions of this subsection constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its Membership Rights and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of Article 5.02(D) of the BOC. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

8.03   Certificate of Termination. On completion of the distribution of Company assets as provided herein, the Manger Member (or such other Person or Persons as the BOC may require or permit) shall file a Certificate of Termination with the Secretary of State of Texas, cancel any other filings made in any other state and take such other actions as may be necessary to terminate the existence of the Company. Upon the filing of the Certificate of Termination by the Secretary of State of Texas, the existence of the Company shall cease, except as may be otherwise provided by the BOC or other applicable Law.

## Article IX. General Provisions

9.01   Offset. Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

9.02   Notices. Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail or by facsimile, telegram, telex, cablegram, Internet mail or "e-mail" or similar transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A, or such other address as that Member may specify by notice to the other Members. Any notice, request or consent to the Company or the Manager Member or the Members must be given to the Manager Members at the following address: 22809 Citron Circle, San Antonio, Texas 78260. Whenever any notice is required to be given by Law, the Certificate, or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

9.03   Entire Agreement; Supersedure. This Agreement constitutes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

9.04   Effect of Waiver or Consent. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

9.05   Amendment or Restatement.

(a)     This Agreement may be amended or restated only by a written instrument adopted by the Manger Member and executed and agreed to by a Supermajority Interest; provided, however, that (i) an amendment or restatement reducing a Member's Sharing Ratio or increasing its Capital Contributions (other than to reflect changes

FINAL: MAY 11, 2017

otherwise provided by this Agreement) is effective only with that Member's consent, and (ii) an amendment or restatement reducing the required Sharing Ratio or other measure for any consent or vote in this Agreement is effective only with the consent of Members having the Sharing Ratio or other measure theretofore required.

(b)    The Certificate of Formation may be amended or restated only with the approval of the Manager Members and a Supermajority Interest; provided, however, that (i) no such amendment or restatement of the Certificate of Formation may affect any change described in clause in this Agreement without the consent of the Member or Members whose consent would be required under such clauses if such change were being effected through an amendment or restatement of this Agreement.

9.06    <u>Binding Effect</u>. Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

9.07    <u>Governing Law; Severability</u>. THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT- OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate, or (b) any mandatory, non-waivable provision of the BOC, such provision of the Certificate or the BOC shall control. If any provision of the BOC provides that it may be varied or superseded in the company agreement of a limited liability company (or otherwise by agreement of the Members or Manger Members of a limited liability company), such provision shall be deemed superseded and waived in its entirety if this Agreement contains a provision addressing the same issue or subject matter. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by Law.

9.08    <u>Further Assurances</u>. In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

9.09    <u>Waiver of Certain Rights</u>. Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

9.10    <u>Directly or Indirectly</u>. Where any provision of this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person.

9.11 <u>Indemnification</u>. To the fullest extent permitted by Law, each Member shall indemnify the Company, each Manger Member, and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement, provided, however, no Member shall have liability under this subsection to the Company or any other Member or any Manger Member as provided in subsection entitled, "No Restoration of Deficit Capital Accounts."

9.12 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

**[Signature page follows]**

The undersigned hereby agree, acknowledge, and certify that the foregoing Agreement constitutes the Agreement of CCW Braun Heights, LLC, a Texas limited liability company, adopted by the Members of the Company, as of the date first set forth above.

**COMPANY**

**CCW BRAUN HEIGHTS., LLC,**
a Texas limited liability company

By Its Sole Manager Member:
Conrad Car Wash, Inc.
a Utah Corporation.

BY: _____
SUSAN W. CONRAD
President

**MANGER MEMBER**

Conrad Car Wash, Inc.
a Utah Corporation.

BY: _____
SUSAN W. CONRAD
President

**MEMBERS**

The Clif and Susan Conrad Trust

BY: _____
SUSAN W. CONRAD, Trustee

BY: _____
CLIF CONRAD, Trustee

**<u>MEMBERS</u>**

deeproot Funds, LLC,
a Texas limited liability company

BY:    deeproot Capital Management, LLC,
       Its Manager

BY:    _____
       Robert J. Mueller, Manager

## EXHIBIT A

### NAME, ADDRESS AND CAPITAL CONTRIBUTION OF THE MANAGER AND MEMBER

| Names and Addresses of Members | Capital Contribution | Sharing Ratios |
|---|---|---|
| | | |
| **Manager Member** | | |
| Conrad Car Wash Inc. 22809 Citron Circle San Antonio, TX 78260 | $0.00 | $0.00 |
| | | |
| **Member** | | |
| | | |
| The Clif and Susan Conrad Trust | $150,000.00 | 4.286% |
| | | |
| deeproot Funds, LLC | $3,350,000.00 | 95.714% |
| | | |
| **Total** | **$ $3,500,000.00** | **100%** |

## EXHIBIT A-1

## SCHEDULE OF INSTALLMENTS OF CAPITAL CONTRIBUTIONS OF THE MEMBERS

| Date | Company | Action | Amount-Deep | Total for Mo | C&S Pay | Paid on/prior | | |
|------|---------|--------|-------------|--------------|---------|---------------|--|--|
| 2016 | Seller/Title | Earnest $ Deposit | | | 15,000 | 2016 | | |
| Apr-17 | Rob Holt | Legal fees | | | 16,985 | 4/5/2017 | | |
| Apr-17 | Randon McKee | Civil Eng | | | 22,016 | 4/5/2017 | | |
| 15-May | Title- | Close including fees | 625,000* | 625,000 | | | | |
| 15-May | City of SA | Building Permit fees | | | 40,000 | | | |
| 15-May | STI belt conveyor | Deposit to hold | | | 33,000 | | | |
| 1-Jun | Modern Wash | 1/2 building inv-12 wks | 244,600 | 244,600 | 23,000 | 4/5/2017 | | |
| 30-Jul | STI belt conveyor | Bal- STI belt deposit | 33,550 | | | | | |
| 30-Jul | Randon McKee | Engineering | 19,000 | | | | | |
| 30-Jul | Contractor | GC & Site | 94,000 | 146,550 | | | | |
| 15-Aug | Equipment | 1/2 general equip deposit | 282,000 | | | | 348,184 | 1/2 w/out /sti or ship |
| 30-Aug | Contractor | Site, Utilities, elec, metals | 170,000 | 452,000 | | | | |
| 30-Sep | Modern wash | Bal of building to ship | 315,000 | | | 10-Sep Bldg arrives | | |
| 30-Sep | Contractor | GC, site, Bldg,Special,elec | 144,700 | | | | | |
| 30-Sep | Equipment | Bal of deposit-ship | 422,300 | 882,000 | | 15-Oct Equip arrives-Includes 1/2 STI | | |
| 30-Oct | Building Install | Begin building install | 35,000 | | | | | |
| 30-Oct | Contractor | GC, site, Bldg,finish etc | 167,900 | | | | | |
| 30-Oct | Building Install | Finish install | 29,800 | | | | | |
| 30-Oct | Building glazing etc | Finsih building | 94,500 | | | | | |
| 30-Oct | Contractor | MEP, GC, Site, bldg + | 184,200 | | | | | |
| 30-Oct | Equipment | Equip Install | 25,000 | 536,400 | | | | |
| 30-Nov | Equipment | Equip-Finish install | 45,200 | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 30-Nov | Signage | Install sign | 16,200 | | | | | |
| 30-Nov | Landscape | Landscape | 18,900 | | | | | |
| 30-Nov | Equipment-Vac cover | Cover | 68,850 | | | | | |
| 30-Nov | Randon Mckee | Engineer final | 14,200 | 163,350 | | | | |
| 15-Dec | Contractor | Final-Retention | $85,000 | | | | | |
| 15-Dec | Building Install | Final-Retention | $7,200 | | | | | |
| 15-Dec | Equip Install | Final-Retention | $7,800 | | | | | |
| 15-Dec | Signage | Final-Retention | $1,800 | | | | | |
| 15-Dec | Landscape | Final-Retention | $2,100 | | | | | |
| 15-Dec | Building-Other | Final-Retention | $10,500 | | | | | |
| 15-Dec | Building-Vac cover | Final-Retention | $7,650 | $122,050 | | | | |
| Total | | | 3,171,950 | 3,171,950 | 150,001 | | | |
| | C&S contribution | | 150,000 | | | | | |
| | Const contingency | | $103,050 | | | | | |
| | Working Capital | | 75,000 | | | | | |
| Grand Total | | | $3,500,000 | | | | | |

*This installment payment shall be paid upon the execution of the Subscription Agreement and the Operating Agreement.

## EXHIBIT B

## SPECIAL AND REGULATORY ALLOCATIONS

1.00    Definitions.

(a)    Adjusted Capital Account. A Capital Account determined and maintained for each Member throughout the term of this Agreement, the balance of which shall be equal to such Member's Capital Account balance, modified as follows:

(i)    increased by the amount, if any, of such Member's share of the Minimum Gain of the Company as determined under Treasury Regulation Sec. 1.704-2(g)(1);

(ii)    increased by the amount, if any, of such Member's share of the Minimum Gain attributable to Member Nonrecourse Debt of the Company pursuant to Treasury Regulation Sec. 1.7042(i)(5);

(iii)    increased by the amount, if any, of such Member is treated as being obligated to contribute subsequently to the capital of the Company as determined under Treasury Regulation Sec. 1.704- 1(b)(2)(ii)(c);

(iv)    decreased by the amount, if any, of cash that is reasonably expected to be distributed to such Member, but only to the extent that the amount thereof exceeds any offsetting increase in such Member's Capital Account that is reasonably expected to occur during (or prior to) the tax year during which such distributions are reasonably expected to be made as determined under Treasury Regulation Sec. 1.704-1(b)(2)(ii)(d)(6); and

(v)    decreased by the amount, if any, of loss and deduction that is reasonably expected to be allocated to such Member pursuant to Code Sec. 704(e)(2) or 706(d), Treasury Regulation Sec. 1.751- 1(b)(2)(ii) or Treasury Regulation Sec. 1.704-1(b)(2)(iv)(k).

(b)    Book Depreciation. For each fiscal year (or other period for which Book Depreciation must be computed) the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset, except that, if the Book Value of an asset differs from its adjusted tax basis at the beginning of the year, subject to Treasury Regulation Sec. 1.704-3(d), Book Depreciation will be an amount which bears the same ratio to Book Value at the beginning of the year as the federal income tax depreciation, amortization or other cost recovery deduction for the year bears to the beginning adjusted tax basis; provided, however, that if the adjusted tax basis of the asset at the beginning of the year is zero, Book Depreciation will be determined by the Manager Member using any reasonable method.

(c)    Member Nonrecourse Deductions. The meaning assigned to the term "partner nonrecourse deductions" in Treasury Regulation Sec. 1. 704-2(i).

(d)  <u>Member Nonrecourse Debt</u>. The meaning assigned to the term "partner nonrecourse debt" in Treasury Regulation Sec. 1.704-2(b)(4).

(e)  <u>Member Nonrecourse Minimum Gain</u>. The meaning assigned to the term "partner nonrecourse minimum gain" in Treasury Regulation Sec. 1. 704-2(i)(3).

(f)  <u>Minimum Gain</u>. The meaning assigned to that term in Treasury Regulation Sec. 1.704-2(d).

(g)  <u>Net Agreed Value</u>. (a) in the case of any property contributed to the Company, the Book Value of the Company's property reduced by any indebtedness either assumed by the Company upon the contribution of the property or to which such property is subject when contributed; and (b) in the case of any property distributed to a Member, the Book Value of such property reduced by any indebtedness either assumed by such Member upon such distribution or to which such property is subject at the time of distribution.

(h)  <u>Nonrecourse Deductions</u>. The meaning assigned that term in Treasury Regulation Sec. 1.704- 2(b)(1).

(i)  <u>Nonrecourse Liability</u>. The meaning assigned that term in Treasury Regulation Sec. 1.704-2(b)(3).

(j)  <u>Officer</u>. Any Person designated as an officer of the Company as provided in Sec. 6.09, but such term does not include any Person who has ceased to be an officer of the Company.

1.01.  <u>Adjustment of Book Value</u>. Book Value with respect to any asset of the Company is the asset's adjusted tax basis for federal income tax purposes, except as follows:

(a)  The initial Book Value of any asset contributed to the Company by a Member shall be the fair market value of the asset as of the date of contribution.

(b)  The Book Value of each asset shall be its respective fair market value, as of (i) the issuance of an Interest in the Company to a new or existing Member in exchange for either a Capital Contribution or as consideration for the provision of services to or for the benefit of the Company, (ii) the distribution by the Company to a Member in liquidation of the Member's interest in the Company, and (iii) the liquidation of the Company within the meaning of Treasury Regulation Sec. 1.704-1(b)(2)(ii)(g).

(c)  The Book Value of each asset distributed to any Member will be the fair market value of the asset as of the date of distribution.

(d)  The Book Value of each asset will be increased or decreased to reflect any adjustment to the adjusted basis of the asset under Code Sec. 734(b) or 743(b), but only to the

extent that the adjustment is taken into account in determining Capital Accounts under Treasury Regulation Sec. 1.704- 1(b)(2)(iv)(m), provided that the Book Value will not be adjusted under this Sec. 1.01(d) to the extent that an adjustment under Sec. 1.01(b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment under this Sec. 1.01(d).

Book Value will be adjusted by Book Depreciation, and gain or loss on a disposition of any asset shall be determined by reference to such assets Book Value as adjusted herein. The determination of the fair market value of property as required under this Sec. 1.01 shall be determined by the Manager Member using any reasonable method of valuation.

    1.02.   <u>Tax Allocations</u>.

(a)    Except as otherwise provided in this Sec. 1.02, each item of income, gain, loss, deduction, and credit determined for federal income tax purposes shall be allocated among the Members in the same manner as each correlative item of income, gain, loss, deduction, and credit is allocated to the Members for purposes of maintaining their respective Capital Accounts.

(b)    Under Code Sec. 704(c) and Treasury Regulation Sec. 1.704-3, income, gain, loss, and deduction with respect to any asset contributed to the capital of the Company, solely for federal income tax purposes, shall be allocated among the Members so as to take into account any variation between the adjusted tax basis of the asset for federal income tax purposes and the initial Book Value. If the Book Value of any asset is adjusted under Sec. 1.02, subsequent allocations of income, gain, loss, and deduction, solely for federal income tax purposes, will be allocated among the Members so as to take into account any variation between the adjusted tax basis of the asset and its Book Value as adjusted in the manner required under Treasury Regulation Sec. 1.704-3(a)(6). The allocations required by this Sec. 1.02 shall be made by the Manager Member using any reasonable method of valuation.

    1.03.   <u>Stop Loss</u>. Notwithstanding any other provision hereof to the contrary, no Loss (or item of loss or deduction) of the Company shall be allocated to a Member if such allocation would result in a deficit balance in such Member's Adjusted Capital Account. Such Loss (or item of loss or deduction) shall be allocated among the Members whose Adjusted Capital Account balances are positive in proportion to such positive balances to the extent necessary to reduce the balances of such other Member's positive Adjusted Capital Accounts balances to zero, it being the intention of the Members that no Member's positive Adjusted Capital Account balance shall fall below zero while any other Member's positive Adjusted Capital Account balance has a positive balance.

    1.04.   <u>Nonrecourse Deductions</u>. All Nonrecourse Deductions shall be allocated among the Members in their Sharing Ratios.

    1.05.   <u>Minimum Gain Chargeback</u>. Notwithstanding any other provision hereof to the contrary, if there is a net decrease in Minimum Gain for a taxable year (or if there was a net decrease in Minimum Gain for a prior fiscal year and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this Sec. 1.05) then items of

income and gain shall be allocated to each Member in an amount equal to such Members' share of the net decrease in such Minimum Gain (as determined pursuant to Treasury Regulation Sec. 1.704-2(g)(2)), It is the intent of the Members that any allocation pursuant to this Sec. 1.05 shall constitute a "minimum gain chargeback" under Treasury Regulation Sec. 1.704-2(f) and shall be interpreted consistently therewith.

1.06.    Member Nonrecourse Deductions. All Member Nonrecourse Deductions attributable to Member Nonrecourse Debt shall be allocated among the Members bearing the economic risk of loss for such debt as determined under Treasury Regulation Sec. 1.7042(b)(4); provided, however, that if more than one Member bears the economic risk of loss for such debt, the Member Nonrecourse Deductions attributable to such debt shall be allocated to and among the Members in the same proportion that they bear the economic risk of loss for such debt. This Sec. 1.06 is intended to comply with the provision of Treasury Regulation Sec. 1.704-2(i) and shall be interpreted consistently therewith.

1.07.    Member Nonrecourse Minimum Gain Chargeback. Notwithstanding any other provision hereof to the contrary (except for Sec. 1.05 regarding minimum gain chargeback), if there is a net decrease in Member Nonrecourse Minimum Gain for a taxable year (or if there was a net decrease in Member Nonrecourse Minimum Gain for a prior fiscal year and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this Sec. 1.07), then items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in such Member's Nonrecourse Minimum Gain (as determined pursuant to Treasury Regulation Sec. 1.704-2(i)(4)). It is the intent of the Members that any allocation pursuant to this Sec. 1.07 shall constitute a *"minimum gain chargeback"* under Treasury Regulation Sec. 1.704-2(i)(4) and shall be interpreted consistently therewith.

1.08.    Qualified Income Offset. A Member who unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulation Secs. 1.704-1(b)(2)(ii)(d)(4), (5) or (6) will be specially allocated items of income or gain (after the allocations required by Sec. 1.05 regarding minimum gain chargeback and Sec. 1.07 regarding minimum gain chargeback for Member Nonrecourse Debt but before any other allocation required by this Article 5) in an amount and in the manner sufficient to eliminate any deficit balance in his Adjusted Capital Account as quickly as possible; provided, however, that an allocation shall be made pursuant to this Sec. 1.08 only if and to the extent that such Member would have a deficit in his Adjusted Capital Account after all allocations in this Article V have been tentatively made as if Sec. 1.08 were not in the Agreement. This Sec. 1.08 is intended to satisfy the provisions of Treasury Regulation Sec. 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.09.    Curative Allocation. If any items of income and gain (including gross income) or loss and deduction are allocated to a Member pursuant to Secs. 1.02 through 1.07, 5.16, and 1.10, and subject to Secs. 1.02 through 1.07, 1.10, and 1.12, items of income and gain (including gross income) and items of loss and deduction for subsequent periods shall be allocated to the Members in a manner designed to result in each Member's Adjusted Capital Account having a balance equal to the balance it would have had if such allocation of income and gain (including gross income) and item of loss and deduction not occurred pursuant to Secs. 1.02 through 1.07, 1.10, and 1.12. For purposes of applying the foregoing provisions of this Sec. 1.09: (i) allocations hereunder with respect to allocations under Sec. 1.12  shall be made only to the extent that the Managers reasonably

determine that such allocations are consistent with the economic agreement of the Members; (ii) allocations hereunder with respect to allocations under Sec. 1.04 shall not be made prior to a year in which there is a net decrease in Minimum Gain and then only to the extent that the Managers reasonably determine that such allocations are necessary to avoid a potential distortion in the economic agreement of the Members and allocations hereunder with respect to allocations under Sec. 1.03 shall be made only to the extent that the Managers reasonably determine that such allocations are necessary to avoid a potential distortion in the economic agreement of the Members; and (iii) allocations hereunder with respect to allocations under Sec. 1.06 shall not be made prior to a year in which there is a net decrease in Member Nonrecourse Minimum Gain and then only to the extent that the Managers reasonably determine that such allocations are necessary to avoid a potential distortion in the economic agreement of the Members and allocations hereunder with respect to allocations under Sec. 1.05 shall be made only to the extent that the Managers reasonably determine that such allocations are necessary to avoid a potential distortion in the economic agreement of the Members.

1.10.    <u>Investment Return Allocation</u>. After giving effect to all special allocations provided in Secs. 1.04 through 1.08 and Sec. 1.09, all or a portion of the remaining items of income or gain for the taxable year, if any, will be specially allocated to the Members in proportion to the cumulative distributions each Member has received pursuant to the distribution provision from the formation of the Company and is reasonably anticipated to receive to a date 75 Days after the end of the taxable year until the aggregate amounts of income and gain allocated to each such Member pursuant to this Sec. 1.10 for the year in question and all prior years is equal to such cumulative distribution.

1.11.    <u>Gross Income Allocation</u>. In the event any Member has a deficit balance in its Capital Account at the end of any fiscal year or other period that is in excess of the amount such Member is obligated to restore under this Agreement or pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income or gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 1.11 shall be made only if and to the extent that such Member would have a deficit Capital Account balance in excess of such amount after all other allocations provided in this Section 1.11  have been made as if this Section 1.11 and Section 1.08 were not contained in this Agreement.

1.12.    <u>Interests in Company</u>. Notwithstanding any other provision of this Agreement, no allocation of Profits or Losses or item thereof will be made to a Member if the allocation would not have *"economic effect"* under Treasury Regulation Sec. 1.704-1(b)(2)(ii) or otherwise would not be in accordance with the Members' interests in the Company within the meaning of Treasury Regulation Sec. 1.704-1(b)(4) or 1.7042(b)(1). The Manager Member will have the authority to reallocate any item in accordance with this Sec. 1.12; provided, however, that (a) no such change shall have a material adverse effect upon the amount of cash or other property distributable to any Member, (b) each Member shall have 30 Days prior notice of such proposed modification and (c) if such proposed modification would be material, the Company shall have received an opinion of tax counsel to the Company that such modification is necessary to comply with Code Sec. 704(b).

1.13.    <u>Code Sec. 754 Adjustment</u>. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sec. 734(b) or Code Sec. 743(b) is required to be taken into

account in determining Capital Accounts pursuant to Treasury Regulation Sec. 1.704-1(b)(2)(iv)(m), Book Value of the Company's assets shall be adjusted as set forth in Sec. 1.01, and any such adjustment in Book Value shall be treated as gain or loss (as the case may be) in computing Profits or Losses.

1.14.    <u>Withholding</u>. All amounts required to be withheld pursuant to Code Sec. 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Members for all purposes under this Agreement.

1.15.    <u>Varying Interests</u>. All Profit and Loss (and any item of income, gain, loss, deduction, or credit specially allocated under this Agreement) shall be allocated, and all distributions shall be made, to the Persons shown on the records of the Company to have been Members as of the last calendar day of the period for which the allocation or distribution is to be made. Notwithstanding the foregoing, if during any taxable year there is a change in any Member's interest in the Company, the Members agree that their allocable shares of the Profits and Losses (or items thereof) for the taxable year shall be determined on any method determined by the Manager Member to be permissible by Code Sec. 706 and the related Treasury Regulations to take account of the Member's varying interest. The Members agree to the use of the proration method to account for changes in Members' interests, to the extent permitted by law or applicable Regulations.

1.16.    <u>Interest in Company Profits</u>. Pursuant to Sec. 1.752-3(a)(3) of the Regulations, the Members' interest in Company profits for purposes of determining the Members' proportionate share of the excess nonrecourse liabilities (as defined in Sec. 1.752-3(a)(3) of the Regulations) of the Company shall be determined in accordance with their respective Sharing Ratios.

## **EXHIBIT C**

## **SPOUSAL CONSENT**

## **SPOUSAL CONSENT**

## **OPEARTING AGREEMENT**

## **OF**
## **CCW BRAUN HEIGHTS, LLC**

I, _____, certify and declare that:

1.      I am the spouse of _____ ("**Spouse**"), one of the persons who has executed, or otherwise agreed to be bound by all of the terms and conditions set forth in, that certain First Amended and Restated Operating Agreement of CCW Braun Heights, LLC, dated May __, 2017, as such agreement may be amended from time to time ("**Agreement**").

2.      My spouse has acquired an ownership interest in CCW Braun Heights, LLC, a Texas limited liability company.

3.      I agree to be bound by and accept my rights under the provisions of the Agreement in lieu of all community property or other interests I may have in property subject to the terms of the Agreement.

4.      I grant my spouse an irrevocable special power of attorney, which is coupled with the interest of my spouse and myself under the Agreement, to deal with the subject matter of the Agreement and to modify, amend, and add to the Agreement without further signature, acknowledgment, agreement, or consent on my part.

5.      I agree not to take any action at any time which might interfere with or hinder the operation of the Agreement and any interest or rights now or later acquired by me or my spouse arising from or related to the Agreement, and any modifications, amendments, or additions to the Agreement.

6.      I have been afforded the opportunity to seek independent legal and tax counsel of my own choosing regarding the Agreement and this Spousal Consent and have done so to the extent I have judged desirable.

7.      I have read, understand, and agree to have my legal rights determined by the Agreement.

Executed in the City of _____, County of _____, State of _____.

Dated: _____            _____
                                                                     *[signature]*

Exhibit C- Spousal Consent                                                                     Page 1 of 1

FINAL EXECUTION COPY

---

**SECOND AMENDMENT TO THE**

**FIRST AMENDED AND RESTATED OPERATING AGREEMENT**

**OF**

**CCW BRAUN HEIGHTS, LLC A TEXAS**

**LIMITED LIABILITY COMPANY**

---

EFFECTIVE DATE:  November 20, 2018

FINAL EXECUTION COPY

# TABLE OF CONTENTS

**I RECITALS** — 1

  A.  Formation — 1

  B.  Car Wash Development — 1

  C.  Investor Failed to Fund — 1

  D.  Alternative Financing — 1

  E.  Failed SBA Loan — 2

  F.  Complete  Un-Wind of First Amendment — 2

  G.  Affirmation, Approval, and Ratification of Conrad Loan — 2

  H.  Existing Capital Needs — 2

  I.  Deeproot Capital Commitment — 3

  J.  Interim Raise of New Capital — 3

  K.  Modification of Distribution Provisions on Capital Transactions — 3

  L.  Modification to the Distribution Provisions-Timing of Distributions — 3

  M.  Appointment of Co-Manager and Related Modifications. — 3

**II COVENANTS** — 3

  1.  Recitals — 3

  2.  Unwind of First Amendment — 3

  3.  Confirmation of Conrad Loans — 3

    (a)  Loan Documents — 3

    (b)  Reimbursement for Expenses — 4

    (c)  Commitment to Retire the Conrad Loans — 4

  4.  Conversion of Deeproot Equity to Loan — 4

    (a)  Deeproot's Equity — 4

    (b)  Redemption of Deeproot Equity — 4

    (c)  Deeproot Loan to Company — 4

    (d)  Company's Approval of Deeproot Loan — 5

    (e)  Repayment of Conrad Loan — 5

  5.  Authority to Raise New Capital — 5

    (a)  Approval — 5

    (b)  Authority of the Manager Member — 5

  6.  Amendment to Net Capital Proceeds from Capital Transactions Provision — 5

  7.  Amendment to the Distribution Provisions — 6

  8.  Amendment to Management Provision — 6

  10.  Restatement of Operating Agreement — 6

FINAL EXECUTION COPY

| 11. | Defined Terms | 7 |
| 12. | General | 7 |
| 13. | Legal Representation | 7 |
| 14. | Effective Date | 7 |

**SECOND AMENDMENT TO THE**

**FIRST AMENDED AND RESTATED OPERATING AGREEMENT**

**OF**

**CCW BRAUN HEIGHTS, LLC**

**A TEXAS LIMITED LIABILITY COMPANY**

This SECOND AMENDMENT TO THE FIRST AMENDED AND RESTATED OPERATING AGREEMENT OF CCW BRAUN HEIGHTS, LLC A TEXAS LIMITED LIABILITY COMPANY ("Amendment") is entered into by and among (i) CCW BRAUN HEIGHTS, LLC a Texas limited liability company ("Company"), (ii) CONRAD CAR WASH, INC., a Utah Corporation ("Manager Member"), (iii) THE CLIF AND SUSAN CONRAD TRUST ("Conrad Trust"), (iv) DEEPROOT FUNDS, LLC, a Texas limited liability company ("Deeproot Funds"), and (v) Mike and Angie Conrad ("M & A Conrad"). The Conrad Trust, Deeproot Funds, and M & A Conrad are sometimes collectively referred to as the "Members."

## I  RECITALS

A.      Formation. On or about September 28, 2016, the Company was formed under the laws of the state of Texas and is governed by that *First Amended and Restated Operating Agreement* dated on or about May 11, 2017 ("Restated Operating Agreement"), as amended by that certain *First Amendment to the First Amended and Restated Operating Agreement* dated on or about August 22, 2018 ("First Amendment"). The Restated Operating Agreement and the First Amendment are collectively referred to as "Operating Agreement").

B.      Car Wash Development.  The Company was formed to purchase undeveloped land and develop a car wash facility ("Car Wash Facility") as contemplated by the Company's *Confidential Investment Offering*.

C.      Investor Failed to Fund.  Deeproot Funds failed to fund its equity contributions in accordance with Exhibit A and the *Schedule of Installments of Capital Contributions of the Member* in Exhibit A-1 of the Operating Agreement, as well as their *Subscription Agreement*. Due to this failure, the Company has not been able to complete the construction of the Car Wash Facility, failed to timely pay contractors and venders, and fallen behind in the construction schedule. The delay of capital funding has caused damages to the Company.

D.      Alternative Financing.  The Manager Member has sought alternative financing from a variety of sources. In order to pay venders and contractors, Clif and Susan Conrad took out a home equity loan on their personal residence and borrowed money from friends, which they loaned to the Company. Over a period of months, Clif and Susan Conrad loaned the Company a total of $842,000.00 ("Conrad Loan"). This balance was reduced by $25,000.00 that was funded by an additional contribution from M & A Conrad, which reduced the Conrad Loan principal balance to $817,000.00. Clif and Susan Conrad incurred personal liability and out-of-pocket expenses in the process of raising the funds that comprise the Conrad Loan.  Notwithstanding the Conrad Loan, the Company needs approximately $600,000.00 to complete the construction and opening of the Car Wash Facility.

E.     Failed SBA Loan .  The Manager Member applied for a Small Business Administration Loan ("SBA Loan") to fund the completion of the Car Wash Facility. The SBA Loan had certain guidelines and regulations regarding guarantors and member loans. In order to comply with these requirements, the Company entered into the *First Amendment.* Under the *First Amendment*, the Conrad Loan was converted to equity ("Conrad Loan to Equity Conversion") and Deeproot Funds, reduced its Sharing Ratio from 95.714% to 18%, and the other Members increased their Sharing Ratios as set forth in the Exhibit A to the *First Amendment* ("Modified Sharing Ratios").   Unfortunately, the SBA Loan did not materialize and close, primarily due to the fact that the SBA is hesitant to lend to an existing construction project due to outstanding lien rights of the service and material providers.

F.     Complete  Un-Wind of First Amendment .  The Company, Manager Member, and the Members desire to: (i) unwind the Conrad Loan to Equity Conversion and (ii) unwind the Modified Sharing Ratios in the *First Amendment*,  and they desire to declare the *First Amendment* null and void.

G.     Affirmation, Approval, and Ratification of Conrad Loan.  As stated in the *First Amended and Restated Operating Agreement,* Clif and Susan Conrad contributed $150,000 equity to the Company through the Conrad Trust.  As noted above, the current principal balance of the Conrad Loan is $817,000.00. Clif and Suzanne Conrad have agreed to convert $42,000 of the Conrad Loan to equity, leaving a principal balance of $775,000.00.    The Company, Manager Member, and the Members desire to affirm, approve, and ratify the Company entering into the Conrad Loan in the amount of $775,000.00 and the granting of a first lien security interest against the Car Wash Facility to secure the payment of the Conrad Loan.

H.     Existing Capital Needs .  The Manager Member estimates that the total cost to complete the construction project and open to the public will be $3,600,000.00, instead of $3,500,000.00 as set forth in the Operating Agreement and the *Confidential Investment Offering.*  As of the date of this Amendment, the Company has raised $2,399,000.00 in equity funding as shown on the below chart.  The Company needs to raise approximately $600,000.00 to complete the construction of the Car Wash Facility and open to the public.  Additionally, the Company needs $775,000.00 plus interest and carrying costs to pay off the Conrad Loan.

| Names of Member | Current Capital Contribution |
|---|---|
|  |  |
| The Clif and Susan Conrad Trust | $192,000,00 |
|  |  |
| Mike and Angie Conrad | $150,000.00 |
|  |  |
| Deeproot Funds, LLC | $2,057,000.00 |
|  |  |
| Total: | $2,399,000.00 |

I.    Deeproot Capital Commitment.    Currently Deeproot Funds have contributed $2,057,000.00 of its capital commitment of $3,350,000.00. Deeproot Funds has committed to complete the contribution of the outstanding capital commitment balance, $1,293,000.00, but it does not know the exact dates that it will be able to complete its contribution.  Deeproot Funds has expressed that it will continue to make payments as funds become available, but it has expressed a desire to convert its equity investment into loan to the company, which would be secured by a second lien against the Company Car Wash Facility subordinate to the Conrad Loan.

J.    Interim Raise of New Capital .    In this interim period, the Company, Manager Member, and the Members desire to authorize the Manager Member to raise additional capital to complete the construction project and, if necessary, to retire the Conrad Loan.  In order to raise this additional capital, the parties desire to modify the business economics to attract new investors by (i) reducing the purchase price for a 1% interest in the company; and (ii) reducing the Manager Member's profit interest in Section 4.01(c) of the Operating Agreement, as set forth in this Amendment. Additionally, they desire to authorize the Manager Member to negotiate and execute loans from institutional and or private lenders for the purpose of paying off the Conrad Loan, if necessary.

K.    Modification of Distribution Provisions on Capital Transactions. The Company, Manager Member, and the Members desire modify the distributions percentages in Section 4.01(c) of the Operating Agreement.

L.    Modification to the Distribution Provisions-Timing of Distributions.    The Company, Manager Member, and the Members desire modify Section 4.01 of the Operating Agreement to provide for the timing of distributions of net cash flow from operations.

M.    Appointment of Co-Manager and Related Modifications. The Company, Manager Member, and the Members desire to appoint Mike Conrad as a Co-Manager Member and modify Article VI. of the Operating Agreement.

For mutual consideration, the parties hereby agree as follows:

## II COVENANTS

1.    Recitals.  The Company, Manager Member, and the Members agree that the above Recitals are true and correct and that the Recitals are incorporated into the Covenants.

2.    Unwind of First Amendment. The Company, Manager Member, and the Members hereby agree to nullify and void the First Amendment.

3.    Confirmation of Conrad Loans.    Due to the fact that the SBA Loan did not close, the Company, Manager Member, and Members hereby agree to reinstate, clarify and confirm the Conrad Loan as set forth in this Section.

(a)    Loan Documents. The Company, Manager Member, and the Members hereby approve and ratify a $775,000.00 loan to the Company from Clif and Susan Conrad, and

further approve the Company granting a first lien deed of trust on the Property to secure payment of the loan. The terms of the loan are set forth in the Promissory Note attached as <u>Exhibit B-1</u> and Deed of Trust attached as <u>Exhibit B-2</u> that are being executed simultaneously with this Amendment.

(b)  <u>Reimbursement for Expenses</u>.  The Company agrees to reimburse Clif and Susan Conrad and the Conrad Trust for all of their out-of-pocket expenses that they has incurred in raising the proceeds that were used to fund this loan, including, but not limited to the approximately $3,300.00 in expenses incurred in a home equity loan, interest charges on the home equity loan, and approximately $3,500.00 in expenses relating to interest expense and fees incurred in borrowing money from other individuals (collectively referred to as "<u>Ancillary Loan Costs</u>").

(c)  <u>Commitment to Retire the Conrad Loans</u>.

(1)  The Company, Manager Member, and the Members hereby agree that upon the completion of the construction and opening of the Car Wash Facility, the Company shall immediately explore options to obtain a loan from an institutional and or private lenders  for the purpose of paying off the Conrad Loan and Ancillary Loan Costs ("<u>Take-Out Loans</u>").

(2)  The Company, Manager Member, and the Members hereby authorize the Manager Member to negotiate, in its sole discretion, the business and security terms of the Take-Out-Loans, and further authorize the Manager Member to execute loan and security documents without any further approval of the Members.

4.  <u>Conversion of Deeproot Equity to Loan</u>.  The Company, Manager Member, and the Members hereby agree to convert the equity investment made Deeproot Funds into a loan to the Company as set forth herein and the other documents attached hereto.

(a)  <u>Deeproot's Equity</u>.  As set forth in the *First Amended and Restated Operating Agreement,* the Deeproot Funds agreed to invest $3,350,000.00 in exchange for a 95.714% Sharing Ratio ($35,000.00 per 1% Sharing Ratio). As noted above, Deeproot Funds has funded only $2,057,000.00, which, at $35,000.00 per 1% Sharing Ratio, is a 85.75% Sharing Ratio.

(b)  <u>Redemption of Deeproot Equity</u>.  The Company hereby redeems all of the Sharing Ratios of Deeproot Funds , as well as all of their other rights ("<u>Redemption</u>") at the same price that Deeproot Funds paid for those rights, or $2,057,000.00 ("<u>Redemption Purchase Price</u>").  By this Redemption, Deeproot Funds shall no longer be a Member of the Company and have no economic or other rights in the Company.

(c)  <u>Deeproot Loan to Company</u>. Deeproot agrees to loan to the Company $3,350,000.00, subject to certain adjustments to the principal amount ("<u>Deeproot Loan</u>"). The Parties agree that the $2,057,000.00 that represents the Redemption Purchase Price is hereby converted into loan funds that are being loaned to the Company under the Deeproot Loan, and those funds shall constitute an outstanding principal balance of $2,057,000.00. Deeproot is obligated to loan the Company the additional principal amount of

$1,293,000.00, which is subject to certain adjustments that are set forth in the to the *First Amendment to the Subscription Agreement* attached as <u>Exhibit C-1</u>.

(d)  <u>Company's Approval of Deeproot Loan</u>.  The Company, Manager Member, and Members hereby approve and ratify a loan in the original principal amount of $3,350,000.00 (subject to principal balance adjustment) to the Company from Deeproot Funds, and further approve the Company granting a second lien deed of trust on the to secure payment of the loan. The terms of the loan are set forth in the (i) *First Amendment to the Subscription Agreement* attached as <u>Exhibit C-1</u>, (ii) *Promissory Note* attached as <u>Exhibit C-2</u>, and (iii) *Subordinated Second Lien Deed of Trust* attached as <u>Exhibit C-3</u> that are being executed simultaneously with this Amendment.

(e)  <u>Repayment of Conrad Loan</u>.  As noted above, it is the intent of the Company, Manager Member, and Members to retire the Conrad Loan upon the completion of the construction and opening of the Construction Facility. Once the Company has raised $600,000.00 from either Deeproot Funds, or new investors, or a combination thereof, then the remaining balance of the Deeproot Funds' loan proceeds shall be allocated and used to paydown the outstanding interest and principal on the Conrad Loan.

5.  <u>Authority to Raise New Capital</u> .

(a)  <u>Approval</u>.  The Company, Manager Member, and the Members hereby approve the Company raising an additional Six Hundred Thousand Dollars ($600,000.00) in equity at a purchase price of Twelve Thousand Dollars ($12,000.00) per one percent (1%) Sharing Ratio. At the sole option of the Manager Member, the Manager Member may raise more than $600,000.00 in equity at $12,000.00 per 1% Sharing Ratio if necessary to retire the Conrad Loan.

(b)  <u>Authority of the Manager Member</u>. The Manager Member, in its capacity as the Manager Member of the Company, is hereby authorized to (a) sign, execute, certify to, verify and acknowledge, deliver, accept, file and record any and all instruments and documents and (b) take, or cause to be taken, any and all such action, in the name and on behalf of the Company, in the Manager Member's judgment, is necessary, desirable, or appropriate in order to consummate raising new capital to complete the construction and roll-out of opening the carwash project to the public.

6.  <u>Amendment to Net Capital Proceeds from Capital Transactions Provision</u>. The Company, Manager Member, and the Members hereby delete Section 4.01(c) of the Operating Agreement and replace it with the following:

4.01  Distributions.

(c)  <u>Net Capital Proceeds from Capital Transactions</u>. Within 90 days of the Company's receipt of proceeds from a Capital Transaction, the Net Capital Proceeds therefrom shall be distributed and applied by the Company in the following order of priority:

(i)  First, to the Members, pro rata, in an amount equal to the Unreturned Investment Capital Balance; and then,

(ii) The balance is divided: (i) 82% to the Members, pro rata; and (ii) 18% to the Manger Member.

7.  Amendment to the Distribution Provisions. The Company, Manager Member, and the Members agree to supplement Section 4.01 with the following subparagraph (d):

(d)  Distributions. The Manager Member shall distribute Net Cash Flow from Operations thirty (30) days following the end each fiscal quarter.

8.  Amendment to Management Provision. The Company, Manager Member, and the Members hereby appoint Mike Conrad to act as Co-Manager Member. Section 6.01(a) of the Operating Agreement is hereby deleted and replaced with the following:

6.01 Manager Member.

(a) In General. The Company's business shall be managed by and under the direction of the Co-Manager Members, which shall be referred to collectively as the "Manager Member" in this Agreement unless referred to specifically as "Co-Manager Member" or "Co-Manager Members."

Except as expressly provided otherwise in this "Agreement; (i) the Manager Member shall have the exclusive responsibility and authority to control, manage and direct the Company's business; (ii) all Company matters shall be decided by and require the consent of the Manager Member; (iii) the Manager Member shall be responsible for the day-to-day management of the Company's Business.

The Co-Manager Members shall be (i) Conrad Car Wash, Inc., a Utah Corporation and (ii) Mike Conrad. The Co-Manager Members shall make decision by unanimous vote; provided, however, in the event that the Co-Managers are unable to reach unanimity, then Conrad Car Wash, Inc. shall have the authority to make the final decision.

The Co-Manager Members shall equally share (50% / 50%) all distributions and allocations of tax items to the Manager Member.

9.  Restatement of the Sharing Ratios. Due to the Redemption of the Sharing Ratios of Deeproot Funds, there has been a reverse dilution of the remaining Members' Sharing Ratios. The Company, Manager Member, and Members agree that the new Sharing Ratios are set forth in the Updated Exhibit A. Upon the Redemption of Deeproot Funds, the remaining Members will be the Conrad Trust and M&A Conrad. In the event that the Company is successful in raising new equity capital, as described above, the Parties agree that the current Members' Sharing Ratios shall be diluted as follows: for each 1% Sharing Ratio sold, the Conrad Trust shall be diluted and reduced by a 0.56% Sharing Ratio and M&A Conrad shall be diluted and reduced by a 0.44% Sharing Ratio.

10.  Restatement of Operating Agreement. Except as expressly amended hereby, the Operating Agreement and all rights and obligations created thereby or thereunder are in all respects ratified and confirmed and remain in full force and effect. Where any paragraph, section, subsection or clause of the Operating Agreement is modified or deleted by this Amendment, any unaltered provision of such section, subsection or clause of the Operating Agreement shall remain in full

force and effect. However, where any provision of this Amendment conflicts or is inconsistent with the Operating Agreement, the provision of this Amendment shall control.

11.　　<u>Defined Terms</u>. Terms used herein, which are not otherwise defined or modified herein, but which are defined in the Operating Agreement, shall have the meanings therein ascribed to them.

12.　　<u>General</u>.　　This Amendment (a) shall be governed by, construed under and enforced in accordance with the laws of the State as designated in the Operating Agreement, without regard to conflicts of laws principles that would require the application of any other law; (b) shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; (c) may be modified or amended only in writing signed by each party hereto; (d) may be executed by facsimile or electronic signatures which shall constitute original signatures for all purposes hereof; (e) may be executed in several counterparts, and by the parties hereto on separate counterparts, and each counterpart, when so executed and delivered, shall constitute an original agreement, and all such separate counterparts shall constitute one and the same agreement; and (f) embodies the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior agreements relating to such subject matter.

13.　　<u>Legal Representation</u> .  By its execution of this Agreement, each party to this Agreement hereby understands, acknowledges and agrees that legal counsel for the Company, Rob H. Holt, has (i) prepared this Agreement on behalf of The Company and the Manager Member, and (ii) not undertaken the responsibility for evaluating this Agreement (or transactions contemplated hereby) from the point of view of any other party hereto to determine whether this Agreement is in the best interests of such other party, and each party hereby consents to such representation by Rob H. Holt. Each party to this Agreement acknowledges that it has retained, or has had adequate opportunity to retain, legal counsel independent and separate from The Company and the Manager Member and Rob H. Holt (and their respective affiliates and representatives) to (i) help it in evaluating this Agreement, (ii) assist it in determining whether the provisions contained in this Agreement are in its best interests and consistent with its economic, legal and tax objectives, and (iii) advise such party regarding the investment, legal and tax ramifications of this Agreement (and the transactions contemplated hereby). Furthermore, each party to this Agreement understands and acknowledges that no representations are being made to such party by The Company and The Manager Member or Rob H. Holt (or their respective affiliates or representatives) regarding any legal, economic or tax consequences relative to this Agreement (or the transactions contemplated hereby).

14.　　<u>Effective Date</u>. The undersigned have caused this Amendment to be executed effective as of November 20, 2018.

　　　　The undersigned hereby agree, acknowledge, and certify that the foregoing Amendment constitutes an agreement of the Company, its , and adopted by the Members of the Company, as of the date first set forth above.

**[Signatures begin on the next page]**

**COMPANY**

CCW Braun Heights, LLC
a Texas limited liability company

    ITS:    Co-Manager Members

        BY:    Conrad Car Wash, Inc.
             a Utah corporation

            BY:   _____
                 Susan W. Conrad
                 President

        BY:   _____
             Mike Conrad

**CO-MANAGER MEMBERS**

Conrad Car Wash, Inc.
a Utah corporation

    BY:   _____
        Susan W. Conrad
        President

Mike Conrad

    BY:   _____
        Mike Conrad

**[Signatures continue on the next page]**

Second Amendment to Operating Agreement            Page 1 of 1

**MEMBER**

The Clif and Susan Conrad Trust


BY: _____
         Susan W. Conrad, Trustee


BY: _____
         Clif Conrad, Trustee


**MEMBER**

Deeproot Funds, LLC,
a Texas limited liability company


BY:    Deeproot Capital Management, LLC,
       Its Manager

BY: _____
         Robert J. Mueller, Manager


**MEMBER**

Mike and Angie Conrad


BY: _____
         Mike Conrad, Individually


BY: _____
         Angie Conrad, Individually

## UPDATED EXHIBIT A

### NAME, ADDRESS AND CURRENT CAPITAL

### CONTRIBUTION AND NEW SHARING RATIOS OF THE MANAGER AND

### MEMEBERS

| Names and Addresses of Members | Current Capital Contribution | New Sharing Ratios |
|---|---|---|
| | | |
| **Manager Member** | | |
| Conrad Car Wash Inc.<br>22809 Citron Circle<br>San Antonio, TX 78260 | $0.00 | 0% |
| | | |
| Mike Conrad | $0.00 | 0% |
| | | |
| **Existing Members** | | |
| | | |
| The Clif and Susan Conrad Trust | $192,000.00 | 56% |
| | | |
| Mike and Angie Conrad | $150,000.00 | 44% |
| | | |
| Total: | $342,000.00 | 100% |

# EXHIBIT B-1

## CONRAD PROMISSORY NOTE

## **EXHIBIT B-2**

**CONRAD DEED OF TRUST**

## **EXHIBIT C-1**

## **FIRST AMENDMENT TO THE SUBSCRIPTION AGREEMENT**

EXHIBIT C-1                                                                                    Page 1 of 1

## EXHIBIT C-2

### DEEPROOT PROMISSORY NOTE

EXHIBIT C-2                                                                                    Page 1 of 1

# EXHIBIT C-3

**DEEPROOT DEED OF TRUST**

EXHIBIT C-3                                                                 Page 1 of 1

# EXHIBIT D

## OPERATING AGREEMENT

## EXHIBIT E

## SUBSCRIPTION AGREEMENT

**COVER SHEET AND INSTRUCTIONS**
**SUBSCRIPTION PACKAGE**
**CCW BRAUN HEIGHTS, LLC**
22809 Citron Cir.
San Antonio, Texas 78260

May 11, 2017

A person desiring to subscribe for/acquire Membership Interests in **CCW BRAUN HEIGHTS, LLC** a Texas limited liability company (the "**LLC**"), is required to do the following:

**Step 1**: <u>Subscription Agreement</u>. Read, complete, date and sign the Subscription Agreement and counterpart signature page to the LLC Agreement (as defined herein), in the form which is included as part of this Subscription Package.

**Step 2**: <u>Questionnaire</u>. Complete, date and sign the Investor Questionnaire in the form appearing as Appendix I to this Subscription Package (the "**Investor Questionnaire**").

**Step 3**: <u>W-9 and FIRPTA</u>. Complete, date and sign: (a) the IRS Form W-9 attached as Appendix II to this Subscription Package or, if applicable, the appropriate IRS Form W-8 (available from the IRS website); and (b) the appropriate FIRPTA Certificate attached as Appendix III.

**Step 4**: <u>Overnight Documents and Signature Pages</u>. Send the following completed, dated and originally signed documents to the address listed above
    (a) Executed Subscription Agreement;
    (b) Executed counter-part signature page to the Operating Agreement;
    (c) Executed Investor Questionnaire;
    (d) Executed IRS Form W-9/Form W-8 (as applicable); and
    (e) Executed appropriate FIRPTA Certificate

**CCW BRAUN HEIGHTS, LLC**
Attn: Clif Conrad

**Step 5**: <u>Payment</u>. Send payment for the full subscription amount by wire as per the following wiring instructions:

Bank Name: Frost
Bank Routing No.: 114000093
Bank Address: 1162 N. Loop 1604 West, SA, TX 78248
Beneficiary Name: CCW Braun Heights, LLC
Beneficiary Account no.:

## SUBSCRIPTION AGREEMENT
## ( CCW BRAUN HEIGHTS, LLC, LLC)

This Subscription Agreement (**"Subscription Agreement"**), dated for reference purposes only May 11, 2017, is entered into by and between **CCW BRAUN HEIGHTS, LLC**, a Texas limited liability company (**"LLC"**), and the undersigned (**"Subscriber"**).

## <u>RECITALS</u>

A.     The LLC is governed by that certain *First Amended and Restated Operating Agreement of Conrad New Company, LLC*, dated May 11, 2017, as such agreement may be amended from time to time (**"Operating Agreement"**).

B.     Conrad Car Wash, Inc., a Utah corporation (**"Conrad Car Wash"**), in its capacity as the Manager Member (as defined in the Operating Agreement), desires to admit Members (as defined in the Agreement) to the LLC in exchange for capital contributions pursuant to Section 3 of the Operating Agreement.

C.     The Subscriber agrees to acquire an ownership interest as a Member in the LLC in exchange for a contribution of cash to the capital of the LLC in the amount indicated in Section 11 below in accordance with this Subscription Agreement.

Now, therefore, the parties hereto agree as follows:

## <u>AGREEMENT</u>

1.   <u>Subscription Right</u>.

1.1   <u>Offering</u>.   Subscriber acknowledges and agrees that the LLC shall sell to the Subscriber percentage ownership interest and that the Subscriber shall be a Member of the LLC in accordance with the terms and conditions of the Operating Agreement.

1.2   <u>Purchase Price</u>.   Each one percent ownership interest shall be sold to a Preferred Member for a   capital contribution of cash in the amount of Thirty-Five Thousand and 00/100 Dollars ($35,000.00).   The aggregate initial offering for all ownership interests issued to the Members shall not exceed, in the aggregate, Three Million, Five Hundred Thousand and No Cents ($3,500,00.00) in capital contributions.

1.3   <u>Capital Contribution</u>. Pursuant to the Operating Agreement, solely in exchange for an ownership interest as a Member (as defined in the Operating Agreement), the Subscriber shall contribute cash to the capital to the LLC in the amount set forth in Section 11 below (**" Capital Contribution"**).

1.4   <u>Payment of Capital Contribution</u>.   Subscriber shall be deemed to have paid the entire   Capital Contribution upon its (i) execution of the Operating Agreement and this Subscription Agreement, and (ii) conveyance of its Capital Contribution to the LLC.

**CCW BRAUN HEIGHTS, LLC**                                         Page 1 of 10

2. <u>Subscription Period</u>.  The subscription period for offers to acquire an ownership interest in the LLC pursuant to this Subscription Agreement shall close at 5:00 p.m. on such date as Conrad Car Wash may determine, in its sole discretion.  If the Subscriber fails to fully execute and deliver this Subscription Agreement to the LLC, together with the Capital Contribution, to the LLC by such date, this Subscription Agreement shall be void <u>ab</u> <u>initio</u>.

3. <u>Acceptance Period</u>.  The LLC shall have the right, in its sole discretion, to accept or reject the Subscriber's offer to acquire an ownership interest in the LLC under this Subscription Agreement.  The LLC shall accept or reject such offer by written notice thereof to the Subscriber. The LLC shall give such written notice to the Subscriber within thirty (30) days after its receipt of the Subscriber's (i) fully executed Subscription Agreement, and (ii) the Capital Contribution.  If the LLC rejects the Subscriber's offer to acquire an ownership interest in the LLC hereunder, the LLC shall return the Capital Contribution to the Subscriber within the thirty (30)-day period referenced above.  Except as provided in this Section 3, no other act (or omission to act) shall constitute an acceptance by the LLC.

4. <u>Securities Limitations</u>.  The Subscriber understands and acknowledges that (i) all ownership interests in the LLC are "securities" under Texas and Federal law, and (ii) as such, they are subject to a number of limitations, including, without limitation, the following:

(a) THE SECURITIES THAT ARE THE SUBJECT OF THIS SUBSCRIPTION AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED, OR THE TEXAS SECURITIES LAWS AND, BECAUSE THEY WILL BE OFFERED TO A LIMITED NUMBER OF QUALIFIED INVESTORS ONLY, IT IS ANTICIPATED THAT THEY WILL BE EXEMPT FROM THE REGISTRATION AND QUALIFICATION PROVISIONS OF THOSE LAWS.  THE INVESTOR HAS NO RIGHT AT ANY TIME TO REQUIRE SUCH REGISTRATION OR QUALIFICATION OF THE SECURITIES;

(b) THE SECURITIES CANNOT BE READILY SOLD OR LIQUIDATED, EVEN IN AN EMERGENCY, BECAUSE THERE ARE TRANSFER RESTRICTIONS ON THEM AND BECAUSE THERE WILL BE NO PUBLIC MARKET FOR THEM.  THE INVESTOR HAS ASSURED THE ISSUER AND HIMSELF OR HERSELF THAT THE PURCHASE OF THESE SECURITIES WILL CAUSE NO UNDUE FINANCIAL DIFFICULTIES AND THAT THE INVESTOR HAS SUFFICIENT LIQUID ASSETS TO PROVIDE FOR CURRENT NEEDS AND POSSIBLE PERSONAL CONTINGENCIES; AND

(c) NO STATE OR FEDERAL AGENCY HAS MADE OR WILL MAKE ANY FINDING OR DETERMINATION AS TO THE FAIRNESS OF THIS INVESTMENT, NOR HAS OR WILL ANY STATE OR FEDERAL AGENCY MAKE ANY ENDORSEMENT OR RECOMMENDATION OF THESE SECURITIES.

5. <u>Subscriber's Representations and Warranties</u>.  As further inducement and consideration to the LLC to sell the Subscriber an ownership interest in the LLC pursuant to this Subscription Agreement, the Subscriber represents and warrants to the LLC that the following are true and correct:

**CCW BRAUN HEIGHTS, LLC**

(a)  The Subscriber has received, read and analyzed each and every provision set forth in the Operating Agreement, including, without limitation, those provisions relating to (i) the admission of members and the allocation of profits, losses, distributions and other items among the partners, and (ii) the rights and obligations of the Members thereunder.  Excepting the information set forth in the Operating Agreement, in making its decision to invest in the LLC, the Subscriber has relied only on information which the Subscriber has derived from its own sources and advisors independent of the LLC and the Manager Member;

(b)  The Subscriber understands that its acquisition of an ownership interest in the LLC pursuant to this Subscription Agreement is being made without relying upon any offering literature or prospectus.  The Subscriber also understands that no representations are being made to it regarding any tax consequences relative to this transaction, including, without limitation, those pertaining to the Subscriber's desire, if any, to qualify any aspect of its investment in the LLC for exchange treatment under Section 1031 of the Internal Revenue Code of 1986;

(c)  The Subscriber is acquiring an ownership interest in the LLC for its own account for long-term investment, and not with the intention of resale to others.  The Subscriber has (i) a pre-existing personal and/or business relationship with the Manager Member, and/or (ii) knowledge and experience in financial and business matters (personally or through its advisors) that will enable the Subscriber to utilize the information made available in connection with this transaction to evaluate the risks and merits of the prospective investment and make an informed investment decision;

(d)  The Subscriber recognizes that (i) the LLC is developing a new business, and (ii) such new business has no financial or operating history of its own.  The Subscriber further recognizes that (i) an equity interest, as an investment, involves many risks, and (ii) an investment in the LLC is highly speculative;

(e)  All information which the Subscriber provides to the LLC concerning (i) the Subscriber's financial position, and (ii) the Subscriber's knowledge of financial and business matters (or that of its advisors), as such information is set forth in the "Investor Questionnaire" attached hereto as Appendix I, is correct and complete as of the date of the Subscriber's execution of this Subscription Agreement.  If there is any material change in such information prior to its becoming a Member, the Subscriber immediately will provide the LLC with the information regarding such material change;

(f)  The Subscriber has been advised to consult, and has consulted (to the extent he or she deems necessary), with legal and tax advisors independent of the LLC and the Manager Member regarding (i) its acquisition of an ownership interest in the LLC pursuant to this Subscription Agreement, and (ii) the tax ramifications of investing in the LLC;

(g)  The Subscriber has (i) evaluated the risks of investing in the LLC, and (ii) has determined that such investment is suitable for the Subscriber.  The Subscriber has adequate financial resources for an investment of this character, and at this time can bear the complete loss of its investment in the LLC;

**CCW BRAUN HEIGHTS, LLC**

(h)  The Subscriber has been given the opportunity to (i) inspect documents in the possession of the LLC relating to the LLC's business, finances, and all other aspects of the LLC, and (ii) ask questions of, and receive answers from, the Manager Member relating to such matters;

(i)  The Subscriber acknowledges and is aware that (i) there will be no public market for any ownership interest in the LLC, and (ii) it may not be possible for the Subscriber to sell, dispose of, or liquidate its investment in the LLC in the event of an emergency. Accordingly, the Subscriber acknowledges that he or she must not acquire an ownership interest in the LLC unless it has liquid assets sufficient to (i) assure the Subscriber that such acquisition will not cause it undue financial difficulties, and (ii) provide for the Subscriber's current needs and possible personal contingencies.  The Subscriber's overall commitment to investments which are not readily marketable is not disproportionate to its net worth, and its acquisition of an ownership interest in the LLC pursuant to this Subscription Agreement will not cause such overall commitment to become excessive;

(j)  The Subscriber understands that the securities which it is acquiring pursuant to this Subscription Agreement may not be assigned, pledged, encumbered or otherwise transferred unless (i) such disposition is registered with the Securities and Exchange Commission and qualified with the Texas Commissioner of Corporations, or (ii) such registration and qualification are not required in the opinion of legal counsel for the LLC in accordance with the Operating Agreement;

(k)  Neither the LLC nor the Manager Member has offered any ownership interest in the LLC for sale, or allocated, issued or sold any ownership interest in the LLC, to the Subscriber by any means of general advertising or general solicitation;

(l)  The Subscriber acknowledges and understands that the securities subject to this Subscription Agreement have been offered for sale to the Subscriber upon the LLC's express reliance on the foregoing exemptions to registration and qualification. SHOULD SUBSCRIBER'S RELATIONSHIP WITH THE LLC CHANGE OR OTHER CIRCUMSTANCES ARISE WHICH, IN THE OPINION OF THE LLC'S COUNSEL, MAKES IT NO LONGER ADVISABLE FOR THE LLC TO RELY ON SUCH EXEMPTIONS, THEN THE LLC, AT ITS SOLE OPTION, MAY RESCIND THIS SUBSCRIPTION AGREEMENT, RETURN ALL MONIES RECEIVED FOR SECURITIES NOT YET ISSUED, AND DECLARE ANY REMAINING OBLIGATIONS TO SELL SECURITIES VOID AND WITHOUT EFFECT;

(m)  The Subscriber further acknowledges and understands that, the Manager Member and/or its affiliates will receive fees from the LLC, as described in Section 6.6 of the Operating Agreement (Property Management Fee and Refinance Fee);

(n)  The Subscriber further acknowledges and understands that the Manager Member is entitled to a "carried-interest" (also known as a "profit-interest") of 18% of the distributions from net cash flow from operations net income and 80% of the distributions capital transaction  (as defined in Section 4.01 the Operating Agreement);

**CCW BRAUN HEIGHTS, LLC**

(o) The Subscriber further acknowledges that Subscriber has read the "Recontribution Obligation" in Section 3.02 (c) of the Operating Agreement. The Manager Member and its management may be required to guarantee a financial obligation of the Company in the event that the Company borrowers money from a financial institution. In the event that the project fails, and the lender makes demand under the guarantee, then the Manager will be required to honor the guarantee. In such an event, Manager Member may require the Subscribers to recontribute any distributions that have been made to them during their period of ownership. In other words, if the company fails, and if management is required to pay $100,000.00 on the guaranty obligation, and if prior to failure the Company had distributed $200,000.00 to the Subscribers, then the Subscribers would be obligated to recontribute back to the Company $100,000.00;

(p) The Subscriber further acknowledges and understands that, (i) the Manager Member may permit one or more members of the LLC to make advances and loan funds to the LLC if and to the extent provided in Section 3.03 of the Operating Agreement, and (ii) such loans, together with interest thereon, have priority payment over LLC distributions to members of the LLC; and

(q) No Manager Member (or any agent or employee of a Manager Member), nor any other person, has ever, at any time, expressly or implicitly represented, guaranteed, or warranted to the Subscriber any of the following:

(i) That the Subscriber will not have to remain as owner of its LLC ownership interest for an exact or approximate length of time prior to either the sale of any property to be owned by the LLC or the sale of its ownership interest in the LLC;

(ii) That any amount of profit will be realized as a result of the Subscriber's investment in the LLC;

(iii) That past performance or experience on the part of the Manager Member or its affiliates or any other person, including without limitation its associates, agents or employees, in any way indicates the predictable results of any ownership in the LLC or the overall LLC venture;

(iv) That any cash distributions from LLC operations or otherwise will be made to members of the LLC by any specific date or will be made at all; or

(v) That any specific tax benefits will accrue as a result of an investment in the LLC.

6. <u>Indemnification</u>. The Subscriber shall indemnify, defend and hold harmless the LLC, its members, and each and every other officer, employee, shareholder, attorney, partner, member agent, registered representative, director or control person of any such entity who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by the Subscriber to the LLC, including, without limitation, the information set forth in this Subscription Agreement and/or the Investor Questionnaire attached hereto as <u>Appendix I</u>, against losses,

**CCW BRAUN HEIGHTS, LLC**                                        Page 5 of 10

liabilities and expenses of the LLC, each other member of the LLC and each and every other officers, employees, shareholders, partners, members, agent, registered representatives, directors or control persons of any such entity (including attorneys' fees, judgments, fines and amounts paid in settlement) incurred by such person or entity in connection with such action, suit or proceeding.

7.  <u>Revocation</u>.  The Subscriber agrees that (i) the Subscriber may not cancel, terminate or revoke this Subscription Agreement (or any agreement hereunder), and (ii) this Subscription Agreement shall survive the death or disability of the Subscriber and be binding upon the Subscriber's heirs, executors, administrators, successors and assigns.

8.  <u>Adoption of Operating Agreement</u>.  By its execution of this Subscription Agreement, the Subscriber (i) consents to and agrees to be bound by each and every term and provision set forth in the Operating Agreement, and (ii) agrees to perform all obligations imposed on Members, as such obligations are set forth in the Operating Agreement and/or conferred by law.

9.  <u>Power of Attorney</u>.  The Subscriber hereby irrevocably makes, constitutes and appoints, Conrad Car Wash with full power of substitution, the Subscriber's true and lawful attorney-in-fact, for the Subscriber and in its name, place, and stead for its use and benefit to execute and acknowledge and, to the extent necessary, file and record:

(a)  The LLC's Articles of Organization in accordance with the Operating Agreement, including any amendments thereto which, under the laws of the State of Texas or the laws of any agency or other jurisdiction, the LLC is required to file or which Conrad Car Wash elects to file;

(b)  Any other instrument or document required to be filed by the LLC under the laws of any state or by any governmental agency, or which Conrad Car Wash elects to file; and

(c)  Any instrument or document which may be required to effect the continuation of the LLC, the admission of an additional or substituted member of the LLC, or the dissolution and termination of the LLC (provided that the continuation, admission, or dissolution and termination are in accordance with the terms of the Operating Agreement), or to reflect any reduction in the amount of the Subscriber's invested capital or reduction in the Subscriber's capital account in the LLC.

The foregoing grant of authority:

(a)  Is a Special Power of Attorney coupled with an interest, is irrevocable and shall survive the death or legal incapacity of the Subscriber;

(b)  May be exercised by Conrad Car Wash for each Member by a facsimile signature of Conrad Car Wash or by listing all the Members executing any instrument with a single signature of Conrad Car Wash acting as attorney-in-fact for all of the Members; and

(c)  Shall survive the delivery of any assignment by the Subscriber of all or any part of the Subscriber's interest in the LLC, except that where the assignee thereof has been admitted to the LLC as a substituted Member, this Power of Attorney shall survive the delivery of

**CCW BRAUN HEIGHTS, LLC**

such assignment for the sole purpose of enabling Conrad Car Wash to execute, acknowledge and file any instrument necessary to effect such substitution.

10. <u>Miscellaneous</u>.

10.1 <u>Assignment</u>. No party shall have the right, without the prior written consent of the LLC, to sell, assign, mortgage, pledge or otherwise transfer, by operation of law or otherwise, any interest or right created by this Subscription Agreement. This Subscription Agreement is made solely for the benefit of the Subscriber and the LLC to the extent set forth in this Subscription Agreement and no other person, LLC, limited liability company, association or corporation shall acquire or have any right under or by virtue of this Subscription Agreement.

10.2 <u>Binding Effect</u>. Except as otherwise provided in this Subscription Agreement, and subject to any restrictions against or limitations upon assignment contained in this Subscription Agreement, this Subscription Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

10.3 <u>Further Assurances</u>. The parties hereto shall duly execute, acknowledge and deliver such further instruments and do such further acts and things as may be necessary or expedient to carry out the intent and purposes of this Subscription Agreement.

10.4 <u>General Interpretation</u>. The terms of this Agreement have been negotiated by the parties hereto and the language used herein shall be deemed to be the language chosen by the parties hereto to express their mutual intent. This Agreement shall be construed without regard to any presumption or rule requiring construction (i) against the party causing all or any part of such instrument to be drafted, or (ii) in favor of the party receiving a particular benefit under the Agreement. No rule of strict construction will be applied against any party hereto.

10.5 <u>Governing Law</u>. This Subscription Agreement shall be governed by, and construed in accordance with, the procedural and substantive laws of the State of Texas.

10.6 <u>Integration</u>. This Subscription Agreement contains all of the agreements and understandings of the parties hereto with respect to any matter mentioned herein, and supersedes and terminates all prior and contemporaneous agreements between such parties with respect to the matters covered in this Subscription Agreement. This Subscription Agreement may be modified in writing only, signed by the parties at the time of modification.

10.7 <u>Meaning of Terms</u>. Any pronouns or references used in this Subscription Agreement shall be deemed to include the masculine, feminine, or neuter gender, as appropriate in the context. Any expression in the singular or plural shall, in appropriate in the context, include both the singular and the plural.

10.8 <u>Notices</u>. Any and all notices between the parties provided for or permitted under this Subscription Agreement shall be in writing and shall be deemed duly effectively given to Subscriber upon (i) personal delivery, (ii) electronic facsimile, (iii) twenty-four (24) hours after

**CCW BRAUN HEIGHTS, LLC**                                        Page 7 of 10

deposit with Federal Express or a comparable express courier, addressed to a party at the address set forth below its signature hereto, or (iv) forty-eight (48) hours after deposit in the United States mail, by certified mail, return receipt requested, postage prepaid, addressed to Subscriber at the address set forth below its signature hereto. Subscriber may designate another address for notice purposes upon written notice thereof to the LLC. The LLC's address for such notice purposes shall be its principal place of business. Notwithstanding the foregoing provisions, any notice to the LLC shall be effective only if and when received by the LLC.

10.9 <u>Obligations of Each Party Independent</u>. The obligation of the Subscriber under this Subscription Agreement is an independent obligation and is not dependent upon the performance by any other subscriber to the securities under this Subscription Agreement or any other contemporaneously executed agreement. Nothing contained in this Subscription Agreement shall render any party liable for the obligation of any other party, and the obligations of each party are several in accordance with their respective interests and not joint. If the Subscriber fails to fulfill all or any part of its obligations under this Subscription Agreement, the LLC may offer subscription rights remaining unexercised or unfulfilled to other persons, subject, however, to compliance with any federal or state regulations at the time applicable.

10.10 <u>Recitals and Exhibits</u>. All recitals set forth above, and all exhibits referenced in and attached to this Subscription Agreement, are incorporated herein by this reference.

10.11 <u>Intentionally Omitted.</u>

10.12 <u>Severability</u>. In case any one or more of the provisions contained in this Subscription Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Subscription Agreement and other applications thereof shall not in any way be affected or impaired thereby, and such invalidity shall be construed and limited as narrowly as practical.

10.13 <u>Signator's Warranty</u>. Each party hereto warrants to the other party that he is fully authorized to enter into this Subscription Agreement in the capacity indicated by its signatures and agrees to be bound by this Subscription Agreement as of the day and year first mentioned above upon the execution of this Subscription Agreement by each party.

10.14 <u>Time of Essence</u>. Time is of the essence of this Subscription Agreement and of each and all of its provisions.

10.15 <u>Waivers</u>. No waiver of any breach or default of a term or condition of this Subscription Agreement shall constitute a waiver of any other breach or default, whether of the same or any other term or condition. No wavier, benefit, privilege or service, voluntarily given or performed by either party, shall give the other party any contractual right by custom, estoppel or otherwise.

11. <u>Amount of Capital Contribution</u>. The Subscriber hereby agrees to contribute cash in the amount of **Three Million, Three Hundred and Fifty Thousand and No Cents and 00/100 Dollars ($3,350,000.00)** to the capital of the LLC solely in exchange for an ownership interest as a Member of the LLC. The Subscriber's payment of the Capital Contribution by check

shall be made out to " CCR Braun Heights, LLC". The Subscriber agrees to fund its Capital Contribution by installments in accordance with monthly construction schedule set forth Appendix IV. Each individual installment shall be remitted to the Company within three (3) business days after receiving a written email notification from the Manager Member.

The Subscriber understands and agrees that subscriptions will be accepted or rejected by the LLC, in its sole discretion.

Dated:_____5.12.2017_____

_____

*Subscriber*: deeproot Funds, LLC,
a Texas limited liability company

BY:     deeproot Capital Management, LLC,
Its Manager

BY:   _____
        Robert J. Mueller, Manager

SS No / EIN:  ___46-2909404_____

Address:

___PO Box 691610_____
___San Antonio, TX 7826-1610_____
Telephone:  _(888) 316-2935_____
Facsimile:  _(888) 316-2782_____

**CCW BRAUN HEIGHTS, LLC**

## ACKNOWLEDGMENT OF RECEIPT

Full payment of Six Hundred Thousand Twenty-Five Dollars and No Cents and 00/100 Dollars ($625,000.00) representing an installment payment against the capital contribution for an ownership Interest as a Member of the LLC was received on or about the _12_ day of May 2017.

**CCW BRAUN HEIGHTS, LLC**, a Texas limited liability company

By:   Conrad Car Wash, Inc., a Utah corporation, Manager Member

By:   _____
Its:   Authorized Signatory

## ACCEPTANCE OR REJECTION

The undersigned ( x) accepts (   ) rejects the above subscription offer on the _____ day of May ___, 2017

**CCW BRAUN HEIGHTS, LLC**, LLC, a Texas limited liability company

By:   Conrad Car Wash, Inc., a Utah corporation, Manager Member

By:   _____
Its:   Authorized Signatory

| COUNTERPART SIGNATURE PAGE *FOR ENTITIES* TO SUBSCRIPTION AGREEMENT |
|---|

IN WITNESS WHEREOF, the undersigned Subscriber has executed this Subscription Agreement as of the date set forth below such Subscriber's signature.

**OWNERSHIP INTERESTS AS A MEMBER @ $35,000.00 per one percent:**
95.714% ($35,000.00 * $3,350,000.00)

_____
deeproot Funds, LLC, a Texas limited liability company

BY:    deeproot Capital Management, LLC, Its Manager

BY:    _____
        Robert J. Mueller, Manager

**APPENDIX I**
**Investor Questionnaire**

**INVESTOR QUESTIONNAIRE**
**(CCR Braun Heights, LLC)**

**A.**     Names in which ownership interest are to be registered:

1.  deeproot Funds, LLC, a Texas Limited Liability Company by Robert J. Mueller, VP
2.  _____

**B.**     Social security number (trusts, corporations, partnerships and estates <u>must</u> furnish a tax identification number.  All others <u>must</u> furnish social security number(s).  IRAs and Keogh trust companies <u>must</u> furnish both the investor's social security number and the trustee's tax identification number):

46-2909404

**C.**     ~~Residence~~ Mailing address:
  PO Box 691610 San Antonio, TX 78269-1610
  _____
  _____

**D.**     Business address:
  8200 W Interstate 10, Ste. 600 San Antonio, TX 78230
  _____
  _____

**E.**     Telephone numbers and email:
  (210) _____ (mobile)
  _____ (residence)
  (888) 316-2935 (business)
  robert@deeprootfunds.com (email)

**F.**     Correspondence should be sent to my:
  ( x )  ~~Residence~~ Mailing address
  ( ___ )  Business address

    **ATTENTION TRUST, IRA AND KEOGH INVESTORS:**  All information will be sent to your trustee unless you provide your address above.  An independent trustee must sign the

Application Form below for IRA and Keogh investments.  Distributions for trust, IRA and Keogh investors will be sent to the trustee.

COMPLETE THIS SECTION <u>ONLY</u> IF YOU WOULD LIKE CHECKS MAILED TO AN ADDRESS <u>OTHER</u> THAN THE ABOVE.

_____
c/o
_____
Street Address
_____
Suite Number (if applicable)
_____
City                                        State                    Zip Code

**G.**     Title to my ownership interest in the LLC will be held as:

(___)     Married person as his or her community property

> *Note: Your spouse must sign both (i) a Community Property Spousal Consent in the form attached to the Subscription Agreement as <u>Exhibit A</u>, and (ii) a Community Property Spousal Consent in the form attached to the Operating Agreement as <u>Exhibit C</u>.*

(___)     Married person as his or her separate property

(___)     Single person

(___)     Joint Tenancy with:_____

> *Note:  Each joint tenant will be treated as a member of the LLC and therefore must execute a Subscription Agreement and complete an Investor Data Sheet.*

(___)     Tenancy in Common with:_____

> *Note:  Each tenant in common will be treated as a member of the LLC and therefore must execute a Subscription Agreement and complete an Investor Data Sheet.*

(___)     Individual retirement account

(___)     Trust

*Note:  Please attach a complete copy of the trust's governing documents.*

( ___ )    Corporation

>*Note:  Please attach an executed copy of a corporate resolution authorizing this investment.*

( x )    Partnership or limited liability company // deeproot Capital Management, LLC sole member

>*Note:  Please (i) state names of all partners or all members, as the case may be, and (ii) attach a complete copy of the partnership agreement or the operating agreement, as the case may be.*

(  )    Other *(please specify)*:_____

>*Note:  Subscribing persons who wish to hold title to the ownership interests in a manner other than those specifically set forth above may be required to provide additional documentation and information.*

**H.**    The Subscription Agreement to which this document is an exhibit, and the transaction underlying that Subscription Agreement, has been negotiated and will be entered into in the State of Texas.

**I.**    Business or Professional Education and Degrees:
  N/A
_____
_____
_____
_____

**J.**    Prior Employment (5 years):

| Employer | Nature of Duties | Dates of Employment |
|---|---|---|
| N/A | | |

**K.**    Prior Investments of Purchaser (cumulate amounts):

1. <u>Real Estate</u>:

(___) None
(___) Up to $50,000
(___) $50,000-$250,000
(_x_) Over $250,000

2. <u>Oil and Gas</u>.

(___) None
(___) Up to $50,000
(___) $50,000-$250,000
(___) Over $250,000

3. <u>Other</u>.

(___) None
(___) Up to $50,000
(___) $50,000-$250,000
(_x_) Over $250,000

**L.** Financial Information:

1. Your net worth <u>excluding</u> home, home furnishings, and personal automobiles, is more than $___1MM_____.

2. Your net worth <u>including</u> home, home furnishings, and personal automobiles, is more than $___1MM_____.

**M.** If you are a partnership, limited liability company, corporation or association, your fiscal year ends on:
___December 31st_____

**N.** Based on the definition of an "accredited investor" which appears below, I am an "accredited investor".

(_x_) Yes   (____) No

*Note:  Prospective investors claiming "accredited investor" status may be required to supply the Manager Members with a balance sheet, prior years' federal income tax returns or other appropriate documentation to verify and substantiate the investor's status as an "accredited investor".*

If yes, I am an "accredited investor" because I fall within one of the following categories:

*(check appropriate category)*

( x )      A natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000.

( x )      A natural person who had an individual income in excess of $200,000 in each of the two most recent years, or joint income with that person's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year. Individual income is defined as adjusted gross income (as reported for federal income tax purposes), less any income earned by a spouse or from property owned by a spouse increased by the following amounts (not attributable to a spouse): (i) the amount of any tax exempt interest income received, (ii) the amount of losses claimed as a limited partner in a limited partnership, and (iii) any deductions claimed for depletion.

( x )      Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of making this investment, whose investments are directed by a sophisticated person as described in Rule 506(b)(2)(ii), as adopted by the Securities and Exchange Commission pursuant to the Securities Act.

**O.**      My business and personal relationship to each Manager Member is *(describe in detail, using back of page if necessary)*:

  N/A

**P.**      My basis for sophistication in this type of investment is:

( x )      Personal experience *(describe in detail, using back of page if necessary)*:

        deeproot Funds, LLC and its officers are experts in investing in the due course of business

( ___ )      My advisor *(identify)*:

_____
_____
_____
_____

**Q.**    I am a person who is able to bear the economic risk of an investment in the LLC.  In making this statement, consideration has been given to whether I could afford to hold my LLC investment for an indefinite period of time and whether, at this time, I could afford a complete loss.

**R.**    Any purchase of an ownership interest in the LLC will be solely for my account, and not for the account of any other person or with a view to any resale or distribution of such ownership interest in the LLC.

The Subscriber declares under penalty of perjury that the information set forth in this questionnaire is correct.  In the case of sales to fiduciary accounts, the fiduciary represents that such conditions are met by the fiduciary, by the fiduciary account, or by the donor who directly or indirectly supplies the funds for the purchase of an ownership interest in the LLC.

Executed this ___12___ day of ____May____, _2017_, in the City of _San Antonio___, County of ____Bexar_____, State of Texas.

_____          _____
*Signature (1)*                                      *Signature (2)*

___Robert J. Mueller_____          _____
*(Please Print Name)*                          *(Please Print Name)*

SIGNATURES OF ALL NAMED INVESTORS ARE REQUIRED IN ORDER FOR THIS APPLICATION TO BE PROCESSED.  FOR IRA AND KEOGH INVESTORS:  AN INDEPENDENT TRUSTEE MUST SIGN THIS APPLICATION FORM.

**EXHIBIT A**
**Intentionally Omitted**

## APPENDIX II TO SUBSCRIPTION AGREEMENT

## FORM W-9

| Form **W-9**<br>(Rev. December 2014)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification** | Give Form to the requester. Do not send to the IRS. |
|---|---|---|

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Robert J. Mueller

**2** Business name/disregarded entity name, if different from above

deeproot Funds, LLC

**3** Check appropriate box for federal tax classification; check only one of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

☒ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ __S__

Note. For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

(Applies to accounts maintained outside the U.S.)

**5** Address (number, street, and apt. or suite no.)

PO Box 691610

**6** City, state, and ZIP code

San Antonio, TX 78269-1610

Requester's name and address (optional)

**7** List account number(s) here (optional)

### Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

| | | | – | | | – | | | | |

or

Employer identification number

| 4 | 6 | – | 2 | 9 | 0 | 9 | 4 | 0 | 4 |

### Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

Sign Here | Signature of U.S. person ▶ | Date ▶ 5/12/2017

### General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

### Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding.* See *What is backup withholding?* on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X

Form **W-9** (Rev. 12-2014)

## APPENDIX III TO SUBSCRIPTION AGREEMENT

### Certificate of Non-Foreign Status
### To be Provided by each Subscriber that is a United States Person and
### that is <u>not</u> a Natural Person

Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For United States tax purposes (including section 1445 of the Code), the owner of a disregarded entity (which has legal title to a United States real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform CCR Braun Heights, LLC (the "**Company**") that withholding of tax is not required upon the disposition of a U.S. real property interest by the Company, the undersigned Subscriber hereby certifies the following:

1. The Subscriber is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and Treasury Regulations);

2. The Subscriber is not a disregarded entity as defined in Treasury Regulations Section 1.1445-2(b)(2)(iii);

3. The Subscriber's U.S. employer identification number is __46-2909404__; and

4. The Subscriber's office address is __8200 W Interstate 10, Ste. 600__
    San Antonio, TX 78230
_____.

The Subscriber understands that this certification may be disclosed to the Internal Revenue Service by the Company and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of the Subscriber.

Subscriber

By: _____

Name: __Robert J. Mueller_____

Title: __VP_____

Date: __May 12, 2017_____

# APPENDIX IV
## (CCR Braun Heights, LLC)

## INVESTOR INSTALLMENT PAYMENT SCHEDULE

| Date | Company | Action | Amount-Deep | Total for Mo | C&S Pay | Paid on/prior | | |
|---|---|---|---|---|---|---|---|---|
| 2016 | Seller/Title | Earnest $ Deposit | | | 15,000 | 2016 | | |
| Apr-17 | Rob Holt | Legal fees | | | 16,985 | 4/5/2017 | | |
| Apr-17 | Randon McKee | Civil Eng | | | 22,016 | 4/5/2017 | | |
| 15-May | Title- | Close including fees | 625,000* | 625,000 | | | | |
| 15-May | City of SA | Building Permit fees | | | 40,000 | | | |
| 15-May | STI belt conveyor | Deposit to hold | | | 33,000 | | | |
| 1-Jun | Modern Wash | 1/2 building inv-12 wks | 244,600 | 244,600 | 23,000 | 4/5/2017 | | |
| 30-Jul | STI belt conveyor | Bal- STI belt deposit | 33,550 | | | | | |
| 30-Jul | Randon McKee | Engineering | 19,000 | | | | | |
| 30-Jul | Contractor | GC & Site | 94,000 | 146,550 | | | | |
| 15-Aug | Equipment | 1/2 general equip deposit | 282,000 | | | | 348,184 | 1/2 w/out /sti or ship |
| 30-Aug | Contractor | Site, Utilities, elec, metals | 170,000 | 452,000 | | | | |
| 30-Sep | Modern wash | Bal of building to ship | 315,000 | | | | 10-Sep Bldg arrives | |
| 30-Sep | Contractor | GC, site, Bldg,Special,elec | 144,700 | | | | | |
| 30-Sep | Equipment | Bal of deposit-ship | 422,300 | 882,000 | | | 15-Oct Equip arrives-Includes 1/2 STI | |
| 30-Oct | Building Install | Begin building install | 35,000 | | | | | |
| 30-Oct | Contractor | GC, site, Bldg,finish etc | 167,900 | | | | | |
| 30-Oct | Building Install | Finish install | 29,800 | | | | | |
| 30-Oct | Building glazing etc | Finsih building | 94,500 | | | | | |
| 30-Oct | Contractor | MEP, GC, Site, bldg + | 184,200 | | | | | |
| 30-Oct | Equipment | Equip Install | 25,000 | 536,400 | | | | |
| 30-Nov | Equipment | Equip-Finish install | 45,200 | | | | | |
| 30-Nov | Signage | Install sign | 16,200 | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 30-Nov | Landscape | Landscape | 18,900 | | | | | |
| 30-Nov | Equipment-Vac cover | Cover | 68,850 | | | | | |
| 30-Nov | Randon Mckee | Engineer final | 14,200 | 163,350 | | | | |
| 15-Dec | Contractor | Final-Retention | $85,000 | | | | | |
| 15-Dec | Building Install | Final-Retention | $7,200 | | | | | |
| 15-Dec | Equip Install | Final-Retention | $7,800 | | | | | |
| 15-Dec | Signage | Final-Retention | $1,800 | | | | | |
| 15-Dec | Landscape | Final-Retention | $2,100 | | | | | |
| 15-Dec | Building-Other | Final-Retention | $10,500 | | | | | |
| 15-Dec | Building-Vac cover | Final-Retention | $7,650 | $122,050 | | | | |
| Total | | | 3,171,950 | 3,171,950 | 150,001 | | | |
| | C&S contribution | | 150,000 | | | | | |
| | Const contingency | | $103,050 | | | | | |
| | Working Capital | | 75,000 | | | | | |
| Grand Total | | | $3,500,000 | | | | | |

*This installment payment shall be paid upon the execution of the Subscription Agreement and the Operating Agreement.

FINAL EXECUTION COPY

# FIRST AMENDMENT

## TO

## SUBSCRIPTION AGREEMENT

**THIS FIRST AMENDMENT TO SUBSCRIPTION AGREEMENT** (this "**Amendment**"), dated as of November 20, 2018 is entered into by and among: **CCW BRAUN HEIGHTS, LLC**, a Texas limited liability company  ("**LLC**"), and **DEEPROOT FUNDS, LLC**, a Texas limited liability company (the "**Subscriber**").

## I. R E C I T A L S:

**WHEREAS**, the LLC and the Subscriber entered into that certain *Subscription Agreement* on May 11, 2017 (the "**Deeproot Subscription Agreement**" or "**Agreement**") regarding the investment of cash capital for an ownership interest as a Member in the LLC defined in the Agreement;

**WHEREAS**, LLC and Subscriber have set forth in detail the history of their relationship in the Second Amendment to the Operating Agreement ("**Second Amendment to the Operating Agreement**");

**WHEREAS**, LLC and Subscriber desire to incorporate the recitals and covenants of the *Second Amendment to Operating Agreement*; and

**WHEREAS,** LLC and Subscriber desire to amend the Agreement as hereinafter set forth.

## II. A G R E E M E N T S:

Now, therefore, in consideration of the mutual agreements set forth below, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Company and Subscriber agree as follows:

1.      <u>Amendments to the Agreement</u>.  In accordance with the *Second Amendment to the Operating Agreement,* the LLC and Subscriber hereby agreed to amend the Deeproot Subscription Agreement to convert (i) the Subscriber's commitment to make capital contributions to (ii) a commitment to make a loan to the LLC in accordance with the following terms:

(a)      <u>Principal Loan Amount</u>.  The Subscriber hereby agrees to loan to the LLC the total principal loan amount of $3,350,000.00, subject to certain adjustments described below.

(b)      <u>Current Principal Balance</u>.  The Subscriber and LLC agree that Subscriber has funded total loan proceeds in the amount of $2,057,000.00 as of the date of the

FINAL EXECUTION COPY

Amendment, and that the Subscriber is obligated to continue funding the outstanding balance of $1,293,000.00.

(c) <u>Loan Amount Adjustments</u>. As stated in the *Second Amendment to the Operating Agreement,* the Company is attempting to raise $600,000 in new capital. The Parties agree that for every dollar raised in new equity capital, the outstanding balance of the Subsciber's loan commitment shall be reduced. By way of example and not limitation, in the event that the LLC raises $300,000.00 in new equity capital, then the Subscriber's remaining loan commitment shall be reduced by $300,000.00 to $3,050,000.00.

(d) <u>Loan Funding Deadline</u>. Subscriber agrees to fund the outstanding balance of $1,293,000.00, as adjusted, by no later than December 31, 2019.

(e) <u>Maturity Date</u>. The LLC shall designate and hold a grand opening event of the Car Wash Facility, which shall be after a *soft opening.* The maturity date of the loan shall be five (5) years from the date of the grand opening of the Car Wash Facility.

(f) <u>Balloon Payment</u>. No interest or principal payments shall be due and owning to the Subscriber except for one balloon payment on the maturity date when all principal and interest shall be due and owing.

(g) <u>Interest Rate</u>. The Parties have agreed to express the interest rate charged by the Subscriber in terms of a balloon payment of principal and interest upon maturity in an amount equal to 118% of the principal loan amount. By way of example, if the principal loan amount is $3,350,000.00, then the balloon payment of principal and interest would be $3,953,000.00. By another example, if the principal loan amount is $3,050,000 as described in the example in sub-paragraph (c), above, then the balloon payment of principal and interest would be $3,599,000.00.

(h) <u>Interest Rate Adjustment</u>. The Parties agree that in the event that the Subscriber fails to completely and timely fund the remaining balance of the outstanding loan amount, as adjusted if applicable in sub-paragraph (c), by December 31, 2019, then the balloon payment of principal and interest upon maturity shall be an amount equal to 112.5% of the principal loan amount.

(i) <u>Default Interest Rate</u>. In the event the LLC fails to pay the loan on the Maturity Date, the default annual interest rate shall be 5% simple interest, not compounded, on 118%, or 112.5%, if applicable, of the then outstanding principal balance.

(j) <u>Reimbursement of Certain Expenses</u>. As stated in the *Second Amendment to the Operating Agreement,* the failure of the Subscriber to timely and completely fund its capital contribution commitment resulted in Clif and Susan Conrad loaning money to the LLC ("**Conrad Loan**"). In accordance with the *Second Amendment to the Operating Agreement,* the LLC has entered into a loan with Clif and Susan Conrad and shall incur interest carrying costs ("**interest costs**"). Additionally, the LLC has agreed to reimburse Clif and Susan Conrad for certain out-of-

FINAL EXECUTION COPY

pocket expenses ("**related costs**") that they have and will incur in securing the funds they loaned to the LLC. The Subscriber hereby agrees to reimburse the LLC for all of interest costs and related costs that the LLC incurs arising out of the Conrad Loan. Subscriber shall make reimbursement payments within 15 days of receipt of a written request from the LLC (which shall include detail and support for the request).

   (k) Use of Loan Proceeds. Once the LLC has completed the construction and opening of the Car Wash Facility, the LLC shall use any remaining loan proceeds funded by the Subscriber to payoff and retire the Conrad Loan.

   (l) Subordinated to the Conrad Loan. Subscriber agrees that at all times its loan and deed of trust shall be subordinated to the Conrad Loan and the related deed of trust. Subscriber further agrees that in the event that it is necessary for the Company to borrower funds from an institutional and or private lenders ("**Take-Out Lender**s")in order to retire the Conrad Loan, the interest costs, and related costs (described above), then the Subscriber shall execute all necessary documents to subordinate its loan and deed of trust to the loan documents and security agreements of the Take-Out Lender.

   2. Restatement of Agreement. Except as expressly amended hereby, the Agreement and all rights and obligations created thereby or thereunder are in all respects ratified and confirmed and remain in full force and effect. Where any paragraph, section, subsection or clause of the Agreement is modified or deleted by this Amendment, any unaltered provision of such section, subsection or clause of the Agreement shall remain in full force and effect. However, where any provision of this Amendment conflicts or is inconsistent with the Agreement, the provision of this Amendment shall control.

   3. Defined Terms. Terms used herein, which are not otherwise defined or modified herein, but which are defined in the Agreement, shall have the meanings therein ascribed to them.

   4. General. This Amendment (a) shall be governed by, construed under and enforced in accordance with the laws of the State of Texas, without regard to conflicts of laws principles that would require the application of any other law; (b) shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; (c) may be modified or amended only in writing signed by each party hereto; (d) may be executed by facsimile or electronic signatures which shall constitute original signatures for all purposes hereof; (e) may be executed in several counterparts, and by the parties hereto on separate counterparts, and each counterpart, when so executed and delivered, shall constitute an original agreement, and all such separate counterparts shall constitute one and the same agreement; and (f) embodies the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior agreements relating to such subject matter.

   5. Effective Date. The undersigned have caused this Amendment to be executed effective as of the date first set forth above.

FINAL EXECUTION COPY

**[Signatures on the next page]**

FINAL EXECUTION COPY

**AGREED AND ACCEPTED BY SUBSCRIBER:**


DEEPROOT FUNDS, LLC
a Texas limited liability company

      BY:    deeproot Capital Management, LLC
               a limited liability company

      ITS:   Manager

      BY:   _____
               Robert J. Mueller
               Manager

FINAL EXECUTION COPY

**AGREED AND ACCEPTED BY LLC:**

CCW BRAUN HEIGHTS, LLC
a Texas limited liability company

BY:    Conrad Carwash, Inc.
       a Utah corporation

ITS:   Co-Manager

BY:      _____
          Clif Conrad
          Authorized Person

BY:      _____
          Susan Conrad
          Authorized Person

# EXHIBIT F

## NOTICE OF APPRAISED VALUE

**This is NOT a Tax Statement**

# 2022 Notice of Appraised Value

**Do Not Pay From This Notice**

**BEXAR APPRAISAL DISTRICT**
**411 N. FRIO, P.O. BOX 830248**
**SAN ANTONIO, TX 78283-0248**
Phone: (210) 224-2432   Fax: (210) 242-2453

DATE OF NOTICE: April 8, 2022

#BWNCTVY
#0112871694#

**Property ID: 1287169 - 19142-002-0050**
D3 REAL ESTATE CONSULTANTS LLC
Agent for: CCW BRAUN HEIGHTS LLC
PO BOX 592226
SAN ANTONIO, TX 78259-0161

**Account#:** 1287169
**Ownership %:** 100.00
**Geo ID:** 19142-002-0050
**DBA:** AUTO GLIDE EXPRESS CAR WASH
**Legal:** NCB 19142 (CCW BRAUN HEIGHTS   COMMERCIAL), BLOCK 2 LOT 5
**Legal Acres:** 1.019
**Situs:** 10670 BANDERA  SAN ANTONIO, TX 78250
**Agent ID:** 2872182
**Efile PIN:** XXXXXXXXXXXXXXXXXXXXXXXXX

**\*\*\* THIS IS NOT A BILL \*\*\***

Dear Property Owner,
   We have appraised the property listed above for the tax year 2022.  As of January 1, our appraisal is outlined below.

| Appraisal Information | Last Year - 2021 | Proposed - 2022 |
|---|---|---|
| Market Value of Improvements (Structures / Buildings, etc.) | 533,110 | 598,870 |
| Market Value of Non Ag/Timber Land | 664,040 | 689,780 |
| Market Value of Ag/Timber Land | 0 | 0 |
| Market Value of Personal Property/Minerals | 0 | 0 |
| Total Market Value | 1,197,150 | 1,288,650 |
| Productivity Value of Ag/Timber Land | 0 | 0 |
| Appraised Value | **1,197,150** | **1,288,650** |
| Homestead Cap Value excluding Non-Homesite Value (i.e. Ag, Commercial) | 0 | 0 |
| Exemptions   (DV - Disabled Vet; DP-Disabled Person; HS-Homestead; OV65-Over 65) | | |

| 2021 Exemption Amount | 2021 Taxable Value | Taxing Unit | 2022 Proposed Appraised Value | 2022 Exemption Amount | 2022 Taxable Value | 2021 Tax Rate | 2022 Estimated Taxes | FreezeYear and Tax Ceiling |
|---|---|---|---|---|---|---|---|---|
| 0 | 1,197,150 | BEXAR CO RD & FLOOD | 1,288,650 | 0 | 1,288,650 | 0.023668 | 305.00 | |
| 0 | 1,197,150 | SA RIVER AUTH | 1,288,650 | 0 | 1,288,650 | 0.018580 | 239.43 | |
| 0 | 1,197,150 | ALAMO COM COLLEGE | 1,288,650 | 0 | 1,288,650 | 0.149150 | 1,922.02 | |
| 0 | 1,197,150 | UNIV HEALTH SYSTEM | 1,288,650 | 0 | 1,288,650 | 0.276235 | 3,559.70 | |
| 0 | 1,197,150 | BEXAR COUNTY | 1,288,650 | 0 | 1,288,650 | 0.276331 | 3,560.94 | |
| 0 | 1,197,150 | CITY OF SAN ANTONIO | 1,288,650 | 0 | 1,288,650 | 0.558270 | 7,194.14 | |
| 0 | 1,197,150 | NORTHSIDE ISD | 1,288,650 | 0 | 1,288,650 | 1.261300 | 16,253.74 | |

**DO NOT PAY FROM THIS NOTICE**   Total Estimated Tax:  $33,034.97

**The governing body of each unit decides whether or not property taxes will increase.  The appraisal district only determines the value of your property. _The Texas Legislature does not set the amount of your local taxes.  Your property tax burden is decided by your locally elected officials, and all inquiries concerning your taxes should be directed to those officials._**

If you qualified your home for an age 65 and older or disabled person homestead exemption for school taxes, the school taxes on that home cannot increase as long as you own and live in that home. The tax ceiling is the amount that you pay in the year that you qualified for the 65 and older or disabled person exemption. The school taxes on your home may not go above the amount of the ceiling, unless you improve the home (other than normal repairs and maintenance).

Beginning August 7th, visit Texas.gov/PropertyTaxes to find a link to your local property tax database where you can easily access information regarding your property taxes, including information regarding the amount of taxes that each entity that taxes your property will impose if the entity adopts its proposed tax rate. Your local property tax database will be updated regularly during August and September as local elected officials propose and adopt the property tax rates that will determine how much you pay in property taxes. Property owners who file a notice of protest with the appraisal review board (ARB) may request an informal conference with the appraisal district to attempt to resolve disputes prior to a formal ARB hearing. In counties with populations of 1 million or more, property owners may request an ARB special panel for certain property protests. Contact your appraisal district for further information.

**If you currently receive a residence homestead exemption, the exemption amounts shown on this notice are those provided by law as of the date of this notice. If Texas voters approve the proposed constitutional amendment to increase the general residence homestead exemption for school taxes from $25,000 to $40,000, your exemption amount will automatically increase, and school districts will compute your taxes using the greater exemption amount.**

To file a protest, complete the notice of protest form following the instructions included in the form and no later than the deadline below, mail or deliver the form to the appraisal review board at the following address: Bexar Appraisal Review Board * PO Box 830248 * San Antonio, TX 78283-0248

**Deadline for filing a protest:**      **May 16, 2022**
**Location of Hearings:**      **411 N FRIO ST**
**ARB will begin hearings:**      **June 6, 2022**

Included are copies of the following documents published by the Texas Comptroller of Public Accounts: (1) Property Taxpayer Remedies; (2) Notice of Protest; and (3) Exemption Description List.
If you have any questions or need more information, please contact the appraisal district office at (210) 224-2432 or at the address shown above.
Sincerely,
Michael Amezquita, Chief Appraiser

## EXHIBIT G

**SALE PROCEDURES**

## SALE PROCEDURES

On December 9, 2021 (the "**Petition Date**"), deeproot Funds, LLC, one of eleven jointly administered debtors ("**Debtor**"), and the holder and payee of the Note (defined below), filed a voluntary petition under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

On December 21, 2021, J. Patrick Lowe, was appointed chapter 7 Trustee ("**Trustee**") for the estate of *In re deeproot Funds, LLC.*, Case No. 21-51521, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division, which case is being Jointly Administered under *In re deeproot Capital Management, LLC, et al.*, Case No. 21-51523, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division.

These Sale Procedures have been approved and authorized pursuant to the *Trustee's Motion to Approve (A) Sale Procedures, and (B) the Form of Notice for the Sale of Property of the Estate of deeproot Funds, LLC* (the "**Sale Motion**") and the *Order Approving Trustee's Motion to Approve (A) Sale Procedures, and (B) the Form of Notice for the Sale of Property of the Estate of deeproot Funds, LLC* (the "**Sale Procedures Order**"), entered by the United States Bankruptcy Court for the Western District of Texas, San Antonio Division.

### A. Assets to be Sold

Generally, the assets to be sold include the conveyance free and clear of all liens, claims, encumbrances, and interests in a certain promissory note, as described in the Sale Motion, a copy of the Note is attached hereto as Exhibit A (the "**Note**").

Any interested purchaser who notifies the Trustee of their desire to submit a bid for the purchase of the Note will, upon request to the Trustee, be provided copies of relevant financial information and due diligence materials (the "**Due Diligence**"), provided such interested purchaser first executes a confidentiality agreement in the form attached hereto as Exhibit B (the "**Confidentiality Agreement**").

### B. Submission of Initial Qualifying Bids by Potential Purchasers

Any party wishing to participate as a qualified bidder should submit (a) a bid for the Note ("**Bid**"), (b) a purchase agreement ("**Purchase Agreement**"), signed by an authorized representative of such bidder, (c) evidence of the bidder's financial ability to close the transaction, to J. Patrick Lowe, Trustee, 2402 E. Main, Uvalde, Texas 78801; email pat.lowe.law@gmail.com, and (d) an earnest money deposit in the amount of One Hundred Thousand and no/100 Dollars ($100,000.00) ("**Deposit**") with Trustee's counsel, Randall A. Pulman, at Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Phone No. (210) 222-9494, Fax No. (210) 892-1610; email rpulman@pulmanlaw.com by no later than five (5) days prior to the hearing on the Sale Motion (the "**Bid Deadline**").

Any such Bid submitted by the Bid Deadline shall be in the amount of at least One Million, Fifty Thousand and no/100 Dollars ($1,050,000.00) to be a qualified bid ("**Qualified Bid**") and to allow the bidder to become a Qualified Bidder ("**Qualified Bidder**"). The deposited funds will be

held by Pulman, Cappuccio & Pullen, LLP in its trust account until after the closing of the sale. The Deposits of all Qualified Bidders (except for the highest bidder (the "**Successful Bidder**")) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale

### D.  <u>The Selection of the Successful Bid</u>

In the event Trustee receives at least one Qualified Bid by the Bid Deadline, and such bid is better than CCW 's offer as may be determined solely by the Trustee in exercising his best business judgment and discretion, a public outcry auction shall be conducted at the hearing on the Sale Hearing.  Only CCW and any Qualified Bidder(s) shall be eligible to bid at the auction. At the conclusion of the auction, the Court shall select the Successful Bidder.

### E.  <u>Objections to Sale</u>

Any objection(s) filed to the sale of the Note (i) shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position; (ii) shall be filed with the Court no later than five (5) days prior to the hearing on the Sale Motion (the "**Objection Deadline**").  Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the sale of the Note, including the transferring of the Note free and clear of any and all liens, claims and other interests, and will be deemed to consent to the sale of the Note.

### F.  <u>Court Approval</u>

In the event that Trustee has not received a Qualifying Bid with a cash offer of at least $1,050,000.00 by the Bid Deadline, the Court shall hold a hearing to approve the sale of the Note to the Purchaser or its assignee, free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. § 363.

In the event Trustee receives at least one Qualified Bid, counsel for Trustee will file a notice with the Court and notify the Court's courtroom deputy that the sale hearing will be held seven (7) days following the filing of the Bid Notice, or as soon thereafter as may be scheduled by the Court (the "**Sale Hearing**"), where Trustee will seek approval of the sale of the Note to the Successful Bidder.

At the Sale Hearing, Trustee will seek entry of an order approving the sale of the Note to the Successful Bidder pursuant to 11 U.S.C. §363(f) and free and clear of all liens, claims, encumbrances, and interests.  The Sale Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court or by Trustee with the approval of the Successful Bidder and without further notice to creditors and parties in interest other than by announcement by Trustee of the adjourned date at the Sale Hearing.

Trustee's presentation to the Bankruptcy Court for approval of a Successful Bid does not constitute Trustee's acceptance of the Bid. Trustee will be deemed to have accepted a Bid only when the Bid has been approved by Order of the Bankruptcy Court.

### G. **Closing**

The closing of the sale of the Note to the Successful Bidder shall occur no later than seven (7) days following the Court filing an order approving the sale of the Note to the Successful Bidder (the "**Closing Deadline**"). The Closing Deadline may be modified upon an agreement between Trustee and the Successful Bidder; provided, however, that this requirement may be waived upon an agreement between Trustee and the Successful Bidder.

### H. **Failure to Consummate Purchase**

If any Successful Bidder fails to consummate the purchase of the Note, and such failure to consummate the purchase is the result of a breach by such Successful Bidder, an amount equal to twenty percent (25%) of the Deposit of such Successful Bidder shall be forfeited to the Estate.

### I. **Back-Up Bidders**

If any Successful Bidder fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, the Qualified Bidder that had submitted the next highest or otherwise best Qualified Bid (if any), (the "**Back-Up Bidder(s)**") will be deemed to be the Successful Bidder for the Note and Trustee will be authorized to consummate the sale of the Note to such Back-Up Bidder without further order of the Bankruptcy Court and such Qualified Bid shall thereupon be deemed the Successful Bid. If any Qualified Bidder fails to consummate the sale because of a breach or failure to perform on the part of such Qualified Bidder or for any reason within ten days after being deemed the Back-Up Bidder pursuant to this section of the Sale Procedures, the process described above may continue as determined by Trustee until a Qualified Bidder shall consummate the sale.

### J. **Return of Deposit**

The Deposits of all Qualified Bidders, who are not the Successful Bidder, will be returned, without interest, to each such Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the sale of the Note.

### K. **Reservation of Rights**

1.    Determination of Successful Bid. Trustee reserves the right to: (a) determine whether any bid is a Qualified Bid, and (b) reject, at any time prior to the entry of the Sale Order, any Bid that the Trustee in its discretion determines to be inadequate, insufficient, not in conformity with the Sales Procedures or the Bankruptcy Code, or contrary to the best interest of the Trustee and its Estate.

2.    Modification of Bidding Procedures. Trustee may modify the Sale Procedures, without the need for any further order of the Bankruptcy Court, including, without limitation (a) extending the deadlines set forth in these Sale Procedures, and (b) adjourning the Sale Hearing.

3.      Nothing contained in these Sale Procedures, or the court's order, shall limit, restrict, alter, modify, waive or otherwise impair Trustee's reasonable business judgment in relation to the sale process contemplated by these Sale Procedures.

## L.   **As Is, Where As Sale**

The sale of the Note shall be on an **"as is, where as"** basis and without representations or warranties of any kind, nature, or description by the Trustee, the Estate, or its agents and representatives. Except as otherwise expressly provided in these Sale Procedures, by submitting a Bid, each bidder shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Note prior to makings its bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any and all documents and/or the Note in making its bid, and (iii) did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Note, or the completeness of any information provided in connection therewith.

## M.   **Trustee's 's Counsel**

Any questions regarding these Sales Procedures should be addressed to Trustee's Counsel whose contact information is:

Randall A. Pulman
rpulman@pulmanlaw.com
W. Drew Mallender
dmallender@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

# <u>EXHIBIT H</u>

## CONFIDENTIALITY AGREEMENT

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (this "Agreement") is dated and effective as of _____, 2022 by and between _____ ("Receiving Party") and John Patrick Lowe, Chapter 7 Trustee, ("Trustee") of, and on behalf of, deeproot Capital Management, LLC and its affiliated entities (collectively the "Debtor").

WHEREAS, Receiving Party has requested that Trustee provide certain information in connection with Receiving Party's consideration of an evaluation of a note purchase offer (the "Note Purchase"), and Trustee desires to protect the confidentiality of the information that it provides and to have Receiving Party take or abstain from taking certain actions in accordance with the provisions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Definitions**.

(a) "Confidential Material" means any information (whether prepared by Trustee, CCW BRAUN HEIGHTS, LLC ("CCW") or their respective Representatives (as defined herein) or any other person, and regardless of the form of communication, including whether written, oral or otherwise) first provided, furnished, or made available on or after the date hereof to Receiving Party or any of its Representatives by or on behalf of Trustee or any of its Representatives, and all notes, analyses, compilations, studies, interpretations, memoranda, reports, projections, forecasts or other documents or materials (regardless of the form thereof) prepared by Receiving Party or any of its Representatives which contain or otherwise reproduce or reflect, in whole or in part, any such information; provided, that "Confidential Material" does not include information which:

(i) is or becomes generally available to the public other than as a result of an act or omission directly or indirectly by Receiving Party or any of its Representatives in violation of this Agreement or any other obligation of confidentiality (contractual, fiduciary, or otherwise) known by Receiving Party or any of its Representatives;

(ii) is already in Receiving Party's or any of its Representatives' possession and was not furnished by or on behalf of Trustee or his Representatives pursuant to this Agreement or any other person known by Receiving Party or any of its Representatives providing such information in violation of a confidentiality agreement or other obligation of confidentiality (contractual, fiduciary, or otherwise);

(iii) becomes available to Receiving Party or any of its Representatives on a non-confidential basis from a source other than Trustee or any of its Representatives, provided, that Receiving Party and its Representatives do not know such source to have made such information available on a non-confidential basis in violation of another confidentiality agreement or other obligation of confidentiality (contractual, fiduciary, or otherwise); or

(iv) is independently developed by Receiving Party or its Representatives without the use of, reference to or reliance upon any information furnished to Receiving Party or any of its Representatives by or on behalf of Trustee or any of its Representatives pursuant hereto and without any violation of this Agreement or any other obligation of confidentiality (contractual, fiduciary, or otherwise) known by Receiving Party or any of its Representatives.

{00582151;4}

(b)     "<u>Representatives</u>" means, with respect to a party, such party's directors, officers, employees, agents, and advisors (including without limitation attorneys, accountants, financial advisors, and investment bankers).  The Trustee and each of his Representatives is considered a Representative of the Debtor for purposes of this Agreement.

(c)     The term "<u>person</u>" means any corporation, partnership, joint venture, group, limited liability company, or other entity or individual; the term "<u>affiliate</u>" has the meaning set forth in Rule 12b-2 under the Securities Exchange Act of 1934, as amended (such Act, as amended, being referred to herein as the "<u>Exchange Act</u>"); and the term "<u>including</u>" and correlative terms shall be deemed to be followed by "without limitation".

2.     <u>**Use and Disclosure of Confidential Material**</u>.

(a)     Receiving Party agrees that it shall, and that it shall cause its Representatives to:

(i)     use the Confidential Material solely for the purpose of evaluating and negotiating a Note Purchase; and

(ii)     except as provided in Section 3 hereof, keep the Confidential Material confidential and not disclose any Confidential Material, directly or indirectly, to any other person. Notwithstanding the foregoing provisions of this Section 2(a), Receiving Party may: (A) disclose Confidential Material to Receiving Party's Representatives who need to know such information for the sole purpose of evaluating and negotiating a Note Purchase, <u>provided</u>, that Receiving Party's Representatives prior to any such disclosure are informed of the confidential nature of such Confidential Material and agree (i) to use such information solely for the purpose of evaluating and negotiating the Note Purchase and (ii) to maintain the confidentiality of such Confidential Material.

(b)     Receiving Party shall be directly responsible and liable to Trustee for any use or disclosure by any of Receiving Party's Representatives of any Confidential Material which, if done by Receiving Party itself, would be a breach of this Agreement, it being understood that such responsibility and liability shall be in addition to and not by way of limitation of any right or remedy Trustee may have against Receiving Party's Representatives with respect to such breach.  Receiving Party agrees, at its sole expense, to use reasonable best efforts to restrain its Representatives from making or allowing to be made prohibited or unauthorized uses or disclosures of Confidential Material under this Agreement.  Receiving Party shall immediately notify Trustee in the event of any breach of this Agreement by the Receiving Party or its Representatives.

(c)     All Confidential Material shall remain the property of Trustee.  No license or, except as provided in Section 2(a) hereof, right to use or other similar rights with respect to the Confidential Material is granted to Receiving Party or any of its Representatives, by implication or otherwise pursuant hereto.

3.     <u>**Legally Required Disclosure**</u>.

If Receiving Party or any of its Representatives is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any Confidential Material, Receiving Party shall, to the extent permitted by law, promptly provide Trustee with written notice of any such request or requirement (and the terms and conditions thereof).  If Trustee seeks a protective order or other remedy, Receiving Party shall, at the Receiving Party's expense, provide such cooperation as Trustee shall reasonably request.  If, in the absence of a protective order or other remedy or the receipt by Receiving Party of a waiver from Trustee, Receiving Party or any of its Representatives is nonetheless required to disclose Confidential Material to

any tribunal or other entity, then Receiving Party or such Representative may, without liability hereunder, disclose to such tribunal or other entity that portion (but only that portion) of the Confidential Material that is legally required to be disclosed, underlined provided, that Receiving Party and such Representative shall exercise reasonable best efforts to minimize the disclosure of Confidential Material and to preserve the confidentiality thereof, including by seeking, at the Receiving Party's expense, to obtain a protective order or other assurance that confidential treatment will be accorded to such Confidential Material. Notwithstanding any of the foregoing to the contrary, the Receiving Party shall cooperate with Trustee regarding any disclosures of Confidential Material that may be required in connection with the Case and disclosures made pursuant thereto shall not be a breach of any of the foregoing provided that they are made after such consultation and cooperation with Trustee in connection therewith.

4.    **Return of Confidential Material**.

At any time upon the written request of Trustee (in its sole discretion and for any or no reason), Receiving Party shall promptly (and in any event within five (5) business days after such request) return to Trustee (or, at Trustee's option, destroy) all Confidential Material (and all copies thereof) furnished to Receiving Party or its Representatives by or on behalf of Trustee or its Representatives, or prepared by Receiving Party or any of its Representatives, and shall not retain any copies, extracts or other reproductions (including Confidential Material stored in any computer or other electronic storage device) in whole or in part of such material.

Notwithstanding the return or destruction of Confidential Material, Receiving Party and its Representatives shall continue to be bound by their obligations hereunder.

**Term**.

This Agreement shall continue in force and effect until the second (2nd) anniversary of the date hereof. Notwithstanding any such expiration or termination of this Agreement, the Receiving Party's obligations hereunder with respect to trade secrets of CCW shall survive and remain in full force and effect indefinitely following such expiration or termination of this Agreement.

5.    **No Representations and Warranties; Relationship to Definitive Agreement**.

(a)    Receiving Party understands and agrees that neither Trustee nor any of its respective affiliates or Representatives, nor any other person on any of their behalves, has made or is making, and that each of the foregoing hereby disclaims, any representation or warranty, express or implied, as to the accuracy or completeness of any of the Confidential Material, and Receiving Party represents that neither it nor any of its affiliates or Representatives has relied, is relying, is entitled to rely on or will rely upon any such representation or warranty, in each case except as may be set forth in any definitive agreement with respect to a Note Purchase. Receiving Party agrees that neither Trustee nor Debtor any of its respective affiliates or Representatives, nor any other person on any of their behalves, shall have any liability to Receiving Party or any of its affiliates or Representatives or any other person relating to or resulting from any use of the Confidential Material or any errors therein or omissions therefrom, in each case except as may be set forth in any definitive agreement with respect to a Note Purchase. Without limiting the generality of the preceding two sentences, the Confidential Material may include statements, estimates and projections provided by CCW or its affiliates or Representatives with respect to the anticipated future performance of CCW. Such statements, estimates and projections reflect various assumptions made by CCW concerning anticipated results, which assumptions may or may not prove to be correct. Other than such statements, estimates and projections are provided in good faith on the basis of reasonable assumptions therefor, no representations are made as to the accuracy of such assumptions, statements, estimates or projections. Only those representations or warranties which are made in a definitive agreement, when, as and if executed, and subject to such limitations and restrictions as may be

{00582151;4}

3

specified therein, will have any legal effect.  For purposes of this Agreement, the term "definitive agreement" means a definitive written agreement executed by the parties hereto, but does not include any executed letter of intent, term sheet or any other preliminary written agreement, nor does it include any written or verbal acceptance of any offer or bid made by one party.

6. **Miscellaneous.**

(a)     This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to the conflicts of law principles thereof.  Each party irrevocably and unconditionally submits to the exclusive jurisdiction of the United States Bankruptcy Court for the Western District of Texas, San Antonio Division, over any suit, action or proceeding arising out of or relating to this Agreement.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO EACH HEREBY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, COUNTERCLAIM OR PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT.

(b)     Receiving Party recognizes and acknowledges the confidential nature of the Confidential Material, and that irreparable damage may result to CCW if information contained therein or derived therefrom is disclosed to any person except as herein provided or is used for any purpose other than the evaluation and negotiation of the Note Purchase.  Receiving Party further acknowledges and agrees that money damages will not be a sufficient remedy for any breach of this Agreement by Receiving Party or any of Receiving Party's Representatives, and that Trustee and/or CCW shall be entitled to seek equitable relief, including injunctive relief and specific performance, as a remedy for any such breach.  Receiving Party agrees to waive any requirement for the posting of any bond or other security in connection therewith.  Such remedies shall not be deemed to be the exclusive remedies for a breach of this Agreement by Receiving Party or any of Receiving Party's Representatives, but shall be in addition to all of the Debtor's other remedies available at law or in equity.

(c)     This Agreement may not be assigned in whole or in part by either party without the prior written consent of the other party, and any purported assignment without such consent shall be null and void.

(d)     This Agreement contains the entire agreement between the parties concerning the subject matter hereof.  No provision of this Agreement may be waived or amended except by the express written consent of the parties.  No failure or delay by the parties in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder.

(e)     For the convenience of the parties, this Agreement may be executed by facsimile or e-mail and in counterparts, each of which shall be deemed to be an original, and both of which taken together, shall constitute one agreement binding on both parties.

(f)     The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(g)     If any provision or portion of this Agreement is determined to be invalid or unenforceable for any reason, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by applicable law and such invalid or unenforceable provision or portion shall be replaced by a provision or term that is valid and enforceable and that comes closest to expressing the parties' intention with respect to such invalid or unenforceable provision or portion.

{00582151;4}

Executed as of the date first written above.

_____

**JOHN PATRICK LOWE, Trustee for the Chapter 7,
bankruptcy estate of deeproot Capital Management, LLC**

**RECEIVING PARTY:**

By: _____
Name: _____
Title: _____

## EXHIBIT I

## SALE NOTICE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT CAPITAL MANAGEMENT, | § | |
| LLC, ET AL.,[1] | § | BANKRUPTCY NO. 21-51523-MMP |
| | § | LEAD CASE |
| DEBTORS. | § | JOINTLY ADMINISTERED |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT FUNDS, LLC | § | BANKRUPTCY NO. 21-51521 |
| | § | |
| DEBTOR. | § | JOINTLY ADMINISTERED |

TRUSTEE'S NOTICE OF SALE OF THE PROPERTY OF THE ESTATE OF POLICY SERVICES, INC.

## PLEASE READ THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED AS SET FORTH HEREIN.

On December 9, 2021 (the "**Petition Date**"), the Debtors filed their respective voluntary petitions under Chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"). The Court approved joint administration of Debtors listed in the captioned footnote on December 20, 2021. On December 21, 2021, John Patrick Lowe was appointed Chapter 7 Trustee (the "Trustee") of the estates of the Jointly Administered Debtors.

On September ___, 2022, Trustee filed *Trustee's Motion to Approve (A) Sale of Property of the Estate of deeproot Funds, LLC, (B) Sale Procedures in Connection with the Sale of Property of the Estate of deeproot Funds, LLC, and (c) the Form of Notice for the Sale of Property of the Estate of deeproot Funds, LLC* (the "**Sale Procedures Motion**") seeking approval of certain procedures for the sale of and taking bids (the "**Sale Process**") on property of the Estate of deeproot Funds, LLC. Through this Sale Process, Trustee seeks the highest and best offer(s) for the sale (the

---

[1] The administratively consolidated chapter 7 cases, along with their respective case numbers and the last four digits of each Debtor's federal tax identification number, are: In Re: Policy Services, Inc. 21-51513 (2864), In Re: Wizard Mode Media, LLC, 21-51514 (3205), In Re: deeproot Pinball LLC, 21-51515 (0320), In Re: deeproot Growth Runs Deep Fund, LLC, 21-51516 (8046), In Re: deeproot 575 Fund, LLC, 21-51517 (9404), In Re: deeproot 3 Year Bonus Income Debenture Fund, LLC, 21-51518 (7731), In Re: deeproot Bonus Growth 5 Year Debenture Fund, LLC, 21-51519 (9661), In Re: deeproot Tech, LLC, 21-51520 (9043), In Re: deeproot Funds LLC, 21-51521 (9404), In Re: deeproot Studios LLC , 21-51522 (6283), and In Re: deeproot Capital Management, LLC, 21-51523 (2638), each an "**Estate**" and collectively, the "**Estates**".

"**Sale**") of a certain Promissory Note (the "**Note**") free and clear of any and all liens, claims, rights, interests, and encumbrances in accordance with Section 363(f) of the Bankruptcy Code, with such liens, claims, rights, interests, and encumbrances to attach to the sale proceeds. The Sale Process is subject to, and all offers must be in accordance with, the sale procedures approved by the Bankruptcy Court, which are attached hereto as **Exhibit A** (the "**Sale Procedures**").

On September ___, 2022, the Bankruptcy Court entered its Order Approving *Trustee's Motion to Approve (A) Sale of Property, and (B) the Form of Notice for the Sale of Property of the Estate of deeproot Funds, LLC* [Docket No. ___ (the "**Sales Procedures Order**") in which the Bankruptcy Court, among other things, (a) approved the Sales Procedures, (b) approved the form and manner of notice of the Sale Procedures, (c) set an Objection Deadline to the Sale, and (d) established the date for the sale hearing.

Any party wishing to participate as a qualified bidder should submit (a) a bid for the Note ("**Bid**"), (b) a purchase agreement ("**Purchase Agreement**"), signed by an authorized representative of such bidder, (c) evidence of the bidder's financial ability to close the transaction, to J. Patrick Lowe, Trustee, 2402 E. Main, Uvalde, Texas 78801; email pat.lowe.law@gmail.com, and (d) a deposit in the amount of One Hundred Thousand and no/100 Dollars ($100,000.00) ("**Deposit**") with Trustee's counsel, Randall A. Pulman, at Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Phone No. (210) 222-9494, Fax No. (210) 892-1610; email rpulman@pulmanlaw.com by no later than five (5) days prior to the day of the hearing on the Sale Procedures Motion (the "**Bid Deadline**"). Any such Bid submitted by the Bid Deadline shall be in the amount of at least One Million Fifty Thousand and no/100 Dollars ($1,050,000.00) to be a qualified bid ("**Qualified Bid**") and to allow the bidder to become a Qualified Bidder ("**Qualified Bidder**"). The deposited funds will be held by Pulman, Cappuccio & Pullen, LLP in its trust account until after the closing of the sale. The Deposit of all Qualified Bidders (except for the highest bidder (the "**Successful Bidder**")) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

In the event Trustee receives at least one Qualified Bid by the Bid Deadline and such bid is better than CCW 's offer as may be determined solely by the Trustee in exercising his best business judgment and discretion, a public outcry auction shall be conducted at the hearing on the Sale Hearing. Only CCW and any Qualified Bidder(s) shall be eligible to bid at the auction. At the conclusion of the auction, the Court shall select the Successful Bidder.

In the event Trustee receives at least one Qualified Bid, counsel for Trustee will file a notice with the Court and notify the Court's courtroom deputy that the sale hearing will be held seven (7) days following the filing of the Bid Notice, or as soon thereafter as may be scheduled by the Court (the "**Sale Hearing**"), where Trustee will seek approval of the sale of the Note to the Successful Bidder.

The Sale Hearing will be held at Hipolito F. Garcia Federal Building and United States Courthouse, Courtroom No. 3, Fifth Floor, 615 E. Houston St., San Antonio, Texas 78205.

Objections, if any, to the consummation of the Sale, shall be filed with the Bankruptcy Court by no later than five (5) days prior to the day of the hearing on the Sale Procedures Motion (the "**Objection Deadline**"). Any person failing to timely file an objection to the Sale prior to the deadlines set forth in the Sale Procedures Order shall be forever barred from objecting to the Sale, including the transferring of the Note free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: _____
    Randall A. Pulman
    Texas State Bar No. 16393250
    rpulman@pulmanlaw.com

**ATTORNEYS FOR JOHN PATRICK LOWE, CHAPTER 7 TRUSTEE**

# EXHIBIT A TO SALE NOTICE
## SALE PROCEDURES

## SALE PROCEDURES

On December 9, 2021 (the "**Petition Date**"), deeproot Funds, LLC, one of eleven jointly administered debtors ("**Debtor**"), and the holder and payee of the Note (defined below), filed a voluntary petition under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

On December 21, 2021, J. Patrick Lowe, was appointed chapter 7 Trustee ("**Trustee**") for the estate of *In re deeproot Funds, LLC.*, Case No. 21-51521, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division, which case is being Jointly Administered under *In re deeproot Capital Management, LLC, et al.*, Case No. 21-51523, in the United States Bankruptcy Court of the Western District of Texas, San Antonio, Division.

These Sale Procedures have been approved and authorized pursuant to the *Trustee's Motion to Approve (A) Sale Procedures, and (B) the Form of Notice for the Sale of Property of the Estate of deeproot Funds, LLC* (the "**Sale Motion**") and the *Order Approving Trustee's Motion to Approve (A) Sale Procedures, and (B) the Form of Notice for the Sale of Property of the Estate of deeproot Funds, LLC* (the "**Sale Procedures Order**"), entered by the United States Bankruptcy Court for the Western District of Texas, San Antonio Division.

### A. Assets to be Sold

Generally, the assets to be sold include the conveyance free and clear of all liens, claims, encumbrances, and interests in a certain promissory note, as described in the Sale Motion, a copy of the Note is attached hereto as Exhibit A (the "**Note**").

Any interested purchaser who notifies the Trustee of their desire to submit a bid for the purchase of the Note will, upon request to the Trustee, be provided copies of relevant financial information and due diligence materials (the "**Due Diligence**"), provided such interested purchaser first executes a confidentiality agreement in the form attached hereto as Exhibit B (the "**Confidentiality Agreement**").

### B. Submission of Initial Qualifying Bids by Potential Purchasers

Any party wishing to participate as a qualified bidder should submit (a) a bid for the Note ("**Bid**"), (b) a purchase agreement ("**Purchase Agreement**"), signed by an authorized representative of such bidder, (c) evidence of the bidder's financial ability to close the transaction, to J. Patrick Lowe, Trustee, 2402 E. Main, Uvalde, Texas 78801; email pat.lowe.law@gmail.com, and (d) an earnest money deposit in the amount of One Hundred Thousand and no/100 Dollars ($100,000.00) ("**Deposit**") with Trustee's counsel, Randall A. Pulman, at Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Phone No. (210) 222-9494, Fax No. (210) 892-1610; email rpulman@pulmanlaw.com by no later than five (5) days prior to the hearing on the Sale Motion (the "**Bid Deadline**").

Any such Bid submitted by the Bid Deadline shall be in the amount of at least One Million, Fifty Thousand and no/100 Dollars ($1,050,000.00) to be a qualified bid ("**Qualified Bid**") and to allow the bidder to become a Qualified Bidder ("**Qualified Bidder**"). The deposited funds will be held by Pulman, Cappuccio & Pullen, LLP in its trust account until after the closing of the sale. The

Deposits of all Qualified Bidders (except for the highest bidder (the "**Successful Bidder**")) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale

### D.  The Selection of the Successful Bid

In the event Trustee receives at least one Qualified Bid by the Bid Deadline, and such bid is better than CCW 's offer as may be determined solely by the Trustee in exercising his best business judgment and discretion, a public outcry auction shall be conducted at the hearing on the Sale Hearing.  Only CCW and any Qualified Bidder(s) shall be eligible to bid at the auction. At the conclusion of the auction, the Court shall select the Successful Bidder.

### E.  Objections to Sale

Any objection(s) filed to the sale of the Note (i) shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position; (ii) shall be filed with the Court no later than five (5) days prior to the hearing on the Sale Motion (the "**Objection Deadline**").  Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the sale of the Note, including the transferring of the Note free and clear of any and all liens, claims and other interests, and will be deemed to consent to the sale of the Note.

### F.  Court Approval

In the event that Trustee has not received a Qualifying Bid with a cash offer of at least $1,050,000.00 by the Bid Deadline, the Court shall hold a hearing to approve the sale of the Note to the Purchaser or its assignee, free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. § 363.

In the event Trustee receives at least one Qualified Bid, counsel for Trustee will file a notice with the Court and notify the Court's courtroom deputy that the sale hearing will be held seven (7) days following the filing of the Bid Notice, or as soon thereafter as may be scheduled by the Court (the "**Sale Hearing**"), where Trustee will seek approval of the sale of the Note to the Successful Bidder.

At the Sale Hearing, Trustee will seek entry of an order approving the sale of the Note to the Successful Bidder pursuant to 11 U.S.C. §363(f) and free and clear of all liens, claims, encumbrances, and interests.  The Sale Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court or by Trustee with the approval of the Successful Bidder and without further notice to creditors and parties in interest other than by announcement by Trustee of the adjourned date at the Sale Hearing.

Trustee's presentation to the Bankruptcy Court for approval of a Successful Bid does not constitute Trustee's acceptance of the Bid. Trustee will be deemed to have accepted a Bid only when the Bid has been approved by Order of the Bankruptcy Court.

### G. <u>Closing</u>

The closing of the sale of the Note to the Successful Bidder shall occur no later than seven (7) days following the Court filing an order approving the sale of the Note to the Successful Bidder (the "**Closing Deadline**"). The Closing Deadline may be modified upon an agreement between Trustee and the Successful Bidder; provided, however, that this requirement may be waived upon an agreement between Trustee and the Successful Bidder.

### H. <u>Failure to Consummate Purchase</u>

If any Successful Bidder fails to consummate the purchase of the Note, and such failure to consummate the purchase is the result of a breach by such Successful Bidder, an amount equal to twenty percent (25%) of the Deposit of such Successful Bidder shall be forfeited to the Estate.

### I. <u>Back-Up Bidders</u>

If any Successful Bidder fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, the Qualified Bidder that had submitted the next highest or otherwise best Qualified Bid (if any), (the "**Back-Up Bidder(s)**") will be deemed to be the Successful Bidder for the Note and Trustee will be authorized to consummate the sale of the Note to such Back-Up Bidder without further order of the Bankruptcy Court and such Qualified Bid shall thereupon be deemed the Successful Bid. If any Qualified Bidder fails to consummate the sale because of a breach or failure to perform on the part of such Qualified Bidder or for any reason within ten days after being deemed the Back-Up Bidder pursuant to this section of the Sale Procedures, the process described above may continue as determined by Trustee until a Qualified Bidder shall consummate the sale.

### J. <u>Return of Deposit</u>

The Deposits of all Qualified Bidders, who are not the Successful Bidder, will be returned, without interest, to each such Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the sale of the Note.

### K. <u>Reservation of Rights</u>

1.     <u>Determination of Successful Bid</u>. Trustee reserves the right to: (a) determine whether any bid is a Qualified Bid, and (b) reject, at any time prior to the entry of the Sale Order, any Bid that the Trustee in its discretion determines to be inadequate, insufficient, not in conformity with the Sales Procedures or the Bankruptcy Code, or contrary to the best interest of the Trustee and its Estate.

2.     <u>Modification of Bidding Procedures</u>. Trustee may modify the Sale Procedures, without the need for any further order of the Bankruptcy Court, including, without limitation (a) extending the deadlines set forth in these Sale Procedures, and (b) adjourning the Sale Hearing.

3.      Nothing contained in these Sale Procedures, or the court's order, shall limit, restrict, alter, modify, waive or otherwise impair Trustee's reasonable business judgment in relation to the sale process contemplated by these Sale Procedures.

## L.  As Is, Where As Sale

The sale of the Note shall be on an **"as is, where as"** basis and without representations or warranties of any kind, nature, or description by the Trustee, the Estate, or its agents and representatives. Except as otherwise expressly provided in these Sale Procedures, by submitting a Bid, each bidder shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Note prior to makings its bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any and all documents and/or the Note in making its bid, and (iii) did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Note, or the completeness of any information provided in connection therewith.

## M.  Trustee's 's Counsel

Any questions regarding these Sales Procedures should be addressed to Trustee's Counsel whose contact information is:

Randall A. Pulman
rpulman@pulmanlaw.com
W. Drew Mallender
dmallender@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

## **EXHIBIT J**

**SALE PROCEDURE ORDER**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT CAPITAL MANAGEMENT, | § | |
| LLC, ET AL.,[1] | § | BANKRUPTCY NO. 21-51523-MMP |
| | § | LEAD CASE |
| DEBTORS. | § | JOINTLY ADMINISTERED |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT FUNDS, LLC | § | BANKRUPTCY NO. 21-51521 |
| | § | |
| DEBTOR. | § | JOINTLY ADMINISTERED |

ORDER APPROVING TRUSTEE'S MOTION TO APPROVE
(A) SALE PROCEDURES, AND (B) THE FORM OF NOTICE FOR THE SALE OF PROPERTY
OF THE ESTATE OF DEEPROOT FUNDS, LLC

---

[1] The administratively consolidated chapter 7 cases, along with their respective case numbers and the last four digits of each Debtor's federal tax identification number, are: In Re: Policy Services, Inc. 21-51513 (2864), In Re: Wizard Mode Media, LLC, 21-51514 (3205), In Re: deeproot Pinball LLC, 21-51515 (0320), In Re: deeproot Growth Runs Deep Fund, LLC, 21-51516 (8046), In Re: deeproot 575 Fund, LLC, 21-51517 (9404), In Re: deeproot 3 Year Bonus Income Debenture Fund, LLC, 21-51518 (7731), In Re: deeproot Bonus Growth 5 Year Debenture Fund, LLC, 21-51519 (9661), In Re: deeproot Tech LLC, 21-51520 (9043), In Re: deeproot Funds LLC, 21-51521 (9404), In Re: deeproot Studios LLC , 21-51522 (6283), and In Re: deeproot Capital Management, LLC, 21-51523 (2638), each an "**Estate**" and collectively, the "**Estates**".

Came on for consideration the *Trustee's Motion to Approve (A) Sale Procedures, and (B) the Form of Notice for the Sale of Property of the Estate of deeproot Funds, LLC* (the "**Sale Procedures Motion**").[2] Based on the representations made in the Sale Procedures Motion, the Court finds that (i) it has jurisdiction over the matters raised in the Sale Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order on the Sale Procedures Motion; (iii) the relief requested in the Sale Procedures Motion seeking the establishment of Sale Procedures is in the best interests of the Estate and the creditors; (iv) proper and adequate notice of the Sale Procedures Motion has been given and no further notice is necessary; (v) all objections to the Sale Procedures Motion that were filed have been resolved or are hereby overruled; and (vi) based on the record herein, after due deliberation, good and sufficient cause exists for the granting of the Sale Procedures Motion in all respects, and pursuant to Bankruptcy Rule 7052, made applicable by Bankruptcy Rule 9014, the Court makes the additional **FINDINGS OF FACT AND CONCLUSIONS OF LAW.**

**THE COURT FINDS THAT:**

A.     Notice of the Sale Procedures Motion and related hearing on the matter was reasonable and sufficient and complied with all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules in light of the circumstances and nature of the relief requested therein, and no other or further notice is necessary. A reasonable and fair opportunity to object to the Sale Procedures Motion and all relief requested therein and granted in this Order has been afforded.

---

[2] Capitalized terms unless otherwise defined herein shall have the meaning as ascribed to them in the Sale Procedures Motion.

B.      The legal and factual basis set forth in the Sale Procedures Motion establish just cause for the relief granted herein. Granting the relief is in the best interests of the Estate and the creditors.

C.      Trustee has articulated good and sufficient reasons for this Court to grant the Sale Procedures Motion and to approve the Sale Notice, in substantially the same form as Exhibit 1 to this Order, and the Sale Procedures, in substantially the same form as Exhibit 2 to this Order.

D.      The Sale Procedures are reasonable and appropriate and designed to maximize the value of the property of the Estate.

**THEREFORE, IT IS ORDERED THAT:**

1.      The Sale Procedures Motion is approved and granted.

2.      Any objections to the Sale Procedures Motion that have not been withdrawn, waived or settled as announced to the Court at the hearing on the Sale Procedures Motion, are overruled in their entirety.

3.      The Sale Notice, attached to the Sale Procedures Motion as <u>Exhibit I</u>, is approved. Within three business days after the Court enters an Order approving this Sale Procedures Motion, Trustee shall serve the Sale Notice by (a) by first-class United States mail, postage-prepaid, or by email if an email address has been provided on (i) the Limited Notice Parties, as such term is defined in the Limited Notice Order [ECF No. 74}, and, (ii) any other parties who have expressed an interest in acquiring the Note; and (b) the Court's electronic-filing system on those parties receiving electronic notice by such system. Service of such Sale Notice is proper, due, timely, good, and sufficient notice of, among other things, the Sale Procedures, the proposed Sale, and the procedure for objecting thereto.

4.      The Sale Procedures, attached as <u>Exhibit 2</u> to this Order, which relate to the sale of the Note (the "**Sale**"), are approved.

5.      The Purchase Agreement, attached as <u>Exhibit 3</u> to this Order, is approved.

6.      The Purchase Agreement and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and the Purchaser will be deemed to be a Qualified Bidder.

7.      Any party wishing to participate as a qualified bidder should submit (a) a bid for the Note ("**Bid**"), (b) a purchase agreement ("**Purchase Agreement**"), signed by an authorized representative of such bidder, and (c) evidence of the bidder's financial ability to close the transaction, to J. Patrick Lowe, Trustee, an earnest money deposit in the amount of One Hundred Thousand and no/100 Dollars ($100,000.00) ("**Deposit**") with Trustee's counsel, Randall A. Pulman, at Pulman, Cappuccio & Pullen, LLP, by no later than five (5) days prior to the hearing on the Sale Motion (the "**Bid Deadline**").  Any such Bid submitted by the Bid Deadline shall be in the amount of at least One Million Fifty Thousand and no/100 Dollars ($1,050,000.00) to be a qualified bid ("**Qualified Bid**") and to allow the bidder to become a Qualified Bidder ("**Qualified Bidder**").  The deposited funds will be held by Pulman, Cappuccio & Pullen, LLP in its trust account until after the closing of the sale. The Earnest Money Deposit of all Qualified Bidders (except for the highest bidder (the "**Successful Bidder**")) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

8.      By no later than noon on the day immediately following the date of the Bid Deadline, Trustee will file a notice (the "**Bid Notice**") with the Court stating whether it has timely received a binding offer to purchase the Note in a cash amount of at least $1,050,000.00.

9.     The Court shall then hold a hearing, which hearing shall be held on the date that is seven (7) days following the filing of the Bid Notice, or as soon thereafter as may be scheduled by the Court (the "**Sale Hearing**"), to approve a sale of the Note.  In the event that Trustee files a notice stating that Trustee has not received a cash offer of at least $1,050,000.00, at the Sale Hearing the Trustee will seek approval the Sale of the Note to the Purchaser, or its assignee, free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. § 363, based on the Purchase Agreement.  In the event Trustee files a notice stating that Trustee has received at least one Qualified Bid, at the Sale Hearing, Trustee will seek approval of the Sale of the Note to the Successful Bidder, or its assignee, free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. § 363.

10.     In the event Trustee receives at least one Qualified Bid by the Bid Deadline, and such bid is better than CCW 's offer as may be determined solely by the Trustee in exercising his best business judgment and discretion, a public outcry auction shall be conducted at the Sale Hearing.  Only CCW and any Qualified Bidder(s) shall be eligible to bid at the auction.  At the conclusion of the auction, the Court shall select the Successful Bidder.

11.     The closing of the sale of the Note to the Successful Bidder shall occur no later than seven (7) days following the Court filing an order approving the sale of the Note to the Successful Bidder (the "**Closing Deadline**"). The Closing Deadline may be modified upon an agreement between Trustee and the Successful Bidder.

12.     If any Successful Bidder fails to consummate a Sale because of a breach or failure to perform on the part of such Successful Bidder, the Qualified Bidder that had submitted the next highest or otherwise best Qualified Bid (if any), as determined by the Trustee (the "**Back-Up Bidder(s)**"), will be deemed to be the Successful Bidder for the Note and Trustee will be

authorized to consummate the Sale of the Note to such Back-Up Bidder without further order of the Bankruptcy Court and such Qualified Bid shall thereupon be deemed the Successful Bid.

13.     If any Successful Bidder fails to consummate the purchase of the Note, and such failure to consummate the purchase is the result of a breach by such Successful Bidder, an amount equal to 25% of the Deposit of such Successful Bidder shall be forfeited to the estate.

14.     Any objection(s) filed to the sale of the Note (i) shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position and (ii) shall be filed with the Court no later than five (5) days prior to the hearing on the Sale Motion (the "**Objection Deadline**").  Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the Sale, including the transferring of the Note free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

15.     Trustee reserves the right to (i) determine in its discretion whether any Qualified Bid is a Successful Bid and (ii) reject, at any time prior to the entry of the Sale Order by the Bankruptcy Court, without liability, any Bid that Trustee in its discretion, determines to be inadequate, insufficient, not in conformity with the Sale Procedures or the Bankruptcy Code, or contrary to the best interests of the Estate.

16.     Trustee reserves the right to modify the Sale Procedures, without the need for any further order of the Bankruptcy Court, including, without limitation (a) extending the deadlines set forth in these Sale Procedures, and (b) requesting a continuance of the hearing on the Sale Motion.

17.     Nothing contained in the Sale Procedures or this Order shall limit, restrict, alter, modify, waive or otherwise impair Trustee's reasonable business judgment in relation to the sale process contemplated by the Sale Procedures.

18. Notwithstanding Bankruptcy Rule 6004, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. To the extent applicable, the stays described in Bankruptcy Rule 6004(h) are hereby waived.

19. The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

### # # #

**ORDER SUBMITTED BY:**

Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

**ATTORNEYS FOR CHAPTER 7 TRUSTEE**

## EXHIBIT K

### SALE ORDER

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT CAPITAL MANAGEMENT, | § | |
| LLC, ET AL., [1] | § | BANKRUPTCY NO. 21-51523-MMP |
| | § | LEAD CASE |
| DEBTORS. | § | JOINTLY ADMINISTERED |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT FUNDS, LLC, | § | BANKRUPTCY NO. 21-51521 |
| | § | |
| DEBTOR. | § | JOINTLY ADMINISTERED |

**ORDER APPROVING TRUSTEE'S MOTION TO APPROVE THE SALE**
**OF PROPERTY OF THE ESTATE OF DEEPROOT FUNDS, LLC, FREE AND CLEAR OF ALL**
**INTERESTS PURSUANT TO 11 U.S.C. §§ 363(B) AND (F)**

---

[1] The administratively consolidated chapter 7 cases, along with their respective case numbers and the last four digits of each Debtor's federal tax identification number, are: In Re: Policy Services, Inc. 21-51513 (2864), In Re: Wizard Mode Media, LLC, 21-51514 (3205), In Re: deeproot Pinball LLC, 21-51515 (0320), In Re: deeproot Growth Runs Deep Fund, LLC, 21-51516 (8046), In Re: deeproot 575 Fund, LLC, 21-51517 (9404), In Re: deeproot 3 Year Bonus Income Debenture Fund, LLC, 21-51518 (7731), In Re: deeproot Bonus Growth 5 Year Debenture Fund, LLC, 21-51519 (9661), In Re: deeproot Tech LLC, 21-51520 (9043), In Re: deeproot Funds LLC, 21-51521 (9404), In Re: deeproot Studios LLC, 21-51522 (6283), and In Re: deeproot Capital Management, LLC, 21-51523 (2638), each an "**Estate**" and collectively, the "**Estates**".

On September ___, 2022 the Court conduced a hearing on the Sale Motion of John Patrick Lowe, the Trustee ("**Trustee**") of the bankruptcy estate of *In re deeproot Funds, LLC*, Case No. 21-51521, ("**deeproot Funds**") which case is jointly administered under lead case *In re deeproot Capital Management, LLC* with other related entities at Case No. 21-51523, for an Order approving *Trustee's Motion to Approve (A) Sale of Property of the Estate of deeproot Funds, LLC, (B) Sale Procedures in Connection with the Sale of Property of the Estate of deeproot Funds, LLC, and (c) the Form of Notice for the Sale of Property of the Estate of deeproot Funds, LLC* (the "**Sale Motion**")[2] concerning property described as follows:

> Promissory Note dated November 20, 2018, in the original principal sum of $3,350,000 (the "**Note**"), executed by CCW Braun Heights, LLC ("**Purchaser**" and/or "**CCW**") and payable to the order of Debtor. Payment of the Note is secured by a lien on certain real property located at 10670 Bandera, San Antonio, Texas 78250 (the "**Property**") pursuant to a certain Subordinated Second Lien Deed of Trust of even date with the Note (the "**Deed of Trust**"), executed by Debtor, as lender, and by CCW, as grantor, and recorded in the official public records of Bexar County, Texas. A copy of the Note and a copy of the Deed of Trust are attached as **Exhibit A** and **Exhibit B**, to the Sale Motion.

The Note and the Deed of Trust are sometimes collectively referred to herein, as "**the Assets**". The sale and conveyance of the Assets for which approval is sought is occasionally referred to herein as "the Sale". The Court has reviewed the Sale Motion and has heard the evidence in support of the relief requested therein at a hearing before the Court on _____, 2022 (the "**Sale Hearing**"). The Court considered any objections to the Sale Motion, each of which are overruled, resolved, or withdrawn; and including the announcements and agreements stated on the record at the hearing, the Court has determined that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein. After due deliberation the Court finds that:

---

[2] Capitalized terms unless otherwise defined herein shall have the meaning as ascribed to them in the Sale Motion.

1.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over this bankruptcy case and the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 105(a).  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (M).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

2.      <u>Statutory Predicates</u>.  The statutory predicates for the relief sought in the Sale Motion are sections 105(a) and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") 2002, 6004, 9007 and 9014, and the applicable Local Rules for the United States Bankruptcy Court for the Western District of Texas (the "**Local Rules**").

3.      <u>Final Order</u>.  This order approving the Sale Motion (this "**Order**") constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and to any extent necessary under Bankruptcy Rules 9014, Rule 54(b) of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7054, and any other applicable rule or law, the Court expressly finds that there is no just reason for the delay in the implementation of this Order, waives any stay, and expressly directs entry of the order as set forth herein.  This Order shall be effective and enforceable immediately upon entry.

4.      <u>Notice</u>.  As evidenced by the certificates of service filed with this Court, based upon the record of the case and representations of counsel at the Sale Hearing:  (i) in accordance with inter alia, Bankruptcy Rule 2002, due proper, timely, adequate and sufficient notice of the Sale Motion and the transactions contemplated therein (the "**Sale**") has been provided; (ii) no other or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate under the circumstances of this bankruptcy case; and (iv) no other or further notice of the Sale Motion, the Sale Hearing or the Sale is or shall be required.  The disclosures made by

the Trustee concerning the Sale Motion, the Sale, and the Sale Hearing were reasonable, adequate, and complete.

5. _Opportunity to Object_. A reasonable opportunity to object and to be heard with respect to the proposed Sale, the Sale Motion and the relief requested therein has been given to all interested persons and entities, including, without limitation, the following: (i) all potential purchasers previously identified by the Trustee and any additional parties who have expressed an interest in potentially acquiring the Note, including those parties that have submitted formal expressions of interest; (ii) all other potentially interested parties identified by the Trustee in his business judgment as a potential purchaser of the Note; (iii) the Office of the United States Trustee; (iv) all applicable federal, state and local regulatory or taxing authorities; and (v) the debtors and all parties on the most current service list.

6. _Sale in the Best Interests of the Trustee, the Debtors' Estates and Creditors_. Good and sufficient reasons for approval of the Sale have been articulated, and the relief requested in the Sale Motion and granted herein is in the best interest of the Trustee, deeproot Funds, LLC., and the other debtors, their estates, their creditors, and other parties in interest.

7. _Business Justification_. The Trustee has demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Sale outside of the ordinary course of business under section 363(f) of the Bankruptcy Code. Given all the circumstances of this bankruptcy case and the adequacy and fair value of the purchase price, the proposed Sale constitutes a reasonable and sound exercise of the Trustee's business judgment and should be approved.

8. _Subscription Agreement_. The Subscription Agreement is an executory contract as it is a contract under which performance remained due by both Debtor and CCW as of the date

the order of relief was granted. The Trustee did not expressly accept or reject the Subscription Agreement within 60 days after the order of relief, and, therefore, the Subscription Agreement was deemed rejected by the Trustee, as provided by §365(d)(1) of the Bankruptcy Code. Because the Subscription Agreement was rejected, the Trustee shall sell the Note at the Sale free and clear of any encumbrance or obligation of the Subscription Agreement.

9.    <u>Free and Clear</u>.  deeproot Funds, LLC is the sole and lawful holder of the Note. The conveyance of the Note will be a legal, valid, and effective transfer of the Assets and vests or will vest CCW Braun Heights, LLC  with all right, title, and interest of the Debtors to the Assets free and clear of all interests to the fullest extent permitted under 11 U.S.C. §363(f) including without limitation all liens (as defined in section 101(37) of the Bankruptcy Code, whether consensual, statutory, possessory, judicial or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code and including without limitation successor liability claims), or other interests, of any kind or nature whatsoever, whether known or unknown, legal or equitable, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or after the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise, accruing, arising or relating thereto (collectively, the "<u>Interests</u>"[3]), at any time prior to the date of the Closing Date.

10.    <u>Satisfaction of 363(f) Standards</u>.  The Trustee may sell and transfer, and CCW Braun Heights, LLC, may purchase, the Note free and clear of any interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  The proposed sale of the Note will be free and clear

---

[3] The term "<u>Interests</u>" as used in this Order includes, without limitations:  all encumbrances; obligations; debts; liabilities; demands; guaranties; options; rights; restrictions; contractual commitments, including but not limited to, any license obligations; rights of first refusal or interests; any of the foregoing that purport to give to any party any defense, a defense or right of setoff, or recoupment against or a right or option to effect any forfeiture, modification or termination of the Debtors' interests in the Note, or any similar rights; any of the foregoing arising under any mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, the interest of any Debtor other than deeproot Funds, LLC or any other person or entity, whether asserted as to the totality of the Note, or any portion thereof, including any fractional interest in the Note.

of all liens, claims, Interests, and encumbrances including any liabilities that arose prior to the Closing Date, with all such liens, claims, Interests, encumbrances and liabilities to transfer and attach to the sale proceeds with the same validity, priority, force and effect (if any) that such liens, claims, interests, encumbrances and liabilities had on the Note immediately prior to the closing date.

11.     Back-up Bid.  In the event that the sale to CCW Braun Heights, LLC does not close, the Trustee is authorized and directed to proceed to closing of a sale to _____, or their assigns, at a cash sales price of $_____ without further Order of this Court.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:

1. Sale Motion is Granted.   The Sale Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein and on the record of the Sale Hearing, which is incorporated herein in its entirety, and the Sale as contemplated thereby is granted and approved. All findings of fact and conclusions of law of this Court stated on the record as part of the Court's ruling at the Sale Hearing are incorporated herein by reference and made a part hereof. The Trustee is authorized and directed to sell the Note to CCW Braun Heights, LLC for $1,000,000.

2. Objections Overruled.  Any objections to the entry of this Order or the relief granted herein or requested in the Sale Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3.    Subscription Agreement. The Subscription Agreement is an executory contract rejected by the Trustee pursuant to §365(d)(1) of the Bankruptcy Code; the Note shall be sold free and clear of any encumbrance or obligation of or created by the Subscription Agreement,

including, but not limited to, the obligation to reimburse CCW for the interest expense and other related costs incurred by CCW in connection with the Conrad Loan.

4. <u>Free and Clear</u>. Except as expressly provided for in this Order, pursuant to §§ 105(a) and 363(f) of the Bankruptcy Code, as of the Closing Date, the Trustee shall transfer, and CCW Braun Heights, LLC shall take title to and possession of, the Note and the Deed of Trust free and clear of all Interests, with all such Interests attaching to the proceed of sale, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Note.

5. <u>Valid Transfer</u>. As of the Closing Date, the transaction shall effect a legal, valid, enforceable and effective sale and transfer of the Note and the assignment of the Deed of Trust to CCW Braun Heights, LLC and shall vest CCW Braun Heights, LLC with valid legal title free and clear of any Interests of any kind whatsoever. The Note and the Deed of Trust are transferred to CCW Braun Heights, LLC "as is, where is" with all faults, and without recourse to the Trustee or the Debtor's Estate.

6. <u>Direction to Release Interests</u>. On the Closing Date, each of the Debtors, creditors or Interest holders is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Interests in Note, if any, as such Interests may have been recorded or may otherwise exist.

7. <u>Good Faith</u>. The transactions contemplated are undertaken by CCW Braun Heights, LLC, its affiliates, agents, and representatives, without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization is duly stayed pending such appeal prior to the closing.

CCW Braun Heights, LLC, which shall include its affiliates, agents and representative, is a good faith purchaser of the Assets, and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

8. <u>Retention of Jurisdiction</u>. The Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, (a) interpret, implement, and enforce the terms and provisions of this Order, any related order, the Purchase Agreement, and any other agreement executed in connection therewith; (b) resolve any disputes arising under or related to the Purchase Agreement; (b) protect CCW Braun Heights, LLC, or any of the Assets, against any Interests in the Assets of any kind or nature whatsoever; (c) adjudicate all issues concerning all Interests in and to the Assets, including the extent, validity, enforceability, priority and nature of all such Interests; and (d) adjudicate any and all issues or disputes related to the right, title and interest of the Debtors in the Assets or the proceeds thereof.

9. <u>Application of Sale Proceeds</u>. Any and all valid and perfected Interests in the Note shall attach to any proceeds in the order of priority, and with the same validity, force and effect (if any) that such liens, claims, Interests, encumbrances and liabilities had on the Note immediately prior to the Closing Date.

10. <u>Non-Material Modifications</u>. The Purchase Agreement and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Trustee or the Debtors' estates in the business judgment of the Trustee.

11.  <u>General Authorization</u>.  The Trustee is further authorized and directed to perform such tasks and execute, acknowledge and deliver such instruments or documents as may be necessary to evidence and/or consummate the sale of the Note pursuant to this Order.

12.  <u>Sale to the Back-up Bidder</u>.    In the event that the sale to CCW Braun Heights, LLC does not close, the Trustee is authorized and directed to proceed to closing of a sale to_____ or their assigns, at a cash sales price of _____ in accordance with the other terms of this Order.

13.  <u>Withdrawal of Proof of Claim</u>.  Provided CCW Braun Heights, LLC is the Successful Bidder and, provided the sale of the Note to CCW Braun Heights, LLC closes, within three (3) business days of closing, CCW Braun Heights, LLC shall file with the Court a Notice of Withdrawal pursuant to Rule 3006, withdrawing the Proof of Claim [ECF No. 86] filed by CCW Braun Heights, LLC in the Bankruptcy Case.

14.  <u>Order Controls</u>.  To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in this bankruptcy case, the terms of this Order shall govern.

15.  The Court herein incorporates all rulings made on the record as part of this Order.

###

<u>**Submitted by**</u>:

Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile
**ATTORNEY FOR JOHN PATRICK LOWE,**
**CHAPTER 7 TRUSTEE**