IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT CAPITAL MANAGEMENT, LLC ET AL.,[1] | § | BANKRUPTCY NO. 21-51523-MMP |
| | § | |
| DEBTORS | § | JOINTLY ADMINISTERED |
| | § | |
| | § | |
| JOHN PATRICK LOWE, | § | |
| CHAPTER 7 TRUSTEE | § | |
| FOR THE BANKRUPTCY ESTATE | § | |
| OF DEEPROOT CAPITAL | § | |
| MANAGEMENT, LLC ET AL., | § | ADV. PROC. NO. _____ |
| PLAINTIFF | § | |
| | § | |
| v. | § | |
| | § | |
| GM CONSULTANTS GROUP, INC, | § | |
| GREGORY CURTIS MINEAR, AND | § | |
| SHELLEY MINEAR, | § | |
| DEFENDANTS | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, John Patrick Lowe, Chapter 7 Trustee ("**Plaintiff**" or "**Trustee**") for the jointly

administered Bankruptcy Cases of deeproot Capital Management, LLC et al. ("**deeproot**")[2]

hereby files this Original Complaint, respectfully showing the Court as follows:

---

[1] The jointly administered chapter 7 cases, along with their respective case numbers and the last four digits of each Debtor's federal tax identification number, are:  *In Re: Policy Services, Inc.*, 21-51513 (2864), *In Re: Wizard Mode Media, LLC*, 21-51514 (3205), *In Re: deeproot Pinball LLC*, 21-51515 (0320), *In Re: deeproot Growth Runs Deep Fund, LLC*, 21-51516 (8046), *In Re: deeproot 575 Fund, LLC*, 21-51517 (9404), *In Re: deeproot 3 Year Bonus Income Debenture Fund, LLC*, 21-51518 (7731), *In Re: deeproot Bonus Growth 5 Year Debenture Fund, LLC*, 21-51519 (9661), *In Re: deeproot Tech LLC*, 21-51520 (9043), *In Re: deeproot Funds LLC*, 21-51521 (9404), *In Re: deeproot Studios LLC* , 21-51522 (6283), and *In Re: deeproot Capital Management, LLC*, 21-51523 (2638) (collectively, the "**Bankruptcy Cases**").

[2] Policy Services, Inc., Wizard Mode Media, LLC, deeproot Pinball LLC, deeproot Growth Runs Deep Fund, LLC, deeproot 575 Fund, LLC, deeproot 3 Year Bonus Income Debenture Fund, LLC, deeproot BonusGrowth 5 Year

## I.   PRELIMINARY STATEMENT

1.      From late 2012 to mid-2021, Robert J. Mueller ("**Mueller**"), the sole principal and manager of the Debtors, orchestrated a Ponzi scheme wherein he persuaded investors (typically retirees) to cash out annuities and individual retirement accounts and invest the funds in Mueller's various investment funds, including but not limited to the deeproot BonusGrowth 5 Year Debenture Fund, LLC (the "**5 Year Debenture Fund**"), the deeproot 575 Fund, LLC (the "**575 Fund**") and deeproot Growth Runs Deep Fund, LLC (the "**dGRD Fund**" and collectively the "**Subsidiary Funds**"). Beginning in 2012, the deeproot Entities offered and sold life settlements. However, after the Texas Supreme Court's 2015 decision holding that life settlements constituted securities under the Texas Securities Act,[3] the deeproot Entities began to offer and sell debenture bonds. Investors would be located through insurance agents, wealth advisors, and other financial professionals (the "**Finders**"). The vast majority of the Finders were not licensed to sell securities as broker-dealers or registered investment advisors. Monies invested in the Subsidiary Funds were eventually transferred to deeproot Funds, LLC before being paid out to investors in the form of interest payments, dividend payments, or withdrawals of principal. deeproot Funds, LLC was the parent of the Subsidiary Funds, and Policy Services, Inc. was the parent of deeproot Funds, LLC.

2.      On August 20, 2021, a few weeks prior to the filing of the Debtors' bankruptcy cases, the United States Securities and Exchange Commission ("**SEC**") initiated a civil action against Mueller and several of his entities for violations of federal securities laws.[4] As a result of that investigation, it became clear that Mueller not only funneled money to his other related

---

Debenture Fund, LLC, deeproot Tech LLC, deeproot Funds, LLC, deeproot Studios, LLC, and deeproot Capital Management, LLC are referred to herein as "**Debtors**" or "**deeproot Entities**."

[3] *Life Partners, Inc. v. Arnold*, 464 S.W.3d 660, 667 (Tex. 2015).

[4] *Securities and Exchange Commission v. Robert J. Mueller et al.*, Case No. 5:21-cv-00785-XR (W.D. Tex.).

entities from the investment funds and used investors' money to prop up his ultimately unsuccessful pinball business, but Mueller also used new investor money to pay moneys owed to earlier investors, making the deeproot Entities a Ponzi scheme. Because Mueller operated the deeproot Entities as a Ponzi scheme, neither the Trustee nor any other creditor had the ability to know of the fraudulent nature of the conveyances complained of herein until the investigations by the SEC and the Trustee. Almost all of the deeproot Entities' investors lost every dollar they invested.

3.     The books and records of the Debtors showed that the Finders contracted with deeproot Funds, LLC to find new investors for deeproot Funds, LLC, but received finders' fees and commissions payments from Policy Services, Inc. Policy Services, Inc. did not receive any value in exchange for the finder's fee and commission payments, because the alleged services provided by the Finders were for deeproot Funds, LLC, and Policy Services, Inc. was not a party to the agreements between deeproot Funds, LLC and the Finders. The commissions and fees received by Finders that were not registered as registered investment advisors or broker-dealers are contrary to securities laws.

## II.     PARTIES

4.     Plaintiff is the duly qualified and acting Chapter 7 Trustee of the Debtors' jointly administered Bankruptcy Cases. The Trustee brings this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001, 28 U.S.C. § 157, and all other applicable law.

5.     Defendant GM Consultants Group, Inc ("**GM Consultants**") is a Nevada corporation with its principal place of business in Las Vegas, Nevada. It may be served with process via United States First Class Mail to its corporate officer, Gregory Minear, at 4870

Lionesse Ct., Las Vegas, Nevada 89130, or wherever else he or anyone authorized to accept service may be found.

6.      Defendant Gregory Minear ("**G. Minear**") is an individual residing in Las Vegas, Nevada. He may be served with process via United States First Class Mail to 4870 Lionesse Ct., Las Vegas, Nevada 89130, or wherever else he may be found.

7.      Defendant Shelley Minear ("**S. Minear**," and, collectively with G. Minear, the "**Minears**") is an individual residing in Las Vegas, Nevada. She may be served with process via United States First Class Mail to 4870 Lionesse Ct., Las Vegas, Nevada 89130, or wherever else she may be found

### III.      JURISDICTION AND VENUE

8.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1331 and 1334 and Fed. R. Bankr. P. 7001. This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157. To the extent necessary, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

9.      To the extent the reference is withdrawn or the Bankruptcy Court is unable to enter a final judgment, Plaintiff requests the Bankruptcy Court be permitted and assigned to preside over all pre-trial matters, including the issuance of findings of fact and conclusions of law.

10.      Venue in this adversary proceeding is proper in this Court pursuant to 28 U.S.C. § 1409(a).

### IV.      FACTS

11.      Mueller served as the principal of all of the deeproot Entities and orchestrated a Ponzi scheme wherein he offered and sold securities to individuals for investment in pooled

investment funds. Mueller then used the invested money to fund his other business ventures, including his pinball machine business. He also used the money to fund his lavish lifestyle. Crucially, Mueller used later investors' money to pay fictional returns to earlier investors.

A.    **The deeproot Entities and the Ponzi Scheme**

12.    A Ponzi scheme is "a fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." BLACK'S LAW DICTIONARY, Ponzi scheme (11th ed. 2019). A Ponzi scheme operates by using money from new investors to pay earlier investors, typically "without any operation or revenue-producing activity other than the continual raising of new funds." *Id.* "[A] Ponzi scheme is, as a matter of law, insolvent from its inception." *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011).

13.    The deeproot Entities commenced operations in 2012. The first entity formed was Policy Services, Inc. deeproot Funds, LLC   is a direct subsidiary of Policy Services, Inc.  The Subsidiary Funds were formed as direct subsidiaries of deeproot Funds, LLC. A review of the deeproot Entities' QuickBooks files and other financial books and records revealed that all of the Finders that contracted to find investors for deeproot Funds, LLC, were paid commissions and fees from Policy Services, Inc.

14.    Policy Services, Inc. and its subsidiaries never received an initial equity investment, and the deeproot Entities were all insolvent as of inception in 2012 and continued to operate at a loss. The deeproot Entities gave the appearance of profitability, which Mueller used to entice new investors and obtain new money from investors. The deeproot Entities offered investments at higher-than-market levels of return—for example, deeproot BonusGrowth 5 Year Debenture Fund, LLC's five-year debenture bonds were offered for a 7% return in 2014, which

was nearly seven times more than the national rate for five-year debenture bonds at the time, according to data available from the Board of Governors of the Federal Reserve. *See* Exhibit A.

15.     There was no recorded capital investment on the balance sheet, and disbursements to Mueller and others were improperly recorded as assets rather than expenses, further boosting the appearance of profitability. After recharacterizing the disbursements as expenses, the equity for Policy Services, Inc. was $(1,490,187) for the year ending on December 31, 2013, and $(423,785) for the year ending on December 31, 2012. Policy Services and its subsidiaries had minimal revenue and had no net income as of at least December 31, 2012. Policy Services, Inc. continued to operate at a loss from the time of its inception and all of the deeproot Entities remained insolvent until filing for bankruptcy on December 9, 2021 ("**Petition Date**").

16.     Since there was no source of revenue, the deeproot Entities relied on newly invested money to fund operations and make payments to earlier investors. From 2013 until 2021, deeproot Funds, LLC used new investor money to pay interest and dividends to earlier investors. For example, during the final three years of the deeproot Entities' operation, the following payments were made: (1) in 2019, deeproot Funds, LLC received $18,300,190.00 from new investors and used $1,074,885.00 to pay previous investors; (2) in 2020, deeproot Funds, LLC received $7,093,055.00 from new investors and used $1,333,554.00 to pay previous investors; and (3) in 2021, deeproot Funds, LLC received $10,827,147.00 from new investors and used $918,391.00 to pay previous investors.

17.     Based upon the books and records of deeproot Funds, LLC, the entity only had $865 in income (beyond investor deposits) during the nine years of its existence. Policy Services, Inc. had only minimal revenue from the time of its inception in 2012.

18.     On December 9, 2021, the deeproot Entities each filed for relief under title 11 of the United States Code. The Bankruptcy Cases were ordered to be jointly administered under the lead case *In re: deeproot Capital Management, LLC*, 21-51523.

19.     On or about December 21, 2021, John Patrick Lowe was appointed as Chapter 7 Trustee of the Debtors' jointly administered Bankruptcy Cases.

## B.     **Finders**

20.     As the principal of the deeproot Entities, Mueller (through deeproot Funds, LLC) contracted with Finders all across the country to locate new investors and raise money for the deeproot Entities. A securities broker-dealer is defined as "any person engaged in the business of effecting transactions for the account of others." 15 U.S.C. § 78c.  Broker-dealers are required to register as such with the SEC. 15 U.S.C. § 78*o*. Prior to 2015, the deeproot Entities offered and sold life settlements. After the Texas Supreme Court's 2015 decision holding that life settlements are securities, the deeproot Entities offered securities in the form of debenture bonds.[5]

21.     The vast majority of the deeproot Entities' contracted Finders were unregistered as broker-dealers despite the fact that they engaged in transactions to facilitate the sale of securities, including debenture bonds and life settlements.[6] The Finders that were registered investment advisors or broker-dealers failed to conduct the requisite due diligence into the

---

[5] The deeproot Entities obtained Form D exemptions from the SEC to offer these securities.

[6] The so-called "finder exception" permits a person to "perform a narrow scope of activities without triggering the broker/dealer registration requirements," such as "[m]erely bringing together the parties to transactions, even those involving the purchase and sale of securities." *S.E.C. v. Kramer*, 778 F. Supp. 2d 1320, 1336 (M.D. Fla. 2011) (quoting *Apex Global Partners, Inc. v. Kaye/Bassman Intern. Corp.*, No. 3:09-cv-637-M, 2009 WL 2777869, at *3 (N.D. Tex. Aug. 31, 2009)). The most frequently cited factors as to whether someone is an unregistered broker-dealer or a finder (for which there is an exception to liability) are: "whether a person (1) works as an employee of the issuer, (2) receives a commission rather than a salary, (3) sells or earlier sold the securities of another issuer, (4) participates in negotiations between the issuer and investor, (5) provides either advice or a valuation as to the merit of an investment, and (6) actively (rather than passively) finds investors." *Id.* at 1334. "[T]ransaction-based compensation" is one of the hallmarks of being a broker-dealer. *Id.* (*citing Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, 2006 WL 2620985, at *6 (D. Neb. 2006).

financial condition of the deeproot Entities when making investment recommendations to clients. The deeproot Entities relied on these Finders to bring in a steady flow of money because there was no other source of revenue for the deeproot Entities other than newly invested money because the deeproot Entities continuously operated at a loss.

22.     Monies invested with one of the Subsidiary Funds were eventually transferred to deeproot Funds, LLC, which was the principal entity that handled payments to investors, before being transferred elsewhere. The Finders typically entered into contracts with deeproot Funds, LLC to be paid fees (the "**Finder Fees**") based off of the amount of money invested in one of the deeproot Entities by new investors. The Finder Fees were paid to Finders from Policy Services, Inc. regardless of where the new investor invested the monies. The outlandishly generous structure of the Finders Fees should have alerted the Defendant that the investment was not legitimate. Generally, Finders Fees were paid based on the below investment levels. The transaction-based Finders Fees are directly tied to the amount of the investment.

i.      The Fee for the575 Periodic election ('the575-P') shall be calculated as $7,000.00 (the575-P base rate) for each $100,000.00 of principal.

ii.     The Fee for all other Securities shall be calculated as $8,000.00 (base rate) for the first $100,000.00 of principal, and an additional $500.00 (to the previous incremental fee amount) enhancement for each additional $100,000.00 of principal invested.

iii.    Any principal that does not give rise to a consideration of a fee may be paid at a later time as *hanging surplus*, as provided in (c) below.

iv.     Example #1: if an Offeree invests $125,000.00, the Fee would be $7,000.00 for the575-P, or $8,000.00 for all other Securities; with a potential hanging surplus of $25,000.

v.      Example #2: if an Offeree invests $286,000.00, the Fee would be $14,000.00 for the575-P, or $16,500.00 [$8,000 + $8,500] for all other Securities; with a potential hanging surplus of $86,000.

vi.     Example #3: if an Offeree invests $499,999.99 the Fee would be $28,000.00 for the575-P, or $35,000.00 [$8,000 + $8,500 + $9,000 + $9,500] for all other Securities; with a potential hanging surplus of $99,999.99.

### a.  Finder Agreements with G. Minear and GM Consultants

23.     During the four years preceding Petition Date, GM Consultants received $328,617.04 from Policy Services, Inc. (the "**GM Consultants 544 Transfers**"). A true and

correct copy of Policy Services, Inc.'s QuickBooks records showing the GM Consultants 544 Transfers is attached hereto as Exhibit B.

24.     During the two years preceding Petition Date, GM Consultants received $68,117.40 from Policy Services, Inc. (the "**GM Consultants 548 Transfers**"). A true and correct copy of Policy Services, Inc.'s QuickBooks records showing the GM Consultants 548 Transfers is attached hereto as Exhibit C. The QuickBooks records also show that the GM Consultants 548 Transfers and the GM Consultants 544 Transfers, were booked as Finders Fees. Exhibits B and C.

25.     Based on the records available from the records of the Nevada Secretary of State, the Minears are the sole principals of GM Consultants. G. Minear is the President, Secretary, and Director of GM Consultants and S. Minear is the Treasurer. A true and correct copy of the Nevada Secretary of State record for GM Consultants is attached hereto as Exhibit D.

26.     Upon information and belief, the Minears, as the principals of GM Consultants, were the individuals for whose benefit the GM Consultants 544 Transfers and the GM Consultants 548 Transfers were made. Upon further information and belief, GM Consultants paid the Minears from the GM Consultants 544 Transfers and GM Consultants 548 Transfers.

27.     A review of the Debtors' books and records revealed that G. Minear executed numerous Finder Agreements with deeproot Funds, LLC. Specifically, he signed three (3) Standard Four Month Finder Agreements on behalf of GM Consultants; two (2) Standard Four Month Finder Agreements in his individual capacity; and two (2) Standard Six Month Finder Agreements in his individual capacity (collectively the "**Finder Agreements**"). Policy Services, Inc. was not a party to the Finder Agreements and had no involvement with the Subsidiary Funds.

28.     The Finder Agreements provided that deeproot Funds, LLC would pay Finders Fees to GM Consultants and G. Minear as compensation for locating new investors for the Subsidiary Funds. At all times, GM Consultants and G. Minear contracted to provide services for deeproot Funds, LLC, never for Policy Services, Inc. Policy Services, Inc. did not receive any value in exchange for the GM Consultants 544 Transfers or the GM Consultants 548 Transfers.

29.     G. Minear is not a registered broker-dealer or registered investment advisor. GM Consultants is not a registered investment firm. As an individual who is not a registered broker-dealer or registered investment advisor, G. Minear should have known he could not sell securities, such as the debentures offered by the deeproot Entities pursuant to Regulation D.

## V.     CAUSES OF ACTION

30.     The Trustee brings this adversary proceeding to recover these fraudulently transferred funds for the benefit of creditors of Policy Services, Inc.

31.     Paragraphs 1 through 29 are incorporated by reference into each of the causes of action that follow.

## Count 1 – Avoidance of Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) (GM Consultants) (Actual Fraud)

32.     Pursuant to 11 U.S.C. § 548(a)(1)(A), the Trustee files this complaint seeking to avoid fraudulent transfers of property of Policy Services, Inc. to GM Consultants during the two years prior to Petition Date, and for damages against the fraudulent transferees of Policy Services, Inc. during the applicable time period.

33.     The GM Consultants 548 Transfers in the amount of $68,117.04 were made within the two years prior to Petition Date. Exhibit C. The GM Consultants 548 Transfers constitute a transfer of Policy Services, Inc.'s interest in property.

34.     The GM Consultants 548 Transfers were made with an actual intent to hinder, delay or defraud the creditors of Debtor Policy Services, Inc., as evidenced by the existence of a Ponzi scheme wherein interest and dividend payments were made to earlier investors from new investor money.

35.     Additionally, and in the alternative, Debtor Policy Services, Inc. was insolvent at the time of its creation and at the time of each of the GM Consultants 548 Transfers or became insolvent as a result of the GM Consultants 548 Transfers, in that (a) the sum of Policy Services, Inc.'s debts were greater than all of Policy Services, Inc.'s assets at a fair valuation; (b) Policy Services, Inc. was engaging in or about to engage in a business or transaction for which Policy Services, Inc.'s remaining assets were unreasonably small in relation to the business or transaction; or (c) Policy Services, Inc. was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

36.     There was no capital infusion at the time Policy Services, Inc. was created.

37.     The GM Consultants 548 Transfers constituted fraudulent transfers under 11 U.S.C. §548(a)(1)(A), such that the Trustee is entitled to a judgment in the amount of $68,117.04 on behalf of Debtor Policy Services, Inc. to recover the GM Consultants 548 Transfers from GM Consultants.

## Count 2 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B) (GM Consultants) (Constructive Fraud)

38.     Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee files this complaint seeking to avoid fraudulent transfers of property of Policy Services, Inc. to GM Consultants during the two years prior to the Petition Date, and for damages against the fraudulent transferees of Policy Services, Inc. during the applicable time period.

39.     The GM Consultants 548 Transfers in the amount of $68,117.04 occurred within two years prior to Petition Date. Exhibit C. The GM Consultants 548 Transfers constitute a transfer of Policy Services, Inc.'s interest in property.

40.     The GM Consultants 548 Transfers were not made in exchange for reasonably equivalent value for Policy Services, Inc., a non-party to the Finder Agreements, because (1) GM Consultants entered into the Finder Agreements with deeproot Funds, LLC, and (2) GM Consultants and its agents acted as Finders for deeproot Funds and provided the contracted services to deeproot Funds, LLC.

41.     Policy Services, Inc. was insolvent at the time of its creation and at the time of each of the GM Consultants 548 Transfers or became insolvent as a result of the GM Consultants 548 Transfers, in that (a) the sum of Policy Services, Inc.'s debts were greater than all of Policy Services, Inc.'s assets at a fair valuation; (b) Policy Services, Inc. was engaging in or about to engage in a business or transaction for which Policy Services, Inc.'s remaining assets were unreasonably small in relation to the business or transaction; or (c) Policy Services, Inc. was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

42.     There was no capital infusion at the time Policy Services, Inc. was created.

43.     The GM Consultants 548 Transfers constituted fraudulent transfers under 11 U.S.C. §548(a)(1)(B), such that the Trustee is entitled to a judgment in the amount of $68,117.04 on behalf of Debtor Policy Services, Inc. to recover the GM Consultants 548 Transfers from GM Consultants.

**Count 3 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(1)) (GM Consultants) (TUFTA Actual Fraud)**

44.     Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(1), the Trustee files this complaint seeking to avoid fraudulent transfers of property of Policy Services, Inc. to GM Consultants during the applicable time period, and for damages against the fraudulent transferees of Policy Services, Inc. during the applicable time period.

45.     The GM Consultants 544 Transfers in the amount of $328,617.04 occurred within four years prior to Petition Date. Exhibit B. The GM Consultants 544 Transfers constitute transfers of Debtor Policy Services, Inc.'s interest in property.

46.     The GM Consultants 544 Transfers were made with an actual intent to hinder, delay or defraud Debtor Policy Services, Inc.'s creditors. The deeproot Entities were operated as a Ponzi scheme in which interest and dividend payments to earlier investors were paid using new investor money, thus paying fictitious profits for earlier investors.

47.     Additionally, and in the alternative, Debtor Policy Services, Inc. was insolvent at the time of its creation and at the time of each of the GM Consultants 544 Transfers or became insolvent as a result of the GM Consultants 544 Transfers, in that (a) the sum of Policy Services, Inc.'s debts were greater than all of Policy Services, Inc.'s assets at a fair valuation; (b) Policy Services, Inc. was engaging in or about to engage in a business or transaction for which Policy Services, Inc.'s remaining assets were unreasonably small in relation to the business or transaction; or (c) Policy Services, Inc. was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

48.     There was no capital infusion at the time Policy Services, Inc. was created.

49.     Policy Services, Inc. had at least one outstanding creditor at the time of each of the GM Consultants 544 Transfers, or such creditor's claim arose within a reasonable time after

the GM Consultants 544 Transfers. Proof of Claim No. 145-1 of the Policy Services, Inc. Claims Register filed by creditor Jill Ellis reflects an allowable claim dating back to March 25, 2013, evidenced by a life settlement certificate purchased on the same date. Proof of Claim No. 145-1 remains unpaid.

50.     The GM Consultants 544 Transfers constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(1), such that the Trustee is entitled to a judgment in the amount of $328,617.04 to recover the GM Consultants 544 Transfers from GM Consultants.

**Count 4 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(2)) (GM Consultants) (TUFTA Constructive Fraud)**

51.     Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(2), the Trustee files this complaint seeking to avoid fraudulent transfers of property of Policy Services, Inc. to GM Consultants during the applicable time period, and for damages against the fraudulent transferees of Policy Services, Inc. during the applicable time period.

52.     The GM Consultants 544 Transfers in the amount of $328,617.04 took place within the four years preceding Petition Date. Exhibit B. The GM Consultants 544 Transfers constitute transfers of Debtor Policy Services, Inc.'s interest in property.

53.     The GM Consultants 544 Transfers were not made in exchange for reasonably equivalent value for Policy Services, Inc., a non-party to the Finder Agreements, because (1) GM Consultants entered into the Finder Agreements with deeproot Funds, LLC, and (2) GM Consultants and its agents acted as Finders for deeproot Funds and provided the contracted services to deeproot Funds, LLC.

54.     Debtor Policy Services, Inc. was insolvent at the time of its creation and at the time of each of the GM Consultants 544 Transfers or became insolvent as a result of the GM

Consultants 544 Transfers, in that (a) the sum of Policy Services, Inc.'s debts were greater than all of Policy Services, Inc.'s assets at a fair valuation; (b) Policy Services, Inc. was engaging in or about to engage in a business or transaction for which Policy Services, Inc.'s remaining assets were unreasonably small in relation to the business or transaction; or (c) Policy Services, Inc. was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

55.     There was no capital infusion at the time Policy Services, Inc. was created.

56.     Policy Services, Inc. had at least one outstanding creditor at the time of each of the GM Consultants 544 Transfers, or such creditor's claim arose within a reasonable time after the GM Consultants 544 Transfers. Proof of Claim No. 145-1 of the Policy Services, Inc. Claims Register filed by creditor Jill Ellis reflects an allowable claim dating back to March 25, 2013, evidenced by a life settlement certificate purchased on the same date. Proof of Claim No. 145-1 remains unpaid.

57.     The GM Consultants 544 Transfers constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(1), such that the Trustee is entitled to a judgment in the amount of $328,617.04 to recover the GM Consultants 544 Transfers from GM Consultants.

**Count 5 – Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.009(b)) (All Defendants)**

58.     GM Consultants was the initial transferee of the GM Consultants 548 Transfers and the GM Consultants 544 Transfers. As the corporate officers of GM Consultants, the Minears were the entities for whose benefit the GM Consultants 548 Transfers and the GM Consultants 544 Transfers were made.

59.     The Trustee is entitled to recover from GM Consultants, the Minears, or any other immediate or mediate transferee of GM Consultants, the GM Consultants 548 Transfer and the GM Consultants 544 Transfers, or the value of the GM Consultants 548 Transfers and the GM Consultants 544 Transfers, along with prejudgment and post-judgment interest, pursuant to section 550 of the Bankruptcy Code and section 24.009(b) of the Texas Business and Commerce Code.

**Count 6 – Recovery of Attorneys' Fees and Costs**

60.     The Trustee has been forced to incur attorneys' fees and costs in connection with the filing and prosecution of this Complaint.

61.     Pursuant to 11 U.S.C. § 544 and section 24.013 of the Texas Business and Commerce Code, the Court may award costs and reasonable attorneys' fees in connection with a proceeding brought under the Texas Uniform Fraudulent Transfer Act. The Trustee hereby requests that any judgment include an award of the costs and attorneys' fees incurred by the Trustee in connection with prosecuting this Complaint.

62.     Prior to filing suit, the Trustee has made demand on the Defendants. The demand has not been met. All conditions precedent to filing suit have been satisfied.

63.     Furthermore, the Trustee requests an award for such attorneys' fees and costs incurred in the filing and prosecution of this Complaint to the extent allowed under the Bankruptcy Code and Texas law. *See* 11 U.S.C. §§ 105(a) & 550(a).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## VI.    PRAYER

WHEREFORE, JOHN PATRICK LOWE, Chapter 7 Trustee for the jointly administered Bankruptcy case of deeproot Capital Management, LLC, prays for judgment in favor of the Chapter 7 Trustee against Defendants GM Consultants Group, Inc., Gregory Curtis Minear, and Shelley Minear on all claims and relief sought herein, including but not limited to:

a.    Avoiding the GM Consultants 548 Transfers and the GM Consultants 544 Transfers as fraudulent transfers under sections 544 and 548 of the Bankruptcy Code and Chapter 24 of the Texas Business & Commerce Code;

b.    Damages against Defendants, jointly and severally, in the amount of $328,617.04;

c.    Permitting recovery of the GM Consultants 548 Transfers and the GM Consultants 544 Transfers, or the value of the GM Consultants 548 Transfers and the GM Consultants 544 Transfers, together with prejudgment and post-judgment interest;

d.    Permitting recovery of all costs and attorneys' fees incurred obtaining the relief sought; and

e.    Such other and further relief, at law or in equity, as the Court deems to be just, proper, and equitable.

Dated: January 31, 2023          Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By:    */s/ Randall A Pulman*
Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Anna K. MacFarlane
Texas State Bar No. 24116701
amacfarlane@pulmanlaw.com

**ATTORNEYS FOR JOHN PATRICK LOWE, CHAPTER 7 TRUSTEE FOR DEEPROOT CAPITAL MANAGEMENT, LLC ET AL.**

# EXHIBIT A

FRED

— Market Yield on U.S. Treasury Securities at 5-Year Constant Maturity, Quoted on an Investment Basis

Source: Board of Governors of the Federal Reserve System (US)

fred.stlouisfed.org

# EXHIBIT B

Policy Services, Inc.
Transactions by Account
All Transactions

| | | Type | Date | Name | Split | Amount |
|---|---|---|---|---|---|---|
| Policy Services | **Finders Fee** | Check | 08/07/2019 | GM Consultants Group, Inc | Corporate Checking 8461 | 78,750.00 |
| Policy Services | **Finders Fee** | Check | 08/15/2019 | GM Consultants Group, Inc | Corporate Checking 8461 | 50,000.00 |
| Policy Services | **Finders Fee** | Check | 09/03/2019 | GM Consultants Group, Inc | Corporate Checking 8461 | 12,000.00 |
| Policy Services | **Finders Fee** | Check | 09/03/2019 | GM Consultants Group, Inc | Corporate Checking 8461 | 8,000.00 |
| Policy Services | **Finders Fee** | Check | 09/03/2019 | GM Consultants Group, Inc | Corporate Checking 8461 | 39,750.00 |
| Policy Services | **Finders Fee** | Check | 09/09/2019 | GM Consultants Group, Inc | Corporate Checking 8461 | 12,000.00 |
| Policy Services | **Finders Fee** | Check | 09/23/2019 | GM Consultants Group, Inc | Corporate Checking 8461 | 21,000.00 |
| Policy Services | **Finders Fee** | Check | 10/10/2019 | GM Consultants Group, Inc | Corporate Checking 8461 | 15,000.00 |
| Policy Services | **Finders Fee** | Check | 10/10/2019 | GM Consultants Group, Inc | Corporate Checking 8461 | 24,000.00 |
| Policy Services | **Finders Fee** | Check | 02/14/2020 | GM Consultants Group, Inc | Corporate Checking 8461 | 14,000.00 |
| Policy Services | **Finders Fee** | Check | 02/14/2020 | GM Consultants Group, Inc | Corporate Checking 8461 | 3,600.00 |
| Policy Services | **Finders Fee** | Check | 04/08/2020 | GM Consultants Group, Inc | Corporate Checking 8461 | 8,000.00 |
| Policy Services | **Finders Fee** | Check | 04/29/2020 | GM Consultants Group, Inc | Corporate Checking 8461 | 16,750.00 |
| Policy Services | **Finders Fee** | Check | 04/29/2020 | GM Consultants Group, Inc | Corporate Checking 8461 | 8,000.00 |
| Policy Services | **Finders Fee** | Check | 06/18/2020 | GM Consultants Group, Inc | Corporate Checking 8461 | 8,750.00 |
| Policy Services | **Finders Fee** | Check | 10/07/2020 | GM Consultants Group, Inc | Corporate Checking 8461 | 9,017.04 |
| | | | | **GM Consultants 544 Transfers** | | **328,617.04** |

# EXHIBIT C

**Policy Services, Inc.**
**Transactions by Account**
**All Transactions**

| | | Type | Date | Name | | Split | Amount |
|---|---|---|---|---|---|---|---|
| Policy Services | Finders Fee | Check | 02/14/2020 | GM Consultants Group, Inc | | Corporate Checking 8461 | 14,000.00 |
| Policy Services | Finders Fee | Check | 02/14/2020 | GM Consultants Group, Inc | | Corporate Checking 8461 | 3,600.00 |
| Policy Services | Finders Fee | Check | 04/08/2020 | GM Consultants Group, Inc | | Corporate Checking 8461 | 8,000.00 |
| Policy Services | Finders Fee | Check | 04/29/2020 | GM Consultants Group, Inc | | Corporate Checking 8461 | 16,750.00 |
| Policy Services | Finders Fee | Check | 04/29/2020 | GM Consultants Group, Inc | | Corporate Checking 8461 | 8,000.00 |
| Policy Services | Finders Fee | Check | 06/18/2020 | GM Consultants Group, Inc | | Corporate Checking 8461 | 8,750.00 |
| Policy Services | Finders Fee | Check | 10/07/2020 | GM Consultants Group, Inc | | Corporate Checking 8461 | 9,017.04 |
| | | | | **GM Consultants 548 Transfers** | | | **68,117.04** |

# EXHIBIT D



BUSINESSINFORMATION 

## ENTITY INFORMATION

### ENTITY INFORMATION

| | | | |
|---|---|---|---|
| **Entity Name:** | GM CONSULTANTS GROUP INC. | **Entity Number:** | E0015222012-1 |
| **Entity Type:** | Domestic Corporation (78) | **Entity Status:** | Active |
| **Formation Date:** | 01/10/2012 | **NV Business ID:** | NV20121019576 |
| **Termination Date:** | Perpetual | **Annual Report Due Date:** | 1/31/2023 |

### REGISTERED AGENT INFORMATION

| | | | |
|---|---|---|---|
| **Name of Individual or Legal Entity:** | GREG MINEAR | **Status:** | Active |
| **CRA Agent Entity Type:** | | **Registered Agent Type:** | Non-Commercial Registered Agent |
| **NV Business ID:** | | **Office or Position:** | |
| **Jurisdiction:** | | | |
| **Street Address:** | 7815 RED COACH AVE, LAS VEGAS, NV, 89129, USA | | |
| **Mailing Address:** | | | |

**Individual with Authority to Act:**

**Fictitious Website or Domain Name:**

## OFFICER INFORMATION

**VIEW HISTORICAL DATA**

| Title | Name | Address | Last Updated | Status |
|-------|------|---------|--------------|--------|
| President | GREGORY MINEAR | 4870 LIONESSE COURT, LAS VEGAS, NV, 89130, USA | 01/24/2022 | Active |
| Secretary | GREGORY MINEAR | 4870 LIONESSE COURT, LAS VEGAS, NV, 89130, USA | 01/24/2022 | Active |
| Treasurer | SHELLEY MINEAR | 4870 LIONESSE COURT, Las Vegas, NV, 89130, USA | 01/24/2022 | Active |
| Director | GREGORY MINEAR | 4870 LIONESSE COURT, LAS VEGAS, NV, 89130, USA | 01/24/2022 | Active |
| President | GREGORY MINEAR | 4870 LIONESSE COURT, Las Vegas, NV, 89130, USA | 01/06/2020 | Active |

< Previous | ... | **1** | 2 | 3 | ... | Next > | Page 1 of 3, records 1 to 5 of 11 | Go to Page

## CURRENT SHARES

| Class/Series | Type | Share Number | Value |
|--------------|------|--------------|-------|
| No records to view. | | | |

Number of No Par Value Shares: **75000**

Total Authorized Capital: **75,000**