IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT CAPITAL MANAGEMENT, | § | BANKRUPTCY NO. 21-51523-MMP |
| LLC ET AL.,[1] | § | |
| | § | |
| DEBTORS | § | JOINTLY ADMINISTERED |
| | § | |
| | § | |
| JOHN PATRICK LOWE, | § | |
| CHAPTER 7 TRUSTEE | § | |
| FOR THE BANKRUPTCY ESTATE | § | |
| OF DEEPROOT CAPITAL | § | |
| MANAGEMENT, LLC ET AL., | § | ADV. PROC. NO. _____ |
| PLAINTIFF | § | |
| | § | |
| v. | § | |
| | § | |
| FIDELITY MUTUAL FINANCIAL | § | |
| PLANNING, LLC, AND DARRYL JAY STEIN, | § | |
| DEFENDANTS | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, John Patrick Lowe, Chapter 7 Trustee ("**Plaintiff**" or "**Trustee**") for the jointly

administered Bankruptcy Cases of deeproot Capital Management, LLC et al. ("**deeproot**")[2] hereby

files this Original Complaint, respectfully showing the Court as follows:

---

[1] The jointly administered chapter 7 cases, along with their respective case numbers and the last four digits of each Debtor's federal tax identification number, are:  *In Re: Policy Services, Inc.*, 21-51513 (2864), *In Re: Wizard Mode Media, LLC*, 21-51514 (3205), *In Re: deeproot Pinball LLC*, 21-51515 (0320), *In Re: deeproot Growth Runs Deep Fund, LLC*, 21-51516 (8046), *In Re: deeproot 575 Fund, LLC*, 21-51517 (9404), *In Re: deeproot 3 Year Bonus Income Debenture Fund, LLC*, 21-51518 (7731), *In Re: deeproot Bonus Growth 5 Year Debenture Fund, LLC*, 21-51519 (9661), *In Re: deeproot Tech LLC*, 21-51520 (9043), *In Re: deeproot Funds LLC*, 21-51521 (9404), *In Re: deeproot Studios LLC* , 21-51522 (6283), and *In Re: deeproot Capital Management, LLC*, 21-51523 (2638) (collectively, the "**Bankruptcy Cases**").

[2] Policy Services, Inc., Wizard Mode Media, LLC, deeproot Pinball LLC, deeproot Growth Runs Deep Fund, LLC, deeproot 575 Fund, LLC, deeproot 3 Year Bonus Income Debenture Fund, LLC, deeproot BonusGrowth 5 Year Debenture Fund, LLC, deeproot Tech LLC, deeproot Funds LLC, deeproot Studios, LLC, and deeproot Capital Management, LLC are referred to herein as "**Debtors**" or "**deeproot Entities**."

1

## I.    PRELIMINARY STATEMENT

1.    From late 2012 to mid-2021, Robert J. Mueller ("**Mueller**"), the sole principal and manager of the Debtors, orchestrated a Ponzi scheme wherein he persuaded investors (typically retirees) to cash out annuities and individual retirement accounts and invest the funds in Mueller's various investment funds, including but not limited to the deeproot BonusGrowth 5 Year Debenture Fund, LLC (the "**5 Year Debenture Fund**"), the deeproot 575 Fund, LLC (the "**575 Fund**") and deeproot Growth Runs Deep Fund, LLC (the "**dGRD Fund**" and collectively the "**Subsidiary Funds**"). Beginning in 2012, the deeproot Entities offered and sold life settlements. However, after the Texas Supreme Court's 2015 decision holding that life settlements constituted securities under the Texas Securities Act,[3] the deeproot Entities began to offer and sell debenture bonds. Investors would be located through insurance agents, wealth advisors, and other financial professionals (the "**Finders**"). The vast majority of the Finders were not licensed to sell securities as broker-dealers or registered investment advisors. Monies invested in the Subsidiary Funds were eventually transferred to deeproot Funds, LLC before being paid out to investors in the form of interest payments, dividend payments, or withdrawals of principal. deeproot Funds, LLC was the parent of the Subsidiary Funds, and Policy Services, Inc. was the parent of deeproot Funds, LLC.

2.    On August 20, 2021, a few weeks prior to the filing of the Debtors' bankruptcy cases, the United States Securities and Exchange Commission ("**SEC**") initiated a civil action against Mueller and several of his entities for violations of federal securities laws.[4] As a result of that investigation, it became clear that Mueller not only funneled money to his other related entities from the investment funds and used investors' money to prop up his ultimately unsuccessful

---

[3] *Life Partners, Inc. v. Arnold*, 464 S.W.3d 660, 667 (Tex. 2015).

[4] *Securities and Exchange Commission v. Robert J. Mueller et al.*, Case No. 5:21-cv-00785-XR (W.D. Tex.).

pinball business, but Mueller also used new investor money to pay moneys owed to earlier investors, making the deeproot Entities a Ponzi scheme. Because Mueller operated the deeproot Entities as a Ponzi scheme, neither the Trustee nor any other creditor had the ability to know of the fraudulent nature of the conveyances complained of herein until the investigations by the SEC and the Trustee. Almost all of the deeproot Entities' investors lost every dollar they invested.

3.      The books and records of the Debtors showed that the Finders contracted with deeproot Funds, LLC to find new investors for deeproot Funds, LLC, but received finders' fees and commissions payments from Policy Services, Inc. Policy Services, Inc. did not receive any value in exchange for the finder's fee and commission payments, because the alleged services provided by the Finders were for deeproot Funds, LLC, and Policy Services, Inc. was not a party to the agreements between deeproot Funds, LLC and the Finders. The commissions and fees received by Finders that were not registered as registered investment advisors or broker-dealers are contrary to securities laws.

## II.      PARTIES

4.      Plaintiff is the duly qualified and acting Chapter 7 Trustee of the Debtors' jointly administered Bankruptcy Cases. The Trustee brings this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001, 28 U.S.C. § 157, and all other applicable law.

5.      Defendant Fidelity Mutual Financial Planning, LLC ("**Fidelity Mutual**") is a Florida limited liability company. It may be served with process via United States First Class Mail to its Registered Agent, Registered Agents Inc., 7901 4th Street North, Suite 300, St. Petersburg, Florida 33702, or wherever else anyone authorized to accept service on its behalf may be found.

6.      Defendant Darryl Jay Stein ("**Stein**") is an individual residing in Plantation, Florida. He may be served with process via United States First Class Mail to 1233 NW 107th Terrace, Plantation, Florida 33322, or wherever else he may be found.

### III.    JURISDICTION AND VENUE

7.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1331 and 1334 and Fed. R. Bankr. P. 7001. This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157. To the extent necessary, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8.      To the extent the reference is withdrawn or the Bankruptcy Court is unable to enter a final judgment, Plaintiff requests the Bankruptcy Court be permitted and assigned to preside over all pre-trial matters, including the issuance of findings of fact and conclusions of law.

9.      Venue in this adversary proceeding is proper in this Court pursuant to 28 U.S.C. § 1409(a).

### IV.    FACTS

10.     Mueller served as the principal of all of the deeproot Entities and orchestrated a Ponzi scheme wherein he offered and sold securities to individuals for investment in pooled investment funds. Mueller then used the invested money to fund his other business ventures, including his pinball machine business. He also used the money to fund his lavish lifestyle. Crucially, Mueller used later investors' money to pay fictional returns to earlier investors.

**A.      The deeproot Entities and the Ponzi Scheme**

11.     A Ponzi scheme is "a fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." BLACK'S LAW DICTIONARY, Ponzi scheme (11th ed.

2019). A Ponzi scheme operates by using money from new investors to pay earlier investors, typically "without any operation or revenue-producing activity other than the continual raising of new funds." *Id.* "[A] Ponzi scheme is, as a matter of law, insolvent from its inception." *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011).

12.     The deeproot Entities commenced operations in 2012. The first entity formed was Policy Services, Inc. deeproot Funds, LLC is a direct subsidiary of Policy Services, Inc.  The Subsidiary Funds were formed as direct subsidiaries of deeproot Funds, LLC. A review of the deeproot Entities' QuickBooks files and other financial books and records revealed that all of the Finders that contracted to find investors for deeproot Funds, LLC, were paid commissions and fees from Policy Services, Inc.

13.     Policy Services, Inc. and its subsidiaries never received an initial equity investment, and the deeproot Entities were all insolvent as of inception in 2012 and continued to operate at a loss. The deeproot Entities gave the appearance of profitability, which Mueller used to entice new investors and obtain new money from investors. The deeproot Entities offered investments at higher-than-market levels of return—for example, deeproot BonusGrowth 5 Year Debenture Fund, LLC's five-year debenture bonds were offered for a 7% return in 2014, which was nearly seven times more than the national rate for five-year debenture bonds at the time, according to data available from the Board of Governors of the Federal Reserve. *See* Exhibit A.

14.     There was no recorded capital investment on the balance sheet, and disbursements to Mueller and others were improperly recorded as assets rather than expenses, further boosting the appearance of profitability. After recharacterizing the disbursements as expenses, the equity for Policy Services, Inc. was $(1,490,187) for the year ending on December 31, 2013, and $(423,785) for the year ending on December 31, 2012. Policy Services and its subsidiaries had

minimal revenue and had no net income as of at least December 31, 2012. Policy Services, Inc. continued to operate at a loss from the time of its inception and all of the deeproot Entities remained insolvent until filing for bankruptcy on December 9, 2021 ("**Petition Date**").

15.     Since there was no source of revenue, the deeproot Entities relied on newly invested money to fund operations and make payments to earlier investors. From 2013 until 2021, deeproot Funds, LLC used new investor money to pay interest and dividends to earlier investors. For example, during the final three years of the deeproot Entities' operation, the following payments were made: (1) in 2019, deeproot Funds, LLC received $18,300,190.00 from new investors and used $1,074,885.00 to pay previous investors; (2) in 2020, deeproot Funds, LLC received $7,093,055.00 from new investors and used $1,333,554.00 to pay previous investors; and (3) in 2021, deeproot Funds, LLC received $10,827,147.00 from new investors and used $918,391.00 to pay previous investors.

16.     Based upon the books and records of deeproot Funds, LLC, the entity only had $865 in income (beyond investor deposits) during the nine years of its existence. Policy Services, Inc. had only minimal revenue from the time of its inception in 2012.

17.     On December 9, 2021, the deeproot Entities each filed for relief under title 11 of the United States Code. The Bankruptcy Cases were ordered to be jointly administered under the lead case *In re: deeproot Capital Management, LLC*, 21-51523.

18.     On or about December 21, 2021, John Patrick Lowe was appointed as Chapter 7 Trustee of the Debtors' jointly administered Bankruptcy Cases.

**B.     Finders**

19.     As the principal of the deeproot Entities, Mueller (through deeproot Funds, LLC) contracted with Finders all across the country to locate new investors and raise money for the

deeproot Entities. A securities broker-dealer is defined as "any person engaged in the business of effecting transactions for the account of others." 15 U.S.C. § 78c. Broker-dealers are required to register as such with the SEC. 15 U.S.C. § 78o. Prior to 2015, the deeproot Entities offered and sold life settlements. After the Texas Supreme Court's 2015 decision holding that life settlements are securities, the deeproot Entities offered securities in the form of debenture bonds.[5]

20.    The vast majority of the deeproot Entities' contracted Finders were unregistered as broker-dealers despite the fact that they engaged in transactions to facilitate the sale of securities, including debenture bonds and life settlements.[6] The Finders that were registered investment advisors or broker-dealers failed to conduct the requisite due diligence into the financial condition of the deeproot Entities when making investment recommendations to clients. The deeproot Entities relied on these Finders to bring in a steady flow of money because there was no other source of revenue for the deeproot Entities other than newly invested money because the deeproot Entities continuously operated at a loss.

21.    Monies invested with one of the Subsidiary Funds were eventually transferred to deeproot Funds, LLC, which was the principal entity that handled payments to investors, before being transferred elsewhere. The Finders typically entered into contracts with deeproot Funds,

---

[5] The deeproot Entities obtained Form D exemptions from the SEC to offer these securities.

[6] The so-called "finder exception" permits a person to "perform a narrow scope of activities without triggering the broker/dealer registration requirements," such as "[m]erely bringing together the parties to transactions, even those involving the purchase and sale of securities." *S.E.C. v. Kramer*, 778 F. Supp. 2d 1320, 1336 (M.D. Fla. 2011) (quoting *Apex Global Partners, Inc. v. Kaye/Bassman Intern. Corp.*, No. 3:09-cv-637-M, 2009 WL 2777869, at *3 (N.D. Tex. Aug. 31, 2009)). The most frequently cited factors as to whether someone is an unregistered broker-dealer or a finder (for which there is an exception to liability) are: "whether a person (1) works as an employee of the issuer, (2) receives a commission rather than a salary, (3) sells or earlier sold the securities of another issuer, (4) participates in negotiations between the issuer and investor, (5) provides either advice or a valuation as to the merit of an investment, and (6) actively (rather than passively) finds investors." *Id.* at 1334. "[T]ransaction-based compensation" is one of the hallmarks of being a broker-dealer. *Id.* (*citing Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, 2006 WL 2620985, at *6 (D. Neb. 2006).

LLC to be paid fees (the "**Finder Fees**") based off of the amount of money invested in one of the deeproot Entities by new investors. The Finder Fees were paid to Finders from Policy Services, Inc. regardless of where the new investor invested the monies. The outlandishly generous structure of the Finders Fees should have alerted the Defendant that the investment was not legitimate. Generally, Finders Fees were paid based on the below investment levels. The transaction-based Finders Fees are directly tied to the amount of the investment.

i. The Fee for the 575 Periodic election ('the575-P') shall be calculated as $7,000.00 (the575-P base rate) for each $100,000.00 of principal.

ii. The Fee for all other Securities shall be calculated as $8,000.00 (base rate) for the first $100,000.00 of principal, and an additional $500.00 (to the previous incremental fee amount) enhancement for each additional $100,000.00 of principal invested.

iii. Any principal that does not give rise to a consideration of a fee <u>may</u> be paid at a later time as *hanging surplus*, as provided in (c) below.

iv. Example #1: if an Offeree invests $125,000.00, the Fee would be $7,000.00 for the575-P, or $8,000.00 for all other Securities; with a potential hanging surplus of $25,000.

v. Example #2: if an Offeree invests $286,000.00, the Fee would be $14,000.00 for the575-P, or $16,500.00 [$8,000 + $8,500] for all other Securities; with a potential hanging surplus of $86,000.

vi. Example #3: if an Offeree invests $499,999.99 the Fee would be $28,000.00 for the575-P, or $35,000.00 [$8,000 + $8,500 + $9,000 + $9,500] for all other Securities; with a potential hanging surplus of $99,999.99.

### a.  Finder Agreements with Defendants

22.     During the two years preceding Petition Date, Defendants received transfers in the total amount of $265,382.84 from Debtor Policy Services, Inc. Specifically, Fidelity Mutual received $74,460.84 from Policy Services, Inc. (the "**Fidelity Mutual Transfers**"). A true and correct copy of Policy Services, Inc.'s QuickBooks records showing the Fidelity Mutual Transfers is attached hereto as <u>Exhibit B</u>.

23.     Stein received $190,922.00 from Policy Services, Inc. (the "**Stein Transfers**"). A true and correct copy of Policy Services, Inc.'s QuickBooks records showing the Stein Transfers is attached hereto as <u>Exhibit C</u>. The Stein Transfers and Fidelity Mutual Transfers were recorded in Policy Services, Inc.'s QuickBooks records as Finders Fees. *See* <u>Exhibits B and C</u>.

24.     Based on the records available from the records of the Florida Division of Corporations, Stein is the sole manager of Fidelity Mutual. A true and correct copy of the Florida Division of Corporations record for Fidelity Mutual is attached hereto as <u>Exhibit D</u>.

25.     Upon information and belief, Stein, as the sole manager of Fidelity Mutual, was the entity for whose benefit the Fidelity Mutual Transfers were made, and Fidelity Mutual paid Stein from the Fidelity Mutual Transfers.

26.     A review of the Debtors' books and records revealed that Stein executed Finder Agreements with deeproot Funds, LLC. Specifically, he signed two (2) Standard Four Month Finder Agreements and one (1) Standard Six Month Finder Agreement in his individual capacity (the "**Stein Finder Agreements**") and one (1) Four Month Standard Finder Agreement on behalf of Fidelity Mutual (the "**Fidelity Mutual Finder Agreement**"). Michael Andrus signed one (1) Four Month Standard Finder Agreement in his individual capacity, which was later assigned to Fidelity Mutual (the "**Andrus Finder Agreement**" and collectively, with the Stein Finder Agreements and Fidelity Mutual Finder Agreement, the "**Finder Agreements**"). Policy Services, Inc. was not a party to the Finder Agreements and had no involvement with the Subsidiary Funds.

27.     The Finder Agreements provided that deeproot Funds, LLC would pay Finders Fees to Stein and Fidelity Mutual as compensation for locating new investors for the Subsidiary Funds. At all times, Fidelity Mutual and Stein contracted to provide services for deeproot Funds, LLC, never for Policy Services, Inc. Policy Services, Inc. did not receive any value in exchange for the Stein Transfers or the Fidelity Mutual Transfers.

28.     Stein is not a registered investment advisor or broker-dealer.  Fidelity Mutual is not a registered investment advisory firm. As an individual who is not a registered broker-dealer or

registered investment advisor, Stein should have known he could not sell securities, such as the debentures offered by the deeproot Entities pursuant to Regulation D.

## V.    CAUSES OF ACTION

29.    The Trustee brings this adversary proceeding to recover these fraudulently transferred funds for the benefit of creditors of Policy Services, Inc.

30.    Paragraphs 1 through 28 are incorporated by reference into each of the causes of action that follow.

## Count 1 – Avoidance of Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) (Fidelity Mutual) (Actual Fraud)

31.    Pursuant to 11 U.S.C. § 548(a)(1)(A), the Trustee files this complaint seeking to avoid fraudulent transfers of property of Policy Services, Inc. to Fidelity Mutual during the two years prior to the Petition Date, and for damages against the fraudulent transferees of Policy Services, Inc. during the applicable time period.

32.    The Fidelity Mutual Transfers in the amount of $74,460.84 were made within the two years prior to the Petition Date. Exhibit B. The Fidelity Mutual Transfers constitute a transfer of Policy Services, Inc.'s interest in property.

33.    The Fidelity Mutual Transfers were made with an actual intent to hinder, delay or defraud the creditors of Debtor Policy Services, Inc., as evidenced by the existence of a Ponzi scheme wherein interest and dividend payments were made to earlier investors from new investor money.

34.    Additionally, and in the alternative, Debtor Policy Services, Inc. was insolvent at the time of its creation and at the time of each of the Fidelity Mutual Transfers or became insolvent as a result of the Fidelity Mutual Transfers, in that (a) the sum of Policy Services, Inc.'s debts were greater than all of Policy Services, Inc.'s assets at a fair valuation; (b) Policy Services, Inc. was

engaging in or about to engage in a business or transaction for which Policy Services, Inc.'s remaining assets were unreasonably small in relation to the business or transaction; or (c) Policy Services, Inc. was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

35.     There was no capital infusion at the time Policy Services, Inc. was created.

36.     The Fidelity Mutual Transfers constituted fraudulent transfers under 11 U.S.C. §548(a)(1)(A), such that the Trustee is entitled to a judgment in the amount of $74,460.84 on behalf of Debtor Policy Services, Inc. to recover the Fidelity Mutual Transfers from Fidelity Mutual.

## Count 2 – Avoidance of Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) (Stein) (Actual Fraud)

37.     Pursuant to 11 U.S.C. § 548(a)(1)(A), the Trustee files this complaint seeking to avoid fraudulent transfers of property of Policy Services, Inc. to Stein during the two years prior to the Petition Date, and for damages against the fraudulent transferees of Policy Services, Inc. during the applicable time period.

38.     The Stein Transfers in the amount of $190,922.00 were made within the two years prior to Petition Date. Exhibit C. The Stein Transfers constitute a transfer of Policy Services, Inc.'s interest in property.

39.     The Stein Transfers were made with an actual intent to hinder, delay or defraud the creditors of Debtor Policy Services, Inc., as evidenced by the existence of a Ponzi scheme wherein interest and dividend payments were made to earlier investors from new investor money.

40.     Additionally, and in the alternative, Debtor Policy Services, Inc. was insolvent at the time of its creation and at the time of each of the Stein Transfers or became insolvent as a result of the Stein Transfers, in that (a) the sum of Policy Services, Inc.'s debts were greater than all of

Policy Services, Inc.'s assets at a fair valuation; (b) Policy Services, Inc. was engaging in or about to engage in a business or transaction for which Policy Services, Inc.'s remaining assets were unreasonably small in relation to the business or transaction; or (c) Policy Services, Inc. was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

41.     There was no capital infusion at the time Policy Services, Inc. was created.

42.     The Stein Transfers constituted fraudulent transfers under 11 U.S.C. §548(a)(1)(A), such that the Trustee is entitled to a judgment in the amount of $190,922.00 on behalf of Debtor Policy Services, Inc. to recover the Stein Transfers from Stein.

## Count 3 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B) (Fidelity Mutual) (Constructive Fraud)

43.     Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee files this complaint seeking to avoid fraudulent transfers of property of Policy Services, Inc. to Fidelity Mutual during the two years prior to Petition Date, and for damages against the fraudulent transferees of Policy Services, Inc. during the applicable time period.

44.     The Fidelity Mutual Transfers in the amount of $74,460.84 occurred within two years prior to Petition Date. Exhibit B. The Fidelity Mutual Transfers constitute a transfer of Policy Services, Inc.'s interest in property.

45.     The Fidelity Mutual Transfers were not made in exchange for reasonably equivalent value for Policy Services, Inc., a non-party to the Finder Agreements, because (1) Fidelity Mutual entered into the Fidelity Mutual Finder Agreements with deeproot Funds, LLC, and (2) Fidelity Mutual acted as a Finder for deeproot Funds and provided the contracted services to deeproot Funds, LLC.

46.     Policy Services, Inc. was insolvent at the time of its creation and at the time of each of the Fidelity Mutual Transfers or became insolvent as a result of the Fidelity Mutual Transfers, in that (a) the sum of Policy Services, Inc.'s debts were greater than all of Policy Services, Inc.'s assets at a fair valuation; (b) Policy Services, Inc. was engaging in or about to engage in a business or transaction for which Policy Services, Inc.'s remaining assets were unreasonably small in relation to the business or transaction; or (c) Policy Services, Inc. was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

47.     There was no capital infusion at the time Policy Services, Inc. was created.

48.     The Fidelity Mutual Transfers constituted fraudulent transfers under 11 U.S.C. §548(a)(1)(B), such that the Trustee is entitled to a judgment in the amount of $74,460.84 on behalf of Debtor Policy Services, Inc. to recover the Fidelity Mutual Transfers from Fidelity Mutual.

**Count 4 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B) (Stein) (Constructive Fraud)**

49.     Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee files this complaint seeking to avoid fraudulent transfers of property of Policy Services, Inc. to Stein during the two years prior to Petition Date, and for damages against the fraudulent transferees of Policy Services, Inc. during the applicable time period.

50.     The Stein Transfers in the amount of $190,922.00 occurred within two years prior to Petition Date. Exhibit C. The Stein Transfers constitute a transfer of Policy Services, Inc.'s interest in property.

51.     The Stein Transfers were not made in exchange for reasonably equivalent value for Policy Services, Inc., a non-party to the Finder Agreements, because (1) Stein entered into the

Stein Finder Agreements with deeproot Funds, LLC, and (2) Stein acted as a Finder for deeproot Funds and provided the contracted services to deeproot Funds, LLC.

52. Policy Services, Inc. was insolvent at the time of its creation and at the time of each of the Stein Transfers or became insolvent as a result of the Stein Transfers, in that (a) the sum of Policy Services, Inc.'s debts were greater than all of Policy Services, Inc.'s assets at a fair valuation; (b) Policy Services, Inc. was engaging in or about to engage in a business or transaction for which Policy Services, Inc.'s remaining assets were unreasonably small in relation to the business or transaction; or (c) Policy Services, Inc. was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

53. There was no capital infusion at the time Policy Services, Inc. was created.

54. The Stein Transfers constituted fraudulent transfers under 11 U.S.C. §548(a)(1)(B), such that the Trustee is entitled to a judgment in the amount of $190,922.00 on behalf of Debtor Policy Services, Inc. to recover the Stein Transfers from Stein.

**Count 5 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(1)) (Fidelity Mutual) (TUFTA Actual Fraud)**

55. Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(1), the Trustee files this complaint seeking to avoid fraudulent transfers of property of Policy Services, Inc. to Fidelity Mutual during the applicable time period, and for damages against the fraudulent transferees of Policy Services, Inc. during the applicable time period.

56. The Fidelity Mutual Transfers in the amount of $74,460.84 took place within the four years preceding Petition Date. Exhibit B. The Fidelity Mutual Transfers constitute transfers of Debtor Policy Services, Inc.'s interest in property.

57.     The Fidelity Mutual Transfers were made with an actual intent to hinder, delay or defraud Debtor Policy Services, Inc.'s creditors. The deeproot Entities were operated as a Ponzi scheme in which interest and dividend payments to earlier investors were paid using new investor money, thus paying fictitious profits for earlier investors.

58.     Additionally, and in the alternative, Debtor Policy Services, Inc. was insolvent at the time of its creation and at the time of each of the Fidelity Mutual Transfers or became insolvent as a result of the Fidelity Mutual Transfers, in that (a) the sum of Policy Services, Inc.'s debts were greater than all of Policy Services, Inc.'s assets at a fair valuation; (b) Policy Services, Inc. was engaging in or about to engage in a business or transaction for which Policy Services, Inc.'s remaining assets were unreasonably small in relation to the business or transaction; or (c) Policy Services, Inc. was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

59.     There was no capital infusion at the time Policy Services, Inc. was created.

60.     Policy Services, Inc. had at least one outstanding creditor at the time of each of the Fidelity Mutual Transfers, or such creditor's claim arose within a reasonable time after the Fidelity Mutual Transfers. Proof of Claim No. 145-1 of the Policy Services, Inc. Claims Register filed by creditor Jill Ellis reflects an allowable claim dating back to March 25, 2013, evidenced by a life settlement certificate purchased on the same date. Proof of Claim No. 145-1 remains unpaid.

61.     The Fidelity Mutual Transfers constituted fraudulent transfers under Tex. Bus. & Com. Code § 24.005(a)(1), such that the Trustee is entitled to a judgment in the amount of $74,460.84 to recover the Fidelity Mutual Transfers from Fidelity Mutual.

**Count 6 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(1)) (Stein) (TUFTA Actual Fraud)**

62.     Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(1), the Trustee files this complaint seeking to avoid fraudulent transfers of property of Policy Services, Inc. to Stein during the applicable time period, and for damages against the fraudulent transferees of Policy Services, Inc. during the applicable time period.

63.     The Stein Transfers in the amount of $190,922.00 took place within the four years preceding Petition Date. Exhibit C. The Stein Transfers constitute transfers of Debtor Policy Services, Inc.'s interest in property.

64.     The Stein Transfers were made with an actual intent to hinder, delay or defraud Debtor Policy Services, Inc.'s creditors. The deeproot Entities were operated as a Ponzi scheme in which interest and dividend payments to earlier investors were paid using new investor money, thus paying fictitious profits for earlier investors.

65.     Additionally, and in the alternative, Debtor Policy Services, Inc. was insolvent at the time of its creation and at the time of each of the Stein Transfers or became insolvent as a result of the Stein Transfers, in that (a) the sum of Policy Services, Inc.'s debts were greater than all of Policy Services, Inc.'s assets at a fair valuation; (b) Policy Services, Inc. was engaging in or about to engage in a business or transaction for which Policy Services, Inc.'s remaining assets were unreasonably small in relation to the business or transaction; or (c) Policy Services, Inc. was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

66.     There was no capital infusion at the time Policy Services, Inc. was created.

67.     Policy Services, Inc. had at least one outstanding creditor at the time of each of the Stein Transfers, or such creditor's claim arose within a reasonable time after the Stein Transfers.

Proof of Claim No. 145-1 of the Policy Services, Inc. Claims Register filed by creditor Jill Ellis reflects an allowable claim dating back to March 25, 2013, evidenced by a life settlement certificate purchased on the same date. Proof of Claim No. 145-1 remains unpaid.

68.     The Stein Transfers constituted fraudulent transfers under Tex. Bus. & Com. Code § 24.005(a)(1), such that the Trustee is entitled to a judgment in the amount of $190,922.00 to recover the Stein Transfers from Stein.

**Count 7 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(2)) (Fidelity Mutual) (TUFTA Constructive Fraud)**

69.     Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(2), the Trustee files this complaint seeking to avoid fraudulent transfers of property of Policy Services, Inc. to Fidelity Mutual during the applicable time period, and for damages against the fraudulent transferees of Policy Services, Inc. during the applicable time period.

70.     The Fidelity Mutual Transfers in the amount of $74,460.84 took place within the four years preceding Petition Date. Exhibit B. The Fidelity Mutual Transfers constitute transfers of Debtor Policy Services, Inc.'s interest in property.

71.     The Fidelity Mutual Transfers were not made in exchange for reasonably equivalent value for Policy Services, Inc., a non-party to the Finder Agreements, because (1) Fidelity Mutual entered into the Fidelity Mutual Finder Agreements with deeproot Funds, LLC, and (2) Fidelity Mutual acted as a Finder for deeproot Funds and provided the contracted services to deeproot Funds, LLC.

72.     Debtor Policy Services, Inc. was insolvent at the time of its creation and at the time of each of the Fidelity Mutual Transfers or became insolvent as a result of the Fidelity Mutual Transfers, in that (a) the sum of Policy Services, Inc.'s debts were greater than all of Policy Services, Inc.'s assets at a fair valuation; (b) Policy Services, Inc. was engaging in or about to

engage in a business or transaction for which Policy Services, Inc.'s remaining assets were unreasonably small in relation to the business or transaction; or (c) Policy Services, Inc. was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

73.     There was no capital infusion at the time Policy Services, Inc. was created.

74.     Policy Services, Inc. had at least one outstanding creditor at the time of each of the Fidelity Mutual Transfers, or such creditor's claim arose within a reasonable time after the Fidelity Mutual Transfers. Proof of Claim No. 145-1 of the Policy Services, Inc. Claims Register filed by creditor Jill Ellis reflects an allowable claim dating back to March 25, 2013, evidenced by a life settlement certificate purchased on the same date. Proof of Claim No. 145-1 remains unpaid.

75.     The Fidelity Mutual Transfers constituted fraudulent transfers under Tex. Bus. & Com. Code § 24.005(a)(1), such that the Trustee is entitled to a judgment in the amount of $74,460.84 to recover the Fidelity Mutual Transfers from Fidelity Mutual.

### Count 8 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(2)) (Stein) (TUFTA Constructive Fraud)

76.     Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(2), the Trustee files this complaint seeking to avoid fraudulent transfers of property of Policy Services, Inc. to Stein during the applicable time period, and for damages against the fraudulent transferees of Policy Services, Inc. during the applicable time period.

77.     The Stein Transfers in the amount of $190,922.00 took place within the four years preceding Petition Date. Exhibit C. The Stein Transfers constitute transfers of Debtor Policy Services, Inc.'s interest in property.

78.     The Stein Transfers were not made in exchange for reasonably equivalent value for Policy Services, Inc., a non-party to the Finder Agreements, because (1) Stein entered into the

Stein Finder Agreements with deeproot Funds, LLC, and (2) Stein acted as a Finder for deeproot Funds and provided the contracted services to deeproot Funds, LLC.

79.     Debtor Policy Services, Inc. was insolvent at the time of its creation and at the time of each of the Stein Transfers or became insolvent as a result of the Stein Transfers, in that (a) the sum of Policy Services, Inc.'s debts were greater than all of Policy Services, Inc.'s assets at a fair valuation; (b) Policy Services, Inc. was engaging in or about to engage in a business or transaction for which Policy Services, Inc.'s remaining assets were unreasonably small in relation to the business or transaction; or (c) Policy Services, Inc. was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

80.     There was no capital infusion at the time Policy Services, Inc. was created.

81.     Policy Services, Inc. had at least one outstanding creditor at the time of each of the Stein Transfers, or such creditor's claim arose within a reasonable time after the Stein Transfers. Proof of Claim No. 145-1 of the Policy Services, Inc. Claims Register filed by creditor Jill Ellis reflects an allowabl claim dating back to March 25, 2013, evidenced by a life settlement certificate purchased on the same date. Proof of Claim No. 145-1 remains unpaid.

82.     The Stein Transfers constituted fraudulent transfers under Tex. Bus. & Com. Code § 24.005(a)(1), such that the Trustee is entitled to a judgment in the amount of $190,922.00 to recover the Stein Transfers from Stein.

**Count 9 – Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.009(b)) (All Defendants)**

83.     Fidelity Mutual was the initial transferee of the Fidelity Mutual Transfers. As the manager of Fidelity Mutual, Stein was the entity for whose benefit the Fidelity Mutual Transfers were made.

84.     The Trustee is entitled to recover from Fidelity Mutual, Stein, or any other immediate or mediate transferee of Fidelity Mutual, the Fidelity Mutual Transfers, or the value of the Fidelity Mutual Transfers, along with prejudgment and post-judgment interest, pursuant to section 550 of the Bankruptcy Code and section 24.009(b) of the Texas Business and Commerce Code.

**Count 10 – Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.009(b)) (All Defendants)**

85.     Stein was the initial transferee of the Stein Transfers and the entity for whose benefit the Stein Transfers were made.

86.     The Trustee is entitled to recover from Stein, or any other immediate or mediate transferee of Stein, the Stein Transfers, or the value of the Stein Transfers, along with prejudgment and post-judgment interest, pursuant to section 550 of the Bankruptcy Code and section 24.009(b) of the Texas Business and Commerce Code.

**Count 11 – Recovery of Attorneys' Fees and Costs**

87.     The Trustee has been forced to incur attorneys' fees and costs in connection with the filing and prosecution of this Complaint.

88.     Pursuant to 11 U.S.C. § 544 and section 24.013 of the Texas Business and Commerce Code, the Court may award costs and reasonable attorneys' fees in connection with a proceeding brought under the Texas Uniform Fraudulent Transfer Act. The Trustee hereby requests that any judgment include an award of the costs and attorneys' fees incurred by the Trustee in connection with prosecuting this Complaint.

89.     Prior to filing suit, the Trustee has made demand on the Defendants. The demand has not been met. All conditions precedent to filing suit have been satisfied.

90.     Furthermore, the Trustee requests an award for such attorneys' fees and costs incurred in the filing and prosecution of this Complaint to the extent allowed under the Bankruptcy Code and Texas law. *See* 11 U.S.C. §§ 105(a) & 550(a).

## PRAYER

WHEREFORE, JOHN PATRICK LOWE, Chapter 7 Trustee for the jointly administered Bankruptcy case of deeproot Capital Management, LLC, prays for judgment in favor of the Chapter 7 Trustee against Defendants Fidelity Mutual Financial Planning, LLC and Darryl Jay Stein on all claims and relief sought herein, including but not limited to:

a.     Avoiding the Fidelity Mutual Transfers and the Stein Transfers as fraudulent transfers under sections 544 and 548 of the Bankruptcy Code and Chapter 24 of the Texas Business & Commerce Code;

b.     Damages against Defendants, jointly and severally, in the amount of $265,382.84, comprising of the Stein Transfers in the amount of $190,922.00 and the Fidelity Mutual Transfers in the amount of $74,460.84;

c.     Permitting recovery of the Fidelity Mutual Transfers and the Stein Transfers, or the value of the Fidelity Mutual Transfers and the Stein Transfers, together with prejudgment and post-judgment interest;

d.     Permitting recovery of all costs and attorneys' fees incurred obtaining the relief sought; and

e.     Such other and further relief, at law or in equity, as the Court deems to be just, proper, and equitable.

[Remainder of Page Left Intentionally Blank]

Dated: January 31, 2022        Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By:    */s/Randall A. Pulman*
       Randall A. Pulman
       Texas State Bar No. 16393250
       rpulman@pulmanlaw.com
       Anna K. MacFarlane
       Texas State Bar No. 24116701
       amacfarlane@pulmanlaw.com

**ATTORNEYS FOR JOHN PATRICK LOWE,**
**CHAPTER 7 TRUSTEE FOR DEEPROOT CAPITAL**
**MANAGEMENT, LLC ET AL.**

# EXHIBIT A

Market Yield on U.S. Treasury Securities at 5-Year Constant Maturity, Quoted on an Investment Basis

Source: Board of Governors of the Federal Reserve System (US)

fred.stlouisfed.org

# EXHIBIT B

3:49 PM
07/25/22
Accrual Basis

21-51523-mmp   Doc#239   Filed 01/30/23   Entered 01/30/23 22:26:32   Main Document   Pg 26
of 31

Policy Services, Inc

**Transaction Detail By Account**
All Transactions

| | | Type | Date | Num | Name | Memo | Clr | Split | Amount |
|---|---|---|---|---|---|---|---|---|---|
| Policy Services | Finders Fee | Check | 03/08/2021 | | Fidelity Mutual Financial Planning LLC | WF Direct pay - Levitt - Stein Fidelity | | Corporate Checking 8461 | 22,978.40 |
| Policy Services | Finders Fee | Check | 03/29/2021 | | Fidelity Mutual Financial Planning LLC | WF Direct Pay - Macvane to Stein Fidelity | | Corporate Checking 8461 | 21,217.73 |
| Policy Services | Finders Fee | Check | 05/13/2021 | | Fidelity Mutual Financial Planning LLC | WF Direct Pay - Henderson to Stein Fidelity | | Corporate Checking 8461 | 30,264.71 |
| | | | | | **Fidelity Mutual Financial Planning LLC Total** | | | | **74,460.84** |

# EXHIBIT C

**Policy Services, Inc.**

## Transaction Detail By Account
### All Transactions

| | | Type | Date | Num | Name | Memo | Clr | Split | Amount |
|---|---|---|---|---|---|---|---|---|---|
| Policy Services | **Finders Fee** | Check | 08/06/2020 | | Darryl Stein | | | Corporate Checking 8461 | 20,167.73 |
| Policy Services | **Finders Fee** | Check | 01/08/2021 | | Darryl Stein | WF- Direct payment Adkins (Finder Fee to Fleming | | Corporate Checking 8461 | 38,254.27 |
| Policy Services | **Finders Fee** | Check | 01/12/2021 | ACH | Darryl Stein | Wire transfer | | Sweep Account  8487 | 132,500.00 |
| | | | | | **Darryl Stein Total** | | | | **190,922.00** |

# EXHIBIT D

10/17/22, 4:54 PM    24-51523-mmp   Doc#239   Filed 01/31/23   Entered 01/31/23 22:26:32   Main Document   Pg 30 of 31
Detail by Entity Name

DIVISION OF CORPORATIONS



## Detail by Entity Name

Florida Limited Liability Company
FIDELITY MUTUAL FINANCIAL PLANNING, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L19000052365 |
| **FEI/EIN Number** | 85-0739174 |
| **Date Filed** | 02/22/2019 |
| **State** | FL |
| **Status** | ACTIVE |

**Principal Address**

1233 NW 107th Terrace
Plantation, FL 33322

Changed: 04/16/2020

**Mailing Address**

1233 NW 107th Terrace
Plantation, FL 33322

Changed: 04/16/2020

**Registered Agent Name & Address**

REGISTERED AGENTS INC.
7901 4TH STREET NORTH
SUITE 300
ST.PETERSBURG, FL 33702

Address Changed: 03/25/2019

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

Stein, Darryl Jay
1233 NW 107th Terrace
Plantation, FL 33322

**Annual Reports**

| **Report Year** | **Filed Date** |
|---|---|

| 2020 | 04/16/2020 |
| 2021 | 01/12/2021 |
| 2022 | 03/16/2022 |

**Document Images**

| | |
|---|---|
| 03/16/2022 -- ANNUAL REPORT | View image in PDF format |
| 01/12/2021 -- ANNUAL REPORT | View image in PDF format |
| 04/16/2020 -- ANNUAL REPORT | View image in PDF format |
| 02/22/2019 -- Florida Limited Liability | View image in PDF format |

Florida Department of State, Division of Corporations