IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| § | | |
| deeproot Capital Management, § | BANKRUPTCY NO. 21-51523-MMP | |
| LLC ET AL.,[1] § | | |
| § | | |
| Debtors § | JOINTLY ADMINISTERED | |
| § | | |
| _____§ | | |
| § | | |
| John Patrick Lowe, § | | |
| Chapter 7 Trustee § | | |
| for the Bankruptcy Estate § | | |
| of deeproot Capital § | | |
| Management, LLC et al., § | ADV. PROC. NO. _____ | |
| Plaintiff § | | |
| § | | |
| v. § | | |
| § | | |
| JP Morgan Chase Bank, N.A. § | | |
| Defendant § | | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff, John Patrick Lowe, Chapter 7 Trustee ("**Plaintiff**" or "**Trustee**") for the jointly administered Bankruptcy Case of deeproot Capital Management, LLC et al. ("**deeproot**")[2] hereby files this Original Complaint, respectfully showing the Court as follows:

---

[1] The jointly administered chapter 7 cases, along with their respective case numbers and the last four digits of each Debtor's federal tax identification number, are: *In Re: Policy Services, Inc.*, 21-51513 (2864), *In Re: Wizard Mode Media, LLC*, 21-51514 (3205), *In Re: deeproot Pinball LLC*, 21-51515 (0320), *In Re: deeproot Growth Runs Deep Fund, LLC*, 21-51516 (8046), *In Re: deeproot 575 Fund, LLC*, 21-51517 (9404), *In Re: deeproot 3 Year Bonus Income Debenture Fund, LLC*, 21-51518 (7731), *In Re: deeproot Bonus Growth 5 Year Debenture Fund, LLC*, 21-51519 (9661), *In Re: deeproot Tech LLC*, 21-51520 (9043), *In Re: deeproot Funds LLC*, 21-51521 (9404), *In Re: deeproot Studios LLC*, 21-51522 (6283), and *In Re: deeproot Capital Management, LLC*, 21-51523 (2638) (collectively, the "**Bankruptcy Cases**").

[2] Policy Services, Inc., Wizard Mode Media, LLC, deeproot Pinball LLC, deeproot Growth Runs Deep Fund, LLC, deeproot 575 Fund, LLC, deeproot 3 Year Bonus Income Debenture Fund, LLC, deeproot BonusGrowth 5 Year

## I. PRELIMINARY STATEMENT

1. Robert Mueller, a trained lawyer licensed by the State of Texas, was the sole owner and principal of the debtors Policy Services, Inc. ("**Policy Services**") and its wholly owned subsidiaries Wizard Mode Media, LLC, deeproot Pinball LLC, deeproot Growth Runs Deep Fund, LLC ("**dGRD Fund**"), deeproot 575 Fund, LLC ("**575 Fund**"), deeproot 3 Year Bonus Income Debenture Fund, LLC, deeproot BonusGrowth 5 Year Debenture Fund, LLC ("**5 Year Debenture Fund**"), deeproot Tech LLC, deeproot Funds, LLC, deeproot Studios, LLC, and deeproot Capital Management, LLC (collectively, the "**deeproot Entities**" or "**Debtors**"). Mueller used Policy Services and its subsidiaries to raise approximately $71,000,000 from investors from 2012 through 2021. Almost all of this money was lost to ill-conceived purchases of life insurance policies, investments in unrelated and worthless businesses, payment of unreasonable commissions and finders fees to wealth advisors, insurance agents, and other financial professionals, self-dealing transactions entered into between the Debtors and Mueller and his family members for the purchase of real estate in Hawaii, the payment of fictitious profits to investors in order to keep the Ponzi scheme going, and payments to credit card companies for his own personal expenses. A substantial amount of investor money was used to develop a pinball machine manufacturing business which was never properly capitalized and doomed to fail from the start—it was just a ruse.

2. On December 9, 2021, the deeproot Entities each filed for relief under title 11 of the United States Code (the "Petition Date"). The Bankruptcy Cases were ordered to be jointly administered under the lead case *In re: deeproot Capital Management, LLC*, 21-51523.

---

Debenture Fund, LLC, deeproot Tech LLC, deeproot Funds, LLC, deeproot Studios, LLC, and deeproot Capital Management, LLC are referred to herein as "**Debtors**" or "**deeproot Entities**."

2

3. On or about December 21, 2021, John Patrick Lowe was appointed as Chapter 7 Trustee of the Debtors' jointly administered Bankruptcy Cases.

## II. PARTIES

4. Plaintiff is the duly qualified and acting Chapter 7 Trustee of the jointly administered Bankruptcy Cases. Trustee brings this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001, 28 U.S.C. § 157, and all other applicable law.

5. Defendant JP Morgan Chase Bank, N.A. ("**Chase Bank**") is a New York national association, based in New York, New York. Chase Bank can be served via U.S. First Class Mail and U.S. Certified Mail - Return Receipt Requested, on its Registered Agent, C T Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## III. JURISDICTION

6. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1331 and 1334 and Fed. R. Bankr. P. 7001. This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157. To the extent necessary, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7. To the extent the reference is withdrawn, or the Bankruptcy Court is unable to enter a final judgment, Plaintiff requests the Bankruptcy Court be permitted and assigned to preside over all pre-trial matters, including the issuance of findings of fact and conclusions of law.

## IV. VENUE

8. Venue in this adversary proceeding is proper before this Court pursuant to 28 U.S.C. § 1409.

## V. FACTS

9. Mueller served as the principal of all of the deeproot Entities and orchestrated a Ponzi scheme wherein he offered and sold securities to individuals for investment in pooled investment funds. Mueller then used the invested money to fund his other business ventures, including his pinball machine business. He also used the money to fund his lavish lifestyle. For purposes of this lawsuit, the key fact is that he used later investors' money to pay earlier investors.

### A. THE DEEPROOT ENTITIES AND THE PONZI SCHEME

10. A Ponzi scheme is "a fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." BLACK'S LAW DICTIONARY, Ponzi scheme (11th ed. 2019). A Ponzi scheme operates by using money from new investors to pay earlier investors, typically "without any operation or revenue-producing activity other than the continual raising of new funds." *Id.* "[A] Ponzi scheme is, as a matter of law, insolvent from its inception." *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011).

11. The deeproot Entities commenced operations in 2012. The first entity formed was Policy Services, Inc. deeproot Funds, LLC is a direct subsidiary of Policy Services, Inc. The dGRD Fund, 575 Fund, and 5 Year Debenture Fund (the "**Subsidiary Funds**") were formed as direct subsidiaries of deeproot Funds, LLC.

12. Policy Services and its subsidiaries never received an initial equity investment, and the deeproot Entities were all insolvent as of inception and continued to operate at a loss through the Petition Date, although, the Subsidiary Funds gave the appearance of profitability, which Mueller used to entice new investors and obtain new money from investors.

13. The Subsidiary Funds offered investments at higher-than-market levels of return—for example, deeproot BonusGrowth 5 Year Debenture Fund, LLC's five-year debenture bonds were offered for a 7% return in 2014, which was nearly seven times more than the national rate for five-year debenture bonds according to data available from the Board of Governors of the Federal Reserve. *See* Exhibit A.

14. Mueller informed investors that the 575 Fund would invest "the simple majority of our Fund Assets" in life insurance policies. The 575 Fund purchased these life insurance policies indirectly by re-investing funds into the dGRD Fund, which then invested the majority of its assets in life insurance policies purchased by Policy Services. Policy Services was the record owner and sole beneficiary of all of the life insurance policies, and life settlements, purchased using investor money, the Subsidiary Funds never actually received any ownership or other interests in return for the monies funneled to Policy Services or the deeproot Entities.

15. Mueller was responsible for the drafting and dissemination of the private placement memoranda ("**PPMs**") as well as other marketing materials for the Subsidiary Funds. Although there were multiple versions of the PPMs, in general, the PPMs disclosed, among other things: (i) the investment strategy and investors' expected returns; and (ii) that Mueller and deeproot had exclusive control over, and responsibility for, managing the Subsidiary Funds and their investments.

16. As described in the PPMs, the investment strategy involved a plan to purchase life insurance policies that insured the lives of individuals not affiliated with Mueller or the deeproot Entities who had sold their life insurance policies for cash settlements while still alive, otherwise known as life settlements. By purchasing these life insurance policies, the Subsidiary Funds would be entitled to the death benefit upon maturity (i.e., the death of the insured). Although not

disclosed in the 575 Fund PPM until 2019, the 575 Fund never held any interest in the life insurance policies directly, rather it purchased securities issued by the dGRD Fund, which in turn owned the life insurance policies (which was untrue – Policy Services was the owner and beneficiary of all the life insurance policies).

17. There was no recorded capital investment on the deeproot balance sheet, and it appears that there was a deliberate effort to minimize the reported lack of profit. Disbursements to Mueller and others for directing investor funds to Policy Services were improperly recorded as assets rather than expenses, these expenditures should have been recorded as an expense as incurred. After recharacterizing the disbursements as expenses, the equity for Policy Services was $(1,490,187) for the year ending on December 31, 2013, and $(423,785) for the year ending on December 31, 2012. Policy Services and its subsidiaries had minimal revenue and had no net income as of at least December 31, 2012. Policy Services continued to operate at a loss from the time of its inception and all of the deeproot Entities remained insolvent until filing for bankruptcy on December 9, 2021.

18. Since there was no source of revenue, the deeproot Entities relied on newly invested money to fund operations and make payments to earlier investors. From 2013 until 2021, deeproot Funds, LLC used new investor money to pay interest and dividends to earlier investors; these were a major cost of deeproot Funds, LLC's annual operations. For example, during the final three years of the deeproot Entities' operation, the following payments were made: (i) in 2019, deeproot Funds, LLC received $18,300,190.00 from new investors and used $1,074,885.00 of new investor money to pay previous investors; (ii) in 2020, deeproot Funds, LLC received $7,093,055 from new investors and used $1,333,554.00 to pay previous investors; and (iii) in 2021, deeproot Funds, LLC

received $10,827,147 from new investors and used $918,391.00 of new investor money to pay previous investors.

19. Based upon the books and records of deeproot Funds, LLC, from 2019 and 2021, the entity only generated $865 in revenue during its entire nine-year existence.

20. Over $71,000,000 was received by Debtors from investors. Debtor deeproot Funds, LLC paid investor redemptions of $60,000 in 2020, and $1,951,135 in 2021, and $4,879,884 was remitted by Debtors to the investors for interest and dividend payments during the same period, all such investor payments were made using new investors' money. The remaining funds received from new investors were principally transferred to other deeproot Entities or used to pay operating expenses. The deeproot Funds, LLC intercompany receivable balance was $57,797,231 as of December 31, 2021.

21. As of December 31, 2021, Policy Services owed $36,769,087 to the various Subsidiary Funds and had reported negative equity of $(19,420,543).

B. THE MUELLER TRANSFERS

22. Mueller used approximately $2.1 million from the Debtors' bank accounts to pay his personal expenses, including his daughter's private school tuition, federal income tax payments, medical and dental bills, family vacations, his second wedding, his second divorce, his third wedding, jewelry for his second and third wives, lifestyle spending for himself and his family. (the "**Mueller Transfers**").

23. From August 12, 2019 to January 12, 2021, $177,758.40 of the Mueller Transfers were charged by Mueller to a Chase Bank Southwest Rapid Rewards Card, account ending in -7864, issued to Robert J. Mueller, PO Box 690562, San Antonio, Texas 78269 (the "**Chase Bank**

7

Card"). Mueller paid Chase Bank for the personal expenses he charged to the Chase Bank Card using Debtor, Policy Services' bank accounts.

24. Policy Services received nothing of value in return for the payments made to Chase Bank from Policy Services' bank accounts.

### VI. CAUSES OF ACTION

25. Paragraphs 1 through 24 are incorporated herein by reference.

**Count 1 – Avoidance of Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) (Actual Fraud) (Chase Bank)**

26. Pursuant to 11 U.S.C. § 548(a)(1)(A), the Trustee files this complaint seeking to avoid fraudulent transfers of property of Policy Services, Inc. to Chase Bank during the two years prior to the Petition Date, and for damages against the fraudulent transferees of Policy Services, Inc. during the applicable time period.

27. The Mueller Transfers in the amount of $177,758.40 were made between August 12, 2019 and January 12, 2021 and constitute a transfer of Debtors' interest in property [Exhibit B].

28. The Mueller Transfers were made with an actual intent to hinder, delay or defraud Debtors' creditors. As described above, the Debtors were insolvent from inception and used new investor money to pay fictitious returns to previous investors.

29. Debtors had at least one outstanding creditor at the time of each of the Mueller Transfers, or such creditor's claim arose within a reasonable time after the Mueller Transfers, which currently remains unpaid.

30. Therefore, the Trustee has demonstrated that the Mueller Transfers constituted fraudulent transfers under 11 U.S.C. § 548(a)(1)(A), such that the Trustee is entitled to a judgment

4880-1385-6604, v. 1 / 1934.062

in the amount of $177,758.40 on behalf of the Estate to recover the Mueller Transfers from Defendant Chase Bank.

**Count 2 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B) (Constructive Fraud) (Chase Bank)**

31. Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee files this complaint seeking to avoid fraudulent transfers of property of Policy Services, Inc. to Chase Bank during the two years prior to Petition Date, and for damages against the fraudulent transferees of Policy Services, Inc. during the applicable time period.

32. The Mueller Transfers in the amount of $177,758.40 were made between August 12, 2019 and January 12, 2021 and constitute a transfer of Debtors' interest in property [Exhibit B].

33. The Mueller Transfers were made with an actual intent to hinder, delay or defraud Debtors' creditors. As described above, the Debtors were insolvent from inception and used new investor money to pay fictitious returns to previous investors.

34. Debtors had at least one outstanding creditor at the time of each of the Mueller Transfers, or such creditor's claim arose within a reasonable time after the Mueller Transfers, which currently remains unpaid. The Mueller Transfers constituted fraudulent transfers under 11 U.S.C. §548(a)(1)(B), such that the Trustee is entitled to a judgment in the amount of $177,758.40 on behalf of Debtor Policy Services, Inc. to recover the Mueller Transfers from Defendant Chase Bank.

**Count 3 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(1)) (TUFTA Actual Fraud) (Chase Bank)**

35. Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(1), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on

9

fraudulently transferred property of Debtors, and/or for damages against the fraudulent transferees of Debtors during the applicable time periods.

36. The Mueller Transfers in the amount of $177,758.40 were made between August 12, 2019 and January 12, 2021 and constitute a transfer of Debtors' interest in property [Exhibit B].

37. The Mueller Transfers were made with an actual intent to hinder, delay or defraud Debtors' creditors. As described above, the Debtors were insolvent from inception and used new investor money to pay fictitious returns to previous investors.

38. Debtors had at least one outstanding creditor at the time of each of the Mueller Transfers, or such creditor's claim arose within a reasonable time after the Mueller Transfers, which currently remains unpaid.

39. Therefore, the Trustee has demonstrated that the Mueller Transfers constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(1), such that the Trustee is entitled to a judgment in the amount of $177,758.40 on behalf of the Estate to recover the Mueller Transfers from Defendant Chase Bank.

**Count 4 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(2)) (TUFTA Constructive Fraud) (Chase Bank)**

40. Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(2), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Debtors, and/or for damages against the fraudulent transferees of Debtors during the applicable time periods.

41. The Mueller Transfers in the amount of $177,758.40 were made within the last four years and constitute a transfer of Debtors' interest in property [Exhibit B].

4880-1385-6604, v. 1 / 1934.062

42. At the time of each of the Mueller Transfers, Debtors were either (a) engaging in or about to engage in a business or transaction for which Debtors' remaining assets were unreasonably small in relation to the business or transaction; or (b) intending to incur or believed or reasonably should have believed that Debtors would incur debts beyond their ability to pay such debts as they became due.

43. Debtors did not receive reasonably equivalent value in exchange for the Mueller Transfers.

44. Debtors had at least one outstanding creditor at the time of the Mueller Transfers, or such creditor's claim arose within a reasonable time after the Mueller Transfers, which currently remains unpaid.

45. Therefore, the Trustee has demonstrated that the Mueller Transfers constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(2), such that the Trustee is entitled to a judgment in the amount of $177,758.40 on behalf of the Estate to recover the Mueller Transfers from Defendant Chase Bank.

**Count 5 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.006(a)) (Chase Bank)**

46. Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.006(a), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Debtors, and/or for damages against the fraudulent transferees of Debtors during the applicable time periods.

47. The Mueller Transfers in the amount of $177,758.40 were made within the last four years and constitute a transfer of Debtors' interest in property [Exhibit B].

48. Debtors were insolvent at the time of each of the Mueller Transfers or became insolvent as a result of the Mueller Transfers, in that the sum of Debtors' debts were greater than all of Debtors' assets at a fair valuation.

49. Debtors did not receive reasonably equivalent value in exchange for the Mueller Transfers.

50. Debtors had at least one outstanding creditor at the time of the Mueller Transfers, which currently remains unpaid.

51. Therefore, the Trustee has demonstrated that the Mueller Transfers constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.006(a), such that the Trustee is entitled to a judgment in the amount of $177,758.40 on behalf of the Estate to recover the Mueller Transfers from Defendant Chase Bank.

## VII. PRAYER

WHEREFORE, JOHN PATRICK LOWE, Chapter 7 Trustee for the Bankruptcy Estate of deeproot Capital Management, LLC, prays for judgment in favor of the Chapter 7 Trustee on all claims and relief sought herein, including but not limited to:

    a. Judgment for all actual damages in the amount of $177,758.40 or as otherwise proved at trial;

    b. Constructive trust on the Defendants' assets and all property received from the Debtors;

    c. Pre-judgment interest at the highest rate allowed by law;

    d. Post-judgment interest at the highest rate allowed by law from the date of judgment until paid;

    e. All costs of court for this action; and

    f. Such other and further relief, at law or in equity, as the Court deems to be just, proper, and equitable.

4880-1385-6604, v. 1 / 1934.062

Dated: April 20, 2023

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Randall A Pulman*
Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Anna K. MacFarlane
Texas State Bar No. 24116701
amacfarlane@pulmanlaw.com

**ATTORNEYS FOR JOHN PATRICK LOWE, CHAPTER 7 TRUSTEE FOR DEEPROOT CAPITAL MANAGEMENT, LLC ET AL.**

# EXHIBIT A

FRED — Market Yield on U.S. Treasury Securities at 5-Year Constant Maturity, Quoted on an Investment Basis

Source: Board of Governors of the Federal Reserve System (US)

fred.stlouisfed.org

# EXHIBIT B

3:20 PM
07/25/12
Accrual Basis

21-51523-mmp Doc#278 Filed 04/20/23 Entered 04/20/23 15:53:01 Main Document Pg 17 of 17

Policy Services, Inc.
Transactions by Account
All Transactions

| Date | Num | Name | Memo | Split | Amount |
|---|---|---|---|---|---:|
| 08/12/2019 | | Chase | | Client Reserve 3081 | 8,000.00 |
| 08/20/2019 | | Chase | | Client Reserve 3081 | 10,000.00 |
| 08/29/2019 | | Chase | | Client Reserve 3081 | 9,905.78 |
| 08/29/2019 | | Chase | | Client Reserve 3081 | 21,540.20 |
| 09/12/2019 | | Chase | | Client Reserve 3081 | 10,169.15 |
| 09/12/2019 | | Chase | | Client Reserve 3081 | 19,933.27 |
| 12/19/2019 | | Chase | | Client Reserve 3081 | 990.00 |
| 12/19/2019 | | Chase | | Client Reserve 3081 | 9,000.00 |
| 12/31/2019 | | Chase | | Client Reserve 3081 | 6,000.00 |
| 01/10/2020 | | Chase | | Client Reserve 3081 | 12,000.00 |
| 01/27/2020 | | Chase | | Client Reserve 3081 | 3,000.00 |
| 01/27/2020 | | Chase | | Client Reserve 3081 | 4,000.00 |
| 02/10/2020 | | Chase | | Client Reserve 3081 | 5,000.00 |
| 02/12/2020 | | Chase | | Client Reserve 3081 | 5,000.00 |
| 02/21/2020 | | Chase | | Client Reserve 3081 | 5,000.00 |
| 02/27/2020 | | Chase | | Client Reserve 3081 | 2,500.00 |
| 02/27/2020 | | Chase | | Client Reserve 3081 | 2,500.00 |
| 03/25/2020 | | Chase | | Client Reserve 3081 | 3,000.00 |
| 03/25/2020 | | Chase | | Client Reserve 3081 | 4,000.00 |
| 04/30/2020 | | Chase | | Client Reserve 3081 | 5,000.00 |
| 05/20/2020 | | Chase | | Client Reserve 3081 | 2,000.00 |
| 05/20/2020 | | Chase | | Client Reserve 3081 | 7,000.00 |
| 06/17/2020 | | Chase | | Client Reserve 3081 | 1,000.00 |
| 06/17/2020 | | Chase | | Client Reserve 3081 | 4,000.00 |
| 08/05/2020 | | Chase | | Client Reserve 3081 | 700.00 |
| 08/05/2020 | | Chase | | Client Reserve 3081 | 2,300.00 |
| 11/19/2020 | | Chase | | Client Reserve 3081 | 2,200.00 |
| 01/04/2021 | | Chase | | Client Reserve 3081 | 200.00 |
| 01/04/2021 | | Chase | | Client Reserve 3081 | 820.00 |
| 01/12/2021 | | Chase | | Client Reserve 3081 | 1,000.00 |
| 01/12/2021 | | Chase | | Client Reserve 3081 | 10,000.00 |
| | | Chase Transfers Total | | | 177,758.40 |